Volume 6

Pages 1110 - 1359

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
   vs.                       )    NO. 3:24-cr-00329-CRB
                             )
RUTHIA HE and DAVID BRODY,   )
                             )
          Defendants.        )
_____)

                    San Francisco, California
                    Tuesday, October 7, 2025

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    CRAIG H. MISSAKIAN
                    United States Attorney
                    Northern District of California
                    450 Golden Gate Avenue
                    San Francisco, California 94102
               BY:  **KRISTINA GREEN**
                    **ASSISTANT UNITED STATES ATTORNEY**

                    U.S. DEPARTMENT OF JUSTICE
                    FRAUD SECTION
                    950 Pennsylvania Avenue NW
                    Washington, D.C. 20530
               BY:  **JACOB N. FOSTER,**
                    **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:  (CONTINUED)

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
            BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
            BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
            BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
            BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                 **STEVEN J. BALLEW, ATTORNEY AT LAW**


For Defendant Brody:
                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
            BY:  **VALERY NECHAY, ATTORNEY AT LAW**


**Also Present:**  **Thifany Braga**
                 **Simon Hall**
                 **Andy Cepregi**
                 **Ashley Moore**
                 **Casey Donnelly**
                 **Michael Yu Zhu, Mandarin Interpreter**
                 **Barbara Hua Robinson, Mandarin Interpreter**

**I N D E X**

Tuesday, October 7, 2025 - Volume 6

<u>GOVERNMENT'S WITNESSES</u>                                    <u>PAGE</u>   <u>VOL.</u>

<u>EMERUEM, NWAMAKA (RECALLED)</u>
(PREVIOUSLY SWORN)                                         1119     6
Cross-Examination by Mr. Schachter                         1119     6
Redirect Examination by Ms. Gurskis                        1162     6

<u>COOKE, DAWNETTE</u>
(SWORN)                                                    1172     6
Direct Examination by Ms. Green                            1172     6
Cross-Examination by Ms. Bell                              1228     6
Redirect Examination by Ms. Green                          1310     6

<u>BOWEN, KRISTIN</u>
(SWORN)                                                    1314     6
Direct Examination by Ms. Green                            1314     6

**E X H I B I T S**

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 353 | | 1332 | 6 |
| 356 | | 1338 | 6 |
| 359 | | 1339 | 6 |
| 450 | | 1214 | 6 |
| 471 | | 1206 | 6 |
| 472 | | 1212 | 6 |
| 487 | | 1223 | 6 |
| 923 | | 1343 | 6 |
| 2483 | | 1196 | 6 |
| 2484 | | 1196 | 6 |
| 5470 | | 1121 | 6 |
| 6227 | | 1149 | 6 |

<u>**Tuesday - October 7, 2025**</u>                                    <u>**9:14 a.m.**</u>

<u>P R O C E E D I N G S</u>

---o0o---

(Proceedings were heard out of the presence of the jury.)

     **THE COURTROOM DEPUTY:**  All rise.  Court is now in session, the Honorable Charles R. Breyer presiding.

  You may he be seated.

     **THE COURT:**  All right.  Let the record show all parties are present.  We're waiting for a juror.  But I thought I'd take this time to address a couple of issues.

  One is -- is the intention of the defense to examine this witness on the video, the famous video?

     **MR. SCHACHTER:**  No.  This witness?

     **THE COURT:**  Yes.

     **MR. SCHACHTER:**  Ms. Emeruem, no.

     **THE COURT:**  Okay.  Thank you.  Then I'll address that later.

  There is a question about the subpoenas of -- I guess it's a mother of one of the decedents.  And I think -- I think the -- it's awfully confusing, what was presented to me, because of the back-and-forth, but that's fine.  That's not that's to be expected in any trial.

  I'm just trying to figure out why it's not a -- it's not a pretrial subpoena; it's a trial subpoena.  In other words, it's a -- it's telling -- it says when you come to testify, please

 1  bring the following documents.  So it doesn't -- the question

 2  about pretrial subpoenas and so forth isn't applicable to this

 3  showing.

 4      So it appeared to me that -- that it would -- these things

 5  should be produced.  I don't know why they shouldn't, assuming

 6  they haven't.

 7          **MS. GREEN:**  Your Honor, our view on that subpoena was

 8  particularly the impeachment purpose, so I don't believe it is

 9  proper to use for a subpoenas for documents just for purposes

10  of impeachment.  And Ms.--

11          **THE COURT:**  I'm not sure it is just for the purposes

12  of impeachment.  It is an attempt -- I think -- I don't know

13  that it's impeaching.  It's an attempt to put into perspective

14  her testimony on -- yeah.  I mean the argument is had Done

15  conducted -- as I understand it -- you can tell me if I'm

16  wrong.  Had Done conducted a person -- an in-person examination

17  of the -- of the patient, I suppose either by way of video or

18  by -- by, you know, personal on -- present, it is the position

19  of the -- of the Government that it would have been evident or

20  it should have been -- could have been evident that the person

21  ought not to be prescribed the medication.

22          **MS. GREEN:**  Yes.  Your Honor, these individuals -- and

23  it might help to explain kind of the scope.  They're percipient

24  fact witnesses who will testify as to their observations of

25  their children both before and during the time at Done as well

1   as their mental conditions before and during.  And the reason

2   that is relevant is ADHD onsets in childhood.  That's when it

3   onsets.  You'll hear that from witnesses and the experts.

4       So these mothers' observations of their children,

5   daughters and sons now, in childhood and up to the point that

6   they reached Done are important and relevant because to the

7   extent they did not observe ADHD symptoms and to the extent

8   they observed other comorbidities because, as Your Honor has

9   heard, if someone has anxiety or depression, et cetera, that

10  can affect the appropriateness of the treatment with

11  stimulants.

12      So these individuals -- and they are not emotional -- I

13  should front that.  Their kids didn't die, so there won't be

14  inflammatory statements such as that.  They are just testifying

15  as fact witnesses about their observations of their children in

16  childhood and leading up to Done, both things like you

17  mentioned, physical signs --

18          THE COURT:  So let me just cut you off, if I might.

19      So in other words, it is your position that an in-person

20  or video examination or even a lengthier examination would have

21  disclosed what this witness said she saw in her child.

22          MS. GREEN:  Yes, Your Honor.

23          THE COURT:  And having disclosed that, it would have

24  suggested to the clinician that the proposed treatment is

25  inappropriate.

 1          MS. GREEN:  Yes, Your Honor.

 2          THE COURT:  That's the relevance of the witness's

 3   testimony.

 4          MS. GREEN:  Yes, Your Honor.

 5          THE COURT:  And you are prepared to, I guess, in a

 6   sense close the loop, which is to -- which is you will have

 7   someone testify that had a longer interview taken place, the --

 8   these -- what the mother saw would have become evident to the

 9   provider.

10          MS. GREEN:  Yes, Your Honor.

11          THE COURT:  Okay.  I think I've got that.  I mean, I

12   think that's -- I understand that, and that -- that obviously

13   is relevant.

14      Now I turn to your subpoena.  And how is the subpoena for

15   the production of whatever it is -- I don't have it in front of

16   me -- relevant to that issue or not?

17          MR. SCHACHTER:  As Ms. Green said, these are -- these

18   are adults who could testify.  Instead, they're calling the

19   mothers of these adult -- adults.  And the subpoena calls for

20   their observations, effectively, their communications.  The

21   Government is going to testify -- going to call the witness to

22   testify about their observations of their adult children at the

23   time of these examinations.  These communications and

24   photographs reflect those observations.

25      We believe that those observations will show that there

 1   was nothing that would have stood out to the Done provider that

 2   would have suggested that this person was not suffering from

 3   ADHD or that they -- the evaluation was in any way deficient.

 4   That's the purpose.

 5          **THE COURT:**  Well, okay.  I guess it's not clear in my

 6   mind, but maybe you could help.

 7       You are not saying that the observations of the witness

 8   are incorrect; what you are saying -- as I understand it, you

 9   are saying that they're incomplete, that had -- that there were

10   additional observations, as reflected in the documents, that

11   would -- that would -- well, I guess it is -- it is

12   impeachment, is it not?  It's a form of impeachment.

13       But you say why -- why -- is there a rule which says you

14   can't subpoena documents for trial which would be impeaching.

15   I don't know; is there that rule?  I have to go take a look.

16          **MR. SCHACHTER:**  Two issues:  First of all, the Nixon

17   standard, which applies to 17C subpoenas for the early return

18   of, doesn't apply, and that's the rule that talks about

19   subpoenaing for impeachment or for case in chief.  That doesn't

20   apply, so it really doesn't matter.

21       The second point is I don't know that this is impeachment.

22   For one thing, we haven't met with these witnesses, and we have

23   not heard their testimony.  We do anticipate that their

24   communications with their children with actually support our

25   case --

PROCEEDINGS

 1         THE COURT:  It strikes me as potentially highly

 2   relevant, and I'm not going to quash the subpoena.

 3         MR. SCHACHTER:  Thank you, Your Honor.

 4         THE COURT:  Thank you.

 5      Do we have the other -- do we have everybody yet?

 6         THE COURTROOM DEPUTY:  I don't believe so, but let me

 7   double-check.

 8         THE COURT:  All right.  Okay.  Yes, Ms. Green.

 9         MS. GREEN:  Sorry, Your Honor.  One note:  That's why

10   I do disagree for the record that this is not being used for

11   impeachment, but also the scope of the subpoenas is extremely

12   broad, and I'm not sure if Your Honor had a --

13         THE COURT:  I'll take a look at it, and we can return

14   to it during a recess.

15         MS. GREEN:  Thank you, Your Honor.

16         THE COURT:  Thank you, Ms. Green, for pointing that

17   out.

18         THE COURTROOM DEPUTY:  Please rise for the jury.

19              (The jury enters the courtroom.)

20      (Proceedings were heard in the presence of the jury.)

21      (Nwamaka Emeruem steps forward to resume the stand.)

22         THE COURTROOM DEPUTY:  You may be seated.

23         THE COURT:  Okay.  Let the record reflect all parties

24   are present.

25      You may continue.

**NWAMAKA EMERUEM**,

called as a witness for the Government, having been previously

duly sworn, testified further as follows:

      **MR. SCHACHTER:**  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. SCHACHTER:**

**Q.**   Good morning, Ms. Emeruem.

**A.**   Good morning.

**Q.**   I'm sorry we couldn't get you home back to Texas

yesterday.

**A.**   It's okay.

**Q.**   But we will get you on your way shortly.

    When we left off, we were talking about EKGs and in

particular the -- I guess it was text message that the

Government had shown you regarding an EKG for that patient,

Rich.

      **MR. SCHACHTER:**  I think it was Exhibit 39, Your Honor.

If we could display that.

    Okay.  Great.

    Does that show up on everybody's screen?

      **THE COURTROOM DEPUTY:**  Not yet.

      **MR. SCHACHTER:**  Okay.

      **THE COURT:**  It's on.

      **MR. SCHACHTER:**  Okay.  Thank you.

\\\

EMERUEM - CROSS / SCHACHTER

**BY MR. SCHACHTER:**

Q.   So do you recall that in the discussion of EKGs with the prosecutor, she asked you whether it's easy to get an EKG, to ask for an EKG and have the patient show up an for EKG.

     Do you recall that?

A.   Yes.

Q.   Okay.  I just want to note the date of this communication. When is it?

A.   April 9th, 2020.

Q.   Mm-hmm.  Do you recall when the global pandemic began?  Do you recall it was around like just a couple weeks before then?

A.   Thereabouts, yes.

Q.   And getting an EKG would require making an appointment with a primary care physician; right?

A.   Yes.

Q.   And then traveling to the primary care physician's office when -- is that right?

A.   Correct.

Q.   And do you recall -- well, withdrawn.

     Do you recall that right around this time, a couple weeks into the global pandemic, people weren't going out that much?

A.   That's correct.

Q.   All right.  So it may have been a little bit more difficult to get an EKG around that time?

A.   I would say so.

1    Q.    Okay.  Okay.  And I believe that you said that you do not

2    recall or did not know that, in fact, this patient did procure

3    an EKG before proceeding with their treatment at Done?  You

4    don't know that?

5    A.    Yeah, I don't remember specific things about a patient.

6    It was -- I saw a lot of patients while I was there.

7    Q.    Okay.  But with respect to EKGs, in fact, there were times

8    where --

9         MR. SCHACHTER:  You can take that down, Mr. Cepregi.

10   BY MR. SCHACHTER:

11   Q.    There were times at Done when you did see a patient with a

12   heart condition and you did have them get an EKG; is that

13   right?

14   A.    Correct.

15   Q.    I'm going to show you just one example.  If I can show

16   you --

17        MR. SCHACHTER:  Your Honor, we'll offer Exhibit 5470.

18        THE COURT:  5470 admitted.

19   (Trial Exhibit 5470 received in evidence.)

20        MR. SCHACHTER:  I'm sorry, Mr. Cepregi.  Can we look

21   at the whole thing?  Thanks.

22   BY MR. SCHACHTER:

23   Q.    And this was -- we can see is you e-mailing Nikita

24   Mercado, who you were speaking about?

25   A.    Correct.

EMERUEM - CROSS / SCHACHTER

1  Q.   And this is September 1st, 2020; is that right?

2  A.   Yes.

3  Q.   Okay.  So at this point, in time you'd been working at

4  Done or on the Done platform for roughly five months?

5  A.   From around April to September, yes.

6  Q.   Okay.  And here in this example, you are asking -- you

7  have obtained an EKG from this patient, and you're asking

8  Ms. Mercado to add it to the chart; is that right?

9  A.   Correct.

10  Q.   Okay.  Nobody stopped you from obtaining this EKG?

11  A.   No.

12  Q.   Okay.

13       You, in your medical judgment, thought that it was

14  appropriate, and so you asked the patient to get an EKG?

15  A.   Correct.

16  Q.   All right.  Thank you.

17          MR. SCHACHTER:  You can take that down.

18  BY MR. SCHACHTER:

19  Q.   Okay.  Now, you also mentioned, I believe, that you -- you

20  in your practice at times liked to have a patient do a drug --

21  a urine drug test --

22  A.   Correct.

23  Q.   -- before starting them on stimulants; is that right?

24  A.   Well, I usually request for a random drug test depending

25  on what the situation is.  If I feel that a patient needs it, I

**EMERUEM - CROSS / SCHACHTER**

1  will request for it.  And that can also be in the course of

2  treatment.

3  **Q.**  I see.  So sometimes you'll ask for it where in your

4  medical judgment you believe it's appropriate?

5  **A.**  Correct.

6  **Q.**  Sometimes you won't?

7  **A.**  Yes, correct.

8  **Q.**  Okay.  And again, the prosecutor asked you if that's

9  relatively easy to ask a patient to have a urine drug test;

10  correct?

11  **A.**  Correct, yes.

12  **Q.**  And, again, at the time that you started working at Done

13  in April of 2000 [sic] through the time that you leave in

14  roughly September of 2000, that's right there in the time of

15  the pandemic when a lot of people are staying at home; is that

16  correct?

17  **A.**  Correct.

18  **Q.**  All right.  And fair to say at that point in time, it may

19  be a little bit more challenging for a patient to go out and

20  get a urine drug screen; is that right?

21  **A.**  Yeah, it could be, but people were still going to the

22  doctor.  People are wearing mask and all that, so it was

23  still -- it was still being done.

24  **Q.**  We all remember.  Thank you.

25      Let's talk about a urine drug screen, though, and its

1    usefulness when you're talking about telemedicine.  Okay?

2        So a urine drug screen -- that is designed to determine

3    whether or not when somebody goes to the doctor and -- and for

4    lack of a better word, pees in a cup, and then that's tested to

5    see if there is any evidence of Adderall or some other drug in

6    the said cup; is that right?

7    **A.**    Correct.

8    **Q.**    Okay.  Now, that -- those -- so if you asked a patient to

9    go out and get a urine drug test, they would then need to take

10    a little bit of time, make an appointment, go out and get the

11    drug test; is that right?

12    **A.**    Correct.

13    **Q.**    Okay.  Now, the drugs, they don't last in urine forever,

14    do they?

15    **A.**    No, they don't.

16    **Q.**    Okay.  So, for example, if your concern was that somebody

17    was abusing Adderall, it only stays in the -- it will only show

18    up in the urine for like less than two days; isn't that

19    correct?

20    **A.**    Sometimes three.  It depends --

21    **Q.**    Sometimes three?

22    **A.**    -- on the individual.

23    **Q.**    Okay.  And so by the time you said to the patient, okay,

24    I'm thinking about starting you on stimulants, please go out

25    and get a urine drug screen, and then the patient made the

EMERUEM - CROSS / SCHACHTER

1  appointment and got the urine drug screen, very possible that

2  if they were abusing stimulants, it wouldn't show up in the

3  urine drug screen in any event; is that right?

4  **A.**   It depends on the individual.  And you say those things so

5  the patient knows that you're being monitored.  You don't want

6  a patient to think that you're getting this medicine and you're

7  not being monitored.

8  **Q.**   Sure.  But would you agree with me that in your

9  experience, someone who is secretly abusing drugs and lying to

10 their medical provider in order to get them, they may also have

11 access to the Internet, which may tell them that it doesn't

12 show up in their urine for two days; correct?

13 **A.**   I would imagine so.

14 **Q.**   Okay.  And even other drugs -- heroin, you understand,

15 lasts in the -- will show up in urine only for one to three

16 days.  Do you know that?

17 **A.**   Correct.

18 **Q.**   Methamphetamines only for two to three days?

19 **A.**   Correct.

20 **Q.**   Cocaine, two to three days?

21 **A.**   Yes, sir.

22 **Q.**   Okay.  All right.  Let's talk about follow-up

23 appointments.

24      Now, when you started at Done, it was your practice to see

25 patients for follow-ups every single month; is that right?

1    **A.**    That's correct.

2    **Q.**    And that would be a condition of them getting their

3    refills; they would need to see -- you would need to see them,

4    lay eyes upon them as a condition of giving them a refill; is

5    that right?

6    **A.**    Yes.  I had to interact with them, physically talk to them

7    and interview them before.

8    **Q.**    All right.  That was your practice?

9    **A.**    Yes.

10    **Q.**    All right.  Now, in approximately June of 2020, you had

11    been on the Done platform for a couple of months; is that

12    right?

13    **A.**    Yes.

14    **Q.**    And it was around that time that Done hired Dr. Les Tsang

15    to be medical director?

16    **A.**    I'm not sure exactly when he was hired.

17    **Q.**    Do you recall that it was -- even if you don't recall the

18    exact dates, do you recall it was shortly after you started?

19    **A.**    That's correct.

20    **Q.**    All right.  And you understood that he was a

21    board-certified psychiatrist?

22    **A.**    I -- I just know that he was a director.  He was a -- he

23    was a psychiatrist.

24    **Q.**    Okay.  Did you know trained at UCLA or any of his

25    experience as a medical director at Kaiser?

1    A.    None of that.  I wasn't aware of any of that.

2    Q.    Okay.  And then it was a couple of months after that that

3    also joining Done's clinical leadership with Dr. David Brody;

4    is that right?

5    A.    Yes.

6    Q.    And similarly -- well, you understood that he became

7    Done's clinical president in around August; is that right?

8    A.    Yes.

9    Q.    And you understood he too was a board-certified

10   psychiatrist; is that right?

11   A.    Yes.

12   Q.    Did you know anything about where he had trained or about

13   his amount of experience he had in psychiatry?

14   A.    No.

15   Q.    Did you know anything about his work at community mental

16   health clinics, working with people that couldn't afford mental

17   health care?  Did you know anything about that?

18   A.    No.

19   Q.    All right.  Now -- and as we talked about yesterday,

20   although you had experience in psychiatry, at the time that you

21   had started at Done, you had really just earned your

22   certification as a psychiatric mental health -- mental health

23   nurse practitioner; is that right?

24   A.    That's correct, the year before.

25   Q.    Okay.  And you testified, I think, that at -- there came a

EMERUEM - CROSS / SCHACHTER

1  point in time where Dr. Tsang once called in a prescription for

2  one of your patients; is that right?

3  **A.**    That's correct.

4  **Q.**    And I am correct that you did not -- you did not like

5  that?

6  **A.**    I didn't.

7  **Q.**    Now, am I correct -- or do you know whether Dr. Tsang had

8  access to the medical records of your patients?

9  **A.**    He did.

10  **Q.**    And you practice in Texas; is that right?

11  **A.**    Yes.

12  **Q.**    Okay.  Are you aware that in the state of Texas that a

13  physician with access to the patient's clinical information is

14  able to prescribe controlled substances to that patient?  Do

15  you know that?

16  **A.**    Yes, I guess he can, but he was not my supervising

17  physician.

18  **Q.**    Okay.  And -- and you did not care for that at all?

19  **A.**    Correct.

20  **Q.**    All right.

21      Now, both -- you learned through your interactions with

22  them that both Dr. Tsang and Dr. Brody had different views than

23  you did about how frequently face-to-face appointments should

24  be required for stable patients; is that correct?

25  **A.**    I would imagine so, that they had a different view,

1  because they were offering the new refill policy.

2  **Q.**   Right.  Right.  And that was communicated to you a couple

3  of different times; is that right?

4  **A.**   I received an e-mail, and I also had a conversation with

5  the operations manager, Dori.

6  **Q.**   Okay.  And was there -- let me ask you this:  Was there

7  also a separate meeting that you and other providers had with

8  Dr. Tsang in June of 2020 in which Dr. Tsang explained to you

9  that it was not medically necessary to require a stable patient

10  to still show up month after month as a condition of getting a

11  monthly refill on their prescription?  Do you recall that?

12  **A.**   I don't recall.  It was -- this was a long time ago, so --

13  **Q.**   Of course.

14  **A.**   -- this was in 2020.  There could have been a Zoom

15  meeting.  There could have been a Zoom meeting, but I -- the

16  details of it, I don't remember.

17  **Q.**   Okay.  Great.  That's what I'm asking you about.

18      A Zoom meeting -- you have -- sounds like you have some

19  recollection of a Zoom meeting in which Dr. Tsang talked to you

20  about what, in his views, was medically appropriate with

21  respect to refills?

22  **A.**   Well, I don't remember that conversation, but I know that

23  there was -- I believe there was some type of Zoom meeting.

24  **Q.**   Okay.  And let me ask you this:  Whether it's in a Zoom

25  meeting or not, do you recall that Dr. Tsang said that Done's

EMERUEM - CROSS / SCHACHTER

1  policy, based on his medical view, was that monthly --

2  month-to-month follow-up visits are not required for a stable

3  patient to get a monthly refill on their prescription?  Do you

4  recall that?

5  **A.**   I don't recall -- I don't remember having that

6  conversation specifically with Dr. Les.

7  **Q.**   Okay.  Thank you.  It's a long time ago.

8       Do you recall, whether it's in that meeting or at any

9  other time, Dr. Tsang telling you that it would be Done's

10 policy that stable patients would be encouraged to have a

11 follow-up appointment every three months?

12 **A.**   I don't remember having that conversation with Dr. Les.

13 **Q.**   Okay.  All right.

14      Do you recall, whether it's in that meeting or at any

15 time, that Dr. Tsang encouraged medical providers to use

16 information that's received from the patient through online

17 messaging in assessing whether or not a prescription is

18 appropriate?  Do you recall that?

19 **A.**   I don't -- I did not have any conversation with Dr. Les.

20 **Q.**   And again, just to be clear, I'm not asking about

21 necessarily one-on-one conversations, but even in a Zoom

22 setting in which Dr. Tsang is explaining his medical views both

23 to you and other medical providers at the same time, around the

24 time that he first started?

25 **A.**   I don't recall.

EMERUEM - CROSS / SCHACHTER

1  **Q.**    Okay.

2      Putting aside Dr. Tsang, I think you do recall that

3  Dr. Brody said that Done wanted medical providers to see stable

4  patients every three months?

5  **A.**    Correct.

6  **Q.**    Do you recall that?

7      Now, you described the refill policy yesterday, and you

8  talked about how -- that if you've seen a patient, and you've

9  seen them like three times, and they're on the same dose of

10  medicine, instead of you scheduling a follow-up appointment

11  with that provider, the patient would send a message of some

12  sort stating, hey, I'm stable on this medicine; I just need you

13  to refill.

14      Do you recall providing that testimony yesterday?

15  **A.**    Do I recall saying that that's the refill policy?

16  **Q.**    Yes.

17  **A.**    Yes.

18  **Q.**    Okay.  And then in describing the refill policy, you said

19  that there would be additional work that the medical provider

20  would need to do; is that right?

21  **A.**    Yes, absolutely.

22  **Q.**    So even though you're not seeing the patient but instead

23  are simply getting this message from the patient, you still

24  would be expected to -- I think you said, "And then the

25  provider would now have to check the PDMP.  In California I

**EMERUEM - CROSS / SCHACHTER**

1    think, they call it CURES."

2        So this is a -- essentially a database that shows all the

3    controlled substances that the patient is on?

4    **A.**    That's correct.

5    **Q.**    So as part of this policy, there was work for the

6    providers, and part of that work was that you would need to go

7    on some database and before approving the refill, check the

8    database to see if the patient was on other drugs, for example,

9    getting the same drug from a different provider; right?

10   **A.**    Correct.

11   **Q.**    Okay.  All right.

12       Now, I believe that you were shown a document yesterday

13   where Dr. Brody sent you -- and other providers, not just

14   you -- the refill policy in September of 2020 by e-mail; is

15   that right?

16   **A.**    Correct.

17   **Q.**    Okay.  I'm going to show you that now, and that's

18   Exhibit 123, which is in evidence.

19       All right.  Do you recall the prosecutor showed you this

20   yesterday?

21           **THE COURT:**  123?

22           **MR. SCHACHTER:**  Yes, Your Honor.  It's in evidence.

23           **THE COURT:**  Thank you.

24           **THE WITNESS:**  Yes, I recall.

25   \\\

BY MR. SCHACHTER:

Q.   Okay.  Now, this is September of 2020, and I guess I'm --
and you recall that Dr. Tsang had started about three months
earlier; is that right?

A.   Thereabout.

Q.   Thereabout.  All right.

     And I'm sorry.  I just want to make sure I understand your
recollection, and I know it's a long time ago.

     It sounded like you have some faint recollection of a Zoom
meeting with Dr. Tsang; is that right?

A.   I don't -- I can't remember who was -- who was in the Zoom
meeting, but I -- I believe there was some type of Zoom -- Zoom
meeting that we had about the new refill policy.

Q.   Okay.  And that would have been a few months before this
e-mail?

A.   Yeah.  I can't remember exactly, specifically.

Q.   And what you do recall is a session with Dr. Tsang, not
Dr. Brody; is that right?

A.   I don't remember who was in that meeting.

Q.   Okay.

A.   I don't recall.

Q.   Okay.  Thank you so much.  Thank you for doing your best
to try to remember.

     All right.  I'd like to -- I think the prosecutor asked
you about your response to Dr. Brody, but I want to ask you --

1    I don't think that she asked you about Dr. Brody's

2    communication of the refill policy to the medical providers,

3    and I would like to do that.

4         All right.  He wrote (as read):

5              "Hello, colleagues.  We believe that providing a

6         consistent experience is the key to building trust

7         with our patients.  As we are a patient-centered

8         organization focused on attention deficit disorder,

9         we will provide the best care if we tailor our

10        clinical guidelines to provide for the issues that

11        affect those in the ADHD spectrum.  This is my goal

12        in sending this summary of our revised medical

13        guidelines."

14        And he provides input, which you provided; right?

15   A.   I'm sorry?

16   Q.   Never mind.  Withdrawn.

17        Okay.  He then says (as read):

18             "We have received patients' commendations for

19        easing their burden of medication management.  In

20        medicine, patient compliance is always a major issue,

21        but even more so among the ADHD population due to the

22        distractibility and difficulty with planning inherent

23        in the disorder.  Thus, it is incumbent on Done to

24        help our patients overcome such obstacles by changing

25        traditional approaches to issues such as punctuality

**EMERUEM - CROSS / SCHACHTER**

 1          for appointments, missed appointments, and intervals

 2          for follow-up appointments."

 3          Do you see that?

 4   **A.**    Yes.

 5   **Q.**    Okay.  Now, you are familiar with the concept of

 6   medication adherence; is that right?

 7   **A.**    Yes.

 8   **Q.**    Okay.  Can you describe to the jury what is -- what is

 9   medication adherence?

10   **A.**    Essentially, the patient taking their meds as prescribed.

11   That's pretty much it.

12   **Q.**    Right.

13   **A.**    Just being compliant with your -- with the prescription.

14   **Q.**    Thank you.

15          And so that is the idea, that you as a medical provider

16   may prescribe medication, but it is -- it is still sometimes an

17   issue with the patient actually getting their medication and

18   taking their medication; is that correct?

19   **A.**    Yes.

20   **Q.**    All right.  And that's the idea of medication adherence?

21   **A.**    Yes, and medication management.

22   **Q.**    And medication management.

23          And I am correct, am I not, that, in fact, there are

24   studies that have been done about how ADHD patients struggle

25   with medication adherence; is that correct?

**EMERUEM - CROSS / SCHACHTER**

1  **A.**    I'm sure there is some type of study out there, yes.

2  **Q.**    Are you aware of studies that also talk about the problems

3  that ADHD patients have in keeping appointments?  Are you

4  familiar with that?

5  **A.**    I have a lot of ADHD patients, and they keep to that

6  appointment.  They don't miss their appointments.

7  **Q.**    Okay.  My question was a different one:  Are you familiar

8  with the actual scientific literature that has studied

9  incidents of problems with ADHD patients showing up for

10  appointments, if you're familiar?

11  **A.**    I haven't seen that study specifically.

12  **Q.**    Okay.  And this concept of medication adherence, you

13  understood that that is the concept that Dr. Brody is

14  addressing in this paragraph; is that correct?

15  **A.**    It's not just that.  He's discussing other things:

16  Medication adherence, missed appointments, punctuality and

17  such.

18  **Q.**    Okay.  And then he goes on to say that (as read):

19        "Our patients have chosen Done because we

20     specialize in treating the disorder that is causing

21     them major disruption and distress.  The reason for

22     our policies is to fulfill their expectations by

23     providing a treatment environment sensitive to how

24     their disorder affects their day-to-day life."

25     Do you see that?

1    **A.**    Yes.

2    **Q.**    All right.  And then he goes onto describe the actual

3    refill policy; is that right?

4    **A.**    Yes.

5    **Q.**    Okay.  And the first word of the refill policy is the word

6    "stable"; is that right?

7    **A.**    Yes.

8    **Q.**    Okay.  And he says (as read):

9            "Stable patients will be reviewed by their

10           provider online and issued their refills without a

11           follow-up being required."

12    So you understood that in the sentence he's talking about

13    stable patients; is that correct?

14    **A.**    Yes.

15    **Q.**    All right.  And then it says -- he says (as read):

16           "They will be strongly encouraged to book

17           follow-ups every 90 days."

18    Do you see that?

19    **A.**    Yes, I do.

20    **Q.**    Okay.  And so Dr. Brody is communicating to the providers

21    that they should strongly encourage their stable patients

22    nonetheless to show up every 90 days; is that correct?

23    **A.**    Correct.

24    **Q.**    Then he goes on, and he says (as read):

25           "Patients with medical necessity, significant

**EMERUEM - CROSS / SCHACHTER**

1     physical problems that may be exacerbated by the

2     medications, a potential for abuse or addiction,

3     serious depression with risks of suicide attempts,

4     and/or self-harm attempts may be seen every 30 days

5     or as often as necessary for patient safety until

6     they are stable enough to be seen every 90 days."

7     Do you see that?

8    **A.**   Yes, I do.

9    **Q.**   So Dr. Brody is saying that if there is medical necessity,

10   which would include concerns that there is a potential for

11   abuse or addiction, those patients may be seen every 30 days;

12   correct?

13   **A.**   Yes.

14   **Q.**   Or even more frequently if the provider deems it necessary

15   for patient safety; is that right?

16   **A.**   That's what he wrote.

17   **Q.**   Okay.  And to be clear, this policy is coming from

18   Dr. David Brody; is that correct?

19   **A.**   He sent the e-mail, yes.

20   **Q.**   Right.  It's not -- you were not sent this e-mail by

21   Ruthia; is that correct?

22   **A.**   No.

23   **Q.**   Now, nonetheless, you after receiving this policy, you

24   objected to it; right?

25   **A.**   Yeah.

EMERUEM - CROSS / SCHACHTER

1  Q.   You did not feel that that is the way that you wanted to

2  practice medicine; is that right?

3  A.   Correct.

4  Q.   Now, understanding that this is -- that you believe this

5  is, in your medical judgment, clinically appropriate -- you've

6  made that very clear and I understand that -- I'm going to ask

7  you a different question.

8       Am I correct that under your contract with Done, you were

9  paid for the time that you spent with your patients on your

10  hourly rate?  Is that correct?

11  A.   I was paid per patient.

12  Q.   Right.  When you -- when you started with Done and around

13  this time, you had a contract with Done that said that you

14  would be paid for the time that you spent in your visits with

15  your patients; is that correct?

16  A.   I don't believe it was stated that way specifically.

17  It's -- my understanding is that I would be paid based on the

18  patients that I saw.

19  Q.   Right, for the time that you spent with them?

20  A.   I'm not sure.  I don't know how to answer that.  It

21  specifically states that I would be paid based on the patients

22  that I saw.

23  Q.   Right.  But -- and we can look at the agreement in a

24  moment.

25  A.   Okay.

EMERUEM - CROSS / SCHACHTER

1  Q.   But the way that you were paid was based on the time that
2  you spent with your patient.  If you spent a certain amount of
3  time, you spent half an hour in an initial appointment with a
4  patient, you were paid for your time; correct?
5  A.   Yeah, I was paid for that patient, for seeing that
6  patient.
7  Q.   That's -- I think we're saying the same thing.
8  A.   Okay.
9      THE COURT:  I don't think they are the same.  She's
10  saying that -- you're asking the question was she compensated
11  by Done for time that she spent with the patient.  And I
12  understand the witness is saying -- she can correct me in if my
13  understanding is incorrect -- that she was paid by the patient,
14  but that she is not saying she was paid for, quote, the time
15  she spent for the patient.
16      In other words, if she spent an hour for the patient, was
17  she paid one hour?  I don't know.
18      But that's the disconnect, as I understand it.  So I don't
19  think you can characterize it as we're saying the same thing.
20  She's not saying what you're saying.
21      MR. SCHACHTER:  I will clarify.  Thank you, Your
22  Honor.
23      THE COURT:  And maybe she wouldn't if you clarify it,
24  but at the present time, she isn't.
25      MR. SCHACHTER:  Understood.

EMERUEM - CROSS / SCHACHTER

 1              THE COURT:  Go ahead.

 2    BY MR. SCHACHTER:

 3    Q.   At this point --

 4              THE COURT:  If you want to -- or if you simply want to

 5    get the document and show her the document, if it does address

 6    that issue, that will -- that may be useful.

 7              MR. SCHACHTER:  I'll do it in one second if I don't

 8    get there more quickly.

 9    BY MR. SCHACHTER:

10    Q.   So you spent half an hour for an initial evaluation, you

11    were paid half of your hourly wait for 30 minutes; correct?

12    A.   I was paid for seeing that patient.  Like a patient was

13    scheduled for 30 minutes for initial appointment, and then

14    subsequent follow-ups were 15 minutes.

15         So I would be paid for seeing that patient at that time

16    slot.

17    Q.   Right.  I think we are maybe saying the same thing.  You

18    were paid for -- if you saw the patient for initial evaluation,

19    Done paid you?

20    A.   Yes.

21    Q.   And at this point in time, if you saw the patient for a

22    follow-up visit, Done paid you?

23    A.   Correct.

24    Q.   Okay.  And so if you had follow-up patients every month,

25    Done paid you every month for the follow-up?

1    **A.**    Correct.

2    **Q.**    Okay.  Thank you.

3          Now, once this refill policy came into place, and if you

4    were not seeing the patient on a monthly basis but simply

5    processing the refills, at that point in time, you were not

6    getting paid for that work; correct?

7    **A.**    Yeah, I wasn't getting paid, but I wasn't interested in

8    the amount that I would be paid whether I saw the patient or

9    didn't.

10   **Q.**    Understood.  We're going to get to that in a minute.

11         My only question is that there came a point in time when

12   this refill policy got put in place where you were -- if you

13   were no longer seeing the patient every month, you weren't

14   getting paid; correct?

15   **A.**    That -- that's correct.

16   **Q.**    And -- however, you would still need to process the refill

17   and check the PDMP, and that took some time?

18   **A.**    Correct.

19   **Q.**    And you weren't getting paid for it?

20   **A.**    Well, they did have some dollar amount that was attached

21   to a refill.

22   **Q.**    Okay.  There was some discussion of that; is that right?

23   **A.**    There was a dollar amount attached to a refill.

24   **Q.**    Okay.  Let's try to get into some of the communications.

25         Now, you were shown some text messages with other nurse

**EMERUEM - CROSS / SCHACHTER**

1  practitioners by the prosecutor.  Do you remember that?

2  A.   Correct.

3  Q.   All right.  And do you recall that in those text messages,

4  you and other nurse practitioners that were practicing on

5  Done's platform were complaining that you wouldn't be paid for

6  issuing the refills unless you saw the patient face-to-face?

7       Do you remember that being in your text messages?

8  A.   That was a text message, but I never complained

9  specifically about not being paid.

10 Q.   Okay.  My only question is:  In the text messages that the

11 prosecutor showed you, do you recall you and the group of nurse

12 practitioners complaining about not getting paid to do the work

13 to process the refills, and you would only get paid if you saw

14 the even stable patient every month?

15 A.   Respectfully, sir --

16 Q.   Do you recall that?  I'm going to show you some of these

17 in a moment, but do you remember that?

18 A.   I did not -- I'm sorry, sir.  Respectfully, you said "you

19 and other nurse practitioners."  But the text message, there

20 were some people that were complaining about the -- about not

21 being paid, but I was never part of that.  I never complained

22 about the amount that I would be paid.

23 Q.   Okay.  We're going to look at couple of those in a minute.

24 But it is your recollection that some of the other nurse

25 practitioners on that text chain were upset that if they

 1   weren't seeing the patient every month, they wouldn't be

 2   getting paid?

 3   **A.**   Correct.

 4   **Q.**   All right.  I'm going to show you a couple of those.

 5           **MR. SCHACHTER:**  Mr. Cepregi, if we can put what's in

 6   evidence as Exhibit 72 at page 3.

 7           And if we can reinforce the bottom of the page there.

 8   Thank you.

 9   **BY MR. SCHACHTER:**

10   **Q.**   Do you see the text message from a nurse practitioner

11   named Shannon Wozniak at the bottom?

12   **A.**   Yes, I do.

13   **Q.**   Okay.

14           **MR. SCHACHTER:**  And can you just blow up that, just

15   the bottom one, "BTW" at the bottom, so we can see that more

16   clearly.

17           All right.

18   **BY MR. SCHACHTER:**

19   **Q.**   And Ms. Wozniak writes (as read):

20           "BTW, I reached out to Les to express my concern

21       about the refill policy and also asked how our time

22       is compensated when those patients aren't placed on

23       our schedule yet, we are expected to spend our time

24       refilling and documenting the refills betweens

25       appointments.  He said they came up with a strategy

EMERUEM - CROSS / SCHACHTER

1    to pay $5 per refill that we process.  Is this insane

2    or what?"  All caps.

3        And then Ms. Wozniak writes "$5" and has some exclamation

4    points; is that correct?

5  **A.**   Yes.

6  **Q.**   Okay.  And then you respond to that on page 5.

7            **MR. SCHACHTER:**  If we can zoom back out, Mr. Cepregi.

8    That's at the bottom of the page.  And then we can look at 4,

9    and then if we can look at 5.  Okay.

10 **BY MR. SCHACHTER:**

11 **Q.**   And then you respond (as read):

12           "That's" --

13     That's you responding?

14 **A.**   Yes.

15 **Q.**   Okay.  And you write (as read):

16           "That's just crazy.  That's doing extra work for

17     five bucks.  With those temp refills, you still have

18     to do the legwork, checking prescription history,

19     et cetera.  What makes the most sense is to put the

20     patient on the schedule.  Refilling those meds takes

21     as much time as seeing the patient."

22     Do you see that?

23 **A.**   Correct.

24 **Q.**   All right.  And then if we can turn to the very next page,

25    page 6.  There's another nurse practitioner named

EMERUEM - CROSS / SCHACHTER

```
 1   Harman Randhawa.

 2            MR. SCHACHTER:  In the middle of the page, can we blow

 3   up that one.

 4   BY MR. SCHACHTER:

 5   Q.   And Harman is -- that's a -- Harman Randhawa writes (as

 6   read):

 7            "How are we being compensated for the refills

 8        and extra admin time with e-mails?"

 9        Do you see that?

10   A.   Yes.

11   Q.   And then Shannon writes (as read):

12            "Les said he asked Ruthia to consider

13        compensation for admin time based on the number of

14        patients in our caseload, but apparently she shot him

15        down.  At this point we get no compensation for

16        e-mails or other admin work and only $5 per refill we

17        submit, which he said will be a new line item on our

18        next paycheck at the end of this month."

19        Do you see that?

20   A.   Mm-hmm.

21            MR. SCHACHTER:  Okay.  You can take that down.

22   BY MR. SCHACHTER:

23   Q.   Now, there came a point in time where you told Ruthia in a

24   conversation that you would not comply with the follow-up

25   policy which had been communicated by Dr. Tsang and Dr. Brody;
```

1   is that correct?

2   **A.**    I believe so, towards the end of my work with them, yes.

3   **Q.**    Okay.  Now, I believe in your testimony the prosecutor

4   asked you if any patient had complained about you.

5        Do you remember that?

6   **A.**    Yes.

7   **Q.**    And I believe you said no?

8   **A.**    Not that I recall.

9   **Q.**    Okay.  There was a -- there was a complaint about -- from

10  a patient that you had been treating --

11  **A.**    Okay.

12  **Q.**    -- regarding a refill.  Do you recall that?

13  **A.**    Yeah, there was one that complained about not getting her

14  refill, yes.

15  **Q.**    Okay.  I'm going to show that to you.  It's in evidence,

16  I believe, at Exhibit 884.

17       I believe that these are screenshots of text messages that

18  you provided to the Government; is that correct?

19  **A.**    I haven't seen it yet.

20  **Q.**    If you look at the very top, it says --

21            **THE COURTROOM DEPUTY:**  I haven't displayed it yet.

22            **MR. SCHACHTER:**  Oh, I'm sorry.

23  **BY MR. SCHACHTER:**

24  **Q.**    Okay.  Does that refresh your recollection that these are

25  some screenshots which you showed to the -- shared with the

1    Government?

2    **A.**    Correct.

3    **Q.**    Okay.  Now, there is a communication --

4         **MR. SCHACHTER:**  I'd like to -- Mr. Cepregi, if we can

5    focus on pages 3 and 4.  Perfect.  Thank you.

6    **BY MR. SCHACHTER:**

7    **Q.**    So you received -- I'm sorry.

8         There is a text message -- there was a -- I guess it's an

9    e-mail which looks like it was sent to you by Nikita Mercado;

10    is that right?

11    **A.**    Yes.

12    **Q.**    All right.  And it is from a patient A. Barbour.

13         Do you see that?

14    **A.**    Yes.

15    **Q.**    To Done (as read):

16         "Hi.  No, this is not helpful.  As my

17    prescription has been steady, why am I again being

18    asked to have a follow-up when it's been said for the

19    last two to three months that I can just request my

20    refills?

21         "I'm about to travel out of state for a month,

22    and this service has been unable to provide me a

23    refill before I leave and also is it is unable to

24    make an out-of-state referral.

25         "I would like to expedite this process as soon

EMERUEM - CROSS / SCHACHTER

1          as possible.  Would forwarding my previous e-mails be

2          sufficient?  All my best, Ally."

3          Do you see that?

4   **A.**   Yes.

5   **Q.**   Okay.  Now -- so this patient is complaining -- this

6   patient Ally Barbour is complaining that her prescription has

7   been steady and she is about to travel out of state; is that

8   right?

9   **A.**   Correct.

10  **Q.**   Now, I am correct, am I not, that you had prescribed

11  Alyssa Barbour 15 milligrams of Adderall for months before she

12  wrote this e-mail with no side effects?  Do you recall?

13  **A.**   I don't have her notes, I don't recall.

14  **Q.**   Okay.  Let me show you your notes.

15          **MR. SCHACHTER:**  Your Honor, we'll offer Exhibit 6227,

16  which are Ms. Barbour's medical records.

17          **THE COURT:**  6227 admitted.

18          (Trial Exhibit 6227 received in evidence.)

19          **MR. SCHACHTER:**  If we could start --

20          **MS. GURSKIS:**  Sorry. I don't know if you've given

21  those to us.

22          **MR. SCHACHTER:**  We did.  We gave them to you.

23          **MS. GURSKIS:**  Or your notice that they were going to

24  be used with this witness.

25          **MR. SCHACHTER:**  Okay.

```
 1                    (Pause in proceedings.)

 2              MR. SCHACHTER:  Everybody see them?

 3   BY MR. SCHACHTER:

 4   Q.   Okay.   These are the records of patient Alyssa Barbour.

 5        Do you see that?

 6   A.   Yeah.

 7   Q.   Okay.   I'd like to start with you on page 26.

 8        Okay.   You saw this patient --

 9              MR. SCHACHTER:  We need to -- there we go.

10   BY MR. SCHACHTER:

11   Q.   On May 3rd of 2020?

12   A.   Yes.

13   Q.   And you started this patient on Strattera 40 milligrams;

14   right?

15   A.   Mm-hmm.

16   Q.   And I don't know if I'm getting good this or not good at

17   this.

18        BID, that's twice a day?

19   A.   Yes.

20   Q.   All right.   Why don't you just say twice a day?

21   A.   Twice a day.

22   Q.   You know, every time I see something like that, I need to

23   look it up on the Internet to remind myself whether BID --

24   what's once a day?

25   A.   QD.
```

1   Q.   Okay.  So Strattera is a non-stimulant; right?

2   A.   Correct.

3   Q.   And I am correct that nobody called you?  Ruthia didn't

4   call you and say, hey, you know, we only prescribe stimulants

5   here because we are a drug dealing operation, did she?

6   A.   No.

7   Q.   All right.  You prescribed her a non-stimulant, Strattera,

8   because you believed that it was medically appropriate for this

9   patient; is that right?

10  A.   Correct.

11  Q.   All right.  And if we can look at your notes, she writes

12  (as read):

13           "Client reports" --

14           MR. SCHACHTER:  It's a little bit further down.

15  Page 27.  I'm sorry, Mr. Cepregi.

16           Thank you.

17  BY MR. SCHACHTER:

18  Q.   (as read):

19           "Client reports I've taken different ADHD drugs

20       going back to childhood.  Most recently I've been on

21       a low dose of Strattera, but in the past I've been

22       prescribed Adderall."

23       And she describes what she was prescribed as a kid.  And

24  it says (as read):

25           "Reports low dose Strattera has been helpful;

EMERUEM - CROSS / SCHACHTER

1        however, continues to struggle with her focus."

2        Do you see that?

3    A.   Yes.

4    Q.   Okay.  That's May 3rd of 2020.  You next saw the patient

5    on -- if I can show you page 25.

6        Okay.  You see you next saw the patient on May 30th, 2020?

7    A.   Mm-hmm.

8    Q.   I'm sorry.  You have to answer out loud.  "Yes"?

9    A.   Yes.  I'm sorry.

10   Q.   And that's actually 27 days after your first appointment

11   with her?

12   A.   Yes.

13   Q.   All right.  And here you have changed the prescription to

14   be Adderall Extended Release 10 milligrams every morning as

15   needed.  Do you see that?

16   A.   Correct.

17   Q.   Okay.  And then you write (as read):

18        "The patient reports no changes in ADHD symptoms

19        since starting the medication.  Reports side effects

20        of nausea and vomiting.  Patient instructed to stop

21        medication and start Adderall XR."

22        Do you see that?

23   A.   Correct.

24   Q.   Okay.  So just to interpret that, that means that this

25   patient is -- has been reporting what she was experiencing on

```
 1   the non-stimulant Strattera, reports nausea and vomiting, and

 2   then you changed the prescription to Adderall XR, extended

 3   release, 10 milligrams --

 4   A.   Correct.

 5   Q.   Okay.  And then you next saw the patient --

 6          MR. SCHACHTER:  If we can go to page 23.

 7   BY MR. SCHACHTER:

 8   Q.   -- a little bit less than a month later, on June 28th,

 9   2020.  And if we can look at the report from the patient (as

10   read):

11          "Patient reports a decrease in ADHD symptoms;

12      however focus could be better."

13      And you wrote (as read):

14          "No reported medication side effects."

15      Do you see that?

16   A.   Yes.

17   Q.   And you have increased the prescription from Adderall

18   Extended Release 10 milligrams in the morning to 15 milligrams

19   in the morning --

20   A.   Correct.

21   Q.   -- is that correct?

22      You did that not because Ruthia told you to push more

23   stimulants on this patient; correct?

24   A.   Correct.

25   Q.   You did it because you thought it was medically
```

EMERUEM - CROSS / SCHACHTER

1  appropriate?

2  **A.**   Correct.

3  **Q.**   All right.  And so that is June 28th.

4       You saw the patient again less than a month later.

5           **MR. SCHACHTER:**  If we can turn to page 22.

6  **BY MR. SCHACHTER:**

7  **Q.**   You saw the patient on June -- July 26, 2020; is that

8  correct?

9  **A.**   Correct.

10  **Q.**   And you wrote (as read):

11           "The patient reports a decrease in ADHD symptoms

12      and better sleep pattern.  Will continue medication

13      regimen."

14      Do you see that?

15  **A.**   Correct.

16  **Q.**   And you continued exactly the same prescription, Adderall

17  Extended Release 15 milligrams; correct?

18  **A.**   Correct.

19  **Q.**   All right.  You see the patient one month after that, on

20  August 30th of 2020.

21           **MR. SCHACHTER:**  If we can show page 20.

22  **BY MR. SCHACHTER:**

23  **Q.**   And when you saw the patient again the month after that,

24  you noted that (as read):

25           "The patient reports a decrease in ADHD

EMERUEM - CROSS / SCHACHTER

1    symptoms.  Will continue current medication regimen."

2    Do you see that?

3    **A.**    Correct.

4    **Q.**    And you kept the patient on Adderall Extended Release

5    15 milligrams; correct?

6    **A.**    Correct.

7    **Q.**    You saw the patient again a little bit less than -- so

8    that was August the 30th.  You saw her again on -- well, I'll

9    just show it to you:

10    **MR. SCHACHTER:**  If we could turn to 18.

11    Page 18.  I'm sorry.

12    **BY MR. SCHACHTER:**

13    **Q.**    At the very bottom, you see it says September 24, 2020?

14    **A.**    Yes.

15    **Q.**    Okay.  And so we just saw an appointment on August

16    the 30th, so now you had another follow-up with the patient on

17    September the 24th.  That's a little bit less than a month

18    afterwards?

19    **A.**    Yes.

20    **Q.**    Okay.  And if we can look at your notes of that visit, you

21    wrote (as read):

22    "Patient reports a decrease in ADHD symptoms."

23    And your prescription was exactly the same as it had been

24    for several months, Adderall Extended Release 15 milligrams

25    every morning; is that correct?

 1   A.   Correct.

 2   Q.   Okay.  So you had diagnosed this patient -- I'm sorry.

 3        You had prescribed this patient Adderall 15 milligrams in

 4   the morning --

 5        Oh, I'm sorry.  I just want to focus on something.  You

 6   wrote --

 7           MR. SCHACHTER:  Can we go back to -- are we on

 8   September 24th?  Yeah, that's it.  Can you blow that up.

 9        No, no, no.  I'm sorry.  The Adderall -- the prescription.

10   BY MR. SCHACHTER:

11   Q.   I just want to note this.  You wrote -- your prescription

12   was Adderall XR 15 milligrams every morning as needed; is that

13   correct?

14   A.   Yes, yes.

15   Q.   Okay.  Okay.

16           MR. SCHACHTER:  You can take that down.

17   BY MR. SCHACHTER:

18   Q.   So you had seen this patient every month, sometimes more

19   frequently than -- every -- less than a month?  Sometimes it

20   was less than a month?

21   A.   Pretty much monthly.

22   Q.   Okay.  And for -- for three straight months you noted the

23   medication is doing just fine?

24   A.   Yes.

25   Q.   And you kept the prescription exactly the same?

EMERUEM - CROSS / SCHACHTER

1   **A.**   Correct.

2   **Q.**   You noted no negative side effects?

3   **A.**   None was reported during those visits.

4   **Q.**   Okay.  And notwithstanding that fact, you -- you felt that

5   it was nonetheless necessary for the patient, stable patient,

6   to continue to show up and -- so that you could lay eyes upon

7   her every single month; is that right?

8   **A.**   Yes, absolutely.

9   **Q.**   And you understood that Dr. Brody and Dr. Tsang disagreed

10  and did not believe that that was medically necessary; is that

11  correct?

12  **A.**   I guess that was their thinking when they wrote that

13  refill policy.

14  **Q.**   Okay.  Now, after you were told about Ms. Barbour's

15  complaint about needing to go out of town, you made it very

16  clear, nonetheless, it is your medical belief that you were --

17  you could not follow the refill policy that had been

18  communicated to you by both Dr. Tsang and by Dr. Brody; is that

19  right?

20  **A.**   Correct.

21  **Q.**   And you then had a conversation with Ruthia, but also with

22  Dr. Brody and Dr. Tsang at the same time, about you insisting

23  that in your medical judgment, you could not follow the refill

24  policy.  Do you remember that?

25  **A.**   Correct.

1   Q.   And if we can show you Exhibit 884 in evidence, page 9.

2        This is a text message that you received from Ruthia; is

3   that correct?

4   A.   Yes.

5   Q.   And she writes (as read):

6            "Sorry if this was not clear.  Since we

7            transitioned to a clinical organization, we will need

8            nurse practitioners to follow the same policy under

9            physician's guideline.  We will have a new contract

10           for the clinical organization.  If you think the

11           practice style doesn't match with yours, we would

12           need to unfortunately terminate the collaborations

13           and discuss when would be the last day for you to see

14           the patients."

15       Do you see that?

16  A.   Yes.

17  Q.   Okay.  And were you aware that around this time, there was

18  a change in the Done structure?  Were you aware of that?

19  A.   I believe they were implementing a new -- they were

20  changing -- they were reorganizing their company and -- into a

21  different practice style, yes.

22  Q.   Right.  So through the entire time that you had been

23  working there, you were operating under a platform access

24  agreement; is that right?

25  A.   Yes.

EMERUEM - CROSS / SCHACHTER

1  Q.   And that was an agreement that just said that -- it was

2  essentially structured that Done would provide the platform,

3  handle the billing, and it was structured in such a way in the

4  contract that the provider was paying -- technically paying

5  Done to access the platform but would receive an amount that

6  was greater than that for your time spent with patients.

7       Do I generally have that right?

8  A.   They were acting as an advertising agency.  That was the

9  verbiage they used on the contract.

10 Q.   Okay.  And then that was that five months that you worked

11 there.  And then, as Ruthia says in this e-mail, there is a

12 transition to a clinical organization?

13 A.   Correct.

14 Q.   And I know you didn't work there for this much longer, but

15 let me see if you have an understanding that at that point,

16 there was a structure put in place that there was a technology

17 company and then also a -- a -- what's called a professional

18 corporation, a medical professional corporation.

19      Did you understand that or --

20 A.   Yes, they were moving to a corporation, I believe.

21 Q.   Okay.  And do you understand this to be a common way the

22 telemedicine companies are structured that are owned by

23 non-doctors where there is this technology company and then

24 this -- what's called a friendly PC?

25      Does that mean anything to you?

EMERUEM - CROSS / SCHACHTER

1    **A.**    I'm not in that industry, so I don't know.

2    **Q.**    Fair enough.   Thank you.

3         In any event, she talks about this transition to a

4    clinical organization and the need for nurse practitioners to

5    follow the policies under the physician's guideline.

6         Do you see that?

7    **A.**    Yes.

8    **Q.**    All right.

9              **MR. SCHACHTER:**   And if we can zoom out so we can see

10   who is on this text message.

11   **BY MR. SCHACHTER:**

12   **Q.**    It's not just Ruthia that's on this text chain.   Do you

13   see where it says Ruthia, Amberlee, and then you see it says

14   David?   Okay.   And you understood that's Dr. Brody is on the

15   same text message chain where Ruthia is communicating this to

16   you; is that correct?

17   **A.**    Yes.

18   **Q.**    All right.   And then after you had communicated that you

19   would not follow the policy that Dr. Brody -- about the refills

20   that Dr. Brody had communicated, you received in the same text

21   chain a communication from Ruthia that says -- hold on one

22   second -- confirming that you won't be willing to see patients

23   through Done starting from next week.   Do you see that.

24        And somewhere in here that -- like it's unfortunate that

25   it won't work out?

 1          MR. SCHACHTER:  Do you have that, Mr. Cepregi?  There

 2    you go.

 3    BY MR. SCHACHTER:

 4    Q.   Okay.  In the same text message, again with Dr. Brody,

 5    Ruthia writes (as read):

 6          "It's unfortunate that it doesn't work out.

 7          Thanks for letting us know."

 8          Do you see that?

 9    A.   Yes.

10    Q.   All right.

11          MR. SCHACHTER:  If we can go a little bit further up,

12    just to show.

13    BY MR. SCHACHTER:

14    Q.   And, in fact, on this text message, it's not just Ruthia

15    that's on this text message; it's also both Dr. Tsang and

16    Dr. Brody; is that correct?

17    A.   Correct.

18          MR. SCHACHTER:  I have no further questions.  Thank

19    you for your time, and safe travels back.

20          THE COURT:  Okay.  Ladies and gentlemen --

21          THE WITNESS:  Thank you.

22          THE COURT:  Well, do you have any questions?

23          MS. NECHAY:  I'll pass on this witness, Your Honor.

24    Thank you.

25          THE COURT:  Any redirect?

<u>REDIRECT EXAMINATION</u>

BY MS. GURSKIS:

Q.   Good morning, Ms. Emeruem.

A.   Good morning.

        MS. GURSKIS:  Is it possible to use the ELMO, or will
that create some issues?

            THE COURTROOM DEPUTY:  We can only use one at a time.

            THE WITNESS:  Okay.  That's fine.

BY MS. GURSKIS:

Q.   Ms. Emeruem, when Mr. Schachter was asking you some
questions, he was asking about the circumstances around your
termination and your departure.

     Do you recall that?

A.   Yes.

Q.   How clear was it that if you stayed at Done, you would be
violating the your ethical obligations as a nurse practitioner?

A.   It was very clear.

Q.   Can you elaborate on that for the jury?

A.   It was very clear because I was essentially going to
relinquish my autonomy and my rights to be able to make a
decision whether a patient needed to be followed up on before I
could refill a controlled substance.

Q.   You mentioned medical autonomy?

A.   Yes.

Q.   How important is medical autonomy to you as a nurse

EMERUEM - REDIRECT / GURSKIS

1    practitioner in providing safe care?

2    **A.**    As a nurse practitioner, when I'm seeing a patient, I'm

3    the provider seeing the patient.  The patient places their

4    trust on me, and it is my responsibility to ensure that any

5    medicine that I prescribe, any instruction that I give that

6    patient is followed up appropriately.

7        So I take it personally.  It's my responsibility.  The

8    patient doesn't know any better.  I bring my expertise to the

9    table and they listen to me.  They trust me.  And I felt like I

10   wasn't going to be able to provide that to my patient.

11   **Q.**    How clear was it that if you stayed and followed the new

12   policies that you would risk providing unsafe care to patients?

13   **A.**    It was very clear.

14   **Q.**    You were asked some questions about the payment structure

15   and the payments for refill.

16       Do you recall that?

17   **A.**    Yes.

18   **Q.**    Were you concerned when Defendant He and Defendant Brody

19   wanted to pay only for refills and not also for the admin time

20   and the time spent with patients?

21   **A.**    I didn't pay too much attention to their -- to the amounts

22   that they were paying, but it just seemed that -- a refill was

23   being attached to a dollar amount, and that -- that just seems

24   strange to me.

25   **Q.**    Why did that seem strange to you?

1  **A.**    Because we're dealing with controlled substances.  Most of

2  the patients we treat are ADHD patients, and they are -- a

3  controlled substance, Schedule II substances being the first

4  line of treatment, you're going to probably see a lot of

5  patients on Schedule IIs.

6      So it just didn't seem right that if you send in a refill,

7  you get this amount.  If you send this refill, you get this

8  amount.  That was concerning to me.

9  **Q.**    Was the lack of follow-up associated with the refill also

10  concerning to you?

11  **A.**    Yes.

12  **Q.**    Why?

13  **A.**    Because when you are seeing a patient, you're evaluating

14  that patient as a whole.  You're not just looking at the fact

15  that you're sending a refill for a controlled substance.

16  Right?

17      You are looking at -- you're looking at the patient as a

18  whole.  You're asking a lot of questions.  How are you feeling

19  today?  How is it going at work?  How are you doing on the

20  medicine?  Are you having any side effects?  Are you having any

21  issues?  Are you eating okay?  Are you sleeping okay?

22      All these are questions that you -- that help you make a

23  decision.  In the course of asking these questions, you get to

24  know these patients.  You get to know more about these

25  patients, and a lot -- especially during the pandemic, a lot of

EMERUEM - REDIRECT / GURSKIS

1  these patients did not have people that they could talk to.

2  They did not have people they could actually communicate with.

3  They looked forward to seeing me as their provider?

4       So in a course of talking to them, I can get a lot of

5  collateral about what's going on with them, and I can decide,

6  hey, you might be having a side effect on this medicine.  You

7  might not be sleeping because what time are you taking this

8  medicine.  It could be causing some side effects.  Or you're

9  having heart palpitations.  What's going on?  Have you seen

10 your primary care doctor?

11      There are a lot of things, a lot of information you can

12 get from seeing that patient, so when you sending these refills

13 without actually seeing that patient, they can actually send

14 you a text message that, oh, I'm good, but when you actually

15 talk to them, you can draw a lot of things out of those

16 patients?

17      Yes, it might seem redundant that you're prescribing the

18 same prescription, but in the course of seeing that patient,

19 you can actually find out other things that's going on that

20 could impact that prescription that you're giving or could

21 actually make you want to prescribe something else to address

22 another mental issues that they are having.

23 Q.  You mentioned some things about side effects and not

24 having side effects just one moment ago.

25      And Mr. Schachter was asking you some questions about

EMERUEM - REDIRECT / GURSKIS

1  stability and whether a patient is stable.

2      Do you recall when he was asking you that?

3  **A.**   Yes.

4  **Q.**   How are you able to determine a patient is stable by a

5  text message?

6  **A.**   It's not -- you can't.  You cannot.

7  **Q.**   Why not?

8  **A.**   Because most times, patients will not tell you.  It's --

9  if it's easy, it's comfortable, I can deal with it on my own.

10  They will just -- oh, just give me my medicine, and they just

11  keep moving?

12      But when you actually have a conversation with that

13  patient, you get a lot more.  You get -- if you have the

14  skills, you can draw out a lot, get a lot of information about

15  what's going on with that patient, and it could impact whether

16  you want to continue with that medicine.  It might not even be

17  effective anymore.  They might just be getting some subpar

18  response from the medicine, not fully -- fully effective for

19  their symptoms, but when you have that conversation with them,

20  you get to find out.  A patient could just tell you, oh, I'm

21  doing okay, but the medicine might not actually be working for

22  them the way that it's prescribed to.

23  **Q.**   So it sound like having that follow-up is a basic standard

24  of care when you're providing --

25  **A.**   It's very important to me, yes.

1  Q.   And do you need to have that follow-up to determine

2  whether the drug is medically necessary for the patient?

3  A.   Absolutely.

4  Q.   And Mr. Schachter asked you some questions about

5  medical -- something being medically necessary, and that meant

6  that -- in Dr. Brody's e-mail.

7       Do you recall that?

8  A.   Yes.

9  Q.   I just want to draw your attention to Exhibit 80 at

10  page 4.  Can you read your message that's highlighted there,

11  Ms. Emeruem.

12  A.   It's not up yet.

13  Q.   Oh, it's not up there?

14  A.   Uh-uh.

15  Q.   So you see it?

16  A.   Yes.

17  Q.   If you could just read your message that's highlighted

18  there.

19  A.   Okay.  (as read):

20           "This bull about prioritizing medical necessity

21       just blows my mind.  These are C IIs, Schedule II

22       substances, being prescribed with very limited

23       interactions.  These are not regular meds."

24  Q.   So I think you are saying that having that appointment is

25  critical to that medical necessity determination?

1  A.   Correct.

2  Q.   That stability determination?

3  A.   That's correct.

4  Q.   You were also asked some questions about Dr. Tsang and his

5  reputation.  Do you recall that?

6  A.   Yes.

7         MS. GURSKIS:  Showing you Exhibit 80 -- 88 -- I'm

8  sorry -- for the record.

9  BY MS. GURSKIS:

10 Q.   Do you see that highlighted message on the screen,

11 Ms. Emeruem?

12 A.   Yes, I do.

13 Q.   Can you read that message from Ms. Wozniak?

14        MR. SCHACHTER:  Your Honor, asked and answered.  The

15 witness read the same message in her direct testimony.

16        THE COURT:  Sustained.

17 BY MS. GURSKIS:

18 Q.   Did you and the other providers have complaints about how

19 Dr. Tsang was behaving as a medical director?

20 A.   Yes.

21 Q.   Were those inconsistent with what you would expect from a

22 medical director?

23 A.   Correct.

24 Q.   Were they inconsistent with what you'd expect from a

25 medical director who has a board certification or a medical

EMERUEM - REDIRECT / GURSKIS

1    degree?

2    **A.**    That's correct.

3    **Q.**    You were also asked some questions about Defendant

4    Dr. David Brody.  Do you recall that?

5    **A.**    Yes.

6    **Q.**    And you were asked some questions about his reputation and

7    his medical expertise.  Do you recall that?

8    **A.**    I don't recall the questions specifically.

9    **Q.**    Do you recall when Mr. Schachter was asking you if you

10   were aware that a Dr. Brody was, I believe, board-certified as

11   a psychiatrist?

12   **A.**    Yes.

13   **Q.**    And Dr. Brody, during your time at Done, was hired in

14   medical leadership at Done?

15   **A.**    Yes, yes.

16   **Q.**    And did you find that he was acting in a way that was

17   consistent or inconsistent with the standard of care with

18   regard to patients?

19   **A.**    I felt that he -- he was -- the refill policy that he

20   implemented was essentially removing my autonomy and my right

21   to make a decision as the treating provider.

22   **Q.**    And is that standard or outside the standard to have your

23   medical autonomy removed in that fashion?

24   **A.**    Yes, it's out of standard, especially him not being my

25   collaborating physician.

1    Q.    And Mr. Schachter also spent some time with you yesterday

2    on a questionnaire.  Do you recall that?

3    A.    Yes.

4    Q.    Is a questionnaire one of the tools that you use to

5    diagnose a patient?

6    A.    It's part of my tools, yes.

7    Q.    Are you able to issue a diagnosis based on a questionnaire

8    alone?

9    A.    No.

10    Q.    If that questionnaire had been shortened to, say, five

11    questions, how would that affect its utility to you in your

12    practice?

13    A.    It's practically useless to me.

14            MS. GURSKIS:  May I have a moment, Your Honor?

15                (Government counsel conferring.)

16            MS. GURSKIS:  Nothing further.  Thank you.

17            THE COURT:  Anything further?

18            MR. SCHACHTER:  No, Your Honor.  Thank you.

19            THE COURT:  You're excused.  Thank you very much for

20    coming.

21            THE WITNESS:  Thank you.

22                    (Witness excused.)

23            THE COURT:  Ladies and gentlemen, we'll take a recess

24    now.  We'll be in recess until a quarter of.

25        Remember the admonition given to you:  Don't discuss the

 1   case, allow anyone to discuss it with you, form or express any

 2   opinion.  Thank you.

 3                        (The jury leaves the courtroom.)

 4       (Proceedings were heard out of the presence of the jury.)

 5                      (Recess taken at 10:30 a.m.)

 6                   (Proceedings resumed at 10:48 a.m.)

 7       (Proceedings were heard out of the presence of the jury.)

 8           **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

 9   session.

10       You may be seated.

11           **THE COURT:**  Let the record reflect all parties are

12   present.  The jury is not.

13       With respect to the -- this, I understand you're calling a

14   witness who has been subpoenaed?  No?

15           **MS. GREEN:**  No.

16           **THE COURT:**  Okay.  Thank you.

17       Bring in the jury.

18       (Dawnette Cooke steps forward to be sworn.)

19                      (The jury enters the courtroom.)

20         (Proceedings heard in the presence of the jury.)

21           **THE COURT:**  Okay.  Please be seated.  Let the record

22   reflect all jurors are present.  The parties are present.

23       You may call your next witness.

24           **MS. GREEN:**  Thank you, Your Honor.

25       The Government call Ms. Dawnette Cooke.

```
 1              THE COURTROOM DEPUTY:  Please stand to be sworn.

 2    Please raise your right hand.

 3                          DAWNETTE COOKE,

 4    called as a witness for the Government, having been duly sworn,

 5    testified as follows:

 6              THE WITNESS:  Yes.

 7              THE COURTROOM DEPUTY:  Thank you.  You may be seated.

 8         Please state your full name for record and spell your

 9    first and last name.

10              THE WITNESS:  Dawnette Cooke, D-A-W-N-E-T-T-E,

11    C-O-O-K-E.

12                        DIRECT EXAMINATION

13    BY MS. GREEN:

14    Q.   Good morning, Ms. Cooke.

15    A.   Good morning.

16    Q.   Where do you live?

17    A.   I live in Indian Shores, Florida.

18    Q.   Who do you live with?

19    A.   I live with my partner, Mike Giordano.

20    Q.   Do you have any children?

21    A.   I do.  I have two children.

22    Q.   What are their names?

23    A.   Cheryle-Lane Cooke and David Thomas Cooke.

24    Q.   Where did you -- how old are your children?

25    A.   Cheryle is 28 and David Thomas is 27 in a few weeks.
```

COOKE - DIRECT / GREEN

1  Q.   Where did you live while your children were growing up?

2  A.   Primarily in Eustis, Florida.

3  Q.   How hard is it for you to be here testifying today?

4  A.   I'm sorry?

5  Q.   How hard is it for you to be here testifying today?

6  A.   It's challenging.

7  Q.   For what periods of time did your daughter Cheryle Cooke

8  live with you?

9  A.   Cheryle lived with me from the time she was born until she

10  graduated from high school to go to college and then

11  periodically post-college.

12  Q.   Are you familiar with ADHD?

13  A.   I am.

14  Q.   How are you familiar with it?

15  A.   My son -- I was -- became most familiar with it with my

16  son.  He was in fourth grade, and teachers suggested that he

17  may have ADHD and for him to go for further evaluation.

18  Q.   And did you go with him for that further evaluation?

19  A.   I did.

20  Q.   Was he diagnosed with ADHD?

21  A.   He was.

22  Q.   And was he prescribed anything for it?

23  A.   He was.

24  Q.   Have you ever been diagnosed with ADHD?

25  A.   I have.

COOKE - DIRECT / GREEN

1    Q.    Through what process were you diagnosed?

2    A.    First through my general practitioner, who recommended

3    that I went to an APRN, psychiatric APRN.

4    Q.    And were you diagnosed as an adult or a child?

5    A.    An adult.

6    Q.    Approximately how many years ago was that?

7    A.    So probably that came to be right after David Thomas's, so

8    20 years or so ago.  So I was late thirties, early forties.

9    Q.    Were you prescribed with any medication?

10   A.    I was.

11   Q.    Were you prescribed with a stimulant?

12   A.    Yeah, Vyvanse.

13   Q.    Did you take that stimulant?

14   A.    I did for a short while.

15   Q.    Did you stop taking it?

16   A.    I did.

17   Q.    Why?

18   A.    Because of the way that it affected me.  It brought on

19   more nervousness.  Somebody pointed it out at work that my

20   speech was even faster.  I'm a fast-talker from the Midwest and

21   that my speech was even faster and maybe more focused, so

22   somebody actually brought it to my attention, and I was feeling

23   that way as well, so I stopped taking it.

24   Q.    Have you been able to manage your ADHD okay since then?

25   A.    I have.

COOKE - DIRECT / GREEN

1   Q.   How have you managed it?

2   A.   Well, just awareness, planning.  You know, there's a spot

3   for everything, very scheduled.  Those type of things help me

4   manage.

5   Q.   Did your son show signs of inattentiveness or

6   hyperactivity as a child?

7   A.   Inattentiveness, yeah.  Not hyperactivity.

8   Q.   And you mentioned the school suggested he get tested, so

9   was he struggling in school?

10  A.   He was.  He was.

11       His grades were fine, but it took a long time for him to

12  just -- like the spelling words and, you know, those type of

13  things.  So it was suggested.

14       And it was really at that time where standardized testing

15  came into play in the fourth grade, and he was having trouble

16  with that that the teachers pointed out, to the point that they

17  maybe wanted to hold him back a year.

18  Q.   Which of your children ultimately became a Done member?

19  A.   My daughter Cheryle.

20  Q.   Was Cheryle diagnosed with ADHD as a child?

21  A.   She was not.

22  Q.   Did Cheryle show any signs you associated with

23  inattentiveness or hyperactivity as a child?

24  A.   No, she didn't.  She was -- kind of had a very different

25  academic experience than my son did, AP classes and very active

1    in, you know, cheerleading and volunteering.

2        And so, yeah, her experience was very different than my

3    son.

4    Q.   Was she also in student government?

5    A.   She was in student government.  She volunteered.  She kind

6    of, to me, was like the high school experience that you would

7    wish for, you know, a child.

8    Q.   We'll be focusing on discussing Cheryle today, if that's

9    okay.

10   A.   Mm-hmm.

11   Q.   Is it okay if I refer to her as Cheryle just to

12   distinguish from yourself, Ms. Cooke?

13   A.   For sure, yeah.

14   Q.   Okay.  Did your daughter Cheryle go to college?

15   A.   She did.

16   Q.   Where?

17   A.   She went to University of Alabama in Tuscaloosa.

18   Q.   How frequently did you interact with Cheryle while she was

19   at college?

20   A.   Well, multiple times a day through FaceTime.  She loves

21   that.

22        And, of course, when she would come home for breaks.  I

23   would go up there.  I moved her in, moved her out, you know,

24   fairly frequently.

25   Q.   Did Cheryle complete her college education at Alabama?

COOKE - DIRECT / GREEN

1    **A.**   She did not.

2    **Q.**   What happened?

3    **A.**   At the end of her senior -- she was a senior.  At the end

4    of her senior year, things just weren't going well for her, and

5    she needed to step away.

6    **Q.**   And where did she go?

7    **A.**   She came home.

8    **Q.**   Home to Florida?

9    **A.**   Yeah.  Sorry.

10   **Q.**   And approximately when did Cheryle return home?

11   **A.**   2018-ish, I think.

12   **Q.**   After returning home senior year, did you observe that

13   Cheryle was struggling when she was living with you?

14   **A.**   No, not at that time.  So I -- yes, 2019, I think would

15   have been -- anyway, 2018.

16        And what was the question?  Was she struggling.

17   **Q.**   Did you notice that she appeared to be struggling when she

18   was living with you?

19   **A.**   No.

20   **Q.**   Okay.  At some point in time after she moved back, did you

21   observe that she appeared to be struggling in any way?

22   **A.**   Yeah.  Things were different for Cheryle.  Cheryle -- and

23   not only did I notice them; Cheryle shared that, like,

24   you know, that maybe like her kind of plans and her trajectory,

25   she feels like -- she felt like things were changing for her

COOKE - DIRECT / GREEN

1    and she, you know, sought help for that.

2    Q.   You mentioned she sought help.  What did she do?

3    A.   At one period, Cheryle voluntarily -- well, she would have

4    to be voluntary because she was an adult -- went into a young

5    women's residential program in North Carolina for anxiety and

6    potential trauma and just to help because she felt things were

7    not maybe ticking correctly.

8        And then following that, about a 100-day stay, she went to

9    a less intensive program that was recommended where she could

10   kind of relaunch her life but still be under the care of a

11   psychiatrist and a therapist.

12   Q.   Okay.  And you mentioned two different places.  Was the

13   first place called The Willows?

14   A.   The first place was The Willows.

15   Q.   And you mentioned she went there for anxiety and help with

16   anxiety and trauma; is that right?

17   A.   Correct.

18   Q.   Okay.  When Cheryle moved from The Willows to the next

19   facility, what was that facility called?

20   A.   Red Mountain.  It was in Sedona, Arizona.

21   Q.   Did you go with Cheryle from willows to Red Mountain?

22   A.   Yeah.  We made a little trip of it.

23   Q.   Did you observe what medications The Willows had

24   prescribed to Cheryle, if anything, during that trip with her?

25   A.   Yeah, so she was prescribed an antianxiety medication and

COOKE - DIRECT / GREEN

1    I believe it was Lexapro.  And then she was also prescribed

2    trazodone, which was just a -- it's an antidepressant, but

3    really to help with sleeping.

4    **Q.**  Was she prescribed any stimulants, based on your

5    observations?

6    **A.**  She was not.

7    **Q.**  Okay.  Approximately when -- how long was she at The

8    Willows for?

9    **A.**  About 100 days.

10   **Q.**  Did she leave in approximately January 2020?

11   **A.**  Yeah, like the 1st.  Like so she stayed there through the

12   holidays just for -- yes, January.

13   **Q.**  Were you with Cheryle when she had the intake process at

14   Red Mountain?

15   **A.**  Yes.

16   **Q.**  And for what purpose did Cheryle inform the medical

17   practitioners at Red Mountain that she was there?

18   **A.**  Just a continuity of care of the things that she had been

19   experiencing, again, just from, you know, stability and being

20   able to relaunch and to address her anxiety, because that was

21   really what the primary focus was.  And trauma.

22   **Q.**  Whose decision was it to go to Red Mountain?

23   **A.**  Hers.

24   **Q.**  So in both of these cases, is it fair to say Cheryle felt

25   like she was shrugging and she sought help?

1    A.    Correct.

2    Q.    How frequently did you interact with Cheryle while she was

3    at Red Mountain?

4    A.    Well, she had access to her phone, and then so we

5    FaceTimed a lot and called a lot.  And I visited fairly often.

6    They had open visitation for parents, so fairly often.

7    Q.    And when you visited Cheryle, did you observe what

8    medications and prescriptions Red Mountain had prescribed to

9    her?

10   A.    Yeah, because -- well, one, we had a open dialogue because

11   there was a release form.  But also, when Cheryle would come

12   with me for the weekend, we would -- you know, she would check

13   out her meds and it would be with -- with me.

14   Q.    Did Red Mountain prescribe Cheryle any stimulants for

15   ADHD?

16   A.    No.

17   Q.    Where did Cheryle go after Arizona?

18   A.    She moved to Asheville, North Carolina.

19   Q.    And when was that, approximately?

20   A.    It was approximately in April -- in the late spring of

21   2020.  Like end of May, June 2020.

22   Q.    And where were you living at that time?

23   A.    I had relocated to be in Asheville.

24   Q.    Why did you do that?

25   A.    To support Cheryle.

COOKE - DIRECT / GREEN

**Q.** Okay. And between late June, May-June 2020 and the spring of 2021, how frequently were you interacting with Cheryle while she was in Asheville?

**A.** Frequently. We lived, you know, 2 miles apart, probably, and so very frequently. Sometimes daily, because she would drop her puppy off at my house to take care of it while she was working.

**Q.** And how was Cheryle doing?

**A.** I felt like Cheryle was doing well she was working and she was living on her own in October of that year. She -- or late September of that year. She had her own apartment and she was employed and -- yeah.

**Q.** Was she -- you mentioned she was working. So was she working in Asheville at least until about August 2020 -- 2021?

**A.** Yes.

**Q.** Was she also trying to do online school?

**A.** She did want to complete her degree, so she did go back for online school, yeah.

**Q.** Were you providing her with any other type of tangible support besides emotional support, such as paying for groceries or rent when she was there?

**A.** Yeah. We -- you know, her father and I both -- we helped, you know, supplement and -- rent, groceries, clothes, cell phone. You know, the things that we do, yeah.

**Q.** Okay. At some point in time, did you become aware that

COOKE - DIRECT / GREEN

1  Cheryle had joined Done as a member?

2  **A.**    Yes.

3  **Q.**    Did you reach out to individuals at Done numerous times in

4  2021 and onwards with concerns about their treatment of your

5  daughter?

6  **A.**    I did.

7  **Q.**    Okay.  We're going to talk about some of the events that

8  led up to those periods of outreach.

9         When did you learn that Cheryle become a Done member?

10  **A.**    In the spring of 2021.

11  **Q.**    How did you learn this?

12  **A.**    I think that I learned it because I had a bill on my

13  credit card that I was unaware of, and then also I saw her

14  prescriptions.

15  **Q.**    Okay.  Did you try to gather additional information about

16  Done?

17  **A.**    I did.

18  **Q.**    Were you concerned when you learned about Done?

19  **A.**    Yes.

20  **Q.**    Why?

21  **A.**    Well, because Cheryle had just completed the -- you know,

22  a program, and she was concerned with, you know, just kind of

23  her trajectory and -- well, you know.

24         And also because -- I was concerned about Done because

25  Cheryle had not been diagnosed with ADHD or prescribed

1  stimulants, and I know that's -- I know from, you know,

2  Adderall is a highly addictive narcotic, and it was just a

3  concern.

4  Q.  Was part of your concern also stemming from an incident

5  in -- when she was at Alabama when she attempted to obtain a

6  stimulant?

7  A.  Yeah, she did -- she did.  When she was at the University

8  of Alabama went to the clinic, the college clinic, to try to

9  obtain -- Adderall, to get diagnosed with ADHD, and I know that

10 because they sent forms to me and her father, and she was

11 not -- at that time they did not move forward with prescribing

12 her or I don't think diagnosing her.

13 Q.  Okay.  So while at Alabama, she hadn't been diagnosed or

14 prescribed a stimulant, to your knowledge?

15     MS. BELL:  Objection.  Misstates the testimony, Your

16 Honor.

17     THE COURT:  Overruled.

18 BY MS. GREEN:

19 Q.  As you were trying to get --

20     (Reporter interruption for clarity of the record.)

21     MS. GREEN:  I think Judge Breyer was overruling the

22 objection.

23     THE COURT:  Yes.

24     MS. GREEN:  Proceed?

25     THE COURT:  Please.

1          MS. GREEN:  Thank you, Your Honor.

2    BY MS. GREEN:

3    Q.   As you were trying to gather more information about Done,

4    did you observe Done advertisements?

5    A.   I did.

6    Q.   Did those advertisements concern you?

7    A.   Yes.

8    Q.   Why?

9    A.   Because I felt like it was a place to shop for Adderall I

10   felt like it was an easy -- I mean, that's basically what the

11   advertisement was:  Come here, shop for, you know, Adderall,

12   get a quick diagnosis.  And -- yeah, I was kind of concerned.

13   Q.   Did you also observe online reviews related to Done?

14   A.   I did.  I mean, I -- you know, I started digging and

15   researching, as one does when you're worried about your child

16   or a loved one, and so I really started, you know, trying to

17   understand.

18        One, the name didn't kind of lend itself to anything I

19   could come up with, so I started researching and saw some

20   Reddit, you know, responses.

21   Q.   Did those concern you?

22   A.   Yeah.

23   Q.   Why?

24   A.   Because --

25          MS. BELL:  Your Honor, I'm sorry.  Objection to the

 1    extent that this would be hearsay based on the reviews.

 2              MS. GREEN:  These are not coming in for a hearsay

 3    purpose.  The impact on Ms. Cooke.

 4              THE COURT:  Okay.  Proceed.

 5              MS. GREEN:  Thank you, Your Honor.

 6    BY MS. GREEN:

 7    Q.   Why did those Reddit reviews concern you?

 8    A.   Well, like I stated earlier, I mean, I'm -- you know, I

 9    was familiar with Adderall being highly addictive, frequently

10    used with college students, and that kind of just -- those

11    reviews lent itself that this was a really easy place to shop

12    Adderall, get a diagnosis, get your drugs, get your Adderall or

13    stimulants or drugs quickly and easily, and especially for

14    those who had been denied.  Like that was the big highlight.

15    Like, oh, I couldn't get them from X, Y, Z.  I'm there and I

16    got them.

17         So it was a -- yeah, a big concern.

18    Q.   And you mentioned that you had observed that Cheryle had

19    received prescriptions from Done; correct?

20    A.   Correct.

21    Q.   Were those stimulant prescriptions?

22    A.   Yes.

23    Q.   Did you become concerned about the stimulant presumptions

24    that Cheryle was receiving from Done?

25    A.   Yes.

COOKE - DIRECT / GREEN

1   Q.   When did you first become -- start to become concerned?

2   A.   I mean, probably from start day one, but really in June,

3   her behavior -- which that's her birthday; that's why I would

4   know that.  Her behavior started changing to an extent.

5        And, you know, also I had seen the prescriptions, so I

6   knew what the -- I'm not -- the milligrams were, and it seemed

7   like a high dose for -- for her.

8   Q.   Okay.  And could you explain to the jury what types of

9   behavioral changes you had noticed that were causing you

10  concern?

11  A.   Cheryle became -- and this is early on; right?

12  Q.   Yeah.

13  A.   So in the beginning, she became like more aggressive and

14  volatile and very much more opinionated, and it just was out of

15  character for Cheryle to -- you know, she's not perfect, but

16  just her being volatile and argumentative and maybe being

17  less -- well, not maybe.  She was not joining us as much in

18  family gatherings, and if she would, she was late for them.

19  And, you know, it just seemed a little chaotic.

20  Q.   Okay.  Did your observations of Cheryle -- did you grow

21  more concerned as time progressed?

22  A.   Oh, yes.

23  Q.   Okay.  And what types of things did you start to notice?

24  A.   Cheryle's -- again, kind of that aggressiveness or that

25  assertiveness really escalated.  She was making -- taking

1  riskier -- she was being more reckless with, you know, her own

2  personal safety.  She lived in a city.  Again, being more

3  disassociated from things that mattered.

4      It got severe.  It was like a progression, but a really

5  fast progression, the severity of where she was paranoid.  She

6  became delusional.  She thought people were following her.

7  She, you know, crashed her car, would call me in the middle of

8  night that she was out of gas.  I mean, it was -- it was

9  frightening.

10 Q.  Let's walk through some of that progression.

11     In around August 2021, did you reach out to Done?

12 A.  I did.

13 Q.  Okay.  Why?

14 A.  I was concerned for Cheryle, again, because of the --

15 because of what I was experiencing with her and seeing these

16 changes, and then also talking to my own therapist and,

17 you know, my own GP and just kind of getting maybe some

18 validation that what I was, you know, seeing was -- you know,

19 should be a concern and it wasn't just an overconcerned mother?

20     So, yeah, I reached out for that -- for that reason.

21 Q.  Who did you reach out to at Done?

22 A.  I think the first time that I reached out was to the

23 provider that I saw on the prescription bottle, Cassidy.

24 Q.  Cassidy Orr, O-R-R?  Does that sound familiar?

25 A.  Sounds familiar, yeah.

1  **Q.**    Okay.  And what did you say?  Did -- how did you reach

2  out?

3  **A.**    So I think I may have reached out to the Done general

4  site, but I know for sure that I needed -- I wanted attention,

5  so I found Cassidy's information and reached out on her

6  personal e-mail.

7  **Q.**    What did you say in your outreach to Done about Cheryle?

8  **A.**    Just that I was very concerned, that I felt like she

9  needed more attention, that she -- like I think I said what her

10  weight was because of the level of milligrams or the script

11  that they were giving maybe, you know, was too much.  I was

12  just concerned and asking for attention.

13  **Q.**    Why did you think -- so you mentioned you told them about

14  her weight.  What led you to believe that given her weight, the

15  level was too much?

16  **A.**    In talking to my therapist, you know, I suggested like

17  what she was receiving and, you know, Cheryle at the time was

18  5-7, 120-something pounds, maybe less.

19          **MS. BELL:**  Your Honor, I'm sorry.  Objection, hearsay.

20          **MS. GREEN:**  It's coming in for a non-hearsay purpose

21  to explain why she wrote that in her message to Done.

22          **THE COURT:**  Let me take a moment to explain that

23  again.

24       This witness can testify as to things that she was told,

25  and it -- it is introduced into evidence not because what she

 1   was told was necessarily accurate or inaccurate.  It comes in

 2   because it affected this witness's state of mind; that is, what

 3   she thought.  And so it comes in for that purpose and that

 4   purpose only to be considered by you.

 5       And it is -- your judgment, of course, remains as to

 6   whether any issues related to the credibility -- that is, you

 7   believe the witness when she says X or Y -- that she had these

 8   discussions or information given to her.

 9       That's totally within your province and not in the

10   Court's.

11       But it comes in what we call for a non-hearsay purpose and

12   can be considered by you for a purpose that is -- that it

13   affected this witness's state of mind, what she thought.

14       Okay.  Go ahead.

15           MS. GREEN:  Thank you, Your Honor.

16   BY MS. GREEN:

17   Q.   What had your therapist told you that made you want to

18   inform Done about Cheryle's weight?

19   A.   He said based upon his experience that she was being

20   diagnosed a level that would be a conducive to a really tall

21   and large man, so 6-foot 4, 6-foot 5, 400-pound man.  And that

22   was a concern, right, because she is none of those things, was

23   not close to that size.

24       So I was felt like in -- from a layman's perspective,

25   hearing that from a professional that she was being

1    overprescribed a volume of medicine.

2    Q.    What response did you receive either from Done or Ms. Orr

3    to that outreach in August 2021?

4    A.    I don't believe any.  None.

5    Q.    Were you aware of Done doing something else?

6    A.    Sorry.  The question?

7    Q.    Did Done or anyone at Done reach out to your daughter?

8    A.    Oh, gosh, yeah.

9         So the way that my daughter found out about it was --

10   because I didn't tell my daughter I was reaching out to Done.

11   The way that she found out about it was the provider told her

12   that somebody has reached out to me and that it completely

13   freaked me out.  Like how did she get my personal e-mail, who

14   was -- you know, it was your mother.  You know, I -- Cheryle

15   heard that it was her mother.  But the provider told Cheryle

16   how freaked out she was that I was able to like track her down

17   and use her -- and it wasn't -- I mean, it's public

18   knowledge -- but that I used her e-mail.

19   Q.    To your knowledge, did the provider address your concerns

20   about Cheryle substantively, like her weight or the potential

21   over --

22   A.    No, it was more about concern for herself, the provider,

23   and not a concern that I had expressed to please take a look at

24   my daughter.

25   Q.    Did you look further into this Done provider?

COOKE - DIRECT / GREEN

1    **A.**    I did.

2    **Q.**    And what did you find?

3    **A.**    It was challenging because I think she was a provider in

4    Florida, and then I was able to find like the listed address of

5    like her professional office, but it was just like this random

6    like cinderblock small place in the middle of nowhere Florida.

7    **Q.**    Did that concern you?

8    **A.**    Yes, yes, yes.

9    **Q.**    After this August outreach to Done, did you continue to be

10    concerned about Cheryle?

11    **A.**    Yes.

12    **Q.**    Why?

13    **A.**    It just -- it just was getting progressively scary and

14    worse, her, you know, how she was able to manage her life and

15    show up in her life.

16    **Q.**    Can you describe for the jury some of things that you

17    noticed that made you think it was getting worse?

18    **A.**    Well, she lost her job, which she had -- you know, was on

19    a pretty good career path and had recently been recruited for a

20    new position that she was super excited about and a new

21    company, and she lost that job.

22        And, you know, she was kind of -- didn't share that

23    because, you know, she had some shame around that.

24        Again, just her appearance became very different.  There

25    was a point in time where she like self-dyed her hair, which

COOKE - DIRECT / GREEN

1  there's nothing wrong with that unless you've not -- if that's

2  not your typical behavior.  But she used like henna dye her

3  hair and cut her own hair.  Started dressing differently.

4      Behaviorally, it was frightening.  She just was not

5  herself.

6  **Q.**  What have you noticed -- and did you notice, if anything,

7  about paranoia?

8  **A.**  Yeah, she was super paranoid.  So she would -- she lived

9  in a nice apartment complex.  Maybe there were 50 -- I don't

10 know -- units.  But one door, log in and out.  So everybody was

11 kind to one another.  And she would think that somebody on her

12 floor was watching her.  And she had a very small balcony, and

13 she thought that there was the same car there, you know, at the

14 same time or following her.

15     She also then -- as it really progressed, she put like

16 painter's tape or electrical tape over the peephole of her door

17 and -- because she was afraid somebody was going to shoot

18 inside her apartment.

19     And then she felt like -- I didn't know if this was going

20 to come up.  Sorry.  I mean my emotions.  Sorry.

21     She felt like my -- me and her father were like somehow

22 plotting against her, that we were like in some religious cult

23 and that we were going to sex traffic her?

24     I mean, it was super, super bizarre and very, very scary

25 behavior that you couldn't really understand unless you were

COOKE - DIRECT / GREEN

1    part of that.

2        She thought that her electronics were being tampered with,

3    and so she would go down to the police department with her

4    electronics to have them research, and I think out of, you

5    know, kindness -- they were seeing that there was something

6    wrong with her, but they said that they couldn't do anything

7    for her.  She --

8        I'm sorry.  Thank you.

9        And she tried to -- you know, she just was thinking that

10   we were against her, but at the same time she was very afraid

11   of everything.  And so while she was trying to kind of figure

12   out like, am I, you know, there to help or hurt her, like is it

13   still mom, she still wanted us there all the time.  So we would

14   spend the night with her a lot and just be part of this chaos

15   where she wasn't sleeping, and then it was hard for us not to

16   sleep, and nobody slept.  And so that was just also kind of

17   exasperating the situation.

18   Q.   So you also noticed that she wasn't sleeping?

19   A.   Yes.

20   Q.   Would she always -- when she attempted to sleep, would

21   that be in her bed or would it be somewhere else?

22   A.   So that was also -- she was afraid to like be out and

23   sleep in her bed.  It was a one-bedroom apartment, fairly tiny,

24   but she would put a -- she ended up -- the only way to kind of

25   feel like she was surrounded, she would put a pallet in the

COOKE - DIRECT / GREEN

1  bathroom and sleep in the bathroom.  Yeah.

2  Q.  How was her speech during this time frame?  Did she sound

3  like her normal self or did she sound different?

4  A.  You know, there was a point in time when she just sounded

5  like a different person.  Like she looked like a different

6  person.  Her eyes seemed like a different person.  You know,

7  she would have erratic speech, like pressured, erratic.  She

8  wouldn't kind of let you get a word in.  You know, it was just

9  like her kind of projecting everything that was in her mind.

10  Q.  Did she always make sense when she was speaking to you?

11  A.  No.  No, no, no.

12  Q.  How noticeable were these changes in Cheryle, in your

13  view?

14  A.  Well, I think I said already.  She was a literally and

15  frighteningly a different person.  Her appearance being one

16  thing, but also her -- just the way she would process the world

17  or the way that she would interact with us was very -- just

18  night-and-day different.

19  Q.  Was she ever -- did you ever notice erratic behaviors not

20  just with you, but say out on the street or in her apartment?

21  A.  Yeah.  So she had just renewed her lease so she would have

22  been there for a second year, but especially from the bathroom

23  when she would be there, in there at nighttime, she would just

24  scream and talk and scream and like pray or -- and the

25  neighbors, who were very -- trying to be very kind and not do

COOKE - DIRECT / GREEN

1  much to report Cheryle to like the landlord or the police -- it

2  got too bad, so they did.

3     And then also, you know, when you have -- well, you don't

4  know.  But for me, when I have, you know, my daughter, a loved

5  one, and her father and I being concerned, we did have other

6  family come in town and her brother there and like family

7  friends from years ago that maybe hadn't seen her for a while

8  and -- yeah, it was -- there was no denying that it was not

9  Cheryle.

10  Q.   Did those individuals also notice changes, the family --

11  A.   Oh, my gosh, yes.

12  Q.   So you don't have to be her mother to notice, in your

13  opinion?

14  A.   No.  I mean, you -- you could have been like maybe a

15  neighbor that she passed maybe three times or more.  You could

16  have been on the street, probably, because the way that she

17  became -- like going to the police station and that ranting

18  almost a little bit.

19  Q.   On approximately -- through this time frame from spring

20  2021 through this decline into the fall, did you observe that

21  Cheryle was obtaining -- still obtaining stimulant

22  prescriptions from Done?

23  A.   Correct, yes.

24  Q.   On approximately November 11th, 2021, did Cheryle go to

25  the hospital?

1    A.    Yes.

2    Q.    Where was that hospital?

3    A.    In Asheville, North Carolina.

4    Q.    Did you go to the hospital with her?

5    A.    I took her, yeah.

6    Q.    And were you present with her while she was in the

7    hospital?

8    A.    Yes.

9         **MS. GREEN:**  Your Honor, the Government is going to

10   move to admit Exhibit 2483 and 2484.  These are records of two

11   hospital visits in November 2021, business records which the

12   Government obtained and has showed to Ms. Cooke.

13        She was present and has personal knowledge of many of

14   those events.

15        **THE COURT:**  Admitted.

16        (Trial Exhibits 2483 and 2484 received in evidence.)

17   BY MS. GREEN:

18   Q.    So focusing on this November 11th, approximately, 2021

19   hospital visit, what circumstances led up to that hospital

20   visit?

21   A.    Cheryle asked to go to the emergency room.  Like there was

22   something she -- she just -- something was not right, and she

23   likened it to like, Mom, I feel like somebody poured water --

24   like my brain is a circuit board and somebody poured water on

25   it.  That's what she had likened it to.

```
 1        And her temperature was irregular and her heart rate
 2   scared her, and -- you know, she thought like something was
 3   really wrong and asked to go to the emergency room.
 4   Q.   So she felt concerned for her own safety?
 5   A.   Correct.
 6   Q.   How concerned were you at this point?
 7   A.   Very.
 8   Q.   So you went to the hospital with her?
 9   A.   I did.
10   Q.   Okay.  And looking at Exhibit 2484 --
11        MS. GREEN:  2483, please, Ms. Braga, page 3, the
12   bottom paragraph.
13   BY MS. GREEN:
14   Q.   Discharge disposition comments.
15        We see there -- and I'll just read a part of it (as read):
16        "She needs detox.  Patient presents with safety
17        concerns in the context of overuse of her Adderall
18        medication.  She presents in the ED as paranoid and
19        anxious."
20        And then later on (as read):
21        "chronic risk factors include substance misuse,
22        history of trauma, lack of outpatient treatment, and
23        poor medication management.  she is requesting to
24        return home with her mother and go to detox in the
25        morning."
```

COOKE - DIRECT / GREEN

1    So we discussed Cheryle's concerns with her own safety.

2  Is that consistent with what we just saw here?

3  **A.**    Yeah.

4  **Q.**    And the paranoia and anxiety mentioned here, had you also

5  observed this paranoia and anxiety in Cheryle?

6  **A.**    Yes.  Even at this hospital stay, it -- or not stay, visit

7  to the ER -- it took a team of people to try to reassure her

8  that she was there for help and not for -- because then she

9  kind of got it in her mind that she was going to die there or

10 that they were going to do -- you know, that it wasn't for her

11 best interest.

12    And so it was this whole team trying to walk her back to

13 get just evaluated, and it took -- it was -- it wasn't minutes.

14 It was maybe 20 minutes -- and I'm just approximating.

15    And they were concerned for her with -- but she kept

16 saying to them, "What is wrong with me?  Like what is wrong?"

17    And then she kind of wanted to go back but she didn't

18 because they wanted to test her heart, and they said, "You took

19 too much Adderall.  You need to stop taking Adderall."

20    And so it just took this process to get her to go back.

21 So she was paranoid even trying to seek care.

22 **Q.**    Mm-hmm.  And you mentioned the paranoia to the jury that

23 you even had observed before this hospital visit, you know,

24 like the peephole, et cetera, and the -- in her apartment.

25    What about like sharpshooters?  Had she -- had you

1  observed her being concerned about sharpshooters?

2  **A.**    Yeah.    I mean, you know, she closed her -- I think I said

3  she taped off her peephole in her apartment.    And then her

4  apartment was kind of a walk-in because it was small, but then

5  she hung like a tapestry, so when you would first enter the

6  door, you wouldn't be able to see.    These are part of things

7  that were so concerning?

8      So she was afraid that people were following her, out to

9  get her, potentially shooting her, and then, of course, even,

10  you know, with her own family.

11          **MS. GREEN:**    And turning to page 5, focusing on the

12  bottom paragraph, Ms. Braga.

13  **BY MS. GREEN:**

14  **Q.**    And, again, I'm not going to read this whole thing.    It

15  mentions (as read):

16          "With patient is her mother, who is present

17      throughout the assessment.    Patient is obviously

18      anxious and somewhat paranoid.    Patient reports she

19      is currently prescribed Adderall 60 milligrams and

20      today took extra of her Adderall.    Patient's mother

21      reports she has been struggling with this for some

22      time.

23          "Her PCP currently prescribes her Lexapro, and

24      she gets her Adderall from an online system called

25      Lifestream.    Patient's mother is supportive and has

COOKE - DIRECT / GREEN

```
 1            agreed to stay with patient overnight.  Patient

 2            reports she would like to go to detox in the

 3            morning."

 4            "Patient reports she is currently prescribed Adderall

 5   60-milligrams and today took extra Adderall," consistent with

 6   what you had been noticing with the prescription bottles that

 7   you had been seeing in the apartment?

 8   A.   From the milligram perspective, yeah.

 9   Q.   Had you -- did you also think you had observed some other

10   stimulants?

11   A.   I thought at the same time that she was also given -- and

12   I saw it, so I didn't think -- but Vyvanse as well, which then

13   was a concern.  Like so she would be giving Adderall

14   60-milligram and I think Vyvanse 40 milligrams on top of the

15   Adderall.

16   Q.   She -- it mentions she gets her Adderall from an online

17   system called Lifestream.  Do you know what Lifestream is?

18   A.   Yeah.  I think that was just a bad note-taking there

19   Lifestream was a psychiatric hospital that was in our -- in her

20   hometown in Eustis, Florida.

21   Q.   And had she been going to Lifestream at this period of

22   time?

23   A.   No.

24   Q.   Was that actually two or three years ago?

25   A.   Correct.
```

COOKE - DIRECT / GREEN

 1  Q.   Okay.  And to your knowledge, had Lifestream given her
 2  Adderall or stimulants?
 3  A.   No.
 4        **MS. BELL:**  Objection, Your Honor.
 5  **BY MS. GREEN:**
 6  Q.   How receptive was Cheryle to the idea of ending her Done
 7  membership at this time?
 8  A.   No, she wasn't.
 9  Q.   Okay.
10        **MS. GREEN:**  Focusing on page 7, history of present
11  illness, please, Ms. Braga.
12  **BY MS. GREEN:**
13  Q.   And, again, just pointing out a couple of sentences here
14  (as read):
15        "The patient reports she has been on Adderall
16        for the last six months.  She is getting it from an
17        Internet doctor.  She has reportedly been misusing
18        this.
19        The patient's mother notes that she is here
20        today because over the last few days, she has been
21        exhibiting bizarre behavior.  The patient has not
22        been sleeping normally.  Today the patient was in the
23        grocery store when she freaked out.  She contacted
24        her boyfriend and then called her mother."
25        What had happened in the grocery store Ms. Cooke?

COOKE - DIRECT / GREEN

1    A.    She was actually with her boyfriend in the grocery

2    store --

3            MS. BELL:    Your Honor, I'm sorry.    Objection, hearsay.

4    BY MS. GREEN:

5    Q.    Did you go to the grocery -- did you go to the grocery

6    store?

7    A.    I met them in the parking lot right at this incident when

8    they called me.

9    Q.    Okay.    And had what you learned happened in the grocery

10   store incident also led up to her going to the hospital?

11   A.    Correct.

12   Q.    Okay.

13           MS. GREEN:    Your Honor, it's coming in for a

14   non-hearsay purpose, please.

15           Thank you.

16   BY MS. GREEN:

17   Q.    Please go ahead, Ms. Cooke.

18   A.    I'm sorry.    I don't know the question.

19   Q.    What had happened any grocery store that contributed to

20   this visit?

21   A.    She was in the grocery store shopping with her then

22   boyfriend and --

23           MS. BELL:    Your Honor, objection.    Hearsay again, and

24   foundation, speculation.

25           THE COURT:    Well, let me understand the context of

 1    this.  As I understand it, the witness was outside the grocery

 2    store; is that right?

 3         **MS. GREEN:**  My understanding, Your Honor, is the

 4    individual Cheryle was in the grocery store with her

 5    boyfriend.  There was an incident, and then Ms. Cooke went to

 6    the grocery store, and then they proceeded together from the

 7    grocery store in the hospital.

 8         **THE COURT:**  So my question is -- my question is:  When

 9    her daughter spoke to her, what was it -- you have to lay a

10    foundation.  Was it immediately after the incident?  Is it

11    after some time?  Because it's an exception to the hearsay rule

12    excited, utterances and statement of what just transpired.  If,

13    under the circumstances, would suggest that it's truthful and

14    not made up, it would come in as an exception to the hearsay

15    rule.  Therefore, it would be -- it could be considered by the

16    jury as non-hearsay.

17         **MS. GREEN:**  Thank you, Your Honor.

18         **THE COURT:**  As an exception.

19    **BY MS. GREEN:**

20    **Q.**   When did you go --

21         **THE COURT:**  You have to lay a foundation.

22    **BY MS. GREEN:**

23    **Q.**   Did you go to the grocery store area?

24    **A.**   I went to the -- I went to the parking lot where -- they

25    left the grocery store.  We went to the parking lot.  They

1    called me for like a 9-1-1 call, like come help, and then

2    that's when I was witnessing her still in this freaked-out

3    situation.

4    Q.   Was she in an excited state?  You just freaked out at this

5    time?

6    A.   Yeah.  She was screaming, and I was trying to understand

7    what happened, so I was talking -- I was with her, and she felt

8    like he had said something about being a vampire like and then

9    some -- some woman scared her, so she just got into like a

10   frenzied state of fear.

11   Q.   And what I had just read also pointed out that "the

12   patient is not sleeping normally."

13        Is that consistent with the type of lack of sleeping that

14   you had observed in all your interactions with Cheryle leading

15   up to this time frame?

16   A.   If I understand the question correctly, yeah.  I mean, she

17   wasn't sleeping, so, you know, you can't go along without

18   sleep.  Is that -- I'm sorry --

19   Q.   Yeah.  No, that's correct.

20   A.   Okay.

21   Q.   When at the hospital at this point in time was -- and

22   Cheryle -- you were with her as Cheryle was speaking to the

23   medical providers; correct?

24   A.   Correct.

25   Q.   Was she worried about potential misuse of Adderall at this

1  time, Cheryle?

2  **A.**    Yeah.

3  **Q.**    Looking at Exhibit 2483, page 13, and just focusing on

4  that very top little section, what had you noticed or observed

5  leading up to this point about Cheryle having convulsions?

6  **A.**    So I was driving her to the hospital.  It wasn't a

7  terribly long drive, but I -- when we stopped, I think, or I

8  stopped, she was just like on the floorboard, you know, and

9  just shaking.  And not in convulsions, like where I would think

10  on TV where she was like laid out, her eyes rolling, but just

11  literally -- she's like, I'm convulsing.  Like even she was

12  saying it, and that was kind of like on the floorboard.

13  **Q.**    And what had you observed about Cheryle making up stories?

14  **A.**    Well, you know, all of -- you know, the making up stories

15  like about, you know, her father and I being in some religious

16  cult, just that -- you know, that we were somehow doing things

17  to her electronics so we could follow or control what she was

18  doing.  That's just -- yeah, one of many.

19  **Q.**    And had she had -- had she jumped out of the car on

20  occasions prior to going to this hospital visit?

21  **A.**    Mm-hmm.

22  **Q.**    Any of these behaviors that we've been discussing, had you

23  observed those prior to the spring of 2021?

24  **A.**    No, not to -- not -- no.

25  **Q.**    And focusing on page 12, just in the -- in the diagnosis

1  section, did the hospital diagnose Cheryle with ADHD?

2  **A.**    No.

3  **Q.**    After leaving the hospital, did you go home with Cheryle?

4  **A.**    Yes.

5  **Q.**    Did you observe whether the hospital had prescribed

6  Cheryle any stimulants?

7  **A.**    They did not.  They told her not to -- to stop taking

8  Adderall.

9  **Q.**    Did you reach out to Done after this hospital visit?

10  **A.**    Yes.

11  **Q.**    Okay.  Why?

12  **A.**    It was -- well, because the hospital is like she needs to

13  stop taking Adderall.  Like the only way for this like to stop

14  whatever it was -- mania, Adderall psychosis, whatever it

15  was -- that she needed to stop taking Adderall.  And I

16  couldn't -- so I had -- I thought I was going to the source to

17  share to give awareness.

18  **Q.**    To give awareness and share.  Okay.

19        **MS. GREEN:**  Let's admit Exhibit 471, please.

20        **THE COURT:**  Sorry.  471?  Is it in evidence?

21        **MS. GREEN:**  No.  I would like to admit it.  Thank you,

22  Your Honor.

23        **THE COURT:**  471 admitted.

24     (Trial Exhibit 471 received in evidence.)

25  \\\

1          **MS. GREEN:**  And let's zoom in, Ms. Braga, on like the

2    text portion, including the bolded headings, please, just so

3    the jury is able to also read it.

4          Thank you so much.

5    **BY MS. GREEN:**

6    **Q.**   Okay.  Did you send a Linked -- you mentioned you reached

7    out.  Did you send some LinkedIn messages?

8    **A.**   I did.

9    **Q.**   Let's look at this message.

10         You write (as read):

11              "Personal plea, private health matter.

12         Desperate parent seeking help.  My daughter is a

13         member/patient with Done.  Her dosage for Adderall

14         has been increased to 60 milligrams with a Vyvanse

15         script as well.  She had to be taken to the hospital

16         last week because of Adderall psychosis.  she is

17         still very paranoid and confused a week later.  She

18         won't leave her apartment, and we cannot get it to

19         seek any medical help because she is confident that

20         she is under the care of Done.  Cheryle Cooke, 24,

21         5-foot 7, 125 pounds or less.  The rapid decline in

22         her physical and medical health over the past six

23         month is blatantly obvious.  I know that you nor

24         anyone at Done can speak with me, but I am hopeful

25         that this information can be shared and with that, no

1        longer will be prescribed any Adderall or Vyvanse and

2        certainly not in such high doses, and that future

3        sessions/treatment are used to help her and encourage

4        her to get help.  If I wasn't in fear for my

5        daughter's life, I would not use this professional

6        outlet to contact you.  However, you are publicly

7        listed on both the Done site and here."

8        And that message was sent to Shannon Wozniak; is that

9   right?

10  **A.**   Correct.

11       **MS. GREEN:**  And just looking at page 2, Ms. Braga, and

12  then we'll come back to this.

13  **BY MS. GREEN:**

14  **Q.**   Did you also sent the same message to an individual called

15  Les Tsang?

16  **A.**   I did.

17  **Q.**   How did you find these two individuals to send this

18  message to?

19  **A.**   So I was trying to find like the most senior person or

20  people at Done so I could hopefully get some attention; right?

21  Like start with the top down.

22       And I think they were -- I think Les was listed as the

23  chief medical officer at the time, I think, and I saw that on

24  the site, but you couldn't reach out to him.  So then I used my

25  LinkedIn membership that is the premium to find them.

1    Q.    Okay.

2           MS. GREEN:  And let's go back to page 1, Ms. Braga,

3    and just zoom in as you had before.

4    BY MS. GREEN:

5    Q.    So she had just come out of the hospital.  Had any of this

6    paranoia and confusion and the behaviors you had been

7    describing abated?

8    A.    No.  No, no.

9    Q.    And what had you observed about Cheryle not wanting to

10   leave her apartment at this time?

11   A.    She -- then -- yeah.  Then she just didn't want to leave.

12   She was afraid to leave her apartment.  She was afraid people

13   were after her.  There was -- like she took her -- like her

14   cable box.  Like, you know, how you have for Internet that's on

15   the wall, right, like an AT&T box.  She took all that down.

16   She like blue tape wired it.  Her electrical outlets were --

17        I mean, she just was not -- you know, she was very, very

18   unstable.

19   Q.    And --

20   A.    And very, very -- she was afraid for her life.  She was

21   afraid.

22   Q.    And you write that (as read):

23           "We cannot get her to seek any medical help

24        because" -- you wrote it; I'm going to say "she."  I

25        assume that's a typo -- "is confident that she is

COOKE - DIRECT / GREEN

1        under the care of Done."

2        Can you explain to the jury what you meant by that?

3   **A.**   Well, because she -- you know, when I'm like, Cheryle, you

4   need to see somebody, we need help, the hospital says you need

5   help, she's like I am getting help.  I have an appointment with

6   Done?

7        And at that point, she wanted to continue with Done

8   because, you know, because -- well, anyway, because she was

9   seeing Done, and Done was prescribing her medicine that she

10  felt like was helping her.  But hurting her.

11  **Q.**   Right.  You said "felt that it was helping her," but in

12  the hospital visit that we just looked at, you know, just the

13  week prior, it sounded like she had concerns about her

14  Adderall?

15  **A.**   Yeah.  I don't mean helping her -- like she knew better.

16  Like she knew she needed to stop taking Adderall.  She knew

17  that she -- like the hospital told her.  She told the hospital,

18  and that was all in there.

19       But I feel like, you know, in the place of some

20  dependence, she felt like she needed to stay with Done or get

21  what they were using, you know.

22  **Q.**   And you were unable to get her to seek other help at this

23  time?

24  **A.**   Right.

25  **Q.**   And you write (as read):

COOKE - DIRECT / GREEN

1          "Her rapid decline in her physical and mental

2      health over the past six months is blatantly

3      obvious."

4      Why did you write that?

5  **A.**   I knew -- and -- because.  Because I wrote it because she

6  was a different person, and anybody that would have seen her,

7  like, say, her coffee shop from -- you know, if you were a

8  coffee shop place that she went from that day to that day, she

9  was not recognizable, not only in her appearance and her upkeep

10 and her like really unkemptness and the way she was layering

11 clothes on to kind of shield off that she had, you know, lost a

12 tremendous amount of weight.  She just -- she wasn't -- so

13 besides just physical appearance, it was the way she spoke, the

14 way she processed, the -- you know, it was across the board.

15 She just didn't communicate like herself, and it would not take

16 any -- like I said here, it's blatantly obvious.  If anybody

17 had been -- known her at least for two times, they would say,

18 wow, this was a different person in such a short time frame.

19 **Q.**   Had she been interviewing for jobs?

20 **A.**   Yeah, she had, because she lost her job, and then she

21 started interviewing.  And like the course of the interview

22 was -- it was a long interview, and she had to go through three

23 or four iterations.

24      At the very onset, she was interviewing and they were like

25 on fire for her, scheduled her an interview right away.  It was

1  a great gig.  And then the second interview, she still went

2  through, but then the third interview, it was just cut off?

3      But even in that time frame of interviewing, she told me

4  they had mentioned, wow, you look very different.  You changed

5  your hair.  Because she had like sliced her bangs and dyed it

6  with green hemp, you know, and that is not the way she had

7  appeared first interview when she was progressing through the

8  interview process.

9  **Q.**  Was she successful in getting that job?

10 **A.**  No, no, no.

11 **Q.**  You wrote that you were in fear of your daughter's life.

12 How concerned were you about Cheryle at this point?

13 **A.**  I meant that.  I mean, I meant that.  To me, life and

14 death situation.  Not only did I not know like what --

15 you know, if she would -- if her heart could handle what she

16 was taking, that many stimulants, putting herself in reckless

17 situations.  I didn't know what was going on, and so, yeah.  It

18 was a -- it just -- it's something that I wouldn't wish on any

19 parent or anybody that has a loved one.

20 **Q.**  Did you hear back from Les Tsang or Shannon Wozniak?

21 **A.**  I did not hear back from them.

22      **MS. GREEN:**  The Government moves to admit Exhibit 472,

23 Your Honor.

24      **THE COURT:**  472 admitted.

25      (Trial Exhibit 472 received in evidence.)

1    **MS. GREEN:**  Can we zoom in on the text section,

2    Ms. Braga, just to make that a bit bigger.  Okay.

3    **BY MS. GREEN:**

4    **Q.**   Okay.  So we see your same LinkedIn message copied at the

5    below here.  I'm not going to read that again.

6        But on November 21st, 2021, did an individual called

7    Michelle Nam from Done First respond to you?

8    **A.**   Yes.

9    **Q.**   And who was Ms. Nam, according to this message?

10   **A.**   The Done general counsel.

11   **Q.**   You know, we see some text in the second line (as read):

12           "We can neither confirm nor deny that your

13       daughter is a patient," and then some text below that

14       about Done -- "the health and safety of our patients

15       is the highest priority," et cetera.

16       Did this message from Ms. Nam relieve your concerns at

17   all?

18   **A.**   No.

19   **Q.**   Why not?

20   **A.**   Because it says really nothing; right?  Even that it --

21   just she was redirecting me or -- you know, to reach back out

22   to her even though she couldn't say -- share anything with me.

23       I felt like it was just a very canned response for any

24   complaint or whatever she would have gotten to brush it off.

25           **MS. GREEN:**  Okay.  And the Government moves to admit

1    Exhibit 450, please, Your Honor.

2              THE COURT:  4?

3              MS. GREEN:  450.

4              THE COURT:  450 admitted.

5         (Trial Exhibit 450 received in evidence.)

6              MS. GREEN:  Thank you, Ms. Braga.

7    BY MS. GREEN:

8    Q.   Did you send another message to Done on November 27th,

9    2021?

10   A.   Yes.

11             MS. GREEN:  And let's just zoom in on the "to" line

12   here:  Done Care Team jane@donefirst.com.

13   BY MS. GREEN:

14   Q.   How did you find out how to -- well, how did you determine

15   who to send this message to?

16   A.   I think that I sent quite a few messages.  I think that I

17   was going onto just the Done site where you don't e-mail;

18   right?  And they just e-mail you back.

19        So I think I -- I believe I sent many messages, but

20   somehow I found this to be one on the Done care team.

21   Q.   Okay.  And the text is small, so I'll just read that out

22   for the jury.  You write (as read):

23             "Before treating Cheryle-Lane Cooke" -- and her

24        date of birth -- "be advised that she needs help, as

25        she is suffering from Adderall psychosis and it is in

1  a life-threatening state, and that should be the

2  objective when speaking to her.  Please contact your

3  (Done's) general counsel prior to communicating with

4  Cheryle Cooke per earlier messaging."

5  Why did you send this message, Ms. Cooke?

6 **A.** To get attention.  I think I -- well, I think that's been

7 my thing, clinician attention.  Just I didn't have a lot of

8 confidence that maybe that message -- that those messages I had

9 sent were even thought about or went downstream, so I wanted to

10 get a message to anybody that maybe her file would be flagged

11 or her -- whatever the case is, and that I thought that it

12 would add a little bit of weight if I said, listen, you need to

13 reach out to your counsel -- you need to reach out to counsel.

14 That's always -- you know, like for me in my business, that

15 would a red flag, you know, to take heed and do something?

16  So, again, it was clinician attention to our -- to all

17 those desperate pleas I already made.

18 **Q.** And were you trying to bring, you know, yet again, more

19 awareness to your daughter's condition?

20 **A.** Hundred percent.

21 **Q.** Did you get a response to this message?

22 **A.** I think whether it was this message or one of the many

23 that I had written, I think I received a message that "your

24 message has been received."

25 **Q.** And that was it?

1  **A.**    That was it, yeah.

2  **Q.**    And I think you've mentioned this a few times now, but

3  we've looked at some messages.  Do you believe you sent more

4  messages than what we've just been looking at?

5  **A.**    I do.  I feel like I was hammering that customer care

6  website throughout, but especially when things were so bad.

7  **Q.**    You mentioned you were sending those through like the Done

8  website?

9  **A.**    Correct.

10  **Q.**    Do you have access to those messages after you sent them?

11  **A.**    No, because it's on their site.

12  **Q.**    Okay.  How many messages, approximately, do you think you

13  sent, if you can remember?

14  **A.**    I can't remember, but, you know, I was on a mission.

15  **Q.**    Okay.  Did Cheryle return to the hospital around

16  November 30th, 2021?

17  **A.**    She did.

18  **Q.**    Did you also go to the hospital?

19  **A.**    I did -- I did.

20      **MS. GREEN:**  Ms. Braga, can we show Exhibit 2484, which

21  has already been admitted, and focus on page 3, bottom

22  paragraph, History of Present Illness, please.

23  **BY MS. GREEN:**

24  **Q.**    Here it says (as read):

25      "She has a documented history of anxiety, DO,

1    ADHD, stimulant dependence, Rx Adderall.  She was

2    brought to the ER initially as a voluntary patient

3    following an altercation in which patient maced her

4    mother.  Patient has allegedly been abusing her

5    prescribed Adderall.  Patient has a documented

6    history of doing so.  The argument was over money

7    issues, as mother helps support patient financially,

8    as well as concerns about Adderall use."

9    Ms. Cooke what circumstances had led up to this hospital

10   visit?

11   **A.**   I was with Cheryle, and we -- I convinced her to go for a

12   walk outside with the pup, you know, just right outside her

13   apartment.  And while we got out there, I was carrying,

14   you know, like I have a small wallet that has my keys, like my

15   car keys.  It had an armband on it.

16   And she wanted to take my car and grabbed my wallet and

17   car -- you know, grabbed my wallet with the -- or tried to grab

18   my wallet with the car keys, and I wasn't letting it go because

19   I didn't want her to take my car or to have access to money.

20   And so she maced me.

21   **Q.**   Had she been asking you for money?

22   **A.**   Yeah.

23   **Q.**   Had you been willing to give her money at that time?

24   **A.**   I was doing everything but giving money, because she would

25   had to pay for Done and going to get prescriptions.  So at that

1   point, I stopped just giving money, but I did buy groceries

2   and, you know, anything she needed.  But I had not been giving

3   her cash because I was trying to avoid her getting, you know,

4   prescriptions, because they cost money and whatever the case

5   was.

6   Q.   And on this occasion, were you actually taking her to the

7   grocery store to get food?

8   A.   Maybe at that time -- yeah.  I mean, we were going for a

9   walk, and so that -- yeah, that probably -- that sounds right

10   that I would have been taking her.  I did take her.  Well, I

11   didn't take her because she maced me.

12   Q.   Mm-hmm.

13   A.   Which -- well, you didn't ask.  I mean, that was --

14   Q.   Concerning?

15   A.   Yeah.  I mean, you know, it was her, you know, my baby

16   doing that.  Like she was just not okay.

17   Q.   Mm-hmm.

18        And just looking at the top of page 3, it says (as read):

19             "Patient using stimulants and behaviorally

20        dysregulated in the community."

21        "Dysregulated in the community" -- is that something that

22   you had observed?

23   A.   Yes.

24   Q.   Could you give an example?

25   A.   Asheville is a very walkable, very kind of forgiving,

1  welcoming city, so -- but dysregulated in the community in

2  particular would have been around like her landlord who,

3  you know, owned the building, and her neighbors, and then just,

4  you know, her communicating with us about going out.

5       And I do remember she -- on Thanksgiving, the night before

6  Thanksgiving, they had booths where people would pick up their

7  turkeys, right, or restaurants, and she said she remembered

8  that they just looked at her like she was crazy and that --

9  then -- anyway, yeah.

10      I mean, in the community she would have been somebody

11 that -- or she was somebody that everybody -- like her

12 neighbors were concerned.  People that knew us.  Strangers.

13 The police had been called.

14 **Q.**  And some were public behaviors, just taking this example

15 of fighting with you in the street and macing?

16 **A.**  Yeah.  They -- I mean, somebody called the police because

17 she maced me, and -- yeah.

18      And other -- and there were other circumstances.  Like one

19 time in there she had, I think, like threw -- I had taken her

20 food and she had thrown her food all over me, and somebody

21 called the police that time.

22      But they just -- the police kind of stopped responding to

23 her apartment complex because there were a lot of calls from

24 concerned people, not to have her, you know, jailed, but

25 because -- to get her help.

COOKE - DIRECT / GREEN

1   Q.   And had you ever had a strained relationship with Cheryle

2   prior to this decline in 2021?

3   A.   No, I don't have a -- even then, even as bad as it was, I

4   don't think it was -- it was obviously strained, but I was

5   still -- that's still my daughter that I'm trying to help.

6   Q.   And during this time frame in the fall of '21, were you

7   continuing to visit with her?

8   A.   Yeah, the visits became a little bit less about --

9   you know, they weren't fun visits; they were more welfare

10  checks.  Like how is she going to be today, and bringing her

11  food, and leaving things outside.  And that's when neighbors

12  would come out and talk to me, like how she's doing and things

13  like that?

14       So I was -- yeah, daily I was checking on her.  And some

15  days we would walk the dog or we would do something, and some

16  days she wanted absolutely nothing to do with me.

17  Q.   Okay.  Did Cheryle also wreck her car a couple of days

18  before this hospital visit?

19  A.   She did.

20  Q.   And also on this hospital visit, was this at the time

21  where you had observed the henna-dyed hands and the green hair

22  dye?

23  A.   Yeah.  She had continued like making, you know, changes,

24  and so I -- yeah, she had dye on her hands.  She had dye all

25  over her apartment.  And it was green, because it was supposed

COOKE - DIRECT / GREEN

1  to be brown, but it's henna, I guess.  I don't -- I haven't

2  used henna.

3  Q.   And looking at page 7 of these records, did they test her

4  urine and find that she was positive for amphetamine,

5  cannabinoids, and methamphetamine?

6  A.   I haven't seen these.

7        MS. GREEN:  Looking at page 11, please, Ms. Braga.

8  Just the top discharge disposition.

9  BY MS. GREEN:

10 Q.   It says there (as read):

11        "Risks, chronic Adderall use with

12     substance-induced psychosis.  Maced and attempted to

13     rob mother of cash yesterday.  Unwilling to avail

14     self of voluntary substance abuse treatment.

15     Strengths:  Supportive mother providing patient with

16     groceries, past financial support, outpatient

17     therapist."

18     Do you see that?

19 A.   Yeah.  Oh, I'm sorry.  Yeah.

20 Q.   No worries.

21        MS. GREEN:  Let's go to page 22, please.  Focusing on

22  the recommendations.

23 BY MS. GREEN:

24 Q.   Does it say here (as read):

25        "When patient is actively using stimulants or

COOKE - DIRECT / GREEN

1           withdrawing from stimulants, she exhibits psychotic

2           symptoms which resolve when she is not acutely

3           intoxicated.  her stimulant use disorder is causing

4           major disruptions in her life, and she would likely

5           benefit from voluntary substance abuse treatment, to

6           which she will not presently consent."

7           Do you see that?

8    A.    I do.

9    Q.    Okay.  And looking at page 52, please in the diagnosis

10   section.  Did the hospital diagnose Cheryle with ADHD?

11   A.    No.

12   Q.    Did they prescribe her stimulants?

13   A.    Absolutely not.

14   Q.    Do you know whether in this time frame, in the fall of

15   2021 and through this date, did you observe that Cheryle was

16   still obtaining stimulant prescriptions from Done?

17   A.    Yes.

18   Q.    What was your reaction to that?

19   A.    My reaction to that was like severe -- like I was

20   disappointed.  I was helpless.  I felt helpless, like after all

21   the things that, you know, we -- I tried to reach out and at

22   least, you know, that maybe they would -- you know, that they

23   would do better, I felt --

24         And, you know, obviously angry.  But mostly at that time,

25   just helpless.

1    **Q.**   Helpless.

2            **MS. GREEN:**   The Government moves to admit Exhibit 487.

3    **BY MS. GREEN:**

4    **Q.**   Did you, after this second hospital visit, again try to

5    reach out to Done?

6    **A.**   I'm sure, yeah.

7            **MS. GREEN:**   Could we show Exhibit 487, please.

8            **THE COURT:**   487 admitted.

9        (Trial Exhibit 487 received in evidence.)

10           **MS. GREEN:**   Thank you.

11       And if we can just zoom in on the top half of the page,

12   Ms. Braga.

13   **BY MS. GREEN:**

14   **Q.**   So this is a Facebook comment sent on December 17th, 2021.

15   It's a bit cut off, but you write (as read):

16           "Protect your loved ones.  Adderall is highly

17       addic" -- and then it cuts off.

18       Why did you write this message to Done?

19   **A.**   I think to get more -- to try another way to get Done's

20   attention, right, because now it was social media.  You know,

21   my name is on there, so -- and also because -- to help others.

22   To help others that -- yeah.  I don't know that, you know, it

23   is widely -- I had researched so much and I had lived so much,

24   and I knew that Cheryle couldn't have been the only person.  I

25   know that for sure.

1  So to warn others and to help others and to get awareness

2  and maybe one last shot of maybe Done maybe doing the right

3  thing for Cheryle.

4  **Q.**  And the message is cut off.  Do you still have the full

5  message?

6  **A.**  I don't because I wrote it on their site, I think, not my

7  site.

8  **Q.**  And what had you learned at the hospital about stimulants

9  that also caused you to write this message?

10  **A.**  Well, if -- you know, if stimulants -- you know, it

11  causes --

12  **Q.**  I'll correct my question.  I didn't mean generally.

13  I meant stimulants with respect to Cheryle and whether she

14  should be taking them or not taking them.

15  **A.**  Oh.  Well, I mean, over and over and over again,

16  you know -- and, again, I can hear it from them:  Like stop

17  taking Adderall.  Or like when she would say, what's wrong with

18  me?  You've taken too much Adderall.

19  But it was clear that what she -- the state she was in was

20  not going to just go away, and she needed to stop taking

21  Adderall.

22  **Q.**  What happened to Cheryle in December 2021?

23  **A.**  She voluntarily went back into a in-patient treatment

24  center.

25  **Q.**  Do you know for approximately how long she was there?

1    **A.**   I think for that treatment center it was a 90-day program,

2    and then, you know, afterwards, she would do follow-up.   But

3    was a 90-day successfully completed program.

4    **Q.**   And did you visit her when she was there?

5    **A.**   Yeah.

6    **Q.**   Did you observe what -- did you have a chance to observe

7    what the treatment center had prescribed?

8    **A.**   Yeah.

9    **Q.**   Had they prescribed her any stimulants for ADHD?

10   **A.**   No.  She was in detox from stimulants to start with.

11   **Q.**   Do you know whether Done continued to prescribe Cheryle

12   stimulants from December through into 2022?

13   **A.**   I -- I don't.

14   **Q.**   Okay.

15       Ultimately you reached out to Done at least four separate

16   occasions that we've looked at today to give them information

17   about your daughter.

18       Why did you keep persisting in trying to reach out to

19   Done?

20   **A.**   So they would do better.  So they would stop.  So for

21   awareness that they had a patient that was in a critical,

22   critical state, and to ask them to work with her and to with --

23   with the other professionals that we were seeing that they

24   didn't have visibility into to help -- you know, to help her.

25   To do better.  To help her.  To know what was going on.

COOKE - DIRECT / GREEN

1    Q.    And how reassured were you by what you had seen from

2    Done's response, if anything?

3    A.    I was 0 percent reassured.

4    Q.    And the fact that Done had continued to prescribe Cheryle

5    stimulants to the period that you had testified to today

6    through 2021, what was your reaction to that, despite, you

7    know, your outreach?

8    A.    Just I -- wild disappointment, because these are people or

9    this is a place of --

10    My daughter has serious mental health issues, and they --

11    are on the site saying that we help with, you know, psychiatric

12    challenges or issues, and that was not what happened.

13    So I think they did her a huge disservice, and a lot of it

14    could have been avoided.

15    Q.    You said earlier that it was hard for you to be here

16    today.  How concerned were you about Done practices such that

17    you agreed to be here today?

18         MS. BELL:  Objection, Your Honor, 403.

19         THE COURT:  I'll permit it.

20    BY MS. GREEN:

21    Q.    You may answer.

22    A.    Can you repeat it?  I'm sorry.  I'm distracted.

23    Q.    When you started today, you said it was hard for you to be

24    here today testifying.

25    How concerned were you about Done's practices such that

1    you did agree to be here taw?

2    **A.**    Yeah, I was wildly concerned.  Yeah, this was not easy to

3    be here.  I didn't sign up for this.

4        But it was important.  It was important that what happened

5    to my -- it was important for my daughter, but it's equally as

6    important to bring awareness to, you know, hopefully help

7    things get better.

8            **MS. GREEN:**  One moment, Your Honor.

9        Thank you.

10            **THE COURT:**  Cross?

11        **MS. BELL:**  Yes, Your Honor.

12    Your Honor, would the Court like us to take our break, our

13    lunch break now?

14            **THE COURT:**  How long will you be?

15        **MS. BELL:**  I think an hour or so.

16            **THE COURT:**  Oh.  Yeah, okay.

17        Ladies and gentlemen, we'll take our noon recess.  We will

18    return at a quarter of one.

19        Remember the admonition given to you:  Don't discuss the

20    case, allow anyone to discuss it with you, form or express any

21    opinion.

22                (The jury leaves the courtroom.)

23        (Proceedings were heard out of the presence of the jury.)

24                (Recess taken at 12:04 p.m.)

25                (Proceedings resumed at 12:52 p.m.)

1     (Proceedings were heard out of the presence of the jury.)

2          **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

3   session.

4       You may be seated.

5          **THE COURT:**  I think we can talk about this note during

6   the recess.

7          **MR. FOSTER:**  Yes.

8          **MS. BELL:**  Yes, Your Honor.

9          **THE COURT:**  Bring in the jury.

10                  (Pause in proceedings.)

11         **THE COURTROOM DEPUTY:**  Please rise for the jury.

12                 (The jury enters the courtroom.)

13      (Proceedings were heard in the presence of the jury.)

14         **THE COURT:**  Okay.  Let the record reflect all jurors

15  are present, parties are present.

16      You may proceed.

17         **MS. BELL:**  Thank you, Your Honor.

18                      <u>**CROSS-EXAMINATION**</u>

19         **MS. BELL:**  Good afternoon, everyone.

20  BY MS. BELL:

21  Q.   Good afternoon, Ms. Cooke.

22  A.   Good afternoon.

23  Q.   Ms. Cooke, thankfully, today your daughter Cheryle is

24  doing very well; correct?

25  A.   Thank you.  She -- yeah, she's living independently as an

1    adult.

2    **Q.**   And she's her amazing, wonderful self today; right?

3    **A.**   She's doing her best, yes.

4    **Q.**   Do you recall meeting with the Government and telling them

5    that today, thankfully, she's her amazing, wonderful self?

6    **A.**   I certainly could have said that, yes.

7    **Q.**   Okay.  So you don't dispute you told the Government that

8    when you met with them?

9    **A.**   No.

10   **Q.**   Okay.  And as you said, she's an adult; right?

11   **A.**   Correct.

12   **Q.**   And she was 24 years old at the time of her treatment at

13   Done; right?

14   **A.**   Yes.

15   **Q.**   Okay.  And she lives in Florida today?

16   **A.**   She does.

17   **Q.**   She's an HR professional?

18   **A.**   She is.

19   **Q.**   She's passionate about supporting the workforce ecosystem

20   through HR compliance, onboarding, and client experience?

21   **A.**   It sounds like you're reading her LinkedIn profile, so if

22   that's what she has, yes.

23   **Q.**   Okay.

24        And, in fact, she has two different positions today with

25   two different companies; right?

COOKE - CROSS / BELL

1   **A.**   Correct.

2   **Q.**   Including a company called MBO Partners?

3   **A.**   Correct.

4   **Q.**   And at that company, in an HR role, she supports

5   enrollment compliance?

6   **A.**   Correct.

7   **Q.**   Background checks?

8   **A.**   Correct.

9   **Q.**   Audits?

10  **A.**   I don't have her full job description, so -- but that's

11  what she does, yes.

12  **Q.**   Okay.  Now, to your knowledge, the Government has not even

13  tried to speak with your adult daughter about her experience

14  getting treatment through Done; is that correct?

15          **MS. GREEN:**  Objection, foundation.

16          **THE COURT:**  Okay.  Lay a foundation.

17  BY MS. BELL:

18  **Q.**   Well, it seems that you're very close with your daughter;

19  is that correct?

20  **A.**   I'm close with my daughter, yes.

21  **Q.**   And you have been in close contact about her experiences;

22  correct?

23  **A.**   Yeah.  Yes, in general, yes.

24  **Q.**   And to your knowledge, do you have any knowledge that the

25  Government has reached out to her to speak with her about her

 1    experience on the Done telehealth platform?

 2           MS. GREEN:  Same objection.

 3           THE COURT:  Well, sustained.

 4           MS. BELL:  With further foundation or shall I move on,

 5    Your Honor?

 6           THE COURT:  No, because it's calling for hearsay.

 7           MS. BELL:  Very well.

 8           THE COURT:  And there's no exception.  There's no

 9    exception to the hearsay rule.  You're calling for hearsay:

10    What is it that her daughter said.  Unless she has personal

11    experience, and you have no basis for that, so I think you

12    should move on.

13           MS. BELL:  Very well.

14    BY MS. BELL:

15    Q.    So you've shared your perspective on your daughter's

16    treatment; correct?

17    A.    Yeah, for the time frame of Done, yes, I did, yup.

18    Q.    And now, today, your daughter is doing well, as we

19    discussed, thankfully, despite the fact that she has a chronic

20    condition with no linear pathway; right?

21           MS. GREEN:  Objection, vague.

22           THE WITNESS:  Yeah.  I don't know -- I don't

23    understand like the -- you know, what I was here to talk about

24    it Cheryle's time frame that we were discussing with Done and

25    for her own personal -- so I don't understand the question or

COOKE - CROSS / BELL

1   what I -- what you're asking me to agree or disagree with.

2   **BY MS. BELL:**

3   **Q.**   Let me clarify.

4       She has current diagnoses of ADHD as well as bipolar

5   disorder; correct?

6   **A.**   I don't have -- in her diagnosis from the treatment

7   centers that she's been treated at, the primary diagnosis,

8   which would trump anything else, is bipolar I.

9       But, again, this predates -- this is post-date of Done,

10  the window of the conversation that we're having here, and so

11  for her -- her own personal HIPAA rights or any of those

12  things, I'm -- you know, I'm not really at a place that I want

13  to discuss whether her current diagnoses are that weren't at

14  that time.

15  **Q.**   So am I correct that she has a current diagnosis --

16          **THE COURT:**   Well, I think as to her present condition,

17  I'm going to require a discussion outside the presence of the

18  jury to make a determination as to whether it's relevant or

19  whether it's admissible.   I'm not arguing --

20          **MS. BELL:**   I will certainly make the connection --

21          **THE COURT:**   Okay.   So let's move on.   Any questions

22  about her present situation I think will be the subject of a

23  discussion outside the presence of the jury.   Okay?

24          **MS. BELL:**   Yes.   Thank you, Your Honor.

25  \\\

 1    BY MS. BELL:

 2    Q.    So in terms of the no linear pathway --

 3              THE COURT:  I thought she said -- she didn't answer

 4    that question.  I don't know what "linear pathway" means.  I

 5    don't know that she can testify as to linear pathways.

 6              MS. BELL:  I believe those are her words, Your Honor,

 7    but if we could take this up -- and perhaps we should have a

 8    break and we can discuss this, or a sidebar.

 9              THE COURT:  Well, we certainly can, but are there

10    other subjects?

11              MS. BELL:  There are, Your Honor, but this is

12    important to frame the conversation.

13              THE COURT:  Okay.

14        Ladies and gentlemen, we will take a ten-minute recess,

15    and I'll discuss it with the client -- with the parties.

16                    (The jury leaves the courtroom.)

17      (Proceedings were heard out of the presence of the jury.)

18              THE COURT:  Okay.  Let the record reflect the jury has

19    left.

20        Yes, Counsel.

21              MS. BELL:  Your Honor, may we excuse the witness for

22    the discussion?

23              THE COURT:  Yes.  You can step outside.

24              THE WITNESS:  Okay.  Just go that way?

25              THE COURT:  Right.

1          (The witness steps down and leaves the courtroom.)

2          **THE COURT:**  Ms. Bell.

3          **MS. BELL:**  So, Your Honor, much of the thrust of the

4    direct testimony, the direct examination and the testimony

5    elicited was about her symptoms including, her psychosis and

6    her paranoia.

7          Shortly after --

8          **THE COURT:**  You mean in '20 -- '19, '20, 2021?

9          **MS. GREEN:**  In the time period leading up to her Done

10   treatment and while -- during her Done treatment, correct,

11   Your Honor.  So information that would have been relevant to a

12   treating practitioner at Done, what she was suffering from at

13   that time.

14         **MS. BELL:**  And, Your Honor, if I may.

15         So she is on the Done platform through the end of May of

16   2022.  In August of 2022, she has a psychotic episode that

17   makes the news, where she is arrested.  She is -- she actually,

18   you know, is driving down -- the wrong way down a -- down the

19   highway.  She has an accident.  There's a whole series of

20   events that's very dramatic.  It makes the news, leads to her

21   arrest.

22         She's evaluated, and they determine at that point that she

23   has bipolar disorder.  This was a subject of the Government's

24   interviews starting from their --

25         **THE COURT:**  I don't care about that.

1          MS. BELL:  Very well.  In any event --

2          (Reporter interruption for clarity of the record.)

3          MS. BELL:  Sorry.

4      The reason why it's relevant, of course, is because there

5   is an alternative explanation for the psychosis and the

6   paranoia, not the Adderall; right?  The entire thrust of the

7   testimony was she is behaving in this fashion, and Done is

8   super dangerous, and this is the fault of the Adderall.  And,

9   in fact, multiple doctors missed this, including the in-patient

10  treatment facility where she was -- where she was attending

11  from December through April, and upon her release from that

12  facility, she had this incident, and it was discovered.

13      So it's directly relevant to the impression that the

14  Government has left with the jury that Adderall, indeed, was

15  the cause of the psychosis.

16      The second reason why --

17          THE COURT:  So let's take that one first.  Then we'll

18  get to the second one.

19      As to that one, it is not the Government's -- my

20  understanding of the Government's questioning was not that

21  Adderall caused all this behavior.  The question was:  When a

22  person is taking Adderall and has these symptoms, is it

23  appropriate to continue with the treatment of Adderall?

24      It's not that Adderall was the cause.  We've had a lot of

25  testimony about comorbidities, and the question is -- and there

1    may be some expert testimony on this subject.  The question is:

2    Is it appropriate to continue with the prescription of

3    Adderall?

4         That's one question.  There are two questions.

5         -- when a person has a comorbidity.  They -- we're not

6    suggesting that Adderall caused it.

7         Number two is:  What was her behavior -- what did her

8    behavior look like?  Not what caused it.  What did her behavior

9    look like to a physician or a provider during this period of

10   time?

11             MS. BELL:  Yes, Your Honor.  And precisely to that --

12             THE COURT:  And regardless -- regardless of the cause.

13             MS. BELL:  And precisely to point, Your Honor, bipolar

14   disorder causes large fluctuations in a person's mood and

15   presentation; right?  And we heard the witness testify that,

16   for example, she was in this -- the mother thought was a

17   psychotic state, and then she goes to the hospital; they don't

18   catch it there.  And what I will -- I will establish what

19   happened they hospital, which we didn't get into, but

20   effectively she's released within, you know, an hour.

21        And the issue with bipolar disorder is you can present

22   quite fine in one moment and not fine in another moment.  And

23   so that is a very important part of the -- in fact, that's the

24   crux of the entire cross-examination is to demonstrate that

25   there are two sides of the presentation.  Both things can be

 1   true at once, which is very much consistent with a bipolar --

 2   bipolar disorder and would be inconsistent with the

 3   Adderall-induced psychosis.

 4       So even the mother said she got through, for example, two

 5   rounds of a job interview.  She was -- did great in the first

 6   round, not -- great in the second round, and in the third

 7   round, she didn't get the job; and she attributed that to the

 8   Adderall.

 9       Well, there's another much more --

10           THE COURT:  I don't think so.

11           MS. GREEN:  Correct, Your Honor.

12           THE COURT:  That's not what I heard.

13           MS. BELL:  Well, in any event, Your Honor, it's a

14   critical part of the equation.  It's absolutely --

15           THE COURT:  It may be.  It may be a critical part.

16   But -- though I don't know whether it is or not.

17       But clearly, you would be -- if it is a critical part, I

18   think you'd be entitled to adduce testimony on -- in that

19   regard.

20       However, the question is you want to question the witness

21   about subsequent examinations or diagnoses or behavior

22   subsequent to the time that -- that Done treated the witness.

23           MS. BELL:  Your Honor, it's -- it's immediately after

24   she leaves Done, she gets this diagnosis, and it was missed by

25   multiple doctors, but it explains everything.  It's absolutely

 1   critical.  I cannot do my job without getting to question this

 2   witness about this.  This is such an important part of the

 3   psychiatric condition of this young woman and what is -- and

 4   what is happening --

 5           THE COURT:  And how is she able to give that

 6   diagnosis?  How is she able to testify?

 7           MS. BELL:  How is the mother?

 8           THE COURT:  Yeah.

 9           MS. BELL:  First of all, the mother was questioned all

10   about this by the Government --

11           THE COURT:  Well, that doesn't -- because a witness

12   hears X, Y, or Z, or because a witness is questioned doesn't

13   make it then admissible.

14      The question is:  Under the rules of evidence, I want you

15   to tell me how you can ask questions of this witness as to

16   diagnoses or that were -- you could ask about behavior, I

17   think, but you're now asking her what, as I understand it,

18   diagnoses that occurred subsequent to that date.  I don't know

19   that you can ask that kind of question because it seems to me

20   that calls for hearsay.

21           MS. BELL:  Your Honor, we filed a motion in limine

22   making that exact argument about the entire testimony that the

23   Government elicited.  Our whole point in our motion in limine

24   was that a family member -- that the whole thing was hearsay.

25   To have a family member testify about her children's diagnoses

1    was improper.  And the Court overruled that and did limit the

2    scope but overruled -- overruled that objection.

3         THE COURT:  She's not testifying to a diagnosis; she's

4    testifying as to conduct.

5         MS. BELL:  Your Honor, she --

6         THE COURT:  You want to ask her questions about a

7    diagnosis given by a third party.

8         MS. BELL:  Your Honor, we heard that on direct.  The

9    whole tenor was she wasn't diagnosed as a child.  She wasn't

10   diagnosed at Willow.  She wasn't diagnosed at the other

11   in-patient facility.  She wasn't diagnosed at the university.

12       She was diagnosed at Done.  She was -- at the hospital,

13   they diagnosed her with this and that.

14       She testified -- her direct examination was replete with

15   testimony about her diagnoses, and the fact of the matter is

16   she has personal knowledge of these events.  She knows her

17   daughter.  She just said so.  She doesn't want to talk about

18   it, but she knows about the incident.  She was there --

19        THE COURT:  Personal knowledge is not the test.  The

20   test is whether or not she can testify as -- because this is

21   what I understand you offering.  You are basically offering

22   this witness to tell the jury about a diagnosis that occurred

23   subsequent to her treatment by Done.  Okay.  That's -- that's

24   what you're offering her for.

25        Now the question is:  Can she testify?  Is that admissible

1    evidence?

2        I don't know that it is.  That's what I'm saying.  Is

3    there some evidence code you have that would then permit it

4    into evidence?

5        MS. BELL:  Well, Your Honor, I think that given that

6    the Government has done the same thing, we should be

7    permitted --

8        THE COURT:  On that basis, denied.

9        Now, do you have a -- there's no such thing as Evidence

10   Code Number X says, "If the Government says it, I can do it."

11   That's not a -- that's not an admissibility principle that at

12   least I accept, and I've never heard of a court accepting that.

13       There are things like opening doors and so forth.  That's

14   a different issue.

15       Now, the question is if -- there are a lot of different

16   ways you can get diagnoses in, but this isn't one of them is

17   what I'm saying.

18       MS. BELL:  So I believe that -- and this, I don't know

19   the answer to.  But when her daughter had this psychotic

20   episode, I believe she was arrested, and the mother was the one

21   who took her for an evaluation.  I don't know whether the

22   mother was present, but it seems like we've heard a lot of

23   testimony on direct that the mother was present during the

24   hospital visit.  The mother had in the past --

25       THE COURT:  "She is present" isn't a justification for

 1    admissibility.  It's not like, oh, the witness heard it

 2    herself.  If, for example, Dr. X came to her and said, your

 3    daughter has bipolar.  She says -- so a doctor is telling her

 4    that.  Is that admissible?  I don't think it is, because it's

 5    being introduced --

 6        You see, it's being introduced for the truth of the

 7    matter.  That's what you're doing.  You're introducing --

 8        So if it's introduced, it's hearsay.  If it's being

 9    introduced for the truth of the matter, just show me the code

10    section that allows it in, because I don't think it does.

11            MS. BELL:  Well, let me say this as well, Your Honor.

12    I do think it goes to state of mind also, because the point is

13    she has -- back at the time that she had all of these feelings

14    about Done, she believed that Adderall was causing her

15    daughter's psychosis, which is what she reported to Done.

16    However, she did not know at the time, because every single

17    doctor that has treated this child up until that date had

18    missed the fact that she has bipolar disorder.

19            THE COURT:  Okay.  So now you say it does go to her

20    state of mind or present --

21        First of all, the state of mind that's relevant in the

22    testimony elicited by the Government is the state of mind

23    during the period of time that she was treated by Done.  That

24    was her state of mind.  It went -- either it was admissible

25    because there were whole hospital records indicating -- which

1   were received in evidence which is an exception to the hearsay

2   rule which allows it in, or it was admissible for her state of

3   mind; that is, it wasn't hearsay.  It came in because it was

4   not introduced for the truth of the matter.  That's Number 1.

5        Number 2, her state of mind -- her state of mind post --

6            MS. GREEN:  Done.

7            THE COURT:  -- post-Done, I don't understand to be

8   relevant.  I don't understand how it's relevant.

9            MS. BELL:  Well, I believe it goes to -- she's

10  testifying now; right?  And so if she has a different

11  perception, which I think she should, frankly.  So she's

12  blaming Done.  She's given highly inflammatory testimony, Your

13  Honor, about Done being dangerous, and she's not happy to be

14  here.  She's going essentially to -- beyond her daughter to

15  warn others out there.  And we really need to get to the bottom

16  of this and to refute and do our job --

17           THE COURT:  I don't know what it means to get to the

18  bottom of something.  That's another nonlegal term.  You don't

19  get to the bottom of things.  We've got months of testimony

20  that we're going to get to the bottom of.

21       Now, the question is:  Can this witness testify as to

22  diagnoses that she observed or heard?

23       And I don't believe -- I believe the answer is "no" unless

24  you can show me some code section that permits it.

25           MS. BELL:  Your Honor, so --

1          THE COURT:  Yes.

2          MS. BELL:  -- respectfully, I understand --

3          THE COURT:  It's okay.

4          MS. BELL:  -- the Court's position on this.  This was

5    the exact argument we made to the Court in our motion in

6    limine, which was overruled, and the Government was able to

7    elicit all of this testimony about what -- whether she did or

8    did not have ADHD throughout her life at various institutions

9    without putting in medical records.

10         So the Government has done it.  She has personal knowledge

11   of this.  And in fairness, Your Honor, I think we should be

12   entitled to the same -- the same treatment as to the ADHD -- as

13   to the bipolar, since these are two coexisting current

14   diagnoses, and the bipolar disorder, we will later establish

15   through our medical expert, could have been and was, in fact,

16   the cause --

17         THE COURT:  Then you do it through your medical expert

18   through competent evidence --

19         MS. BELL:  But, Your Honor, if I may, it also

20   impeaches her testimony.  I mean, it does.

21         So she comes up and she says:  Look, I mean, this is

22   everything I saw.  This is everything I experienced.  It was

23   Adderall psychosis.

24         And, in fact, there is an alternate explanation.

25         And also, the testimony that her daughter -- she saw her

PROCEEDINGS

 1  daughter all the time and this is how her daughter looked and

 2  therefore anyone would have recognized this, including the Done

 3  professionals, is impeached by this medical condition, not

 4  ADHD.  This medical condition, bipolar, is a condition where

 5  people can be --

 6          **THE COURT:**  That may be true.

 7          **MS. BELL:**  -- perfectly fine one day --

 8          **THE COURT:**  Counsel, I'm not arguing with you as to

 9  the truth of the matter.  But that's the whole point, isn't it?

10  The truth of the matter.  And you can't introduce this

11  testimony for the truth of the matter through this particular

12  witness.  You can use it with an expert.

13      You know, you're planning a lot of witnesses.  You can

14  certainly -- and the Government's expert, if the Government is

15  going to testify as to this.

16          **MR. SCHACHTER:**  Your Honor, may I --

17          **THE COURT:**  And I obviously allow you to -- you know,

18  to demonstrate that -- the witness's child is living, she's

19  doing a productive thing and so forth, to disabuse the jury of

20  the fact that -- of an impression that maybe she died as a

21  result of it or that it did her in in some manner.

22      So that -- that, I thought, was entirely appropriate

23  cross, even though it -- it went into the present, because

24  it -- because it -- it impeached or it led further -- it

25  explained a set of circumstances.

 1          I understand you want to explain a set of circumstances,

 2     but you can't with this witness.  That's what I keep saying.

 3               MR. SCHACHTER:  Your Honor, may I --

 4               THE COURT:  Oh, sure.  Go right ahead.  It's a

 5     free-for-all.

 6               MR. SCHACHTER:  The last set of questions that the

 7     Government asked was:  This is very challenging for you.  Why

 8     are you here?

 9          And she says, I am here to -- I don't have the words

10     exactly, but effectively to send a message to Done so that

11     they'll change.

12          But, in fact, this witness knows that the episodes of

13     mania -- she may not have known at the time, but she knows now,

14     as she testified, that she's here to send a message, hopefully,

15     Done will change -- she knows that it's bipolar disorder that

16     waxes and wanes, that sometimes she is manic and sometimes

17     she's not.  She knows that that is -- now she knows that that

18     is the cause of what happened to her daughter, and it's not

19     Done.

20          And that is fair impeachment given the Government's last

21     question.

22               THE COURT:  Let me hear the response.

23               MS. GREEN:  Your Honor, I think the very first thing

24     you said when you started discussing this matter is entirely

25     appropriate.

 1          One, she did not say for the truth that Adderall caused

 2    this -- these episodes.  She was --

 3              **THE COURT:**  But they raised another point.

 4          **MS. GREEN:**  Yeah.

 5              **THE COURT:**  Answer that point.

 6          **MS. GREEN:**  That point --

 7              **THE COURT:**  They say -- their point, which I think is

 8    a valid point -- they're saying that when you ask the question,

 9    "Isn't it difficult for you to be here?  Why are you here?" and

10    she testified for all intents and purposes she's here with the

11    hope -- or sending a message that people who prescribe Adderall

12    should be very concerned about -- about the effects of it and

13    how to conduct it.

14          And it, of course -- it, of course, is based upon her

15    testimony of this completely bizarre, alarming behavior in

16    which she is seeing vampires and plots and so forth, that --

17    that they have a right to show, as it stands now, don't you

18    know, given your -- given your appearance in front of this jury

19    today, your state of mind today, that it wasn't the Adderall

20    that did it.  Or that there is another diagnosis.

21          I think from that point of view, it's appropriate.  I

22    don't know why it wouldn't be.

23              **MS. GREEN:**  Your Honor, she's -- first of all, what

24    she said at the end was to raise awareness.  And her point

25    was -- was the point that you were making.  She didn't say

 1    Adderall caused.  In fact, the beginning of the testimony was

 2    all about the severe anxiety that her daughter had and -- you

 3    know, what she was dealing with before Done.

 4        And it's the point that Your Honor made.  Her daughter has

 5    comorbidities, severe anxiety, like they want to say bipolar.

 6    But either way, the point of her testimony was that someone

 7    with severe comorbidities who's receiving stimulants, that that

 8    is a risky situation --

 9        **THE COURT:**  Then I think it's proper cross.  I think

10    it's proper cross to show that from her point of view, her

11    state of mind, she is aware, if she is -- and it's not coming

12    in for the truth of the matter.  That's where Ms. Bell and I

13    part ways, because she somehow thinks that she can explain it

14    if the other side does X, it could be Y, and that's -- there's

15    no such rule.

16        But it's not coming in for the truth, so I have to tell

17    the jury that it is not coming in for the truth, but this

18    witness was told X, and therefore, that would influence her

19    attitude towards this particular case.

20        I don't know which way it cuts.  I'm not saying --

21    because, as Ms. Green points out, it's a comorbidity.  And

22    you're not arguing it's not a comorbidity, and that's why she

23    wants to alert it.

24        However, in fairness to the Defense, I think that they

25    should be allowed to -- to ask this witness whether she was

1  aware of these various things.

2          MR. SCHACHTER:  Thank you, Your Honor.

3          THE COURT:  And they don't come in for the truth of

4  the matter; they simply come in for her state of mind.

5          MS. GREEN:  How is her state of mind, Your Honor,

6  after Done relevant?  Because we --

7          THE COURT:  Because she's testifying today.  So a

8  witness's state of mind today is always relevant.  It's

9  always -- you were the one who asked the question, Ms. Green.

10  You didn't have to ask the question about her attitudes today,

11  and then it would have been a little less murky.

12      But you introduced the topic, introducing -- and they

13  objected, and I overruled their objection.  And so you have to

14  live with it.  You decided to ask her that question.

15          MS. GREEN:  I believe they also already have

16  established on cross that she had bipolar.  The witness just

17  testified to it.  So I'm not sure how much --

18          THE COURT:  I'm going to allow it.

19      But I really do want to caution you, Ms. Bell.  Just don't

20  go into trying to bolster the opinion that she has or the

21  knowledge that she has with some documentation of medical

22  records or otherwise.  But you can do it -- try to do it in a

23  little sensitive way, in a way that will accommodate time and

24  so forth.  Okay?

25          MS. BELL:  Yes, Your Honor.

1           **THE COURT:**  Let's see.

2       Thank you.  Bring the witness in.  Bring the jury in.

3                   (The jury enters the courtroom.)

4       (Proceedings were heard in the presence of the jury.)

5           **THE COURT:**  Please be seated.

6       Let the record reflect all jurors are present, parties are

7    present.

8       You may proceed.

9           **MS. BELL:**  Thank you, Your Honor.

10                  <u>**CROSS-EXAMINATION**</u>

11   BY MS. BELL:

12   **Q.**   Now, Ms. Cooke, before our break we were talking about

13   your understanding that your daughter has been diagnosed with

14   ADHD as well as bipolar disorder; is that right?

15   **A.**   Yes.  I am under the understanding that Cheryle-Lane --

16   but this is post the time frame in which we were speaking about

17   the Done incident, which is really how it was framed up and for

18   my kind of agreement to be here in order to protect my

19   daughter's serious mental health illness, which I don't think

20   is everybody's business, to be honest.  That's -- you know, I

21   would think there was HIPAA around that.

22       But, yes, Cheryle-Lane is primarily diagnosed with

23   bipolar I and general anxiety disorder and PTSD.

24   **Q.**   And, in fact, she went into this in-patient treatment

25   plan, a program which you had mentioned, and that was in

1   December of 2021 through about spring of 2022; right?

2   A.   Yes, following the Done.  So she went in -- are you

3   talking about Done time frame --

4   Q.   No, you mentioned that -- sorry.

5        You mentioned that she had gone into an in-patient

6   treatment program in around December of 2021.

7        Do you recall that testimony?

8   A.   She went into The Willows.  Are you referring to The

9   Willows?

10  Q.   This was later.  This was during her time at Done, you

11  mentioned -- after the hospital in November --

12  A.   Right.

13  Q.   -- you mentioned she had gone into an in-patient --

14  A.   While she was in -- while she was -- after her experiences

15  with the severity in Asheville, she did go seek treatment, yes.

16  Q.   And they didn't catch the bipolar there; right?  To your

17  understanding?

18  A.   So, no.  "Catch" is a term that I kind of find offensive.

19       But, no, because she was there with such severe paranoia

20  and disillusionment that most of her focus was on bringing her

21  out of that; right.

22       And because it's difficult -- it was difficult for them to

23  determine that it was anything other than, you know, substance

24  abuse at that time.

25  Q.   And then what happened was in August of 2022, there was --

COOKE - CROSS / BELL

1   you have an understanding that there was an incident; right?

2   **A.**   Yes, there was an incident.

3   **Q.**   And based on your understanding, can you tell us what

4   happened in August of 2022?

5   **A.**   Well, again, I was here, hopefully, to talk about the time

6   frame that was under Done purview, and that was what my

7   agreement was when I talked to the Government and the state.

8       So, again, I would rather not, but if I have to, I will.

9   So do I have to?

10      **THE COURT:**  Well, I think you should answer.  The

11  reason we want to explore -- and the jury is entitled to

12  explore your present state of mind.  What is it that you know

13  now -- maybe you don't know it at the time.  What is it that

14  you know now about your daughter's condition that --

15      So I think you do have to answer the question.

16      **THE WITNESS:**  Okay.

17      So my daughter, as I said, I think before we broke,

18  definitely has -- you know, definitely she knew -- we didn't

19  know -- that there were -- well, we knew when the actions were

20  there.  But my daughter was continually seeking help because

21  she went from this, you know, on-track trajectory to be an

22  attorney, go away to college, and things were slipping for her.

23      So she was constantly trying to get help.  It's not

24  unusual -- even it's listed in DM-5, but I'm sure that you'll

25  have experts.  But as she's my daughter, I've done tons of

1  research about -- as you would if they have lupus or celiac or

2  whatever the case is.

3      So it's not uncommon that mental health providers would

4  not catch bipolar mainly because bipolar is episodic.  It's not

5  like you walk every day through being in a state of mania or

6  depression.  So it was very easy while she was at The Willows

7  for such an extended period of time or Red Mountain where

8  Cheryle -- well, number one, she's high-functioning anyway.

9  And by high-functioning it's -- I'm -- partly probably a

10 defense mechanism.

11     But she was not -- it wasn't caught because she wasn't

12 episodic, and she wasn't on stimulants.  And from a bipolar

13 perspective, adding Adderall or Vyvanse is like throwing

14 gasoline on a fire.

15 **BY MS. BELL:**

16 **Q.**   And so -- thank you for that explanation about it being

17 episodic and high-functioning and your daughter being

18 high-functioning.

19     Can you explain the episode, please, in August of 2022

20 that led to her being arrested and evaluated and ultimately

21 your discovery of the fact that she has now been diagnosed with

22 bipolar disorder?

23 **A.**   I will.

24     I -- you know, one of things too, I think about -- like

25 I'm not -- there's no shame in sharing that she has a serious

1    mental illness, but I do feel like this is victim blaming and

2    like, you know -- so I'm -- disheartened that we're going down

3    this path.

4         But my daughter was arrested, which are not two words you

5    would ever put together with her, and so we've had this like

6    six years of a run.  And so she, again, became very scared of

7    us and of that, but she was also taking Adderall at the time

8    when she was arrested.  She had a prescription for Adderall?

9         And I don't know that that was from Done.  It very well

10   could have been but I don't know that.

11        So she was in a very heightened manic situation, and we

12   were trying to get her help.  And we were at the hospital and

13   we were at -- it -- she's part of a very -- our system, while

14   there's well-meaning -- some well-meaning outlets and

15   facilities, it has not been our experiences that hospitals have

16   a lot of opportunity to help or law enforcement, for that

17   matter.

18        So we were in the process of -- she went to an emergency

19   room because she was, again, having symptoms of things being

20   out of control.  She did admit to taking Adderall.  And the

21   hospital let her go even though that they had Baker -- the

22   police had Baker Acted Cheryle because she was acting erratic.

23   She tried to jump off a bridge.  She jumped out of her father's

24   car and tried to jump off a bridge.  And so the police Baker

25   Acted her because they were very concerned for her life,

 1   safety, and safety of others.  They had to close the bridge

 2   down?

 3        But the hospital, instead of keeping her under psych

 4   evaluation, they sent her home with no purse, no phone, no

 5   shoes, and no way to get in contact with us.  So she was on the

 6   streets overnight in Jacksonville.  And I had a Good Samaritan

 7   reach out to me the next day and say, hey, I bet you're

 8   wondering where your daughter is.  And I'm like, no, I think my

 9   daughter is at the Jacksonville psych ward, as we expected.

10   But, no, they had let her out.  And that's just a broken system

11   that exists.

12        And so she -- I picked her up in this -- because she

13   called Mom, which she always does.  So I picked her up, and we

14   were driving and I -- we were going to go drive to get help,

15   and she was afraid of going over that same bridge that she had

16   gone over the night before because there was tons of rain and

17   she had her -- so she didn't want to go over the same bridge.

18   And I was telling her she wasn't going to go over the same

19   bridge, but she got scared, jumped out of my car on the

20   highway.

21        I tried to help her, and then she took my car and she took

22   off, and she was driving the wrong way down a highway.  And

23   ultimately, when she had to stop, she jumped into a FedEx

24   truck, and she drove the FedEx truck.  And she was running for

25   her life because she was afraid that somebody was going to kill

1    her and follow her.  And then she jumped in the -- in the

2    Jacksonville River and started swimming until she got rescued,

3    and she said she had been kidnapped.

4         So I hope that that -- I hope that that answers your

5    question.  Again, from a Done perspective, don't agree with it.

6    But there you go.  You got a little victim shaming in there.

7    Q.   Ms. Cooke, thank you for providing that -- that context.

8    And that's certainly not what we're here to do, but we are

9    trying to understand the total picture.

10        So let me ask you this:  So that was August 2022; correct?

11   A.   Yes.

12   Q.   Okay.  And your daughter was -- stopped treatment at Done

13   in May of 2022; correct?

14             MS. GREEN:  Objection, foundation.

15             THE WITNESS:  I have no idea when she stopped

16   treatment.

17   BY MS. BELL:

18   Q.   You're unaware?

19             MS. GREEN:  Objection, foundation and asked and

20   answered.

21             THE COURT:  She said she's unaware.

22             THE WITNESS:  Oh, maybe I shouldn't have answered.  I

23   apologize.

24        I don't know why you're smiling, because -- because that

25   Done, now that you've shared with me that it was May 2022, that

1  means that Done prescribed Cheryle medication after I had

2  already sent all those warnings to them and after she was MIA

3  because she was in treatment.

4      So now that I've learned that Done re-prescribed her

5  post-treatment, shame on you in such a big way.

6  BY MS. BELL:

7  Q.   I appreciate your honesty in sharing how you feel.  I do.

8      Let's talk about -- so that was August 2022, and what

9  happened was after that, she was evaluated, and that's when you

10  learned that she, indeed, has bipolar disorder; is that

11  correct?  The timeline?

12  A.   Correct.

13  Q.   Okay.  And you've now learned that untreated bipolar

14  disorder can cause these types of psychotic episodes; correct?

15      MS. GREEN:  Objection, foundation.

16      THE WITNESS:  Incorrect.  I don't agree with that.

17  People have bipolar disorder, and there's all various

18  types.  So, no, I absolutely don't agree with that, because if

19  you weren't adding fuel to the fire, then I don't know that

20  Cheryle's levels of mania -- because, again, when you get your

21  experts in, I would absolutely hope that they would talk about

22  what a stimulant does to somebody that even potentially has

23  high anxiety or mania.

24  BY MS. BELL:

25  Q.   And after this diagnosis, she's now gotten treatment;

1    correct?

2    **A.**    She continues to get treatment.

3    **Q.**    And she's on an antipsychotic medication; correct?

4    **A.**    Again, this is where -- this is where Cheryle is an adult.

5    Cheryle is going -- is under adult care.

6        I don't -- from -- again, from her personal -- I mean, I

7    feel like -- so, you know, again, do I have to answer what

8    medication she's on today?

9            **THE COURT:**  I don't think so.  Okay.  Let's move on.

10            **THE WITNESS:**  I don't think I need to bring --

11            **THE COURT:**  Fine.  Okay.

12            **THE WITNESS:**  Sorry, sir, Judge, Mr. Judge.  I'm

13    sorry.

14            **THE COURT:**  You don't have to answer any further

15    except if another question is asked.

16            **MS. BELL:**  We can move on.

17    BY MS. BELL:

18    **Q.**    But in any event, she's now getting treatment and she's

19    her wonderful, amazing self, as you said?

20            **MS. GREEN:**  Objection, asked and answered.

21            **THE COURT:**  Okay.  Let's move on.

22    BY MS. BELL:

23    **Q.**    Now, when you said episodic, in terms of bipolar disorder

24    being episodic, much of Cheryle's life before Done was up and

25    down; right?

1  **A.**   No.

2  **Q.**   Well, she had periods of doing well.  She was at the

3  university, right, for four-years, the University of Alabama?

4  **A.**   Correct.

5  **Q.**   But she didn't quite finish college at the end; right?

6  **A.**   Correct.

7  **Q.**   Okay.  And she may have been struggling in school at one

8  point; right?

9  **A.**   Yeah.  I mean, she was seeking help at the time for some

10  unknown things that she was not familiar with.

11       So, yes, she sought help.

12  **Q.**   And she -- that's when she went and sought out an ADHD

13  diagnosis, you testified?

14  **A.**   Correct.

15  **Q.**   And, in fact, they did a battery of tests; right?

16  **A.**   Yes, for -- for that.

17  **Q.**   And you are not sure one way or another if she received a

18  diagnosis; correct?

19  **A.**   I believe that I -- well, I believe -- they sent us

20  questionnaires to have her input from Cheryle's school life,

21  like high school life and things like that.  So we were

22  involved in the process.

23       So I feel like either I was notified, but I can't say for

24  sure.  But I do know that -- that -- I do know that she was not

25  prescribed stimulants from the University of Alabama.

COOKE - CROSS / BELL

1  Q.   And she -- she did ultimately get a prescription for

2  Adderall prior to Done; right?  When she was -- in 2022 -- 22

3  years old?

4  A.   That's possible.

5  Q.   Do you recall telling the Government that when you met

6  with them?

7  A.   I -- I don't remember if -- I don't remember.

8  Q.   Do you dispute that that's what you told the Government?

9  A.   If I told the Government, then I'm sure that I'm -- that I

10 was being -- from a timeline perspective -- so at 2020 -- 2022

11 she would have been how old?

12 Q.   Sorry.  I misspoke.  When she was 22 years old, so before

13 Done, she received an Adderall prescription from a different

14 provider?

15 A.   I believe so, yes.

16 Q.   Okay.  Now, you mentioned you didn't notice any symptoms

17 when she was a little girl; right?

18 A.   Right.

19 Q.   And you mentioned that both you and your son have been

20 diagnosed; correct?

21 A.   Correct.

22 Q.   And that your son's school actually caught or identified

23 the ADHD in your son?

24 A.   Correct.

25 Q.   But your daughter's school did not -- did not flag that

1  for you?

2  **A.**    They were in the same school.

3  **Q.**    And they didn't flag that for your daughter?

4  **A.**    They did not.

5          **MS. GREEN:**  Objection, foundation, "flagged that."

6          **THE COURT:**  Overruled.  Go ahead.

7  BY MS. BELL:

8  **Q.**   And are you aware that the medical community agrees that

9  oftentimes diagnoses in little girls are missed because ADHD

10  presents differently in little boys and little girls?

11          **MS. GREEN:**  Objection, foundation.

12          **THE COURT:**  Sustained.

13  BY MS. BELL:

14  **Q.**   In any event, you yourself were not diagnosed until -- I

15  think you said your late thirties or early forties?

16  **A.**    Correct.

17  **Q.**    And it -- you mentioned that what made you go to -- you

18  saw a psychiatric mental health nurse practitioner; right?

19  **A.**    Correct.

20  **Q.**    And what made you go was you were talking fast, you said,

21  and people were pointing this out to you; is that right?

22  **A.**    No, that's not right.  What made me go was after -- and

23  I believe it was kind of the same timing of DT.  I did a lot of

24  research about ADHD, and I'm like, wow, I check a lot of the

25  boxes.  I also heard it my whole life; right?  Like because

1   people will make -- just like people make random statements,

2   oh, you must have bipolar, but people would make random

3   statements like maybe my forgetfulness, like I was -- you know,

4   on top of certain things but not other things?  And so I think

5   that's really when I went to seek that out.

6        And what I did say about talking too fast and those things

7   was when I took Vyvanse, that was really -- I'm a fast talker

8   anyway, but when I took Vyvanse, my speech was -- and then I

9   then became a little bit too focused and too intense on certain

10  things, and it just -- the benefit of it did not outweigh

11  probably the negatives for me.

12  Q.   Mm-hmm.  And your son also is not on medication; right?

13  You decided that you didn't want that for him?

14  A.   I didn't decide that for him.  I mean, I talked to his

15  pediatrician as well.  My son, very different from my daughter,

16  which all are.  He has a very -- Cheryle has high, you know.

17  generalized anxiety disorder, but my son is very chill, and

18  what he said to me at a young age was that it made him feel

19  nervous and that he didn't want to eat.  And so, again, was the

20  benefit going to outweigh the negative feelings.

21       So I didn't -- I'm not against.  I know a lot of folks

22  that take even Adderall, that it works very well for them, so

23  I'm not against it.  But for him, the benefit didn't outweigh

24  it.

25  Q.   Understood.

1          So going back to Cheryle, so she ultimately -- was it --

2    didn't finish college, and you mentioned she spent some time in

3    different institutions for treatment; right?  There was

4    Lifestream, I think you said?

5    **A.**    Lifestream was a psychiatric hospital.

6    **Q.**    Okay.

7          And then there was Willows?

8    **A.**    Right.

9    **Q.**    As well as Red Mountain; right?

10   **A.**    Correct.

11   **Q.**    And are you -- that was all back in prior to Done; right?

12   **A.**    Yes.

13   **Q.**    And are you aware that Cheryle did not share that history

14   with Done?

15   **A.**    I have no idea what conversations she had with Done.

16   **Q.**    And when you reached out to Done, you didn't happen to

17   provide any of those prior records; right?

18   **A.**    I would not have -- I don't think I shared records, no.

19   **Q.**    Or mentioned that she had been treated at these

20   institutions previously; right?

21   **A.**    I don't know that.

22   **Q.**    Based on what we saw on your direct, in your direct

23   testimony, those messages, at least, did not reflect --

24   **A.**    In those messages, if it wasn't there, then yes.

25   **Q.**    Okay.  So let's talk about spring of 2021, which is when,

COOKE - CROSS / BELL

1    to your understanding, your daughter began her treatment

2    through the Done telehealth platform.

3    **A.**    Okay.

4    **Q.**    So she was actually treated by two different psychiatric

5    mental health nurse practitioners.

6          Do you recall that?

7               **MS. GREEN:**  Objection, foundation.

8               **THE COURT:**  Sustained.

9    **BY MS. BELL:**

10   **Q.**    Do you have an understanding of how many practitioners saw

11   her there?

12   **A.**    I don't.

13   **Q.**    Okay.  But you know that a psychiatric mental health nurse

14   practitioner is a specialist provider; right?

15   **A.**    Yes.

16   **Q.**    Okay.  And based on your own experience it was your -- I

17   think you said it was your general practitioner who initially

18   said maybe you should go and get evaluated, and then he or she

19   referred you to a psychiatric mental health nurse practitioner,

20   and that's the person that ultimately provided your diagnosis;

21   right?

22   **A.**    Correct.

23   **Q.**    Okay.  Now, you were not present for any of the

24   appointments that your daughter had with the psychiatric mental

25   health nurse practitioners on the Done telehealth platform;

1  right?

2  **A.**    Yes, correct.

3  **Q.**    Okay.  But you testified that you were concerned with the

4  dosage increase that you saw --

5  **A.**    Yes.

6  **Q.**    -- through the pill bottles; right?

7      And I think you also had looked at some records; is that

8  right?

9  **A.**    I don't -- I don't think -- I don't think I have records.

10  I mean, I got a charge on my credit card that I disputed that,

11  you know, they charged me.  But I did see the pill bottles.

12  **Q.**    Okay.  And you were also -- you also felt that if someone

13  saw Cheryle that they would have known something is wrong with

14  her; right?

15  **A.**    At a point in time, yes.

16  **Q.**    Okay.  At a point in time because there were episodes of

17  her doing better and worse?

18  **A.**    No.  From the time she started till the end, yes, you

19  would have noticed a change in her.

20  **Q.**    Okay.

21  **A.**    So not like spot, you know, one week good in June and one

22  week bad in June.  No.  I think it was, you know, towards the

23  end.

24  **Q.**    Towards the end.  And so your assumption was, well, they

25  might not -- they must not be seeing her because they would

COOKE - CROSS / BELL

1    know; right?

2    **A.**    No.  My assumption was how could you be -- my assumption

3    was that they probably -- my hope was and my assumption was

4    that you would not have a telehealth appointment where somebody

5    wasn't seeing you, especially when they were prescribing

6    narcotics.

7        So when I said it's blatantly obvious, my assumption was

8    that they would be seeing Cheryle, and how could you continue

9    to treat her the way you were treating her if you're seeing her

10   for however many appointments she had.

11   **Q.**    Okay.  So when you say narcotics, do you mean Adderall;

12   right?

13   **A.**    Yeah.

14   **Q.**    A stimulant?

15   **A.**    Yeah, for sure.

16   **Q.**    And are you aware that Adderall, while it's a controlled

17   substance, it's not a narcotic?

18   **A.**    Sorry.  So, no.  So there's my layman things.  But I know

19   it's a controlled substance.  You, I think, have to show ID if

20   you get it.  I mean, it's not something that is easily gotten,

21   so when -- so sorry.  Yeah, controlled substance.

22   **Q.**    Okay.

23       So are you aware that the first psychiatric mental health

24   nurse practitioner who treated Cheryle saw her five different

25   times over an eight-month period?

1           **MS. GREEN:**  Objection, foundation.

2           **THE COURT:**  Are you -- I mean, I think she can ask the

3    question.

4        Are you aware that -- what is your question?

5    **BY MS. BELL:**

6    Q.   Are you aware that she was seen five times over the

7    eight-month course of treatment by the first psychiatric mental

8    health nurse practitioner that treated Cheryle?

9           **THE COURT:**  At Done.

10   **BY MS. BELL:**

11   Q.   At Done.

12          **THE COURT:**  Okay.  Were you aware of that or not?

13          **THE WITNESS:**  No, because I wasn't aware --

14          **THE COURT:**  Okay.  Fine.

15       And, ladies and gentlemen, let me just caution you that

16   that is not evidence that she was seen by five -- on five

17   occasions.  She might have been, but that's not evidence of it,

18   so...

19   **BY MS. BELL:**

20   Q.   Now, are you aware that before the initial appointment,

21   she scored positive for probable ADHD on an initial screening

22   test?

23          **MS. GREEN:**  Objection, foundation.

24          **THE COURT:**  Yeah, I think -- I think -- I'm just

25   trying to figure out, since it's fairly clear that she doesn't

 1   have this awareness of these facts as you state them, I don't

 2   think it's a good idea to run through all the facts when she is

 3   going to say -- if you anticipate she's going to say "I'm

 4   unaware of this, I'm unaware of that," because then all you're

 5   doing is just telling the jury what your version of the facts

 6   are.  And questions aren't evidence.

 7        So I think you sort of say what -- I think you have to ask

 8   it a little bit open-ended to find out what knowledge she had

 9   of the treatment at Done so we don't spend 10 minutes going

10   through all the things that she doesn't know.

11              MS. BELL:  Yes.  We will try to make it expeditious.

12   BY MS. BELL:

13   Q.   So I'm asking you these questions because it's clear that

14   you're close with your daughter, and you testified that you

15   observed her very closely in the 2021 to 2022 period.  So I'm

16   going to ask some questions.  If you don't know the answer,

17   it's fine, but I'm trying to understand what your observations

18   were the same way the Government asked you --

19              THE COURT:  Well, actually, you're asking her about --

20   not about observations.  You're asking her about knowledge that

21   she gained, if she gained this knowledge.  And that's a

22   different category.  It's not an observation; it's what she was

23   told.  Was she told these things?  That's your question.

24        And I thought we sort of agreed that if you do realize

25   that the answer is going to be "no," she doesn't know, you'll

COOKE - CROSS / BELL

```
 1    move on.
 2              MS. BELL:  Yes, Your Honor.  I will do that.
 3    BY MS. BELL:
 4    Q.    So in March of 2021, spring of 2021, do you know -- did
 5    you observe that Cheryle was struggling with the ability to
 6    listen, to focus, and to pay attention?
 7    A.    No.
 8    Q.    Did you learn or did you know that she was having trouble
 9    at her job and in her personal life due to these issues?
10    A.    Not due to those issues, no.
11    Q.    Did you learn that she was having trouble due to some
12    other issue?
13    A.    You know, I think she has anxiety.  I mean, I know she has
14    generalized anxiety disorder, so that would not have been,
15    you know, unusual.  Like with starting a new job, you would --
16    you know, she would have the normal new job jitters.  And for
17    her, it's not normal.  It's -- you know, it's more.
18              So, yeah, I'm...
19    Q.    Now, are you aware -- did you ever recommend to her that
20    she should increase her Vyvanse prescription from 10
21    milligrams, the starting dose, to something higher in March of
22    2021?
23    A.    Did I encourage her to increase her dose?  I would -- I --
24    I can't imagine that I did that, but -- because I wouldn't have
25    wanted her on it.
```

1   **Q.**   Are you aware that 10 milligrams is a very low starting

2   dose, far below the FDA recommended initial dose for adults?

3   **A.**   Yeah.  I mean -- I mean, I -- it's -- again, I'm not a

4   medical professional, but I have researched things.  So 10 --

5   10 sounds like it would be a normal way to start.

6        I mean, now that we're throwing everything on the table,

7   like I take Lexapro for anxiety.  They started me at 5 and then

8   moved me up to 10.  So all of those things could be -- yeah.

9   **Q.**   And are you aware that a provider can increase Vyvanse by

10  10 to 20 milligrams every seven days?  In other words, every

11  week until a patient reaches a dose that alleviates symptoms?

12           **MS. GREEN:**  Objection, foundation.

13           **THE COURT:**  Sustained.

14  **BY MS. BELL:**

15  **Q.**   Well, you testified that you were concerned about the dose

16  as well as what you perceived to be a dose increase, and so I'm

17  trying to get a sense of what you knew about Vyvanse in

18  particular and Adderall as well.

19  **A.**   So I -- I mean, I understand, especially through Cheryle's

20  journey and then my own or my other children, that, yeah,

21  titration is natural; right?  That people would titrate up if,

22  again, it is necessary and it's according -- you know, it

23  matches with their height, weight, any other things they have.

24  So, yeah, I understand titration.

25  **Q.**   Okay.  And did you ever discuss with Cheryle the need --

 1  at any point in time the need to increase her medication to

 2  address the symptoms she was experiencing at work and in her

 3  personal life?

 4  **A.**    To -- did I ever -- did I ever say to Cheryle, you need to

 5  increase your Vyvanse or your Adderall?  No.

 6  **Q.**    Okay.  And so you don't know, just to be clear, what she

 7  told her psychiatric mental health nurse practitioners?

 8          **THE COURT:**  We know that.  We know that.  Okay?

 9  **BY MS. BELL:**

10  **Q.**    You don't know at all at any point in time?  She was not

11  discussing that with you?

12  **A.**    I mean, I think that's been established.

13  **Q.**    Okay.  So do you recall that she attended an HR conference

14  where she had to make a presentation in public in spring of

15  2021?

16  **A.**    What date?

17  **Q.**    This would have been end of March, so March 25th.  And in

18  particular, the issue was that audience members had submitted

19  anonymous comments about her presentation, that she was

20  unfocused, fidgety, and spoke too fast.

21          Do you recall that?

22  **A.**    No.

23  **Q.**    Do you recall her saying she had to keep on getting up

24  every 15 minutes, and people were noticing how she was

25  shuffling her feet?

COOKE - CROSS / BELL

1   **A.**   I wasn't at the conference, so I don't know.  I mean, no.

2   **Q.**   Do you recall Cheryle getting a promotion from a recruiter

3   to field service coordinator in April of 2021?

4   **A.**   With what employer?

5   **Q.**   Perhaps with The Bud Group?

6   **A.**   She did -- she was employed with The Bud Group, yes.

7   **Q.**   Do you recall her getting a promotion at that point around

8   that time?

9   **A.**   I know her responsibilities were changing, yeah.

10  **Q.**   Okay.  And so in the spring, do you recall that she was

11  feeling more organized and she could concentrate better?

12  **A.**   No.  I didn't notice any -- yes, no.

13  **Q.**   Did you did she tell you that she felt her ADHD was so

14  manageable, it's unbelievable?

15          **MS. GREEN:**  Objection, hearsay.

16          **THE COURT:**  Overruled.  Go ahead.

17          **THE WITNESS:**  I -- I don't -- I have no recollection

18  of having -- her having said that to me.

19  **BY MS. BELL:**

20  **Q.**   Do you have any recollection of her attributing her

21  promotion and the success she was having in the workforce to

22  the fact that she was getting treat from her psychiatric mental

23  health nurse practitioner on the Done platform?

24  **A.**   Again, I would say from memory that would not be something

25  that Cheryle would share with me, because it is very known that

1  I do not support for her -- for before everything that she'd

2  been through and learned through her providers to be on

3  stimulants.

4  Q.   I see.

5       Okay.  You didn't support that?

6  A.   For her taking stimulants?  No.

7  Q.   She knew you didn't support that?

8  A.   Well, I mean, I didn't support it is what I can say.

9  Q.   Okay.  Do you recall that the same month, in April of

10 2021, she decided to go back to school in the afternoons and

11 the evenings?

12 A.   I know that she did decide to go back to school to do like

13 a Maymester, which is a really compressed completion of a

14 class, yes.

15 Q.   She was only 12 credits away from getting her BA?

16 A.   Correct.

17 Q.   And, in fact, she -- in May she got a 95 on her first

18 final exam.  Do you remember that?

19 A.   I do.  I mean, yes, I know that it was a -- that she did

20 well.

21 Q.   And that was a super hard class; right?  For her?

22 A.   Yeah, for her.

23      I mean, am I allowed to say anything or I just have to

24 answer questions?

25           THE COURT:  I don't know.  If you need to explain it,

1    you can.

2          THE WITNESS:  Well, I just feel like if this is

3    saying, oh, she would have never gotten a 95 or gotten a

4    promotion because she was being treated by Done, that is not

5    the case, because Cheryle had gotten 95 in classes before and

6    taken AP.  So I feel like if that's where we're leading, I felt

7    compelled to say that.  So if we weren't, my apologies.

8    BY MS. BELL:

9    Q.    I understand your feelings, and I appreciate your honesty.

10   Thank you for telling us that.

11         Okay.  So she got this 95.  And, in fact, she felt she --

12   this was a big deal because she had left the University of

13   Alabama before finishing earlier; right?

14   A.    Correct.

15   Q.    And so she actually decided, after doing so well in this

16   test, that she wanted to go back and sign up for summer

17   classes.

18         Do you remember that?

19   A.    I don't know that she signed up for summer classes.  I

20   know that completing her degree was important to her.

21   Q.    And are you aware that she got a new job shortly

22   thereafter, in June, that paid way more than her prior job?

23   A.    Yes.

24   Q.    Okay.  And so she was actually juggling school and job,

25   right, together?

COOKE - CROSS / BELL

1    A.    For the month of May.  I think her class was only for the

2    month of May, yup.  And then she took a new role with Kelly

3    after that, yup.

4    Q.    Okay.  And so I think the answer is going to be "no," but

5    just so we can move on, are you aware that with respect to the

6    dose increase that concerned you that Cheryle, in addition to

7    the five face-to-face meetings, was in constant or very close

8    e-mail communication with her psychiatric mental health nurse

9    practitioner about these events in her life and how her

10   medication was functioning for her?

11          MS. GREEN:  Objection --

12   BY MS. BELL:

13   Q.    Did you know that?

14          MS. GREEN:  Foundation.

15          THE COURT:  She said "no."  So she answered.

16   BY MS. BELL:

17   Q.    Okay.  Now, do you recall that in July, she was having

18   trouble again with some symptoms, having to get up,

19   interrupting on Zoom calls, and that that was an issue that

20   she'd had as a child and that was presenting itself again in

21   the summer of 2021?

22   A.    No.  I don't participate with her on her Zoom calls.  I

23   mean, it is something that we've shared that --

24          No, I don't participate with her on her Zoom calls.

25   Q.    Okay.  And are you aware of the issue -- the interrupting

1    on the Zoom calls?  Is that something that you've --

2    A.    No.

3    Q.    Okay.  Do you -- with respect to the dose, are you aware

4    that a dose of 60 milligrams of Vyvanse is below the

5    FDA-recommended maximum?

6          THE COURT:  Sustained.  Next.

7          MS. BELL:  Okay.

8    BY MS. BELL:

9    Q.    So you -- you're not -- you don't have any information

10   about whether or not the ultimate dose that your daughter --

11   that you believed your daughter was prescribed, whether that is

12   within or outside the FDA recommended range --

13         MS. GREEN:  Objection.

14   BY MS. BELL:

15   Q.    -- for adults?

16         MS. GREEN:  Objection, foundation.

17         THE COURT:  She doesn't.  Let's move on.

18   BY MS. BELL:

19   Q.    Well, you testified that you spoke with your therapist

20   about the dose; right?

21   A.    I can tell you from my own personal experience, I think

22   that that's what I was given, 60 milligrams, and I had -- I

23   was -- I couldn't tolerate it, and I'm -- was a lot heavier

24   than my daughter?

25         So do I know FDA regulations?  I feel like I looked them

1    up at some time.  But 60 milligrams of Vyvanse, and was she

2    also prescribed Adderall at that time?  I mean, you're asking

3    me specifically what I knew.  Was she -- was that the only

4    thing she was given was 60-milligram of Vyvanse?

5    Q.   My question was just if you knew what the FDA recommended

6    range of --

7         THE COURT:  Why would you ask that question?

8    BY MS. BELL:

9    Q.   I'm asking because you mentioned you spoke to your

10   therapist --

11        THE COURT:  Whatever the therapist said.  That, again,

12   would be hearsay.  So it's hearsay on hearsay.

13        MS. BELL:  She already testified --

14   BY MS. BELL:

15   Q.   You testified on direct about what your therapist told you

16   and that that informed --

17        THE COURT:  I understand, but you asked the question

18   about the FDA, and now we're getting -- it's so far afield from

19   her field of knowledge and expertise that it just is

20   time-consuming.

21        MS. BELL:  Yes, Your Honor.  We will move on.  I

22   wanted to --

23        THE COURT:  Go right ahead.  Move on.

24        MS. BELL:  Yes.  Thank you.  Okay.

25   \\\

1    BY MS. BELL:

2    Q.    So do you know one way or another whether weight -- you

3    were left with the impression that -- from your therapist, it

4    sounds like, that a weight matters when you're prescribing --

5    when you're prescribing Adderall or Vyvanse.

6        Is that your -- is that your understanding, that it's

7    based on a person's weight?

8    A.    I don't think it's solely based on a person's weight, but

9    I think weight, you know, would contribute to it, which to me

10   is something --

11       Again, I can use my own self as an example that 60

12   milligrams made somebody like complain about me at work, so --

13   and I'm a lot heavier.

14       So do I think weight -- do I now for sure?  It seems

15   logical that if somebody weighs a hundred pounds versus

16   500 pounds, they would use a different amount of dosage.

17       But to your point, like I work in technology solutions.  I

18   don't have an -- you know, I don't know how to speak to FDA.

19   Q.    Understood.

20       So by August, you were sufficiently concerned that you

21   found psychiatric mental health nurse practitioner Orr's

22   personal e-mail address and sent her the message; correct?

23   A.    Correct.

24   Q.    And we don't have a copy of your e-mail, but you have seen

25   her response; right?  The Government has showed you her

1  response?

2  **A.**    She didn't respond to me.

3  **Q.**    Right, but you've seen -- you've seen her response; right?

4           **MS. GREEN:**  Objection.  Misstates --

5           **THE COURT:**  I'm sorry.  Her response to what?

6           **MS. BELL:**  The -- so let me lay a bit more of a

7  foundation.

8  **BY MS. BELL:**

9  **Q.**    Your perception, because you didn't hear back from her,

10  was that she wasn't concerned; she was just concerned about

11  herself and the fact that you had found her personal e-mail

12  address?  I believe that was your testimony; right?

13  **A.**    Yeah.  She didn't respond to me, and her -- and she

14  expressed concern to Cheryle about how I would do that, and she

15  was stared and she told her husband about it.

16       That is what I knew at the time.

17  **Q.**    But what you know now is that, in fact, she was concerned,

18  and she said -- in fact, she said she called your e-mail

19  concerning, and she specifically said that she wasn't sure who

20  you were talking about because your e-mail didn't list your

21  daughter's name, but she would like to know what patient you

22  were trying to alert her about because she wants to make sure

23  that the patient is doing okay and not abusing or losing too

24  much weight, et cetera.

25       Are you aware that that is what her actual response was to

1    your e-mail?

2    **A.**    So I got no response from the e-mail, and so if you're

3    saying did the Government share we her e-mail with me, I didn't

4    review it.  Like -- that we looked at my piece, but did I

5    thoroughly get to read what Cassidy Orr said?  I did not.

6            **MS. BELL:**  Can we put the e-mail up, Your Honor,

7    please.  And I'd offer it into evidence.  It's Government

8    Exhibit 410.

9            **THE COURT:**  I'm sorry.  What exhibit is it?

10           **MS. BELL:**  Government Exhibit 410.

11           **MS. GREEN:**  Objection, foundation to this being

12   admitted into evidence.  If you need it to refresh, I'm happy

13   for you to show just the witness.

14           **THE COURT:**  Let's do it one step at a time.  Take 410

15   for demonstrative purposes and show if to the witness.

16   **BY MS. BELL:**

17   **Q.**    All right.  Take a moment and -- if you would, and if you

18   would read through what the psychiatric mental health nurse

19   practitioner says after receiving your e-mail.

20   **A.**    Okay.  So, yes --

21           **THE COURT:**  Just take a moment and read it.

22           **THE WITNESS:**  Okay.  Sorry.

23       I was going to say I have had a view of this, so -- okay.

24   Let me read it.

25           (Witness examines the document.)

1              **MS. GREEN:**  Your Honor, I don't believe it's

2    appropriate for this exhibit to be used to refresh her about

3    what Ms. Orr thought or felt.

4              **THE WITNESS:**  Because I didn't see --

5              **THE COURT:**  Wait a minute, wait a minute.  Okay.

6         First of all, you can show a witness anything that would

7    refresh her recollection.

8         But I don't quite understand your question.

9              **MS. BELL:**  Yes.

10             **THE COURT:**  Were you asking her -- the Done employee

11   or however it's characterized -- she did not respond to this

12   witness's e-mail to this witness; is that correct?

13             **MS. BELL:**  That is correct.

14             **THE COURT:**  So he did, however, respond in that she

15   said she sent an e-mail to somebody else, but not this witness.

16             **MS. BELL:**  Yes, Your Honor.

17             **THE COURT:**  And the document that is on the screen now

18   is the e-mail that she sent to somebody else?

19             **MS. BELL:**  Correct.

20             **THE COURT:**  And you are asking this witness does it

21   refresh her recollection as to what?  As to what this witness

22   wrote to -- to Ms. Orr?

23             **MS. BELL:**  No, Your Honor.

24             **THE COURT:**  Then what are you asking?

25             **MS. BELL:**  She testified that she felt that

 1   psychiatric mental health nurse practitioner Orr wasn't

 2   responsive, wasn't concerned, was not concerned about her

 3   daughter.

 4         **THE COURT:**  That was her impression.

 5         **MS. BELL:**  However, she knows something different

 6   based on the e-mail, and this is to complete --

 7         **THE COURT:**  Okay.  Fine.  That's not appropriate.

 8   Okay.  It's not appropriate to -- to use this document to

 9   demonstrate the point you want to demonstrate from this

10   witness's based upon her recollection, since she has no

11   recollection.  She has no recollection --

12      You can't give a document to somebody and say, Does this

13   refresh your recollection?  And then her answer would be "It

14   doesn't refresh my recollection, since I never received this

15   document."

16      But actually, what you're asking her is now you see a set

17   of facts different from what you may have thought at the time,

18   and that, of course, is an improper question.

19   So -- how much longer do you have with this?

20         **MS. BELL:**  Hard to say, Your Honor, but --

21         **THE COURT:**  Okay.

22         **MS. BELL:**  -- I will move it along.

23         **THE COURT:**  I'm just concerned about a recess.  But

24   can we go on for a bit more?

25      Okay.  Proceed.

1    BY MS. BELL:

2    Q.    Okay.  Are you aware that one week after getting your

3    e-mail in August, psychiatric mental health nurse practitioner

4    Orr had a -- scheduled a face-to-face telehealth appointment

5    with your daughter?

6            MS. GREEN:  Objection, foundation, asked and answered.

7    We've been over that she doesn't know about done.

8            THE COURT:  She could be aware of it or not aware of

9    it.  The question is -- I don't know what it was asked or not,

10   but are you aware that this event purportedly occurred?

11           THE WITNESS:  I --

12           THE COURT:  Are you aware of it?

13           THE WITNESS:  Yes.  As I answered earlier is that the

14   reason why I'm aware of it is because this person told my

15   daughter that she got some crazy e-mail to her personal e-mail

16   and that she was concerned about it.  That's the only reason

17   why I know that Carolyn got my -- or Cassidy got my message.

18       Is that the question?  I'm sorry.

19   BY MS. BELL:

20   Q.    Okay.  So you know she got the message and that there was

21   a face-to-face appointment between them where this was

22   discussed?

23   A.    No, I do not know there was a face-to-face appointment.  I

24   do now that there was some type of a conversation or, like you

25   said, they sent an e-mail, os there was some type of a

1  communication that I did not -- I wasn't aware of but -- I

2  mean, I didn't see.

3        So I don't know if it was face-to-face.  I don't know if

4  it was an e-mail.  I don't know if it was a phone call.  But I

5  do know that Carolyn -- or Cassidy.  I don't know where

6  Carolyn's coming from.  Sorry.

7        Cassidy was concerned about getting an e-mail from me.

8  Q.   And you also know because Cheryle was infuriated with you

9  to learn that you had been intruding in what she felt was her

10 private relationship with her medical provider; right?

11 A.   Yes.  She was upset about it for sure.

12 Q.   Okay.

13 A.   And mainly because she was upset that Cassidy was upset.

14 Q.   She was actually upset also that you had reached out to

15 her medical provider to discuss her treatment; right?

16 A.   Sure, sure.

17 Q.   Okay.  Now, are you aware that at this point in time, for

18 your daughter, the medication was working a night-and-day

19 transformation in her life in terms of her work ethic and her

20 life in general?

21 A.   Absolutely not.

22 Q.   Are you aware that after that conversation following your

23 e-mail, her dose was lowered?

24 A.   I don't know that.

25 Q.   Are you aware that psychiatric mental health nurse

1    practitioner Orr was very clear at that point that she would

2    not prescribe your daughter any additional medication --

3              MS. GREEN:  Objection, foundation.

4    BY MS. BELL:

5    Q.    -- beyond the dosage at the time?

6              MS. GREEN:  Objection, foundation.

7              THE COURT:  Asked what she was aware of.

8              THE WITNESS:  I was not aware of it, but then my

9    question would be did that continue, and then what happens when

10   the other person you said that she saw -- because you said

11   there were more.  I'm also not aware if they didn't -- I didn't

12   know they lowered it and I didn't know if they upped it.

13   BY MS. BELL:

14   Q.    We will get to that.

15   A.    Okay.

16   Q.    Do you recall that at one point, your daughter was

17   actually doing a dissertation in her school program?

18   A.    So I know for her class, the Maymester class, which was --

19   she's a history major, I don't know that the word -- like I

20   don't know because I haven't reached that level of academia,

21   but I thought a dissertation was more like around a doctorate

22   or whatever the case was.

23        But I do know there was probably some pretty intensive

24   paperwork and reports that were required.

25   Q.    And that was in the October time frame, 2021?

1   **A.**    I'm not sure --

2        (Reporter interrupts for clarity of the record.)

3   **BY MS. BELL:**

4   **Q.**    October 2021 time frame when she had a big paper due for

5   school?

6   **A.**    I can't recall.

7   **Q.**    Do you recall that at that time, she felt that her dose

8   was great, just right?

9   **A.**    Again, I can't recall.

10  **Q.**    Okay.

11  **A.**    She shouldn't have been on any of it, so, you know, I'm --

12  you know.

13  **Q.**    I certainly understand your perspective.

14       So in that same month, in October, that's when you really

15  felt like you saw a big decline?

16  **A.**    I saw a -- there was a progression of decline from June

17  through, yes, and it just continued to grow.

18  **Q.**    And in October, I think that's when you first described

19  seeing a type of psychotic episodes; is that right?

20  **A.**    You know, so if I said that, that's the case.  It was

21  getting progressively worse.

22       I cannot say that that was the first time.  I can say that

23  we were -- it was, again, a progression.  So it was probably --

24  not probably.  I'm sure I was extra concerned about it then if

25  it was in October for sure.

1    Q.   And do you recall that she got a new job in October at a

2    place called Advanced Theraceuticals as an HR associate?

3    A.   So Advanced Theraceuticals is her dad -- her dad owns that

4    company.

5    Q.   I see.  And she's still working there today?  That's one

6    of the two companies where she works?

7    A.   Yeah.

8    Q.   Okay.  But she did start there in October of 2021; right?

9    A.   Yes, remote.  And she had light responsibilities.

10   Q.   Okay.  But that was that same month; right?

11   A.   Well, yeah.  It's her dad's company, and I think it was a

12   way to give her something to do and also to pay her.

13   Q.   And she's still -- she stayed there for -- until now;

14   right?

15   A.   It's not a full-time.  It's a seasonal.  It's project.

16   It's not full-time.

17   Q.   Okay.  So this brings us, then, to November and your

18   further outreach to Done, and this was following the

19   November 11th visit to the hospital.

20        So that month, that's when -- do you recall psychiatric

21   mental health nurse practitioner Orr leaves the platform and

22   there's a new provider?  I guess you said you weren't sure

23   about that; is that right?

24   A.   Correct.

25   Q.   You're not sure about that?

1   **A.**   I said correct, yeah.  I'm sorry.

2   **Q.**   And I assume the same would go -- you're not sure about

3   what appointments, if any, she had in the November and December

4   time frame?

5   **A.**   No, I know that she said she had appointments, but I don't

6   know what they were.

7   **Q.**   Okay.  Do you know that the new mental -- psychiatric

8   mental health nurse practitioner said that he would not write

9   any prescriptions until she met with him face-to-face after

10  getting your communication?

11  **A.**   I did not -- I don't know that.

12  **Q.**   Okay.  Now, the Government showed you Exhibit 471.

13       **MS. BELL:**  Maybe we can put that back up.

14  **BY MS. BELL:**

15  **Q.**   Okay.  And so you say there, kind of midway through, (as

16  read):

17       "I know that you nor anyone at Done can speak

18       with me."

19       And so that's a reference to the fact that because of

20  doctor-patient confidentiality, you did understand that there

21  couldn't be any information shared with you without your

22  daughter expressly consenting; correct?

23  **A.**   Yeah, I -- yes.

24  **Q.**   Okay.  And you say there that your daughter -- "She had to

25  be taken to the hospital last week because of an Adderall

1    psychosis."

2        Do you see that?

3    A.    I do.

4    Q.    And, in fact, the doctors at the ER however did not

5    diagnose your daughter with psychosis at all, did they?

6    A.    That -- I learned about Adderall psychosis or even the

7    word "psychosis" and Adderall through talking to -- because it

8    wasn't something I was familiar with, so that I would have

9    gained that information from healthcare providers?

10        Now, whether they diagnosed her with that, I would -- if

11    it's not on the paperwork, then I would say no.

12    Q.    Let's take a look at Government Exhibit 2483, which is

13    already admitted, at page 12.

14        And so we see here that the diagnosis is anxiety.

15        Do you see that?

16    A.    I do.

17    Q.    Okay.  And if we could go to page 13, when you arrived at

18    the hospital, it was around 9:00 p.m.

19        Do you see that?

20    A.    Mm-hmm.

21    Q.    And you departed -- Cheryle was discharged by 10:30 p.m.

22        Do you see that?

23    A.    Yes.

24    Q.    So you were there for about an hour and a half?

25    A.    Yes.

1   Q.   And if we could go up to the top of that same page.

2        You did tell them that you had seen paranoia, making up

3   stories, whole body convulsions, jumping out of the car.

4        Do you see that?

5   A.   Yes.

6   Q.   And while you were there, the ER gave Cheryle a physical

7   exam.

8        MS. BELL:  Could we go to page 8.

9   BY MS. BELL:

10  Q.   And they checked her heart, for example.  They found that

11  her heart was regular, regular rate and rhythm.  Neurological:

12  Alert and oriented to person, place, time, and situation.

13       Do you see that?

14  A.   I do.

15  Q.   Under Psychiatric, can you read there what it says?

16  A.   (as read):

17            "The patient the has been labile.  she will

18        frequently laugh during conversation and has also

19        been tearful.  She admits to misusing her Adderall

20        and has been taking what sounds like around

21        90 milligrams a day for the last few days.  She has

22        not been sleeping.  The patient is not experiencing

23        any AV hallucinations currently but does feel

24        paranoid and that she's not suicidal or homicidal."

25            MS. BELL:  And if we could go down a little bit.

```
 1   BY MS. BELL:

 2   Q.   And then we see, I think, down at the bottom, they mention

 3   midway through that she -- her thought process has a basis in

 4   reality.

 5        Do we see that?

 6   A.   Oh, in the top, yeah.

 7   Q.   Okay.  (as read):

 8            "Patient is redirectable and seems to be

 9        primarily mentating with a basis in reality."

10        So she had reported that she was misusing her Adderall and

11   taking 90 milligrams.  That was her report; right?

12   A.   That's what it says, yup.

13            MS. BELL:  Okay.  And if we could go to page 3, which

14   is --

15   BY MS. BELL:

16   Q.   You looked at in your direct examination testimony, we see

17   at the bottom that the comments are (as read):

18            "Substance misuse and poor medication

19        compliance" -- in terms of discharge disposition

20        compliance.

21        Do you see that?

22   A.   I do.

23   Q.   (as read):

24            "Chronic risk factors include substance misuse,

25        history of trauma, lack of outpatient treatment, and
```

1         poor medication compliance."

2         Okay.  But they -- they didn't -- on this visit, they did

3    not call a psychiatrist to perform an exam; do you recall that?

4    **A.**    I do.

5    **Q.**    Okay.  And so even though your perspective on things based

6    on what you had seen was that anyone on the street would be

7    able to tell she was not doing well, at the hospital they did

8    discharge her without doing the psychiatric exam; right?

9    **A.**    So this is what I talked about earlier is that -- and I

10   see the time and date stamp on here, but I don't know that it

11   takes into effect how long it took to get Cheryle back to a

12   room to get seen.

13        So we were probably there a lot longer than that, and she

14   would not go back.  This is the time when I talked earlier

15   about there were teams of nurses and doctors trying to reassure

16   her to come in; that she was paranoid and -- and so it's --

17        So this is a pretty benign report, and I'm not saying it's

18   not accurate for the time that we left, but from the time that

19   we got there --

20        And I -- and also, does it say that they gave her an

21   Ativan or a sedative during this time as well?  I'm not sure.

22        But this is -- you know, again, it was a very long

23   process -- it felt like a very long process from her like

24   dropping to the seat, you know, the floorboard of my car and

25   talking about convulsions and not doing okay, and then getting

1   her in the hospital and then just loads of people coming

2   around.  And they're really hesitant to overwhelm her or like

3   immediately take her to like a psych ward if they can help her

4   and understand.  And she was clear about -- like I think I took

5   too much Adderall.

6       So -- so while this is the way it was when she was

7   leaving, it certainly wasn't the way when we were there.

8       And at that time, they also did bring in -- but I won't

9   remember the names -- of the ER doctor that kind of came in and

10  asked me, Mom, do you think she'll be okay to go home with you

11  and those things.

12      And so -- yes.  But this, I believe, is the time that I

13  talked earlier about --

14      So I don't know that they even started recording our time

15  there until they actually got her in a room and took her

16  vitals.

17  Q.   Okay.

18          MS. BELL:  And so on page 39, if we can go there.

19  BY MS. BELL:

20  Q.   We see that they drug screen was actually canceled.

21      Do you see that?

22  A.   Okay.

23  Q.   So they didn't do a drug screen on this occasion; right?

24  A.   Okay.

25  Q.   Do you recall?

 1   **A.**   I don't.  They -- I wasn't consulted about labs.

 2   **Q.**   She -- she was discharged, and it looks like it was

 3   canceled.

 4        However, this is when she told them that she had gotten

 5   extra Adderall --

 6              **MS. BELL:**  If we can go back to page 5 --

 7   **BY MS. BELL:**

 8   **Q.**   -- from Lifestream?  It should be -- we looked at it in

 9   your direct.

10        From the online system called Lifestream.  Do you see

11   that?

12   **A.**   I do.

13   **Q.**   Okay.  And so let's go to page 9.

14   **A.**   But I think we, again -- well, we can go -- I don't know

15   that there's a online prescription for Lifestream, but

16   Lifestream -- again, I think maybe it was not good note-taking,

17   which -- no fault.

18        But Lifestream, she may have mentioned that she had

19   previously been in a psychiatric hospital, and that is the name

20   of Lifestream.  And at no time would they online prescribe

21   Adderall.

22   **Q.**   So let's go to page 9.

23   **A.**   Okay.

24   **Q.**   And we see that her diagnosis here mentions both anxiety

25   and then a mild Adderall use disorder, what they termed mild.

1    And the recommendation was "tonight go home and rest."

2    Do you see that?

3  **A.**    I do.

4  **Q.**    And that's after she reported that she had taken she had

5  been misusing her prescription and taking three times the dose;

6  right?

7  **A.**    I don't know if it was three times the dose.  I don't know

8  what she was prescribed.  But she did talk about what she was

9  taking.

10  **Q.**    Okay.  And so they discharge her and say go home and rest;

11  right?

12  **A.**    Right.

13  **Q.**    Okay.  Let's move to --

14  **A.**    Which is challenging, and that was -- it's challenging

15  when you go to providers and that's the best you get.  Right?

16    But they're only there to, you know, do the

17  life-threatening or not; right?  Do we need to save or triage?

18  That's the problem with ER -- hot the problem, but that's what

19  they're there for.

20    So "go home and rest," but the case she was in was a

21  really -- not only a tall order, but not something --

22    But anyway, yeah.

23  **Q.**    Okay.  So you reach out again.  So following this --

24  following this visit to the hospital is when you reach out and

25  say, help, please, my daughter has had an Adderall psychosis,

1  which was your interpretation of what was happening; right?

2  **A.**   I don't know that it's my interpretation because it wasn't

3  something I knew.  Like I didn't even know there was such a

4  thing.  So, again, it was my thought, yes, because of things

5  that I had heard by medical professionals or therapists or

6  whatever the case is.

7  **Q.**   Right.

8      But it wasn't the diagnosis in the records we just looked

9  at; right?

10  **A.**   Well, no.

11  **Q.**   Okay.  And so you get this response from --

12      **MS. BELL:**  And we can put 472 back up.

13  **BY MS. BELL:**

14  **Q.**   You got this response from Done's in-house counsel.

15      **MS. BELL:**  And if we could blow that up.

16  **BY MS. BELL:**

17  **Q.**   You felt that this was canned, I think was the word you

18  used in your direct testimony.

19      Do you recall that?

20  **A.**   Right.  Protected and canned, yeah.

21  **Q.**   Okay.  So she says there (as read):

22          "We will neither confirm nor deny that your

23      daughter is a patient of Done as we cannot disclose

24      any protected health information to you due to

25      relevant federal and state privacy regulations."

1      Do you see that?

2   **A.**   I do.

3   **Q.**   Okay.  And you understood what she was talking about;

4   right?  Based on the other exhibit we looked at, 471, where in

5   your outreach to Ms. Wozniak, the psychiatric mental health

6   nurse practitioner that you found on LinkedIn, you said, I know

7   that neither you nor anyone else at Done can speak to me?

8      So you understood that; right?

9   **A.**   Yeah.  I sent that to the chief medical officer and her,

10  and I understood that, which is also, I thought, would apply

11  here, because I thought it was very clear that medical records

12  can't be discussed?

13     But yes, I did understand that.

14  **Q.**   Okay.  And then you see she goes on to say (as read):

15          "Claims regarding our patients' health and

16          safety are investigated by our clinical leadership

17          and also discussed with relevant providers.

18          Thereafter, if necessary, a course of action to

19          address the same is also formulated."

20     Do you see that?

21  **A.**   I do.

22  **Q.**   And then she says (as read):

23          "Please direct any other questions or concerns

24          you have regarding our services to me, rather than

25          reaching out to other -- to any of our providers."

1    Right?

2  **A.**    Right.

3  **Q.**    Now, do you know that, in fact, Cheryle's file was

4  reviewed by clinical leadership following your outreach?

5         **MS. GREEN:**  Objection, foundation.

6         **THE COURT:**  Does she know that?

7  BY MS. BELL:

8  **Q.**    No?  Okay.

9  **A.**    What I do know is that nobody responded to me.

10  **Q.**    Understood.

11  **A.**    Nothing, at least, you know, "message received" or all of

12  those -- I mean -- yeah, no.  What I know, nobody responded to

13  me.

14  **Q.**    Okay.  So then there's a second visit to the ER, which you

15  talked about, and that was at the end of November; right?

16  **A.**    Correct.

17  **Q.**    Okay.  And you did not tell anyone at Done about that

18  visit; correct?  Your outreach was after the first visit, but

19  you did not follow up after the second visit; right?

20  **A.**    If there aren't any messages that -- I feel --

21    I did follow up; right?  Didn't I send additional messages

22  to Done?

23  **Q.**    You did send messages, but those were prior to the second

24  hospital visit.

25  **A.**    Oh.  I thought --

1          MS. GREEN:  Objection, misstates the testimony.

2          THE COURT:  I don't know.

3          MS. GREEN:  Prior testimony.

4    BY MS. BELL:

5    Q.   We can certainly look at those messages quickly, just --

6    but let me see if this refreshes your recollection without

7    pulling them up.

8         So we saw your messages were dated -- I believe we had

9    471, which were the LinkedIn outreach.

10        Do you recall that?  That was November 19th?

11   A.   Okay.

12   Q.   And then we had the response from Michelle Nam.

13        Do you recall that?

14   A.   Yes.

15   Q.   That was November 21st, what we just looked at.

16        And then you also sent a message to the care team, which

17   was Jane at Done, and that was November 27th.

18        Do you recall that?

19   A.   Right, and that doesn't coincide with this visit that

20   you're talking about?

21   Q.   So the end of November hospital visit was November 29th to

22   30th.

23   A.   Okay.

24   Q.   Okay.  So let's talk about that visit.

25        So you had mentioned that Cheryle had totaled her car or

1    had a car accident prior; right?

2    **A.**    Correct.  Sorry.

3    **Q.**    And you and Cheryle's father actually went to court and

4    sought to have her involuntarily committed at this point.

5         Do you recall that?

6    **A.**    Yes.

7    **Q.**    Okay.

8         **MS. BELL:**  And maybe we can pull up

9    Government Exhibit 2484, which is in evidence, at page 49.

10   **BY MS. BELL:**

11   **Q.**    So this was actually the petition that you filed, which is

12   part of the hospital record.

13        **MS. BELL:**  We can scroll down.

14   **BY MS. BELL:**

15   **Q.**    And do you see that what you write -- I think it was

16   actually your husband -- is (as read):

17        "Respondent has had a history of addiction to

18        Adderall such that it has led to psychosis."

19   Do you see that?  In the first line?

20   **A.**    Oh, sorry.  Yes.

21   **Q.**    Okay.  And the police actually came to Cheryle's

22   apartment, at which point she agreed to go to the hospital with

23   them that night; is that right?

24   **A.**    I guess.

25   **Q.**    Okay.  And then she got a physical exam at the ER once

1  again when she arrived; right?

2  **A.**    Right.

3  **Q.**    Let's look at page 54.

4  **A.**    Is this -- sorry.  Is this the same -- did we already

5  review this?  Like is this the same time of the macing

6  incident?

7  **Q.**    Yes.  This is --

8  **A.**    Okay.

9  **Q.**    Okay.  This is what happened after the mace.  So we'll get

10  to that in a moment.

11      Okay.  So we see that the ER staff did this -- did this

12  exam, the cardiac.  Again, heart is regular rate and rhythm.

13  We see neurological, where it says alert and oriented to

14  person, place, time, and situation.  No gross motor or sensory

15  deficit observed.

16      And then we see psychiatric:  Cooperative, appropriate

17  mood and affect.

18      Do you see that?

19  **A.**    I do.

20  **Q.**    And then if we can go to page 53.

21      That day Cheryle told a very different story than the one

22  you've told today.

23      Do you recall that?

24  **A.**    Can you -- can you -- no, I don't -- if you can share it

25  with me, I'm certainly that it will help me.

1  Q.  We can look right here.  It says (as read):

2          "Patient says she has a very abusive

3      relationship with her parents.  She said they tried

4      to tell her what to do and how to live her life all

5      the time.  She said that she is 24 years old and

6      lives on her own and pays all of her own bills, but

7      they continue to follow her about.

8          "She said today she got into an altercation with

9      her mother and she ended up pepper spray in her.  She

10     said that her mother was attacked.  She was the

11     victim.  She denies any thoughts of harming herself

12     or others.  She said she is here because her father

13     threatened to take out an IVC on her."

14     That's the involuntary commitment petition?

15         "She said she did not, even though that he was

16     in town and he showed up in town and several women

17     who she says that she doesn't know who they are.

18     Right now she denies any history of even hurting --

19     ever hurting herself or others."

20     And then she goes on.

21     And so she says -- she goes on, and this time they do

22  examine her.  The two different psychiatrists examine her this

23  time.

24         Do you recall that?

25  A.  I wasn't -- I wasn't present for that, no.

1  Q.    Okay.  Do you recall she also told them in the context of

2  this story that you have a key to her apartment?

3         MS. BELL:  Maybe we can go to 16 to 17.  Okay.

4  BY MS. BELL:

5  Q.    Somewhere in the middle of the page, she relayed that you

6  have a key to her apartment that she didn't provide.  And --

7         MS. BELL:  It might be actually page 17.  This might

8  be 16.  Oh, that is 17.  So maybe it's 16.

9         THE COURT:  I think we're going to take a recess now.

10     Ladies and gentlemen, we'll be in recess until 10 to

11  3:00 .

12     Remember the admonition given to you:  Don't discuss the

13  case, allow anyone to discuss it with you, form or express any

14  opinion.

15              (The jury leaves the courtroom.)

16     (Proceedings were heard out of the presence of the jury.)

17         THE COURT:  You can step down.

18         THE WITNESS:  Thank you.

19                   (Witness steps down.)

20         THE COURT:  The jury has retired.  So let's address

21  this note.

22     Juror Number 4 wants to be excused at 4:00 -- I mean,

23  pardon me, 12:00 on Thursday.  We're not meeting on Friday --

24  is that right? -- or we are meeting on Friday?

25         MR. FOSTER:  We're not currently.  We'd be happy to,

1  though, Your Honor.  We can make up the time then.

2      **THE COURT:**  I think I told the jury we're not.  So I

3  don't want to go against that.

4      Well, where are we in this case?  I mean, we're now like

5  witness number 4 or something, five.

6      **MR. FOSTER:**  I think the issue, Your Honor, is --

7      **THE COURT:**  Pardon me?

8      **MR. FOSTER:**  Yes, Your Honor.

9      I think the issue, Your Honor, is that so far, the

10  cross-examinations have consumed I would say double, if not

11  more, the amount of time as direct.  And a lot of the

12  consumption is due to asking witnesses if they know something

13  and then, when they don't, asking them over and over again

14  about things they don't know; and so that is what is slowing

15  down the proceedings.

16      **MS. BELL:**  Your Honor --

17      **THE COURT:**  Well, I'm not going to -- the proceedings

18  are the proceedings.  And, you know, there're different ways of

19  cross-examining.  I'm not going to get into that.  What I want

20  to try to figure out is for scheduling purposes where we are.

21      **MR. FOSTER:**  We're behind.

22      **THE COURT:**  This is key to where are we.  That's what

23  I need to know.

24      **MR. FOSTER:**  Behind, Your Honor, I think we're getting

25  to a witness who -- Ms. Neland is up, we may have disclosed

1    her --

2            THE COURT:  Pardon?

3            MR. FOSTER:  We may have disclosed the next witness

4    like almost -- we disclosed her over a week ago, so we're

5    moving much slower than the Government anticipated as a result

6    of the length of the crosses.

7            THE COURT:  Well, okay.  Well, what's the position of

8    the parties?  I mean, I can excuse her and put in a -- she's a

9    juror, so I can put in an alternate.  Then I'm down to five

10   alternates.

11           MR. FOSTER:  We'd like to keep her given the pace and

12   the length of the trial, like half day.  And if the jury is

13   amenable --

14           THE COURT:  I think one thing I can't do is -- I

15   think, I can do anything I want.  What I can't do is proceed

16   with the trial in her absence --

17           MR. FOSTER:  Correct.

18           THE COURT:  -- and is say we'll play catchup.  It's

19   taking the so long you can sort of guess what the testimony is.

20       So I think you have to decide and tell me, do you want her

21   excused -- assuming that I will if I excuse her, we'll go for

22   Thursday afternoon.  If don't excuse her I will, I mean --

23           MR. FOSTER:  We'd like to keep her.

24           THE COURT:  If I excuse her -- if I excuse her, we

25   won't do Thursday afternoon.  And if I don't excuse her, we

 1   will do Thursday afternoon.  That's the choice; isn't it?  Have

 2   I said it right?

 3           MR. FOSTER:  Yes, Your Honor.  We would like to keep

 4   her and not excuse her and --

 5           THE COURT:  Okay.  You want to keep her, therefore I

 6   would not go on Thursday afternoon.  And that's okay.

 7      Okay.  So you can tell her we will adjourn at noon.

 8           THE COURTROOM DEPUTY:  Okay.

 9           THE COURT:  Okay.  Thank you.

10      How much closer are we to the conclusion of this witness's

11   testimony.

12           MS. BELL:  Close.  Very close.  So I guess under half

13   an hour for sure.  Maybe 20 minutes.

14           THE COURT:  I really think that there is some grain of

15   truth into the observation of the Government that you are

16   spending a lot of time asking her things you know she doesn't

17   know.  There's no foundation for asking her these questions

18   because you know that she can't testify as to those things

19   because she's unaware of them.  And you're doing so in an

20   effort just to get the information in front of the jury.

21      I mean, that's obvious.  Why would you do it?  There's no

22   other reason to do it, other than to get evidence -- or what

23   purports to be evidence, but which isn't evidence -- before the

24   jury.  It's not to test her recollection.  It's not to do

25   anything other than demonstrate that there are other events of

 1  which she's unaware.

 2      Okay.  So I think you can do some of it, but, you know --

 3  and I'm not giving any -- I just if that's -- that's my

 4  observation as well.

 5          MS. BELL:  We'll move things along, Your Honor.  And

 6  we will separately establish through the medical record that

 7  these things happened.

 8          THE COURT:  Then, that being the case, there was no

 9  justification for asking her those questions.

10      Thank you.

11          MS. NECHAY:  Your Honor, I just wanted to confirm that

12  we are -- the Court is resuming on Friday, then, afternoon?

13          THE COURT:  Friday afternoon?  No, unless there's

14  something to be taken up.

15          MS. NECHAY:  Okay.

16          THE COURT:  I won't do it Friday afternoon unless

17  there's something that needs to be addresses.

18          MS. NECHAY:  I understood that we're not excusing this

19  witness and that we're then --

20          THE COURT:  What are we doing?

21          MS. NECHAY:  So based on the -- my understanding is

22  that the Court is not inclined to excuse that --

23          THE COURT:  Did you just listen to what was said?

24          MS. NECHAY:  I did, but maybe I'm --

25          THE COURT:  I thought I said I was excusing her.

1          MS. NECHAY:  I'm so sorry.  I missed that Your Honor.

2          MR. FOSTER:  No, Your Honor.  I think -- I think, Your

3    Honor.

4          THE COURT:  Did I misspeak.

5          THE COURTROOM DEPUTY:  You said we were going to

6    recess at noon on Thursday.

7          THE COURT:  That's -- yeah that's what I said.

8                    (Recess taken at 2:40 p.m.)

9                 (Proceedings resumed at 3:01 p.m.)

10     (Proceedings were heard out of the presence of the jury.)

11         THE COURTROOM DEPUTY:  Come to order.  Court is now in

12    session.

13         THE COURT:  Okay.  Bring in the jury.

14                  (The jury enters the courtroom.)

15       (Proceedings were heard in the presence of the jury.)

16         THE COURT:  Please be seated.

17    You may proceed.

18         MS. BELL:  Thank you.

19    BY MS. BELL:

20    Q.   Could we pull back up 2484 at page 9.

21         So before the break we were discussing the psychiatrist's

22    consultation with your daughter and the story that your

23    daughter told at the hospital.

24         And so, here we see the notes on that.  And what they say

25    is (as read):

1           "She reported childhood trauma.  Was brought in

2       under involuntary commitment filed by her father

3       after we reportedly assaulted her mother with mace

4       trying to obtain money from her.  IVC claims that

5       patient was psychotic in the context of abusing

6       stimulants.

7           "On my assessment, the patient provides her own

8       story which describes her parents as invasive and

9       attempting to sabotage her independence.  She does

10      not appear acutely psychotic and was able to provide

11      a relatively rational and cohesive narrative of

12      events.  Patient also admitted to her difficulty with

13      substances and stated she has recently established

14      with the therapist who she hopes will help her be

15      able to proceed with recovery as well as process

16      trauma which she feels like she has sustained at the

17      hands of her parents."

18      Do you see that?

19  A.  I do.

20  Q.  And ultimately the hospital did not decide that an

21  involuntary commitment was appropriate; right?

22  A.  I don't know that it says that here, but okay.  Yes.

23  Q.  We can just go to the -- do you see at the bottom it says,

24  "Diagnoses:  Unspecified anxiety," the bottom of that page?

25  A.  Yeah.

1    Q.    And then if we go to the top of the next page, we see that

2    it says (as read):

3              "At this time, plan" --

4        At the top it notes, "Stimulant use disorder," and then it

5    says (as read):

6              "Plan:  At this time the patient does not appear

7        to meet criteria for involuntary commitment."

8        Do you see that?

9    A.    I do.

10            MS. BELL:  Okay.  And then could we just go to

11   page 179, and if we could blow that up.

12   BY MS. BELL:

13   Q.    And so here we see the final diagnosis.  There's a

14   principal and a secondary.

15       Do you see that?

16   A.    I do.

17   Q.    And under secondary we see various things including ADHD.

18       Do you see that?

19   A.    I do.

20   Q.    And "other stimulant use, uncomplicated."

21       Do you see that?

22   A.    I do.

23   Q.    And some other things; right?

24   A.    Yes.

25            MS. BELL:  Thank you, Ms. Cooke.  No further

1   questions.

2          **THE COURT:**  Anything further?

3          **MS. NECHAY:**  No, Your Honor, thank you.

4          **MS. GREEN:**  Very briefly, Your Honor.

5                    <u>**REDIRECT EXAMINATION**</u>

6          **MS. GREEN:**  Ms. Braga, I think we can just put up

7   Exhibit 2484, page 179, just where Ms. Bell ended.

8   BY MS. GREEN:

9   **Q.**   Good afternoon again, Ms. Cooke.

10  **A.**   Hi.

11  **Q.**   Sorry.

12         **MS. GREEN:**  Ms. Braga, Exhibit 2484, page 179.  I

13  think it was just where we ended.

14  BY MS. GREEN:

15  **Q.**   Okay.  And just focusing where Ms. Bell ended on the final

16  diagnosis principal.  Ms. Bell just asked you, Ms. Cooke, about

17  one of the secondary diagnoses, but what was the primary

18  diagnosis, principal diagnosis, at the hospital?

19  **A.**   Paranoid personality disorder.

20  **Q.**   Okay.  And you testified on cross when you were being

21  asked about some of Cheryle's conditions that giving Cheryle

22  stimulants was like putting -- pouring gasoline on a fire.

23         Could you explain to the jury what you meant by that?

24  **A.**   Yeah.  Any time that Cheryle had -- had those experiences

25  of mania and erratic behavior, and even volatile, it was -- it

1    was when she was on stimulants.

2        And whether at the time -- at the time of Done we knew

3    that she had severe generalized anxiety disorder, which adding

4    stimulants to that is, again, like dumping, you know, putting

5    stimulants on top of a -- already really --

6        And generalized anxiety disorder is more than, you know,

7    being -- how anxious I feel about being here today; right?  It

8    is a condition.  It is a disorder which is widely used.

9        And then, in particular, once that mania which can be

10   induced just, you know, by Adderall or that psychosis or

11   paranoid -- the only way to stop it is to stay off of

12   stimulants.

13       And when I talked about Cheryle's behaviors of not being

14   episodic and her being able to sit and talk to a clinician and,

15   at this time, make up some stories, but -- it is just that.  It

16   is, you know, when she is on basic Adderall, or when she's

17   abusing it, that's when her life becomes unmanageable.  That's

18   when she becomes a different person.  That's when we become in

19   fear for her life and those consequences.

20   Q.   And you mentioned on cross with Ms. Bell close to the

21   beginning of her cross-examination that in December 2021, she

22   did go into treatment.

23       Did that treatment facility prescribe her stimulants?

24   A.   Absolutely not.  I mean, the main point of that treatment,

25   which I feel like she could have stayed longer or done more.

1    But the main -- the main thing of that treatment for the very

2    first -- for so long honestly was to get her to detox, to get

3    that out of her system; and then to counter the mania and the

4    delusions that existed.

5        And it took a while for her to come out and to like

6    recognize some of the things that she really believed; like

7    that we were not her parents or that were out to get her

8    somehow.  I parented like Queen Victoria, which all sounds as

9    bizarre as it does.  But it's really scary.  It took her some

10   time to do that.

11       So that was one of primary, first parts, of that treatment

12   is just to detox her off of the stimulants, and then let all of

13   the symptoms subside.

14   **Q.**  And you were asked a fair amount on cross about sort of

15   some earlier jobs that Cheryle may have had or speaking

16   engagements in 2021.

17       The suggestion that Adderall was essentially good for

18   Cheryle.  What was your view of that based on your

19   observations?

20   **A.**  I feel like Cheryle -- I feel like Cheryle, at that time,

21   before she started -- at that time, she probably felt that it

22   was because of that like she -- something was.

23       But then that was a really short-lived window before she's

24   like:  Oh, my gosh take me to the hospital.  Something is

25   wrong.

1    Right?

2    So -- and Cheryle had, again, she was, you know, an AP

3 student in high school.  She was on the dean list in college.

4 She had those successes and got those jobs without being on

5 Adderall or being on stimulants prior.  So to kind of indicate

6 that, "Oh, wow, look how good I'm doing because of this," it's

7 really the contrary because that was the start of really,

8 really horrific season of her life.

9 **Q.**   And I believe you testified on direct that you had really

10 noticed that decline start in around June 2021, and then

11 progress steadily worse until the hospitalizations.

12    Were you asked on cross about any job that Cheryle was

13 able to maintain after she lost that job in August that wasn't

14 the job that your -- that her father had given her?

15 **A.**   Oh, no, she got fired.  I mean, it was a really, really

16 short-lived, unmanageable -- yeah, that was -- she just -- it

17 didn't last.

18    So whether she got it -- when she got it, I mean, she was

19 done working there.  When did she get the job?  I think, it was

20 June.  She was done in early August.

21        **MS. GREEN:**  Thank you, Your Honor.

22        **THE COURT:**  Anything further?

23        **MS. BELL:**  Nothing, Your Honor.  Thank you.

24        **THE COURT:**  Okay.  Thank you very much.  You're

25 excused.

1          **THE WITNESS:**  Thank you very much, Your Honor.

2                          (Witness excused.)

3          **THE COURT:**  Call your next witness.

4          **MS. GREEN:**  The Government calls Ms. Kristin Bowen.

5      (Kristin Bowen steps forward to be sworn.).

6                       <u>**KRISTIN BOWEN**</u>,

7  called as a witness for the Government, having been duly sworn,

8  testified as follows:

9          **THE WITNESS:**  I do.

10          **THE COURTROOM DEPUTY:**  Thank you so much.  Please be

11  seated.  Please state your full name for the record and spell

12  your last name.

13          **THE WITNESS:**  It's Kristin Danette Bowen, B-O-W-E-N.

14      (Reporter interruption for clarity of the record.)

15          **THE WITNESS:**  D-A-N-E-T-T-E.

16                      <u>**DIRECT EXAMINATION**</u>

17  BY MS. GREEN:

18  Q.   Good afternoon, Ms. Bowen.

19  A.   Hi.

20  Q.   Where do you live?

21  A.   Corte Madera, California.

22  Q.   How long have you lived there?

23  A.   Since 2019.

24  Q.   Where you do you currently work?

25  A.   Currently work at Santa Rosa Behavioral Healthcare

1    Hospital.

2    **Q.**    What do you do there?

3    **A.**    I'm a psychiatric nurse practitioner.

4    **Q.**    How long have you worked there?

5    **A.**    I have worked there, first, as a nurse since 2022; then as

6    a nurse practitioner since March.

7    **Q.**    Could you briefly summarize your educational background?

8    **A.**    So I first received my associate degree in nursing in

9    2006, in Houston, San Jacinto College.

10    And then bachelor's of science in nursing from University

11    of Texas, as well as a master's in public health from

12    University of Texas, and my master's of science in nursing from

13    Spring Arbor University in Michigan.

14    **Q.**    We're going to be focusing on the 2021 time period.

15    In 2021 were you a registered nurse?

16    **A.**    Yes, I was.

17    **Q.**    And in 2021, were you aware of the regulations that

18    controlled the prescribing of controlled substances based on

19    your training and experience?

20    **A.**    Yes.

21    **Q.**    Just because we will look at some documents later, at

22    prior points in time have you gone by other surnames,

23    specifically Ms. Neland and Ms. Oliver?

24    **A.**    Yes.

25    **Q.**    Okay.  Are you familiar with a company called Done?

```
1   A.   Yes.

2   Q.   Did you work at Done in 2021?

3   A.   Yes, I did.

4   Q.   When did you join Done?

5   A.   In February of 2021.

6   Q.   Who did you interview with prior to joining Done?

7   A.   Ruthia and a handful of other employees there.

8   Q.   And what did Ms. He tell you about what Done did during

9   the recruiting process?

10  A.   She said Done was a comprehensive program through

11  telehealth to treat ADHD, so with medication but as well as

12  through therapy and lifestyle coaching.

13  Q.   And did you come to find whether Done covered lifestyle

14  coaching and therapy and these other treatment options besides

15  stimulants when you worked there?

16  A.   No, they didn't offer any of that.

17  Q.   Why did you want to work at Done?

18  A.   I'm very passionate about ADHD.  I myself have ADHD.  My

19  two children have ADHD.  It's something that I've seen the

20  real-life impact of.

21  Q.   You mentioned that you have ADHD.  Were you diagnosed as

22  an adult?

23  A.   Yes, I was.

24  Q.   Was that before you started working at Done?

25  A.   Yes.
```

**BOWEN - DIRECT / GREEN**

1   Q.   Could you briefly describe that process?

2   A.   Yes, so I first went to my psychiatrist at Kaiser because

3   my daughter had been diagnosed and her pediatrician suggested

4   that maybe the parents might have it -- which her father did.

5   But it suggested that I get screened.

6        So a psychiatrist then referred me to a clinical

7   psychologist who did a two-part evaluation.  So the first was

8   an interview that lasted about an hour and 45 minutes, hour and

9   a half.  And then there was a second meeting to go through the

10  results.  And that was about 45 minutes.  And then those

11  results were then sent to the psychiatrist, who then I met with

12  and then he prescribed medication.

13  Q.   And were those in-person or telehealth evaluations?

14  A.   They were all in person.

15  Q.   Did up have follow-up appointments after you were

16  prescribed medication?

17  A.   Yes.  So in the beginning, for the first two to

18  three weeks I met weekly to go -- you know, evaluate the

19  medication:  Was it working?  Did we need dose changes?  Any

20  side effects?

21       Then, I think, it was for every two weeks, and then

22  monthly after that.

23  Q.   And did you receive other medical care after you received

24  your diagnosis besides just the stimulant prescription?

25  A.   Yes.  So they -- Kaiser actually had a program where you

```
 1    would go.  They had this Leeds researcher.  You'd go, and they

 2    daily for two weeks to have education, lifestyle coaching,

 3    understanding ADHD, how to manage it.

 4    Q.    How similar was the process you just described to the

 5    process you observed for diagnosis and prescriptions at Done?

 6    A.    Like night and day different.

 7    Q.    Okay.  We're going to talk about some of that in more

 8    detail, what you were your day-to-day responsibilities at Done?

 9    A.    So I oversaw and it's a startup so also helped out with

10    provider recruitment, onboarding, management, so also a lot of

11    data analytics regarding those different aspects.

12    Q.    Did you have a title?

13    A.    It was a startup so it was kind of loose, but loosely it

14    was head of provider operations.

15    Q.    And through that role did you interact a lot with

16    providers?

17    A.    Yes.

18    Q.    Discuss concerns with them?

19    A.    Yes, daily.

20    Q.    Okay.  Who did you report to?

21    A.    Ruthia at first, and then later TJ Williams.

22    Q.    When did you stop working at Done?

23    A.    It was in August of 2021.

24    Q.    So that was about six months later.  Why did you leave

25    Done after six months?
```

1  **A.**   It was an incredibly difficult decision.  I was actually a

2  single mom at the time.  I did not have another job lined up.

3  But, it was just becoming very conflicting.  I was having to

4  interview these providers and provide them all these assurances

5  that we were doing things that we weren't doing.

6       And every effort that we had made, most of us at the

7  company, to try to make things more legitimate, to protect the

8  providers and their desire to practice ethically, was just

9  being challenged every time, and I just did not feel that I

10  could keep taking on that kind of risk.

11  **Q.**   You mentioned that the attempts you were making to improve

12  things at Done, make sure the providers were able to practice

13  ethically, were shut down.

14       Who was shutting you down?

15  **A.**   Primarily Ruthia.

16  **Q.**   Okay.  And did you feel that you were able to you

17  mentioned you were doing recruiting and it sounded like that

18  was a concern for you.  Did you feel that you could, in good

19  faith, keep recruiting providers to Done?

20  **A.**   No.  No.

21  **Q.**   Why is that?

22  **A.**   Every single provider that we interviewed, they always had

23  the same concerns:  What were we doing to, you know, screen out

24  people that had complex psychiatric illness, since we were just

25  focusing on one diagnosis; what were we doing to prevent abuse

1  and diversion of the medications; what were we doing to help

2  make sure that they could actually do a full psychiatric

3  evaluation in 25 minutes.

4      And they had -- every single one of them had these

5  concerns.  And I was essentially being told that I needed to

6  tell them information that was not true.

7  **Q.**  Okay.  Let's talk about that.  First of all, who was

8  telling you to tell them information that was not true?

9  **A.**  Ruthia.

10  **Q.**  And what types of information were you being told to

11  convey to these providers to mitigate their concerns, but that

12  wasn't true?

13  **A.**  We had to tell them that we had all these screeners and

14  questionnaires that were given to them beforehand that would

15  screen for anxiety and depression, that would screen for severe

16  mental illness.  We were telling them that we had this care

17  team that would check the CURES report ahead of time; that we

18  had the technology to verify people's identity to make sure

19  that they were who they said they were so that we could

20  actually verify that the person they were meeting was indeed

21  the person on the CURES report, for example.  And none of that

22  was happening.

23  **Q.**  So did you feel that the information that was being

24  conveyed to the providers about sort of this robust screening

25  process was not accurate?

1   A.   Right, it was not accurate.

2   Q.   Okay.  What were you told to tell them to alleviate their

3   concerns about the -- you mentioned 25-minute visits?

4   A.   The line that we were told to tell them was that:  Well,

5   you can do this in 25 minutes because we're doing so much of

6   this other work up front.  So we're doing these questionnaires,

7   we're screening them for severe mental illness, so you know a

8   lot of the work of the full evaluation is being already done.

9   Q.   Was that accurate?

10  A.   No.

11  Q.   Okay.  And we're going to discuss this in more detail, but

12  had those screeners, in fact, been removed and reduced?

13  A.   Yes.

14  Q.   By whom?

15  A.   Ruthia.

16  Q.   Okay.  We'll come back to that in a moment, but based on

17  your observations while you were at Done, what was your view as

18  to whether Done providers were able to prescribe stimulants in

19  accordance with standard practice?

20  A.   I mean, they weren't.  I mean, there was a lot of

21  challenges and obstacles to them doing that.  The institution

22  was not -- definitely not supportive.  And no matter how many

23  requests the providers made, the leadership at Done was not

24  willing to bend or budge to that.

25  Q.   So no matter how many requests the providers made to

1  change policies, practices, to allow them to practice in

2  accordance with their standard practice, those were being shut

3  down.  Was that your observation?

4  A.    Yes.

5  Q.    Were the providers able to practice according to their

6  independent clinical judgment based on the model they were in?

7  A.    No, I would not say so.

8  Q.    How frequently did you interact with Ms. He?

9  A.    Daily.

10 Q.    What language did you speak to Ms. He in?

11 A.    English.

12 Q.    Did Ms. He ever require a translator to engage in

13 conversations with you?

14 A.    No, absolutely not.

15 Q.    Did you have to translate documents or messages when you

16 sent them to her -- Ms. He in order for her to read them?

17 A.    No, no.

18 Q.    Were your perspective, based on your interactions with

19 Ms. He, what was her primary concern when it came to running

20 Done?

21 A.    She was very, very laser-focused on revenue and growth.

22 Q.    Okay.  Did you hear Ms. He use the term "conversion"?

23 A.    Yes, frequently.

24 Q.    What did that term mean in the Done context?

25 A.    So it was two parts.  So there's two different points

1  where a patient converted.

2      So essentially, first, when they came to the website, did

3  they make that conversion to setting up that initial

4  psychiatric evaluation, paying the $200 fee.  And once they had

5  their evaluation that initial appointment with the provider,

6  did they convert to become a subscribing member, so paying a

7  monthly fee.

8  Q.   And did you have discussions with Ms. He about conversion?

9  A.   Yes.

10 Q.   What was your -- based on your interactions what was your

11 understanding for why Ms. He was so focused on conversion?

12 A.   Because, as she put it, conversion was the key to

13 unlocking growth for the company.

14 Q.   And what was why was that?

15 A.   Because the more paying members that you have, because

16 they're paying a recurring fee, its recurring revenue.  And

17 money that comes in for essentially Done is not having to pay

18 their providers.  It's a tiny, tiny amount they are providing.

19 So it's literally almost all entirely revenue, that monthly

20 fee.

21 Q.   And you mentioned because Done essentially wasn't paying

22 providers, what did you mean by that?

23 A.   They were a part of their panel pay, which was, I think,

24 1/14 of their hourly pay, which is nothing; it's like, I think,

25 seven minutes or something.

1    So I mean, even just sending just the prescription itself

2    barely -- you know, probably takes more than seven minutes.  So

3    they were -- anything else they might be doing, if they were

4    doing a follow-up with them, if they were communicating with

5    them through the messaging system, if they were doing anything

6    else outside of that, it essentially was unpaid time.

7    **Q.**    Okay.  So under this subscription model it sounds like you

8    had this recurring revenue and not -- not paying for the other

9    time of the providers.

10    Is that what you meant when you were referring to how this

11    was basically where the growth is unlocated --

12    **A.**    Right.

13    **Q.**    -- and profit.  Okay.

14    Was Ms. He focused on other metrics besides growth and

15    revenue related to prescriptions?

16    **A.**    I mean, one of things that -- the metrics that we had to

17    report in daily standup was the number of prescriptions that

18    were filled.  Yeah.

19    **Q.**    What was your understanding for why that was a metric that

20    was important to Ms. He?

21    **A.**    Because it was a direct representation of whether or not

22    they were giving the members what they wanted.  So as long as,

23    you know, the number of prescriptions was growing then it was

24    reflective that they were successfully prescribing medications

25    to their members.

**BOWEN - DIRECT / GREEN**

1  Q.   Based on your interactions with Ms. He, how concerned was

2  she about ensuring there were adequate clinical controls around

3  Done prescribing controlled substances?

4  A.   I never heard her voice a single concern about that.

5  Q.   How much control did Ms. He exert over the clinical

6  practices at Done?

7  A.   She was very involved.

8  Q.   Who controlled provider compensation?

9  A.   Ruthia.

10 Q.   And who made decisions regarding the patient intake

11 process?

12 A.   Ruthia was the ultimate say.

13 Q.   Who was the ultimate decision-maker on the criteria used

14 to recruit providers?

15 A.   That was Ruthia.

16 Q.   And who decided ultimately how long appointments would be

17 scheduled for?

18 A.   That was Ruthia.

19 Q.   Who directed Done's policy as to whether follow-up

20 appointments were required for controlled substance

21 prescriptions?

22 A.   Ruthia.

23 Q.   Did you have concerns about how much control Ms. He was

24 exercising over clinical practices?

25 A.   Yes.  I was very shocked to learn that someone with no

1  clinical experience whatsoever had so much decision-making

2  capacity in how the providers worked.

3  **Q.**   Did you express concerns to Ms. He that some of the

4  practices or policies she was putting in place were unsafe for

5  Done members?

6  **A.**   Yes.

7  **Q.**   And what was Ms. He's response to that?

8  **A.**   She minimized.  She deflected.  A common thing that she

9  would say is -- when we expressed that there were concerns was:

10  Oh, you just need to follow the process.

11  **Q.**   Okay.  Did providers raise concerns about stimulants being

12  prescribed inappropriately or outside usual practice at Done?

13  **A.**   Yes, frequently.

14  **Q.**   And were those concerns raised with Ms. He?

15  **A.**   Yes.

16  **Q.**   What was her response to that?

17  **A.**   Again, she would often even criticize the providers make

18  it look like they were, you know, weak or inexperienced if they

19  had these concerns.  She would tell us to have them talk to

20  Dr. Brody kind of in an effort to, you know, also make them

21  feel like their concerns were unfounded.  But, yeah, I never

22  saw her actually validly consider any of their concerns.

23  **Q.**   Did you ever hear her make references to other startups in

24  this context?

25  **A.**   Yes.  I mean, she would say things like, you know, we're

1  just going to be the next Airbnb, you know, a platform.  And

2  she would make comparisons to Uber, especially.  That was

3  another common one.

4      She would often talk about how, you know, you have to bend

5  laws sometimes as a startup.  And she would say:  Look at Uber,

6  you know, they broke all these municipal codes when they were

7  starting up.

8      And she would say:  Travis told all his employees,

9  you know, when they were starting up, if they were afraid of

10  breaking laws that he would just buy a Tesla for whoever was

11  the first person to get arrested.

12      So she frequently used this line when we would bring up

13  these concerns, and she'd be like:  Oh, whoever is the first

14  person to get arrested, I'll buy you a Tesla.

15  **Q.**   Did Ms. He seem concerned about breaking the law based on

16  these comments?

17  **A.**   No.

18  **Q.**   What was your view as to the comparison to Uber and Airbnb

19  and whether that was appropriate?

20  **A.**   I mean, these are people sharing their homes, you know,

21  and/or like sharing their cars.  It's quite a bit different

22  from prescribing a controlled substance that can drastically

23  alter one's life.

24      I mean, actually, in my opinion, I feel like homeowners

25  through Airbnb or people who drive their cars probably had more

1  discretion with how they worked in practice than our providers

2  at Done did.

3  **Q.**  The home owners at Airbnb and the drivers at Uber, you

4  felt, had more discretion than the providers at Done?

5  **A.**  Yes.

6      (Reporter interruption for clarity of the record.)

7  **BY MS. GREEN:**

8  **Q.**  And you can feel free to move the mic closer, if that

9  helps you because you -- yeah.  You can pull the base of it

10  closer to you if that helps.

11  **A.**  Yeah.

12  **Q.**  Did providers raise concerns with Ms. He that, given the

13  prescribing practices on the platform, there was a risk of

14  serious negative outcomes for Done members?

15  **A.**  Did -- sorry?

16  **Q.**  Did providers raise those concerns with Ms. He that, given

17  the prescribing practices on the platform, there was a risk of

18  serious negative outcomes for Done members?

19  **A.**  Yes.

20  **Q.**  And how would Ms. He respond regarding who would be

21  culpable if such negative outcomes occurred?

22  **A.**  I mean, if -- she would blame the providers.  And if

23  the -- you know, we explained the providers are concerned

24  they're going to lose their license one time she said:  Well,

25  we're just pay for them to get their license back.

1    And we tried to explain to her that's not how that works.

2  Q.   Okay.  Were clinical concerns also raised with Dr. Brody?

3  A.   Yes.

4  Q.   And what was Dr. Brody's response when concerns about,

5  you know, prescribing stimulants safely on the platform were

6  raised with him?

7  A.   I mean, he would often minimize, deflect.  A couple of

8  times things, you know -- he said, you know:  Stimulants have

9  never really killed anybody.  It's, you know, just like a

10  strong cup of coffee.

11    I think even one time he said something, when a provider

12  was talking to him and she was saying something about being

13  afraid of being sued, and he was like:  Oh, I've been sued lots

14  of times.  It's not that big a deal.

15  Q.   Well, was your what is your reaction to hearing him

16  compare stimulants to a cup of coffee and they've never killed

17  anyone?

18  A.   Well, I mean, if it was just like a cup of coffee they

19  wouldn't pay 200 bucks to get a cup of coffee.  It's clearly

20  more than that.

21  Q.   Have you ever worked in a place that had a similar

22  approach to now that you've discussed of Ms. He and Dr. Brody

23  of complying with the law?

24  A.   No, never.

25  Q.   Did you ever hear Dr. Brody raise concerns or objections

BOWEN - DIRECT / GREEN

1  to the clinical policies that Ms. He was implementing?

2  A.    No.

3  Q.    When Dr. Brody was asked his opinion on something Ms. He

4  wanted to do that affected clinical practices, how would he

5  respond, did you observe, typically?

6  A.    I mean, typically, he would defer to Ruthia.  He would say

7  it's her company.

8  Q.    Did you have concern about practice and policies Ms. He

9  was implementing that affected the ability of providers to

10  practice independently?

11  A.    Yes.

12  Q.    Based on your observations, was Ms. He receptive to

13  suggestions from the providers on how to improve the clinical

14  practice?

15  A.    Not, no not at all.

16  Q.    Where you aware of Ms. He taking action that, in fact, not

17  only -- not receptive to providers but reduced safety for Done

18  members?

19  A.    Yes.

20  Q.    Could you give an example?

21  A.    So, for example, we had members or, you know, patients

22  would fill out the PHQ-9, which screens for depression,

23  possible depression; the GAD-7, which screens for possible

24  anxiety, which these are conditions that could mimic symptoms

25  of ADHD.  And those were in the platform.

1          And then, one day, we just starred getting providers

2    coming to us saying:  They're not in here.  I went to meet with

3    this patient.  The PHQ-9 isn't loaded in.  I was going to

4    review it ahead of time.

5          And there was a lot of confusion.  We couldn't figure out

6    why it wasn't in there.  We thought it was a bug in the system.

7    And Ruthia said, "I took them out last night because they were

8    causing too much friction."  She thought that patients were not

9    converting because they didn't want to have to fill out the

10   screeners.

11   **Q.**   Let's talk about that in a little bit more detail.  Based

12   on your observations who, from the providers, if anyone, did

13   Ms. He consult with before removing those intake screeners?

14   **A.**   No one.

15   **Q.**   What's Ms. He's approach to patient intake?

16   **A.**   She wanted it to be as minimal as possible, so she would

17   always put it to reduce friction.

18   **Q.**   And mentioned PHQ-9 and GAD-7 which I believe you said

19   were associated with anxiety and depression screeners.

20         What did you notice about whether any -- are you with the

21   ASRS?

22   **A.**   The ASRS, yes.

23   **Q.**   What is the ASRS?

24   **A.**   So it's -- the ASRS part A and part B.  So part A is what

25   screens for -- and this is, again, just screens, not

1  diagnostic -- screens for increased probability of having ADHD.

2       The part B screens for severity of symptoms so definitely

3  ads a lot more information to the probability of them having

4  ADHD, but it still requires a thorough examination after that.

5  **Q.**  So are any of these screeners diagnostic?

6  **A.**  No.

7  **Q.**  So can they be used, in your mind, to justify reducing

8  appointment times?

9  **A.**  No.

10 **Q.**  And I believe you mentioned the providers expressed a

11 desire to have these screeners; correct?

12 **A.**  Correct, yes.

13 **Q.**  What was your understanding for why Ms. He removed the

14 screeners?

15 **A.**  She just -- she was worried that patients were just

16 turning away from the platform because they felt like it was

17 taking too much time.

18      (Reporter interruption for clarity of the record.)

19      **MS. GREEN:**  She's writing down everything we're

20 saying, so I'll try to too speak slowly and clearly.  It

21 happens to everyone.

22      Can we please admit Exhibit 353?

23      **THE COURT:**  353 admitted.

24      (Trial Exhibit 353 received in evidence.)

25 \\\

BY MS. GREEN:

Q.   We see here a title of an Asana task, a subtask "Risk:
Pressure to diagnosis ADHD and prescribe stimulants.  Make
PHQ-9 and GAD-7 mandatory for all patients to complete before
first appointment."

     And we see here a Kristin Oliver.  Is that you?

A.   Yes.

Q.   And who did Denis Lam report to?

A.   Directly to Ruthia.

Q.   Okay.  And he writes (as read):

          "These questions are mandatory already on the
     new patient intake form, so why are providers asking
     for the answers?"

And you wrote (as read):

          "Apparently, they used to be mandatory but then
     it was changed so that patients were only prompted to
     complete them if they indicated that they felt
     anxious, GAD-7, or depressed.  However, in clinical
     practice these are used to tell if a patient is
     experiencing anxiety or depression because patients
     may not always know the symptoms of anxiety or
     depression.  So it would be best practice if all
     patients were asked to complete all three screeners.

          "I believe, the GAD-7 and PHQ-9 were made
     conditional because Ruthia," question mark, "or

1    someone wanted to reduce the intake time."

2        This is in May 2021.  Was it after this point in time that

3  you learned it was Ruthia that removed them?

4  **A.**    Yes.

5  **Q.**    How did you learn that?

6  **A.**    Because she said so.

7  **Q.**    Okay.  And let's go to the next page, please.

8          **MS. GREEN:**  Sorry.  Page 3.  I'm sorry, Ms. Braga.

9        And let's just zoom in on Mr. Lam's comment at the bottom.

10  **BY MS. GREEN:**

11  **Q.**    He responds (as read):

12            "I see.  @Ruthia He, can you confirm this, eng

13        can easily make all questions mandatory."

14        Is "eng" a reference to engineering?

15  **A.**    Yes.

16          **MS. GREEN:**  And let's go to the next -- to page 5,

17  please, Ms. Braga.  Let's look at Ms. He's response.

18        We can zoom in on that, please.

19  **BY MS. GREEN:**

20  **Q.**    (as read):

21            "We had debate on things like this before.

22        Every provider may want to add their own screening

23        questions, and if we just add all the questions

24        everyone wants to ask, it would be endless long.

25        Plus, provider has the whole video session to ask

1          more questions.  Don't think this can mitigate risks

2          either."

3          What was your reaction to Ms. He's response?

4          Yeah.  Sorry.

5   **A.**    I mean, it was incredibly frustrating because this was

6   something that it wasn't -- you know, the slippery slope

7   argument that they were asking for questions that were

8   endlessly long -- they were asking for the bare minimum.  And

9   it was something that was already told to them was part of the

10  process that they would get to have.  So that was being taken

11  away from them.

12         And they already had only 25 minutes, where any other

13  psychiatrist would have an hour to make a diagnosis.  And we're

14  telling them, now, they have to now ask those questions in the

15  25 minutes, which further takes away from them making a

16  diagnosis.

17  **Q.**    And were providers asking to, you know, include all of

18  their individually preferred questions or are these pretty

19  standard questions that are asked in all medical -- in many

20  medical practices?

21  **A.**    It's standard.  In any psychiatry practice, you'll fill it

22  out in the waiting room.

23  **Q.**    Was Dr. Brody made aware of this concern?

24  **A.**    Yes.

25  **Q.**    What was his response?

BOWEN - DIRECT / GREEN

1    A.    He didn't -- he didn't object.  He just again, just

2    deferred do Ruthia.

3    Q.    You mentioned at the beginning this sense that you -- or

4    that you felt you were providing inaccurate information about

5    Done to recruiters -- to providers when you were recruiting --

6    when you were recruiting.

7          Is this one of the examples of that?

8    A.    Yes.

9    Q.    Because you were being told to tell providers that you did

10   have a robust screening process; correct?

11   A.    Yes.

12   Q.    By re moving the screeners that providers wanted was

13   Ms. He allowing providers to practice in accordance with their

14   clinical judgment, in your opinion?

15   A.    No.

16   Q.    Do you know who Dr. Brindala was?

17   A.    Yes.

18   Q.    Who was he?

19   A.    He was the chief medical officer.

20   Q.    How would you describe the relationship between Ms. He and

21   Dr. Brindala based on your observation?

22   A.    Adversarial.

23   Q.    Why do you say that?

24   A.    Because Dr. Brindala was constantly trying to identify

25   these risks, essentially really trying to make sure that the

company was legitimate, practicing safely, respecting providers

as independent practitioners that could use their clinical

judgment; and Ruthia was adamantly against it and she

essentially had the final say in everything.

Q.   Okay.  Did Dr. Brindala ever make a comment to you

regarding his view of how Ms. He was operating Done

particularly with regard to clinical practice?

A.   Yeah, he was talking about how -- I mean, the company was

making tons of money.  I mean, just tons of money.  And they --

the reason it was able to grow so fast and make this much money

is because during the pandemic, an exception had been made to

needing to have a face-to-face visit in order to receive a

prescription for a controlled substance.

     And so we had a lot of -- we kind of had this unlocked

growth.  And Ruthia just didn't really have the clinical

awareness; you know, just kind of seemed -- didn't have like

any ethical guidelines.  So he said it was like she drunk-drove

a car over a cliff and landed in a pot of gold.

Q.   And you said she didn't really have the clinical

awareness, but were you and providers making Ms. He aware of

clinical concerns and standard practice when you were at Done?

A.   Yes.

Q.   Did she change her viewpoint or her practices in response

to that?

A.   No.

1          MS. GREEN:  Can we please admit Exhibit 356.

2          THE COURT:  356?

3          MS. GREEN:  Yes, please thank you, Your Honor.

4          THE COURT:  Admitted.

5      (Trial Exhibit 356 received in evidence.)

6          MS. GREEN:  Let's just zoom in on the top half so the

7   jurors can see it.

8   BY MS. GREEN:

9   Q.   So this is slightly -- a few days after that Asana task

10  that we read about the PHQ-9 and GAD-7.  What's the date on

11  this, Ms. Bowen?

12  A.   May 14th, 2021.

13  Q.   Okay.  And you write to Dr. Brindala (as read):

14          "Daily standup has gone almost an hour.  Every

15      one is trying to tell Ruthia that the providers need

16      to have ASRS, PHQ-9, and GAD-7 to make a diagnosis."

17      He replies (as read):

18          "I have had this conversation with her.  She

19      will not change her mind."

20      And you reply (as read):

21          "That was readily apparent after an hour of 10

22      people trying to reason with her.  Disappointed."

23      What happened at this meeting, Ms. Bowen --

24  A.   I mean, it was pretty much the entire company -- I mean,

25  very emotionally making the case why these were important,

1    you know, and how like our providers needed this at a minimum

2    in order to continue doing what they were doing ethically; and

3    she absolutely would not budge.

4    Q.    What was Dr. Brindala's view on the ASRS-B, the PHQ-9, and

5    GAD-7 being removed from based on your interactions with him?

6    A.    What was his?

7    Q.    View.

8    A.    View.

9          He felt they needed to be kept in there.

10   Q.    So Dr. Brindala did not direct her to remove those

11   questionnaires; correct?

12   A.    Oh, no.

13             MS. GREEN:    So could we please admit Exhibit 359?

14             THE COURT:    359 admitted.

15        (Trial Exhibit 359 received in evidence.)

16             MS. GREEN:    And we can just Zoom in on the top.

17   BY MS. GREEN:

18   Q.    Was there another meeting on this topic around May 17th,

19   2021?

20   A.    Yes.

21   Q.    And did you attend this meeting?

22   A.    Yes.

23   Q.    Did Ms. He?

24   A.    Yes.

25   Q.    Did Dr. Brody?

1  A.    Yes.

2  Q.    And we can just look at some of the attached --

3  attachments to this invite.

4       Did this meeting invite attach documentation of some of

5  the Done providers' concerns on this subject?

6  A.    Yes.

7  Q.    And, for example, let's just take page 3 as an example.

8  Did Ms. Ellis -- was she a nurse practitioner?

9  A.    Yes.

10 Q.    Did she write (as read):

11         "I feel that all new patients should fill out

12      these, as are many overlapping symptoms of both

13      bipolar and ADHD.  Also if the patient says they

14      don't have anxiety and depression, do they not have

15      to fill out PHQ-9 and GAD?  I would prefer all my

16      patients fill out all the screenings as it is just

17      good practice."

18      Ms. He provides a response.  (as read):

19         "If you have additional questions, you can

20      always ask them in the appointment."

21      And Ms. Ellis replies (as read):

22         "But the appointments are only 25 minutes.  I

23      feel bad saying this, but I think I may have to

24      resign as, to me, it does not seem reasonable to give

25      an accurate diagnosis in 25 minutes.  I always end up

1          going five to ten minutes over as I have to do these

2          questionnaires that should be done before the

3          appointment."

4          And did Ellis ultimately resign?

5     A.   Yes.

6     Q.   Okay.  And let's just take a look at one other example,

7     page 4 and 5.

8          Did -- and we don't have read all these here.  But did

9     Mr. Johnson, and looking at page 5 as well, and Ms. Oyeka also

10    raise similar concern that were included here about the removal

11    of these questionnaires?

12    A.   Yes.

13    Q.   And looking at page 6, please --

14         Regarding the ASRS-B being removed, Ms. He provides a

15    clinical -- a response (as read):

16              "For ASRS-B the official guideline is there are

17         no thresholds for part B, but these individual scores

18         can provide additional cues and can serve as further

19         probes into the patient's symptoms.  Also we confirm

20         with Dr. David, it's not required for the initial

21         screening, but providers can always ask these

22         questions during the session.

23         Consistent with what your recollection is, that Dr. Brody

24    agreed with Ms. He on this?

25    A.   Yes.

BOWEN - DIRECT / GREEN

1  Q.   So even with all these providers raising these concerns at

2  this meeting, did Ms. He agree to make the forms mandatory

3  again?

4  A.   No.

5  Q.   Did you have concerns that Ms. He was making a clinical

6  decision here that was overriding a request from providers as

7  to how they wanted to practice independently?

8  A.   Yes, I was very concerned.

9  Q.   Was the full ASRS ever reinstated, to your knowledge?

10 A.   No.

11 Q.   To your knowledge, was the PHQ-9 and GAD-7 ever made

12 mandatory again while when you were there?

13 A.   No, they were not made mandatory again.

14 Q.   Let's look at -- well, I want to talk briefly about the

15 screening question that was meant to identify a complex patient

16 in the intake questionnaire.

17      Are you familiar with that?

18 A.   Yes.

19 Q.   Was anyone prevented from booking an appointment based on

20 how they answered that question?

21 A.   Yes.

22 Q.   They were?

23 A.   Well, if they said no, it said you're not appropriate, but

24 then they could just hit the back arrow and reanswer again.

25 Q.   Let's look at that.

1           MS. GREEN:  Could we look at 923, please, for

2    admission, Your Honor.

3           THE COURT:  The number is?

4           MS. GREEN:  923.

5           THE COURT:  923 admitted.

6       (Trial Exhibit 923 received in evidence.)

7    BY MS. GREEN:

8    Q.   This is a Slack conversation from July 1st, 2021.  And

9    let's just go straight to page 3, please.

10       I'm just going to read one portion from this here.

11       Did you write on this date (as read):

12           "The only screening for complex patients that we

13           do is a single question during the initial signup

14           that asks 'Do you have a history of schizophrenia,

15           bipolar disorder, previous hospitalization, or

16           suicide attempts?' If they answer, yes, the system

17           says that they weren't a good fit for the platform,

18           but they can always go back -- there is an actual

19           back arrow -- and change the answer to no.

20           "The care team does dot review any of the intake

21           forms which would not really tell the provider if the

22           patient is too complex complaints it is not, quote,

23           almost impossible that patients are too complex, are

24           seen by the provider.  We deal with many of these

25           every day."

BOWEN - DIRECT / GREEN

1      Were complex patients screened out from being able to

2  access the platform?

3  **A.**    No.

4  **Q.**    During the recruiting process when you were recruiting

5  providers, what were you instructed to tell new providers about

6  this subject?

7  **A.**    That we had an extensive screening process that would

8  identify complex patients and prevent them from booking an

9  appointment.

10 **Q.**    Was this other topic area that you felt was -- you were

11 told to say something false to the new providers?

12 **A.**    Yes.

13 **Q.**    Did Done policies or practice allow for providers to treat

14 complex patients any differently from those who did not have a

15 complex issue?

16 **A.**    Sorry.  Say that again?

17 **Q.**    Did Done's policies or practices allow for providers to

18 treat complex patients differently than those who may not have

19 a complexity or a comorbidity?

20 **A.**    No.

21 **Q.**    For example, were initial appointments scheduled for a

22 longer period of if a patient was complex?

23 **A.**    Oh, absolutely not, no.

24 **Q.**    Were providers paid more for an initial appointment?

25 **A.**    No.

1   Q.   Were providers allowed to schedule more follow-ups if they

2   had a complex patient?

3   A.   No.

4   Q.   Did Done providers get paid for follow-ups with complex

5   patients?

6   A.   No.

7   Q.   Was there any different guidance provided to providers

8   that stimulants may not be the first-line treatment for complex

9   patients?

10  A.   No.

11  Q.   So, fair to say, there was a one-size-fits-all approach at

12  Done, in your opinion?

13  A.   Yes.

14  Q.   I want to go back to a topic related to Dr. Brody.

15       How frequently did you interact with Dr. Brody?

16  A.   He came to some of the daily standups.  Met him in person

17  in San Francisco, but -- yeah, regularly.

18  Q.   Are you aware of whether Dr. Brody wrote controlled

19  substance prescriptions for Done members?

20  A.   Yes.

21  Q.   Did Dr. Brody have appointments with Done members to whom

22  he wrote these prescriptions?

23  A.   No, no.

24  Q.   Do you know whether Dr. Brody reviewed the medical records

25  of Done members in the -- in the EHR, the electronic health

1  record, before writing prescriptions?

2  **A.**    No.  No.  I don't even think he had a login for most of

3  the time that I was there.

4  **Q.**    Are you familiar with the term "bridge refill"?

5  **A.**    Yes.

6  **Q.**    What is that, based on your understanding?

7  **A.**    The concept that is if a patient is no longer seeing their

8  provider, or the provider left the platform and there's no

9  other provider in the state, due do circumstances where the

10  patient is in need of a refill, they're due for one and they

11  don't have a provider to prescribe it immediately, the idea is

12  that you can refill -- like if it's going to be two weeks gap

13  between when they run out and when they can see their provider

14  then you can issue, like, a two-week refill during that time to

15  bridge them until they see their next provider.

16  **Q.**    And what was your view based on your observations as to

17  whether Dr. Brody was -- these refills he was writing were

18  bridge refills as this term in used in normal practice?

19  **A.**    No, these were not bridge refills.

20  **Q.**    Did he know the patients to whom he was prescribing?

21  **A.**    No.  The care team just gave him like this giant

22  spreadsheet of just tons of patients.  Even when I looked at

23  them, I realized a lot of them were duplicates.  And he would

24  just go through and all right.  See the patient, the name, date

25  of birth, where the pharmacy was, and just send, send, send,

BOWEN - DIRECT / GREEN

1    send, send.

2    **Q.**   And did you get a sense of how many of these refills

3    Dr. Brody was writing?

4    **A.**   I mean, there were so many that he was upset and

5    complaining that he was spending so much of his day sending

6    them; but I would say I mean it sounded like in the hundreds.

7    **Q.**   And you said he spent so much time complaining that he --

8    there were so many of them.  But did you hear him suppress sort

9    of clinical concerns about what he was being asked to do?

10   **A.**   No.  No.  He just felt like it was not how he wanted to

11   use his time.

12   **Q.**   While at Done did you do an analysis of refill

13   prescriptions that Dr. Brody was writing?

14   **A.**   Yes.

15   **Q.**   And what did you find in terms of the context in which

16   Dr. Brody was writing prescriptions?

17   **A.**   So a lot of them were either the patient had changed their

18   pharmacy -- and this was a common tactic that patients with --

19   people who were drug-seeking would use, is they would have the

20   provider send it to one pharmacy.  And then, after the provider

21   sent it, then, they would say "Oh, wait.  No, no.  It's

22   actually supposed to be sent to this pharmacy," and it's

23   another one.  And so a lot of times the providers would either

24   refuse to do that or, you know, the providers maybe only worked

25   once or twice a week, so they didn't necessarily see that

1    request, so that was one circumstance.

2        Another circumstance was when a provider did not feel that

3    they were appropriate for a stimulant prescription.  And then

4    if they complained to the care team and they, you know, said

5    something like, "Oh, I've been taking 40 milligrams of

6    Adderall, you know, my entire life," then the care team would

7    put that on there.

8        There were several different circumstances, but basically

9    any time a patient needed a prescription and had not gotten it

10   from the provider.

11   Q.   Okay.  But based on your review, did you -- it sounds like

12   you saw valid reasons why a patient may not have gotten a

13   prescription such as a duplicate request or the provider

14   deeming, in their judgment, that they should not prescribe a

15   stimulant; correct?

16   A.   There were some that were valid; I mean, like the provider

17   had left and so then we didn't have a provider left in the

18   state.  But that was not the majority of those prescriptions.

19   Q.   I meant did you observe valid reasons why the initial

20   provider may not have sent the script?

21   A.   Yeah.  There was circumstances where, you know, they felt

22   the patient wasn't appropriate for a stimulant for a variety of

23   reasons -- maybe they suspect the patient had bipolar disorder

24   or something, where a stimulant would not be appropriate, and a

25   history of substance use, particularly with methamphetamine or

1    stimulants -- and so they had given them a non-stimulant

2    medication, and the patient had not wanted that.

3    Q.    Okay.  And did Dr. Brody ever express concerns like the

4    ones you're discussing here, that he was writing prescriptions

5    where there was actually a valid reason why the initial

6    provider had not sent the script?

7    A.    I did not hear him express any concerns like that.

8    Q.    And you're not a doctor; correct, Ms. Bowen?

9    A.    I'm not.

10    Q.    But you were able to determine that there were reasons

11    that these scripts should not have been sent through your

12    analysis; correct?

13    A.    Yes.

14    Q.    Did you share your concerns about the prescriptions

15    that -- first of all, were you concerned when you did this

16    analysis and had your findings?

17    A.    Oh, yes.

18    Q.    Why?

19    A.    Because these prescriptions weren't appropriate for the

20    patient.  I mean, they had seen a provider.  The provider had

21    deemed that they weren't appropriate.  And then that decision

22    was being overridden.  And -- I mean, without a chart review,

23    without meeting with the patient, without any of those things

24    that might need to go into a second opinion.

25    Q.    And who was overriding that decision?

1    **A.**    Dr. Brody.

2    **Q.**    Okay.  Did you share your concerns with Ms. He?

3    **A.**    Yes.

4    **Q.**    And what was her response?

5    **A.**    She was not concerned.

6    **Q.**    Did you discuss your concerns with Dr. Brody himself?

7    **A.**    Yes.

8    **Q.**    What was his response?

9    **A.**    I think -- you know, he was concerned -- again, he just

10   didn't want to have to have that volume of prescriptions to be

11   sent.  So his concern was that we give feedback to the

12   providers that they need to be sending these prescriptions

13   themselves.

14   **Q.**    Okay.  And what was Ms. He's view on the providers who had

15   not been sending those original scripts?  Was she understanding

16   or did she want you to take different action with them?

17   **A.**    She wanted me to give them the feedback that this was

18   considered poor performance, and that -- you know, wanted to

19   put into place a performance improvement plan, or, you know,

20   possibly remove them from the platform.

21   **Q.**    Did you agree this was poor performance?

22   **A.**    Oh -- no.

23   **Q.**    Was Ms. He concerned about Dr. Brody leaving?

24   **A.**    It seemed so, yes.

25   **Q.**    What was your understanding for why?

```
 1    A.    I wasn't completely certain why.  It seemed --

 2              MR. SCHACHTER:  Objection.  Foundation.

 3              THE COURT:  Lay a foundation.

 4    BY MS. GREEN:

 5    Q.    Did you have discussions with Ms. He about concerns about

 6    Dr. Brody leaving?

 7    A.    Yes.  She seemed to think that, you know --

 8              MR. SCHACHTER:  Objection, Your Honor.

 9              THE COURT:  Overruled.  Go ahead.

10    BY MS. GREEN:

11    Q.    She seemed to think that he was important to the company?

12    A.    Important to the company.  But he didn't seem -- like that

13    seemed like his, actually, main function was filling those

14    prescriptions and occasionally like talking with providers.  He

15    wasn't -- he didn't seem to have this key role, but she seemed

16    to be very concerned about making sure he stayed on the

17    company.

18    Q.    Okay.  What, from your perspective, was a key role that he

19    was providing?

20    A.    Filling these prescriptions that the providers wouldn't

21    fill.  And then, you know, if providers had concerns,

22    essentially he would meet with them to coach them and,

23    you know, try to alleviate those concerns.

24    Q.    Mm-hmm.  How obvious was it to you that Dr. Brody wasn't

25    someone that should be relied upon for clinical advice?
```

 1          MS. NECHAY:  Objection, leading.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  He did not seem to be providing much, if

 4    any, clinical advice outside of really kind of deferring to

 5    what Ruthia wanted.

 6    BY MS. GREEN:

 7    Q.   Did you form an impression as to why Dr. Brody was willing

 8    to write so many of these prescription refills?

 9    A.   I mean, I'm assuming he was getting paid --

10          MS. NECHAY:  Objection, speculation.

11          THE COURT:  Sustained.

12    BY MS. GREEN:

13    Q.   Was Dr. Brody licensed in all the states in which he was

14    prescribed?

15    A.   No.

16          MS. NECHAY:  Objection, lack of foundation.

17          THE COURT:  Lay a foundation.

18          MS. GREEN:  I can lay a foundation.

19    BY MS. GREEN:

20    Q.   Was it discussed at done that Dr. Brody was not -- whether

21    or not Dr. Brody was licensed in all the states where he was

22    prescribing?

23    A.   Yes, extensively.  It was a special project that Michelle

24    Hume.

25    Q.   And was it also discussed with Ruthia, Ms. He?

1  **A.**    Yes.

2  **Q.**    And what was discussed on this topic?

3  **A.**    That he was not licensed in all these states; that the

4  care team in the Philippines were trying to kind of help him

5  get all the paperwork, and fill it all out to try to get

6  licensed in more states.  I think they were mainly concerned

7  that what would they -- they expressed concern that once the

8  pandemic restrictions were lifted that, you know, the agencies

9  might be looking more critically at him writing prescriptions

10  in states he wasn't licensed in.

11  **Q.**    But was that, even during the pandemic, to your knowledge

12  was it permissible to write prescriptions where you were

13  licensed?

14  **A.**    No, it wasn't.  I think they just felt it would become

15  under the radar more.

16  **Q.**    Like more noticeable?

17  **A.**    Yes.

18  **Q.**    And what was Dr. Brody's response to this concern?

19  **A.**    He didn't seem very concerned.

20  **Q.**    What was Ms. He's response?

21  **A.**    I mean, she essentially assigned the task to the care team

22  to work on this, but I don't think it was a top priority.

23            **MS. GREEN:**  Your Honor, I'm switching to a different

24  topic.  I'm happy to continue as you see fit.

25            **THE COURT:**  I think we'll take our recess now.

1    Remember the admonition given to you:  Don't discuss the

2    case, allow anyone to discuss it with you, form or express any

3    opinion.

4    On Thursday we're going to conclude at noon on Thursday.

5    Thank you.

6                    (The jury leaves the courtroom.)

7    (Proceedings were heard out of the presence of the jury.)

8            THE COURT:  You're excused.

9                            (Witness excused.)

10           THE COURT:  Okay.  Thank you.  See you tomorrow.

11          MR. SCHACHTER:  Just raise two very short issues.

12           THE COURT:  Of course.  You have to do it in front of

13   the microphone.

14          MR. SCHACHTER:  I was just waiting for the witness to

15   leave.

16                    (Pause in proceedings.)

17          MR. SCHACHTER:  Two very brief issues with respect to

18   the questions of witness after witness about Ms. He's language

19   capability.  At this point, I mean, we object that it is

20   cumulative.  There is no dispute that Ms. He spoke English in

21   the workplace.  That she wrote in English is something that the

22   jurors have seen; that is not the issue.

23   She is, nonetheless, on trial for her liberty in a trial

24   that is being conducted in a language that is not her own, and

25   the Government seems to be insinuating through these questions

1    that there is something improper about her wanting to hear the

2    proceedings in her own language.

3        I understand -- and the Court made very clear and I

4    understand -- that there may be a useful reason for it, to

5    establish that Ms. He was aware of what was going on.  We get

6    that.  It's cumulative, now --

7            **THE COURT:**  I don't think it's cumulative.  You -- and

8    I'll tell you why I don't think it's cumulative.

9        The witness is testifying about a conversation she had

10   with your client.  It's important to understand that

11   notwithstanding the fact she had no translator there she

12   understood, or appeared to the witness to understand what was

13   being said to her, and appeared to be able to communicate to

14   the witness.  So it's not cumulative in any -- in any -- for

15   any witness to -- who relates conversations with your client.

16   It's totally appropriate question.

17       I mean, even if the person didn't speak -- it wasn't a

18   language issue, it was a different issue.  Frequently you would

19   say:  Well, was the person standing there?  Did the person

20   appear to understand?

21       Even if it's not a language issue.  There's no question,

22   you are entitled to explore the fluency -- I mean, I suppose,

23   in a way, if you want to if -- you think it's becoming

24   cumulative, you can simply enter into a stipulation with the

25   Government that everything that was said to Ms. He, and in

PROCEEDINGS

1    response, and in Ms. He's communications, she understood.  As

2    being -- she understood.  And then I think it does become

3    cumulative at that point.

4        But absent that stipulation -- and I'm not inviting it.

5    Absent that stipulation I think it's proper.

6            MR. SCHACHTER:  Understood.

7            THE COURT:  And your second point?

8            MR. SCHACHTER:  With respect to the text messages that

9    were introduced this morning through Ms. Emeruem, that was the

10    subject of our motion which was pending ruling from the Court.

11    And the Court has made very clear that the Court's practice is

12    oftentimes to allow things to be admitted subject to motions to

13    strike.  I don't know if the Court has ruled now on the motion

14    that was pending, but those -- those text messages were the

15    subject of the motion.

16            THE COURT:  Okay.  So let's take a moment and go back

17    to those text messages.  I don't know whether they ought to be

18    shown to me or you want to simply argue it.

19            MR. SCHACHTER:  I mean, I can describe them, Your

20    Honor.  They were text messages.  They were outside of the

21    company's platform.  They were a set of text messages among

22    various nurse practitioners.  They were complaining about a

23    number of things including not being compensated for their time

24    doing refills, and that they wanted to do follow-ups.

25        We had filed a motion to preclude those.  And it was,

1    I believe, that it remains -- it remains pending.  I understand

2    the practice of the Court is for us to raise it and then it may

3    be stricken.

4         **THE COURT:**  Okay.  Yes.  Would you like to respond?

5         **MS. GURSKIS:**  In the first instance, I don't believe

6    it remains pending.  I think Your Honor was quite clear and

7    before the break said, when this was addressed last week, that

8    subject to your reading of *Bonds* over the lunch break that you

9    were denying their motion to preclude the evidence.  And that

10   if after reading that you wanted to revisit the issue, you

11   would revisit the issue.

12        The evidence came in.  I think, it was quite clear and has

13   been quite clear both from the testimony of the witness and the

14   documents themselves that they were employees discussing

15   matters within the scope of their employment, squarely falling

16   802(d)(2)(D).

17        **THE COURT:**  Okay.  So -- yes, Mr. Schachter.  Yes, go

18   ahead.

19        **MR. SCHACHTER:**  Just to summarize our position, they

20   are not employees, they're independent contractors and no way

21   are they agents of --

22        **THE COURT:**  At this point, I'm allowing them in.

23        I'll just hear if there's any evidence later on that would

24   persuade me -- persuade me otherwise.

25        They certainly do seem to be agents within the -- within

1    the meaning of the evidence code.  Okay.  You can renew it.

2         **MR. SCHACHTER:**  And if I just may, just to preserve

3    the issue.

4         **THE COURT:**  Yes.

5         **MR. SCHACHTER:**  So the issue comes up a lot.  For

6    example, there was a statement in a text message today from --

7    between Dr. Brindala and the witness saying:  I've spoken about

8    this with Ms. He many times.  She won't change her mind.

9         In my view, that is -- that is hearsay.  It is an

10   out-of-court statement that's offered for the truth.  I'm sure

11   the Government's position would be:  Dr. Brindala is an agent

12   of Ms. He.

13        Rather than objecting each time, and obstructing the

14   proceeding, I just want to make sure that our argument, which

15   is threshold to that issue, is preserved; that these are not

16   agency admissions and should not be admitted.

17        **MS. GURSKIS:**  Two points on that, Your Honor.

18        First, he is an employee.

19        Second I think it's been -- was a feature, in fact, of the

20   defense opening how Dr. Brindala was this prestigious

21   individual retained by the defendant to help her at the

22   company.

23        So I think that's a little bit inconsistent.

24        **THE COURT:**  Okay.  Anyway you're -- you have preserved

25   it.

PROCEEDINGS

1          MR. SCHACHTER:  Thank you, Your Honor.

2          THE COURT:  And your motion is denied.

3          MR. SCHACHTER:  Thank you, Your Honor.

4          THE COURT:  Okay.  See you tomorrow.

5              (Proceedings adjourned at 4:10 p.m.)

6                      ---o0o---

7

8                  **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Tuesday, October 7, 2025

13

14

15

16

17   _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
18            Official Reporter, U.S. District Court

19

20

21

22

23

24

25