Volume 18

Pages 3893 - 4076

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
    vs.                        )   NO. **3:24-cr-00329-CRB**
                               )
RUTHIA HE and DAVID BRODY,     )
                               )
            Defendants.        )
_____)

                    San Francisco, California
                    Monday, November 3, 2025

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        Northern District of California
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                   BY:  **KRISTINA GREEN**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        U.S. DEPARTMENT OF JUSTICE
                        FRAUD SECTION
                        950 Pennsylvania Avenue NW
                        Washington, D.C. 20530
                   BY:  **JACOB N. FOSTER,**
                        **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:  (CONTINUED)

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
                    BY: **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
                    BY: **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
                    BY: **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
                    BY: **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                        **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
                    BY: **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:  Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Ashley Moore**
                **Barbara Hua Robinson, Mandarin Interpreter**
                **Jeff Dinn, Mandarin Interpreter**

1                              **I N D E X**

2    Monday, November 3, 2025 - Volume 18

3    <u>**GOVERNMENT'S WITNESSES**</u>                           <u>**PAGE**</u>   <u>**VOL.**</u>

4    <u>**GOODMAN, DAVID**</u>
     (SWORN)                                              3896   18
5    Direct Examination by Ms. Green                      3897   18
     Cross-Examination by Mr. Schachter                   3987   18

6                            **E X H I B I T S**

7    <u>**TRIAL EXHIBITS**</u>                         <u>**IDEN**</u>   <u>**EVID**</u>   <u>**VOL.**</u>

8
      7534A                                                4008   18
9

```
 1   Monday - November 3, 2025                          9:15 a.m.

 2                        P R O C E E D I N G S

 3                            ---oOo---

 4    (Proceedings were heard out of the presence of the jury.)

 5            THE COURTROOM DEPUTY:  All rise.  Court is now in

 6   session.  The Honorable Charles R. Breyer presiding.

 7            MS. NECHAY:  Good morning, Your Honor.  Dr. Brody is

 8   still -- oh, there he is.  Thank you very much.

 9            THE COURT:  Okay.  Bring in the jury.

10                    (The jury enters the courtroom.)

11    (Proceedings were heard in the presence of the jury.)

12            THE COURT:  Okay.  Please be seated.

13    Let the record reflect all jurors are present, parties are

14   present.

15    You may call your next witness.

16            MS. GREEN:  Thank you, Your Honor.  The Government

17   calls Dr. David Goodman.

18    (Dr. David Goodman steps forward to be sworn.)

19            THE COURTROOM DEPUTY:  Please stand to be sworn.

20                        DAVID GOODMAN,

21   called as a witness for the Government, having been duly sworn,

22   testified as follows:

23            THE WITNESS:  Yes.

24            THE COURTROOM DEPUTY:  Thank you.  You may be seated.

25    Please state your full name for the record and spell last
```

GOODMAN - DIRECT / GREEN

1    name.

2         **THE WITNESS:**  Dr. David William Goodman.

3    G-O-O-D-M-A-N.

4                    <u>**DIRECT EXAMINATION**</u>

5    **BY MS. GREEN:**

6    **Q.**    Good morning, Dr. Goodman.

7    **A.**    Good morning.

8         **MS. GREEN:**  Good morning, members of the jury.

9    **BY MS. GREEN:**

10   **Q.**    Dr. Goodman, could you please provide a brief overview of

11   your professional background?

12   **A.**    I'm an assistant professor in the department of psychiatry

13   and behavioral sciences at the Johns Hopkins School of

14   Medicine.  I'm also a clinical associate professor at the State

15   University of New York Upstate.

16        I've been in private practice for 40 years with a focus on

17   ADHD, general adult psychiatry, psychopharmacology.  I've

18   treated thousands of patients.  I'm also a

19   national/international lecturer and invited lecturer to

20   conferences around the world and in the U.S.  I participated in

21   clinical trials for which some of the earlier medications are

22   currently approved and on the market.

23        I teach psychiatric residents for the past 30 years at the

24   Johns Hopkins School of Medicine.

25   **Q.**    Are you also a member of certain professional

**GOODMAN - DIRECT / GREEN**

1  associations, like the American Psychiatric Association?

2  **A.**   I'm a member of the American Psychiatric Association.  I'm

3  a member of the American Professional Society on ADHD and

4  Related Disorders.  I'm on the scientific committee for the

5  World Federation of ADHD.  And I'm also a member and coauthor

6  on an upcoming manuscript for the American Society of Clinical

7  Psychopharmacology.

8  **Q.**   And have you also served on -- I'm sorry.

9          **THE COURT:**  It's going to be a long morning, so...

10      Seriously, let the witness finish.

11          **MS. GREEN:**  Definitely, Your Honor.  Thank you.

12  **BY MS. GREEN:**

13  **Q.**   Have you also served on various executive communities for

14  the American Professional Society for ADHD and Related

15  Disorders?

16  **A.**   Yes.

17  **Q.**   You don't frequently testify as an expert in litigation;

18  correct?

19  **A.**   I do not.

20  **Q.**   In fact, have you only testified once as an expert in the

21  past 10 years, and that was approximately 8 years ago?

22  **A.**   Correct.

23  **Q.**   So you focus your time on your clinical practice,

24  lecturing, and educating as a subject matter expert?

25  **A.**   Yes.

GOODMAN - DIRECT / GREEN

1    Q.    Not typically hired as an expert for litigation?

2    A.    No.  Only one case in -- within the last 10 years.

3          MS. GREEN:  The Government now moves to qualify

4    Dr. Goodman as an expert in the diagnosis and treatment of

5    ADHD.

6          THE COURT:  Okay.  You may proceed.

7    BY MS. GREEN:

8    Q.    Did the Government engage you to serve as an expert in

9    this case in approximately June 2025?

10   A.    Yes.

11   Q.    And did the Government engage you to provide opinions as

12   to the usual course of practice for diagnosing and treating

13   ADHD?

14   A.    Yes.

15   Q.    And did they also engage you to provide expert opinions on

16   whether Done's treatment of a number of members was for a

17   legitimate medical purpose within the usual course of practice?

18   A.    Yes.

19   Q.    How many Done members did you review?

20   A.    16.

21   Q.    Were those members the following:  Harlan Band, Nicholas

22   Chieppa, Cheryle Cooke, Kristiana DePrimo, Shenila Farooq,

23   Brenda Hill, Robert Hunt, Daniel Johnson, Ashley Kelley, Kyle

24   Lesser, Patricia Li, Ali Lynch, Vashti Oechsner-Souza, Adam

25   Richardson, Aldo Soto, Tapasya Trivedi.

GOODMAN - DIRECT / GREEN

1    **A.**    (No verbal response.)

2    **Q.**    Dr. Goodman, based on your review of the 16 Done members,

3    did any of them meet the diagnostic criteria for ADHD?

4    **A.**    Not a single one.

5    **Q.**    Did all 16 receive stimulant prescriptions?

6    **A.**    Yes.

7    **Q.**    What was your opinion as to whether Done's controlled

8    substance prescriptions to these 16 patients was written --

9    were written for a legitimate medical purpose within the usual

10   course of professional practice?

11   **A.**    There was no prescription written for a legitimate medical

12   purpose in the usual course of professional practice.

13   **Q.**    In your --

14        **MR. SCHACHTER:**    Your Honor, I'll just -- just -- for

15   the record, just object to the relevance of that opinion in

16   light of the brief that we submitted.  Just -- I'll just do

17   this one, Your Honor, if it's acceptable, just to preserve the

18   record.

19        **THE COURT:**    Overruled.

20   **BY MS. GREEN:**

21   **Q.**    In 40 years of practice, have you ever seen anything like

22   what you -- what you saw with respect to Done's treatment for

23   these members?

24   **A.**    No.  In fact, it's my opinion, my review of these records

25   was reflective of such a deviation from the usual course of

1  professional practice, that I actually found it sad that

2  patients were being treated this way.

3  Q.  What was your hourly rate for the Government?

4  A.  $850.

5  Q.  Is that similar to what you charge in your private

6  practice?

7  A.  In my private practice, when I see patients, it's $500 an

8  hour.  When I see evaluations for 90 minutes, it's $1,400 an

9  hour, which works out to approximately $950 an hour.

10  Q.  Okay.  And the first point that you mentioned where you

11  said when you see patients it's about $500 an hour, is that

12  with respect to follow-up appointments for existing patients?

13  A.  Yes.

14  Q.  And $1,400 per initial visit, 90 minute -- 90-minute visit

15  for new patients?

16  A.  Correct.

17  Q.  How much do you expect to receive for your work on this

18  case in total, approximately?

19  A.  Somewhere between 2- -- 205 -- 500 hours.

20  Q.  Okay.  Approximately $174,000?

21  A.  If that's the math, yes.

22  Q.  Are the opinions you offer in this case your own

23  independent expert opinions?

24  A.  Yes.

25  Q.  In June 2022, did an individual called Dr. Stephen Stahl

GOODMAN - DIRECT / GREEN

1  reach out to you to see if you were interested in participating

2  on a scientific advisory board for Done?

3  **A.**  He reached out and asked if I was interested in

4  participating in a process that he undertook.  It was a

5  subsequent e-mail that said, "Would you be interested in a

6  scientific advisory board?"

7  **Q.**  And did you initially express a little interest?

8  **A.**  I did express interest.  My interest was into work with

9  any company, especially in the arena of telehealth, on

10  executing mutual course of professional practice in order to

11  ensure patients were being appropriately evaluated, prescribed

12  medications, had follow-up, and their safety was ensured.

13  **Q.**  Mm-hmm.  And were you provided with any specific details

14  about Done's clinical policies and practices?

15  **A.**  No.  My only opinion comes from the 16 records I reviewed.

16  **Q.**  Did your conversations with Dr. Stahl go much further than

17  that initial exchange?

18  **A.**  No.  There were two e-mail exchanges.

19  **Q.**  Do you even know if such a board was ever created?

20  **A.**  No, I do not.

21  **Q.**  And did you have any further conversations with anyone at

22  Done about joining a board?

23  **A.**  No.  I had no conversation with members of Done.  I had no

24  conversations with Dr. Stahl except for the e-mail exchanges.

25  **Q.**  For the 16 Done members in your review, how many different

1   providers were there for those initial evaluations?

2   **A.**   For 16 patients, there were 15 different initial

3   clinicians evaluating.

4   **Q.**   And for those -- approximately how many different Done

5   prescribers prescribed medication across the 16 members?

6   **A.**   There were 36 different prescribers.

7   **Q.**   Did the Government provide you records related to Done's

8   treatment of the members?

9   **A.**   Yes.

10  **Q.**   Are there any records that you sought from the Government

11  to do your work that the Government refused to provide you

12  with?

13  **A.**   No.

14  **Q.**   Did you receive a PDF medical record produced by Done for

15  each of those members?

16  **A.**   Yes.

17  **Q.**   Did those PDF medical records contain complete information

18  regarding the members' treatment at Done?

19  **A.**   No.

20  **Q.**   Did you also review additional records related to Done

21  members' treatment, including an electronic health record in

22  Excel form?

23  **A.**   Yes.

24  **Q.**   I'll refer to that as an "EHR."

25      And did you review additional records, including e-mails

1    from Done members or family members?

2    **A.**    Yes.

3    **Q.**    Internal Done communications related to treatments such as

4    refill requests or transfers?

5    **A.**    Yes.

6    **Q.**    Prescription records?

7    **A.**    Yes.

8    **Q.**    Prescription drug history records?

9    **A.**    Yes.

10   **Q.**    Records that showed the length of an initial appointment

11   video call?

12   **A.**    Yes.

13   **Q.**    Did these records include additional information that was

14   not in the PDF medical record?

15   **A.**    Yes.  In fact, the -- it was necessary to review all of

16   these documents because of inconsistencies across the records.

17   **Q.**    I'm also going to show you Exhibit 3090, please.

18        **MS. GREEN:**  Your Honor, all of the records I'm showing

19   today have been admitted previously either via stipulation or

20   through the case.

21        **THE COURT:**  Okay.  Thank you.

22   BY MS. GREEN:

23   **Q.**    Was one of the records you reviewed also this Excel chart

24   containing more detailed intake questions and answers than what

25   was typically included in the EHR?

 1  **A.**    Yes.

 2  **Q.**    Did you receive this Excel showing responses for all the

 3  Done members or just these five?

 4  **A.**    No, I just received it for these five in this format.

 5  **Q.**    And what did you observe about the timing of the initial

 6  appointments for these five where you received the more

 7  detailed answers?

 8  **A.**    Well, I reviewed 16 medical records, and I received these

 9  five.  The other interesting aspect I noted was that all of

10  these are in 2020, and there's no patient responses for

11  anything beyond 2020.

12  **Q.**    No patient responses with respect to these more detailed

13  questions; correct?

14  **A.**    Correct.

15         **MS. GREEN:**  You can take that down, Ms. Braga.

16  **BY MS. GREEN:**

17  **Q.**    Dr. Goodman, we've walked through a number of records that

18  you reviewed.  How time-consuming was it to review all of these

19  different records for the members?

20  **A.**    It was extremely time-consuming.  I would -- my opinion on

21  reviewing these records is that they were the worst set of

22  medical records I've seen in 40 years of clinical practice.

23         And why do I say that?

24         Because the PDF did not include clinically relevant

25  information that was on the Excel spreadsheet.  It didn't

1    include correspondences that had clinical relevance and

2    decision-making.

3        So coming back to your original question, this was an

4    extremely time-consuming process.

5    **Q.**    We're going to talk about some definitions to help the

6    jury.

7        What is attention deficit hyperactivity disorder?

8    **A.**    So ADHD is a legitimate psychiatric diagnosis defined by

9    the DSM-5.  There is a comprehensive psychiatric evaluation

10   that needs to be undertaken in order to establish all five

11   criteria for the diagnosis of ADHD.

12   **Q.**    You mentioned the DSM-5.  Are there published diagnostic

13   criteria for ADHD?

14   **A.**    There are.  The DSM-5 represents the published diagnostic

15   criteria necessary to make diagnosis of ADHD and all other

16   psychiatric disorders.

17   **Q.**    And at a high level, could you explain to the jury what

18   the criteria are?

19   **A.**    So for ADHD, there are five criteria.  The first criteria

20   are symptoms.  So you have inattention, you have nine symptoms.

21   In inattention, you need five of nine.  And/or

22   hyperactivity/impulsivity, you need five of nine.  That's one

23   criteria.

24       The second criteria is impairments that result from the

25   symptoms.  Those impairments have to occur in several domains.

GOODMAN - DIRECT / GREEN

1  You don't have ADHD because you're not listening to your spouse

2  at dinner.  You have ADHD because you're not listening to your

3  spouse, your coworker, your children, and everyone else in your

4  life.  So you have symptoms and impairments.

5      You have age.  Symptoms have to occur before age 12, which

6  means you need to take that diagnostic history in order to

7  establish childhood onset.

8      And then you have it can't be accounted for by any other

9  psychiatric disorder.  That means you need to have a

10 psychiatric evaluation that includes all of the other

11 psychiatric conditions and medical conditions in order to rule

12 out or rule in whether or not the person has ADHD.

13     This is not just a vague term.  These are very specific

14 diagnostic criteria that have to be evaluated in the course of

15 a comprehensive psychiatric evaluation.

16 Q.  Are there U.S. guidelines published by a professional

17 association related to adult ADHD treatment and diagnosis?

18 A.  In the U.S.?

19 Q.  In the U.S., that's correct.

20 A.  There are no clinical practice guidelines published in the

21 U.S. for the diagnosis and treatment of adults with ADHD.

22 Q.  Are there, nevertheless, international guidelines and

23 published policies by certain entities in the U.S.?

24 A.  There are.  There are international guidelines in Canada,

25 the U.K., the European Union, Australia.  There are also

 1    clinical guidance in the United States by certain agencies:

 2    The Veterans Administration, the Bureau of Prisons, the Agency

 3    for Healthcare Quality Research.

 4         And so, yes, there are guidance here.

 5    **Q.**   Does the absence of published guidelines by a professional

 6    association in the U.S. have any impact on whether or not there

 7    is a clear usual course of practice when it comes to the

 8    treatment and diagnosis of ADHD?

 9    **A.**   The usual course of professional practice is established

10    by training, clinical experience, and ongoing medical

11    education.  That is a separate issue from whether or not

12    clinical practice guidelines have been published.  That is a

13    much more rigorous scientific process.

14         So in the absence of clinical practice guidelines, we

15    already have established usual course of professional practice

16    in treating psychiatric illness and especially in ADHD.

17    **Q.**   How prevalent is ADHD among the general adult population?

18    **A.**   So in the United States, it's approximately 3 to

19    4 percent.

20    **Q.**   And in the general population, what is the prevalence rate

21    of ADHD in those over the age of 50 who have not previously

22    been diagnosed with ADHD?

23    **A.**   Approximately 3 percent.

24    **Q.**   What is a Schedule II controlled substance?

25    **A.**   So Schedule II is determined by the DEA and it's a

1    potentially addictive medication that can lead to abuse, and

2    when using, has the high likelihood of potentially severe

3    psychiatric and physical dependence.

4    Q.    Is Adderall a Schedule II stimulant medication?

5    A.    Yes, it is.

6    Q.    I will be referring to stimulant medication such as

7    Adderall as "stimulants" today.

8         Are you familiar with the requirement that must be met for

9    writing an authorized controlled substance prescription?

10   A.    Yes, having written authorized controlled prescriptions

11   for 40 years.

12   Q.    And what is that requirement?

13   A.    The requirement is that it be prescribed for a legitimate

14   medical purpose in the usual course of professional practice.

15   Q.    Is it the usual course of practice to write a diagnosis of

16   ADHD for a patient that does not meet the DSM-5 diagnostic

17   criteria?

18   A.    No.

19   Q.    In the usual course of practice for -- in the ADHD

20   context, for what legitimate medical purpose is a controlled

21   substance prescribed?

22   A.    It's prescribed for an accurate diagnosis of ADHD that is

23   reached with a comprehensive psychiatric evaluation.

24   Q.    And is there a legitimate medical purpose for prescribing

25   a controlled substance where an accurate diagnosis of ADHD is

1    not made through the usual course of practice?

2    **A.**    No.

3    **Q.**    In the usual course -- we're going to talk about initial

4    evaluations.  In the usual course of professional practice, how

5    long is an initial evaluation for someone who thinks they have

6    ADHD?

7    **A.**    An initial psychiatric evaluation, if you're doing a

8    complete comprehensive psychiatric evaluation, runs 60 to

9    90 minutes.

10    **Q.**    Is scheduling initial evaluations for 25 minutes the usual

11    course of professional practice?

12    **A.**    Not only is it not the usual course of practice, in my

13    opinion, it's impossible to do a comprehensive psychiatric

14    evaluation in 25 minutes.

15    **Q.**    In the usual course of professional practice, could you

16    provide a sort of high-level summary of what a provider should

17    cover during that evaluation?

18    **A.**    So it's important to understand that a psychiatric

19    evaluation is a structured interview.  We want to try to make a

20    comfortable, safe environment for the patient while we ask

21    questions.  But what we start with are the presenting symptoms,

22    what are you experiencing, what don't you experience, and go

23    through that in rigor.

24         For ADHD, we then go down back to childhood symptoms.  So

25    we want to understand whether these symptoms occur before the

1    age of 12, whether these symptoms continue longitudinally over

2    the course of time causing impairments.

3        So you go through presenting symptoms.  Then you go

4    through all of the other psychiatric disorders.  So we want to

5    make sure that the person doesn't have bipolar disorder or

6    clinical depression or post-traumatic stress disorder, anxiety.

7    It's a long list.  You want to go through all of that as to

8    whether it's there or not.

9        Now, patients, when they come in and explain themselves,

10   don't know what information is relevant.  That's why it's

11   important for the clinical interviewer to elicit that

12   information.

13       So then we go to past psychiatric history.  We want to

14   understand who saw the patient in the past, when they were

15   first diagnosed, when they got treated, what are they treated

16   for, what was the follow-up over the course of time.

17       Then we move to family psychiatric history, is there a

18   family member that has a psychiatric illness because we know

19   that this is highly genetic.  Then we move to past medical

20   history; what medical illnesses are occurring currently, what

21   medical illnesses are -- have occurred that might contribute to

22   the presentation of symptoms.  That is if you've had repetitive

23   concussive injuries over the course of playing football, you

24   may have ADHD-like symptoms but you don't have ADHD, you have a

25   brain injury from concussive injuries.  So we're looking for

 1    that information.

 2        Then allergies, list of current medications you're on,

 3    list of over-the-counter --

 4        (Reporter interrupts for clarity of the record.)

 5        **THE WITNESS:**  List of current medications,

 6    over-the-counter supplements they may be taking, because those

 7    will cause interactions with medications you'll prescribe.  We

 8    want to know substance abuse, alcohol, vaping, marijuana, any

 9    narcotic use.

10        And then we move to social history.  So social history

11    includes developmental history, did you have certain things

12    that occurred in your history that might make you likely to

13    have ADHD.  For example, premature birth is a high risk for

14    ADHD.

15        Then I'm looking for developmental history.  Then I'm

16    looking for educational history, lifestyle history, financial

17    history, employment history, and the state of your current

18    life.

19        **THE COURT:**  Slow down.

20        **THE WITNESS:**  And after we do all of that, then we do

21    a mental status exam, so that includes what's the psychological

22    state, how is the patient presenting.  We want a description of

23    what we're seeing in front of us so that in the future, if

24    someone else is reading this medical record, they have a sense

25    of how this person presented while they were being evaluated.

1    At the end of all of that, you come up with a diagnostic

2    formulation:  What's involved?  What does the person have?

3    What does the person not have?  And what, then, are the

4    treatment recommendations going through this?

5        It's a complicated process because people don't present

6    just with ADHD.  They present with other psychiatric and

7    medical conditions.  If you have several conditions, you have

8    to figure out which you prioritize first, so you treat one

9    condition without worsening the other conditions.  After you do

10   all of that, then you have a formulation and a diagnosis and

11   you come up with your treatment plan.

12   **BY MS. GREEN:**

13   **Q.**   You mentioned the importance of screening for other

14   psychiatric disorders, and I think you mentioned examples like

15   bipolar, depression, or anxiety.  Why is that important?

16   **A.**   It's important because, one, the clinician needs to

17   understand and decide what diagnostic categories certain

18   symptoms go into.  Just because the patient comes in and says

19   "I'm anxious," doesn't mean they have an anxiety disorder.

20   It's the clinician's obligation then to figure out what the

21   nature of the psychological experience of anxiety is in order

22   to decide is this a primary anxiety?  Is this anxiety related

23   to PTSD?  Is this anxiety related to ADHD?

24   **Q.**   Could those other psychiatric disorders have symptoms that

25   might mimic ADHD?

1   A.    Certainly, because if you just focus on inattention,

2   distractibility, impulsivity, or fidgetiness, you might

3   conclude that the person has ADHD when, in fact, those symptoms

4   can be accounted for by severe anxiety or clinical depression

5   or post-traumatic stress disorder.

6   Q.    And is it also important to determine whether any of those

7   other psychiatric disorders are at issue with respect to

8   thinking about treatment recommendations?

9   A.    Certainly.  The treatment recommendations occur because if

10  someone has several psychiatric conditions concomitantly, you

11  have to prioritize which gets treated first, second, and third,

12  and the object here is to treat one without making the others

13  worse.

14  Q.    Could there be risks to prescribing stimulants to

15  individuals who, in fact, have those other psychiatric

16  disorders?

17  A.    There are.  If you haven't discerned that the person, for

18  example, has ADHD and bipolar disorder and you prescribe a

19  stimulant, you run the risk of exacerbating their bipolar

20  disorder.

21  Q.    Similar with respect to generalized anxiety?

22  A.    Similar to anxiety or panic attacks.

23  Q.    What is the prevalence rate of adults with ADHD having

24  another psychiatric disorder?

25  A.    So 70 to 80 percent of adults with ADHD will have a second

 1  psychiatric disorder.  50 percent will have at least two

 2  psychiatric disorders.

 3  Q.   Of the 16 Done members that you reviewed, how many, if

 4  any, were diagnosed with other psychiatric disorders besides

 5  ADHD?

 6  A.   Only one was diagnosed with generalized anxiety disorder.

 7  All others had in their record that they had ADHD.

 8  Q.   And in that one, did that diagnosis of generalized anxiety

 9  disorder remain in the patient's record?

10  A.   The GAD, generalized anxiety disorder, was written on the

11  initial evaluation but was not carried forward into the

12  subsequent medical notes.

13  Q.   And did that patient continue to get stimulants

14  purportedly for ADHD?

15  A.   They did.

16  Q.   Can complex -- can conditions like bipolar, depression,

17  or -- and generalized anxiety make a patient complex?

18  A.   By definition it makes the patient complex.

19  Q.   And can -- in the usual course of professional practice,

20  can a prescriber rely on a patient reporting whether or not

21  they're complex -- self-reporting whether or not they're

22  complex?

23  A.   No.  The patient is able to report their psychological

24  experiences, but the elaboration, the detail of that

25  psychological experience has to be expanded by the clinical

1    interviewer.

2    **Q.**    In the usual course of a professional practice, can a

3    prescriber rely on a patient self-reporting that he or she has

4    ADHD when deciding whether to make an ADHD diagnosis?

5    **A.**    No.  If the patient says, "I was diagnosed at age 12 and I

6    was on medication for a few years," okay; but I don't know the

7    credentials of the evaluator.  I don't know how long that

8    evaluation took.  If I can obtain records, that would be great,

9    but I need to and the clinician needs to go through the

10    comprehensive evaluation to reach their own diagnostic

11    conclusions.

12        It may be that the person was diagnosed with ADHD as a

13    child, but for that person, those symptoms might have gone away

14    and they no longer have ADHD.

15        The other issue here is if you have someone who's

16    drug-seeking, they can easily say, "I was diagnosed in the past

17    and I was on Adderall," when, in fact, that's not true at all.

18    **Q.**    Is drug-seeking a particularly relevant concern when

19    prescribing a stimulant such as Adderall?

20    **A.**    It's particularly relevant in prescribing C II drugs and

21    stimulants specifically.  A clinician's worry is that the

22    person sitting in front of them may be giving them a story that

23    is reflecting that they have ADHD when, in fact, they don't

24    because of drug-seeking behavior.

25    **Q.**    Focusing on the issue of self-reporting, you talked about

1  someone reporting an earlier diagnosis, but what about

2  generally; are there any surveys that looked at the issue of

3  relying on a patient self-reporting in the ADHD context?

4  **A.**   So there are screeners that are used for ADHD --

5  **Q.**   I'll rephrase my question.

6      Are there any surveys that were done in the U.S. that

7  looked at the issue of self-reporting and how that might be

8  potentially an inaccurate report of whether someone has ADHD?

9  **A.**   So this is why self-reporting is problematic.  In the age

10 of Internet and TikTok and Dr. Google, people can go and look

11 up psychological symptoms.  It doesn't necessarily mean they

12 have ADHD.  It means that the description of the psychological

13 experience resonates with what they believe they have, and so

14 they come to a self-diagnosis, which is much more descriptive.

15     It's interesting because the New York Times wrote about a

16 survey in October of -- 2024, '23? -- in any case, one out of

17 four people in this survey thought they had ADHD.  One out of

18 four.  And yet the prevalence rate is one out of 20, one out of

19 25.  This is problematic because if you rely on self-diagnosis

20 at the evaluation, and you abbreviate your evaluation, you end

21 up prescribing medication to people who don't have ADHD.

22 **Q.**   And I think you also mentioned that online access to

23 information purportedly about ADHD, like videos, could

24 potentially exacerbate this problem.

25     Was that something that was looked at?

1    **A.**    Again, this is a general example of what happens on the

2    Internet when patients look for information.

3        There was a peer-reviewed scientific publication looking

4    at the top 10 TikTok videos and of those top 10, 52 percent

5    were deemed to be misinformation, inaccurate information.

6        And so if half of your information you're looking at is

7    wrong, it just goes to show how people can be misled.

8    **Q.**    And, Dr. Goodman, you briefly mentioned screening

9    questionnaires.  Are you familiar with the screening

10    questionnaires the GAD-7, the PHQ-9, and the ASRS?

11    **A.**    Yes, these are screening tools.  They're a list of

12    questions.  The GAD-7 refers to generalized anxiety.  The PHQ-9

13    refers to depression, and the ASRS is the Adult ADHD

14    Self-Report Scale.

15    **Q.**    Those screeners, can they be used to diagnose a patient

16    with ADHD in the usual course of practice?

17    **A.**    No, they can't be used to diagnose and they were never

18    intended for that use.

19    **Q.**    Are they intended to just be screeners?

20    **A.**    They're intended just to be screeners.  Like the blip on a

21    radar scene, it shows that more investigation is necessary, but

22    I can't tell from the blip whether it's an airplane, a boat, or

23    a large drone.

24    **Q.**    And let's assume that those screening questionnaires were

25    completed.  Would that justify reducing an appointment time to

1    25 minutes in the usual course of professional practice?

2    **A.**    No, it would not.    Initially, it might seem like it would,

3    but it does not because the patient is completing the symptom

4    survey subjectively and it's the job of the clinician then to

5    evaluate whether or not those symptoms reach a level of

6    clinical importance and significance.

7    **Q.**    Dr. Goodman, for the 16 Done members that you reviewed,

8    what did you observe about how long the initial appointments

9    were scheduled for?

10    **A.**    The initial appointments were scheduled for 25 minutes.

11    **Q.**    And what did you observe about how long they were taking?

12    **A.**    Well, over the course of 16 patients, the range of the

13    evaluations were 6.5 minutes to 31 minutes.    The average was

14    17 minutes, and 80 percent of them were 20 minutes or less.

15    **Q.**    Did you review records -- we're just going to talk about

16    one example, Dr. Goodman.

17        Did you review records for Done member Kristiana DePrimo

18    who was seen by Erin Kim for an initial on February 20th, 2022?

19    **A.**    Yes.

20    **Q.**    And for how long was her initial appointment?

21    **A.**    Six and a half minutes.

22    **Q.**    And did you review that patient's PDMP for her initial --

23    for the time period before her initial appointment?

24    **A.**    Yes.

25    **Q.**    Was Ms. DePrimo previously prescribed opioids, including

1  hydrocodone, oxycodone, tramadol, Pregabalin, et cetera?

2  **A.**    Yes.

3  **Q.**    And did Ms. Kim adequately evaluate that substance use

4  history in the 6.5-minute appointment?

5  **A.**    No.

6  **Q.**    Can there be risks associated with prescribing a stimulant

7  to someone with opioid use?

8  **A.**    Yes.  You want to be very mindful if someone is on

9  narcotic medication either for a legitimate medical purpose or

10  they're taking narcotics for recreation or drug abuse reasons.

11  But in any case, first you have to have an accurate diagnosis.

12  And second, you have to raise your level of vigilance for this

13  person if you're going to consider writing a stimulant

14  medication.

15  **Q.**    Can prescribing a stimulant have risks for someone who has

16  a substance use history?

17  **A.**    It can.  If you don't fully assess that risk in regards to

18  patient adherence to treatment, the person would secure another

19  controlled substance drug that they could abuse.

20  **Q.**    And did you see other members within your review that had

21  a substance use history?

22  **A.**    There were five of the 16 patients who had or were on

23  narcotic medication.

24  **Q.**    We're going to talk about treatment for a moment,

25  Dr. Goodman.

1          What is the usual practice with respect to treatment if

2    someone is diagnosed with just ADHD?

3    **A.**    So the usual course of treatment is threefold.  One is

4    psychoeducation.  Educate the patient as to what this is and

5    what it's not.  It's not because you had a bad parent.  It's

6    because you just got the genetic load.  As I said, 80 percent

7    of the cause of ADHD is genetics.  So psychoeducation is

8    important, psychotherapy is important in order to address the

9    organizational skills, time management, executive functioning.

10   And then the third component of this is considering medication

11   and having that discussion with the patient.

12   **Q.**    So in the usual course of practice, is medication

13   partnered with this psychoeducation and therapy that you just

14   mentioned?

15   **A.**    Yes.  It is the usual course of professional practice to

16   offer skills and pills, as we say in the vernacular.

17   **Q.**    And how often amongst the Done members, if at all, did you

18   review this psychoeducation, therapy, et cetera, offered in

19   addition to the pills?

20   **A.**    So the psychoeducation was infrequent to rare in the

21   course of 16 patients.  Psychotherapy was also equally rare and

22   infrequent.

23   **Q.**    In terms of medications, are stimulants the only option?

24   **A.**    No.  There are several categories of medications.  You

25   have stimulants, which are most frequently prescribed.  You

 1  have non-stimulants, which are non-abusable.  And then there

 2  are other agents that are considered off-label by FDA approval.

 3  Q.   And are non-stimulants controlled substances?

 4  A.   Non-stimulants are not controlled substances because

 5  they're not abusable.

 6  Q.   Are stimulants always the first line of treatment for

 7  ADHD?

 8  A.   No.

 9  Q.   In the usual course of professional practice, when may a

10  nonstimulant be appropriate for the treatment of ADHD?

11  A.   So you may use a nonstimulant in someone who you question

12  about their substance abuse history.  And in that regard, I'll

13  offer a nonstimulant in part to evaluate whether or not the

14  person is drug-seeking or treatment-seeking, and that is if

15  they say, "I don't want a nonstimulant; I want that blue pill

16  called Adderall," my ears perk up and I'm concerned that

17  they're drug-seeking and not treatment-seeking.

18  Q.   Could it also be something you might consider for a

19  patient who has other psychiatric disorders, like you

20  previously mentioned, like bipolar or generalized anxiety?

21  A.   So sometimes non-stimulants can be used for people who

22  have ADHD and anxiety because we know that both sets of

23  symptoms will decline with nonstimulant medications, but there

24  are a number of individual clinical factors that determine

25  whether or not you choose a stimulant medication or a

GOODMAN - DIRECT / GREEN

1    nonstimulant medication.

2    **Q.**    Is it fair to say, Dr. Goodman, that in the usual course

3    of professional practice, a variety of treatment options, not

4    just a stimulant, may be appropriate depending on the unique

5    circumstances of the patient?

6    **A.**    It's the usual course of professional practice to

7    individualize your treatment for a patient with their specific

8    life circumstances, symptoms, medical illnesses, et cetera.

9    **Q.**    And among the 16 Done members, did you see the type of

10   variation in medication prescribed and treatment often --

11   treatment options offered as you would have expected?

12   **A.**    No.

13   **Q.**    Is a controlled substance prescription written for a

14   legitimate medical purpose in the usual course of professional

15   practice just because a patient requests it?

16   **A.**    No.  Medical practice is to deliver what the patient needs

17   in the context of specific diagnoses.

18   **Q.**    And when you say deliver what the patient needs, do you

19   distinguish that between what the patient might want?

20   **A.**    So I certainly make that distinction.  When a patient

21   presents for medical care, they're trusting the person they're

22   seeing to make an accurate diagnosis and to make medical

23   recommendations that are evidence-based.

24          If, however -- and that's a patient-first model.

25          If a patient comes in and says, "Well, I want this

1    medicine," and the prescriber after six and a half minutes

2    writes the medication, that's not -- that's not the usual

3    course of medical practice.  That is satisfying a customer.

4    And in that regard, it's a business model, not a medical model.

5    **Q.**   Is a controlled substance prescription written for a

6    legitimate medical purpose within the usual course of practice

7    when prescribed to someone to make them feel better even though

8    that person does not meet the criteria for ADHD?

9    **A.**   No.  The prescription of psychiatric medications is based

10   on an accurate diagnosis.  We're not giving pills for what was

11   previously coined "cosmetic psychopharmacology."  That's not

12   how we prescribe medications.  And it's the difference between

13   prescribing a medical treatment for a medical illness for which

14   we are reducing symptoms and improving quality of life versus

15   providing performance enhancement to a customer seeking such a

16   service.

17   **Q.**   And in the usual course -- is it the usual course of

18   practice to have a policy where clinicians are told, even if

19   the patient does not meet the criteria for ADHD, the goal is to

20   make the patient feel better so it might be worth doing a

21   medication trial?

22   **A.**   No, that's not the usual course of medical practice and

23   constricts clinical judgment of the clinician.

24   **Q.**   Does a patient claiming that they had a positive response

25   to a prescribed stimulant in and of itself establish that that

1    stimulant was prescribed legitimately?

2    **A.**   No, it doesn't.  And this is a particular important

3    relevant issue in ADHD.  When you're prescribing stimulant

4    medications, you can't make the decision, the diagnosis

5    accurate based on the medication response.

6         For example, if I gave everyone in this room a stimulant,

7    in an hour you'll tell me your mood, your cognition, and your

8    energy level's better.  Does that mean you have ADHD?

9         No.  I rearranged your brain chemistry, and that's the

10   psychological experience.

11        If, however, the clinician relies on the response to

12   medication to say, "Well, if you're better, I guess you'll stay

13   on the medication," people will be prescribed medications for

14   whom they never had a diagnosis.

15   **Q.**   I want to look at one example related to initial

16   evaluation from amongst the Done members, Danielle Johnson.

17        Did you watch a recording of her initial evaluation?

18   **A.**   Yes.

19   **Q.**   Was the Done provider for the initial evaluation someone

20   called LaTesha Reed?

21   **A.**   Yes.

22   **Q.**   We are only going to watch a very short snippet of that

23   recording.

24        **MS. GREEN:**  Ms. Braga, can we pull up Exhibit 1348 at

25   time stamp 8:55.

1     We'll watch it.  Just a couple of minutes.

2          (Video played but not reported.)

3          **MS. GREEN:**  Could we start, again, Ms. Braga, and

4   adjust the volume, if you can, to make sure the volume's up

5   since we cut it pretty close.  Thank you.

6          (Video played but not reported.)

7   **BY MS. GREEN:**

8   Q.   You have reviewed this whole video of Danielle Johnson's

9   appointment; correct?

10  A.   Yes.

11  Q.   And it was another appointment that was scheduled for

12  25 minutes; correct?

13  A.   Yes.

14  Q.   Did Ms. Johnson meet the diagnostic criteria for ADHD --

15  A.   No.

16  Q.   Did the provider prescribe a stimulant?

17  A.   Yes.

18  Q.   Was that prescription written for a legitimate medical

19  purpose within the usual course of practice?

20  A.   Absolutely not.

21  Q.   Why do you say that?

22  A.   Because by her own admission, the provider says the

23  patient doesn't have ADHD.

24  Q.   Is it a legitimate medical purpose to give someone a

25  stimulant to play around with?

1   **A.**    No.  This prescription was offered in some ways as a

2   performance enhancement as the -- in the video, the provider

3   also indicates that she herself took Adderall for her

4   professional exam.

5   **Q.**    And can giving a medication trial of a stimulant to

6   someone that doesn't have ADHD have risks for a patient?

7   **A.**    It does have risks.  The first risk is, as I said,

8   diagnostically, if the patient comes back and says, "Wow,

9   you're a genius.  I feel so much better.  Let's continue it."

10  Now you've got a patient on medication who doesn't have ADHD

11  and will continue, then, to take this medication.

12      The other risk is a psychiatric risk.  You may provoke

13  levels of anxiety, panic attacks, you may destabilize their

14  mood disorder.

15      Psychologically you've now framed their experience as ADHD

16  when, in fact, they don't have ADHD.  And even more

17  importantly, that's not self-evident, is that you've now

18  created a medical record where this person has ADHD.  The

19  impact is that they will then --

20          **MR. SCHACHTER:**  Objection.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  -- potentially have to report this for

23  occupational reasons.

24  **BY MS. GREEN:**

25  **Q.**  We're going to talk about follow-up appointments.

1    Can controlled medications be written with refills in the

2    usual course of professional practice?

3    **A.**    For Controlled Substance IIs, you cannot write refills in

4    the usual course of professional practice.

5    **Q.**    What is the usual -- why is that?

6    **A.**    By the nature of the fact that they're controlled drugs,

7    the DEA restricts refills on the prescriptions.

8    **Q.**    What is the usual course of professional practice for

9    follow-up appointments after a patient is prescribed a

10    controlled substance?

11    **A.**    So usually when patients start on medication, we have them

12    come back within two to four weeks in order to evaluate

13    response to medication, accuracy of the dose, potential side

14    effects, life circumstances, questions the patient might have

15    about psychoeducational issues.  So the follow-ups generally

16    occur within the first month.

17    **Q.**    And after that first month, what's the usual course of

18    practice with respect to follow-up appointments?

19    **A.**    Depending on whether you're changing the dose.  So if at

20    the first follow-up evaluation you're changing the dose, you

21    want the patient to come back again within another month in

22    order to assess the increase in that dose.

23        If they aren't prescribed an increase in the dose, still

24    have them come back within some reasonable period of time, a

25    month or two, in order to see whether or not the medication is

1    continuing to serve its purpose and/or whether there are other

2    issues that are now arising for the patient.

3        But all of that gets assessed in a face-to-face follow-up

4    assessment.

5    **Q.**   And once a patient is stable on their medication, how

6    frequently are follow-ups done usually in the usual course of

7    practice?

8    **A.**   So this depends on the circumstances of the patient and

9    what we're treating.  Remember, we're not treating a patient --

10   we're not treating ADHD, we're treating a patient with ADHD,

11   and the patient has other circumstances in their life that come

12   into play in regards to their ADHD.

13       Just because you've provided a medication doesn't mean

14   you've provided the skills to take care of organization, time

15   management, prioritization, and life challenges.

16   **Q.**   And in the usual course of practice, if someone just has

17   ADHD, typically what's the cadence of follow-up appointments?

18   **A.**   Four to six months.

19   **Q.**   In the usual course of professional practice, does an

20   asynchronous message exchange between a patient and a provider

21   replace the need for a follow-up appointment?

22   **A.**   No.

23   **Q.**   Why?

24   **A.**   Because the asynchronous exchange, whether that's by text

25   or e-mail, is not adequate enough to convey the information you

1   want.  The patient is conveying information in that

2   asynchronous communication, but the clinician doesn't have the

3   opportunity to ask the details of what is being assessed.  So

4   it's an inadequate way of communicating with the patient in

5   order to get a comprehensive understanding of what's going on

6   with them.

7   Q.   Are visual cues of a patient also important in the

8   follow-up appointments?

9   A.   Well, this is why face-to-face appointments are important

10  because it's the visual and the physical presentation of the

11  patient that becomes part of the accuracy and the

12  interpretation of what they're saying.

13       If someone is telling me that they feel good and the

14  medicine is working and they don't have any side effects,

15  they're sitting in my office restless and fidgety and

16  short-fused, then there's an incongruity between what they say

17  and how they present that has to be reconciled in the mind of

18  the clinician.

19  Q.   What is the usual course of professional practice with

20  respect to follow ups when changing a medication or increasing

21  a dose?

22  A.   Well, generally if you increase and/or change a

23  medication, you want a face-to-face follow-up within a month in

24  order to assess what the response has been to that change in

25  medication.

GOODMAN - DIRECT / GREEN

1  Q.    And is it the usual course of professional practice to

2  change a medication or dose based on a patient request without

3  meeting and assessing the patient?

4  A.    No.   Generally, you'll take into account a patient's

5  request, but you have to have the patient come in for

6  face-to-face time to understand why exactly the patient feels

7  they need an increase in the medication.

8       It may turn out that their -- their need for a higher dose

9  has actually been misconstrued by the patient and the clinician

10  is able to assess there are other elements going on for which a

11  medication increase would not be necessary.

12  Q.    Is it also important to assess possible side effects if

13  increasing a dose?

14  A.    Certainly.   Side effects are always part of any

15  face-to-face follow-up.

16  Q.    You mentioned that it's not usual practice to increase a

17  dose without an assessment or change in medication,

18  nevertheless, in your review of the Done members, did you

19  observe this happening?

20  A.    This was happening frequently.

21  Q.    Is it the usual course of practice to have no policy or

22  enforced policy requiring follow-ups within certain intervals?

23  A.    It's the usual course of professional practice to have

24  follow-ups in a reasonable fashion.   "Reasonable" being within

25  months not years.

**Q.**   Is it the usual course of professional practice to have a policy that informs patients -- informs patients that no follow-up appointment is required in order to refill their prescription?

**A.**   No.  It's not the usual course of professional practice to leave the patient in control as to when they get follow-up, when they get assessment.

This becomes a treatment-by-patient dictate, not a treatment by clinical judgment.

**Q.**   And are those concerns exacerbated when dealing with a stimulant such as Adderall?

**A.**   Certainly.  In prescribing antidepressants, we have follow-up.  In prescribing controlled drugs, we have follow-up with a greater level of vigilance because of the potential for abuse, misuse, and diversion.

**Q.**   In the usual course of professional practice to have a policy that allows a patient to decide that he or she is stable and request automatic refills?

**A.**   No.  As I said before, patients are aware of their own psychological experience, but they're not aware of what they don't know.  And it's the clinician's responsibility to expand out that description in order to assess whether or not their experience necessitates changing or increasing a medication or whether there's an alternative treatment approach like psychotherapy.

GOODMAN - DIRECT / GREEN

1  Q.   Is it the usual course of professional practice to have a

2  policy that restricts the providers' ability to schedule

3  follow-ups as they deem medically necessary when prescribing?

4  A.   No.  The usual course of professional practice is for the

5  clinician to make a decision as to when the patient needs a

6  face-to-face follow-up based on the clinical circumstances of

7  that patient.  Any policy, if it existed, would be a -- would

8  be a restriction of clinical judgment.

9  Q.   And I walked through a number of follow-up policy

10  examples, including the scheduling issue.  Overall, how would

11  such policies relating to follow-up appointments impact whether

12  a provider is able to execute care in accordance with their

13  independent clinical judgment?

14  A.   Well, if you have a policy that limits follow-up, then it

15  undermines clinical judgment, it limits clinical assessment.

16  The patient -- it places the patient in jeopardy because

17  they're on a controlled drug.  It -- I mean, there are so many

18  just bad things that can happen.

19      You don't know whether the patient is diverting or abusing

20  and -- so that's why it's all necessary.

21  Q.   And could giving a policy that gives a patient an

22  expectation that they will essentially automatically receive

23  their refill also undermine providers' clinical judgment?

24  A.   When you leave the patient in charge of their medical

25  care, the patient will suffer, even though the patient doesn't

1   realize it, because the patient doesn't understand how to do

2   the assessment.  They're simply reporting psychological

3   experiences, and place the trust in the clinical provider to

4   make the best assessment and to offer up the best

5   evidence-based medicine.

6   Q.   When you reviewed the records for the 16 Done members,

7   what did you observe generally about follow-up appointments?

8   A.   It was infrequent.  I mean to suggest that follow-ups are

9   legitimate by doing them every year, year and a half,

10  two years, two and a half years, you're prescribing a

11  controlled drug and there's no follow-up assessment of how this

12  patient is doing.

13       If there is a policy that leaves the patient in control of

14  follow-up, then the patient begins to understand:  I can just

15  get my refill by calling it in and I don't have to see anybody.

16  I can use the medicine as I want and I don't have to see

17  anybody.

18  Q.   Was Patricia Li an example of one of those patients for

19  whom you saw a lack of follow-up appointments?

20  A.   Patricia Li was seen for an initial evaluation.  She was

21  seen for a follow-up within a month or six weeks, and then for

22  31 months continued to have monthly prescriptions with not a

23  single face-to-face follow-up appointment.

24  Q.   Was there another Done member that was part of your review

25  called Adam Richardson?

1   A.   Yes.

2   Q.   And during your review, were you informed that he passed

3   away, unrelated to controlled substances from Done, in or

4   around March 2022?

5   A.   Yes.

6   Q.   Did Done continue to issue stimulant prescriptions to

7   Mr. Richardson after he died?

8   A.   Yes.

9   Q.   For how long?

10  A.   Despite the fact that he was dead, he received stimulant

11  prescriptions on -- refills for four months.  Four months the

12  patient is dead.

13  Q.   What opinion did you form about Done's approach to

14  follow-up care from that example?

15  A.   Generally, it was nonexistent.  There was no, seeming,

16  oversight internally for prescribing medication to a dead

17  patient.

18  Q.   Was there, nevertheless, a template refill note associated

19  with these prescriptions claiming that the patient was stable?

20  A.   Yes.  And that's what particularly is disturbing for all

21  16 patients, because there is a PDMP template note that's

22  inserted once a month without any corroboration that the

23  information in that template text is accurate because there's

24  no face-to-face assessment despite the fact that the text says,

25  "Patient is stable, no reported side effects, wishes to

1  continue care."

2  **Q.**   We're going to talk about patient transfers.

3       What is the usual course of practice in terms of

4  appointments when a patient is transferred from one provider to

5  a second provider?

6  **A.**   So generally, the usual course of professional practice

7  would be to transfer the patient for whatever reason.  The new

8  provider sees the -- the new provider picks the patient up --

9  agrees to pick the patient up, and then may offer a

10  prescription until they can be seen.  But they are generally

11  seen within a month so the new prescriber can assess the

12  patient's clinical situation, the accuracy of the diagnosis,

13  the efficacy and side effects of the medication and ongoing

14  treatment.

15  **Q.**   And is that the usual course of practice, even if the

16  second provider is just going to copy the same medication as

17  the prior provider?

18  **A.**   Yes, because once you write a prescription for a patient,

19  you're assuming the care of that patient.  And in assuming care

20  of that patient, it's important for you to understand what the

21  clinical circumstances, diagnosis, and treatment of those

22  patients are.

23  **Q.**   Is it the usual course of practice to have no policy

24  requiring a follow-up appointment when a patient is transferred

25  and where the patient continues to get stimulants?

1  **A.**   No.

2  **Q.**   Is it the usual course of practice to always, as a general

3  course of practice, impose a second-level review on a

4  provider's decision to discharge a patient?

5  **A.**   Always?

6  **Q.**   Yes.

7  **A.**   No.

8  **Q.**   Is it the usual course of professional practice to

9  transfer a patient to another provider for provision of the

10  medication the patient seeks where the first provider requests

11  discharge or declines to issue a prescription?

12  **A.**   So if the first provider recommends discharge because the

13  patient doesn't have ADHD or may be inappropriate for the

14  platform, then that's the clinical judgment.

15      It's outside the usual course of professional practice to

16  then take that patient, have it reviewed, and transfer them to

17  another prescriber who simply then rewrites the prescription.

18      That undermines the provider, and it also reflects a

19  degree of clinical management over the patient by someone other

20  than the primary provider.

21  **Q.**   Did you nevertheless see examples within your Done member

22  review of members who were transferred to a second provider

23  when the first did not prescribe a stimulant?

24  **A.**   Yes.

25  **Q.**   And did you see examples where a member was transferred to

GOODMAN - DIRECT / GREEN

1  a second provider to prescribe a stimulant when the first

2  provider wanted to discharge the patient?

3  **A.**   Yes.

4  **Q.**   In these examples, how was the first provider's

5  independent clinical judgment as opposed -- as -- to diagnosis

6  and treatment respected by Done, if at all?

7  **A.**   I don't know if it was respected.   The action of Done was

8  to have the patient transferred to another prescriber who then

9  wrote the prescription.

10      The subsequent provider may and frequently did not have a

11  follow-up with that patient.   So I'm not sure what to make of

12  that.

13  **Q.**   Did it appear that the first provider's independent

14  clinical judgment was executed on?

15  **A.**   It was not executed on.   It was circumvented.

16  **Q.**   Was Ashley Kelley an example of one of those Done members?

17  **A.**   Yes.

18  **Q.**   Was she prescribed stimulants by Done?

19  **A.**   Yes.

20  **Q.**   In October 2021, did Ashley Kelley's Done provider

21  Mr. Faulkner note concerns related to her mood and her heart

22  rate?

23  **A.**   Yes.

24  **Q.**   And did that Done provider decide to reduce her Adderall

25  dose to Adderall 20 milligrams to three times a day?

GOODMAN - DIRECT / GREEN

1   **A.**   To clarify, they mentioned anxiety and heart rate.

2   **Q.**   Mm-hmm.

3   **A.**   Not mood.

4   **Q.**   Thank you.  Yes, you're right, Dr. Goodman.

5   **A.**   So I'm sorry.  Repeat the question.

6   **Q.**   Did that Done provider reduce her Adderall dose to

7   Adderall 20 milligrams three times a day?

8   **A.**   Yes.  From 30 three times a day to 20 three times a day.

9   **Q.**   And did that provider instruct Ms. Kelley to get an EKG?

10  **A.**   Yes.

11  **Q.**   And did, around a month later, in November 2021, did that

12  member ask to change her medication, claiming that the dose

13  wasn't working effectively?

14  **A.**   Yes.

15  **Q.**   Did the provider refuse to change the dose, citing these

16  cardiac concerns and the high amounts of stimulants she was on?

17  **A.**   Yes.

18  **Q.**   Did the Done provider again request an EKG?

19  **A.**   Yes.

20  **Q.**   Did the Done provider agree to refill this patient's

21  stimulant prescription that month?

22  **A.**   No.

23  **Q.**   And let's look at what happened then.

24          **MS. GREEN:**  Can we please pull up Exhibit 2515,

25  Cell I 140, Ms. Braga.

1   BY MS. GREEN:

2   Q.   This is -- so the jury knows what we're looking at, is

3   this an example of the type of Excel you had to review when

4   looking at these patient files?

5   A.   All 16.

6   Q.   Yeah.  Okay.  So let's look at this cell.

7        And in November 2021 --

8        MS. GREEN:  And we can highlight that cell in yellow.

9   Thank you so much, Ms. Braga.

10  BY MS. GREEN:

11  Q.   -- did the -- Ms. Kelley write (as read):

12       "You must be new to Done.  They usually do

13       automatic renewal requests and typically it's a week

14       prior to your fill date and they leave it to the

15       pharmacist to abide by what the state's guidelines

16       are on how soon to fill it."

17       Was that in there?

18  A.   Yes.  Yes.

19  Q.   And what was your opinion with respect to Ms. Kelley's

20  expectation that she would receive a fill?

21  A.   Well, apparently, she was familiar with the refill

22  procedure and she was disappointed that the current prescriber

23  was not going to fulfill her expectations.

24  Q.   And how did this expectation that she have impede the Done

25  provider's ability to execute what he felt was appropriate

1   care?

2   A.   Well, here is a patient who understands what the

3   procedures are and is going to try to circumvent the clinical

4   recommendations that are in her best interest in order to get

5   what it is that she wants.

6   Q.   And when you say understands what the procedures are, she

7   understands what Done's procedures are; correct?

8   A.   Yeah.  She understands that she has a refill here and she

9   can get it upon request.  That's her expectation and her

10  expectation is not being fulfilled.

11  Q.   And after the Done provider did not give this patient the

12  stimulant --

13          MS. GREEN:  Can we pull up Exhibit 476, please.  And

14  we can just zoom in.

15  BY MS. GREEN:

16  Q.   Did Mr. Faulkner request clinical guidance from Dr. Brody

17  and another individual, given his concerns with respect to this

18  patient?

19  A.   Yes.

20  Q.   And two days later -- this was November 24, 2021.

21          Two days later, did Done transfer Ms. Kelley to another

22  provider citing "some issues" in the Excel medical record that

23  we previously looked at?

24  A.   Yes.

25  Q.   And based on that -- your records you reviewed, was that

1    Mr. Faulkner's decision to transfer the patient or was it

2    someone else's?

3    **A.**    It was not Dr. -- it was not Mr. Faulkner's.  I assume

4    that it was the Done management's decision.

5    **Q.**    And let's look at Exhibit 2684, Row 16.

6         On November 27 -- Dr. Goodman, just for this to help the

7    jury, are we looking at the type of prescription data that you

8    see from Done that lists the prescriptions that Done was

9    issuing to a patient?

10   **A.**    Yes.

11   **Q.**    Okay.  And on November 27, 2021, did a new Done provider,

12   Ginger Simor, write Ms. Kelley an Adderall prescription?

13   **A.**    Yes.

14   **Q.**    And that was the prescription that Mr. Faulkner had

15   refused to refill just earlier that month; correct?

16   **A.**    Correct.

17   **Q.**    Did Ms. Kelley continue to receive stimulant prescriptions

18   from Done after that date?

19   **A.**    Yes, as you can see moving down the Column N.

20   **Q.**    Did you observe any records in the evaluations addressing

21   Mr. Faulkner's safety concerns about --

22   **A.**    No.

23   **Q.**    In your opinion, how did this decision to transfer the

24   patient and continue giving stimulants override Mr. Faulkner's

25   concerns for the safety of the patient?

GOODMAN - DIRECT / GREEN

1   **A.**   Dr. -- Mr. Faulkner had legitimate medical considerations.

2   The patient was not following through with his requests to

3   ensure her safety.  The patient was then transferred to other

4   prescribers who continued the prescription.  And Mr. Faulkner's

5   medical concerns for the safety of the patient were never

6   documented in any of the documents I saw.

7   **Q.**   Was Brenda Hill another example that you looked at?

8   **A.**   Yes.

9   **Q.**   Was she a Done member in Texas whom you reviewed?

10  **A.**   Yes.

11  **Q.**   Did Ms. Hill's Done PMHNP, Ms. Ejim, have a collaborating

12  physician who had to approve her prescriptions?

13  **A.**   You'll have to pull up that document, to refresh my

14  memory.

15  **Q.**   We'll look at what he wrote.

16       Just before we get to that, by the time Ms. Hill had come

17  to Done, was she being prescribed 50 milligrams of hydrocodone,

18  an opioid?

19  **A.**   Yes.

20  **Q.**   Okay.  50 milligrams a day; correct?  50 milligrams a day?

21  **A.**   Yes.

22  **Q.**   Did the Done PMHNP recommend Adderall prescriptions for

23  Ms. Hill?

24  **A.**   Yes.

25  **Q.**   Okay.  And let's look at Exhibit 789, which is already

1    admitted.  Page 2.  And let's just focus on that Brenda Hill

2    paragraph.

3        In December 2022, did Ms. Ejim's collaborating physician

4    at the time, Mr. Shalomov, decline to approve the Adderall

5    prescriptions requested?

6    **A.**   He did.

7    **Q.**   Okay.  And did he cite concerns with opioid abuse

8    potentially?

9    **A.**   Yes.

10           **MS. GREEN:**  And let's look at Exhibit 2682, Cell V12,

11   please.

12   **BY MS. GREEN:**

13   **Q.**   So that was in December 2022.  Did Mr. Shalomov also write

14   in Done's prescribing tool -- let's give her a moment to pull

15   it up.  And if we scroll to the right, please.  (as read):

16           "Refill not appropriate - inappropriately

17           prescribed medication."

18   **A.**   Yes.

19   **Q.**   The very next day, on January 4th, 2023, did Done send

20   this prescription to another provider for approval, Eric

21   Miller?

22           **MS. GREEN:**  Can we pull -- keep that back up, please

23   Ms. Braga.

24   **BY MS. GREEN:**

25   **Q.**   The very next day, on January 4th, 2023, did Done send

1  this prescription to another provider for approval?

2  A.  Yes.

3  Q.  Is that Eric Miller?

4  A.  Yes.

5  Q.  And did Eric Miller approve the stimulant medication that

6  Mr. Shalomov had refused?

7  A.  Yes.

8  Q.  Was there any records in the patient's medical chart that

9  Dr. Shalomov's concerns were addressed before that script was

10  issued?

11  A.  No records that were submitted to me.

12  Q.  And, in your opinion, was Mr. Shalomov's independent

13  clinical judgment not to approve the stimulant executed upon by

14  Done?

15  A.  No.  He has a very legitimate concern because of

16  50 milligrams of opioids, which is a high dose, that -- that

17  the dose of the stimulant medication was also high.  And this

18  was his clinical judgment about the safety of the patient.

19  Q.  And did you see in the records any evaluation that

20  addressed that concern after Mr. Shalomov raised it?

21  A.  No.

22  Q.  We'll talk about one more example, Ali Lynch.

23      Was Ms. Lynch's initial evaluation at Done on May 21,

24  2021?

25  A.  Yes.

GOODMAN - DIRECT / GREEN

1   Q.   And let's pull up Exhibit 1927.  Unfortunately, another

2   one of these Excels.  But we'll look at just one cell.  Row 75,

3   Column I.

4       Shortly after that initial evaluation in May 2021, did

5   Ms. Lynch send a message requesting a different provider and

6   saying, "I'd like to have a different provider.  The one I got

7   assigned refused to help me with treatment, so I spent hundreds

8   of dollars for nothing"?

9   A.   Yes.

10  Q.   And did Done transfer Ms. Lynch to a provider called

11  Dr. Decker for another evaluation?

12  A.   Yes.

13  Q.   Was that in July 2021?

14  A.   Yes.

15          MS. GREEN:  And we can take that down.

16  BY MS. GREEN:

17  Q.   How long, if you remember, was Dr. Decker's first visit

18  with Ms. Lynch?

19  A.   I think it was eight-and-a-half minutes.

20  Q.   Nine-and-a-half minutes sound about right?

21  A.   Okay.

22  Q.   Did Dr. Decker prescribe Ms. Lynch Adderall?

23  A.   Yes.

24  Q.   Did Dr. Decker's evaluation establish that the patient met

25  the criteria for ADHD?

1   **A.**    In eight-and-a-half minutes, the answer is definitively

2   not.

3   **Q.**    Did Ms. Lynch have a substance abuse history?

4   **A.**    Yes.

5   **Q.**    Had she actually previously been prescribed buprenorphine?

6   **A.**    Yes.

7   **Q.**    What is that used for?

8   **A.**    Used for opioid -- used for treatment of opioid dependence

9   and for recovery.

10  **Q.**    Was that taken into account in the evaluation?

11  **A.**    I didn't see it.

12  **Q.**    And ultimately, was -- did this patient actually request

13  increases in her Adderall dosage as well as at one point in

14  time requesting Desoxyn?

15  **A.**    Yes.

16  **Q.**    Can you tell the jury what Desoxyn did?

17  **A.**    Desoxyn is methamphetamine.  It's not frequently

18  prescribed.  In fact, it's FDA approved but because it's

19  methamphetamine and not amphetamine, it's more neurotoxic, it's

20  more potentially addictive, and it's -- it's just not

21  prescribed as a -- as the usual course of professional

22  practice.

23  **Q.**    And did Dr. Decker nevertheless provide those medications

24  that she requested?

25  **A.**    Yes.

1    Q.   You had talked at the beginning about examples of sort of

2    patient care by patient dictate.

3         Is this an example of that?

4    A.   It is.  When patients are requesting medications with an

5    expectation that they'll receive and in the absence of

6    necessary follow-up, this is where patients are in control of

7    their prescriptions and not the clinician.

8    Q.   And we're going to switch topics.

9         THE COURT:  Well, before we do, let's take a recess.

10        Ladies and gentlemen, we'll be in recess until a quarter

11   of.

12        Remember the admonition:  Don't discuss the case, allow

13   anyone to discuss it with you, form, or express any opinion.

14        We're in recess.

15                   (The jury leaves the courtroom.)

16        (Proceedings were heard out of the presence of the jury.)

17                   (Proceedings resumed at 10:45 a.m.)

18        (Proceedings were heard out of the presence of the jury.)

19        THE COURTROOM DEPUTY:  Come to order.  Court is now in

20   session.

21        THE COURT:  Okay.  Bring in the jury.

22        Please be -- oh, we're waiting for one juror.  We'll wait.

23                   (Pause in proceedings.)

24        THE COURT:  Okay.  Let the record reflect all jurors

25   are present, parties are present.

GOODMAN - DIRECT / GREEN

1     You may proceed.

2          **MS. GREEN:**  Thank you, Your Honor.

3     **BY MS. GREEN:**

4     **Q.**   Thank you, Dr. Goodman.  I wanted to talk very briefly

5     about a different topic, bridge refills.

6          What is a bridge refill as that term is used outside of

7     the Done context?

8     **A.**   So I'll make the distinction between a bridge refill and a

9     blind refill.

10         A bridge refill is if my colleague asks me to cover his

11    practice.  I know my colleague.  I know the nature of his

12    practice.  I know the nature of his patients.  And so while

13    he's away on vacation for a couple of weeks, I will write a

14    prescription for a patient who runs out of a medication.

15         I know the clinician.  I know their practice.  I have a

16    sense of how they practice and their patient population.  And

17    so that's a bridge refill, to get to the next appointment.

18    **Q.**   Okay.  And you said you were distinguishing that from a

19    blind refill.  What -- what do you mean by that?

20    **A.**   So a blind refill is written by a prescriber who has no

21    clinical information on the patient.  They don't know the --

22    they don't know the primary provider, they don't know the

23    nature of their credential, they don't know the nature of their

24    practice, they don't know anything about the patient.

25         And so simply they are writing a prescription at the

 1    request of someone to write a prescription for someone they

 2    have no clinical information on.  That is a blind prescription.

 3    Q.   Is a blind prescription the usual course of professional

 4    practice?

 5    A.   It is not.

 6    Q.   Can there be safety concerns for a patient where a second

 7    provider writes a blind prescription?

 8    A.   So there are safety concerns because you don't know why

 9    the patient needs a follow-up prescription.  For example, if

10    the prescriber has decided they want to suspend the

11    prescription until they get further clinical information or

12    they have safety concerns, they may have told the patient I'm

13    not writing the prescription until you get an EKG or until you

14    see follow-up or until I see you in a follow-up appointment.

15         The blind prescriber doesn't know this.  They don't have

16    the clinical information.  And so they may offer up and provide

17    a prescription to the patient when the primary provider had not

18    wanted the patient to get it.

19         That's one example.

20    Q.   Did you see examples of blind prescriptions in the Done

21    members that you reviewed?

22    A.   In every single patient of the 16 I reviewed, the answer

23    is yes.

24    Q.   We're going to talk about a member called Nicholas Chieppa

25    who relates to a charge count, Count 5, a prescription to him

1  on or around October 7, 2022.

2  **A.**   Can I clarify my previous answer?  I said in absolutely

3  all 16.  I was incorrect.  I believe there were three who did

4  not have blind prescribers.

5  **Q.**   Okay.  Thank you.

6     So focusing on Nicholas Chieppa, did you form an opinion

7  as to Done's treatment of Nicholas Chieppa based on your review

8  of the records?

9  **A.**   Yes.

10  **Q.**   And what was that opinion?

11  **A.**   Nicholas Chieppa was a patient who was seen for an initial

12  evaluation, who continued to get stimulant medications over the

13  course of the year despite the fact that he was hospitalized

14  not once, but twice, involuntarily by his family.  And the

15  mother alerted Done, and the prescriptions continued without

16  addressing the serious psychiatric decompensation of this

17  patient.

18  **Q.**   What was your opinion as to whether Done's treatment of

19  Nicholas Chieppa was -- well, whether those prescriptions were

20  for a legitimate medical purpose within the usual course of

21  professional practice?

22  **A.**   Not only were they not for a legitimate medical purpose,

23  they were so far beyond the usual course of professional

24  practice to be, in my opinion, egregious care of a patient who

25  had decompensated twice in a psychotic illness.

1   Q.   And we're going to look at some of the details you just

2   mentioned.

3        Was Mr. Chieppa's first appointment on or around

4   November 3, 2021, with a provider called Katrina Pratcher?

5   A.   I believe so.

6   Q.   And was that appointment for approximately 22 minutes?

7   A.   Yes.

8   Q.   And for approximately how long did Mr. Chieppa receive

9   Adderall prescriptions from Done?  And I can pull up a record.

10  Let's look at Exhibit 276, if that helps refresh you.

11       So if you go to the left, we see --

12          MS. GREEN:  All the way to the top, please, Ms. Braga.

13  BY MS. GREEN:

14  Q.   -- a first prescription around November 2021; correct?

15  A.   Correct.

16          MS. GREEN:  And let's scroll down, please, Ms. Braga,

17  and go to the right.  All the way to the right, please.

18  BY MS. GREEN:

19  Q.   Do we see a last prescription around December 24th, 2022?

20  A.   Yes.

21  Q.   So for approximately how long did Mr. Chieppa receive

22  Adderall prescriptions from Done?

23  A.   Approximately one year.

24  Q.   How many follow-up evaluations did Mr. Chieppa have in

25  that one year?

1    **A.**    Zero.

2    **Q.**    So stimulant prescriptions for a year with zero follow-up

3    appointments; correct?

4    **A.**    Correct.

5    **Q.**    You testified before about the general lack of follow-ups

6    you saw among the Done members you reviewed.

7         Is this just one example?

8    **A.**    This is one example.  One patient went out as far as over

9    two years.

10   **Q.**    Did Mr. Chieppa meet the diagnostic criteria for ADHD?

11   **A.**    No.

12   **Q.**    And let's look at Exhibit 1844, page 6.  So this is from

13   the PDF version of the Done medical report.

14        **MS. GREEN:**  And let's zoom in on clinical -- the date

15   for the January 2022 in that note all the way through.  Thank

16   you, Ms. Braga.

17   **BY MS. GREEN:**

18   **Q.**    In January 24, 2022, was there a note in the PDF medical

19   record that said (as read):

20             "Received call from" -- I'll say mother --

21        "today advising that client was placed on a 5150 and

22        has symptoms characteristic of bipolar disorder.

23        Client should not add meds for ADD/ADHD."

24        Do you see that note?

25   **A.**    Yes.

1    Q.    What is a 5150?

2    A.    5150 is an involuntary admission.  In order to be

3    involuntarily admitted -- and remember, to do that means to

4    deprive someone of their civil rights -- they have to have an

5    acute psychiatric illness as judged by observers, and they have

6    to be an immediate danger to themselves, either suicidal

7    homicidal, threatening violence to others.

8    Q.    What is bipolar disorder?

9    A.    Bipolar disorder is a mood disorder, highly genetic, is

10   defined by episodes of clinical depression and episodes of

11   mania.

12   Q.    Can there be risks associated with prescribing stimulants

13   to someone with bipolar?

14   A.    Yes.  If you have an identified bipolar disorder and you

15   prescribe a stimulant, you can potentially destabilize their

16   bipolar disorder.  And what that would look like is they would

17   slowly become insomnic.  Then they become agitated, suspicious,

18   paranoid, frankly psychotic, and potentially dangerous to

19   themselves and to other people.

20   Q.    And you talked before the break about the importance of

21   doing initial evaluations that assess for other psychiatric

22   disorders.  Is this one of the reasons why it's important to

23   assess for such a disorder?

24   A.    This is an example of why a comprehensive psychiatric

25   evaluation is necessary in order to determine the other

1    psychiatric conditions.

2         Now, I want to highlight something on this.  And bipolar

3    disorder is that patients with bipolar disorder don't

4    present -- they don't come in saying "I'm manic, please treat

5    me."  They come in complaining about depression.  You have

6    to -- you, the clinician, have to ask specific questions about

7    episodes of mania in the past.

8         So it's not as if the presentation determines a diagnosis.

9    The diagnosis in part depends on the historical episodes in the

10   history which becomes part of the comprehensive psychiatric

11   evaluation.

12   Q.   And you mentioned episodes but can there be signs, if one

13   was doing follow-up evaluations, can there be signs for a

14   patient with bipolar that can indicate that that might be

15   something to watch for if one was evaluating the patient?

16   A.   This is one of the reasons follow-up face-to-face

17   appointments are necessary in order to evaluate whether there

18   seems to be an emergence of the symptoms rather than wait until

19   the patient gets psychotic if you know that the patient is

20   insomnic, getting agitated, getting irritable, those symptoms

21   might be the preamble to a frank manic episode and you can

22   abort that then by changing the treatment.

23   Q.   Did you see any evaluation in the records of the patient

24   that addressed the concerns raised by the mother in

25   January 2022?

1  **A.**    No.

2  **Q.**    And we see -- I don't want to spend much detail on this

3  template note but we see here just an example of that template

4  note you told the jury about before the break.  This template

5  note, "PDMP reviewed.  Patient reports their symptoms are

6  stable," et cetera, did the fact that that was included right

7  below this note about the mother's call surprise you?

8  **A.**    Yes.  The contrast between the fact that mother is telling

9  Done that the patient was involuntarily admitted for a

10  psychotic illness and then someone places this template note,

11  which should be highlighted, is in direct contrast to the

12  patient's report of the psychiatric state of mind, which leads

13  me to conclude, in my opinion, that this note was placed here

14  without any regard or reference to the actual clinical state of

15  the patient and is, in fact, inaccurate.

16  **Q.**    And what did that tell you -- you mentioned that you saw

17  this template note across -- within the Done members' files and

18  across the Done members' files.

19      What did this tell you about whether you could rely on the

20  accuracy of the template note generally to confirm that

21  patients were stable?

22  **A.**    You couldn't rely on it.  The bottom line was this

23  template was placed in here in the absence of corroborating

24  information from the patient.  I'll highlight this fact:  Out

25  of 16 patients, there were 285 medical notes; 233 were the PDMP

 1   reviewed template.  That's about 80 percent.  82 percent of all

 2   the medical notes were a template text without patient

 3   corroboration, the accuracy of this template.

 4   Q.   What is the usual course of professional practice if

 5   notified about a patient potentially having bipolar and being

 6   placed on a 5150?

 7   A.   The usual course of practice is that before or after --

 8   let's talk about this particular case because the mom notifies

 9   Done after the patient was first hospitalized.  The patient was

10   hospitalized actually twice.

11        So the usual course of practice when a clinician and Done

12   receives this ought to have been a review of the current

13   medical care and prescriptions, a request for the medical

14   records of the first hospitalization in order to assess the

15   state of the patient, the assessment at the emergency room, the

16   course of treatment, and the discharge.

17        That was not secured or requested, at least from the

18   records I saw.

19        The patient is then psychiatrically admitted again within

20   a month or two later and, again, there's no medical record of

21   the second hospitalization.

22   Q.   And did the stimulant prescriptions continue to

23   Mr. Chieppa after these hospitalizations?

24   A.   Yes.  They continued for one year.  No request in the

25   medical record for the medical records of either

1    hospitalizations, and no follow-up face-to-face appointments

2    for one year of continued prescriptions.

3    Q.    Was this fact that -- you mentioned the usual course of

4    practice with respect to getting records from the hospital and

5    why that is important.  Is it also the usual course of practice

6    to bring the patient in for an evaluation before you continue

7    stimulants?

8    A.    Yes.

9    Q.    Why?

10   A.    Because you need to assess the state of this patient,

11   whether they're adhering to treatment recommendations, how

12   they're taking their medication, are they taking their

13   medication, and perhaps discontinue any prescriptions or

14   factors that would exacerbate his bipolar disorder.  And

15   actively treat his bipolar disorder first.

16   Q.    I mentioned that the stimulant prescriptions continued.

17   At one point in time, did the stimulant prescriptions actually

18   increase in dose to Mr. Chieppa?

19   A.    I'm sorry.  The question is?

20   Q.    Did the stimulant prescriptions also increase in dosage --

21   A.    Yes.

22   Q.    -- to Mr. Chieppa?

23         Again, without any evaluation; correct?

24   A.    Correct.

25   Q.    And in approximately June --

```
 1              MS. GREEN:  And we can bring up Exhibit 648.

 2   BY MS. GREEN:

 3   Q.    -- June 28, 2022, did Done transfer Mr. Chieppa to a new

 4   provider, Ms. --

 5              MS. GREEN:  And we can go to page 3.

 6   BY MS. GREEN:

 7   Q.    -- Ms. Shapard as one of approximately 125 patients?

 8   A.    Yes.

 9   Q.    Okay.  And did Ms. Shapard write a prescription to

10   Mr. Chieppa in June of 2022?

11   A.    Yes.

12   Q.    And did she continue to write stimulant prescriptions to

13   him?

14   A.    Yes.

15   Q.    Let's look at a couple of those prescriptions.

16              MS. GREEN:  Could we please pull up Exhibit 2673.

17   BY MS. GREEN:

18   Q.    Was this a prescription from Ms. Shapard that was written

19   to Mr. Chieppa for a stimulant on September 26, 2022, that was

20   filled on -- if we look on the bottom right -- October 13th,

21   2022?

22   A.    Yes.

23   Q.    Was it for Walgreens?

24   A.    Yes.

25              MS. GREEN:  And let's look at Exhibit 2522, please.
```

BY MS. GREEN:

Q.   Is this another prescription written by Ms. Shapard to Mr. Chieppa on or around October 7th, 2022, that was filled on October 10th, 2022?

A.   Yes.

Q.   And this was for Honeybee pharmacy; correct?

A.   Correct.

Q.   Were these prescriptions written for a legitimate medical purpose within the usual course of professional practice?

A.   Absolutely not.

Q.   Why not?

A.   Because the patient just became psychotic earlier in the year, twice, had emergency involuntary evaluations, and he remains on a prescription without ever having received hospital records or a face-to-face evaluation of the clinical status of the patient.

Q.   And in addition to that, did this patient even meet the criteria for ADHD based on your review of the initial evaluation?

A.   No.  So he was initially started on stimulant medication for no legitimate medical purpose in the usual course of professional practice.

Q.   Based on your review of the records, did you observe any actual medical care being provided to Mr. Chieppa besides stimulant refills by Done?

GOODMAN - DIRECT / GREEN

1  **A.**   Not only did I not observe any medical oversight, it

2  appeared to me, in my opinion, there was a complete negligence

3  of oversight, and a certain disregard for the patient's safety

4  and the fact that there was no medical review and response.

5  **Q.**   Did he receive any medical care from Done besides the

6  refills?

7  **A.**   No.  There's no face-to-face.  There's no assessment.

8  There's no review of his involuntary admissions.  There's

9  nothing.

10  **Q.**   You mentioned that in the usual course of professional

11  practice, it would have been to request hospitalization records

12  before continuing to issue stimulant prescriptions; correct?

13  **A.**   Yes.

14  **Q.**   And you didn't see that in Mr. Chieppa's case; is that

15  right?

16  **A.**   Correct.

17  **Q.**   Of the 16 patients, did you notice any member where Done

18  had obtained outside records for the patient?

19  **A.**   I don't recall I saw any.

20  **Q.**   And why is it so important to get those outside medical

21  records?  And we can focus on Mr. Chieppa's case as an example.

22  **A.**   Well, beyond the usual course of professional practice,

23  this is an issue of patient safety.  When you go to a

24  clinician, you want an accurate diagnosis and effective

25  treatment.  You don't want your mental state and your life

1  placed in danger.  This is -- I mean, there aren't words I

2  can -- I can offer to say how appalling this is in the absence

3  of medical oversight.

4  **Q.**   After you -- in forming your opinions about the legitimacy

5  of Done's prescription to Mr. Chieppa, did the Government

6  provide you with hospitalization records related to his January

7  and February 2022 hospitalizations?

8  **A.**   Yes.  One was from MLK hospital and the other one was from

9  UCLA.

10  **Q.**   And did you review those records?

11  **A.**   I did.

12  **Q.**   Did reviewing those records confirm to you why it was

13  important to ask for them in the usual course of practice?

14        **MR. SCHACHTER:**  Objection, Your Honor.  Relevance to

15  records that Done did not have available.

16        **THE WITNESS:**  I should answer?

17        **MS. GREEN:**  Just wait a second.

18                    (Pause in proceedings.)

19        **THE COURT:**  Well, were these records part of -- were

20  they disclosed by the Government or...

21        **MS. GREEN:**  Oh, yeah.  Yes, Your Honor.  So he --

22  Dr. Goodman formed his opinion as to the appropriateness of the

23  Done prescriptions, as we've discussed, and then in the usual

24  course of practice, as he said, you obtain hospital records.

25  So after he formed his opinions, we provided him with those

 1  records to see if it affected anything.

 2          THE COURT:  Is that disclosed in the report?

 3          MS. GREEN:  Yes.  It's disclosed in the report;

 4  correct.

 5          THE COURT:  Okay.  Objection overruled.

 6  BY MS. GREEN:

 7  Q.   When you reviewed those records, did they cause you in any

 8  way to change your opinion as to the legitimacy of the Done

 9  prescriptions to Mr. Chieppa?

10  A.   No, it did not change my opinion.  It strengthened my

11  opinion on the review of the medical records.

12  Q.   Did it confirm to you why it was important to obtain those

13  records in the usual course of practice?

14  A.   Yes.

15  Q.   Did those records show that Mr. Chieppa had been

16  hospitalized in January 2022 for concerns related to psychosis

17  and delirium and an incident of pinning a woman against a wall?

18  A.   Yes.

19  Q.   And in February '22, that he had been hospitalized for

20  concerns related to increasing manic behavior and bipolar?

21  A.   Yes.

22  Q.   We're going to talk very briefly about a different

23  patient, Cheryle Cooke.  Was this member similar to Mr. Chieppa

24  in that she also went to hospital during her time on the Done

25  platform and Done was notified of that --

1    **A.**    Yes.

2    **Q.**    Did she receive stimulant prescriptions from the Done

3    platform from March 2021 to June 2022?

4    **A.**    Yes.

5    **Q.**    So about 15 months?

6    **A.**    Yes.

7             **MS. GREEN:**   Let's look at Exhibit 2499, page 2,

8    please.  Just a part of her patient record.

9    **BY MS. GREEN:**

10   **Q.**    Did this patient -- so I mentioned she was on the Done

11   platform in March 2021 for her initial visit.

12             Did she complete the PHQ-9 or GAD-7 evaluation, according

13   to this record?

14   **A.**    No.

15   **Q.**    Did this patient's initial evaluation meet the criteria

16   for ADHD?

17   **A.**    No.

18   **Q.**    Was an initial visit scheduled for 25 minutes an adequate

19   amount of time to assess whether she had -- was suffering from

20   other psychiatric disorders?

21   **A.**    No.  It's an inadequate period of time to do a

22   comprehensive psychiatric screening evaluation.

23   **Q.**    And was that similar for Mr. Chieppa, who we just looked

24   at?

25   **A.**    Yes.

1              **MS. GREEN:**  And we can take that down.  Thank you.

2    **BY MS. GREEN:**

3    **Q.**    Between March and June 2021, did the Done prescriptions to

4    Ms. Cooke increase in dosage from about 10 milligrams of

5    Vyvanse to 50 milligrams Vyvanse and Adderall?

6    **A.**    Yes.

7    **Q.**    Were those dosage increases the result of requests from

8    the patient or an actual evaluation and assessment by the

9    provider?

10   **A.**    They were requests by the patient.

11   **Q.**    Were there any follow-up evaluations in that period from

12   March to June 2021?

13   **A.**    There was no face-to-face appointments.

14   **Q.**    And I don't think we spent as much time talking about

15   Vyvanse, so can you just tell the jury what Vyvanse is?

16   **A.**    So Vyvanse is another long-acting amphetamine stimulant

17   medication frequently prescribed and FDA indicated for adults

18   with ADHD.

19   **Q.**    It is a Schedule II stimulant similar to Adderall?

20   **A.**    It is Schedule II.

21   **Q.**    In August 2021 and November 2021, did the mother of

22   Ms. Cooke reach out to Done raising concerns about the

23   condition of her daughter?

24   **A.**    Yes.

25   **Q.**    And between August 2021 and May 2022, did Done continue to

1    issue stimulant prescriptions to Ms. Cooke without conducting

2    follow-up evaluations except for just one in December?

3    **A.**    Yes.

4    **Q.**    Was even that evaluation sufficient to find that Ms. Cooke

5    had ADHD?

6    **A.**    No.

7    **Q.**    Were the Done stimulant prescriptions to Ms. Cooke for a

8    legitimate medical purpose within the usual course of practice?

9    **A.**    No.  Without an accurate diagnosis with a comprehensive

10   psychiatric evaluation, it's -- there's no legitimate reason --

11   no legitimate medical reason to prescribe stimulant medication

12   in the usual course of professional practice.

13   **Q.**    And is one follow-up evaluation in the course of 15 months

14   usual course of practice for a patient, particularly a patient

15   that's been hospitalized?

16   **A.**    No.  This, again, is a reflection of a pattern over the

17   course of 16 patients where follow-ups are so infrequent as to

18   render medical oversight almost nonexistent.

19   **Q.**    We're going to talk about a different patient, an

20   individual called Tapasya Trivedi who relates to Count III, a

21   charged prescription to her on around July 27th, 2022.

22        Did you form an opinion as to Done's treatment of Tapasya

23   Trivedi based on your review of the records?

24   **A.**    Yes.

25   **Q.**    And what was that opinion?

1    **A.**    Again, all of the prescriptions were never prescribed for

2    a legitimate medical purpose in the course of usual

3    professional practice.

4    **Q.**    Was Ms. Trivedi's initial appointment on October 16, 2020,

5    with Done provider Shabnam Rahimi?

6    **A.**    Yes.

7    **Q.**    For -- was that appointment for approximately 19 minutes?

8    **A.**    Yes.

9    **Q.**    And we can pull up Exhibit 2820 if we need to.

10        **MS. GREEN:**    So may as well pull it up, Ms. Braga.

11    **BY MS. GREEN:**

12    **Q.**    For approximately --

13        **MS. GREEN:**    And let's go to the top and look at the

14    left.

15    **BY MS. GREEN:**

16    **Q.**    So we see that first prescription on October 16th, 2020.

17        **MS. GREEN:**    And then let's scroll all the way down,

18    please, Ms. Braga, to the table below, please, Ms. Braga.    And

19    let's go to the right so we can see a date.

20    **BY MS. GREEN:**

21    **Q.**    And we see a last prescription around December 6th, 2022.

22        So October 16, 2020, to December 2022.    For approximately

23    how long did Ms. Trivedi receive Adderall prescriptions from

24    Done?

25    **A.**    24 months.

1   Q.   Was Ms. Rahimi a nurse practitioner or a PMHNP?

2   A.   A nurse practitioner.

3   Q.   Is a supervising physician required in California in order

4   for a nurse practitioner to legally write controlled substance

5   prescription?

6   A.   That's my understanding.

7   Q.   If Ms. Rahimi did not have a collaborating physician at

8   the time she was writing Done prescriptions, would they have

9   been written within the usual course of practice for a

10  legitimate medical purpose?

11  A.   They would not have been written for a legitimate medical

12  purpose in the usual course of professional practice under the

13  State of California's guidelines for prescriptions.

14  Q.   And let's look at the PDF medical record for this patient,

15  Exhibit 1988.  Page 2.

16       According to the GAD-7, did this patient report severe

17  anxiety?

18  A.   Moderate anxiety -- I'm sorry.  Severe anxiety on the

19  GAD-7.  Moderate depression on the PHQ-9.

20       **MS. GREEN:**  And we can go to page 12, the initial

21  evaluation note for this patient, and just zoom in on the top

22  paragraph.

23  BY MS. GREEN:

24  Q.   I'm going to -- not going to talk through the details

25  here, but did Ms. Trivedi meet the DSM-5 criteria for ADHD?

 1   A.    No.   Four lines of text is inadequate to call this a

 2   comprehensive psychiatric evaluation.

 3   Q.    And let's look at the treatment plan for this patient.

 4         MS. GREEN:   Page 11 -- sorry, page 14, please.

 5   BY MS. GREEN:

 6   Q.    Did Ms. Rahimi prescribe Adderall after this initial

 7   evaluation?

 8   A.    Yes.

 9   Q.    And she also writes "declined medication for anxiety."

10         MS. GREEN:   But let's look at page 11 of the -- the

11   top part of her note here.   The note for October 17th, 2020,

12   Ms. Braga, the full part, please.

13   BY MS. GREEN:

14   Q.    What diagnosis did Ms. Rahimi put in the record?

15   A.    So F90.0 is ADHD inattentive presentation.   F41.1 is

16   generalized anxiety disorder.

17   Q.    And I think you mentioned before the break that there was

18   just one patient where a diagnosis different than ADHD was put

19   in the record, and I said, "Did that diagnosis remain in the

20   record?"

21         And you said, "No."

22         Do you remember that?

23   A.    I remember that.

24   Q.    Was this the patient you were thinking of?

25   A.    It is.

1  Q.   Did that anxiety diagnosis remain in this patient's

2  record?

3  A.   It was noted only in the initial evaluation and never

4  appears anyplace later in the medical record.

5       MS. GREEN:  And let's pull up Exhibit 160, please.

6  And let's go to page 2.  And then we can just focus on the top

7  paragraph and Ms. Rahimi.

8  BY MS. GREEN:

9  Q.   After that initial evaluation, did Ms. Rahimi message the

10 care team to inform them that she did not believe Ms. Trivedi's

11 symptoms pointed to ADHD at all but more like severe anxiety,

12 however, the patient was very adamant about getting started on

13 stimulants despite having severe anxiety.  Declined treatment

14 for her anxiety.  (as read):

15       "I did end up giving in and prescribing low-dose

16       Adderall."

17      Is a controlled substance prescription written for a

18 legitimate medical purpose in the usual course of professional

19 practice just where a patient is adamant about wanting it?

20 A.   No.  As I said earlier, patients don't dictate what

21 prescriptions they get.  They get medical care that's

22 appropriate for the diagnosis and disorder they have.

23 Q.   And here, did the patient get what the patient wanted or

24 what the patient medically needed?

25 A.   The patient got what they wanted and declined what they

1    medically needed.

2    **Q.**    Did you see this issue across a number of the Done members

3    you reviewed?

4    **A.**    Patients making requests for medication and then having it

5    satisfied by a prescriber, the answer is, yes.

6    **Q.**    And how many follow-up appointments, if any, did

7    Ms. Trivedi have between November 2020 and December 2022?

8    **A.**    None.

9    **Q.**    So she did not receive an ADHD diagnosis in the initial

10    evaluation; correct?

11    **A.**    Correct.

12    **Q.**    She did not meet the criteria -- I should rephrase the

13    question.

14        She was giving an ADHD diagnosis, but she did not meet the

15    criteria for ADHD; correct?

16    **A.**    Correct.

17    **Q.**    And then she continued to get stimulant prescriptions for

18    two years; correct?

19    **A.**    Without follow-up appointments, correct.

20    **Q.**    Let's look at one prescription within that time frame.

21        **MS. GREEN:**  Exhibit 678, please.

22    **BY MS. GREEN:**

23    **Q.**    On July 26th, 2022, did Dr. Brody receive this message

24    asking him to complete urgent refills?

25    **A.**    Yes.

1    Q.   And we can look lower down at this record, but was this

2    one of just -- was there 15 refills that Mr. -- that Dr. Brody

3    was given on this date?

4    A.   Yes.

5    Q.   Did this list of originals have any patient names on it?

6    A.   No.  It has dates of birth.

7    Q.   Okay.

8         MS. GREEN:  And if we look at one of those dates of

9    birth, the one associated with Number 4.  4/10, yeah.

10   BY MS. GREEN:

11   Q.   Was that the date of birth associated with Ms. Trivedi?

12   A.   I know that is yes because that's what I identified when I

13   reviewed these records.

14   Q.   Okay.  And let's look at whether Dr. Brody wrote this

15   script.

16        MS. GREEN:  Can we, please, pull up Exhibit 2521?

17   BY MS. GREEN:

18   Q.   Did Dr. Brody write a prescription to Ms. Trivedi on

19   July 27th, 2022?

20   A.   Yes.

21   Q.   Was there documentation in the medical chart supporting

22   the medical purpose for Dr. Brody's prescription?

23   A.   No.

24   Q.   Was this prescription written for a legitimate medical

25   purpose within the usual course of professional practice?

1  **A.**    Given the patient didn't have an accurate diagnosis of

2  ADHD from a comprehensive psychiatric evaluation, the answer is

3  no.

4  **Q.**    And was this also within that two-year period where the

5  patient hadn't even been having follow-up evaluations?

6  **A.**    Yes, in addition that he did not have a follow-up

7  face-to-face appointment to assess the clinical status and his

8  ongoing care.

9  **Q.**    Are there risks associated with prescribing a stimulant to

10  someone who may have anxiety and with no evaluation for

11  two years?

12  **A.**    The risk in prescribing stimulant medications to someone

13  who has an anxiety disorder is that the anxiety is worsened,

14  and you can develop panic attacks, tachycardia, elevations in

15  blood pressure, a variety of physiologic and psychiatric

16  symptoms.

17  **Q.**    We're going to talk about a different patient, Harlan

18  Band, who's associated with a prescription charged in Count II

19  that he received on or around October 14th, 2020.

20      Did you form an opinion as to Done's treatment of Harlan

21  Band based on your review of records?

22  **A.**    Yes.

23  **Q.**    And what was that opinion?

24  **A.**    Again, none of the prescriptions were written in a -- for

25  a legitimate medical purpose in the usual course of

1  professional practice.

2  **Q.**    Was Mr. Band's initial evaluation with Done on

3  October 14th, 2020?

4  **A.**    Yes.

5  **Q.**    And was it for approximately 13 minutes?

6  **A.**    Yes.

7  **Q.**    Was the Done provider who did that initial evaluation

8  Ms. Shabnam Rahimi again?

9  **A.**    Yes.

10 **Q.**    The same nurse practitioner who did the initial evaluation

11 for Ms. Trivedi that we just looked at?

12 **A.**    Yes.

13 **Q.**    So for the same reason, if Ms. Rahimi did not have a

14 collaborating physician at the time she wrote the Done

15 prescriptions for Mr. Band, would they have been written for a

16 legitimate medical purpose in the usual course of practice?

17 **A.**    In the State of California, yes.

18 **Q.**    Yes or no?

19 **A.**    Yes.

20 **Q.**    They would have been written in the usual course of

21 professional practice?

22 **A.**    They would not have been written in the course of usual

23 practice in the State of California without a collaborating

24 physician.

25 **Q.**    Thank you.

1        **MS. GREEN:**  And we can pull up Exhibit 1823, this

2   patient's record from the October 14th, 2020, visit.

3   **BY MS. GREEN:**

4   **Q.**   Did Mr. Band meet the diagnostic criteria for ADHD?

5   **A.**   No.  For all the reasons I stated previously.

6   **Q.**   And the patient reported that he was diagnosed at age 12

7   and started on Concerta and then stopped taking it.

8        Is that report sufficient to find an ADHD diagnosis?

9   **A.**   No.  It's clinical information provided by the patient,

10  but it's incumbent on the clinician to do the comprehensive

11  psychiatric evaluation, review childhood symptoms, and

12  substantiate that the age criteria for the diagnosis has been

13  met.  It's not met because the patient simply reports they were

14  diagnosed.

15  **Q.**   And there's a reference here to another psychiatrist

16  when -- Mr. Band apparently has an upcoming appointment with a

17  psychiatrist six weeks from now.

18       What is the usual course of practice when a patient

19  mentions they have another psychiatrist, as Mr. Band did here?

20  **A.**   Well, generally, the course of practice would be to call

21  the other psychiatrist or to collaborate with the other

22  psychiatrist, both to get a clinical history of what's been

23  involved and also as to why the particular medications are

24  being prescribed to the patient by the outside psychiatrist.

25  **Q.**   Did this happen in Done's case based on the records?

1    **A.**    I saw no documentation of coordination or communication

2    with the outside psychiatrist.

3            **MS. GREEN:**  And let's look at Exhibit 1823, page 2,

4    please.

5    **BY MS. GREEN:**

6    **Q.**    Do you see that note that says (as read):

7            "CURES review.  CURES database checked for

8            suspicious or concerning substance abuse.  No red

9            flags currently"?

10   **A.**    Yes.

11   **Q.**    What is CURES?

12   **A.**    So CURES in the state of California is the

13   pharmacy-monitoring program that prescribers can access in

14   order to understand what prescriptions are and have been

15   prescribed.

16   **Q.**    And did you check the CURES for Mr. Band in the course of

17   your review?

18   **A.**    Yes.

19           **MS. GREEN:**  So let's look at Exhibit 1805, page 1,

20   please.  And let's just focus on the bottom there.

21   **BY MS. GREEN:**

22   **Q.**    Did you see potential red flags worthy of evaluation in

23   that CURES?

24   **A.**    Well, this would indicate in April he had been treated

25   with buprenorphine and naloxone.  Again, that is used for

1  opioid addiction in recovery.  And also prescribed diazepam,

2  which is Valium.

3  **Q.**  And could there be risks associated with prescribing a

4  stimulant to someone with a substance abuse history?

5  **A.**  Yes.  As I mentioned before, the risk here is that you're

6  going to prescribe a controlled drug and you don't know how the

7  patient is going to take it or whether they're going to comply

8  with the recommended treatments.

9      So, again, there's an added level of vigilance on

10  prescribing C II medications.  And in a case like this, one

11  might consider prescribing a nonstimulant in order to see

12  whether the patient is treatment-seeking versus drug-seeking.

13  **Q.**  Could a stimulant also -- if one is prescribing a

14  stimulant, could that also require additional vigilance given

15  the nature of a stimulant?

16  **A.**  Additional vigilance would be reflected in more frequent

17  face-to-face follow-up appointments.

18  **Q.**  Did Ms. Rahimi prescribe Adderall to Mr. Band?

19  **A.**  Yes.

20  **Q.**  Did you see any record in the notes that Ms. Rahimi

21  evaluated this patient's potential substance abuse history as

22  you've just described?

23  **A.**  No.

24      **MS. GREEN:**  Let's look at Exhibit 2519, please.

25  \\\

1  **BY MS. GREEN:**

2  **Q.**   This is a copy of the prescription.  Did Ms. -- is this a

3  copy of the prescription that Ms. Rahimi wrote to Mr. Band on

4  October 14th, 2020?

5  **A.**   Yes.

6  **Q.**   Was this prescription for a legitimate medical purpose

7  within the usual course of professional practice?

8  **A.**   No.

9  **Q.**   Why?

10  **A.**   For all the reasons -- well, again, the initial evaluation

11  was incomplete.  And there's no follow-up to his care.

12  **Q.**   Well, in fact, there was a follow-up in Mr. Band's case in

13  November 2020; correct?

14  **A.**   Okay.

15  **Q.**   But focusing on this initial evaluation, did Mr. Band meet

16  the diagnostic criteria for ADHD?

17  **A.**   No.

18  **Q.**   And did you see any indication that his substance abuse

19  history was at least taken into account and deciding whether or

20  not a stimulant was appropriate?

21  **A.**   No.

22  **Q.**   And Mr. Band received another stimulant medication in

23  November 2020 from Done; correct?

24  **A.**   I believe so.  You'd have to show me the record.

25  **Q.**   We can show you.

1          **MS. GREEN:**  Let's just look at Exhibit -- I think it

2    will probably be on Exhibit 1805, if we pull it up.

3    **BY MS. GREEN:**

4    **Q.**    Did you see stimulant prescriptions from Ms. Rahimi in

5    November 2020?

6    **A.**    Yes.

7    **Q.**    After rendering your opinion as to the legitimacy of the

8    Done prescriptions to Harlan Band, were you provided with the

9    medical records from Dr. Javaherian, the other psychiatrist who

10   had been treating Mr. Band provider to Done?

11   **A.**    Yes.

12   **Q.**    And did your review of those records change your opinion

13   as to the legitimacy of the Done prescriptions?

14   **A.**    No, it did not at all.

15   **Q.**    Did the record shows that Dr. Javaherian had had a visit

16   with Mr. Band in October 2020?

17   **A.**    Yes.

18   **Q.**    Did Dr. Javaherian make an ADHD diagnosis and prescribe a

19   Schedule II stimulant?

20   **A.**    No.

21   **Q.**    We're going to talk about another Done member called

22   Vashti Oechsner-Souza, who relates to charged Count IV, a

23   prescription on or around June 18th, 2021.

24          Did you form an opinion as to Done's treatment of Vashti

25   Oechsner-Souza based on your review of the records?

1   A.   Yes.

2   Q.   What was that opinion?

3   A.   That prescriptions were not written for a legitimate

4   medical purpose in the usual course of professional practice

5   because there was no evaluation in the medical chart.

6   Q.   And let's talk about that.

7        Was Ms. Oechsner-Souza's initial appointment with Done on

8   April 30th, 2021, with a Done provider called E. Arias?

9   A.   Yes.

10  Q.   And was that appointment for approximately eight minutes?

11  A.   Yes.

12  Q.   Let's look at Exhibit 2679, please.

13       For approximately how long did Ms. Oechsner-Souza receive

14  prescriptions from Done?

15  A.   From April '21 to October '21, so six months.

16  Q.   And was she prescribed Adderall?

17  A.   Yes.

18  Q.   And we see, if we go to the left, Ms. Braga, three

19  different prescribers just across these four prescriptions.

20       What was your opinion, if any, with respect to that?

21  A.   Well, she had three different prescribers over the course

22  of six months.

23  Q.   Is that typical?

24  A.   It would not be typical.  I think, again, in my opinion,

25  this represents the fact that no one clinician is supervising

1  and overseeing the medical care of the patient.  The patient is

2  getting prescriptions from different prescribers who, again,

3  when you write a prescription, you take some responsibility for

4  the clinical status of the patient and who's writing these

5  prescriptions is -- they're written blindly without clinical

6  information.

7  Q.   Was one of those prescriptions written by Dr. Brody on or

8  around June 19th, 2021?

9  A.   Yes.

10       MS. GREEN:  And let's look at the patient record

11  Exhibit 1941.  Page 2.

12  BY MS. GREEN:

13  Q.   This is the extent of the patient record that you saw

14  here; correct, this two-page document?

15  A.   Yes.

16  Q.   And did you see any note documenting an initial evaluation

17  in April 2021?

18  A.   No.  What I see is:  Clinician note updated by care team.

19  Q.   And that's in actually October 2021 --

20  A.   Okay.

21  Q.   -- so about six months after the initial evaluation;

22  correct?

23  A.   Correct.

24  Q.   Did Ms. Oechsner-Souza meet the criteria for ADHD?

25  A.   I would have no way of knowing since there's no evaluation

GOODMAN - DIRECT / GREEN

 1  in the medical chart.

 2  Q.   Does that --

 3  A.   The answer would be no.

 4  Q.   Let's look at Exhibit 374, please, related to Dr. Brody's

 5  prescription.

 6       Did Dr. Brody receive a message requesting refills for --

 7            MS. GREEN:  And we can scroll to the end of this

 8  document, Ms. Braga, for initially -- keep going.  And just up

 9  one.  Up one page, please, page 2.

10  BY MS. GREEN:

11  Q.   -- for 40 patients on or around June 18th, 2021?

12  A.   Yes.

13            MS. GREEN:  And let's go to page 1 -- or the one

14  before that, please.

15  BY MS. GREEN:

16  Q.   And if we look at Item Number 6, was one of these refill

17  prescriptions for Ms. Oechsner-Souza?

18  A.   Yes.

19  Q.   Okay.  And did Dr. Brody write that stimulant prescription

20  to the member on or around June 18, 2021?

21  A.   Yes.

22            MS. GREEN:  Let's look at Exhibit 2520, please.

23  25- -- yeah, there we go.  Thank you so much, Ms. Braga.

24  BY MS. GREEN:

25  Q.   Is this a copy of that prescription that Dr. Brody wrote

1   to this member on or around June 18, 2021, for Adderall?

2   A.   Yes.

3   Q.   Was this prescription written for a legitimate medical

4   purpose within the usual course of professional practice?

5   A.   No.

6   Q.   Why not?

7   A.   There's no evaluation in the chart and so there's no

8   diagnosis to be made and, therefore, there's no prescription to

9   be written, so there's no legitimate medical purpose in the

10  usual course of professional practice.

11  Q.   Did you review the PDMP for this patient?

12  A.   Yes.

13           MS. GREEN:   And can we look at Exhibit 1942, page 4.

14  BY MS. GREEN:

15  Q.   And you see these prescriptions for phentermine that the

16  patient was getting?   Do you see those?

17  A.   Yes.

18  Q.   And some of those were before and around the time the

19  patient was coming to Done; correct?

20  A.   Correct.

21  Q.   What is phentermine?

22  A.   Phentermine is a controlled drug Class 4, so it has a much

23  lower abuse potential.   And it's essentially a stimulant.

24  Q.   Can there be risks associated with those -- with

25  prescribing a stimulant to someone who's also on phentermine?

GOODMAN - DIRECT / GREEN

1    A.    Well, the combination of two stimulants together run the

2    risk of increasing blood pressure, increasing heart rate,

3    increasing tremor, increasing anxiety, decreasing appetite.

4    Yes.

5    Q.    And --

6    A.    And sleep disturbance.

7          MS. GREEN:   And Ms. Braga, just so the jury can see

8    the drug we were talking about, can you highlight the

9    phentermine on the screen, please.   Thank you so much.

10   BY MS. GREEN:

11   Q.    Is this something that you would have expected to have

12   been considered in the usual course of practice before

13   prescribing a stimulant for purported ADHD?

14   A.    Yes, because of drug interactions.

15   Q.    Dr. Goodman, have we talked about every member that you

16   reviewed today or just some of them?

17   A.    Just some of them.

18   Q.    And have we reviewed -- with respect to the sum that we

19   talked about, have we reviewed every issue that led to your

20   opinion that the prescriptions were illegitimate or just some

21   of the reasons?

22   A.    Just some of the reasons.

23   Q.    And you talked about a lot of issues that you saw and we

24   just looked at some examples of how those played out with

25   respect to certain patients.

1          Did you see those issues across the patients that you were

2    reviewing?

3    **A.**    The issues that we pointed out in the patients we

4    highlighted were consistent patterns through the course of 16

5    patients.

6    **Q.**    You reviewed 16 patients and how they were treated by

7    Done.

8          Overall, what was your opinion with respect to Done's

9    treatment of these members?

10   **A.**    None of the 16 patients had a comprehensive psychiatric

11   evaluation.  Without a comprehensive psychiatric evaluation,

12   you don't fulfill the five criteria necessary to make a

13   diagnosis.

14         That is the first step.  That is the basis for a

15   legitimate medical purpose in prescribing any medication and

16   especially given the vigilance that you need when prescribing

17   potentially addictive drugs.  That's one.

18         The second issue is, if you're prescribing these

19   medications, if you're providing appropriate treatment, then

20   follow-up is necessary.  That's not asynchronous

21   communications, it's face-to-face follow-ups in order to do a

22   clinical assessment of the status of the patient, how she's

23   responding, or he's responding, the side effects, any other

24   factors that might account for that.

25         We go on in the medical records with the disturbing

1    insertion of the PMP template, which says that the patient has

2    been stable, not having side effects, indicating that the

3    patient is being monitored when, in fact, there's no

4    face-to-face corroboration of the accuracy of that information.

5         It is my opinion that that text was inserted into medical

6    records in order to appear as if medical care was being

7    rendered when, in fact, it wasn't.

8         Now, you might ask:  Why would you put a statement like

9    that in?

10        And the reason to do that is so that outside reviewers

11   might think that the patient is being overseen.

12        So as a clinician, if I were to see "Received medical

13   records from Done," and "Got the PDMP" -- got the -- "Got the

14   PDF of the medical record," I would have thought there was

15   regular follow-up.

16        Pharmacists asking about the legitimacy of a prescription

17   might be told that the patient has a clinical note in the past

18   month insinuating the patient had oversight.

19        There are so many inaccuracies and transgression and

20   violations of usual care, the undermining of clinical judgment

21   in the transfer of patients, despite the request of the

22   clinician to review safety concerns first, the request of

23   patients to have their prescriptions filled without clinical

24   oversight or follow-up assessment.  The last of transgressions

25   across these 16 patients just continues.

1          Which, for me, led to the difficulty in evaluating all of

2    the records I received because in 40 years, I've never seen

3    such a disorganized set of medical records that I could not

4    follow the chronology of treatment I would usually have been

5    able to do receiving records from other medical and psychiatric

6    practices.

7          So that just enumerates some of the highlights of what

8    transpired as in matters of pattern across these 16 patients.

9    **Q.**   And when you looked at these 16 patients, did you have an

10   opinion as to whether actual patient care was being delivered

11   to these patients or whether it was a different model?

12   **A.**   I was left with the opinion that inadequate evaluation

13   that led to inaccurate diagnoses with the prescription of

14   medications and the infrequent follow-up seem to me that this

15   was a model of patient-dictative treatment and that patients

16   received their automatic refills as a function of their

17   subscription to the Done model.  So this was a model of

18   subscription for prescription.

19             **MS. GREEN:**  Thank you, Your Honor.

20             **THE COURT:**  Okay.  Cross?

21             **MR. SCHACHTER:**  Yes.  Thank you.

22                        <u>**CROSS-EXAMINATION**</u>

23   BY MR. SCHACHTER:

24   **Q.**   Good morning, Dr. Goodman.

25   **A.**   Good morning.

 1   Q.   I introduced myself earlier?

 2          MR. SCHACHTER:  Good morning, ladies and gentlemen.

 3   Nice to meet you.

 4   BY MR. SCHACHTER:

 5   Q.   All right.  So your practice is really focused on ADHD; is

 6   that correct?

 7   A.   No.

 8   Q.   What would you describe the scope of your practice?

 9   A.   The scope of my practice is general adult psychiatry,

10   seeing patients ages 16 and older.  My training had been

11   historically focused on mood and anxiety disorders,

12   psychopharmacology, and then got interested in adult ADHD.

13   Q.   Okay.  So not -- you say not focused on ADHD?

14   A.   It's not entirely focused on ADHD, no.

15   Q.   What is the name of your practice?

16   A.   Suburban Psychiatric Associates.

17   Q.   I thought on your website it says something about ADD.  Am

18   I -- am I incorrect about that?

19   A.   I have two practices.  One's called Attention Deficit

20   Disorder Center of Maryland.

21   Q.   I see.  You have a practice called Attention Deficit

22   Disorder of Maryland; right?

23   A.   Center of Maryland, correct.

24   Q.   All right.  Thanks.

25          So you think a lot about attention deficit disorder;

GOODMAN - CROSS / SCHACHTER

1    correct?

2    **A.**    Mm-hmm.

3    **Q.**    It is, you would agree, a serious neurodevelopmental

4    disorder; is that correct?

5    **A.**    Yes.

6    **Q.**    I believe that you said it afflicts 3 to 4 percent of

7    adults in the United States.

8          Do you recall saying that?

9    **A.**    I do.

10    **Q.**    The CDC recently said it afflicts 6 percent of U.S.

11    residents.

12          Are you aware of that?

13    **A.**    They did.

14    **Q.**    I'm sorry.  Was that a question?

15    **A.**    No, it was a statement.

16    **Q.**    Oh, I see.

17    **A.**    They did, period.

18    **Q.**    I see.  I see.  Okay.

19          And according to the CDC, it afflicts approximately

20    15.5 million people; is that correct?

21    **A.**    If that's what the CDC cites, yes.

22    **Q.**    All right.  It is, in fact, the second most common

23    psychiatric disorder in adults?

24    **A.**    Yes, it is.  That's what I frequently say.

25    **Q.**    It is -- depression afflicts 7 percent of adults in the

1    U.S.?

2    **A.**    I think it's been updated to 8 percent, but sure.

3    **Q.**    And general anxiety disorder afflicts about 3 percent?

4    **A.**    Yes.

5    **Q.**    So it's right there in the middle, second most common

6    disorder?

7    **A.**    Correct.  In adults.

8    **Q.**    Okay.  And adults with untreated ADHD have twice the death

9    rate as the general population?

10   **A.**    So I know the statistic that their mortality is

11   seven years shorter.  I don't know that it's -- I don't know

12   the twofold risk that you're citing.

13   **Q.**    Okay.

14   **A.**    But the statistics are ADHD shortens your life when it

15   goes untreated.

16   **Q.**    Okay.  Significantly?

17   **A.**    Yes.

18   **Q.**    And that is -- that increase in the mortality rate caused

19   by ADHD is caused by a number of factors; is that right?

20        Well, let me ask a more specific question.

21        It is driven by a greater likelihood of dying from

22   unnatural causes like accidents?

23   **A.**    So the way it's stated is, "All cause mortality is

24   associated with a 7-year decrease risk in lifespan."

25   **Q.**    Okay.  You cited to a report called "Expert consensus

1    statement for telepsychiatry and attention deficit

2    hyperactivity disorder" published in *CNS Spectrums* in 2023.

3        Do you recall that?

4    **A.**   Do I recall citing that?  I don't recall I cited that in

5    my testimony.

6    **Q.**   Okay.  Let me hand you a couple of binders.

7            **MR. SCHACHTER:**  May I have just a moment, Your Honor.

8                    (Pause in proceedings.)

9            **MR. SCHACHTER:**  Your Honor, these are for the Court.

10   I have copies for the Government and the witness as well.

11       I will replace your many binders.  Thanks.

12   **BY MR. SCHACHTER:**

13   **Q.**   Okay.  Is there a Number 9115?  It would be towards the

14   end of that binder, which is a copy of your report.

15   **A.**   I don't see 9115.

16           **THE COURT:**  Well, there's a --

17           **MR. SCHACHTER:**  Okay.  No problem.

18           **THE COURT:**  -- 4321.

19           **MR. SCHACHTER:**  Thank you so much.

20       Thank you so much.

21   **BY MR. SCHACHTER:**

22   **Q.**   Ms. Green tells you me that in the small binder just over

23   your left -- right shoulder --

24   **A.**   This one?

25   **Q.**   Right.

1          -- is your report.

2     **A.**   Okay.

3     **Q.**   And if you look on page 24, Footnote 3.

4     **A.**   Hang on.  Hang on.

5          Expert report.  Okay.

6     **Q.**   Right.

7     **A.**   Page what?

8     **Q.**   Page 3.

9     **A.**   One, two, three.  Yes.

10          **THE COURT:**  This is 4321.

11          **THE COURTROOM DEPUTY:**  Thank you.

12    **BY MR. SCHACHTER:**

13    **Q.**   Okay.  Dr. Goodman, do you see in your report where you

14    listed your -- the cites of the different literature that you

15    were relying on in your report?

16    **A.**   Yes.

17    **Q.**   Okay.  And does looking at this help you remember that, in

18    fact, one of the reports that you relied on was a report by a

19    Mr. Hong called "Expert consensus statement"?

20    **A.**   Yes.

21    **Q.**   And you are aware that Dr. Hong in that report said a

22    couple of things, first, that adults with ADHD alone have

23    almost twice the mortality rate compared with the overall cause

24    mortality rate of the general population.

25          Do you recall that?

1   **A.**   I don't recall he stated that, but if that's what is

2   written in the article, then I'll agree with him.

3   **Q.**   Okay.  And do you recall that Dr. Hong also stated that

4   the excess mortality in ADHD was mostly driven by deaths from

5   unnatural causes, especially accidents.

6      Do you remember that?

7   **A.**   I don't recall the specific text, but if you're reading

8   accurately from the publication, I will agree with it.

9   **Q.**   Okay.  Great.

10     Adults with ADHD are four times more likely to attempt

11  suicide; is that correct?

12  **A.**   I believe so.

13  **Q.**   Adults with untreated ADHD have increased rates of

14  anxiety; is that right?

15  **A.**   Correct.

16  **Q.**   They have challenges with impulse control; is that

17  correct?

18  **A.**   Correct.

19  **Q.**   And that -- that ADHD effect on impulse control leads to

20  higher risks of substance abuse disorder; is that correct?

21  **A.**   I'm not sure I would associate the impulsivity with the

22  substance abuse.

23  **Q.**   Okay.  Well, you have.

24     Well, again, Dr. Hong in his -- well, no.  Excuse me.  I'm

25  sorry.

1    You have.  Do you recall writing an article called "Adult

2    attention deficit hyperactivity disorder diagnosis, management,

3    and treatment in the DSM-5 era."

4    Do you recall writing that article?

5    **A.**  I did.  What year was that?

6    **Q.**  That was 2016.

7    **A.**  Okay.

8    **Q.**  Okay.  And it is -- if you want to look at it, it is

9    Exhibit 6210 in the binder.

10   **A.**  Perhaps I have the wrong binder.  I don't see 6120 [sic].

11   **Q.**  All right.  We'll sort out the --

12           THE COURT:  All mine start with 7,000.

13           MR. SCHACHTER:  Your Honor, I think -- I think I

14   handed out --

15           THE COURT:  Wait.  Wait.  Slow down.  Wait.

16   There are two binders.  It's Volume 1.  You asked 6210;

17   right?  It's in the Volume 1.

18           THE WITNESS:  Your Honor, I have two Volume 2s.

19           THE COURT:  Oh, he gave you two Volume 2s?

20           THE WITNESS:  I have two Volumes 2s.

21           MR. SCHACHTER:  This is what happens when I try to do

22   things myself as opposed to asking for Mr. Ballew's assistance.

23   It's okay.  I don't think we're going to need this before the

24   lunch break.

25           THE COURT:  I can hand him mine.

1          **MR. SCHACHTER:**  It's okay, Your Honor.  I don't need

2     to go into it.

3     **BY MR. SCHACHTER:**

4     **Q.**   Do you recall Dr. Hong saying that adults -- that ADHD

5     leads to elevated substance use disorder?  Do you remember

6     that?

7     **A.**   Do I remember it cited in that article?  I do not.

8          Is that a commonly cited statistic, the answer is yes.

9     **Q.**   Okay.  Great.

10         ADHD leads to higher divorce rates?

11    **A.**   Correct.

12    **Q.**   ADHD actually makes it more likely for the ADHD sufferer

13    to engage in criminal activity?

14    **A.**   Yes.

15    **Q.**   They are more likely to suffer from obesity and Type 2

16    diabetes?

17    **A.**   Yes.

18    **Q.**   And it also causes educational underachievement?

19    **A.**   Correct.

20    **Q.**   Trouble with people keeping jobs?

21    **A.**   Yes.

22    **Q.**   And you are aware of studies which estimate a total

23    societal cost attributable to ADHD of about $122.8 billion; is

24    that correct?

25    **A.**   Yes.

1    Q.    It's a serious disorder?

2    A.    Yes.

3    Q.    And I am also correct that the pandemic for many ADHD

4    sufferers really exacerbated their symptoms; is that correct?

5    A.    I suppose that's correct.  Those with ADHD.  It

6    exacerbated the symptoms, the cognitive symptoms of almost

7    everybody who had to deal with the pandemic and the shut-in and

8    the absence of structure and increasing demands.

9    Q.    Right.

10          You, in fact, have said that you think that the absence of

11   structure for many ADHD individuals who no longer had to go to

12   work and be in a work environment, they now had to be at home

13   and structure themselves, that was very problematic for those

14   ADHD sufferers; is that correct?

15   A.    Correct.

16   Q.    All right.  And that's because those sufferers had

17   developed certain coping mechanisms to overcome some of their

18   ADHD symptoms and they were stripped away from them when they

19   were outside of their normal structures.  Is that fair to say?

20   A.    Yes, their usual routine was disrupted and as a result had

21   to rely on their executive functioning and their attention and

22   their distractibility, et cetera, in order to function;

23   correct.

24   Q.    Okay.  Now, notwithstanding how serious a problem it is,

25   you will agree that ADHD is undiagnosed and untreated in

1  millions of adults in the United States?

2  **A.**   In adults, yes, I would agree with that.

3  **Q.**   Now, Done, are you aware that Done started at the very

4  early part of 2020?

5  **A.**   I'm not sure when Done started.

6  **Q.**   Okay.  Just focusing on, if you will, on that time period,

7  you would agree that at that time, only one out of every five

8  adults with ADHD were getting treatment?

9  **A.**   So the statistics have been cited 1 out of 10.  That was

10  years ago.  Prior to the pandemic, one out of four with ADHD,

11  sure, I'll agree with that.

12  **Q.**   Well, at least in a report that you wrote in 2016, it

13  wasn't one out of every four, it was, actually, you said one

14  out of every five of adults with ADHD are currently diagnosed

15  and/or treated for ADHD; is that correct?

16  **A.**   Yes, I probably wrote that.

17  **Q.**   Okay.  So that means that at that time period, four out of

18  every five adults with ADHD were not getting diagnosed or

19  treated; correct?

20  **A.**   Correct.

21  **Q.**   Okay.  Now, let's talk about the reasons why ADHD was and

22  still is so heavily underdiagnosed and undertreated.

23     There is a nationwide shortage of mental health

24  professionals; is that correct?

25  **A.**   I don't know that.

1    Q.    Okay.  Well, in the report that you cited that we've been

2    talking about, from Dr. Hong, the expert consensus statement

3    for telepsychiatry and attention deficit hyperactive disorder,

4    Dr. Hong wrote (as read):

5           "In many communities, access to experts with

6        ADHD expertise is not only limited, but can prove

7        cost prohibitive.  This is especially important given

8        the nationwide shortage of mental health

9        professionals and the systematic limitation on

10        training new psychiatric residents and fellows."

11    Do you agree with that statement from Dr. Hong?

12    A.    I agree with that statement.  It doesn't state that the

13    number of clinicians -- there's variability.  So if you come to

14    Baltimore and you want to be treated for adult ADHD, you're

15    going to find a lot of clinicians who know what they're doing.

16    If you go to Boise, you're unlikely to find somebody who's been

17    trained in adult ADHD.

18        And so there's geographic variability depending on where

19    you are.  So I will agree with you, access to care is fairly

20    limited.  In part because of the degree of expertise amongst

21    clinicians.

22    Q.    All right.  You do not disagree with Dr. Hong's statement

23    that there's a nationwide shortage of mental health

24    professionals?

25    A.    I can't agree with it because I don't know the numbers.

1    If you want to tell me the number of providers, nurse

2    practitioners, PsyDs, MDs, then I can agree with that, but I

3    can't just -- I can't agree with a statement for which I don't

4    have statistics.

5    Q.    Sure.  You agree that the statement is contained in a

6    report which you have considered to be authoritative and cited?

7    A.    Yes.

8    Q.    You agree that more than half of U.S. residents live in

9    what you would describe as a mental health shortage area; is

10   that correct?

11   A.    I don't know of half.  I don't know the statistics.

12   Q.    Okay.  Are you familiar with a report by Dr. Julie Donohue

13   entitled "Who Gets Mental Health Care?  The Role of Burden and

14   Cash-Paying Markets" published in the *Journal of the AMA*, an

15   American Medical Association Health Forum, in which she stated

16   more than half of U.S. residents live in a mental health

17   professional shortage area?

18   A.    I'm not familiar with that publication.

19   Q.    You don't -- JAMA Health Forum?

20   A.    There have been over 10,000 articles on adult ADHD

21   published over the last 10 years.  I have not read each and

22   every one of them.

23   Q.    Okay.  In any event, do you disagree with the statement

24   that more than half U.S. residents live in a mental health

25   professional shortage area?

1    **A.**    I can't agree or disagree because I don't know the

2    statistics.

3    **Q.**    She also states that more than half of all U.S. counties

4    lack a psychiatrist.  Are you familiar with that?

5            **MS. GREEN:**  Objection.  Foundation.

6            **THE COURT:**  I think he can be asked the question

7    whether he agrees or not.  So I'm overruling the objection.

8            **MR. SCHACHTER:**  Thank you, Your Honor.

9    **BY MR. SCHACHTER:**

10   **Q.**    Do you agree with the statement that more than half of all

11   U.S. counties lack a psychiatrist?

12   **A.**    I don't know the statistics so I can't agree or disagree.

13   **Q.**    Okay.  Now, I think you will agree that, as Dr. Hong

14   stated in the report that you cited, in many communities,

15   access to experts with ADHD expertise is not only limited, but

16   it can also prove to be cost-prohibitive.

17          You agree with that statement, yeah?

18   **A.**    I would agree with that.

19   **Q.**    All right.  Now, you charge $1,400 for an initial

20   evaluation; is that correct?

21   **A.**    Yes.  There are other evaluations that I do for which the

22   charge is 1,600.

23   **Q.**    I see.

24          But for ADHD -- I'm sorry.

25          So for many initial evaluations, you will charge a patient

1    $1,600 for that initial evaluation; is that correct?

2    **A.**    There are some patients that are charged $1,400 for

3    90 minutes.  There are some patients who get charged 1,600 for

4    90 minutes.

5    **Q.**    Okay.  You will agree that that cost can be

6    cost-prohibitive for a lot of Americans?

7    **A.**    Yes.

8    **Q.**    You are aware that 45 percent of psychiatrists in the

9    United States do not take any form of insurance?

10    **A.**    I am aware of that, yes.

11    **Q.**    Do you take insurance in your practice?

12    **A.**    I do not.

13    **Q.**    You understand that there are people, adults with ADHD

14    that both can't afford $1,400 for an initial evaluation and

15    also may not have health insurance?

16    **A.**    Yes.

17    **Q.**    You are aware, are you not, that there are psychiatrists

18    who also will not take Medicaid?

19    **A.**    Yes.

20    **Q.**    Medicaid, as a general matter, has a lower reimbursement

21    rate than insurance; correct?

22    **A.**    I believe so.  I don't take Medicaid so I don't know.

23    **Q.**    Okay.  So if you are a person on Medicaid and you cannot

24    afford $1,400 -- withdrawn.  Okay.

25        Let's talk about some other barriers to people getting

1    treatment and evaluation for ADHD.

2        One of those barriers is stigma; is that correct?

3    **A.**    Yes.

4    **Q.**    For some people, it is difficult for them to think that

5    they have a psychiatric disorder that is precluding them from

6    getting things done in a way that people who don't have ADHD

7    can; is that right?

8    **A.**    There were too many variables in there.  Give me the

9    question again.

10   **Q.**    Let me ask you a different question.

11        You said stigma is a barrier.  Can you explain why?

12   **A.**    Sure.  Stigma is a barrier because of a cultural belief

13   that psychiatric illness is a function of willpower.  And that

14   if you just exercise willpower, you won't be depressed, you

15   won't be anxious, you won't be distracted.

16        The other element of this issue is cultural.  So Asians,

17   African-Americans, Hispanic communities don't see psychiatric

18   illness in the same way that a Caucasian population sees it and

19   they're less likely to avail themselves of mental health.  This

20   is an issue across psychiatry.

21   **Q.**    Thank you for describing some of the cultural barriers.

22        Am I correct that there are also, with respect to ADHD

23   care, gender barriers?

24   **A.**    I'm not sure I would call them gender barriers.  Barriers

25   reflects the access to care.  There are other issues around

1   women with ADHD in regards to the diagnostic evaluation and the

2   clinician's awareness of how ADHD may appear different for

3   women versus men.

4       However, the diagnosis, regardless of gender, still

5   follows the DSM-5 diagnostic criteria.

6   **Q.**    Sure.

7       Can you explain to the jury what you mean when you talk

8   about some of the -- I guess what you were starting to say

9   about difficulties for women in -- in ultimately obtaining a

10  diagnosis or treatment for ADHD?

11  **A.**    So there's an ongoing discussion now in the literature

12  about the under-identification of ADHD in women.  Historically,

13  children are identified, males to females, a ratio of two to

14  one, and the children are identified because of the hyperactive

15  disruptive behavior.  If you don't have hyperactive disruptive

16  behavior, you may not be identified except by a skilled teacher

17  who recognizing inattention regardless of gender.

18      As a result then, as the children, both males and females,

19  grow older, that ratio of two to one male to female changes to

20  about 1.5 to 1.  More and more women get diagnosed because as

21  an adult, it's the difficulties that ADHD causes you as a

22  child, it's the difficulties that ADHD causes for other people.

23  The parents, the teachers, everybody else.

24      So, now, this is not a -- this is not one of my lectures,

25  but there's also a gender bias in the diagnosis of ADHD.

1    So women historically have been diagnosed with anxiety and

2  depression and if you're not aware that ADHD exists, ADHD

3  doesn't get identified.  That has since changed over the last

4  15 years.

5  **Q.**   But you would agree there is still an issue with women

6  having their ADHD symptoms dismissed as stress or poor coping;

7  is that correct?

8  **A.**   I would agree that the access to care and the education of

9  clinicians leaves a lot to be desired and, as a result, women

10  are under-recognized, under-identified, underdiagnosed.

11  **Q.**   All right.

12        **THE COURT:**  So let's take our noon recess now.

13    Ladies and gentlemen of the jury, we will be in recess

14  until 1:05.  Remember the admonition given to you:  Don't

15  discuss the case, allow anyone to discuss it with you, form or

16  express any opinion.  I'll see you then.

17                (The jury leaves the courtroom.)

18    (Proceedings were heard out of the presence of the jury.)

19                (Recess taken at 12:08 p.m.)

20              (Proceedings resumed at 1:09 p.m.)

21    (Proceedings were heard out of the presence of the jury.)

22        **THE COURTROOM DEPUTY:**  Come to order.  Court is in

23  session.

24        **THE COURT:**  Bring in the jury.

25                (The jury enters the courtroom.)

1          (Proceedings were heard in the presence of the jury.)

2          **THE COURT:**  Okay.  Please be seated.  Let the record

3   reflect the parties are present, all jurors are present.

4          You may proceed.

5          **MR. SCHACHTER:**  Thank you, Your Honor.

6   BY MR. SCHACHTER:

7   Q.   Good afternoon, Doctor.

8   A.   Good afternoon.

9   Q.   All right.  So before the break, we talked about how -- we

10  talked about the prevalence of ADHD in adults in the United

11  States, and we talked about the problems with under-diagnosis

12  and lack of treatment as a result; right?

13  A.   Correct.

14  Q.   You will agree with me that that is unfortunate because if

15  people are able to get treatment for ADHD, you would describe

16  that treatment in many circumstances to be life-changing?

17  A.   If they receive an appropriate evaluation, an accurate

18  diagnosis, and the prescription of medication in the usual

19  course of professional practice, the answer is yes.

20  Q.   And that is because ADHD is a condition which you have

21  described as remarkably treatable?

22  A.   Yes.

23  Q.   The -- it is, I believe you've said, one of the very few

24  psychiatric disorders that can actually improve within an hour

25  or two of taking medication; correct?

GOODMAN - CROSS / SCHACHTER

1    **A.**    Yes.

2    **Q.**    You agree that the first-line treatment for adults with

3    ADHD that can help people in an hour or two are

4    psychostimulants?

5    **A.**    Yes.  Let me just clarify.  When you say "an hour or two,"

6    that's for a patient appropriately diagnosed, prescribed a

7    stimulant medication, who positively responds well and doesn't

8    have intolerable side effects.

9    **Q.**    Right.  And you've seen patients in those circumstances

10   suffering from ADHD, you've seen their conditions improve in an

11   hour or two?

12   **A.**    Yeah.  Those patients will respond, they'll notice a

13   difference within an hour or two.  Not a full difference but

14   enough to say, okay, yes, this is working.

15   **Q.**    And for ADHD patients, the first-line treatment for adults

16   with ADHD are psychostimulants?

17   **A.**    First line, not the limitation of options available.

18   **Q.**    Right.  The first-line treatment for adults with ADHD are

19   stimulants?

20   **A.**    The first-line treatment for those patients with clinical

21   patients that necessitate that as a first-line is yes.

22   However, if the clinical factors support an alternative, then

23   that becomes the first-line treatment for that particular

24   patient.

25   **Q.**    Understood.

**GOODMAN - CROSS / SCHACHTER**

1      You have said that the psychostimulants,

2  methylphenidate -- and that is Ritalin or Concerta; correct?

3  **A.**   Well, there are over 30 preparations of stimulant

4  medications that break down into two categories.  One category

5  is methylphenidate, the other category is amphetamines, so

6  there's a long list of these preparations.

7  **Q.**   And just so we can define some terms, Ritalin and

8  Concerta, those are stimulants that are called methylphenidate

9  correct?

10 **A.**   Correct.

11 **Q.**   And Adderall is a form of amphetamine; correct?

12 **A.**   Correct.

13 **Q.**   And those are -- both fall into the category of what are

14 called psychostimulants; correct?

15 **A.**   Correct.

16 **Q.**   All right.  And you have said that the psychostimulants

17 methylphenidate and amphetamine are first-line pharmacologic

18 interventions for ADHD and are proven efficacious in treating

19 patients of all ages.

20      That's something you have said; correct?

21 **A.**   Correct.

22 **Q.**   You have said that psychostimulants are the most effective

23 and preferred treatment for moderate to severe ADHD?

24 **A.**   Correct.

25 **Q.**   And I am also correct that stimulants -- and you talked

1    about how there's different options for different patients;

2    correct?

3    **A.**    Yes.

4    **Q.**    All right.  However, stimulants account for 90 percent of

5    medications which are prescribed for ADHD; correct?

6    **A.**    I don't know that exact statistic.  If you're accurately

7    reporting that, I'll stipulate I agree.

8    **Q.**    I don't want you to just take my word for it.

9         You gave a lecture in 2024 with somebody named Adelaide

10    Robb to the 2024 NEI Congress.

11         Do you recall that?

12    **A.**    Yes, I do.

13    **Q.**    And you guys had slides; correct?

14    **A.**    Correct.

15    **Q.**    I'm going to show you --

16         **MR. SCHACHTER:**  And we'll offer, Your Honor, we move

17    to admit 7534A, which is one of the slides from Dr. Goodman's

18    lecture?

19         **THE COURT:**  Admitted.

20    (Trial Exhibit 7534A received in evidence.)

21    BY MR. SCHACHTER:

22    **Q.**    Okay.  Do you see your slide?

23    **A.**    Yes.

24    **Q.**    All right.  And we'll get into this in a little bit more

25    detail, but you see the cite "IOVIA."  Do you see that from --

1    A.    Yes.

2    Q.    You know that to have been a -- a report that was prepared

3    for the Department of Health and Human Services.

4        Do you know that?  I don't need to test your memory if you

5    don't?

6    A.    I don't recall if it was for HSS, but I'm familiar with

7    this reference.

8    Q.    Okay.

9    A.    Very good.

10   Q.    All right.  And in this slide entitled "Physicians

11   utilized stimulants and non-stimulants differently based on

12   patient age," you recorded that 79 percent will get

13   amphetamine; correct?

14   A.    I cited this reference as providing this data.

15   Q.    Right.  And you looked up the statistics, and you included

16   on a slide in a lecture that you were providing; correct?

17   A.    Correct.

18   Q.    All right.  And in this slide, you wrote that 79 percent

19   of adults prescribed medication are going to get amphetamine;

20   right?

21   A.    Correct.

22   Q.    You wrote that 13 percent are going to get this other kind

23   of stimulant called methylphenidate; correct?

24   A.    Correct.

25   Q.    All right.  And so that is 92 percent, 79 and 13?  Did I

1    do my math correctly?

2    **A.**    Correct, yes.

3    **Q.**    Okay.  And then 8 percent will receive non-stimulants; is

4    that correct?

5    **A.**    Correct.

6    **Q.**    All right.

7           **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

8    Thank you.

9    **BY MR. SCHACHTER:**

10   **Q.**    Now, the term "stimulant," you'll agree with me, is

11   actually a bit of a misnomer when you're talking about

12   medication given to ADHD patients; is that correct?

13   **A.**    I'm not sure what the question means.

14   **Q.**    Sure.

15        Well, you have said that -- you said to NPR that, "The

16   term stimulant is a bit of a misnomer because when you give

17   these medications to ADHD individuals, they'll actually say

18   they feel calmer, they're better able to sit for long periods

19   of time, they're not reactive emotionally, and they're not

20   fidgety."

21        Is that something you said to NPR?

22   **A.**    I don't recall the specifics, but I'll stipulate that's

23   probably what I said to NPR.

24   **Q.**    Okay.  And it's accurate?

25   **A.**    Let me clarify the terminology so that we're -- we're

GOODMAN - CROSS / SCHACHTER

1  clear here in the courtroom.

2  **Q.**   Uh-huh.

3  **A.**   The term "stimulant" is a reference to its effect

4  physiologically by increasing certain neurotransmitters,

5  specifically dopamine and norepinephrine.  The outcome of that

6  in a neurotypic brain is that it stimulates the psychological

7  experience, it simulates the physiologic experience.

8      The psychological experiences, your energy is higher, your

9  cognition is sharper, your mood is tenser.  Physically your

10  heart rate goes up, your blood pressure goes up, you may have a

11  tremor, a headache, an appetite suppression.

12      The term "misnomer" in that quote refers to the fact that

13  there's a paradoxical effect in a ADHD brain.

14      So it's not so much a stimulating effect as it is a

15  calming effect, and it has to do with the difference in the

16  brain chemistry between an ADHD individual and a neurotypical

17  individual.

18      So hopefully that clarifies my quote.

19  **Q.**   Very much so.  Thank you so much.

20      Now, I think you've also said that once ADHD is recognized

21  and treated, the world opens up to those patients and they

22  blossom?

23  **A.**   Yes.

24  **Q.**   You've seen people go back to school, finish college,

25  double their income.  You've seen all that?

1  A.    Yes.  Amongst the patients that I've treated who've been

2  accurately diagnosed with a comprehensive psychiatric

3  evaluation with comorbidities sorted out, yes.

4  Q.    Right.  And studies have shown the effects of treatment

5  for people with ADHD; correct?

6  A.    Yes.

7  Q.    There are studies that show that treatment reduces car

8  accidents by 42 percent?

9  A.    I don't know the specifics, but the answer is yes.

10  Q.    Reduces traumatic brain injuries?

11  A.    Reduces concussive injuries.

12  Q.    Sexually transmitted infections?

13  A.    It reduces sexual promiscuity and -- yes.

14  Q.    In fact, treatment for ADHD has also been shown to reduce

15  depression, substance abuse, anxiety, even smoking, correct?

16  A.    Yes.

17  Q.    All right.

18  A.    Remarkable, isn't it, that you can treat a diagnosable

19  disorder so effectively in psychiatry when it's appropriately

20  diagnosed and treated?

21  Q.    Amazing.

22       You have dedicated a portion of your work to a very

23  important cause?

24  A.    40 years of commitment to this field.

25  Q.    Thank you.

1      Now, you testified a little bit to the addictive nature of

2   Schedule II controlled substances.

3      Do you recall that testimony during the course of your

4   direct?

5   **A.**   I do.

6   **Q.**   All right.  Now, although stimulants are a Schedule II

7   controlled substance, I am correct that stimulants prescribed

8   for ADHD taken orally do not have the same kind of potential

9   for abuse as illegal stimulants like cocaine?

10      **THE COURT:**  When you say "illegal," are you talking

11   about Schedule I drugs?  What are you referring to?  When you

12   say "illegal," there are a lot of things that are illegal.

13   Marijuana is illegal.  That's generally disregarded in the

14   Northern District of California.

15      Anyway -- but I'm -- I'm trying to get some clarification,

16   when you use the word "illegal," you're talking about

17   controlled Substance, I, II, III, IV?

18      **MR. SCHACHTER:**  Thank you, Your Honor.  Why don't we

19   just ask Dr. Goodman, because he's the expert, to explain.

20   **BY MR. SCHACHTER:**

21   **Q.**   Doctor, I'd like to -- can you see if in your binder, you

22   can find Exhibit 6200?

23      **MR. SCHACHTER:**  I don't need to admit it, Your Honor.

24   **A.**   Yes.

25   \\\

GOODMAN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    Q.   Now, you recognize the document that you're looking at to

3    be something that you cited in your report; is that right?

4    A.   Yes.

5    Q.   Okay.  These are Canadian practice guidelines; correct?

6    A.   Correct.

7    Q.   All right.  Now, I'd like to direct your attention to

8    page 29.  If you look at the very bottom of the page -- I'm not

9    sure we're looking at the same thing.

10       Page 29, please.

11   A.   I'm looking at 29.  I have, it looks like, 21 on the

12   screen.

13   Q.   I'm sorry.  Yeah, if you look at the -- it's a little bit

14   confusing.  At the very bottom, there's something that TX6200,

15   point, and then you'll see a -- that's a page number that

16   differs from the page in the document.

17   A.   Okay.

18   Q.   Okay.  All right.  Great.

19       So you see where in this document that you cite, it states

20   (as read):

21           "Psychostimulants taken orally do not have the

22       same abuse liability as elicit stimulants, for

23       example, cocaine, due to slower disassociation from

24       the site of action, slower uptake into the striatum,

25       and slower binding and disassociation with the

1        dopamine transporter protein."

2        Do you see that?

3            **MS. GREEN:**  Objection.  Relevance with respect to

4    comparisons to cocaine.

5            **THE COURT:**  Overruled.

6    **BY MR. SCHACHTER:**

7    **Q.**   Can you explain what that means?

8    **A.**   I'm gathering my thoughts to explain it succinctly,

9    otherwise, I'll have to do a six-slide presentation.

10   **Q.**   Can you do it more clearly than the Canadians --

11   **A.**   Sure.

12   **Q.**   -- talking about slower disassociation and slower uptake

13   into the striatum?

14   **A.**   Yeah.  This is all neuroscience terminology.  So let me

15   put it clearly.

16       When you abuse cocaine, you generally introduce it into

17   the system in a rapid fashion, so you're snorting it or you're

18   smoking it.  It gets into your system quickly, gets into your

19   brain quickly.  It activates dopamine very quickly.  You get a

20   dopamine surge.

21       A dopamine surge in the euphorigenic effect of cocaine.

22       Psychostimulants are delivered orally.  You take a pill,

23   most part.  Comes in patches and liquids but, generally, let's

24   just talk about pills.  You take a pill, you swallow the pill.

25   The pill gets absorbed in the stomach.  It goes through the

liver.  It gets digested and metabolized.  It travels up to the brain and then it activates your neurotransmitters.

The speed at which that gets introduced into the brain speaks to the relative addictive potential of the medication. So cocaine, methamphetamine, which is approved for ADHD by the FDA, have rapid increases.  Psychostimulants tend not to.

Let's separate this out.

Psychostimulants come in immediate-release and long-acting.  The long-acting takes slower to rise so it's less abusable.

How do you define abuse by the DEA?  It's the likability. So you have to give these medications to addicts and then they score the likability of these products and that's how the FDA and the DEA decide on the likability and, therefore, the abuse potential.

Dopamine, so a dopamine receptor gets the psychostimulant. It's the pace at which the stimulant hits the dopamine receptor, and then it's the rate at which the stimulant comes off the dopamine receptor.  That is called the dissociation. So psychostimulants stick on for a longer period of time before they come off.

Cocaine hits, punches the dopamine receptor, dopamine receptor reacts, cocaine comes off.

But to make the comparison here, it is written for clinicians which understand much more about the technicalities

1    of the neuroscience and the psychopharmacology than we can

2    convey in this setting.

3         And so my issue with reading this to a lay public and

4    courtroom is that we can misrepresent and inaccurately portray

5    a comparison between psychostimulants, cocaine, and

6    methamphetamine.

7         And hopefully that was clear.

8    Q.   Thank you.  Enormously helpful.

9         So I think you agree that the risks of -- withdrawn.

10        So you compared then the addictive effect of, like, a

11   stimulant medication used for ADHD -- putting aside

12   methamphetamines in a different category -- but for, like,

13   Adderall and the Ritalin and Concerta, you have compared those

14   stimulants to something like cocaine; correct?

15   A.   Yes, because of what you raised.

16   Q.   Okay.  And for the reasons that you described, as a

17   general matter, the cocaine has a -- more risk of addiction;

18   correct?

19   A.   I don't know if it's more risk of addiction because it

20   becomes the drug of choice for the addict.  Some people get

21   addicted to opioids and don't get addicted to stimulants.  Some

22   people get addicted to stimulants and they don't get addicted

23   to opioids.  Some people get addicted to benzodiazepines and

24   not to stimulants.

25        So it depends on the brain of the addict and the drug of

1    choice.   To make these categorical distinctions between cocaine

2    and psychostimulants is not medically legitimate.   These are

3    drugs on a continuum of potential addiction for which the DEA

4    by its classification recognizes.

5    Q.   Yup.   Putting aside what the DEA thinks, when the

6    guidelines that you refer to say psychostimulants taken orally

7    do not have the same abuse liability as illicit stimulants, is

8    that a comparison?

9            MS. GREEN:   Objection.   Asked and answered.

10           THE COURT:   Overruled.

11           THE WITNESS:   Say it again.   I'm sorry.

12   BY MR. SCHACHTER:

13   Q.   Sure.

14       When the guidelines that you reference say that

15   psychostimulants taken orally do not have the same abuse

16   liability as illicit stimulants, that's a comparison; correct?

17   A.   It's a comparison on a spectrum.

18   Q.   Okay.   And just -- you said a lot of things that were very

19   helpful and I thought very clear.   There is a slower

20   dissociation from the site of action in psychostimulants than

21   you would see in illicit stimulants like cocaine; correct?

22   A.   Yes.

23   Q.   Okay.   Now, you also did a comparison, I think, between --

24   that I want to spend a little more time on -- between

25   extended-release stimulants and immediate-release stimulants.

1    Did I understand that correctly?

2    **A.**    Yes.

3    **Q.**    Okay.  And can you just -- one of the things that you have

4    said, I think, is that the risks of patients developing an

5    addiction to stimulant medications with longer-acting

6    preparations is low.

7        That's something that you've said; correct?

8    **A.**    I would rephrase it.  I would clarify it and say the

9    likability and the potential for addiction is lower for

10   long-acting stimulant medications than it is for

11   immediate-release stimulant medication.

12   **Q.**    Okay.  I'm just going to ask you to take a look at an

13   article that you wrote in 2016.  It's 6210 and I'd like to

14   direct your attention to page 7.

15       You wrote an article called --

16   **A.**    Excuse me.

17   **Q.**    Sure.

18   **A.**    So this is 7 by the document?

19   **Q.**    By the little numbers at the very bottom of the page.

20   **A.**    Got it.  Got it.  Okay.  Very good.

21   **Q.**    But before we get to that, you wrote an article called

22   "Adult Addiction Attention-Deficit/Hyperactivity Disorder,

23   Diagnosis, Management, and Treatment in the *DSM-5* era"; is that

24   correct?

25   **A.**    Yes.  2016.

1    Q.    All right.    And if I could direct your attention to

2    page 7.    You wrote in that article, (as read):

3              "While stimulant-based medications have proven

4         effective in treating adult ADHD and the risks of

5         patients developing an addiction to stimulant

6         medications with longer-acting preparations is low,

7         the majority of available clinical trial data have

8         been short-term and have relied heavily on young and

9         middle-aged adult participants."

10        That's what you wrote; is that correct?

11   A.    Yes, that's what I wrote referencing 32 and 105.

12   Q.    Right.

13   A.    So it was written with the citation of those references.

14   Q.    You did; correct.

15        Now, I just want to --

16   A.    It was not my opinion.    It was the reference material that

17   was used to construct that sentence.

18   Q.    You didn't -- you haven't written information in articles

19   that you wrote that you thought were inaccurate, have you?

20   A.    No.    I write based on the science that's present with the

21   research findings.

22   Q.    Right.    That you think will be accurate and also helpful

23   to the reader; correct?

24   A.    Helpful to the reader and accurate, yes.

25   Q.    Okay.    Thank you.

1            And I just want to explore what you wrote (as read):

2                "The risks of patients developing an addiction

3            to stimulant medications with longer-acting

4            preparations is low."

5            That's what you wrote; correct?

6    A.    The majority of available clinical trial data have been

7    short-term and have relied heavily on young adults and

8    middle-aged adult participants, which is a qualifier to the

9    first portion of that sentence.

10           So, yes, in the totality of what I wrote, it's accurate.

11   Q.    Okay.

12   A.    Per the references.

13   Q.    Right.  Accurate.

14           And I want you to explain, if you can, why you used the

15   qualifier.  When you said "the risks of patients developing an

16   addiction to stimulant medications with longer-acting

17   preparations is low," you're comparing the longer-acting

18   preparations to shorter action; correct?

19   A.    Correct.

20   Q.    All right.  Now, that's just -- so that we all understand

21   what that means, so there -- the longer-acting are what are

22   called extended-release; correct?

23   A.    That's one term, yes.

24   Q.    Okay.  And then there are also -- and that would be like

25   for Adderall, that's what's called Adderall XR; is that right?

1    **A.**    Correct, XR is the long-acting.

2    **Q.**    Okay.  And then there's immediate release like Adderall

3    IR; correct?

4    **A.**    Correct.

5    **Q.**    All right.  Now, can you explain the reasons why there is

6    a lower risk of addiction when you're talking about the

7    extended release than the immediate release?

8    **A.**    Sure.

9            **MS. GREEN:**  Objection.  Beyond scope of direct and

10    undue consumption of time.

11            **THE COURT:**  Overruled.

12            **THE WITNESS:**  I'm sorry.

13            **THE COURT:**  You can answer.

14            **THE WITNESS:**  Yeah.  No, I got that, but in the course

15    of that, I lose my train of thought, so I -- please, I

16    apologize for asking you to repeat the question.

17    **BY MR. SCHACHTER:**

18    **Q.**    Sure, sure.  I just want you to explain to the jury why it

19    is that the risk of addiction is greater -- or is less with the

20    extended-release than it is with the immediate-release?

21    **A.**    Good.  Okay.

22            Let me first start off with a qualifier.

23            When I write treating adults' ADHD, it is a patient who's

24    had a comprehensive psychiatric evaluation and has been

25    accurately diagnosed.

1        So let's stay within the context of those patients and I

2    can answer the question.

3    Q.    Thank you.

4    A.    The difficulty with immediate-release, which we tend to

5    recommend clinicians resist starting with, is that unlike

6    long-acting medications, long-acting medications are based on a

7    delivery technology, so there's a patch that's long-acting the

8    way it's absorbed.  Vyvanse is a prodrug, which means it has to

9    be metabolized to the active drug.  Pills are beads and there

10   is a rate at which the dissolution and absorption occur.

11       When you have an immediate-release tablet, you can swallow

12   the tablet, you can crush the tablet and snort it.  You can

13   crush the tablet and smoke it.  You can crush the tablet and

14   turn it into a liquid and inject it, which means that you are

15   able to take an immediate-release tablet and administer it into

16   your system at a rate that's much faster than any of the

17   long-actings.

18       You can't do that with the long-actings because of the

19   mechanized delivery system.  So one needs to be careful when

20   you make this comparison, it's on the basis of the ability of

21   the person with the pill to administer it in whatever route

22   they want to administer it for the purpose of abuse, not the

23   purpose of treatment of their ADHD.

24   Q.    Very helpful.  Thank you so much.

25       Now, let's talk about the use of extended-release versus

1    immediate-release.

2         I am correct that you will, from -- you will try -- am I

3    correct that you will try to prescribe an extended-release

4    medication to a patient that you have done a comprehensive

5    evaluation for, but you may sometimes also prescribe a -- a low

6    dosage of an immediate-release tablet because sometimes with

7    the extended-release, people will flag -- ADHD sufferers with

8    flag in the afternoon or evening and need a boost to assist

9    them?

10   **A.**   That's one prescription pursuit in treating ADHD.  The

11   object is you want to try to treat the symptoms for as long

12   over the course of the day.  So if you wake up at 7:00 and you

13   don't go to bed until 10:00, we'd like to see if we can get

14   that medication to control your symptoms over the course of the

15   whole day.

16   **Q.**   Thank you.

17        Now, am I also correct that in choosing the kind of

18   treatment that you are going to prescribe to one of your ADHD

19   patients, that one of the things that you will look at and

20   speak with the patient about is how much they can afford?

21   **A.**   Correct.

22   **Q.**   So, for example, I think as you described, one example of

23   a long-acting ADHD medication is Vyvanse?

24   **A.**   Yes.

25   **Q.**   Vyvanse had no generic option until 2023?

**GOODMAN - CROSS / SCHACHTER**

1    **A.**    I believe so.

2    **Q.**    And before that, it was very expensive, especially when

3    compared to Adderall?

4    **A.**    It was a branded medication.  I don't know what the cost

5    was to patients because insurance policies vary and co-pays

6    vary differently.

7    **Q.**    And there are a lot of insurance companies that said we're

8    not paying for Vyvanse.  If you've got ADHD, you can take

9    Adderall but Vyvanse is not covered; is that correct?

10   **A.**    I actually don't know the answer to that question.  At

11   some point it became more widely prescribed.

12   **Q.**    Okay.  Well, am I correct that studies that you have done

13   show that people without insurance are more likely to be

14   prescribed immediate-release Adderall?

15   **A.**    I don't know the statistics, so I would stipulate that I

16   would agree with that, sure.

17   **Q.**    And is that because it's cheaper and more often covered by

18   insurance?

19   **A.**    Depending on the insurance, it can be.  The co-pay can be

20   less, but it's not necessarily the case.  That's not always the

21   case.  So it's highly variable from insurance to insurance,

22   from year to year, depending on what's on the formulary, what's

23   approved, what the rebates are.

24        You won't know this, but as a clinician, it's very

25   difficult to discern how much your prescription is going to

1    cost the patient based on the variability of the co-pays.

2    **Q.**    There is no published guideline on whether to prescribe

3    extended release or immediate-release; correct?

4    **A.**    No, that's incorrect.

5    **Q.**    Well, did you say in 2022 at the 2022 NEI psychopharm

6    conference (as read):

7            "Here to date, there is no published guidelines

8        on thinking through this sequence of determining

9        compounds and delivery system technology"?

10    **A.**    Correct, there's no guidelines on determining the sequence

11    on the course of treatment.

12    **Q.**    Okay.

13    **A.**    That's different than what your question conveyed.

14    **Q.**    Okay.  Can you explain?

15    **A.**    Can you repeat your question?

16    **Q.**    Sure.

17        What were you saying -- so when you said at this

18    conference (as read):

19            "There is no published guidelines on thinking

20        through this sequence of determining compounds and

21        delivery system technology," and then you go on to

22        talk about your decision tree --

23    **A.**    Right.

24    **Q.**    -- to the extent that brings back a memory.

25        What does that mean?

**GOODMAN - CROSS / SCHACHTER**

1   **A.**    I'm flattered that you watch my video.

2   **Q.**    I've watched all of your videos.

3   **A.**    Oh, my gosh.  You and my mother.

4                          (Laughter.)

5   **A.**    So what I meant at the time -- and you've selected a quote

6   in the middle of my lecture.  So the preamble to the quote is

7   we were talking about patients who had comorbidities with ADHD.

8        As I mentioned earlier, if you have a complex patient with

9   four different psychiatric conditions, you have to figure out

10  which you treat first without making the others worse.

11       What's an example of that?  If you treat ADHD and you

12  haven't identified the bipolar disorder, you run the risk of

13  making the bipolar disorder worse.  That's not in the interest

14  of the patient, and it's not in the patient's desire to be

15  worsened by your prescription.

16       So what you've selected was I had talked about diagnostic

17  prioritization and then we were talking about the sequence of

18  medication choices you make over time.  That's where the quote

19  comes from.

20  **Q.**    Okay.  And that's what you're saying, there's no published

21  guidelines on determining that sequence of medication?

22  **A.**    Correct.

23  **Q.**    Okay.  And I think you went on to say that a provider

24  should take into account patient preference, costs, co-pays,

25  avoiding prior authorizations, and insurance issues.

GOODMAN - CROSS / SCHACHTER

1          Those --
2  **A.**    That was -- I'm sorry.  I interrupted.
3  **Q.**    Those are all factors that a provider should think about
4  when -- when working with the patient to determine what
5  medication is going to be prescribed?
6  **A.**    That was a few of several additional factors that were on
7  my slide.
8  **Q.**    Okay.  Thank you.
9          Now, you would agree that telehealth has been enormously
10 helpful in expanding access to ADHD evaluation and care?
11 **A.**    I would say telehealth has been helpful in providing
12 access.  As to whether or not it's been helpful in providing
13 care, I have reservations.
14 **Q.**    Okay.  It certainly -- you would agree it has expanded
15 access to care?
16 **A.**    Telehealth has expanded access to care and psychiatry as
17 well as all of medicine.
18 **Q.**    You are aware that almost half of adults with ADHD have
19 used telehealth for ADHD care?
20 **A.**    I don't know the specifics, but if that's an accurate
21 report, I'll agree with it.
22 **Q.**    Well, are you aware that the CDC in 2023 said just that?
23 You're not aware?
24 **A.**    I don't know the number.  I will agree, the CDC published
25 records on that.

GOODMAN - CROSS / SCHACHTER

1   Q.   Fair enough.

2        Are you aware that one-third of adults with ADHD have used

3   telehealth to get a prescription for ADHD medications?

4   A.   Again, I don't know the statistic.  If you're citing a

5   credible sources and it's accurate, then I'll agree with it.

6   Q.   Well, I'm citing the CDC, and I suppose reasonable minds

7   can differ as to whether that's a credible source today.

8        All right.  You talked a little bit about asynchronous

9   communication; correct?

10  A.   Yes.

11  Q.   And what that means is things like messaging as opposed to

12  a face-to-face interaction; is that correct?

13  A.   That's what I assume asynchronous means, but you'd have to

14  operationally define it for me.

15  Q.   Well, you used the term in your testimony.

16       When you used the term, were you referring to messaging?

17  A.   I was referring to messaging, yes.

18  Q.   Okay.

19  A.   E-mails, messaging.  Digital communication.

20  Q.   Thank you.

21       Now, you are familiar with the concept of medication

22  adherence; is that right?

23  A.   Yes.

24  Q.   Can you explain to the jury what is the -- if you agree

25  that there is a problem with medication adherence in ADHD

1    patients -- well, let me ask -- I'm sorry.  Withdrawn.

2        Do you agree that there is -- there is a problem that ADHD

3    patients face in medication adherence?

4    **A.**    Yes.  So the research suggests and supports the fact that

5    ADHD individuals have difficulty staying on medication.  If you

6    view ADHD as a chronic psychiatric disorder, a chronic medical

7    issue, you'll find non-adherence across all of medicine.  So is

8    it specific to ADHD?  Not necessarily.

9    **Q.**    Okay.  Thank you.

10       You are aware that studies have found that adults with

11   ADHD who received a text message reminding them to take and

12   renew their medications had significantly improved medication

13   adherence rates?

14   **A.**    Is there a study you're citing?

15   **Q.**    There sure is.

16       It's behind 7282, but let me just ask you, are you

17   familiar with -- you don't need to look at it.

18       Are you familiar with studies that have shown adults with

19   ADHD who received messages, that it improves their medication

20   adherence.

21   **A.**    Yes.

22   **Q.**    Great.  Okay.  All right.

23       So, now, let me ask you about a term that you used many

24   times during the course of your direct testimony.

25       You used the term repeatedly "usual course of professional

GOODMAN - CROSS / SCHACHTER

1    practice."

2        Right?

3    A.    Yes.

4    Q.    Okay.  Now, you have written a lot of articles.  I know

5    because I've read them.  Correct?  Fair to say you've written a

6    lot of articles?

7    A.    I'm going to let my mom know that somebody else is

8    interested in my work.

9    Q.    We're going to be good friends.

10   A.    I'm impressed you've spent so much reading.  There's close

11   to 40 peer-reviewed scientific articles.  I've given hundreds

12   of lectures.  So if you've spent your time doing that, kudos to

13   you.

14   Q.    It's my job, and it's a labor of love.

15       Anyway, of those 40 peer-reviewed articles that you have

16   written, I am correct that you have never written an article

17   that explains the term "usual course of professional practice";

18   correct?

19   A.    Likely true.

20   Q.    I am also correct that you have never written an article

21   that even uses the term "usual course of professional

22   practice"; correct?

23   A.    Correct.  And that's because I write scientific research

24   articles in psychiatry for clinicians and researchers, not for

25   attorneys.

GOODMAN - CROSS / SCHACHTER

1  Q.   Great.  Unfortunately, this one read them.

2       So, you also cite many articles in your -- the report that

3  you prepared for this case; correct?

4  A.   Yes.

5  Q.   And I am also correct, because I've checked, not a single

6  one of the articles that you cite to support your report ever

7  used the term "usual course of professional practice."

8  A.   You know, you're absolutely right on that.  And, in fact,

9  if I were to pull the last 10,000 publications on ADHD in the

10 scientific literature, you'd not find one article that uses

11 that phrase.  It's not a phrase we use in medicine as a

12 definition.

13 Q.   Exactly.  Thank you.

14      Now, when you use the term "usual course of professional

15 practice" during the course of your testimony, what you really

16 meant was what is, in your view, the best practice; correct?

17 A.   Absolutely not.

18 Q.   Well, let's talk about the word "usual."

19      The word usual means what is done most of the time, at

20 least according to the dictionary.

21      You would agree with that?

22 A.   So you tell me the difference between "usual" defined by

23 the Webster's dictionary and "usual" as a legal definition.

24 Q.   In the law, we also use English.  I'm asking you because

25 you're -- you use the term "usual."  You would agree with me

GOODMAN - CROSS / SCHACHTER

1    that the word "usual" means what is done most of the time?

2    **A.**    If we're going to use the term "usual" as defined by the

3    Webster's dictionary, then I'll stipulate that the answer is

4    yes.

5        If, however, there is a legal definition to the term

6    "usual" that I am unaware of because I am not an attorney, then

7    I don't know how to answer the question.

8    **Q.**    That would make two of us.

9        You are --

10        **MS. GREEN:**    Objection.    Move to strike Mr. Schachter's

11    comment.

12        **MR. SCHACHTER:**    I withdraw.

13    **BY MR. SCHACHTER:**

14    **Q.**    Let's talk about what you understand to be usually done.

15        You are a psychiatrist; is that correct?

16    **A.**    Board-certified adult psychiatrist.

17    **Q.**    Let's pause on that for a minute.

18        Can you explain what it means to be board-certified as a

19    psychiatrist?

20    **A.**    It means that you fulfilled the curriculum criteria.    So

21    there's a year of internship and there's three years of

22    residency.    I did my residency at Johns Hopkins School of

23    Medicine.    Then you have to sit for an oral exam.    This was

24    back in the day.    I did my oral exams in New York.    It's almost

25    an all-day process where they bring in patients.    You have to

1    interview them.  You're observed by two or three other

2    board-certified psychiatrists.  They rate your ability to

3    interview and come to diagnostic formulations.  And there's

4    also a written exam that you have to take.

5         The pass rate during those years, when I was a resident,

6    was about 50 percent.

7    Q.   Wow.  And because it is a rigorous program to reach that

8    kind of designation, you put on your website and on your CV,

9    you note for people that you are board-certified in psychiatry;

10   correct?

11   A.   Yes.

12   Q.   Because it lets you know -- let's people know that you are

13   extremely qualified and have gone through a rigorous training

14   program?

15   A.   It conveys that I've got through a rigorous training

16   program and that I have passed the necessary requisites of an

17   exam to a board-certified psychiatrist.

18   Q.   Thank you.  Okay.  Back to usual.

19        So you are a psychiatrist.  I am correct, am I not, that

20   psychiatrists like you are not the main source of care for

21   adults with ADHD?

22   A.   Is that right?

23   Q.   Unfortunately -- I wish I could answer the questions, it

24   is right, but it's your job to answer the questions.

25   A.   So is this right by -- but what's the database for this?

 1   Is this patients -- the number of patients who are seeking

 2   evaluations or is this based on what specialty are writing ADHD

 3   medications?  I don't know the -- I don't mean to ask you

 4   questions.  I don't know the answer to your question, let me

 5   put it that way.

 6   **Q.**   Let me try to help.

 7        I'd like you to turn in your binder to Exhibit 7283 where

 8   you will find a peer-reviewed article in the *Journal of*

 9   *Attention Disorders* from June of 2024.

10   **A.**   7283?

11   **Q.**   Correct.

12        **THE COURT:**  I think it's Volume 2.

13        **THE WITNESS:**  Yeah, yeah.

14        **MR. SCHACHTER:**  Sorry.

15        **THE WITNESS:**  I've got to get from Volume 1 to

16   Volume 2, and these things are really dense.

17        **MR. SCHACHTER:**  Can I take -- can I take these two

18   binders from you, please?

19        **THE WITNESS:**  Which ones?

20        **MR. SCHACHTER:**  Let me take these away from you.  Make

21   more space.

22        **THE WITNESS:**  More table space.  Thank you.  Thank

23   you.  Thank you.

24        **MS. GREEN:**  Thanks.

25        **THE WITNESS:**  82.

1  BY MR. SCHACHTER:

2  **Q.**  Tell me when you're there.

3  **A.**  7282?

4  **Q.**  7283.

5  **A.**  83.

6     Yes.

7  **Q.**  Okay.  Do you see an article in the *Journal of Attention*

8  *Disorders*?

9  **A.**  Yes.

10 **Q.**  Okay.  And I'd like to direct your attention to page 5.

11 The one at the -- the numbers at the very bottom of the page.

12 **A.**  Okay.

13 **Q.**  Okay.  Now, do you see where it says (as read):

14      "For adult private insurance enrollees with

15      ADHD, 31.9 percent had outpatient ADHD visits with a

16      family practice physician and 25.7 percent with a

17      psychiatrist, 17.1 percent with a nurse

18      practitioner/psychiatric nurse, and 3.9 to 6.6

19      percent with a psychologist, other therapist, or

20      physician's assistant."

21      Do you see that?

22 **A.**  I do.

23      **MS. GREEN:**  Objection to this form of questioning.

24 The witness -- this is not impeaching Mr. Schachter can use to

25 refresh.

1              MR. SCHACHTER:  I'm not impeaching, Your Honor.

2              THE COURT:  Overruled.  Go ahead.

3    BY MR. SCHACHTER:

4    Q.    Okay.  You do not dispute that even among people that have

5    private insurance, only one out of every four adults would see

6    a psychiatrist like you for their ADHD?

7    A.    So we have to qualify this.  And I don't want to turn this

8    into a discussion about statistics, but in this line,

9    there's -- it says, "Refer to Table 1."

10         And, again, I -- I'm not familiar with this.  If I've read

11   it, I've forgotten it.  It says turn to Table 1.  So I don't

12   know what my N is.

13         How many patients are we talking about?  It may be a

14   sufficient number of patients.  It may not be a sufficient

15   number of patients.  I don't have a statistically significant

16   value here.

17         So I don't know whether 32 percent versus 26 percent is

18   statistically significant.

19         Numerically, it's greater, but I think the Court needs to

20   understand the difference between numerical differences and

21   statistically significant differences.

22   Q.    Thanks.  We're going to get into some statements by the

23   CDC on the same subject in just a moment, but before we move

24   off of this journal, I want to make sure, you do not have any

25   information that disputes the fact that only one in four people

1    that have private insurance even see a psychiatrist like you

2    for their ADHD care?  You don't have any information to dispute

3    that, do you?

4    **A.**    I do not.

5    **Q.**    Okay.  So you agree that it's possible that only one out

6    of every four people with insurance go to see a psychiatrist

7    for their ADHD?

8            **MS. GREEN:**  Objection.  Calls for speculation.

9            **THE COURT:**  Well, anything is possible, so let's move

10   on.

11           **MR. SCHACHTER:**  Sure.

12   **BY MR. SCHACHTER:**

13   **Q.**    Okay.  Now, this journal suggests that most ADHD care is

14   done by a family practice physician; correct?

15   **A.**    That's what the statement was you read.

16   **Q.**    Okay.  And it ain't just here.  I'm going to show you what

17   the CDC says.

18       If you can turn to the very next document, Tab 7284, do

19   you see information which has been provided by the Center for

20   Disease Control, the United States Government?

21           **MS. GREEN:**  Objection.  Hearsay.

22           **MR. SCHACHTER:**  It's an --

23           **THE COURT:**  Well, here is my -- my concern is that it

24   is a -- I'm trying to figure out.  This is cross-examination

25   and -- of his opinions.  And I'm trying to figure out how all

1  of this for the last hour or so is cross-examination of his

2  opinions.  I understand you can be given leeway to show what he

3  knows, what he doesn't know, what his -- and when I say that, I

4  mean what his experiences are, and what he's not had experience

5  with.

6      But to spend a lot of time on those things to which he has

7  not had experience and has not offered an opinion -- and has

8  not offered an opinion -- and is not the basis for his opinion

9  to the extent he's given his opinions in front of the jury, is

10  somewhat collateral.  I mean, to go into the history of -- of

11  the disease with -- and its -- all its myriad treatments and

12  progress over time and numbers over time, that's not why this

13  witness was called.

14      And so I do think it's an undue consumption of time to

15  cross on these issues.

16          **MR. SCHACHTER:**  May I explain this point, Your Honor?

17  Dr. Goodman has testified about the usual course of

18  professional practice.  My point is Dr. Goodman has no idea

19  what the usual course of professional practice is because his

20  area of expertise doesn't really see as much ADHD as other

21  disciplines that he does not know about.

22          **THE COURT:**  I don't understand.  That 25 percent of

23  the public -- of a public -- of a number goes to a family

24  psychiatrist.  Doesn't at all mean that this doctor or any

25  witness doesn't have familiarity with all the other people who

1    have the disease and all the other people who are treated.  He

2    has not limited his -- his testimony to say, well, I've just

3    limited to the number of people who have come and -- who have

4    come to a psychiatrist and then, therefore, it becomes relevant

5    that only 25 percent of the public, accepting those numbers, go

6    to the public.

7        His experience is -- at least it purports to be, and it's

8    up to the jury to make these evaluations, is his experience in

9    the field with -- in the treatment of the field.

10        Now, if you can establish, and maybe you can, that it's

11    limited to just people who have gone to psychiatrists, then I

12    understand that connection.  But you haven't done that.

13            MR. SCHACHTER:  That's what I'm trying to do.

14            THE COURT:  And that's why it would be relevant.

15            MR. SCHACHTER:  That's what I'm trying to do.

16            THE COURT:  Pardon?

17            MR. SCHACHTER:  That's where I have embarked -- that

18    the jury I have embarked upon.

19            THE COURT:  Well, then, you just ask the question.

20            MR. SCHACHTER:  Okay.  Well, let me just -- well, Your

21    Honor, also, this is the CDC, so admission by a party opponent.

22            THE COURT:  Well, no, no, no.  No, no.  I mean, you're

23    not seeking the admission of the document.  I mean, we're not

24    arguing over that.  We're just trying to figure out --

25            MR. SCHACHTER:  Yeah.

1              THE COURT:  -- by this witness, if you're -- what you

2      want to demonstrate -- your last sentence, what you want to

3      demonstrate, he has no idea about what the usual course of

4      practice is, you might demonstrate that or inquire into it,

5      which is what you're doing.

6         But it's not established that -- you have to establish the

7      nexus that his experience is limited to those people who have

8      gone to psychiatrists.

9         For example, he hasn't read any materials about AD --

10     about the disease.  I get it confused all the time, which I

11     attribute to my age.  But I'm not looking for a diagnosis.

12                           (Laughter.)

13             THE COURT:  No judge is looking for a diagnosis, I'll

14     tell you that, for obvious reasons.

15        Anyway, the point I'm making is that you have to show that

16     his experience is limited to not reading about, not having

17     conversations with, not studying, not considering an area of

18     material or information broader than just those people who have

19     gone to psychiatrists.

20        You want to establish that, go right ahead.

21             MR. SCHACHTER:  I'm on that journey, Your Honor.

22     BY MR. SCHACHTER:

23     Q.   Last question on this topic.  You know the CDC has said

24     that primary care physicians, such as family practice and

25     internal medicine doctors, are the main source of care for

1  adults with ADHD?

2  **A.**   Yes, I know that that's what the CDC has said.

3  **Q.**   Okay.  Now, you will agree with me that most family

4  practice and primary care physicians have received no training

5  in the evaluation or treatment of ADHD?

6           **MS. GREEN:**  Objection.  Foundation.

7           **THE COURT:**  Let's see.  Overruled.  Go ahead.

8           **THE WITNESS:**  I'm sorry.  I get distracted.  Can you

9  repeat the question?

10 **BY MR. SCHACHTER:**

11 **Q.**   Sure.

12      Well, you have said on Maryland public TV (as read):

13          "Family practice physicians and primary care

14      physicians are coming up to speed but, you know,

15      nobody has been trained in the residency about this."

16      That's something that you said?

17 **A.**   This is something I said.

18 **Q.**   And you have also said in 2024, even psychiatry residents

19 do not get a focus on ADHD; correct?

20 **A.**   Correct.  In most residency programs, they do not.

21 **Q.**   You have also said that nurse practitioner programs do not

22 have a focus on adult ADHD; correct?

23 **A.**   As far as I know, that's true.

24 **Q.**   And so you said in 2024, (as read):

25          "Clinicians are really unaware and inexperienced

1          on how to make the diagnosis."

2          Correct?

3  **A.**    They're coming up to speed.

4  **Q.**    That was not my question.

5          You said in 2024 (as read):

6               "Clinicians are really unaware and inexperienced

7          on how to make the diagnosis"?

8  **A.**    Yes.  And perhaps I overstated that in 2025.  2024.

9  Whenever I said it.

10 **Q.**    Okay.  You said it in your interview on figuring out adult

11 ADHD; correct?

12 **A.**    The interview was for whom?

13 **Q.**    It was with the Broadcast Retirement Network with Jeff

14 Snyder on July 8, 2024, where you said (as read):

15               "ADHD is actually the second most psychiatric

16          disorder in adults and yet there is paucity of

17          training in professional programs.  Psychiatry

18          residents, Ph.D. psychology programs, nurse

19          practitioners don't get a focus on ADHD in adults,

20          and so clinicians are really unaware and

21          inexperienced on how to make the diagnosis."

22          Something you said?

23 **A.**    That's true.

24 **Q.**    Thank you.

25          You are aware that in the -- you are aware that from 2012

1    to 2023, psychiatrists, pediatricians, family practice doctors,

2    and nurse practitioners together only accounted for 75 percent

3    of stimulant prescriptions.

4         Are you aware of that?

5    **A.**   No.  Not by that number.

6    **Q.**   Are you aware of a report prepared for the DEA by a group

7    called IQVIA, report on stimulant trends?  I'll show it to you

8    to see if it refreshes your recollection.

9         You can turn to 7285 in your binder.

10   **A.**   What page would you like?

11   **Q.**   Well, first, do you see the title "Stimulant Prescription

12   Trends in the United States from 2012 to 2023"?

13   **A.**   Yes.

14   **Q.**   Prepared in November of 2024?

15   **A.**   Yes.

16   **Q.**   If you look on the second page, do you see where it says

17   it was prepared for the Drug Enforcement Administration?

18   **A.**   Yes.

19   **Q.**   Okay.  And in this report prepared for the DEA, I'd like

20   you to turn to 7285.  I'm sorry.  I'm sorry.  Page 17 of this

21   report.

22             **THE COURT:**  Sorry.  Page what?

23             **MR. SCHACHTER:**  17.

24             **THE WITNESS:**  Yes.

25   \\\

1    BY MR. SCHACHTER:

2    Q.    Okay.  Do you see where it says (as read):

3           "Among provider specialties, psychiatry,

4    pediatrics, family practice, and nurse practitioners

5    prescribe more than 75 percent of the stimulant

6    prescriptions dispensed from 2012 to 2023."

7    Do you see that?

8    A.    Yes.

9           MS. GREEN:  Same objection.

10          THE COURT:  What's the objection?

11          MS. GREEN:  Foundation.  Hearsay.  Undue consumption

12   of time.

13          THE COURT:  No.  Overruled.

14   BY MR. SCHACHTER:

15   Q.    That would mean that nearly one in four stimulant

16   prescriptions are made from different specialties other than

17   psychiatry, family practice, pediatrics, and nurse

18   practitioners; correct?

19   A.    Okay.

20   Q.    Fair to say, you will admit, Dr. Goodman, that you have no

21   idea how the one-fourth of medical practitioners in the country

22   that are prescribing stimulants, you have no idea what their

23   course of professional practice in these other disciplines that

24   you don't even know what they are.  Fair to say?

25   A.    No.  Completely inaccurate.

1    Q.    Okay.

2    A.    So the reason it's inaccurate is that in the hundreds of

3    lectures I've given and the thousands, 10,000 clinicians I've

4    taught and lectured, I've had endless conversations with people

5    of varying degrees of specialty:  Family practice, nurse

6    practitioners, whoever is prescribing in the arena of ADHD.

7    They have told me how they're prescribing, how they're

8    diagnosing.  I have a very accurate understanding of how people

9    beyond psychiatrists are making a diagnosis and treating and

10   prescribing.

11   Q.    Let me ask you about that.

12         You've given a lot of lectures; correct?

13   A.    Yes.

14   Q.    You're giving lectures to people that actually want to

15   know more about ADHD; correct?

16   A.    They are people who show up for the attendance of that

17   conference and attend my lectures presumably because they want

18   to improve their clinical skills.

19   Q.    Great.  Improve their clinical skills.

20         So presumably the people are not showing up at your

21   lectures because they already know everything that you're about

22   to say; correct?

23             MS. GREEN:  Objection.  Calls for speculation.

24             THE COURT:  Overruled.  I want to hear his answer.

25                         (Laughter.)

BY MR. SCHACHTER:

Q.   You agree with that; right?

A.   I don't agree -- tell me the question again because --

Q.   Sure.

A.   -- all this back and forth is disconcerting to me.

Q.   Sure.

There's people that are showing up at your lectures; right?

A.   Correct.

Q.   You don't think that they're showing up to hear what they already know; correct?

A.   No, they are showing up to know what they already know. Right?  You don't understand that answer?

Q.   I do not understand that answer.

A.   Okay.  Let me explain it.

The audience is composed of several groups of people: Those who do not know and have been asked by patients to know; those who think they know but want to learn more; and those who do know who want to be reassured that they're doing it the right way.

There's a number of people in the audience from 20 people to 2500 people.

Q.   Sure.

And if you're lecturing to 2500 people, you haven't spoken to all of them; correct?

1    **A.**    Obviously not.

2    **Q.**    Okay.  And the people, before they show up at your

3    lectures and they hear what you have to say, you don't have any

4    idea what they were doing before they came to see you, at least

5    not the ones that you didn't speak to; correct?

6    **A.**    Correct.

7    **Q.**    And even once they listen to your lectures, which I can

8    tell you are riveting, you don't actually know what those

9    people do after they leave your lectures with respect to the

10   evaluation and treatment of ADHD because you're not with them;

11   correct?

12   **A.**    The CME organizations have pretest, post-test, and then

13   they have some post-conference follow-ups in order to find out

14   whether or not what they have learned has changed the course of

15   their practice as they relate back to the company.  So in that

16   regard, I don't know what they've done, but the CME companies

17   are keeping track of that metric.

18   **Q.**    Okay.  All right.  In any event, you will agree with me,

19   will you not, that even of the people that have shown up at

20   your lecture, you don't know exactly what their course of

21   practice was, all of them, before they showed up; correct?

22   **A.**    Correct.  And I hope that it's going to be better after

23   they leave the conference.

24   **Q.**    Of course.  But still, you don't know what they're doing

25   after they leave the conference; correct?

1    A.    I don't have a conversation with them, no.

2    Q.    All right.  Now, as Ms. Green asked you, not only is

3    there, as you've described, very limited training for doctors

4    and nurse practitioners in how to train -- treat ADHD, there

5    are also no published clinical guidelines in the United States;

6    correct?

7    A.    Incorrect.

8    Q.    Okay.  Well, you are --

9    A.    Repeat the question, and let's make sure I understood

10   exactly what the question was.

11   Q.    Well, let me ask you this:  You are a member of an

12   organization called APSARD; correct?

13   A.    Correct.  APSARD stands for the American Professional

14   Society for ADHD and Related Disorders.

15   Q.    And APSARD is right now working on guidelines for --

16   clinical guidelines for ADHD; correct?

17   A.    No.

18   Q.    It's not?

19   A.    Rephrase your question so I can answer it.

20   Q.    Well -- okay.

21        APSARD and you started working on clinical guidelines for

22   the treatment of ADHD back in 2023; correct?

23   A.    Here's my hesitation.

24   Q.    Sure.  Share.

25   A.    There's a difference between child and adolescent ADHD and

GOODMAN - CROSS / SCHACHTER

1   adult ADHD.  There are clinical practice guidelines written by

2   the American Academy of Pediatrics, the American Academy of

3   Child and Adolescent Psychiatry, and the Society for

4   Developmental and Behavioral Pediatrics.  All of that clinical

5   practice guidelines are written for ADHD --

6   Q.   Thank you.

7   A.   -- in children and adolescents.

8        So when you ask me the question about clinical practice

9   guidelines, it has to be specific to adults.

10  Q.   Thank you so much.  I appreciate that.

11       Back in 2023, this APSARD organization started --

12  announced -- publicly announced that it is going to be working

13  on clinical guidelines for the treatment of adult ADHD;

14  correct?

15  A.   Correct.

16  Q.   That was in 2023.  It has now been several years and those

17  clinical guidelines still have not been published; is that

18  correct?

19  A.   That is correct.

20  Q.   And I am correct that APSARD decided -- and by the way,

21  you're working on those, are you not?

22  A.   I am not.

23  Q.   In any event, you're a member of this organization?

24  A.   I am a member of the organization.

25  Q.   Okay.  And you understand that APSARD decided to publicly

1    announce that it was starting work on clinical guidelines for

2    the treatment of ADHD because those clinical guidelines were

3    necessary; right?

4    **A.**    Correct.  Might I add --

5    **Q.**    Please.

6    **A.**    -- it would be important for the Court to understand a

7    little bit about the evolution of clinical practice guidelines

8    because the English use of these words doesn't begin to convey

9    the scientific rigor involved.

10        APSARD started the program for developing clinical

11   practice guidelines by a remark that I made in the board of

12   directors meeting in 2022.

13        That became the impetus upon which a three-member group

14   was consolidated, a task force was developed.

15        The other issue here is that when you say after

16   three years, these guidelines haven't been published, it's

17   important for the Court and the jury to understand the rigor

18   involved in a clinical practice guideline.

19        So if you begin to make a distinction between clinical

20   practice guidelines and usual course of professional practice,

21   these are conceptually two different ideas with completely

22   different methodologies, so I just want to put that out there

23   in case your questioning is going to go in that direction.

24   **Q.**    It is.

25   **A.**    I understand.

GOODMAN - CROSS / SCHACHTER

1   Q.   Ms. Green asked you, "Does the absence of clinical

2   guidelines have any impact on the usual course of practice," or

3   your opinions on that subject.

4        Do you remember her asking you that?

5   A.   I do.

6   Q.   You said no; correct?

7   A.   I did say no.

8   Q.   Okay.  You told *The New York Times* in 2024, quote (as

9   read):

10           "Without clear rules, some providers, well

11        intentioned, are just making it up as they go along."

12        Isn't that what you told *The New York Times* in 2024, yes

13   or no?

14   A.   Oh, it is what I told *The New York Times*.

15   Q.   And I am correct, am I not, that in 2024, authors from the

16   CDC and the Clinical Research Program in Adult ADHD at

17   Massachusetts General and Harvard Medical School wrote in the

18   *Journal of Attention Disorders* that (as read):

19           "No established U.S. guidelines for ADHD

20        clinical care for adults leaves the standard of care

21        up to the individual providers."

22        Isn't that correct?

23   A.   The authors on that paper?

24   Q.   You can look at it.  I think we actually just looked at

25   it.  7283.

1    **A.**    Uh-huh.

2    **Q.**    This is the article we looked at "Who provides outpatient

3    clinical care for adults with ADHD," authored by people from

4    the CDC as well as Harvard Medical School and the Clinical and

5    Research Program in Adult ADHD at Massachusetts General.

6        Do you see that?

7    **A.**    I do.

8    **Q.**    Okay.  I'd like to direct your attention to page 2.

9    **A.**    Mm-hmm.

10   **Q.**    Do you see where the authors in this peer-reviewed

11   journals said, third paragraph, second sentence (as read):

12            "There are established diagnostic criteria for

13        adult ADHD in the *Diagnostic and Statistical Manual*

14        *of Mental Disorders*" -- that's the DSM -- "but no

15        established U.S. guidelines for ADHD clinical care

16        for adults, leaving the standard of care up to

17        individual providers.

18        Do you see that?

19   **A.**    I see that it's written, yes.

20        Let it -- let it be noted that when you cite this text, I

21   did not write it, but that's not a disavowment of my

22   interpretation.

23        Again, this is written -- in fact, there's only one

24   clinician, by the way, on your coauthors here, it's Dr. Surman.

25        And so this is written from a clinical perspective, not a

1  legal perspective so, please, let's not use standard of care by

2  the legal definition and not a clinical definition.

3  Q.    Right.  This is an article that is written for medical

4  practitioners; correct?

5  A.    It's written for a variety of people who are interested in

6  the research being developed and published for ADHD.  Policies

7  readers, pharmaceutical companies, clinicians, anyone in the

8  field is reading this with great interest.

9  Q.    Right.  And all of those people who read this article

10  would see that the author said that (as read):

11          "No established U.S. guidelines for ADHD

12      clinical care for adults leaves the standard of care

13      up to individual providers."

14      That's what they would see; correct?

15  A.    They would see that.  What he doesn't note, though, in

16  their understanding is that they're talking about ADHD.  ADHD

17  that has been diagnostically determined from a comprehensive

18  psychiatric evaluation and fulfills the five criteria for the

19  diagnosis of ADHD.

20  Q.    Okay.  Thanks.

21      Okay.  Now, you also cannot say what practitioners from

22  every specialty around the country are doing to diagnose ADHD;

23  correct?

24  A.    Correct.  Which is why I spend my time educating

25  clinicians in multiple lectures to ensure that the quality of

1  care, the usual course of practice, accurate diagnosis, and

2  appropriate treatment is upheld for the safety of patients.

3  Q.  Your education is in high demand because the people don't

4  know about it; correct?

5  A.  People are more informed now than they were 20 years ago.

6  And in -- 20 years ago -- and 20 years later, they'll be better

7  informed.

8  Q.  You are familiar with a Dr. Margaret Sibley; correct?

9  A.  Margaret Sibley?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Okay.  Now, she and her coauthors wrote in *The Lancet*

13  *Psychiatry* that there are many ways to diagnose ADHD; correct?

14  A.  You'll have to show me the article and the specific text,

15  please.

16  Q.  Sure.  Could you turn to 7287, just a couple tabs further.

17  A.  Okay.

18  Q.  All right.  What you're looking at is an article in *The*

19  *Lancet*, which is a well-respected medical journal; correct?

20  A.  Correct.

21  Q.  All right.  And Dr. Sibley wrote an article, "Method of

22  adult diagnosis influences estimated persistence of childhood

23  ADHD: a systematic review of longitudinal studies."

24      Do you see that?

25  A.  Correct.

1    Q.    All right.  And I'd like to direct your attention to --

2    well, page 1.

3         Do you see where --

4              **THE COURT:**  What page?

5              **MR. SCHACHTER:**  Page 1, Your Honor.

6    **BY THE WITNESS:**

7    Q.    Do you see how she writes (as read):

8              "The purpose of this review is to highlight how

9         variability in diagnostic methods can influence

10        estimates of ADHD persistence in adulthood."

11        Do you see that?

12   A.    Yes.

13   Q.    And do you see -- and it's highlighted on the screen for

14   you.  Do you see where Dr. Sibley writes (as read):

15             "Methods of diagnosing ADHD in adulthood varied

16        widely with respect to source of information,

17        diagnostic instruments, for example, rating scales,

18        interviews, diagnostic symptom threshold, and whether

19        impairment was required for diagnosis."

20        Do you see where she wrote that?

21   A.    I see where she wrote that.

22   Q.    You don't disagree with Dr. Sibley's statement here that

23   methods of diagnosing ADHD in adulthood varied widely, do you?

24   A.    I don't disagree with that statement because you'll notice

25   it's a systematic review of longitudinal studies, which means

1   that it also includes international research and there's high

2   variability on the methods and the diagnosis and the prevalence

3   of ADHD across the world.

4   **Q.**    Okay.  So not only does the methods of diagnosing ADHD

5   vary widely in the United States, it also varies widely around

6   the world; correct?

7   **A.**    Correct.

8   **Q.**    Do you see where Dr. Sibley in the second column writes

9   (as read):

10          "The DSM diagnostic procedures for ADHD are

11      well-established and validated in children, leading

12      to relative diagnostic stability in this population.

13      In adulthood, diagnostic procedures for ADHD are not

14      so well-refined.  Research continues to yield

15      conflicting findings about which symptoms optimally

16      define ADHD in adulthood and how best to collect,

17      review, and integrate diagnostic information on

18      adults."

19      Do you see that?

20  **A.**    I see the text.

21  **Q.**    She goes on to say that (as read):

22          "Unless diagnostic procedures for ADHD in adults

23      are refined, persistence and prevalence estimates

24      will continue to vary widely, reflecting

25      inconsistency in diagnostic methods across studies."

1          Do you see that?

2  **A.**    I do.

3  **Q.**    You do not disagree with what Dr. Sibley stated about --

4  about how diagnostic procedures for ADHD are not well-refined

5  for adults; correct?

6  **A.**    I don't disagree, but I would clarify and refine, this is

7  an article looking at the variability of the diagnoses across

8  the world and by what methods those are being done.  The DSM-5,

9  however, has very specific five criteria for making the

10  diagnosis.

11          And so that she's not impeaching the DSM-5.  She is a

12  researcher looking at how to best refine the acquisition of

13  information.  However, the usual course of professional

14  practice is doing a comprehensive psychiatric evaluation, which

15  is the preamble to any of these extracted texts, which you cite

16  in complex scientific articles.

17  **Q.**    Let me ask you this:  When you testified over and over and

18  over again about what the usual course of professional practice

19  is, did you take into account Dr. Sibley's conclusion that the

20  way diagnostic procedures are done for adult ADHD vary widely?

21  **A.**    Show me where it says diagnostic procedures vary widely.

22  **Q.**    Well, if you look at the --

23  **A.**    It says diagnostic procedures for ADHD in adults are

24  refined -- unless they are refined.  The procedures, not the

25  diagnostic criteria.

1    Q.    Sure.   I was referring back to the first paragraph that we

2    talked about, (as read):

3              "Methods of diagnosing ADHD in adulthood varied

4        widely with respect to source of information,

5        diagnostic instruments, e.g. rating scales,

6        interviews, diagnostic symptom thresholds, and

7        whether impairment was required for diagnosis."

8        Do you see that?

9    A.    I do.

10    Q.    Okay.   And when you were telling the jury about what the

11    usual course of professional practice is, did you take into

12    account Dr. Sibley's conclusion that, in fact, the methods for

13    diagnosing ADHD in adulthood vary widely?

14    A.    I'm not sure where we're going with this.   This is a paper

15    that's a systematic review internationally.   If you're going to

16    boil this down to the United States, it's meaningless.   There

17    is a usual course of practice.   Here's the usual course of

18    practice:   One does a comprehensive psychiatric evaluation.   It

19    takes 60 to 90 minutes.   Unless you go through all of the

20    categories that I listed in doing a clinical evaluation,

21    everything after that is not for a legitimate medical reason.

22    Q.    We're going to talk about that.

23              MR. SCHACHTER:   Your Honor, is this an appropriate

24    time for the break or would you like -- I can continue, Your

25    Honor.

```
 1          THE COURT:  Yeah.  We will take an -- yeah, we --
 2   yeah, let's take a break.  Well --
 3          MR. SCHACHTER:  I can also continue, Your Honor, if
 4   that's better.  Whatever pleases the Court.
 5          THE COURT:  Yeah, I'd like to go to three --
 6          MR. SCHACHTER:  Sure.
 7          THE COURT:  -- because there's a -- maybe the jury --
 8   you want to stand up a minute and stretch and so forth?  Let's
 9   take a two-minute in place break.
10       Yeah.  Let's take five minutes.  Take five minutes.  Go
11   ahead.  We'll take five.  10 minutes.  Go ahead.
12                      (Recess taken at 2:31 p.m.)
13                   (Proceedings resumed at 2:37 p.m.)
14     (Proceedings were heard out of the presence of the jury.)
15          THE COURTROOM DEPUTY:  Come to order.  Court is now in
16   session.
17                   (The jury enters the courtroom.)
18      (Proceedings were heard in the presence of the jury.)
19          THE COURT:  Okay.  Please be seated.  Let the record
20   reflect all jurors are present, the parties are present.
21       You may proceed.
22          MR. SCHACHTER:  Thank you.
23   BY MR. SCHACHTER:
24   Q.   All right.  Dr. Goodman, you have an understanding of what
25   you understand to be the best practice in ADHD because you are
```

 1   a specialist in adult ADHD, as well as other psychiatric

 2   conditions; correct?

 3   **A.**   No.

 4   **Q.**   You have been trained in this area; correct?

 5   **A.**   Correct.

 6   **Q.**   And you teach in this area?

 7   **A.**   Correct.

 8   **Q.**   You are not aware of any software designers at Facebook

 9   who specialize in the diagnosis and treatment of ADHD, are you?

10   **A.**   I do not.

11   **Q.**   And you did not see a woman named Ruthia He at any of your

12   many lectures on the evaluation and treatment of ADHD, did you?

13   **A.**   No.

14   **Q.**   All right.  Now, you testified that it is -- that the

15   usual course of professional practice is to evaluate, reach a

16   conclusion, and recommend treatment in 60 to 90 minutes; is

17   that correct?

18   **A.**   Generally, yes.

19   **Q.**   Okay.  All right.

20        Now, I want to talk about what you believe should be done

21   by a provider in that necessary 60 to 90 minutes.  Okay?

22        One of the things that you do with your patients is you

23   discuss signs of inattentiveness; correct?

24   **A.**   Correct.

25   **Q.**   And you mentioned this DSM, the diagnostic of --

1    *Diagnostic and Statistical Manual of Mental Disorders.*

2        Do you remember that?

3    **A.**    Yes.

4    **Q.**    All right.  And it lays out the nine symptoms of

5    inattentiveness; correct?

6    **A.**    Correct.

7    **Q.**    And it lays out nine symptoms of

8    hyperactivity/impulsivity; correct?

9    **A.**    Yes.

10   **Q.**    Okay.  And that's what it says you should look to?

11   **A.**    That is one portion of five criteria.  That's one

12   criteria.

13   **Q.**    Okay.  But those are the criteria listed in the -- right,

14   right.  There's also impairment?

15   **A.**    There's symptoms, impairment, age, impairment across

16   domains, and not accounted for by another medical psychiatric

17   or neurodevelopmental disorder.

18   **Q.**    Those are the five.  Okay.  Thank you.

19       All right.  In any event, so one of the things you talk

20   about with your patients is you talk about their symptoms of --

21   possible symptoms of inattention; right?

22   **A.**    Yes.

23   **Q.**    You try to explore with them whether they are displaying

24   things like the failure to give close attention to details;

25   right?

1    A.    Yes.

2    Q.    Whether they're sustaining attention in tasks or play

3    activities?

4    A.    Yes.

5    Q.    Okay.  Avoiding, disliking, or being reluctant to engage

6    in tasks?

7    A.    Yes.

8    Q.    Losing things?

9    A.    Yes.

10   Q.    Okay.  So those are the -- kind of the inactiveness things

11   that you talk about with your patients?

12   A.    Yeah.  Those are the psychological symptoms.

13   Q.    Okay.  And then you also explore with them things that

14   signal hyperactivity/impulsivity; right?

15   A.    Correct.

16   Q.    You explore with them whether they fidget or tap hands or

17   feet?

18   A.    Yes.

19   Q.    You explore with them whether they leave their seat in

20   situations where remaining seating is expected?

21   A.    Yes.

22   Q.    Whether they feel like they're often on the go, acting as

23   if driven by a motor?

24   A.    Yes.

25   Q.    And other things but those are -- you explore that in your

1    meetings; right?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, you say that a provider should also obtain a

4    social history; correct?

5    **A.**    Yes.

6    **Q.**    You say that this exploring a social history with the

7    patient is the usual course of professional practice in

8    evaluating ADHD?

9    **A.**    It's part of a comprehensive psychiatric evaluation.

10   **Q.**    Right.  Which you say is part of the usual course of

11   professional practice?

12   **A.**    That would depend on the specialty, I suppose.

13   **Q.**    Okay.  So I guess some -- you would say that some

14   specialties -- and we're going to spend more time on this --

15   you don't think they do explore a social history as part of

16   this comprehensive psychiatric evaluation?  You don't think

17   that that's their -- part of their usual course of practice;

18   right?

19   **A.**    I don't know what their usual course of practice is.  I

20   can tell you what a comprehensive psychiatric evaluation

21   entails.  As to whether or not nonpsychiatrists are doing that

22   in their office, I don't sit and watch them in their office so

23   I couldn't state one way or the other.

24   **Q.**    Okay.  And I want to explore some of the things that you

25   say that you do in -- one of the things -- but you do, you do

1  obtain a social history when you're sitting down with patients

2  and evaluating whether they have ADHD; right?

3  **A.**    Yes, because I want to understand what the social aspects

4  of their life has been, the trajectory of their life, what's

5  been involved, and also I'm looking for impairments in their

6  social history.  So I'm looking for issues that have occurred

7  before or during or just after birth that may increase risk for

8  ADHD.

9        I'm looking for associative disorders that co-occur with

10  ADHD.  For example, enuresis, bed wetting occurs in 25 percent

11  of ADHD individuals.  It reflects neurodevelopmental

12  immaturity.  We know that brains of ADHD individuals slow at a

13  rate of two to three years in the prefrontal cortex.

14        So I'm looking for developmental history, then I'm looking

15  for educational history.  There's underachievement

16  academically, et cetera.  Then I'm looking for substance abuse

17  in teens, pregnancy in teens.  Then I'm looking for college

18  performance, first job, marriage.

19        With every developmental stage of one's life, the demands

20  increase, they tax one's executive ability, and that's where

21  the impairments are, so I can substantiate the diagnosis based

22  on the impairments that have occurred during the course of

23  their life.

24  **Q.**    That is what you do in your 90-minute evaluation for which

25  you charge $1,400?

1    A.    Correct.

2    Q.    But you don't know if doctors -- like family practice, you

3    know that family practice physicians -- maybe you don't know

4    the percentage, but you know that family practice doctors are

5    evaluating people for ADHD and prescribing them stimulants;

6    correct?

7    A.    Correct.

8    Q.    All right.  And you don't know what they're doing.  You

9    don't really know if they are obtaining a social history and

10   asking if they were bed wetters, for example, you don't know?

11   A.    I don't know because I'm not in the office with them.

12        What I do know is that when they make a diagnosis, they're

13   following the DSM-5 diagnostic criteria and in order to do

14   that, you would have had to do a psychiatric evaluation.

15   Q.    Sure.  You ask patients whether they wet their beds as

16   children; correct?

17   A.    Most of the time, not always.  I can't always remember

18   every question to ask.

19   Q.    Okay.  You're not here to tell the jury that you think

20   that is actually what is usually happening by -- you don't

21   think that usually medical providers are asking patients if

22   they wet their beds?

23   A.    I will tell you that they usually are not unless they are

24   pediatricians looking at neurodevelopmental histories.

25   Q.    Sure.  Okay.

1  A.   Or familiar practice docs who have some understanding

2  because they treat children, adolescents, and adults.  They may

3  be asking those questions.  But if you're saying, "Gee,

4  Dr. Goodman, do you sit in the office of these specialists and

5  watch how they take their histories," the answer is I do not.

6  Q.   You ask patients whether they sucked thumbs as children,

7  that's part of your -- that's part of your practice?

8  A.   It is.

9  Q.   You ask patients whether they bite their nails, whether

10 they had tics, or stuttering; correct?

11 A.   Correct.

12 Q.   But you're not here to say that that's part -- and that's

13 what you do in your initial evaluation; correct?

14 A.   Correct.

15 Q.   You're not here to tell the jury that that's what -- that

16 is the usual course of professional practice for people that

17 are diagnosing and prescribing stimulants; right?

18 A.   So the usual course of practice has some variability in

19 accessing the information.  But, again, depending on your

20 training, if you're a developmental pediatrics, you're probably

21 asking these questions.  If you're a family physician, you're

22 probably asking these questions.  If you're a mental health

23 nurse practitioner, you're probably asking these questions

24 because you've been trained on the association of coexisting

25 symptoms that indicate neurodevelopmental immaturity.

1    Q.    Okay.  Well, we talked about -- a little bit about the

2    lack of training that family fraction physicians and mental

3    health nurse practitioners received; right?  Remember that?

4    A.    I do.

5    Q.    Okay.  But I just want to make sure what you're saying.

6    So you think that when people see their family practice doctor,

7    and they say they're having trouble paying attention and

8    they're having trouble completing tasks, you're not saying that

9    you think that most family practice doctors also say, "Well,

10   let's explore.  Did you wet your bed?  Did you suck your thumb?

11   Did you bite your nails?  Did you have tics?  Did you stutter?"

12        You don't think that that's happening usually?

13            MR. BODAPATI:  Objection.  Foundation.  Asked and

14   answered as well.

15            THE COURT:  Overruled.

16        Go ahead.

17   BY MR. SCHACHTER:

18   Q.    You don't think that most primary care physicians are

19   asking their patients about those things, do you?

20   A.    My guess is probably not.

21   Q.    Right.  But you think, in your opinion, that's a -- that's

22   a good practice to cover those things?

23   A.    Well, I think it's a comprehensive.

24   Q.    Right.  Okay.

25        You ask about a patient's educational history?

1  **A.**    Correct.

2  **Q.**    You explore with them whether they went -- you think it's

3  important to explore whether they went to public, religious, or

4  private schools for their education?

5  **A.**    Have you been sitting in on my interviews?

6  **Q.**    If only I could.

7        That is something that you cover?

8  **A.**    The answer, yes, I do.

9  **Q.**    Okay.  But you don't think that that's what most

10  practitioners in the world that are prescribing stimulants, you

11  don't think that they do that, do you?

12  **A.**    Probably -- probably not.

13  **Q.**    Okay.  You think it is important to ask --

14  **A.**    By the way -- by the -- I'm sorry to interrupt.  Let me

15  just give a clarification here.

16        The clarification here is I ask that question so as to not

17  be disparaging in regards to their educational history, that

18  is, if I say, "Did you go to private school"; and the person

19  says, "No, I went to religious school."  If I say, "Did you go

20  to private school"; and they say, "No, I went to public

21  school," that's a bit disparaging.  So I couch the questions to

22  include the number options so the patient can then tell me

23  which option is appropriate to them.

24  **Q.**    Okay.  Thank you.

25        You explore with your patients -- before diagnosing them

1   with ADHD, you explore with them whether they were the victim

2   of childhood sexual abuse; is that correct?

3   A.   Most of the time, I do, yes.

4   Q.   But you don't think that that's what your average primary

5   care physician or nurse practitioner who has somebody coming in

6   saying that they're distracted and having trouble completing

7   tasks, you don't think they explore the patient's childhood

8   sexual abuse, do you?

9   A.   Don't know.  Probably not.

10  Q.   You don't know?

11  A.   It's unfortunate, too, isn't it?

12  Q.   I can't -- I can't opine on that.

13       You also, as part of your practice, you ask about sexual

14  orientation, do you not?

15  A.   I do.

16  Q.   Again, you are not here to say that questions that you ask

17  people about their sexual orientation is part of the usual

18  course of professional practice for somebody who is trying to

19  figure out whether somebody has ADHD; correct?

20  A.   Asking the question about sexual orientation is,

21  I believe, a routine question in a medical evaluation as it

22  speaks to risk factors for other potential diseases.

23       And if you are an untreated ADHD, you have a higher risk

24  of promiscuity and sex and early pregnancies.  All of which

25  come into play in the medical evaluation of the patient.

1  Q.   Those may be very good reasons, Dr. Goodman, why in your

2  initial evaluation, your practice is to ask a patient about

3  their sexual orientation.  Thank you for that.

4  A.   It's good practice --

5  Q.   You are --

6  A.   It's good practice in medicine because you're evaluating

7  what the potential risks -- medical risks are to that patient.

8  Q.   Mm-hmm.

9  A.   HIV, sexual transmitted diseases, unplanned pregnancies,

10 et cetera, are part of the medical evaluation.

11 Q.   Okay.  You're -- I just want to make sure I'm

12 understanding.  You're not saying that covering what you do in

13 your practice, asking questions about sexual orientation,

14 you're not saying that's part of the usual course of

15 professional practice of everyone that is figuring out whether

16 somebody has ADHD?

17 A.   The comprehensive psychiatric evaluation doesn't start

18 with a preamble or presumption of diagnosis.  You start with a

19 clean slate.  You evaluate and access and solicit all of the

20 information, both medical, psychological, and psychiatric, in

21 order to formulate a diagnostic conclusion and then move from

22 there.

23 Q.   Right.  You think -- it is -- it is your opinion that it

24 is important and the best practice to do a comprehensive

25 psychiatric evaluation to every patient before you diagnose

1  them with ADHD and prescribe them with stimulants; correct?

2  A.   That is the training of every psychiatric residency

3  program in this country.

4  Q.   Right.  But you also understand that most of the

5  practitioners who evaluate people for ADHD and prescribe

6  stimulants, did not go through a psychiatric residency program;

7  correct?

8  A.   They did not go through a psychiatric program, but they

9  did go through professional training.  And in the course of

10 that professional training, they were taught what was involved

11 with a mental health evaluation.  Whether they're doing it is

12 up to them, based on their time, their experience, and their

13 inclination.

14 Q.   And you don't know whether they are or are not?

15 A.   That is correct.

16 Q.   Okay.  Okay.

17      Now, you had said that you charged $1,400 for your initial

18 evaluations.  You charge $500 for follow-ups; is that right?

19 A.   $500 an hour for follow-ups, yes.

20 Q.   How long are your follow-ups?

21 A.   So typically I'll see two patients, 30 minutes each at

22 250.

23 Q.   Okay.  I see.  Okay.  Thank you.

24      All right.  Now, I believe that you said that the usual

25 course of practice is to spend 60 minutes?

1  A.    60 to 90.

2  Q.    60 to 90.

3        So, first of all, you understand there to be a range?

4  A.    Correct.

5  Q.    And there is no guideline -- there's no written guideline

6  that says that an evaluation needs to take 90 minutes?

7  A.    There's no guideline to the time because the psychiatric

8  examination is already formatted, and so it takes as long as it

9  takes you to do the interview that's necessary to complete a

10 comprehensive psychiatric evaluation.

11 Q.    Right.  But my question was more limited.  There are no

12 written guidelines that say that an initial evaluation for a

13 patient needs to be 90 minutes before you diagnose them with

14 ADHD?

15 A.    There are no guidelines written on the time for an

16 evaluation.

17 Q.    Right.  Nothing that says 90 or 60 or 45 or 30, there's

18 nothing written at all; correct?

19 A.    Correct.  It's the time it takes to do a comprehensive

20 psychiatric evaluation as I laid out.  So that's what

21 determines the time.

22       The restriction of time abbreviates the acquisition of

23 information, and that increases the inaccuracy of the

24 diagnostic conclusion.

25 Q.    Okay.  Now, fair to say that there are greater time

1    limitations that primary care physicians face when they're

2    seeing their patients?

3            MS. GREEN:  Objection.  Foundation.

4            THE COURT:  Overruled.

5            THE WITNESS:  Again, I have to ask you to repeat.

6    BY MR. SCHACHTER:

7    Q.   Sure.  It is an accurate statement that primary care

8    physicians have a greater time limitation than perhaps a

9    psychiatrist does in how much time they spend with patients?

10   A.   I suppose that's true.  I'm not a primary care doc, and I

11   don't run a primary care practice.

12   Q.   Do you see a primary care doctor?

13   A.   Infrequently.

14   Q.   Have you ever spent 60 to 90 minutes with your primary

15   care physician?

16   A.   What would he ask me for 90 minutes?

17   Q.   Exactly.

18   A.   But then, again, he's not doing a psychiatric evaluation.

19   Q.   Exactly.

20   A.   Because I didn't go in complaining of anxiety, depression,

21   inattention, PTSD, or panic disorder.

22   Q.   But you know that primary care physicians are diagnosing

23   patients with ADHD all the time and prescribing them with

24   stimulants; correct?

25           MS. GREEN:  Objection?

1          THE WITNESS:  I know they're diagnosing -- I know

2     they're diagnosing and prescribing.  I don't know the accuracy

3     of their diagnosis or the legitimacy of their prescription.

4     BY MR. SCHACHTER:

5     Q.   Thank you.

6          By the way, pediatricians also evaluate people for ADHD;

7     correct?

8     A.   Children and adolescents?

9     Q.   Yes.

10    A.   Yes.

11    Q.   All the time, pediatricians are meeting with kids or

12    adolescents, they're evaluating them, and they're diagnosing

13    them with ADHD, and they're prescribing them with stimulants,

14    that happens as part of a normal course of pediatric practice;

15    correct?

16    A.   Yes.

17    Q.   You do not believe that pediatricians are spending 60 to

18    90 minutes with each kid or adolescent before they diagnose

19    them with ADHD and prescribe them a stimulant, do you?

20          MS. GREEN:  Objection.  Foundation.

21          THE COURT:  Overruled.

22          THE WITNESS:  Overruled?

23          THE COURT:  Yeah, you can answer.

24          THE WITNESS:  No, they do not spend 60 to 90 minutes

25    because they're interviewing and diagnosing ADHD in an

1  eight-year-old, so there's much less history to obtain.  It's

2  often obtained from a parent.  If I'm interviewing somebody

3  who's 55 years old, I've got 47 years more of history to take.

4       **MR. SCHACHTER:**  Okay.

5       **THE COURT:**  I think we'll take our recess now.

6       Ladies and gentlemen, the Court has some business this

7  afternoon that's unavoidable, and so we're going to end the

8  session today now.  I will see you tomorrow morning at 9:15.

9       Remember the admonition given to you:  Don't discuss the

10  case, allow anyone to discuss it with you, form or express any

11  opinion.

12       We're in recess.

13       And you may go.

14       I want to talk to the parties about scheduling, so it

15  doesn't have to be on the record.  We can put it on the record

16  later.

17            (The jury leaves the courtroom.)

18       (Proceedings were heard out of the presence of the jury.)

19            (Proceedings adjourned at 2:59 p.m.)

20                 ---oOo---

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, November 3, 2025

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court