Volume 20

Pages 4318 - 4601

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    vs.                         )   NO. **3:24-cr-00329-CRB**
                                )
RUTHIA HE and DAVID BRODY,      )
                                )
            Defendants.         )
_____ )

San Francisco, California
Wednesday, November 5, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    CRAIG H. MISSAKIAN
                    United States Attorney
                    Northern District of California
                    450 Golden Gate Avenue
                    San Francisco, California 94102
              BY:   **KRISTINA GREEN**
                    **ASSISTANT UNITED STATES ATTORNEY**

                    U.S. DEPARTMENT OF JUSTICE
                    FRAUD SECTION
                    950 Pennsylvania Avenue NW
                    Washington, D.C. 20530
              BY:   **JACOB N. FOSTER,**
                    **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
           BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
           BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
           BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
           BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                  **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
           BY:  **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:**  **Thifany Braga**
                  **Simon Hall**
                  **Mackenzie Slater**
                  **Andy Cepregi**
                  **Ashley Moore**
                  **Barbara Hua Robinson, Mandarin Interpreter**
                  **Jeff Dinn, Mandarin Interpreter**

# I N D E X

Wednesday, November 5, 2025 - Volume 20

**GOVERNMENT'S WITNESSES**  **PAGE**  **VOL.**

**GOODMAN, DAVID (RECALLED)**
(PREVIOUSLY SWORN)                                    4356    20
Cross-Examination by Mr. Schachter                    4357    20
Redirect Examination by Ms. Green                     4464    20

**PRASAD, AAKASH**
(SWORN)                                               4499    20
Direct Examination by Ms. Green                       4500    20

# E X H I B I T S

**TRIAL EXHIBITS**                        **IDEN**  **EVID**  **VOL.**

897                                                 4502    20

6398                                                4377    20

7452                                                4451    20

7457                                                4421    20

7460                                                4364    20

7462                                                4432    20

7546                                                4366    20

7594                                                4365    20

7633 page 3                                         4419    20

| | |
|---|---|
| 1 | <u>Wednesday - November 5, 2025</u>                                  <u>8:30 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURTROOM DEPUTY:**  All rise.  Court is now in |
| 6 | session.  The Honorable Charles R. Breyer presiding. |
| 7 | You may be seated. |
| 8 | **THE COURT:**  We don't seem to have any defendants. |
| 9 | **MR. SCHACHTER:**  Oh, we waive their presence, Your |
| 10 | Honor. |
| 11 | **THE COURT:**  Well -- okay. |
| 12 | I want to -- this is legal argument on admissibility of |
| 13 | certain documents. |
| 14 | So go ahead. |
| 15 | **MR. SCHACHTER:**  Okay.  Thank you, Your Honor. |
| 16 | **THE COURT:**  Let's not waste time in this. |
| 17 | **MR. SCHACHTER:**  Thank you. |
| 18 | So, Your Honor, we have four issues that we would like to |
| 19 | take up with the Court this morning. |
| 20 | **THE COURT:**  Yeah.  Okay. |
| 21 | **MR. SCHACHTER:**  And we are grateful to the Court for |
| 22 | arriving early and taking the time to hear from us. |
| 23 | The first issue has to do with the introduction of medical |
| 24 | records showing that a number of the 16 patients identified by |
| 25 | the Government were examined by outside providers both prior to |

**PROCEEDINGS**

1    their treatment, as well as after their treatment at Done, in

2    which the provider concluded that the patient had ADHD.

3         One of the issues in this -- and I have multiple

4    arguments.

5              **THE COURT:**  I need to ask a question about that.

6              **MR. SCHACHTER:**  Mm-hmm.

7              **THE COURT:**  Is it asserted that the prescriber here --

8    we'll call them the prescriber, the provider, I don't know,

9    whatever word it is -- the Done employee or independent

10   contractor, whatever you want to call, the prescriber -- are

11   you contending that the prescriber reviewed those records?

12             **MR. SCHACHTER:**  No.

13             **THE COURT:**  Okay.  Okay.  Because I think, as I said

14   last night, that's the issue.

15             **MR. SCHACHTER:**  Sure.

16             **THE COURT:**  And so you want to make an argument, but

17   I'm not going to let it in.  I mean --

18             **MR. SCHACHTER:**  Well, Your Honor, if --

19             **THE COURT:**  Go ahead.

20             **MR. SCHACHTER:**  I ask the Court keep an open mind

21   because there are multiple --

22             **THE COURT:**  I'll keep an open mind.  Tell me why I

23   should let it in notwithstanding it did not in any manner

24   contribute to the decision of the --

25             **MR. SCHACHTER:**  Your Honor, I hand up transcript

PROCEEDINGS

1    pages 2624 and 3979.

2              **THE COURT:**  Okay.  Of the proceeding.  Okay.

3        Okay.  Looking at 3979, this was the direct examination of

4    the doctor and I'll read it (as read):

5                  "After reading your opinion as to the legitimacy

6         of Done prescriptions to Harlan Band, were you

7         provided with medical records from Dr. Javaherian,

8         the other psychiatrist who had been treating Mr. Band

9         prior -- provider to Done?

10            "Yes.

11            "Did you review those records -- did your review

12        of those records change your opinion as to the

13        legitimacy of the Done prescriptions?

14            "No, it did not.

15            "Did the record show that Dr. Javaherian had had

16        a visit with Mr. Band October 2020?

17            "Yes.

18            "Did Dr. Javaherian make an ADHD diagnosis and

19        prescribe a Schedule II stimulant?

20            "No."

21        Okay.  I've read that.

22            **MR. SCHACHTER:**  So that is what the Government

23    elicited from Dr. Goodman.

24            **THE COURT:**  Yeah.

25            **MR. SCHACHTER:**  And now, if we could just turn for a

PROCEEDINGS

1    moment to the testimony of Dr. Hill and the Government -- what

2    the Government elicited from --

3            **THE COURT:**  Okay.

4            **MR. SCHACHTER:**  -- outside provider Dr. Hill, whose

5    records were also --

6            **THE COURT:**  2624.  (as read):

7            "Dr. Hill, did you diagnose Mr. Chieppa with

8        ADHD at this visit?

9            "I did not.

10           "Why not, sir?

11           "Because he was not exhibiting symptoms

12       consistent with a diagnosis of ADHD, at least enough

13       symptoms, and the fact that he was -- he had just got

14       out of a psychiatric hospital.  I did say he reported

15       a history of ADHD, but at that moment in time, my

16       diagnosis was not ADHD."

17       Okay.  I've read the two.

18           **MR. SCHACHTER:**  So this is evidence that the

19   Government introduced about the views of other providers who --

20   whose views were not available to the Done providers.  Why?

21   That they did not have ADHD.  Why?

22       It's because one of the issues in this case is whether

23   Done's prescriptions were for a medical purpose or for no

24   purpose.

25       One of the issues, therefore, is was there a purpose that

PROCEEDINGS

1    existed for the prescriptions that were used in this case.

2        For that reason, the Government introduced -- well, the

3    Government introduced --

4        **THE COURT:**  No, I'm not listening -- I'm now thinking

5    about what you said at the beginning.

6        **MR. SCHACHTER:**  Mm-hmm.

7        **THE COURT:**  Because I'm not sure you're right, you

8    see.  I'm not sure that the answer to the question of whether

9    or not it was prescribed for a medical purpose, leaving aside

10   the course of -- is a -- which, by the way, the Government must

11   prove your client intended it not to be.

12       **MR. SCHACHTER:**  Mm-hmm.

13       **THE COURT:**  Whether this evidence relates to that

14   issue, that's -- because I think that's what you said.  I don't

15   see how it does.

16       **MR. SCHACHTER:**  Well, so --

17       **THE COURT:**  I don't even see how it does if these

18   people, all 16 of them, had serious ADHD.  If they had

19   serious -- I mean, that's not the issue.

20       **MR. SCHACHTER:**  Then, Your Honor, I guess that is the

21   only possible -- I think that the existence of the -- the

22   purpose is probative evidence of whether the prescription

23   was -- whether there was a legitimate medical purpose for the

24   prescription --

25       **THE COURT:**  I would agree with you that it's not

PROCEEDINGS

1    totally irrelevant.  The question under 403 is whether that

2    even -- though it may be relevant, which is what you're

3    arguing, whether it -- whether it has a tendency to confuse

4    rather than to illuminate the issues that the jury has.

5        And my concern here and why I raise it -- and you may not

6    agree with me because you may believe that it's so highly

7    relevant that -- that it ought to overcome any issues of

8    confusion, or maybe issues of confusion can be cleared by

9    limiting your instructions, the Court's view is that when you

10   introduce this type of evidence, it so overshadows and confuses

11   the main inquiry that must be made here that I would rule that

12   it's not admissible.

13       **MR. SCHACHTER:**  Your Honor, I just -- what I am

14   confused by --

15       **THE COURT:**  Go ahead.

16       **MR. SCHACHTER:**  -- is for what purpose then is

17   the Government eliciting testimony from another provider --

18       **THE COURT:**  You got that right.  I don't know what the

19   Government is doing.  If I -- the question really is, I don't

20   know why the Government did what it did.  And maybe it ought to

21   be stricken, I don't know, but I haven't heard from the

22   Government yet, but it didn't quite open -- in my view, it

23   doesn't open the door to its confusion to the issue of whether

24   or not further testimony, or whether this testimony alone

25   warrants the introduction of the testimony you wish to

PROCEEDINGS

 1    introduce.

 2            MR. SCHACHTER:  Well, Your Honor, I have heard the

 3    Court --

 4            THE COURT:  Should we ask the Government?

 5            MR. SCHACHTER:  Please.

 6            MR. FOSTER:  Yes, Your Honor.  I think you're correct.

 7    So to clarify things, what the defense wants to introduce, as I

 8    understand it, are records that the Done prescriber never saw,

 9    records that Mr. Goodman never saw or reviewed, and records

10    I believe, that were not produced to the Government.

11        So it's not relevant.  It's not impeaching of

12    Dr. Goodman's testimony.  And as the Court has said, it's an

13    undue consumption of time.

14            THE COURT:  Well, it has a tendency to confuse --

15    we're so far past undue consumption of time that to even

16    suggest it is ridiculous.  We're way past that, so --

17    however -- I'm not concerned about time.  I am concerned about

18    time.  I'm not concerned about time.  If it's a relevant issue

19    and I think -- and it wouldn't confuse the issues, I'd let it

20    in.  But you haven't answered counsel's question, which is also

21    the Court's question, is how come it's here?  Why did you

22    introduce it?

23            MR. FOSTER:  So the reason is these are different

24    situations.  In Mr. Band's case, the Done prescriber noted that

25    he had a treating psychologist and Dr. Goodman testified in

1    that limited circumstance, the appropriate standard of care is

2    to coordinate the care with that psychologist.  And so that is

3    why after he wrote his report and reached his conclusions, as

4    he testified, he did look at those records and they didn't

5    change them.

6         These records that they're seeking to introduce are not

7    relevant or impeaching of that testimony or that limited

8    circumstance in which the Government introduced them.

9         And in regards to Dr. Hill, he was a percipient witness as

10   to the condition of the patient of the relevant time of the

11   Done prescriptions.

12        So just like the mothers and the family members or anyone

13   who encountered them, his testimony that the symptoms of mania

14   and delusion and paranoia that would have been apparent to

15   anyone, if these Done prescribers were conducting anything more

16   than the most cursory rubber-stamp-type of review was the

17   relevance of his testimony.

18        And it was appropriately admissible and it doesn't open

19   the door into introducing records from witnesses we've never

20   heard of that don't impeach.

21        MR. SCHACHTER:  Two responses.  First, then, it

22   appears that the Government is completely fine with us

23   introducing outside records where the Done provider had been

24   made aware of a prior ADHD diagnosis, which are many of these

25   circumstances, because those records would have been available

1  to the Done prescriber had the Done prescriber had requested

2  it.

3      So that is -- I think that is clear.  We will seek to do

4  that in circumstances where the Done prescriber is made

5  available the prior ADHD diagnosis.

6          THE COURT:  Your other point?  Do you want me to

7  address that point?

8          MR. SCHACHTER:  Yes, Your Honor.

9          THE COURT:  Okay.  No, I don't think it -- I don't

10  think it does make it clear.

11      I do think, though -- and I'm not -- I'm not getting to

12  your second point yet.

13      But I do think there may be -- I don't know how it's going

14  to be argued.  I mean, I think that it has to be argued, if

15  it's going to be argued at all in the 5,000 facts that they

16  have, if it's going to be argued at all, then -- then I think

17  their argument has to be limited, as they indicated, what

18  they -- what the significance of the evidence is.

19      I mean, they can't -- they can't argue this person didn't

20  have ADH- -- ADHD.  I don't think they can --

21          MR. SCHACHTER:  But it is exactly what they elicited.

22      My second point was that Mr. Foster is simply inaccurate.

23  If all they wish to ask Dr. Hill was did he -- how did he

24  appear, they could have asked that.  Instead, the Government

25  says (as read):

1              "Did you diagnose Mr. Chieppa with ADHD at this

2         visit?

3                  "I did not.

4                  "Why not?"

5         That is exactly what we wish to do the converse of, which

6    is show the records -- showing exactly the same medical records

7    of other providers just like Dr. Hill that contemporaneously or

8    before --

9              **THE COURT:**  I don't think that's what you showed me.

10   I'll read it again (as read):

11                 "Dr. Hill, did you diagnose Mr. Chieppa with

12            ADHD at this visit?

13                 "I did not.

14                 "Why not, sir?

15                 "Because he was not exhibiting symptoms

16            consistent with the diagnosis of ADHD, at least

17            enough symptoms.  And the fact that he was -- had

18            just got out of a psychiatric hospital.  I did say he

19            reported a history of ADHD, but at that moment in

20            time, my diagnosis was not ADHD."

21        He doesn't say, "Oh, and I looked at some records of --

22   of -- and that's why I didn't do it," or "That's why I think he

23   doesn't have ADHD."

24        He's saying I saw him; he did not exhibit enough symptoms

25   of ADHD.  Full stop.

1      Well, I guess he also said -- not full stop.  I guess he

2  also says, by the way, he came out of a psychiatric hospital,

3  so that puts -- whether it put some context in it, who knows.

4      I don't know.  I don't know what the significance of just

5  coming out of a psychiatric hospital is.

6      But, the point is, he said "I saw him and this is what I

7  found."

8      Okay.  What are your other -- because I'm not allowing

9  those records.

10         MR. SCHACHTER:  I understand.  I just want to make

11  clear --

12         THE COURT:  Yeah.

13         MR. SCHACHTER:  -- Dr. Goodman was also asked.

14          "Did Dr. Javaherian make an ADHD diagnosis and

15      prescribe a Schedule II stimulant?

16      "No."

17      That is eliciting exactly what we are seeking to elicit

18  with exactly the same witness.  The Government's allowed to do

19  it, we are not.  I think that's unfair.  We are going to -- but

20  I will move on to our other arguments.

21         THE COURT:  Well, I better look at what -- now this is

22  a third thing.  I mean, I don't have the transcript in front of

23  me.

24         MR. SCHACHTER:  This is the transcript that I

25  forwarded to you, did -- this is page 3979.

PROCEEDINGS

1          **THE COURT:**  Oh, I'm sorry.  Okay.  Let me go back to

2     that.  Okay.  I'm...

3                         (Pause in proceedings.)

4          **THE COURT:**  Well, I think that's a different issue.

5     In other words, if your expert relied on some outside records.

6     Dr. Javaherian -- did the records of Dr. Javaherian, were

7     they -- were they given to the provider?

8          **MR. FOSTER:**  No.

9          **MR. SCHACHTER:**  No.

10         **MR. FOSTER:**  No, Your Honor.  So they also --

11    Dr. Goodman rendered his opinion before receiving those

12    records.  So his opinion --

13         **THE COURT:**  That has to be stricken.

14         **MR. FOSTER:**  Well, I think the point -- the point with

15    this patient, Your Honor, is that it's the relevant time

16    period.  It's --

17         **THE COURT:**  Well, if you're getting into that, I think

18    I have to let them have the records in.  I mean, you can't have

19    it both ways.  You can't introduce the records, which were not

20    shown to the provider, and then object to them introducing

21    records of the same patient of his medical history before.  I

22    mean, I think that's so elementary.  I'll strike it then.  I

23    won't get into it.

24         **MS. GREEN:**  Your Honor, can I just respond to that one

25    point?  I think here the difference is this was a very unique

 1    circumstance.  So --

 2            THE COURT:  You make your choice.  Just make your

 3    choice.  Which way do you want it?  Do you want it in or you

 4    want it out?  Just make your choice.  It's --

 5            MR. FOSTER:  We'll strike it, Your Honor.

 6            THE COURT:  Thank you.

 7            MR. SCHACHTER:  Your Honor, I believe -- I believe

 8    that it is fair, and I wish to lay out my other arguments.

 9            THE COURT:  Go ahead.

10            MR. SCHACHTER:  The second point is the Government has

11    said this is a platform that is designed to attract drug

12    seekers.

13        The fact that 10 out of the 16 patients, in fact, had ADHD

14    diagnoses from outside providers is relevant evidence that

15    contradicts the Government's claim that the Government -- that

16    this platform is designed for drug seekers; that the 16 that

17    they handpicked are not drug seekers, they were people with

18    ADHD.  That is relevant evidence, and I think we're allowed to

19    admit that.

20            THE COURT:  Well, I mean, there's -- the first

21    response is the failure of the Government to adduce evidence

22    that any of the 16 were drug seekers is obviously something you

23    can comment on.  I mean, that's clear.  In argument you can

24    comment on it.  There's no evidence at all, as you would say --

25    that Government maintains this is a platform for drug seekers,

1   there isn't any evidence in the record that any of these people

2   were drug seekers.  I mean that's -- that's the short form of

3   the argument about their failure.

4       Now what you want to do is you want to show that in --

5   that these 16 people indeed had other purposes in seeking --

6   that is other than being a drug seeker, purpose in -- in

7   seeking medication.  And, I think, that the argument -- I think

8   that that, again, is a tendency to confuse and bring into other

9   issues.

10      I think, though, that in fairness to both sides, I would

11  think that the argument just sits right as I've described it,

12  that is the Government -- the Government has the burden of

13  proof, they make an allegation that it's a platform for drug

14  seekers.  Now, that they may have witnesses who say this is a

15  platform for drug seekers and here's why, and I think that

16  there's been a lot of evidence, or some evidence, on that

17  issue.

18      But indeed you're right -- I think you're right that --

19  that there's no evidence that these 16 people sought drugs.

20  And I don't know why it just doesn't sit at that.

21      I don't know -- I don't know why it's necessary, that is

22  to say, not necessary, but why it is worth the time and

23  consumption -- the consumption of time and the introduced --

24  introducing this type of evidence to show why they were on the

25  platform.

1        I mean, I assumed, I've been listening to all the

2   evidence, I simply assumed that all 16 have ADHD, I mean --

3   because it doesn't make a difference one way or the other.

4        Now, if the Government even suggests that some of these

5   people were drug seekers, and I'm assured that they're not

6   going to make that argument, I don't see why it's relevant.

7        To the extent you want to demonstrate -- maybe I'll put

8   this this way:  To the extent you want to demonstrate that any

9   of these 16 people wanted the drugs for any illicit purpose or

10  nonmedical purpose, then to the extent that is going to be

11  suggested in argument or by way of examination, I think you're

12  entitled to rebut it by -- by all the medical records and so

13  forth of any of the 16.

14       I think it's a clear -- in my view, it's a nice clear

15  line.  It's a bright line.  And it's a bright line because the

16  crime itself -- if it is a crime, the crime itself is in the --

17  is not in the -- is whether any particular individual was

18  seeking the drug for an illicit purpose, it's whether the

19  prescriber prescribed the medication outside the usual course

20  of medicine and for a non-legitimate purpose.

21       And let's just flip it over a minute.  Let's suppose that

22  Patient 1 was a drug seek- -- a terrible drug abuser and that's

23  why they did it.  No question about it.  That's why they did

24  it.  So what?

25       I mean, the question you would say, many defense would

1  say, "Well, what was the evidence that the provider knew or

2  should have known that the person was a drug seeker?"

3      At the very beginning of the case, with 135,000 patients,

4  I thought we -- at least it was the Court's understanding that

5  the Government was not going to be required to prove that, in

6  any given case, a person didn't have a legitimate medical need

7  for the drugs.

8      What they say, though, is that -- is that the legitimate

9  medical need was not demonstrated to the provider and,

10  therefore, it failed to meet the test that it was for a

11  legitimate medical need.  That it turned out in retrospect that

12  it was for a legitimate medical need is not the proof.  It's

13  not proof except to the extent it had been demonstrated to the

14  provider.

15      If the provider points to X, Y, or Z, and she says "Look

16  at this.  Look at that," and I'm quite sure that in argument,

17  you're going to point to one, two, or three points whatever

18  they are, and say, "That's why the provider did what the

19  provider did and that's -- and that was the intention of the

20  provider."  Okay.

21          MR. SCHACHTER:  I have two things.

22          THE COURT:  I'm not going to let it in.

23          MR. SCHACHTER:  I have two things to point out.

24      First, there are substantive counts which deal with

25  prescriptions to particular patients, Band, Souza, Chieppa,

1    Trivedi.  So the relevant circumstances of those particular

2    patients are very much at issue and the Government does need to

3    prove that there did not exist a legitimate medical purpose and

4    that there -- the process followed was outside of the usual

5    course of professional practice.  On top of that, they also

6    need to show that our client knew that.

7        So the fact that -- in particular, with respect to the

8    four charged counts, we should be able to show that there was a

9    medical purpose.  That is evidence, it is critical to our

10   defense.

11       Now, the Government may say:  Sure, those people -- there

12   was a medical purpose, but those providers did not do the job

13   necessary to determine whether or not that was a purpose.

14       That was an argu- -- that is an argument that they can

15   make.

16       They can also argue that, sure, maybe the provider had a

17   medical purpose, but they didn't follow the appropriate

18   procedures and is, therefore, guilty of a crime and Ms. He knew

19   all that.  Those are all arguments that they can make.

20       The fact that we are deprived of the evidence,

21   particularly with respect to the four charged counts that, in

22   fact, there was a medical purpose that existed --

23           THE COURT:  Okay.  So your argument -- this is simply

24   a variation of your first argument, I think.

25       What you are saying to me is that you should be able to

 1  demonstrate that these people, these four people, or whatever

 2  number you want, these four people who are charged Counts 1

 3  through 4, so it's not unimportant, these four people did have

 4  a medical need for these -- for this drug.  That's what you're

 5  saying.

 6      And to me that goes back to "What's the diff?" -- as they

 7  say in Brooklyn.  What's the diff if these people had a -- had

 8  this illness?  That doesn't mean -- and we'll get into it when

 9  we discuss the law.  And we are sort of discussing it now.  And

10  maybe -- and this is -- if there's -- if there's a conviction,

11  this obviously is an appellate point -- that they did have ADHD

12  and, therefore, they were in -- that satisfied the first prong

13  of a conjunctive test, if it's conjunctive.

14      Okay.  I really think you made your point.  And we have a

15  parting of the ways, but I respect it.  In other words, I don't

16  think it's a frivolous point at all.  I don't think it's a

17  frivolous point at all.

18      However, the way I view the law, and it's not the way you

19  view the law, but this is the way I view the law is it doesn't

20  make any difference whether they have ADHD or not.  That's --

21  the -- the conviction or the -- the question of guilt or

22  innocence doesn't in any way turn on that issue.

23          **MR. SCHACHTER:**  I just wish to make one other point.

24          **THE COURT:**  Go ahead.

25          **MR. SCHACHTER:**  And that is that it is appropriate

**PROCEEDINGS**

1    impeachment of an expert, what records they were shown and what

2    records the Government possessed but chose not to show.

3        They chose, with respect to Mr. Band, to show the records

4    of an outside provider.  With respect to Ms. Souza, they have

5    the records of Kaiser Permanente, which -- they like the Java

6    records because there the provider concluded no ADHD diagnosis.

7    They possess -- with respect to a charged count, Ms. Souza,

8    they possess the records from Kaiser Permanente in which

9    multiple providers concluded that that person had ADHD --

10       **THE COURT:**  So you've just said to me -- you just come

11   back and said to me, "look, the evidence that the Government

12   chose not to introduce, it will clearly establish or tend to

13   establish the fact that these people have ADHD."

14       And you know what?  You might be right.  I don't know.

15   But I'll tell you one thing, Number 1, we're not going to get

16   into a fight about what the Government chose to -- you can

17   comment on the absence of evidence, you can always comment on

18   that.  I'm not saying that.  But I'm not going to get into a

19   dispute about their -- about why did they proceed on a

20   particular theory of the case and exclude other theories.

21       Their answer to your inquiry is:  You know what?  We

22   thought -- we agree with the judge.  It doesn't make any

23   difference whether they have ADHD or not, so we chose not to go

24   down the line of the introduction of records, of showing the

25   expert records, which would either confirm or reject.

1    Now, I think there's -- I have a problem with -- as I

2    indicated with some of that.  But let's not -- I mean let's not

3    just keep arguing it --

4        MR. SCHACHTER:  I guess what I -- I will only sharpen

5    that point and then I'll move on.

6        THE COURT:  Okay.

7        MR. SCHACHTER:  Which is that the point is, they say,

8    "Dr. Goodman, did you review these records?  Did it affect your

9    opinion?"

10    I should be able to say, "Dr. Goodman, would it change

11    your opinion if you saw records of Kaiser Permanente which

12    showed that the person had" -- they said -- they said, "Would

13    it change your" -- they said, "Would it change your -- did you

14    review these records?  Did it change your opinion?"

15    "No, because this person -- "why not?"

16    "Because this person said they don't have ADHD."

17    I should be able to say, "Well, did the Government show

18    you records that they possessed?"

19        THE COURT:  Actually, they didn't say that.  I mean,

20    when you look at the transcript, that's not what he said.  He

21    said, "Did you review those records?  Change your opinion as to

22    the legitimacy of the Done -- the legitimacy of the Done

23    prescription."

24    That is, was it legitimate at the time.  It doesn't become

25    legitimate and I -- we're going to make this clear because I'm

**PROCEEDINGS**

1    going to tell the jury this.

2         It doesn't make a difference whether the person has ADHD.

3    That's not the issue here.  That isn't the issue.

4              **MR. SCHACHTER:**  I don't --

5              **THE COURT:**  That's contrary to your assertion.

6              **MR. SCHACHTER:**  Listen, I don't know that we want that

7    objection -- that instruction.

8              **THE COURT:**  Well, okay.

9              **MR. SCHACHTER:**  We will take a stipulation from the

10   Government that the people had ADHD.  That we welcome.

11             **THE COURT:**  Yeah, I'm sure you do.  But that's like --

12   you know what that is?  "No harm, no foul."

13        I mean, that's -- listen, to give Adderall to a person who

14   has ADHD, that's -- that's the solution.  That's why we have

15   Adderall.

16        I mean, you can't -- I mean, Mr. Schachter, I appreciate

17   your effort and your offer of a stipulation, but -- I mean, you

18   and I, respectfully -- and I do respect you, you know that --

19   have a different view of this.  And it may be that an appellate

20   court would have a different view of it if there's a

21   conviction.

22        But as an initial matter, as a trial matter, I don't think

23   it's allow- -- I mean, I don't know, it may be allowable.  I'm

24   not -- I'm going to exercise my discretion, to the extent it's

25   relevant, to exclude it.

**PROCEEDINGS**

1    **MR. SCHACHTER:**  Ms. Bell has a short point on --

2    **THE COURT:**  Yes.  You can make --

3    **MS. BELL:**  A short point on that, Your Honor.

4    **THE COURT:**  You can make a long point.  Go ahead.

5    **MS. BELL:**  I promise it will be short.  I think we're

6    conflating two things.  One is whether at issue is the

7    substantive fact of whether or not they had this medical

8    condition.

9        Another is, which is actually what is at issue, intent.

10   And the fact that three, or two, non-Done providers concluded

11   that this person had a medical condition as opposed to

12   concluding that they were drug-seeking or wanted the drugs for

13   recreational purposes is circumstantial evidence of intent.

14   Your Honor, said, well, I don't think it makes a difference one

15   way or another --

16       **THE COURT:**  Sorry.  How is it -- circumstantial

17   evidence of intent?  Of whose intent?

18       **MS. BELL:**  It goes to the ultimate question, which is

19   whether there was an intent to prescribe with a legitimate

20   medical purpose.  So the totality of the facts.

21       So, for example, if there had been two or three other

22   providers who determined this person is drug-seeking, that

23   would likewise be circumstantial evidence that the -- that the

24   jury could consider in determining whether -- so I just didn't

25   want to --

1     THE COURT:  I got it.

2     MS. BELL:  -- conflate two -- okay.

3     THE COURT:  I'm not saying -- I'm -- just so it's

4  clear, I'm not saying it's entirely irrelevant.  What I'm

5  saying is under 403, it has a tendency to confuse the jury.  It

6  has a tendency to -- to raise for the jury the very issue that

7  I've identified, which is:  If a person has AD- -- A- --

8  whatever it is -- I seem to have that problem; right?

9     If they have that, then it's really a question of no harm,

10  no foul, because do you -- as I just said, to give drugs to

11  somebody who needs them -- who needs them -- and who -- not

12  to -- they're seeking it.  They actually need it.  They need

13  it.  I got it.  I understand that.

14     Anyway, thank you, Ms. Bell.

15     No, I'm not going back to you, Mr. Schachter, on that

16  point.

17     MR. SCHACHTER:  No, no, no.  Not on that point.

18     THE COURT:  Do you have another point?

19     MR. SCHACHTER:  Different point, Your Honor.  I

20  have --

21     MR. FOSTER:  Sorry.

22     MR. SCHACHTER:  -- sev- -- I have several points.

23     MR. FOSTER:  Sorry.  Just for purposes of the record

24  only, can I say two brief things?

25     THE COURT:  Yeah.

1          **MR. FOSTER:**  One is the testimony on Band, Chieppa,

2     narrowly tailored to people in Band's case where the records,

3     the PDMP, shows getting substance abuse medication, reports of

4     psychiatrists, there's an issue of coordination of care there

5     that does not apply generally to other patients.

6          Second, notwithstanding the relevance generally

7     potentially of testimony, the attempt to introduce records

8     provides an alternate grounds for the Court's ruling under

9     611(b) because it doesn't impeach this witness because what

10    this witness testified was the process.

11         **THE COURT:**  And now he's made it for the record.

12    Thank you.  Let's move on.

13         **MR. SCHACHTER:**  Yes.  With respect to one charged

14    count, Ms. Souza.

15         **THE COURT:**  Okay.

16         **MR. SCHACHTER:**  We would like to examine -- so

17    Dr. Goodman offered a number of areas of testimony in which --

18    and I can hand it up to the Court and -- just for the Court to

19    read during the course of the proceedings.

20         And just to summarize, Dr. Goodman testified that it is

21    inappropriate not to do follow-ups.  It is inappropriate to --

22    no -- it is outside the usual course of practice without a

23    comprehensive psychiatric evaluation to prescribe a stimulant.

24    It is outside the usual course of practice to do a bridge

25    refill where you have not done some review of the charts.

PROCEEDINGS

 1        With respect to Ms. Souza alone, the Kaiser Permanente

 2   records, which the Government has possessed, produced to us,

 3   show that none of those things happened with respect to her

 4   care.

 5        With respect to that patient alone, we would like to be

 6   able to impeach the witness on his view that this is not what

 7   happens by showing with respect to one of the 16 patients that

 8   the Government identified that that is exactly what happened.

 9   That is -- that is all we will attempt to do with respect to

10   one patient.

11        **THE COURT:**  Okay.  Let's talk about Ms. Souza.  You've

12   got to run it by me again.

13        **MR. SCHACHTER:**  Sure, sure, sure.

14        **THE COURT:**  You want to impeach Dr. Goodman on -- what

15   page should I take a look at?

16        **MR. SCHACHTER:**  So, Your Honor, this is a little bit

17   lengthier.  Maybe we put this to the side and I address my two

18   other issues, which I think are brief, just in the interest of

19   time.

20        **THE COURT:**  Go ahead.  You're the boss.

21        **MR. SCHACHTER:**  Okay.  Okay.  Thank you.

22        First, I do not -- Dr. Goodman opined that prescriptions

23   were outside the usual course of practice and not for a

24   legitimate purpose.

25        I then attempted to examine him with pieces of evidence

PROCEEDINGS

1   and I said (as read):

2           "Is this consistent with there being a

3       legitimate medical purpose?

4           "Objection.  Sustained."

5       I do not know why.  I do not know why I cannot explore the

6   witness's opinion that there was not a medical purpose for

7   these prescriptions by presenting evidence and asking:  Isn't

8   this consistent with a medical purpose?  I don't understand.  I

9   would like to continue that line of inquiry and I would like to

10  be permitted to do so.

11          **MS. GREEN:**  Your Honor, I'm going off of what he just

12  said, but my recollection of what Mr. Schachter's question was

13  related to what Ms. Rahimi thought and he was asking the

14  witness something along the lines of, "Isn't it true that

15  Ms. Rahimi could have had a legitimate medical purpose," which

16  goes exactly to Your Honor's point, which I don't want to

17  repeat, and that -- I believe that is why I objected and it was

18  sustained.

19          **THE COURT:**  All right.  What's past is past.  I don't

20  know in the context.

21          **MR. SCHACHTER:**  Fine.

22          **THE COURT:**  However, if what you want to do is ask:

23  Is X, is Y, is Z consistent with the usual course of medical --

24  of course, you can ask it.

25          **MR. SCHACHTER:**  Thank you.

PROCEEDINGS

 1          Now, with respect to Dr. Goodman, the video of his prior

 2     course, I want to raise an issue there.

 3          So Dr. Goodman -- the Government's position is that if you

 4     say you may wish to consider a medication trial, that's a

 5     crime.

 6          Dr. Goodman testified it is outrageous to suggest that

 7     anybody should -- that any medical provider would suggest a

 8     medication trial.

 9          Dr. Goodman oversaw a medical educational --

10          **THE COURT:**  Wait, wait.  Don't make that argument with

11     me.  You got it in.  I -- it's in.  And his response is in.

12     And you could -- if I were standing where you were standing,

13     I'd have a pretty good argument to make to the jury about that.

14          Now, what is it that you want to do in addition to that?

15          **MR. SCHACHTER:**  I want to play the six-minute video of

16     the course that he oversaw.  Now, I understand he is --

17          **THE COURT:**  I think that's -- I --

18          **MR. SCHACHTER:**  It's a central issue, Your Honor.  I

19     mean, this is critical evidence and --

20          **THE COURT:**  No, no, no, no.  He has -- first of all,

21     it's not impeaching in one sense.  Well, he has admitted

22     that -- I -- do you -- should you be allowed to play the entire

23     video?

24          **MR. SCHACHTER:**  It's six minutes.  It's a --

25          **THE COURT:**  Well --

PROCEEDINGS

1          **MR. SCHACHTER:** -- six-minute video where the -- in a

2     course that he oversaw to educate physicians.  The physician in

3     the video does exactly what the Government says is a crime.  I

4     just wish to play that video.

5          **THE COURT:**  First of all, I don't think they say

6     that's a crime.  They don't say, "Ah, you do that, that's a

7     crime."  I don't know how many -- that's not the crime.

8          The crime is a much larger -- many-facetted components of

9     what is -- what is the appropriate medical -- what is -- in the

10    first instance, what is an appropriate medical evaluation or

11    whatever it's called.

12         Okay.  Now, true enough.  He oversaw -- I don't know what

13    that means, oversee, by the way.  Did he produce it?  Did he

14    write it?  Did he watch its filming?  Did he -- what was his

15    role vis-a-vis the video?

16         This is why I'm so concerned about playing a video.  What

17    was his role?

18         You characterize it as, well, this is something he

19    oversaw.  Oversaw means a lot of different things, as it does

20    as in a paper that a person writes, as it was explained in some

21    detail yesterday.  My name may be on it -- I mean, look, if my

22    name is on an opinion, I wrote the whole thing; my law clerks

23    hardly contributed to it, however -- just like every other

24    judge, but -- however, you have a public opinion written by a

25    number of authors and what was his role?

**PROCEEDINGS**

1    The problem you have here about the video, about playing

2    the video, is it is, in the Court's view, an undue consumption

3    of time because then it raises the issues of -- of what was his

4    role vis-a-vis.

5        Now, he said, in the very article that you quoted, and

6    it's in the record, he said, I disavow that, or whatever his

7    words were.

8        Well, okay.  Okay.  Did you withdraw the video?  Did you

9    send out a notice that the video shouldn't be shown?  Did

10   you -- did you do X, Y, and Z, seeing this thing which you now

11   claim to be improper after it was done and you had some role?

12       You can ask those questions.  I just don't want to spend

13   six minutes looking at a video on an issue that's not

14   contested.

15       It's not contested.  He didn't say it.  It's conte- --

16   it's -- that the -- what you are -- what you are -- what you

17   are entitled to look at is -- Number 1, that's established,

18   that it was said and he gave his reason.  And you can certainly

19   inquire as to what his role was with respect to the video, if

20   you wish.

21           **MR. SCHACHTER:**  He's -- Your Honor, he has already

22   talked about his role.  It is for the jury to decide --

23           **THE COURT:**  But then we're going to have -- then we're

24   going to have a long explanation -- and maybe you say, oh, I

25   welcome that because --

PROCEEDINGS

1          MR. SCHACHTER:  Your Honor --

2          THE COURT:  I'll give some thought to that.  Let me

3    just give some thought to it, Mr. Schachter.  Okay?

4          MR. SCHACHTER:  Thank you.  And just to be clear, I

5    just want to note, it is six minutes, and at the conclusion --

6          THE COURT:  Six minutes is a lifetime.

7          MR. SCHACHTER:  -- to educate physicians.  And what

8    the person says at the conclusion is, "Would you like to give

9    it a try?"

10         And it is six minutes.  We would like to play that.  We

11   think that in considering Dr. Goodman's testimony, it is fair

12   for the jury to hear that.  It's critical given the amount of

13   time that has been spent.

14         THE COURT:  Oh, maybe I would -- maybe I need a --

15   maybe I need a presentation outside the presence of the jury as

16   to what his role was.

17         MS. GREEN:  His role with respect to the video, he

18   made this clear in direct, he oversaw the class.

19         THE COURT:  Sorry?

20         MS. GREEN:  He oversaw the class.  The course.  Sorry,

21   my accent.  So there's a course that Dr. Goodman was putting

22   on, I guess, for students or people.  That was what he was

23   overseeing.

24         THE COURT:  But that doesn't -- that doesn't mean --

25         MS. GREEN:  Yeah, he wasn't over -- he didn't have any

PROCEEDINGS

1  role overseeing the video or making the video or producing the

2  video.

3          THE COURT:  Well, wait a minute.  Wait.  Slow down.

4  Did he write the video?  Did he --

5          MS. GREEN:  No.

6          THE COURT:  -- see the -- did he -- he didn't write

7  any of the words of the video?

8          MS. GREEN:  No.

9          THE COURT:  Okay.  He -- so, in other words, the -- I

10  don't know what it means to oversee.  I think that I will

11  allow -- outside the presence of the jury I will allow some

12  voir dire on the issue of what was his role vis-a-vis the

13  video.  If his role -- if I conclude that there's enough

14  evidence to show that he had a particular role in either

15  writing it, producing it, then I think that there is -- I think

16  it's a legitimate avenue.

17      But, Mr. Schachter, move on.

18          MR. SCHACHTER:  Yeah, I'm --

19          THE COURT:  It is now 10 after.

20          MR. SCHACHTER:  The mere fact that there is a video

21  like that being used to educate physicians itself --

22          THE COURT:  Mr. Schachter --

23          MR. SCHACHTER:  I'll move on.

24      Your Honor, last word on that -- on Dr. Goodman and the

25  reason I did not introduce it yesterday.

PROCEEDINGS

1          The Court -- and I appreciate the curative that the Court

2     gave, although --

3          **THE COURT:**  Sua sponte.

4          **MR. SCHACHTER:**  I appreciate that, although I will

5     say, to some extent it also has the impact of emphasizing.  The

6     reason why I believe the Court gave the curative is because

7     the Court understands that when the Court involves itself in

8     examination and doesn't simply say, "That is not relevant, move

9     on," but rather says, "What Mr. -- What Dr. Goodman is saying

10    is this.  He has already told you that," it's --

11         **THE COURT:**  Well, it's an asked and answered.

12         **MR. SCHACHTER:**  We fear it communicates to the jury --

13         **THE COURT:**  Well, I don't know what to do then.  Then

14    I think -- I mean, the problem is that -- and for the most

15    part, I've overruled the Government's objections to it.

16         But when you get to the third or fourth or fifth or sixth

17    time of basically asking the person the same thing, I -- it

18    strikes me that you've got to change course.

19         Now, I could say, "Please change course," not give my

20    reasons to you, and I will try to be more -- I'll try to be as

21    circumspect as I can.

22         I'm sensitive to the issue.  I'm sensitive to the issue,

23    which is I gave the curative instruction.  I'm also sensitive

24    to the point you just made, sometimes the curative instruction

25    makes a point of something other than what the curative -- the

1    opposite of what the curative instruction does.

2        But I'm aware of it.  I will -- I will try to really

3    narrow any response.  But then, the problem will be on these

4    asked and answered and so forth is that -- is that if you get

5    into a colloquy trying to explain it to me, then I have to

6    respond to the colloquy.  So there we are.

7            MR. SCHACHTER:  Understood, Your Honor.  Thank you.

8            MR. FOSTER:  Your Honor, I'd just note that the direct

9    examination of this witness was about two hours.  Cross has

10   been over eight.  And I think the Court is well within its

11   discretion to curtail cross-examination.  And many courts

12   impose time limits, they impose all sorts of forms of

13   curtailment --

14           THE COURT:  I'm not imposing a time limit.  Next.

15           MR. SCHACHTER:  Can I just -- so Your Honor

16   understands what the Court has before it on Souza and what I --

17   what I would like to do with Ms. Souza and the Kaiser

18   Permanente records there.  We're going to get to that towards

19   the end of my examination, which hopefully will be very soon.

20       With respect to Ms. Souza, the witness has said that

21   certain things are outside the course of professional practice.

22   What I would like to establish is that appears to be, from the

23   notes -- which is how Dr. Goodman is reviewing Done's work --

24   from the notes it looks like Kaiser Permanente did exactly the

25   same thing.

PROCEEDINGS

 1         This is just with respect to Ms. Souza.  I understood

 2    the Court's ruling.  That is what I would like to do.  I will

 3    attempt to set it up so that the Court can assess it at the

 4    time, and then the Court will rule as the Court rules.  The

 5    basis for my introduction is laid out in the --

 6         **THE COURT:**  Well, I'd rather not -- I'd rather rule on

 7    it in advance, if I can.  What's -- what's -- do I understand

 8    it -- Mr. Schachter, what you want to introduce are some

 9    records of Kaiser.  Okay.  And these records demonstrate --

10    Kaiser is not a witness.

11         These -- and is it you -- and it's not your view that the

12    doctor has read these records?

13         **MR. SCHACHTER:**  Correct.  It was withheld from him.

14         **THE COURT:**  Okay.  He has not seen these records, nor

15    did the provider see these records.

16         **MR. SCHACHTER:**  Correct.

17         **THE COURT:**  Okay.

18         **MR. SCHACHTER:**  What I would like to do, the --

19    Dr. Goodman has testified that it is outside of the course of

20    professional practice to rely on a patient's self-report.  The

21    records, which the Government possesses, which they chose not

22    to share with Dr. Goodman, shows exactly that.  I would like to

23    show him these records and ask if it changes his --

24         **THE COURT:**  No, I'm not going to allow it for the

25    reasons I've stated.  And if your expert is going to testify on

1   those records, then I think we -- I have to maybe rethink

2   whether I would allow him or her -- I don't know who it is, I

3   think it's him -- I would have to figure out whether that's --

4   he can legitimately do so.

5       But let's move on.  Okay?  So we have a recess?  My court

6   reporter is going to --

7           MS. BELL:  Your Honor, we'll confer.  There may be

8   issues --

9           THE COURT:  Confer.

10          MS. BELL:  -- we need to take up with the Court with

11  regard to the second witness, but we'll try and resolve.

12          THE COURT:  Oh.  The second witness.

13      10 minutes.

14                  (Recess taken at 9:17 a.m.)

15              (Proceedings resumed at 9:25 a.m.)

16          THE COURTROOM DEPUTY:  Come to order.  Court is now in

17  session.

18          THE COURT:  Let the record show, the parties are here,

19  jury is not.

20      Mr. Schachter, I'm going to allow you to play the video.

21          MR. SCHACHTER:  Thank you, Your Honor.

22          THE COURT:  And allow the Government, obviously, to

23  cross-examine on that issue.  That segment.  I mean, I don't

24  know how long the video is.

25          MR. SCHACHTER:  It's six minutes.

1          THE COURT:  Pardon?

2          MR. SCHACHTER:  It's six minutes.

3          THE COURT:  Six minutes?

4          MR. SCHACHTER:  Yeah.

5          THE COURT:  Yeah.  Okay.  You're allowed.

6          MR. SCHACHTER:  Thank you, Your Honor.

7          THE COURT:  Okay.

8          MS. NECHAY:  Good morning, Your Honor.

9          THE COURT:  Yeah.

10         MS. NECHAY:  Thank you for your patience and empathy.

11         THE COURT:  Okay.  All right.  Let's proceed.  Bring

12  in the jury.

13              (The jury enters the courtroom.)

14      (Proceedings were heard in the presence of the jury.)

15      (David Goodman steps forward to resume the stand.)

16                      <u>**DAVID GOODMAN**</u>,

17  called as a witness for the Government, having been previously

18  duly sworn, testified further as follows:

19              (The jury enters the courtroom.)

20      (Proceedings were heard in the presence of the jury.)

21         THE COURT:  Okay.  Please be seated.  Let the record

22  reflect all jurors are present, the parties are present.

23      You may proceed.

24         MR. SCHACHTER:  Thank you, Your Honor.

25  \\\

1          <u>CROSS-EXAMINATION</u>

2   BY MR. SCHACHTER:

3   Q.   Good morning, Dr. Goodman.

4   A.   Good morning.

5          MR. SCHACHTER:  And good morning, ladies and

6   gentlemen.

7   BY MR. SCHACHTER:

8   Q.   All right.  So we left off, we were speaking about a

9   patient named Danielle Johnson and her nurse practitioner,

10  LaTesha Reed.  I would like to now turn to the treatment that

11  the nurse practitioner recommended for Ms. Johnson.

12         MR. SCHACHTER:  And, Your Honor, just for

13  demonstrative purposes, we'd like to put up just a transcript

14  portion of the video that the jury saw at the end of yesterday.

15  That is 1348 T, the video was 1348, lines 11 to -- I'm sorry --

16  page 11, line 2 to page 11, line 22.  If we could just put that

17  on the screen for demonstrative purposes.

18         THE WITNESS:  I'm sorry.  Tell me the exhibit again.

19         THE COURT:  It's on there.

20         MR. SCHACHTER:  Your Honor, may we display it?

21         THE COURT:  Yeah, go ahead.

22  BY MR. SCHACHTER:

23  Q.   Okay.  So, if we can look to -- this is a portion of what

24  you saw -- what the jury saw last night, the nurse practitioner

25  says (as read):

GOODMAN - CROSS / SCHACHTER

1              "I'll give you 5-milligram pills but what I want

2       you to do is you'll try the 5 for a couple days and

3       then you'll try 10 for a couple days."

4       And then says (as read):

5              "What you're going to do is you're going to do 5

6       in the morning for a couple days, and then you could

7       do 5 and 5, 5 in the afternoon.  And then you can try

8       the pure 10 in the morning."

9       So if we can just break that down.

10      What Nurse Reed is saying is that she's -- the patient --

11  she's recommending the patient start with one 5-milligram pill

12  of Adderall IR.  Is that how you read that?

13  **A.**    Yes.

14  **Q.**    And Ms. Johnson is supposed to try that for a couple of

15  days and then she's supposed to take a second pill, is the

16  recommendation, of Adderall IR 5 milligrams in the afternoon.

17  So 5 milligrams in the morning and 5 milligrams in the

18  afternoon.

19      Do you see that?

20  **A.**    Yes.

21  **Q.**    Okay.  And then once the patient has tried that, 5 and 5

22  for a couple of days, then Ms. Reed wants her to try taking two

23  pills together, so 10 milligrams in the morning, without an

24  afternoon dose.

25      Do you see that?

GOODMAN - CROSS / SCHACHTER

1  **A.**   Yes.

2  **Q.**   Okay.  Now, am I correct that after a comprehensive

3  psychiatric evaluation, you do something similar to titrate the

4  patient; is that right?

5  **A.**   Yes.  I tend to start with long-acting as the general

6  recommendations from the international clinical guidelines, but

7  the answer is, yes, you start low and titrate accordingly.

8  **Q.**   Okay.  Am I correct that your -- your typical practice is

9  to prescribe a 10-milligram dose for three or four days, and

10  then you double that dose up to 20 milligrams for five to

11  seven days, and then typically you will recommend the patient

12  go to 30 milligrams of Adderall XR.

13      Do I understand that correctly?

14  **A.**   That's my dosing after a comprehensive psychiatric

15  evaluation.  In this case, the evaluation lasted six minutes

16  and 13 seconds.

17  **Q.**   I was just asking about your practice, Dr. Goodman.

18  **A.**   I'm putting it in context.

19  **Q.**   Okay.

20      So -- and then, you also will write the prescription, am I

21  correct, for 10-milligram pills so that the patient, as you're

22  moving up on the dose, if the patient gets to a dose that is

23  uncomfortable, they have the option of backing it down; is that

24  correct?

25  **A.**   Correct.

GOODMAN - CROSS / SCHACHTER

 1   Q.   All right.

 2         MR. SCHACHTER:  And I'd like to, Your Honor, just for

 3   demonstrative purposes --

 4   BY MR. SCHACHTER:

 5   Q.   And, I guess, so what -- so that -- this is, in some

 6   regards, after a comprehensive psychiatric evaluation, of

 7   course, a little bit what you -- that's similar titration

 8   except Ms. Reed is suggesting going between 5 milligrams and

 9   10, your typical dosing is between 10 milligrams and 30; is

10   that correct?

11   A.   Too many variables in there.  Are you making comparison

12   between my dosing -- sorry, I've got something -- after talking

13   for two days.  I didn't know I was going to be here for a third

14   day.  I would have bought a new suit.

15         But I just don't understand the comparison here, whether

16   you're comparing my dosing to her dosing.

17         The comparison of the dose is inconsequential because the

18   evaluation was 6 minutes and 13 seconds on the video, which is

19   not a comprehensive psychiatric evaluation.

20         She, by her own admission, says she doesn't believe the

21   patient has ADHD.  So the conversation about dosing here is

22   almost irrelevant because it's prescribed not for a legitimate

23   medical purpose in the usual course of professional practice.

24   Q.   Sure.  I'm just comparing the size of the doses.

25         Your typical dosing is between 10 milligrams and

1    30 milligrams, of course, after a comprehensive psychiatric

2    evaluation; correct?

3    **A.**    Correct.

4    **Q.**    Okay.  I want to now show you for demonstrative purposes

5    Exhibit 1348T at lines 13, 10 to 25.

6          **MR. SCHACHTER:**  If we can put that up on the screen.

7    **BY MR. SCHACHTER:**

8    **Q.**    Okay.  Do you recall when Ms. Reed said to the patient (as

9    read):

10          "And our goal here, honestly, is you want to

11        take the least amount of medication that you can to

12        be effective."

13        Do you see that?

14    **A.**    I see the transcript.

15    **Q.**    Okay.  And would you agree that Nurse Practitioner Reed's

16    statement that you want to take the least amount of medication

17    that she can, is consistent with a purpose of treating illness

18    as opposed to facilitating drug addiction?

19    **A.**    No.  The basis of the prescription, in this case, from the

20    video, by the admission of the provider is that "I don't

21    believe you have ADHD."  With that statement, the prescription

22    was then offered as a performance enhancement and not as

23    medical treatment.

24    **Q.**    Okay.  I'd like to now show 7460, in evidence, at page 47,

25    which is the message that Ms. Johnson wrote to Nurse

GOODMAN - CROSS / SCHACHTER

1    Practitioner Reed one month after the initial visit.

2         And we see that Ms. Johnson wrote "Update:  That focusing

3    and paying attention to the task at hand are symptoms that it

4    seems to help with."

5         However, she writes, (as read):

6              "I feel like it could last longer, be a little

7              stronger, if that is the correct word."

8         She says that (as read):

9              "The effectiveness lasts two-ish hours."

10        She said (as read):

11             "I've tried the double dose of 5 milligrams and

12             I'm interested in extended-release or trying the

13             10 milligrams as recommended if that is an option."

14        And then if we can, look at the nurse practitioner's

15   response.

16        She writes (as read):

17             "I received your response and understand that

18             you would like to change your dosage.  Unfortunately,

19             because this is a controlled substance, I can't

20             change your dosage so drastically without discussing

21             your symptoms and behaviors.  I would like for you to

22             schedule an appointment so that we can further review

23             your medication needs.  Also, keep in mind that

24             booking this appointment doesn't necessarily mean

25             that your request will be granted.  I need to

GOODMAN - CROSS / SCHACHTER

1          evaluate each patient individually and make the best

2          decision based on this.  I will not make any

3          medications nor refills until we are able to further

4          discuss this."

5          So Ms. Johnson says she is interested in increasing her

6     dose to 10 milligrams, presumably twice a day.

7          Is that how you read this?

8     **A.**    Yes, the patient is making the request.

9     **Q.**    And the nurse practitioner says she cannot accommodate

10    that request without a follow-up.

11         Do you see that?

12    **A.**    I do.

13    **Q.**    Would you agree that this response is consistent with

14    Nurse Reed having a purpose of treating illness as opposed to

15    facilitating drug addiction?

16    **A.**    No.  Because the patient has highlighted the fact that

17    they're feeling better.  As I said earlier, if I give everyone

18    in this courtroom a stimulant, in an hour you'll tell me your

19    mood, your cognition, and your energy level is better.

20         Does that mean you have ADHD because you had a positive

21    response to a stimulant?  Absolutely not.

22         There was no complete evaluation.  In six-and-half --

23    under six-and-a-half minutes, she makes a decision,

24    acknowledges that the patient doesn't have ADHD, and the

25    prescription is offered for performance enhancement.  The fact

1    that the patient offers an observation that she is better in no

2    way makes this a legitimate prescription, a legitimate course

3    of practice.  And Ms. Reed's concern about overseeing this is

4    the cart in front of the horse.

5    Q.   Okay.  Thank you.  Okay.

6         We're going to move to a different patient.

7              THE COURT:  7460 admitted.

8         (Trial Exhibit 7460 received in evidence.)

9              MR. SCHACHTER:  Thank you, Your Honor.  I apologize.

10   BY MR. SCHACHTER:

11   Q.   We're going to move to a different patient, Cheryle Cooke,

12   next.

13             MR. SCHACHTER:  But before I do that, Your Honor, we

14   would like to play Exhibit 7594, which is the video from the

15   course that Dr. Goodman addressed yesterday?

16             THE COURT:  Go ahead.

17                  (Video played but not reported.)

18             MR. SCHACHTER:  Thank you, Your Honor.

19   BY MR. SCHACHTER:

20   Q.   Okay.

21             THE COURT:  Ms. Scott, who keeps track of these

22   things, says that we haven't admitted 7594, which is the video.

23             MR. SCHACHTER:  Oh, I'm sorry.  We move to admit 7594.

24             THE COURT:  Yeah.  So admitted.

25             MR. SCHACHTER:  Thank you.

1          (Trial Exhibit 7594 received in evidence.)

2    BY MR. SCHACHTER:

3    Q.    Okay.  Let's now talk about a patient named Cheryle Cooke.

4    Cheryle Cooke is a patient that you testified that her

5    prescriptions were outside the usual course of professional

6    practice and not for a legitimate medical purpose; is that

7    correct?

8    A.    Cheryle Cooke -- just refresh my memory on -- Cheryle

9    Cooke, this was the woman who was subsequently hospitalized

10   involuntarily?

11   Q.    Well, she was hospitalized; correct.

12   A.    Okay.

13   Q.    Okay.  A provider -- do you recall that a provider named

14   Cassidy Abbott did her initial evaluation?  You may have seen

15   also the name Cassidy Orr, but that's the same person, Cassidy

16   Abbott and Cassidy Abbott-Orr.

17        Do you recall that?

18             THE COURT:  Give him the opportunity to look at his

19   report.  Okay?

20             THE WITNESS:  So in my report, I cited C. Orr, O-R-R,

21   as the Done provider who did the initial evaluation.

22   BY MR. SCHACHTER:

23   Q.    Thank you.  I think that the Government will stipulate

24   that Cassidy Abbott and Cassidy Abbott-Orr are the same person.

25        In the -- in the documents that we'll look at, sometimes

GOODMAN - CROSS / SCHACHTER

1    Nurse Practitioner Cassidy is just referred to as Cassidy

2    Abbott, but I just want to clarify we're talking about the same

3    person.

4         I'd like to start with exploring the information that was

5    provided by Ms. Cooke to the nurse practitioner before the

6    appointment.

7              MR. SCHACHTER:  I'd like to -- Your Honor, we move to

8    admit 7546, which is the medical records of Ms. Cooke.

9              THE COURT:  Okay.  Admitted.

10        (Trial Exhibit 7546 received in evidence.)

11   BY MR. SCHACHTER:

12   Q.   Okay.  So you see these to be -- records, you see it says

13   "Cheryle Cooke"?

14   A.   Yes.

15   Q.   Okay.  Great.

16        All right.  And then if we can turn to page 1, some of the

17   intake information that's provided.

18        Do you see where Ms. Cooke is asked the question (as

19   read):

20             "Have you had bipolar, psychosis, schizophrenia,

21        suicidal attempts or any mental health

22        hospitalization in the past?"

23        She writes, "No."

24        And then if we can look a little further down (as read):

25             "Have you ever been treated for any behavioral

GOODMAN - CROSS / SCHACHTER

1      health condition, such as ADHD?"

2      The answer's "no."

3           "How many psychiatric medications are you

4      taking?"

5           That's blank.

6           "Do you have difficulty with anxiety or

7      depression?

8           "No."

9           "Any experience with medications used to treat

10     other behavioral health conditions?

11          "No.

12          "Are you currently taking any prescription

13     medication?

14     "No."

15     And then (as read):

16          "Before I was 12 years old, my teacher or coach

17     noted my poor focus, impulsivity, and/or

18     hyperactivity?"

19     And the answer there is "yes."

20     And -- now, by the way, you have never spoken to the nurse

21 practitioner who evaluated Ms. Cooke, have you?

22  **A.**   No, I have not.

23  **Q.**   And you have never spoken to Cheryle Cooke?

24  **A.**   Correct.

25  **Q.**   So aside from reviewing the notes that the nurse

1  practitioner took, you do not actually have personal knowledge

2  of what, during the course of the initial evaluation, the

3  patient said to the nurse or the nurse said to the patient.

4  Agree?

5  **A.**   Of course not.  I was not there.

6  **Q.**   Okay.  And then if we can look at the notes taken, the

7  nurse practitioner writes (as read):

8          "Alert and oriented times four."

9       What does that mean?

10 **A.**   You're oriented in time, place, person -- it's just a --

11 it's a -- it's just a designation of are you alert and are you

12 aware of your surroundings.

13 **Q.**   Okay.  And the notes reflect (as read):

14         "Calm and cooperative.  Well groomed and

15      addressed.  Good eye contact.  Speech is coherent.

16      Mood is euthymic."

17      That just means normal; right?

18 **A.**   Euthymic means that the mood is a state of contentment and

19 not highly reactive.

20 **Q.**   Okay.  And the notes reflect a linear thought -- the

21 thought process is linear.  And then if we can look at page 10,

22 it says "No evident delusions."

23         **MR. SCHACHTER:**  Turn to the next page.  Oh, there --

24 no that's not there.

25 \\\

GOODMAN - CROSS / SCHACHTER

1  BY MR. SCHACHTER:

2  **Q.**   (as read):

3          "No evident delusions or paranoid ideations.

4      Patient reports no history of drug use or alcohol

5      abuse."

6      That's the drugs ETOH.  (as read):

7          "And denies a family history."

8      Okay.  And then if we look at page 9 of this exhibit, see

9  where, according to the notes, the patient reports (as read):

10 **A.**  "Has had prior psychiatric treatment for ADHD.  Started as

11 a child.  Mom and brother also have ADHD and on Vyvanse and it

12 works well for them."

13     And then also, according, to the notes (as read):

14         "The patient recalls symptoms of ADHD back in

15     grade school.  She reports that she was smart and got

16     good grades but frequently wouldn't get her homework

17     done.  As she has gotten older, she notices it

18     affects her personal life.  She's not a good

19     listener.  She often loses focus and doesn't pay

20     attention to what others are saying.  She notes that

21     the patient works in HR and her symptoms are causing

22     her problem in work -- in his work.  Patient was able

23     to compensate for her symptom but is finding it

24     increasingly difficult."

25     Do you see that?

1   **A.**   I do.

2   **Q.**   Now, that idea, is it, in your experience, common that

3   patients with high intelligence find that they, during the

4   course of their childhood, may have been smart and gotten good

5   grades but there are portions that suggest perhaps there is an

6   ADHD issue, like having things like homework that they didn't

7   do, and then they find as they grow into adulthood that the

8   symptoms of ADHD become more obvious.

9        Is that something that you see sometimes in patients?

10  **A.**   Sure.

11  **Q.**   Okay.

12  **A.**   There is a point to be made here as you walk through the

13  representation you're attempting to make.  And that is, if we

14  go back and look at what was denied in the mental health, it

15  was no.  Yet she goes on to say that she was treated as a

16  child.

17       The point here is, these questions that are filled out by

18  patients without further psychiatric elaboration you will find

19  is inconsistent during the course of the clinical interview.

20       So to show me a record that says the patient denied a

21  symptom on a pre-screener, then you find out that the patient

22  actually has a history that she acknowledges in the interview

23  means that there is inconsistency across the reports between

24  what a patient says and then what is elicited.  So let us not

25  take a single statement here and assume that it's accurate and

 1    valid.

 2    **Q.**    Understood.  Understood.  Thank you --

 3    **A.**    Also, I might add --

 4    **Q.**    Please.

 5    **A.**    -- if you ask a patient about, "Have you ever had bipolar

 6    disorder?"

 7         How would the patient know?

 8         "Have you ever had schizophrenia?"

 9         How would the patient know?

10         You have to solicit the specific psychological experiences

11    in order to see whether those experiences reach a clinical

12    threshold for a diagnosis.

13         This abdication and abbreviation of a psychiatric

14    evaluation by having the patient fill out prescreening

15    questionnaires is not an appropriate evaluation, nor does it

16    abbreviate the necessity for a complete psychiatric evaluation.

17         This is a pattern that occurs over the course of a variety

18    of patients of the 16 that I reviewed.  So I just want the jury

19    and the Court to understand that there is inconsistency when

20    patients report what it is that their experiences are or what

21    their history is.

22    **Q.**    Thank you, Dr. Goodman.  And I think that you made the --

23    all your points about what is necessary for a comprehensive

24    psychiatric evaluation and how this does not fit that

25    definition during the course of your direct testimony.

1    I would like to ask you some different questions just to

2    avoid repetition.  Thank you.

3        Now, as we saw a moment ago, Ms. Cooke reports that her

4    mother and brother both have ADHD.

5        Did you see that a moment ago?

6    **A.**   Yes.

7    **Q.**   Okay.  And you agree, do you not, that if the patient's

8    parent or siblings have ADHD, then it is much more likely that

9    the patient will have ADHD; is that correct?

10   **A.**   Correct.

11   **Q.**   And that's because -- that's because there is a genetic

12   component to this disorder; correct?

13   **A.**   Correct.

14   **Q.**   Okay.  And if we can just look at what the Nurse

15   Practitioner Abbott prescribed, on page 9, under prescriptions.

16       Okay.  Do you see where the nurse practitioner prescribes

17   10 milligrams of Vyvanse?

18   **A.**   Yes.

19   **Q.**   Okay.  We've -- and she prescribes that once daily; is

20   that right?

21   **A.**   Correct.

22   **Q.**   Okay.  Now, we haven't really spoken about the dosing for

23   Vyvanse, but am I correct that 10 milligrams of Vyvanse is not

24   the same thing as 10 milligrams of Adderall; is that right?

25   **A.**   Correct.

GOODMAN - CROSS / SCHACHTER

1    **Q.**    Okay.  In order to --

2    **A.**    Do you want to make that distinction clearer to the Court

3    and the jury?

4    **Q.**    I'm going to right now.

5    **A.**    Okay.  Great.

6    **Q.**    Am I correct that in order to figure out the comparable

7    Adderall dose, because Adderall is more potent, you would need

8    to divide the Vyvanse dosage by 2.6; is that correct?

9         I don't mean to put you on the spot.  I can show you a

10   document if it's helpful with respect to the specific

11   conversion rate.

12   **A.**    Well, I have an answer to this, but show me the document

13   you're referring to.

14   **Q.**    Sure.  I'm going to show you -- you're familiar with

15   something called the Carlat report on psychiatry?

16   **A.**    Yes.  Daniel Carlat.  That's now been taken over by one of

17   his colleagues.

18   **Q.**    Okay.  I'm going to show you, just for the witness and the

19   Court and counsel, Exhibit 6360 at page 6.

20   **A.**    6360.

21   **Q.**    It's also on the screen.

22   **A.**    You know, I appreciate that it's on the screen.  Given

23   certain misrepresentations yesterday, I would like to see the

24   document.

25            **THE COURT:**  Okay.  Show the document.  63- -- what

GOODMAN - CROSS / SCHACHTER

```
 1   volume is it in, Mr. Schachter?
 2           MR. SCHACHTER:  You have stumped me, Your Honor.  I
 3   don't know.
 4           THE COURT:  Well, your brain trust over there knows.
 5           MR. SCHACHTER:  6360.
 6           THE WITNESS:  6360.  It's Volume 4, Your Honor.
 7           THE COURT:  Okay.  And what page would you like?
 8           MR. SCHACHTER:  Page 6.
 9           THE COURT:  Page 4, isn't it?
10           MR. SCHACHTER:  I have my notes at page 6, but I may
11   be incorrect.  It's the part that says "Conversion from
12   Adderall to Vyvanse."
13           THE COURT:  Oh.  Sorry.  I was looking at -- no.
14   That's page 6?
15       Thank you.  Yes, you're right.
16   BY MR. SCHACHTER:
17   Q.   Let us know when you've had enough time with the document.
18   A.   I've got it.  Thank you.
19   Q.   Okay.  So -- well, I guess, the document states that when
20   converting from Adderall to Vyvanse, the conversion factor is
21   2.6; is that right?
22   A.   So I think of it differently.  The Vyvanse dose -- so a
23   10-milligram Vyvanse is equivalent to about 3 to 4 milligrams
24   of Adderall, so it's about a third.  The molecular weight
25   accounts for the milligrams, but the actual exposure of
```

GOODMAN - CROSS / SCHACHTER

1  dextroamphetamine, which is the active substance, is one-third

2  of the Vyvanse dose.  So that's how I -- that's how I see it.

3  Q.  Okay.  Thank you.  I'm sorry.  Did you have more to say?

4  A.  Well, I'm going to wait for your next question to clarify

5  something about pharmacokinetics that's not evident in this

6  statement.

7  Q.  Okay.  I guess you said between 3 and 4.  I did the math.

8  At the 2.6 conversion rate, 10 milligrams of Vyvanse would

9  equate to 3.8 milligrams of Adderall.  Is that roughly right?

10  A.  Yeah.  You and I are both in the same ballpark.

11  Q.  Okay.

12  A.  But the conversion here -- again, clarification needs to

13  be necessary when you're presenting this information.

14      So you could have what's called -- and I apologize for the

15  complexity here.  You can have what's called chemical

16  equivalence and clinical equivalence.  What we are looking at

17  here on the conversion is chemical equivalence, the equal if

18  you're looking at the compound.

19      But clinical equivalence is different depending on the

20  patient's metabolism of that drug.

21      So this may be some guidance, but within the prescription

22  to individual patients with medical factors, this doesn't

23  necessarily hold water.

24  Q.  Thank you.  That's very helpful.

25      In other words, different patients will metabolize

GOODMAN - CROSS / SCHACHTER

1    different medications at different rates?

2    **A.**    Correct.

3    **Q.**    Okay.  Great.

4         But from a chemical equivalence, 10 milligrams of Vyvanse,

5    purely from a chemical perspective, is the equivalent of about

6    3.8 milligrams of Adderall?

7    **A.**    If you're talking about test tubes and not human beings.

8    **Q.**    Exactly.

9         And that would be a dose that would be smaller than the

10   smallest dose of Adderall that's commercially available; is

11   that correct?

12   **A.**    Yes.

13   **Q.**    Okay.  And am I correct that Vyvanse is also long-acting

14   and so more difficult to abuse?

15   **A.**    It's not necessarily more difficult to abuse because it's

16   long-acting.  It's more difficult to abuse because it's a

17   prodrug, which means the drug has to be metabolized to the

18   active metabolite.

19        What makes it less abusable then is no matter whether you

20   swallow it, snort it, or inject it, the ascent in the blood

21   system is exactly the same.  It's that ascent that makes things

22   potentially more abusable and addictive.

23        This is unlike Adderall immediate-release tablet, which

24   can be snorted, injected, and swallowed, but if you introduce

25   it rapidly by snorting it or injecting it, you get sudden

GOODMAN - CROSS / SCHACHTER

1    spikes and it's more addictive.

2        So Vyvanse is less likely to be addictive because of its

3    prodrug nature.

4    Q.    Thank you.

5            MR. SCHACHTER:   And I'm sorry, could we put back the

6    screen 7456 at 9.

7        Okay.   Great.

8    BY MR. SCHACHTER:

9    Q.    Now, I am correct, am I not, that the FDA -- the

10    FDA-approved insert for Vyvanse states that the starting dose,

11    the recommended starting dose for adults is 30 milligrams?

12    A.    You want to put up the package insert?

13    Q.    Oh.   Sure.

14            MR. SCHACHTER:   Your Honor, we'll, I guess, move to

15    admit 6398, which is the FDA-approved insert for Vyvanse.

16            THE COURT:   Admitted.

17        (Trial Exhibit 6398 received in evidence.)

18            THE WITNESS:   Question?

19    BY MR. SCHACHTER:

20    Q.    Sure.   Am I correct that the FDA, according to the package

21    insert for Vyvanse, the recommended starting dose is

22    30 milligrams for adults?

23    A.    The starting dose -- the initial dose in adults with ADHD

24    is 30 milligrams.

25    Q.    Okay.

1    A.    However, again, clarification is necessary.  The initial

2    dose here by the FDA is determined by the clinical registration

3    trial submitted.  I was involved in the Vyvanse trial and the

4    trial went 30, 50, 70 milligrams, and so that's what determines

5    whether the package insert says the starting dose.

6         The starting dose, as a function of the research trial, is

7    not necessarily the starting dose written by clinicians.  This

8    is true of antidepressants.  Prozac starting dose, 20;

9    clinicians start at 10.  Starting dose of Zoloft, 50;

10   clinicians start at 25.  I mean, I can go on and on and on.

11        So it's important to understand that the initial starting

12   dose is a function of registration trials.  It's not a function

13   of clinical practice, and it's also not a function of safety

14   and side effects.

15   Q.    Okay.  Thank you for that explanation.

16        So I'm correct that when the nurse started Ms. Cooke on

17   10 milligrams of Vyvanse, that would be roughly one-third of

18   the -- according to the FDA's recommendation, one-third of the

19   recommended starting dose; is that correct?

20   A.    Yes.

21   Q.    Okay.  And it also -- there is on the package insert a

22   titration schedule.  And what that is saying -- that is a

23   recommended -- that in- -- the rate of increase, again,

24   according to the package insert, would be you would increase

25   10 milligrams or 20 milligrams every -- or weekly; is that

1    right?

2    **A.**    Approximately.

3    **Q.**    Okay.  And then it also lays out the recommended dose

4    being from 30 to 70 milligrams and a maximum dose of

5    70 milligrams?

6    **A.**    Again, based on the registration trials, not necessarily

7    clinical practice.

8    **Q.**    Okay.  And in your clinical practice, sometimes you will

9    go over the 70 milligrams if you feel it optimizes the patient?

10    **A.**    Correct.

11    **Q.**    Okay.  All right.

12        And then, so returning to the nurse's treatment of

13    Ms. Cooke --

14            **MR. SCHACHTER:**  If we can -- I'd like to -- I'm not

15    sure it's -- I think it's admitted.  Exhibit 316, which is

16    communications between -- Your Honor, we'll move to admit what

17    the Government identified as Exhibit 316 if it's not already

18    in.

19            **THE COURT:**  Admitted.

20            **THE COURTROOM DEPUTY:**  It's admitted.

21            **MR. SCHACHTER:**  Okay.  Thank you.

22    **BY MR. SCHACHTER:**

23    **Q.**    Okay.  So if we can -- looking at 316 at 1.  So on

24    March 17th, which would be about seven days after her initial

25    appointment, we see that Ms. Cooke reached out to the nurse

 1    practitioner to explain that she thought they needed a higher

 2    dose.

 3          Do you see that?

 4    **A.**   I do.

 5    **Q.**   She writes (as read):

 6              "I wanted to request a higher dose.  The

 7          10-milligram isn't helping like I thought it would.

 8          I still can't sit still or complete my tasks

 9          throughout the day.  I talked to my mom, who is on a

10          higher dose, and she said I should ask.  Thank you."

11    **Q.**   Now, that same day, in addition to this e-mail, Ms. Cooke

12    also sent a more detailed description through the Done portal.

13          **MR. SCHACHTER:**  If we can take a look at that, which

14    is 7456 in evidence at page 9.

15    **BY MR. SCHACHTER:**

16    **Q.**   All right.  This is submitted that same day, seven days

17    after the initial evaluation.  She writes (as read):

18              "1 out of 10.  My focus is a little better, but

19          it doesn't last.  I can't sit still.  I'm still

20          having trouble organizing and planning my tasks out."

21          She writes that (as read):

22              "Working from home is really hard and staying

23          focused is hard.  I'm not able to sit in one place

24          and focus and do my work still.  I'm trying to go

25          back to school, too, and I can't manage all that."

GOODMAN - CROSS / SCHACHTER

```
 1          Okay.
 2          And then if we can look at what Nurse Practitioner Abbott
 3     does following this communication.
 4               MR. SCHACHTER:  That would be 316 at page 2.
 5     BY MR. SCHACHTER:
 6     Q.   She writes (as read):
 7               "I went up to 30 milligrams."
 8          And she writes (as read):
 9               "If that is too much, we can go back down to 20
10          milligrams or if you feel like it is not enough, we
11          can increase"
12          Do you see that?
13     A.   Yes.
14     Q.   Okay.  And -- and that takes her to what, at least
15     according to the FDA insert, is the adult starting dose;
16     correct?
17     A.   Correct.
18     Q.   Okay.  Now, after trying out that medication for another
19     seven days, we see that Ms. Cooke reaches back out on March
20     the 25th.
21               MR. SCHACHTER:  And if we can look at 316 at page 7.
22     BY MR. SCHACHTER:
23     Q.   The nurse writes -- I'm sorry.  Ms. Cooke writes (as
24     read):
25               "It's been about seven days since the
```

GOODMAN - CROSS / SCHACHTER

1    prescription increase to 30 milligrams.  I would like

2    to send in another request to increase it.  I'm still

3    unable to sit still or focus on one task for more

4    than 15 minutes.  There is some progress with not

5    getting sidetracked, but it doesn't last for long."

6        Says she's at an HR training seminar and it's

7    been difficult to focus on the presentations because

8    they are more than an hour long.  Have to keep

9    getting up.

10    She writes that (as read):

11        "People were definitely noticing my shuffling

12    and constant moving of my feet, which I have

13    struggled with my whole life.  I had to share at the

14    seminar, and people filled out anonymous surveys

15    saying I spoke too fast, I was fidgety.  Couldn't

16    focus on one topic.  I spoke with my family and they

17    support my decision to increase my dose."

18    Do you see that?

19    A.    I do.

20    Q.    Okay.  So after Ms. Cassidy describes the struggles that

21    she's having at work -- I'll just show you at 316 at 8 where

22    Ms. Abbot agrees to increase the dosage to 40 milligrams.

23    Do you see that?

24    A.    Yes.

25    Q.    Okay.  And then three weeks later, on April 13th,

 1    Ms. Cassidy -- I'm sorry.  Ms. Cooke reaches out to the nurse

 2    again.

 3              MR. SCHACHTER:  If we can look at 316 at 15.

 4    BY MR. SCHACHTER:

 5    Q.   She writes (as read):

 6              "I wanted to thank you for everything.  My ADHD

 7         is so manageable it's unbelievable.  Work during the

 8         day is manageable.  I'm more organized and

 9         concentrated.  I don't feel all over the place.  My

10         boss even took notice, and I got a promotion from

11         recruiter to field service coordinator.  I'm even

12         going back to school in the evenings.  I'm only 12

13         credits away from my BA."

14         But she also talks about the fact that she requested

15    something to help in the afternoons (as read):

16              "When I do school, the 40 milligrams works

17         perfect for my morning and my early workday but by

18         3:00, I start to notice the effects wearing off.  My

19         legs get jumpy again.  Is there something else I can

20         take during lunch or early afternoon to help with

21         school?"

22         And the nurse says that she sent in a 10-milligrams of

23    Adderall for the afternoon crash.

24         Do you see that?

25    A.   I do.  And yet during all of this asynchronous

1    correspondence, there's not a single face-to-face appointment

2    for a clinical assessment.  So the clinician is relying solely

3    on the patient's report and increasing medications at the

4    patient request.

5    **Q.**    I'm glad you brought up the subject of appointments.

6        Do you recall from your review of the records that, in

7    fact, an appointment was scheduled at this time for

8    May the 10th for about -- in between three and four weeks from

9    this increase?

10       Do you recall that?  I can show you a document.

11   **A.**    You can show me the document, please.

12   **Q.**    Sure.

13   **A.**    Did the patient keep the appointment?

14   **Q.**    We're going to get to it.

15   **A.**    Okay.

16   **Q.**    So if we can look at, let's see, 316 at 15.  Are we there

17   already?

18            **MR. SCHACHTER:**  Could you show the whole document?

19   Okay.  So that's April 15th.  And then if we can look at 7456,

20   in evidence, at page 40.  There's April 15th.  If we can turn

21   to the row from May the 10th.

22   **BY MR. SCHACHTER:**

23   **Q.**    Okay.  So you see that there was an appointment scheduled

24   by the patient on May the 10th that was canceled.

25       Do you see that?

GOODMAN - CROSS / SCHACHTER

1   A.    I do.

2   Q.    Okay.  And I'm going to show you some correspondence on

3   that same day with respect to the cancellation of the

4   appointment that was scheduled.

5          MR. SCHACHTER:  If we can look at 316 at page 18.

6   BY MR. SCHACHTER:

7   Q.    Okay.  You see that on May the 10th, Ms. Cooke writes (as

8   read):

9          "Hey, Dr. Abbott.  I had to reschedule our

10      follow-up appointment for the 31st of this month."

11      Do you see that?

12  A.    I do.

13  Q.    Okay.  And so what's happened is at the time that

14  Ms. Abbott had prescribed the 10 milligrams for the afternoon

15  crash, that there was an appointment scheduled for

16  May the 10th, but then on May the 10th, you see that Ms. Cooke

17  reschedules that appointment for May the 31st.

18      Do you see that?

19  A.    Yes.

20  Q.    Okay.

21  A.    You're going to show me whether the patient showed up for

22  that appointment.

23  Q.    We are going to get to all that.

24  A.    Okay.

25  Q.    Okay.  And in this -- by the way, in this communication on

1    May the 10th, Ms. Cooke also writes (as read):

2              "So far so good with the prescriptions.  Thank

3         you again.  I am fully back into school and working.

4         I might need 20 milligrams of the Adderall XR because

5         I'm still crashing hard in the afternoon.  I'm due

6         for a refill for them on the 15th, so I wasn't sure

7         if the pharmacy notified you or the Done care team.

8         Thank you again.  Hope everything is well."

9              MR. SCHACHTER:  Okay.  Then if we can look at -- okay.

10        Now, 316 -- is that the top e-mail, Mr. Cepregi?

11             MR. CEPREGI:  Pardon me?

12             MR. SCHACHTER:  Is that the top e-mail on that page?

13             MR. CEPREGI:  Yes.

14             MR. SCHACHTER:  Okay.  Great.

15   BY MR. SCHACHTER:

16   Q.   And when Ms. Abbott writes the increase that is requested,

17   this is May the 10th, and at that point in time, there is an

18   appointment that is scheduled for May the 31st.

19        Do you recall that?

20   A.   I do not.

21   Q.   Okay.  But you see the reference in the e-mail to the

22   scheduling of the follow-up appointment for May the 31st?

23   A.   I see that in this e-mail.

24   Q.   Okay.  And then if we can also look at 7456 at page 40,

25   which is the confirmation of that appointment.  Do you see

1    that?  It says "Appointment May 31st," it says "confirmed"?

2    A.   I do.

3         Let me ask you, though, I'm looking at a document then

4    with your spreadsheet, we'll call it a spreadsheet of

5    appointments, that's -- that is derived from what document

6    because I have not seen a document in that format, that the

7    format of appointments is on the Excel spreadsheet, so I can't

8    rely on the accuracy of this because it's not the primary

9    source of the information.

10   Q.   Okay.  Well, I guess let me say this:  All this

11   information was provided to the Government in what's called a

12   SQL database.  Whether or not they provide it to you, that I

13   can't speak to.

14        MS. GREEN:  Your Honor, this is the issue I brought up

15   yesterday.  We allowed him to show but subject to a motion to

16   strike for this exact reason.  These records were not produced

17   to us in this form by Done.

18        MR. SCHACHTER:  No.  All of this information was

19   absolutely produced by Done to the Government.  Whether or not

20   the Government --

21        THE COURT:  Wait a minute.  Wait a minute.  I think

22   we're talking about the format --

23        MS. GREEN:  Correct.

24        THE COURT:  -- of the document and what the witness

25   says I didn't see -- as I understand it, I didn't see this

 1   particular document.  I don't think it's an answer to say --

 2   did you give this particular document to the Government?

 3         MR. SCHACHTER:  I didn't do anything.

 4         THE COURT:  Well, wait a minute.  Yes, you did.  I

 5   mean -- when I say you, I mean them and all the other people

 6   who are working on the case.

 7         MR. SCHACHTER:  No.  The law firm of Fenwick & West

 8   produced all of this data to the Government.  We can take this

 9   up outside of the -- outside of the jury's presence.  I don't

10   want to waste the jury's time.  But, yes, all of this data was

11   produced by Fenwick & West to the Government.

12         MS. GREEN:  Not in this form, Your Honor, so we can't

13   authenticate, which is the point.

14         THE COURT:  Here is what I suggest.  I think it's a

15   legitimate objection.  So I think that maybe what you should do

16   is simply use the document -- if you say it's the same

17   information, simply use the document that was shown to the

18   doctor --

19         MR. SCHACHTER:  Yeah.

20         THE COURT:  -- if it's the same information.

21         MR. SCHACHTER:  That's what I'm doing.  This is --

22         THE COURT:  Well, they --

23         MR. SCHACHTER:  Your Honor, may we take this up at

24   sidebar?

25         THE COURT:  Maybe we'll take it up now.  We can take a

PROCEEDINGS

 1  ten-minute recess.

 2      Ladies and gentlemen of the jury, we'll be in recess

 3  12 minutes.

 4      Remember the admonition given to you:  Don't discuss the

 5  case, allow anyone to discuss it with you, form or express any

 6  opinion.

 7              (The jury leaves the courtroom.)

 8      (Proceedings were heard out of the presence of the jury.)

 9          **THE COURT:**  Okay.  Let the record reflect all jurors

10  have left.

11      Mr. Schachter.

12          **MR. SCHACHTER:**  Your Honor, so --

13          **THE COURT:**  The witness is excused for 12 minutes,

14  yeah.

15      When I say "you," I don't mean you personally.  I don't

16  think it's an answer to -- when the Government says you haven't

17  produced it, I don't think it's an answer for you to say "I

18  haven't produced anything."  It's not you, they mean -- they

19  mean -- as a general rule, they mean the defense.  I guess in

20  this case, they mean the defendant's company.  So I don't

21  know -- there may have been a separate counsel -- there was.

22  I'm not saying -- I know there was.

23      But that counsel was under an obligation as well to

24  produce so I'm not -- but, look, we're in the 25th day of

25  trial, I mean, I'm just trying to get through this.  And if

there's -- if the Government stands up and they have an

objection as to the document, I assume they are saying that the

document is somehow not accurate or they don't know whether

it's accurate or not.

So if it hasn't been produced to the Government, why not

simply use the document that was produced that the Government

used, unless you believe that that document's inaccurate.

**MR. SCHACHTER:**  Your Honor, two things.  First is,

there's no question, all this data was produced by

Fenwick & West to the Government.  It's in what's called a SQL

database.  All this information was produced to the Government.

That's not an issue.

**MR. BALLEW:**  Two weeks ago, we produced these records,

the ones that we are using today, because they are in a -- we

find them to be an easily readable format to the Government.

The Government has had these now for several weeks.  And, in

fact, the Government has gone to Done with respect to patient

records and they've asked, "Can we please have these in this

format," presumably because they're more readable.

So what we are using with the witness is what we provided

to the Government a couple of weeks ago.  And it's data that

was produced to the Government.  We just want to move through

expeditiously.

The Government has stated to the Court and to us they have

no objections to these subject to a motion to strike.

**PROCEEDINGS**

1    Presumably, they at some point may wish to confirm what I'm

2    saying, which is, in fact, that this information is in the

3    production, and they can do that and they can move to strike

4    and the Court will consider that at a time when they have a

5    motion.

6         At this point, we are proceeding with the examination as

7    the Government said was fine.  They said they have no objection

8    except they may wish to move to strike.  That's why they have

9    said we have -- that's why Ms. Green said at the beginning of

10   this examination, "We have no objection subject to a motion to

11   strike."  And so we just want to get through with this

12   examination.

13            **THE COURT:**  Yes.  Is there any -- without going into

14   the history, is there any reason why it can't come in subject

15   to a motion to strike?

16            **MS. GREEN:**  Yes, Your Honor.  I just want to make -- I

17   just want to -- it depends.

18            **THE COURT:**  Wait.  Listen to my question.  Is there

19   any reason why these documents can't be admitted subject to a

20   motion to strike?

21            **MS. GREEN:**  I think that's fine, but it also depends

22   on --

23            **THE COURT:**  Okay.  Then that's the answer.

24            **MS. GREEN:**  Well, I -- can I just make one point clear

25   for the record?  Mr. Schachter keeps saying these are the exact

same information that the Government has and that was provided
in a different form.  That is not correct, and if you just pull
up on the screen -- and this was exactly what I was worried
about with these documents that were not produced in this form
to us, Mr. Schachter gave them, I think, a week ago.

The screen said "Follow-up appointment confirmed."  I
don't know if Your Honor saw it.  That was what was on the
screen of what Mr. Schachter was about to show, and he asked
the witness, "You see here, Dr. Goodman, the follow-up
appointment was confirmed."

What was produced to the Government by the company and
what Mr. -- Dr. Goodman had available to him was an Excel
spreadsheet which had codes with no text, codes and numbers
with no text that explained nicely how Mr. Schachter has in
this form, "follow-up appointment confirmed," which is exactly
why when Dr. Goodman looked at that, he said, "Have I seen
this?"

Because what he had available to him, per the company, was
a spreadsheet with numbers and dates, six, one, two.  He had no
text that said "follow-up appointment confirmed," and that's
exactly why I was trying to assist Mr. Schachter when he told
me these records are exactly the same, but when I saw that and
compared it to the spreadsheet, I'm seeing numbers here, no
text, and that's the issue and that's what's causing confusion
for this witness.

PROCEEDINGS

1           When you ask a question like, "You see this says follow-up

2     confirmed," and that witness never saw that because he did not

3     have that available to him in this form because the company did

4     not produce this to us in this form.  That's the issue.

5           So I think we can see how the forms of the questions go.

6     I want this to move forward, but this is exactly why we

7     actually asked the company to produce records in this form and

8     they gave us Excel spreadsheets that -- which were near

9     impossible to interpret.  And that's why Mr. Schachter does not

10    want to use the spreadsheets, I will note, because they are

11    that hard to interpret.  And Dr. Goodman had to cope with that

12    spreadsheet.

13          **THE COURT:**  Well, she's got a point, doesn't she?  In

14    other words, when you attack -- when are used -- if it is

15    impeachment, or demonstrating that he's -- his testimony is

16    based upon an assumption of a particular type and it turns out

17    that the assumption would have been warranted by the initial

18    document but not warranted by the subsequent document, then

19    there's a -- there's a question as to his -- you know, you're

20    attacking his credibility.

21          On the other hand, if, in fact, the fact is that the

22    appointment was confirmed, if that's the fact, then I think

23    that that would be probative.  I think that that -- whatever

24    point you want to make about that.

25          You know, you're not wedded to a reality which is less

**PROCEEDINGS**

1    than the reality.  In other words, you're not wedded to the

2    Government's documents.  You can have your own documents, and

3    apparently you did, and you -- when I say your own, I mean a

4    different form of the document provided by your client's

5    corporation.

6        But it was not provided to the Government until two weeks

7    ago, I guess.

8            **MS. GREEN:**  One week ago, I believe.

9            **THE COURT:**  One week ago.

10       So, you know, I -- there is a problem cross-examining an

11   expert witness on his report, on his findings and so forth

12   based upon documents that weren't shown to him?  When I say

13   weren't shown to him, I'm saying they weren't in an explicable

14   form to him.

15       I think that that's -- I sort of think both things are

16   true.  I think it's true that it wasn't shown to him because it

17   didn't exist -- the Government did not have those documents.

18   And I think it's also important that the Government be able to

19   demonstrate when they received the documents.

20       But I think to your point, it's important whatever the

21   reality is.  Whatever the reality is.

22       So I think you can do that, but I think there should be

23   some explanation about these documents given to the jury.  I

24   can give it as I understand it to be.  And I would give it just

25   in the same form, though I wouldn't say why it's relevant or

1   what it's probative of.

2        MR. SCHACHTER:  We may just -- that's, of course,

3   fine, Your Honor.  What -- we may want to look at the language

4   of that because I would not want there to be a suggestion that

5   Ms. He is responsible for this.

6        THE COURT:  No, no.

7        MR. SCHACHTER:  Because this is -- this is a -- we

8   have no idea.  It's between Fenwick & West and the Government.

9   I was a prosecutor too and I can -- you review documents, you

10  make further requests, so that's between Ms. Green and

11  Fenwick & West, and what dialogue they had; and Mr. Steskal can

12  explain that.  But I wouldn't want any language suggesting

13  that --

14       MS. GREEN:  I would just caution with respect to how

15  you question this witness then since -- I don't want him -- you

16  to make suggestions he is being impeached based on text that he

17  did not see.  And quite frankly, I can give you the exhibit

18  number for the Excel.  You could use it, you could see the date

19  and you can see what Dr. Goodman saw.  Exhibit 2613.

20       MR. SCHACHTER:  Understand.  I will be completely fair

21  with the witness.  I understand Ms. Green's concern.

22       THE COURT:  Five minutes.

23     Mr. Schachter, about how much longer do we have?

24       MR. SCHACHTER:  Not -- I mean, we're certainly going

25  to finish before lunch.  Certainly.

PROCEEDINGS

1          THE COURT:  Well, I've got to make sure.  Yeah.  Okay.

2          THE COURTROOM DEPUTY:  10 minutes?

3          THE COURT:  10 minutes.

4                    (Recess taken at 10:27 a.m.)

5                  (Proceedings resumed at 10:38 a.m.)

6     (Proceedings were heard out of the presence of the jury.)

7          THE COURTROOM DEPUTY:  Come to order.  Court is now in

8     session.

9          THE COURT:  Okay.  Your client's not -- well, I mean,

10    we'll wait.  We'll wait until he gets here.

11         MS. NECHAY:  Thank you.  Just to be clear, Your Honor,

12    my client's still in the restroom, per my understanding.

13         THE COURT:  Well, we'll just have to wait.  I mean, we

14    can't -- I don't want the jury to come in and then he's not

15    being here.

16         MS. NECHAY:  I'll go and check in with the family.

17         THE COURT:  Yeah, would you, please.

18                    (Pause in proceedings.)

19         THE COURT:  Okay.  Bring in the jury.

20                  (The jury enters the courtroom.)

21     (Proceedings were heard in the presence of the jury.)

22         THE COURT:  Okay.  Let the record reflect that all

23    jurors are present, parties are present.

24         Ladies and gentlemen, during the recess, we had an

25    extended discussion about the documents that are being shown to

 1    the witness because of the fact that there were several sources

 2    of documents.

 3         The documents -- my understanding is that the documents

 4    that are presently being shown, or the one that counsel is just

 5    referring to, is a document that was furnished to the

 6    Government after the witness had already completed his report

 7    and, therefore, it may have contained some information on it,

 8    and I think that it will be a -- it will be questioned about,

 9    that the witness had not had the opportunity of reviewing

10    before he wrote his report.

11         So with that -- and, by the way, that's not to be

12    attributed to one party or the other.  It's just the way

13    documents were produced and requested as they came in during

14    the course of the investigation.  You're to draw no inference

15    from it.

16         Go ahead.

17              MR. SCHACHTER:  Thank you, Your Honor.

18    BY MR. SCHACHTER:

19    Q.   Okay.  So if we can pick up where we left off, which is

20    7456 at page 40.

21              MR. SCHACHTER:  Well, that's great, having, I guess,

22    both documents.

23    BY MR. SCHACHTER:

24    Q.   So at the bottom we see 7456 at page 40.  The confirmed

25    follow-up appointments on May 31.  And then if we can turn to a

1    communication that's three days before that, or four days

2    before that, on May the 27th.  So if we can look at --

3            MR. SCHACHTER:  Great.  Thank you.

4    BY MR. SCHACHTER:

5    Q.   So on May the 27th, Ms. Orr had said (as read):

6            "Try it before your follow-up in a few days.  I

7        look forward to seeing you."

8        And Ms. Cooke says (as read):

9            "Look forward to seeing you too.  Thank you so

10       much."

11       That is on May the 27th.

12       And then if we can look at 316 at 38, the bottom e-mail.

13           MR. SCHACHTER:  Thank you.

14   BY MR. SCHACHTER:

15   Q.   Same day, Ms. Cooke also writes (as read):

16           "I took my first final back to school and I got

17       a 95.  A super hard class and I would have never

18       gotten an A.  I'm signing up for more classes for

19       summer B and the PM IR Adderall is so helpful.  Thank

20       you.  I would like to increase my Vyvanse dose to

21       50 milligrams so I can stay focused longer throughout

22       the day.  Especially at work I'm finding it harder to

23       sit still by like 12:00 p.m."

24       And so this is May the 27th, a few days before what we saw

25   was the scheduled appointment.

1       Then let's talk about what happens -- and by the way, that

2   increase to 50 milligrams of Vyvanse, that is within the

3   package insert FDA recommendation between 30 and 70 milligrams

4   of Vyvanse; is that correct?

5   **A.**   This is with concomitant Adderall XR as well.  So the

6   total dose at this particular time of Vyvanse and Adderall XR

7   is what?

8   **Q.**   I don't know, but high, that is the point that you're

9   making?

10  **A.**   The point I'm making -- I'm making several points.  One is

11  the jury needs to know the patient is both on Vyvanse and

12  Adderall XR.  The doses have now gone up.  There has not been a

13  face-to-face appointment over several months.  There's no blood

14  pressure or pulse ratings.  And despite what the patient is

15  saying, this, in and of itself, doesn't constitute a legitimate

16  clinical assessment of the patient.

17  **Q.**   Thank you so much, Doctor.  That's very helpful.

18      Okay.  So I'd like to now turn -- so that's May.  I'd like

19  to turn to a few weeks later to June the 21st.  And if we

20  can -- if we can turn to 7456 at 45, we see a communication

21  from June the 21st, and Ms. Cooke has said that the Vyvanse at

22  50 milligrams is 7 out of 10, Adderall at 20 milligrams is 3

23  out of 10.  She writes (as read):

24          "My focus on one task at a time during the day

25      has improved a lot.  I'm able to sit still during the

GOODMAN - CROSS / SCHACHTER

1        day until about 4:00.  I notice my projects are done
2        promptly and not at the last minute and I'm able to
3        remember tasks easily."
4        Talks about new demands -- of academic demands and a new
5   job.
6        Okay.  So she says she's still struggling -- she says
7   she's able to sit still during the day until about 4:00 but
8   reports some struggles.
9        Do you see that?
10  **A.**   I do.
11  **Q.**   Okay.  And then if we can go back to 316, at page 51.
12  Okay.
13       This is the -- Ms. Cooke saying that she sent that
14  request, which I think we just saw through the consultation
15  portal.  And then we see that Ms. Orr says that she increased
16  the afternoon dose to 30 milligrams, but she says -- Ms. Cooke
17  says (as read):
18            "I've been having a lot of trouble sitting" --
19       She says -- she says -- (as read):
20            "I'm looking forward to our call."
21       So this is July 1st and she appears to be referencing an
22  upcoming appointment.  Do you see that?
23  **A.**   Yes.
24  **Q.**   And she says (as read):
25            "I have been having a lot of trouble sitting

1              still for class in the afternoons.  I'm having to get

2              up, I'm not staying on task.  I'm also interrupting

3              on Zoom calls, which is something that was bad for me

4              growing up.  My professor said something.  Thank

5              you."

6         And then she sends a similar message over the Done portal.

7    If we can look at that, 7456 at 46.

8         Okay.  Now, she saw -- on July the 1st we saw that there's

9    a reference to speaking again soon.  And so there was a

10   scheduled appointment for July the 6th, but let me -- let me

11   pause here.

12        So you didn't see any records that were provided to you

13   that show that a woman named Ruthia He told Nurse Abbott what

14   to diagnose, did you?

15   **A.**   No.

16   **Q.**   You didn't see any records showing that a woman named

17   Ruthia He told Nurse Abbott what to prescribe?

18   **A.**   No.

19   **Q.**   Okay.  Now, you talked in your direct --

20   **A.**   I also did not see any mention from Ruthia He or Dr. Brody

21   in regards to the monitoring of high doses without a

22   face-to-face follow-up and no blood pressure or pulse or side

23   effect assessment.

24   **Q.**   Thank you.

25        Now, you talked in your testimony about the fact that Done

 1  had received a message from Ms. Cooke's mother.

 2       Do you recall that?

 3  A.   Yes.

 4  Q.   Okay.  To be clear, you have not seen the message that was

 5  written by Ms. Cooke's mother; is that correct?  It's not a

 6  trick question, I think none of us have.  I don't think it

 7  exists.

 8       But you don't recall seeing it?

 9  A.   I don't recall seeing it.  I understand that that call was

10  placed because it's on the Excel spreadsheet.

11  Q.   Okay.  Well, we're going to look at that in a minute, but

12  I think you were also shown Exhibit 410, which is a

13  communication between Ms. Abbott and Mr. Korth.  I think it was

14  on your list.

15          MR. SCHACHTER:  We move to admit 410.

16          THE COURTROOM DEPUTY:  It's already admitted.

17          MR. SCHACHTER:  It's already admitted.  Okay.

18  Fantastic.  Thank you so much.

19  BY MR. SCHACHTER:

20  Q.   Okay.  So this is a communication between Ms. Orr and her

21  colleague Jacob Korth.

22       Do you see that?

23  A.   Yes.

24  Q.   Okay.  And she writes (as read):

25          "Also just received a concurring e-mail to my

1    personal e-mail from someone named Dawnette Cooke

2    that I do not know.  However, their e-mail is

3    extremely disturbing, and I have not replied back to

4    it.  However, I have almost replied back and said,

5    'What patient are you trying to tell me about?'

6         "I looked up the name associated with the e-mail

7    and the name but did not see any similar.  They are

8    saying that they feel there is some abuse for a

9    patient going on and some weight loss.  They

10    mentioned the patient is 130 pounds.  I do not know

11    who they are talking about but do not want to e-mail

12    back because of HIPAA."

13    Do you see that?

14  A.    Yes.

15  Q.    Okay.  You will agree it appears that the e-mail that was

16  sent to Ms. Abbott did not contain the name Cheryle Cooke?  At

17  least it appears --

18         MS. GREEN:  Objection.  Foundation.

19         MR. SCHACHTER:  Withdrawn.  I'll move on.

20         THE WITNESS:  It does contain the last name Cooke, and

21  so if the provider had looked up Cooke on her patient panel,

22  it's hard for me to understand that she would not have been

23  able to identify her own patient.

24  BY MR. SCHACHTER:

25  Q.    Right.  But that is what she seems to report to her

1   colleague?

2          **MS. GREEN:**  Objection.  Asked and answered.  And

3   foundation.

4   **BY MR. SCHACHTER:**

5   **Q.**   Okay.  The document shows --

6          **THE COURT:**  The sustained.

7   **BY MR. SCHACHTER:**

8   **Q.**   The document shows what it shows.

9          Okay.  Now, I'd just like to go on with Ms. Abbott's

10  comments.

11         **MR. SCHACHTER:**  If we can go a little bit further down

12  to "I would like to know what patient" --

13  **BY MR. SCHACHTER:**

14  **Q.**   Oh, okay.  Do you see where Ms. Abbott-Orr says (as read):

15         "Can you figure out what patient they're talking

16      about?"

17      Do you see that?

18  **A.**   That e-mail goes to whom?

19  **Q.**   Jacob Korth, to her colleague.

20  **A.**   And her colleague is whom in the Done management?

21  **Q.**   Okay.  If we can -- he's an employee at Done.

22      And then --

23  **A.**   Well, that's -- that's relevant here.  Is she referring

24  this to the support team without any clinical experience?  Is

25  she reporting this to Dr. Brody?  Is she reporting it to a

GOODMAN - CROSS / SCHACHTER

1    physician colleague for some guidance?

2        This is critical.  Just because she's reaching out to

3    someone, I don't know who that person is.  And clarification

4    would be important to understand.

5    Q.   Sure.  But, Dr. Goodman, if I can just explain the process

6    here.  I'm not permitted to answer questions.  My job is

7    limited to asking questions.  And if you don't know the answer

8    to something, you can simply say "I don't know," "I don't

9    remember," or if you know the answer, please provide it.

10       But I am not permitted to -- to answer questions in our

11   proceeding.

12   A.   So that's helpful.  I won't ask you questions.  I will

13   clarify my answer.

14       In order to answer yes or no, that is an incomplete

15   answer.  It leads to potential misleading.  So I'm going to

16   qualify and clarify the context here so that everyone in

17   the Court and the jury understands -- fully informed about what

18   I see in my opinion is going on.

19   Q.   Okay.  Thank you for that clarification.

20       If we can look a little bit further down at Ms. Abbott's

21   response, she says (as read):

22           "I might e-mail back and say 'I do not want

23       anyone abusing the medications I write for and try to

24       be very careful with all my patients.  Will you

25       provide a patient name and date of birth so I can

1          further look at this person's case and care

2          management?'  What do you think of that response?"

3          And she goes on to say (as read):

4              "I am thinking the patient this person might be

5          talking about is Cheryle Cooke, and I do not see red

6          flags with this patient like this family member does,

7          if this is the patient they are talking about."

8          So you see this communication is August 11th, which you

9    recall is about five months to the day after Ms. Cooke's first

10   appointment with this nurse?

11   **A.**    Yes.  And I'm going to, again, highlight, Ms. Orr is

12   looking for clinical guidance, and I do not know to whom this

13   has been sent.

14   **Q.**    Okay.

15   **A.**    It would be appropriate to send it to a physician or a

16   medical reviewer to understand the circumstances.  But if

17   Ms. Orr is looking for an administrative decision on what to

18   do, that's not appropriate care here.

19   **Q.**    Thank you for that clarification.

20        Okay.  You are aware, are you not, that this nurse,

21   Cassidy Abbott-Orr leaves the Done platform, and Ms. Cooke's

22   care was assigned to a new Done practitioner named Myron

23   Falkner?

24   **A.**    I was not aware that Ms. Orr left the platform.  I am

25   aware that she was transferred to Mr. Falkner.

1    Q.   Okay.  Very good.  Okay.

2        And I'd like to show you a communication which is October

3    the 8th of 2021, which is her first month under Mr. Falkner's

4    care.

5            MR. SCHACHTER:  If we can look at 7456 at -- can we go

6    to the next document?

7            MR. CEPREGI:  Page?

8            MR. SCHACHTER:  I think it's 42.  It's this one.

9        I'm sorry, Your Honor.  Just one moment.  I tried to move

10   things along.

11                     (Pause in proceedings.)

12           MR. SCHACHTER:  Okay.

13   BY MR. SCHACHTER:

14   Q.   All right.  What I'm showing you now is a first

15   communication between Ms. Cooke and then Myron Falkner after

16   the care is transferred.

17       And you see where the topic is -- that Ms. Cooke writes is

18   (as read):

19           "increase Vyvanse.  60-milligrams is good, but

20       it doesn't help with the fidgeting still and need to

21       get up."

22       Do you see that?

23   A.   I do.

24   Q.   And do you see where the Done nurse practitioner Myron

25   Falkner writes (as read):

1              "We need to schedule an appointment, please."

2   A.    Yes.

3   Q.    And I'm going to show you that Ms. Cooke then schedules

4   one about three-and-a-half weeks later.

5              MR. SCHACHTER:  If we can look at 7456 at 40.

6   BY MR. SCHACHTER:

7   Q.    Okay.  Do you see where there's an appointment that is

8   scheduled on November the 15th.

9         And you see where it says "no-show"?

10  A.    Yes.

11  Q.    Okay.  Now, although there was a request -- although there

12  was a request by Ms. Cooke to increase her dosage higher than

13  the 60 milligrams, as we saw, do you happen to recall from her

14  PDMP that he did not -- Myron Falkner did not do what she

15  asked.

16        Do you remember that?

17  A.    He declined to do it because he thought there was a safety

18  consideration.

19  Q.    Exactly.  Okay.

20        And then if we can look at 472 at 1, which is on

21  November 21st, which would be a couple of weeks -- or a week

22  after the follow-up was canceled.

23              MR. SCHACHTER:  Exhibit 472 at 1.

24              THE COURT:  Sorry.  Is it in?

25              MR. SCHACHTER:  I believe -- yes.  Yes, Your Honor.

1    BY MR. SCHACHTER:

2    Q.    Okay.  And do you see this is a communication from a

3    Dawnette Cooke to Done's general counsel.  This is a document

4    that you saw; is that correct?

5    A.    Yes.

6    Q.    Okay.  She writes that (as read):

7              "Her dosage for Adderall has been increased to

8         60-milligram with a Vyvanse script as well."

9         And that part is a little bit inaccurate because it was

10   the Vyvanse script that was 60 milligrams; is that correct?

11   A.    I don't know.

12   Q.    Okay.  In any event, on November 24th, which is three days

13   later, Ms. Cooke reached back out to the nurse, Nurse

14   Falkner --

15             MR. SCHACHTER:  And if we can look at 7456 at 53.

16   BY MR. SCHACHTER:

17   Q.    And here she writes (as read):

18             "Hi.  I want to apologize for my negligence with

19        our scheduled consultations.  I have been slammed at

20        work and the holidays, et cetera.  I also want to say

21        hello and introduce myself and thank you for taking

22        care -- taking on my care plan.  I was working with

23        Dr. Abbott, so far my doses and have increased my

24        grades in school, my job performance, and

25        interpersonal relationships.  I now don't feel as if

1              my brain is everywhere at once.  It was like a breath

2              of relief.  My doses right now are great.  I don't

3              see why I would request any adjustments.  Given my

4              results, I am thrilled.  I look forward to working

5              with you and thank you for being a part of

6              health/ADHD journey."

7              Do you see that?

8     A.     I do.

9              What's the date on this?

10    Q.     Sure.  This is November 24th, which would be three days

11    after Ms. Cooke's mother had e-mailed Done's general counsel.

12             Okay.  And we --

13    A.     And three months since she made her initial concern about

14    H daughter's mental state to Done.

15    Q.     Okay.  Let's look at the nurse's response.  Do you see

16    that he says (as read):

17             "I would like to talk with you" -- by the way in

18             this communication, just focusing on this

19             communication, Ms. Cooke doesn't say anything about

20             being in the hospital; is that right?

21    A.     The mother doesn't say or the patient?

22    Q.     The patient in the patient's communication to her care

23    provider, she doesn't say anything about being in the hospital?

24    A.     Correct.

25    Q.     And would you agree that in this -- just focusing on this

1    communication -- the patient doesn't display paranoia or

2    confusion or grandiose thoughts?

3            **MS. GREEN:**  Objection.  Foundation.  And speculation.

4            **THE COURT:**  Overruled.

5            **THE WITNESS:**  Please repeat the question.

6    **BY MR. SCHACHTER:**

7    **Q.**    Sure.  Do you agree that just -- just looking at the

8    communication that Ms. Cooke sends to her care provider, that

9    in this communication, there's nothing in it that to you

10   appears to be paranoia or confusion or grandiose thoughts?

11   **A.**    I'm not sure how to answer this question because I feel

12   constrained by your questions.  And ripping a page out of *Moby*

13   *Dick* won't tell me the story about Moby Dick.  And what you've

14   done here is that you've portrayed a chronology of events that

15   is, in my opinion, misleading.

16       The mother notified Done management in August.

17   Prescriptions for her medications continued.  The dose went

18   from an initial prescribed dose of Vyvanse 10 milligrams to a

19   dose of 60 milligrams of Vyvanse plus Adderall 30 milligrams.

20   Very high dose, no face-to-face appointment, no blood pressure

21   or impulse monitoring, no assessment of response or side

22   effects.

23       You are extracting communications here which do not

24   portray the full clinical picture, in my opinion.

25   **Q.**    Okay.  If you can't answer any of my questions, please

1    just say I can't answer my questions.  That's fine.  And, of

2    course, if you wish to clarify, whatever you wish to do, you

3    are, of course, welcome to do so and thank you for that.

4        Now, I'd like to look at Myron Falkner's response.  He

5    says (as read):

6            "I would like to talk with you about your doses

7        because over the recommended FDA doses.  And I would

8        like to discuss your symptoms regardless of your

9        outcomes.  We need to have this conversation ASAP."

10       Do you see that?

11   **A.**   Yes.

12   **Q.**   And would you agree that that is, in your view, an

13   appropriate response from this Done provider?

14   **A.**   Yes.

15   **Q.**   Okay.  Now, I'd like to show you an exchange they have two

16   days later, which is November 26.  If we can look at page 53.

17       **MR. SCHACHTER:**  7456 at 53.  Okay.  Thanks.

18   **BY MR. SCHACHTER:**

19   **Q.**   So you see where Ms. Cooke responds (as read):

20           "Of course, I am more than happy to meet with

21       you.  I was unaware of the FDA dose so I'm interested

22       in learning about that and discussing my symptoms."

23       And then Mr. Falkner says (as read):

24           "It is an appointment scheduled.  Please attend

25       or I am not going to be able to continue prescribing

1          this current dose of medication."

2          And then he subsequently writes the next day (as read):

3              "I had an appointment scheduled with you tonight

4          and you missed it.  This is the second consecutive

5          no-show after I have indicated on different occasions

6          that it was imperative to talk with you about your

7          current treatment.  I will have no other choice but

8          discontinue your prescription service."

9          Do you see that?

10    **A.**    Yes.  She had missed her appointments with him and she had

11    missed her appointments with the previous provider.

12    **Q.**    Okay.  And I take it you agree that the response from the

13    Done provider, Mr. Falkner, is appropriate, in your view?

14    **A.**    Yes.

15    **Q.**    Okay.  All right.  And are you aware that Ms. Cooke then

16    schedules an appointment for a couple days later, December 2nd?

17          I don't need to test your memory.  Let me show you 7456 at

18    page 40.

19          Do you see there is yet another appointment scheduled with

20    Ms. Cooke for December the 2nd, which is also -- she no-shows?

21    **A.**    Yes.

22    **Q.**    Okay.  Now, I'm going to show you a message which occurs

23    on the same day, December the 2nd, and I want you to agree with

24    me that in this communication, Ms. Cooke seems unwell.  So let

25    me show you 7456 at 56.

1    So here now on December the 2nd, Ms. Cooke says, in all

2    caps (as read):

3           "Hi.  I'm so sorry.  Please call me or send link

4           because please hacked computer and wi-fi.  Had to

5           file police report.  I am online."

6           Do you see that?

7    A.    Mm-hmm.

8    Q.    Okay.  And she goes on to say (as read):

9           "I am online now if you're awake.  again, I'm so

10          freaking sorry."

11          Do you see that?

12   A.    Mm-hmm.

13   Q.    You would agree with me, would you not, that there are

14   signs in this communication that Ms. Cooke is unwell?

15   A.    There are signs in this communication that the patient is

16   distressed, but without a clinical examination, I have no way

17   of knowing what's going on.

18   Q.    Okay.  And then if we can look at -- just if we can go a

19   little bit further down in this communication.  There's a

20   series of communications on December the 2nd.  And then if we

21   could look at the next day, December 3rd, Ms. Cooke's continued

22   communications.

23          We can look at -- okay.  Great.

24          Okay.  And Ms. Cooke and Mr. Falkner do end up having an

25   appointment on December the 19th, which is about 17 days later.

1    Do you happen to recall that?  If not, I can show you the

2    document.

3    **A.**    I don't.

4    **Q.**    Okay.  Let me look at --

5         **MR. SCHACHTER:**  If we can show 7456 at 23.

6    **BY MR. SCHACHTER:**

7    **Q.**    These are Myron Falkner's notes of that

8    December 19th session.  And do you see where Mr. Falkner's

9    notes reflect (as read):

10         "She denies any recent medical attention or

11         visits to the hospital since last appointment.  Of

12         note, per correspondence, mother reports that the

13         patient was hospitalized due to acute psychosis

14         related to stimulant usage.  Denies any" --

15    And what -- can you just help us with those abbreviations?

16    **A.**    SI is suicidal ideation, HI is homicidal ideations, AH is

17    auditory hallucinations, VH is visual hallucinations, and

18    paranoia.

19    **Q.**    Okay.  And if we can go a little bit further up in

20    Mr. Falkner's notes of this visit, do you see where he writes

21    down that (as read):

22         "Ms. Cooke has said I am doing okay.  I am the

23         poster child for ADHD."

24    He writes (as read):

25         "Denies any adverse effects to the medication.

1           Verbalized 'I am healthy too and if I was to have any

2           adverse effects, I would alert you,' presumably, or

3           Done.  Sleep, endorses she would get eight hours of

4           sleep per night."

5       And he also notes (as read):

6           "CURES reviewed.  No suspicious activity

7           identified."

8       Do you see that?

9   **A.**    I do.

10  **Q.**    Okay.  And then if we can go a little bit further.  He

11  writes (as read):

12          "The patient states that she was struggling

13          while she was attempting to complete school and

14          working.  States that her grades was plummeting prior

15          to going to Done.  Since starting the medication, she

16          was able to increase her grades and maintain her job.

17          Of note, the patient reports a recent issue with her

18          ex-boyfriend, stolen her computer, hacked and leaked

19          information.  States that the effects of Vyvanse last

20          four to five hours.  Reports that she would become

21          jittery and fidgety.  Reports that she would have to

22          take walks.  She denies any recent medical attention

23          or visits to the hospital since last appointment."

24      Okay.  Now -- okay.

25      So we saw the communication that came in to Done from

1    Ms. Cooke's mother saying she was hospitalized, and then we see

2    just Mr. Falkner's notes that the patient denies it, although

3    he seems to be putting that in quotes to make a record of what

4    exactly he is hearing from the patient; is that right?

5    A.    That's what I'm looking at on the screen.

6    Q.    Okay.  Now, at this point in time, do you recall that

7    Mr. Falkner took Cheryle Cooke off of Vyvanse and Adderall

8    altogether?

9    A.    He did -- I don't recall -- I don't want to tax my memory.

10   My recollection was that he did not, but I -- you show me the

11   document.

12   Q.    Sure.  I'm going to show you 7456 at 23.

13        Do you see where on December the 19th he has changed her

14   prescription away from Adderall and Vyvanse and switched it to

15   a medication called Adzenys as 12 1/2 milligrams?

16        Do you see that?

17   A.    I do.

18   Q.    Okay.  And we haven't talked about Adzenys.  That -- am I

19   correct that Adzenys is the equivalent of about 20 milligrams

20   of Adderall XR?

21   A.    I don't know the chemical equivalent conversion to that.

22   Q.    Okay.

23   A.    But what you're saying here, though, is that the

24   patient -- the mother tells Done in August.  There's no

25   face-to-face.  Vyvanse prescriptions and Adderall prescriptions

1    continue to be increased.  The -- they're notified that she was

2    hospitalized; nobody asked for medical records.  They're

3    continuing to prescribe amphetamine stimulants to someone who

4    clearly is decompensating, both in perhaps her e-mails and also

5    by her mother.

6        So this is -- this is so far beyond legitimate medical

7    prescriptions, usual course of practice, in my opinion, this

8    represents the most egregious disregard for the patient's

9    safety with the continuation of medications that are

10   exacerbating her symptoms, in addition to the fact this is a

11   woman who's canceling appointments all the time, making

12   requests online without any face-to-face evaluation.

13       That's my assessment here.  This is not a legitimate

14   medical prescription and you're not changing from an

15   amphetamine to a non-amphetamine, you're simply giving her a

16   different form of amphetamine.

17   Q.   Thank you for that.

18       Fair to say you completely disagree with the way Myron

19   Falkner was handling the situation and you would have handled

20   it very differently had it been your patient?

21   A.   Do not mischaracterize.  Mr. Falkner did what was

22   appropriate after months of disregard from the patient because

23   mother had alerted Done about her daughter's decompensation.

24   Thank God Mr. Falkner intervened and exercised what I thought

25   at that time was good clinical judgment.  The fact that he

1  wrote from one amphetamine to another amphetamine, I don't

2  understand that.

3  Q.   Okay.  Thank you.

4       MR. SCHACHTER:  And just, if we may, Your Honor, I

5  just want to show the dosing for Adzenys.  Your Honor, we move

6  to admit 7633 at page 3.

7       THE COURT:  Admitted.

8       (Trial Exhibit 7633 page 3 received in evidence.)

9  BY MR. SCHACHTER:

10 Q.   And so just to clarify, so Ms. Cooke had been at a -- what

11 you would characterize as a relatively high dosage of both

12 Vyvanse and Adderall, and in reducing her medication he set her

13 at the -- what is the adult starting dose for Adzenys, at least

14 according to the FDA insert; is that correct?

15 A.   He did, but I don't know why he did that.  There are

16 multiple reasons why he did that.  She was already on a high

17 dose of amphetamines.  He didn't want to discontinue a high

18 dose of amphetamines immediately and used a lower, much lower

19 dose in order to see what her response was in coming off a high

20 dose.

21      There are several reasons why this change was made and

22 unless we talk to Dr. Falkner or there's documentation of his

23 reasoning, it's speculation as to why this happened.

24 Q.   Exactly.

25      We talked about the fact that you never spoke to Nurse

1   Orr.  You've also never spoken to Myron Falkner; correct?

2   **A.**   Correct.  My review and expert opinion has been on the

3   documents that I've been given to review.

4   **Q.**   And so you are unable to say what Mr. Falkner's purpose

5   was in prescribing 12 1/2 milligrams of Adzenys to Ms. Cooke;

6   correct?

7          **MS. GREEN:**  Objection.  Calls for speculation and

8   foundation.

9          **THE COURT:**  Sustained.

10  **BY MR. SCHACHTER:**

11  **Q.**   Okay.  Okay.  In any event, you have seen no evidence that

12  a woman named Ruthia He directed Myron Falkner to prescribe

13  12 1/2 milligrams of Adzenys to Cheryle Cooke; correct?

14  **A.**   I'm seeing no documentation that Done management was

15  involved in any review of this case.

16  **Q.**   Thank you.

17        Okay.  Let's turn to another patient, one named Nicholas

18  Chieppa.

19        That's one that you reviewed; is that correct?

20  **A.**   Correct.

21  **Q.**   And you testified that Mr. Chieppa's prescriptions were

22  without a legitimate medical purpose and outside the usual

23  course of professional practice; is that right?

24  **A.**   Correct.

25  **Q.**   Okay.

1    MR. SCHACHTER:  Your Honor, we move to admit, subject

2    to a motion to strike, Exhibit 7457, which are Mr. Chieppa's

3    records.

4         THE COURT:  Admitted.

5    (Trial Exhibit 7457 received in evidence.)

6         MR. SCHACHTER:  If we can put up, Mr. Cepregi, 7457 at

7    page 9.

8    BY MR. SCHACHTER:

9    Q.   Which are some clinical notes of his initial evaluation.

10   Shows strong and direct eye contact.  Interaction polite and

11   engaged.  Hygiene neat and clean appearance.  Calm, clear, and

12   articulate.  Thought process logical, linear, goal directed.

13   And denies those abbreviations that you helpfully explained for

14   us.  And he writes (as read):

15        "Can distinguish reality."

16   Do you see that?

17   A.   Yes.

18   Q.   Okay; and then if we can go a little bit further down,

19   some additional information from the clinical notes.  And then

20   if --

21        MR. SCHACHTER:  And if we can look at 7456 at page 1.

22   Okay.  There's some intake information.

23        MR. CEPREGI:  7457?

24        MR. SCHACHTER:  7456.  Is that a different document?

25   Oh, I'm sorry.  We move to admit 7456, which I think is

1     the intake information for Mr. Chieppa.

2          THE COURTROOM DEPUTY:  It's already admitted.

3          MR. SCHACHTER:  I misspoke.  I apologize, Your Honor.

4     Your Honor, just one moment.

5     Okay.  Let's just move on.

6  BY MR. SCHACHTER:

7  Q.   If we can look at Mr. Chieppa's -- do you recall that

8  Mr. Chieppa had explained that he had been treated for ADHD

9  about 10 years before?

10 A.   Yes.

11 Q.   Okay.

12          MR. SCHACHTER:  And then if we can look at

13 Exhibit 5794, in evidence, which is Mr. Chieppa's CURES report,

14 at page 3.

15 BY MR. SCHACHTER:

16 Q.   Okay.  And we see that Mr. Chieppa had been prescribed

17 Vyvanse in the past in 2010 and 2011, as he reported.

18      Do you see that?

19 A.   I see that now.  The document that I reviewed was the PMP

20 from 2015.  At that point, he hadn't been on prescription

21 medication until he met his Done provider.

22 Q.   Okay.  In any event, you see that he was prescribed

23 Vyvanse 10 or 11 years earlier back in 2020 and 2011?

24          MS. GREEN:  Objection.  Foundation.  Similar reason to

25 what was discussed in the break, Your Honor.

1              MR. SCHACHTER:  This is a document in evidence.  I'm

2    showing the witness a document in evidence, I guess I'll

3    clarify.

4    BY MR. SCHACHTER:

5    Q.   Dr. Goodman, in preparation for your testimony, I guess,

6    you're familiar with CURES reports; right?

7    A.   Yes.

8    Q.   And you know that they can be requested by -- by medical

9    professionals or, I guess, lawyers as well in preparation for a

10   case?

11   A.   Correct.

12   Q.   Okay.

13   A.   Didn't know they could be requested by attorneys until I

14   was involved in this case.

15   Q.   Welcome.

16        And in any event, the CURES report which the Government

17   had provided to you in advance of your testimony only went as

18   far back as 2015; is that right?

19   A.   Right.

20   Q.   Okay.  And you're now looking at a CURES report in

21   evidence which shows that, in fact, he had been prescribed

22   Vyvanse back in 2010 and 2011.

23        Do you see that?

24   A.   Correct.  But there's no -- there's no indication for what

25   this prescription was for or who did it or what the evaluation

1    or what the circumstances were.  So somebody did prescribe

2    Vyvanse back then, but the circumstances of that prescription

3    are unknown.

4         MS. GREEN:  Your Honor, just objection for the record.

5    This wasn't a Done document, i.e., not something the provider

6    at Done had available to them.

7         MR. SCHACHTER:  Correct.  Well, actually, no.  There

8    have been multiple reference to the CURES reports being

9    checked, so I don't --

10        MS. GREEN:  Which was the copy provided to Dr. Goodman

11   that only went back to 2015.  So I would ask that if we're

12   going to ask Dr. Goodman about CURES reports, we should show

13   him the CURES report that he had available to him and that the

14   Done provider had available to her which was the version that

15   went back to 2015.

16        THE COURT:  Well, here's my question, do we know

17   whether the Done provider saw the one that you've just brought

18   out?  Or saw the one that was shown to the witness?

19        MS. GREEN:  The one that was.

20        MR. SCHACHTER:  60 here now, Your Honor.

21        THE COURT:  Wait a minute, wait, okay.

22      What's your position, Mr. Schachter?

23        MR. SCHACHTER:  Sitting here now, I only know about

24   the CURES report which is in evidence which the jury has seen.

25        THE COURT:  Okay.  So you don't know the answer to

1    that.

2         MS. GREEN:  Your Honor, the Done PDMP, which was in

3    the Done patient records, was the one that went back to 2015,

4    and that was the one that Dr. Goodman was given because that

5    was what was in the Done records as to the PDMP.

6         So I would ask that we show that document if we're going

7    to be asking about the PDMP.

8         THE COURT:  Well, if there's another record, but you

9    have -- you do not know whether the provider, the subscriber --

10   I mean the person who wrote the prescription saw the one that

11   went previous to 2015?  You have no information on that

12   subject?

13        MR. SCHACHTER:  Sitting here --

14        THE COURT:  This document is in evidence, but that

15   doesn't mean anything.

16        MR. SCHACHTER:  Sitting here now we just have

17   Dr. Goodman's testimony that he recalls that the provider was

18   told that the patient had, I think, been on Vyvanse before, but

19   I don't know right how, Your Honor, whether this version of the

20   CURES report which is in evidence is exactly the same version

21   of the CURES report that the provider saw.  I just don't know.

22        MS. GREEN:  I'm happy to give Mike Schachter the

23   exhibit number for the copy of the CURES report that was in the

24   Done records and that Dr. Goodman reviewed if he would like to

25   use that version of the PDMP.

1       This one was not in the Done records, and so there is no

2    evidence that the provider saw this version of the CURES report

3    that Mr. Schachter is now trying to use.

4           **THE COURT:**  All right.  We'll straighten that out

5    later, however -- okay.  With that -- with that understanding,

6    it's in subject to a motion to strike.  Now -- and then the

7    jury is well aware of what the issue is with respect to this

8    document.

9       You may proceed.

10          **MR. SCHACHTER:**  Okay.  Thank you.

11   **BY MR. SCHACHTER:**

12   **Q.**   Okay.

13   **A.**   If I can clarify a previous answer.  You had asked me

14   whether or not I was aware Dr. -- Mr. Chieppa was treated as a

15   child, I'm going to say I don't know, and I'd like to see the

16   evaluation that cites that.

17   **Q.**   Okay.  You don't remember one way or the other?

18   **A.**   I do not.

19   **Q.**   Okay.  All right.

20      Let's -- if we can just go back to the clinical notes.  If

21   we can look at 7457 at page 8.  You see the provider -- by the

22   way, do you recall this is a Katherine Pratcher?

23   **A.**   Yes.

24   **Q.**   Okay.  Very good.

25      (as read):

1              "Reports mood.  Depression, mild.  Anxiety,

2         mild.  Panic attacks once 12 years ago."

3         Do you see that?

4    A.   I do see that and, you know, it stands in contrast to the

5    PHQ-9 which is scored as moderate to severe depression.

6         And so, again, this is reflective of an inconsistency

7    between pre-evaluation screening and the clinical interview.

8    Q.   Understood.

9         Just so we may clarify, as you testified on direct, it is

10   your view that this was not a comprehensive psychiatric

11   evaluation and that the care was completely inappropriate; is

12   that correct?

13   A.   Right.  And in addition, the PHQ-9 with severe and

14   moderate depression is not cited in the evaluation documents

15   that you're showing me.

16   Q.   Understood, Dr. Goodman.  Thank you.  We heard you say

17   that on direct, but we appreciate you saying it again now.

18        Okay.

19             **THE COURTROOM DEPUTY:**  Did you say 7547?

20             **MR. SCHACHTER:**  7457.

21             **THE COURT:**  And that is in evidence?

22             **THE COURTROOM DEPUTY:**  Yes.

23   **BY MR. SCHACHTER:**

24   Q.   Okay.  And, now, if we can turn to what Ms. Pratcher

25   prescribed.  Do you see that she prescribed Adderall

GOODMAN - CROSS / SCHACHTER

1   10 milligrams.  Do you see that?  And that would be twice,

2   that's BID; is that right?

3   **A.**    Yes.

4   **Q.**    Okay.  So 20 milligrams of Adderall in total; is that

5   correct?

6   **A.**    Correct.  After a 22-minute evaluation with no childhood

7   history elicited during the -- or documented in the evaluation.

8   **Q.**    Right.  Okay.

9        You saw no evidence that a woman named Ruthia He directed

10  Nurse Pratcher what to diagnose Mr. Chieppa with; is that

11  correct?

12  **A.**    Correct.

13  **Q.**    And you saw no evidence that a woman named Ruthia He

14  directed Ms. Pratcher to prescribe Mr. Chieppa with

15  20 milligrams of Adderall; is that correct?

16  **A.**    Correct.

17  **Q.**    Do you recall -- by the way, you have seen no evidence

18  that Ms. He knew anything about Ms. Pratcher's treatment of

19  Mr. Chieppa; is that correct?

20  **A.**    So I don't recall if there is internal communications,

21  Slack, or e-mails concerning refills, for example, or the

22  clinical circumstances of his ultimate involuntary admission

23  for psychosis.  I don't recall seeing those documents.

24  **Q.**    Okay.  And we're going to get to that in a minute.

25       But do you recall, by the way, that when Ms. Green asked

GOODMAN - CROSS / SCHACHTER

1    you about Mr. Chieppa, she referred to this as a -- as a count

2    or a separate crime that Ms. He is charged with.

3        Do you recall that?

4    A.    I recall that this case is a charged case.  That's all I

5    know.

6    Q.    Okay.  Very good.

7        Now, you noted that Mr. Chieppa's mother called -- called

8    Nurse Pratcher about Mr. Chieppa having been hospitalized and

9    having symptoms characteristic of bipolar?

10   A.    Yes.  And requesting discontinuation of his medication.

11   Q.    Right.  His -- this is an adult male; correct?

12   A.    Correct.

13   Q.    And the mother asked that his -- his treatment be

14   discontinued; is that correct?

15   A.    Because of noted decompensation in his mental state.

16   Q.    Okay.  You saw no evidence that a woman named Ruthia He

17   ever communicated with Mr. Chieppa or his mother; is that

18   correct?

19   A.    I saw no evidence that Ruthia He was involved in any

20   review of this case.

21   Q.    Okay.  Now -- in fact, do you recall that Ms. Pratcher

22   left a note in the patient file saying that the patient should

23   not be administered ADHD medications.

24       Do you recall that?

25   A.    I don't.  I'd have to see that document.

GOODMAN - CROSS / SCHACHTER

1    Q.   Sure.

2              MR. SCHACHTER:  If we can put up 7457 at 12.

3    BY MR. SCHACHTER:

4    Q.   Do you see the notes saying (as read):

5              "Received call from other" -- presumably that's

6         mother -- "today advising that client was placed on a

7         5150 and has symptoms characteristics of bipolar

8         disorder.  Client should not administer medicine for

9         ADD, ADHD."

10        Do you see that?

11   A.   I see that text.

12   Q.   Okay.  Now, am I correct that after this note, a nurse

13   practitioner named Elizabeth Shapard prescribed Mr. Chieppa

14   with additional stimulants.

15        Do you recall that?

16   A.   Correct.

17   Q.   Okay.  And have you been made aware that this note,

18   Ms. Shapard says that she reviewed the note and simply missed

19   it.

20        Were you aware of that?

21             MS. GREEN:  Objection.  Foundation.

22             MR. SCHACHTER:  Well, in preparation for your expert

23   testimony, did the prosecutor tell you about the testimony of

24   Elizabeth Shapard?

25   A.   No.

1    Q.    Okay.

2    A.    This --

3          THE COURT:  No, that's enough.  No.  Okay.

4    Go ahead.  Next question.  Okay.

5    BY MR. SCHACHTER:

6    Q.    Okay.  That's all we have on Mr. Chieppa.

7          Let's turn to a woman named -- a patient named Vashti

8    Oechsner-Souza.

9          You testified that the prescriptions issued to Ms. Souza

10   were outside the usual course of professional practice and not

11   for a legitimate medical purpose; is that correct?

12   A.    Correct, because of an inadequate evaluation that took

13   eight minutes.

14   Q.    Right.

15         Do you recall, again, when Ms. Green asked you about

16   Ms. Souza, do you recall her saying this is a count, meaning it

17   is a separate crime that a woman named Ruthia He is charged

18   with committing?

19   A.    I'm aware that this is a count case.

20   Q.    Okay.  All right.  I'd like to start by showing you

21   Ms. Souza's intake form.

22         MR. SCHACHTER:  Your Honor, we move to admit 7462,

23   which are Mrs. Souza's medical records, subject to a motion to

24   strike.

25         THE COURT:  Admitted.

1          (Trial Exhibit 7462 received in evidence.)

2    BY MR. SCHACHTER:

3    Q.   Okay.  And do you see in the intake information, Ms. Souza

4    reported (as read):

5               "Yes, I have been diagnosed with ADHD before" --

6          If we can go a little bit further down.  (as read):

7               -- "before.  I was 12 years old.  Complained

8          about poor focus, impulsivity, and/or hyperactivity,

9          yes.  And question:  Do you have any experience with

10         ADHD medication?  Patient reports, 'Yes, I was on

11         Adderall XR during previous treatment.'"

12         Do you see that?

13   A.   Yes.

14   Q.   And you understood that intake information was made

15   available to the medical provider in advance of the initial

16   evaluation?

17   A.   Presumably, however, there was one patient who said --

18   there was one provider who said they never saw the intake

19   information, so I'm not sure what the provider saw.  I know

20   these questions were answered.

21   Q.   Okay.  Thank you.

22         And to be clear, did you see any records of Ms. Souza's

23   prior treatment that she reports here?

24   A.   I don't believe so.

25   Q.   Okay.

1          MR. SCHACHTER:  May I have just a moment, Your Honor?

2                    (Pause in proceedings.)

3    BY MR. SCHACHTER:

4    Q.    Okay.  You're not aware of her prior treatment at Kaiser

5    Permanente?

6    A.    No.

7    Q.    Then I won't ask you about those records.

8          Okay.  Now, I believe you recall that Ms. Souza had an

9    appointment with a nurse practitioner -- her appointment was

10   with a nurse practitioner named Arias.  Do you recall that?

11   A.    Yes.

12   Q.    Okay.  And I'm going to show you, if I can, Exhibit 7462

13   at -- well, 1 we were at already.

14         You said that this was a short appointment; is that

15   correct?

16   A.    Just over eight minutes.

17   Q.    Okay.  And you have never spoken to this nurse

18   practitioner named Arias; correct?

19   A.    Correct.

20   Q.    And you have never spoken to this patient, Ms. Souza;

21   correct?

22   A.    Correct.

23   Q.    So you do not have any personal knowledge of what was said

24   in between the Nurse Practitioner Arias or the patient

25   Ms. Souza in that appointment; is that correct?

1          **MS. GREEN:**  Objection.  Foundation and calls for

2    speculation.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  I'm sorry, Counselor.  Could you repeat

5    the question?

6          **THE COURT:**  You have no personal knowledge of what was

7    said between the two?

8          **THE WITNESS:**  No, I have no personal knowledge.  There

9    was no evaluation in the records so I don't know what

10   transpired.

11   **BY MR. SCHACHTER:**

12   **Q.**   Okay.  You don't know if Ms. Souza spoke to Mr. Arias

13   about her prior diagnosis from Kaiser Permanente or that she

14   had been previously treated with Adderall, you don't know if

15   they discussed that?

16   **A.**   Without an evaluation in the medical record, I don't know

17   what was discussed.

18   **Q.**   Okay.  Okay.

19        And I take it the prosecution showed you no evidence that

20   a woman named Ruthia He from China was aware of Ms. Souza or of

21   what in particular Mr. Arias spoke to Ms. Souza about; correct?

22   **A.**   Correct.

23        I'd like to make a correction.  I'm looking at my report.

24   I said earlier I was not aware of the treatment at Kaiser.  I

25   was aware that there was a prescriber at Kaiser.

GOODMAN - CROSS / SCHACHTER

1   Q.   Ah.  Fantastic.

2        Okay.  I would like to show you those records from Kaiser.

3   Thank you so much.

4            MR. SCHACHTER:  All right.  Your Honor, we offer 7574,

5   which are Ms. Souza's Kaiser Permanente records.

6            MS. GREEN:  Objection, Your Honor.  I believe

7   Dr. Goodman is referring to the PDMP that just references a

8   provider; is that -- or I'd like to at least clarify the

9   foundation for the witness saying that before we show records

10  that he has never seen.

11           THE WITNESS:  So let me -- may I read my report to say

12  what I reviewed?  Okay.

13       The report says (as read):

14           "Furthermore, review of the PDMP indicates that

15       in addition to Dr. Brody's script, the patient filled

16       a prescription for Adderall 10 milligrams by

17       different outside provider JD on the same day.

18           "This prescription was filled at a different

19       pharmacy, Kaiser, than the prescription from

20       Dr. Brody."

21       The last sentence was (as read):

22           "On July 19, 2021, the patient filled another

23       10-milligram Adderall prescription for 90 pills at

24       the Kaiser pharmacy from the other outside provider

25       JD."

1    BY MR. SCHACHTER:

2    Q.    Let me explore your recollections.

3         THE COURT:   Well, I think what he says is he didn't --

4    the documents that you want to show him were not the documents

5    that he reviewed.

6         MR. SCHACHTER:   I would just like to explore his

7    recollection to this.

8         THE COURT:   Explore his recollection as to what?

9         MR. SCHACHTER:   Of what he saw and didn't see.

10        THE COURT:   Okay.

11        MR. SCHACHTER:   Okay.

12        THE COURT:   You can do that.

13   BY MR. SCHACHTER:

14   Q.    Did the prosecution tell you that they had --

15        THE COURT:   No, no, wait, wait.   What the prosecution

16   said --

17        MR. SCHACHTER:   I'll ask a different question.

18        (Reporter interrupts for clarification of the record.)

19        MR. SCHACHTER:   Sorry.

20        THE COURT:   What the prosecution said, didn't say,

21   that's -- we're not exploring that.

22        You can certainly -- at this point.   You can certainly

23   explore what the doctor saw.

24        Now, you say I want to refresh his recollection.   Okay.

25   So you show him something and we'll see whether his

1  recollection is refreshed as to whether or not he saw those

2  documents or whatever documents you believe he might have seen.

3  Okay.

4        **MR. SCHACHTER:**  Sure.

5        **THE COURT:**  So show him to him.

6        **MR. SCHACHTER:**  I'll see -- I'll just check his

7  recollection.

8  **BY MR. SCHACHTER:**

9  **Q.**   Do you have a recollection of seeing -- do you have a

10  recollection that Ms. Souza was diagnosed with ADHD and was a

11  long-time patient of Kaiser Permanente and under treatment for

12  her ADHD?  Do you have a memory of that?

13  **A.**   I didn't see -- I don't recall seeing any documents to

14  that.  What I read from my report was the PDMP review that I

15  saw and that was the extent of the documents concerning any

16  care the patient was receiving at Kaiser.

17  **Q.**   Let me just show you a document to see if it refreshes

18  your recollection.  If you could just take a moment to review

19  it to yourself.

20        **MR. SCHACHTER:**  Your Honor, we'd like to show just for

21  the witness, Court, and counsel Exhibit 7574 at page 6.

22        **THE COURT:**  Okay.  For recollection purposes?

23        **MR. SCHACHTER:**  Correct.

24        **THE COURT:**  Okay.

25        **MR. SCHACHTER:**  And if you could just take a moment

1    and look at that to yourself, Doctor.

2            THE WITNESS:  What is it that I'm looking at?

3            THE COURT:  Okay.  What you are looking for is this --

4    that's a good question.  What you're looking for is this:  You

5    look at this piece of paper that is now being shown to you and

6    you determine whether or not you recall having seen this piece

7    of paper on an earlier occasion.  That's the question.

8            THE WITNESS:  I do not.

9            THE COURT:  Okay.  Next question.

10   BY MR. SCHACHTER:

11   Q.   Okay.  So you are unaware of Ms. Souza's treatment for

12   ADHD at Kaiser Permanente?

13           MS. GREEN:  Objection.  Asked and answered and now

14   just argumentative.

15           THE COURT:  Sustained.

16   BY MR. SCHACHTER:

17   Q.   Okay.  Let's turn to a new patient.  Last patient that

18   we're going to talk about.

19       You testified that prescriptions written to a woman named

20   Trivedi were not for a legitimate medical purpose and were

21   outside the usual course of professional practice; is that

22   right?

23   A.   Correct, after a 19-minute evaluation.

24   Q.   Okay.  You recall that that 19-minute evaluation was with

25   a nurse practitioner named Shabnam Rahimi; is that correct?

1   **A.**   Correct.

2   **Q.**   And of the 16 patients that you reviewed, you recall that

3   Shabnam Rahimi, she had also seen this patient named Harlan

4   Band; is that correct?

5   **A.**   Yes.

6   **Q.**   Okay.  Now, and you heard, did you not, that -- when

7   Ms. Green asked you questions, that she referred to the

8   treatment of Ms. Trivedi as a separate count or a separate

9   crime for which a woman named Ruthia He is charged with.

10       Do you recall that?

11  **A.**   Yes.

12  **Q.**   Okay.  Now, the Government showed you an Exhibit 160.  And

13  I'd like to show that to you.

14  **A.**   160.

15          **THE COURTROOM DEPUTY:**  It's admitted.

16          **MR. SCHACHTER:**  If we can look at the second page,

17  please.  Okay.  If we can blow that up.  Okay.

18  **BY MR. SCHACHTER:**

19  **Q.**   You recall testifying about this in your direct testimony,

20  that Ms. Rahimi writes that Trivedi (as read):

21          "Was a difficult encounter.  Her SX" --

22       Is that history?  What is that?

23  **A.**   SX means symptoms.

24  **Q.**   Symptoms.  Thank you.  (as read):

25          -- "did not point to ADHD at all but more like

1    severe anxiety.  She was very adamant about getting

2    started on stimulants.  Despite having severe

3    anxiety, declined treatment for her anxiety and other

4    treatment options.  I did end up giving in and

5    prescribing low-dose Adderall."

6    And says (as read):

7         "I would prefer this patient to be seen by

8    another provider."

9    Do you see that?

10   **A.**   Yes.

11   **Q.**   Okay.  And this is -- you talked about that on direct.

12   You know that Ms. Rahimi prescribed 5 milligrams of

13   Adderall XR; is that correct?

14   I don't need to test your memory.  I'm going to show you

15   what's in evidence as 19 --

16   **A.**   That's correct.  I have it in my report.  That's correct.

17   **Q.**   Okay.  Great.

18   (Reporter interrupts for clarification of the record.)

19        **MR. SCHACHTER:**  I'm sorry.

20   If we can just put on the screen Exhibit 1988 in evidence

21   at page 11.

22   **BY MR. SCHACHTER:**

23   **Q.**   Okay.  Now, to be clear, the Government showed no evidence

24   that a woman named Ruthia He directed Shabnam Rahimi to

25   prescribe 5 milligrams of Adderall to Ms. Trivedi; is that

GOODMAN - CROSS / SCHACHTER

1    correct?

2    **A.**    Correct.

3    **Q.**    I'm also correct that the -- as we talked about, the FDA

4    label would say that the starting dose for children, according

5    to the label, is 10 milligrams; is that correct?

6    **A.**    Yes.

7    **Q.**    Okay.  Now, if we can look at page 12 of the medical

8    records, Ms. Trivedi, according to the notes, says that the

9    past medical history of anxiety and according to the notes the

10    patients said feels that -- and by the way, she says no

11    medication, she's scared of putting anything in her body.

12        Do you see that?

13    **A.**    Yes.

14    **Q.**    Okay.  And in your experience, is that consistent or

15    inconsistent with something a person seeking -- seeking drugs

16    for abuse purposes would say?

17        **MS. GREEN:**  Objection.  Argumentative.  And calls for

18    speculation.

19        **THE COURT:**  Overruled.

20        **THE WITNESS:**  I'm sorry, Your Honor.  I can't answer

21    yes or no here because --

22        **THE COURT:**  Well, then answer it as you feel you

23    should answer.

24        **THE WITNESS:**  So, again, without evaluating this, "I'm

25    scared about putting anything in my body."  The assessment here

1    is, is the person reporting a legitimate concern, or is the

2    person reporting a concern that she wants the provider to hear?

3        Without further evaluation, I'm not quite sure.  So I

4    can't stipulate the interpretation is one versus the other.

5        It would be speculative.

6    **BY MR. SCHACHTER:**

7    **Q.**  I see.  Okay.

8        It may be something that a drug seeker may say to a

9    medical provider?

10   **A.**  Correct.

11   **Q.**  Okay.  Anyway, getting back to the notes.  After that, the

12   notes reflect (as read):

13           ""Feels that anxiety is more related to not

14       getting work done and falling behind compared to

15       other co-workers."

16       Do you see that?

17   **A.**  I do see that.  I also notice that her GAD-7, which is an

18   anxiety scale, reported severe anxiety.

19   **Q.**  Okay.

20   **A.**  From the text you're showing me, it wasn't further

21   explored.

22   **Q.**  Got it.

23       And according to the notes, the -- Ms. Rahimi also notes

24   that the patient stated that she had dropped out UCLA due to,

25   at least what Ms. Rahimi writes, are controlled ADHD symptoms.

1      Do you see that?

2  **A.**    Yes.

3  **Q.**    And I take it that -- certainly we understand you view

4  this evaluation as nowhere close to a comprehensive psychiatric

5  evaluation; correct?

6  **A.**    19 minutes wouldn't even be considered the usual course of

7  professional practice, so it's not my opinion, it's the general

8  standard of care in psychiatry.

9  **Q.**    Understood.  Thank you so much.

10      Okay.  In any event, I just want to ask you a question.

11  If somebody drops out of school due to ADHD symptoms, would you

12  agree that that could be a sign of an impairment?

13  **A.**    Dropping out of school itself is not in and of itself a

14  diagnosis of ADHD.  So unless the diagnosis is confirmed, I

15  don't know how to explain dropping out of school.

16  **Q.**    No.  I meant -- I'm sorry.  Nurse Rahimi wrote (as read):

17          "States dropped out of UCLA due to controlled

18          ADHD."

19      My question was, is dropping out of school due to what a

20  practitioner would conclude is ADHD symptoms, would you agree

21  that that is a form of impairment?

22          **MS. GREEN:**  Can make sure we state the record

23  correctly?  "States dropped out of UCL" is a reference to what

24  the patient states, not what Ms. Rahimi concluded.  So that's

25  just correctly stating the record, please.

1          MR. SCHACHTER:  I don't know if that's an objection.

2    BY MR. SCHACHTER:

3    Q.    But the clinical notes say (as read):

4              "States dropped out of UCLA due to controlled

5          ADHD symptoms."

6          Do you see that?

7    A.    The text says that, that's the patient report.  I don't

8    know whether, in fact, the patient has ADHD symptoms or not.

9    That's her description of what led to dropping out of UCLA.

10   Needing clinical evaluation for further clarification.

11   Q.    Correct.  Because you've never spoken to Ms. Trivedi;

12   correct?

13   A.    It's been established that I've not spoken to any one of

14   the 16 patients that I reviewed.

15   Q.    Okay.  So -- and you've never -- by the way, did you ask

16   to speak to Ms. Trivedi?

17   A.    No.  It's not in the role of an expert opinion.

18   Q.    Well, I guess I don't know about that.

19         You understand that if the Government wished to --

20         THE COURT:  No, no, no, no, no, no.  You're just

21   arguing.

22         MR. SCHACHTER:  I'll move on.

23         THE COURT:  This is argument.

24         MR. SCHACHTER:  I'll move on.

25   \\\

GOODMAN - CROSS / SCHACHTER

BY MR. SCHACHTER:

Q.    You never spoke to Shabnam Rahimi either; is that correct?

A.    Correct.

Q.    And you --

A.    I haven't spoken to any of the Done providers on the 16 cases.

Q.    Okay.  She also reports, if we can turn back to the clinical notes (as read):

        "Reports difficulty getting started on projects
    until the last minute.  Worries a lot about how she
    is performing at work.  Has difficulty paying
    attention to conversation.  Also difficulty
    comprehending what she has read."

Do you see that?

A.    I do see that.  I also see the absence of any evaluation for comorbid psychiatric disorders which is part of the five criteria for the diagnosis of ADHD.

Q.    Thank you.

    If we can look briefly at the ASRS, which was completed by Ms. Trivedi.

    Do you see here the answers that Ms. Trivedi provided in the ASRS?

A.    Yes.

Q.    And this is scored as -- under the ASRS as a probable ADHD.

GOODMAN - CROSS / SCHACHTER

1         Do you see that?

2    A.    The text is written as probable.

3    Q.    Okay.  Thank you.

4         And am I correct that patients do come to you with

5    symptoms of anxiety about performance issues?

6    A.    Yes.

7    Q.    And, in fact, I think you've said ADHD individuals can

8    have anxiety, they're often worried about performance issues,

9    that is:  Can I get to work on time?  Can I finish the project

10   on time?  Can I do this spreadsheet without making mistakes?

11   Can I pick up my kid on time?

12        So that anxiety usually diminishes while we decrease the

13   ADHD symptoms.

14        Because if you decrease the inattention, distractibility,

15   and disorganization, then productivity rises and your anxiety

16   diminishes.

17        That's something that you've said; is that correct?

18   A.    That is correct.  And if the impairments are a function of

19   anxiety, then providing a stimulant medication means that you

20   may exacerbate the anxiety.  So it's not clear here that a

21   diagnosis has been accurately and clearly established,

22   therefore, everything that follows is not for a legitimate

23   medical purpose.

24   Q.    Sure.

25        In your experience, after you complete a comprehensive

1  psychiatric evaluation, you at times will prescribe stimulants

2  to someone who appears to have anxiety because in your

3  assessment, after your comprehensive psychiatric evaluation,

4  you conclude that the anxiety the patient is describing may

5  actually be reflective of that patient's ADHD symptoms.

6      Am I correct about that?

7  **A.**    Yes.  If I determine the anxiety is not a primary disorder

8  and secondary to ADHD.

9  **Q.**    Okay.  Thank you.

10  **A.**    The patient was diagnosed with a primary anxiety disorder

11  F41.1, which is generalized anxiety disorder.

12  **Q.**    Thank you.

13      Would you agree that prescribing the smallest dose of

14  Adderall that is commercially available is consistent with

15  someone having a purpose of treating an illness?

16      **MS. GREEN:**  Objection.  Calls for speculation.

17      **THE COURT:**  Sustained.

18      **MR. SCHACHTER:**  Okay.

19  BY MR. SCHACHTER:

20  **Q.**    You saw no evidence in the record that was provided to you

21  that Ms. Rahimi's purpose in prescribing 5 milligrams of

22  Adderall was to facilitate drug abuse, did you?

23      **MS. GREEN:**  Same objection.  And argumentative.

24      **THE COURT:**  Sustained.

25      **MR. SCHACHTER:**  Okay.

1    BY MR. SCHACHTER:

2    Q.    I'm now going to show you what is in evidence as 1988 at

3    page 11, which are the notes of Ms. Trivedi's follow-up

4    appointment.

5         And do you recall this was about one month after her

6    initial assessment?

7    A.    Yes.

8    Q.    Okay.  And these notes, do you recall that these are taken

9    by a nurse practitioner named Shannon Wozniak who did the

10   follow-up appointment with Ms. Trivedi and prescribed a refill?

11   A.    Can you scroll down and show me Ms. Wozniak's signature at

12   the bottom of this note.

13   Q.    Sure.  Why don't I just direct your attention to page 78

14   of your report where you wrote (as read):

15        "The medical chart indicates that a different

16        provider, S. Wozniak, spoke with the patient who was

17        transferring care."

18        Do you recall that?

19   A.    Well, it's written here.  I wrote it.

20   Q.    Okay.

21        MR. SCHACHTER:  You can take that down.  Okay.

22   BY MR. SCHACHTER:

23   Q.    So returning to the notes from Wozniak, if you can see

24   that Ms. Wozniak writes (as read):

25        "Spoke with patient who is transferring care

1          from another Done provider.  Patient reports

2          therapeutic response to current medication and denies

3          side effects.  Patient is aware dose is low but is

4          hesitant to increase and is receiving benefit at this

5          lower dose.

6              "Patient is stable.  Patient is requesting to

7          continue current treatment plan unchanged."

8       Would you agree that Ms. Trivedi simply wanting to stay on

9    her low dose of Adderall is inconsistent with someone who is

10   seeking drugs for drug abuse?

11          MS. GREEN:  Objection.  Calls for speculation.  And

12   argumentative.

13          THE COURT:  Sustained.

14          MR. SCHACHTER:  Okay.

15   BY MR. SCHACHTER:

16   Q.   Now, we know that Ms. Wozniak spoke to Ms. Trivedi about

17   the dosage because of the messages that exist.

18          MR. SCHACHTER:  And, Your Honor, we offer -- move to

19   admit 74 -- well, I think it's actually already in evidence.

20   7452 at page 42.

21          THE COURT:  7 --

22          MR. SCHACHTER:  7452.  This is in evidence already.

23   We've already been talking about this document.

24          MS. GREEN:  And subject to a motion to strike.

25          MR. SCHACHTER:  Thank you.  Okay.

1    BY MR. SCHACHTER:

2    Q.    And do you see where Ms. Trivedi writes (as read):

3            "I did as you suggested and for the last five to

4        six days of my last prescription, I doubled the

5        dosage to 10 milligrams and it has been extremely

6        effective.  The side effects, dry mouth, dry lips,

7        were same they were on 5 milligrams and have been

8        very manageable so far.  If you can refill for

9        10 milligrams, that would be great."

10       You saw that?

11   A.    I did.

12   Q.    Okay.  And this -- well, this suggests that Ms. Wozniak

13   had recommended that she increase her dosage from 5 to 10; is

14   that correct?

15   A.    I'm sorry.  I don't understand.  I'm looking for -- I"m

16   looking at a text from the patient.  I don't see any text from

17   Ms. Wozniak.

18   Q.    That's fine.

19       You saw no message from Ms. Trivedi that after this

20   indicates that she had any complaints about the medication that

21   she had been prescribed?

22            MS. GREEN:  Objection.  Calls for speculation.  And

23   foundation.

24            THE COURT:  Okay.  We're talking about, first of all,

25   7452 --

1          MR. SCHACHTER:  7452.

2          THE COURT:  You're saying -- Ms. Scott tells me it's

3   not been admitted.

4          MR. SCHACHTER:  Oh, I apologize.  We move to admit it.

5   It's that same document we were looking at with the ASRS.

6          THE COURT:  Okay.  Admitted subject to a motion to

7   strike.

8       (Trial Exhibit 7452 received in evidence.)

9          MR. SCHACHTER:  Okay.  Thank you.

10          THE COURT:  Okay.  So what else?

11          MR. SCHACHTER:  Okay.

12          THE COURT:  Moving ahead.

13   BY MR. SCHACHTER:

14   Q.   Are you aware that Ms. Trivedi stayed at this 10-milligram

15   dosage for the remainder of her care?

16   A.   I don't recall.  I'd have to see the Excel spreadsheet.

17   Q.   Okay.  You did not see any records in which a woman named

18   Ruthia He --

19          THE COURT:  We've established this.  He's seen no

20   records of Ruthia He.

21       He's never spoken to Ruthia He.  He hasn't spoken to the

22   providers.  He hasn't spoken to the patients.  Okay?

23          MR. SCHACHTER:  Okay.

24          THE COURT:  As to all -- is that true of all 16?

25          THE WITNESS:  Ruthia He and Dr. Brody were on some

1    e-mail or Slack correspondence concerning a long list of

2    auto-refills, which is an issue that hasn't come up.  So I did

3    see their names on several e-mails or Slack messages concerning

4    auto-refills, or the medical review of a particular patient

5    about a decompensation and whether the patient should be paused

6    or discharged or what.

7         That's the extent, but, Your Honor, I can't recall

8    specific patients.

9              THE COURT:  Okay.

10             MR. SCHACHTER:  Let me just ask one clarifying

11   question then with respect to Ms. Trivedi.

12   BY MR. SCHACHTER:

13   Q.   Just so clarify, you saw no evidence of Ruthia He telling

14   a provider what to prescribe or pushing a patient to demand a

15   higher dosage of drugs; correct?

16   A.   Correct.

17             MR. SCHACHTER:  I have no further questions.  Thank

18   you very much, Dr. Goodman.

19             THE COURT:  Okay.  Ladies and gentlemen, we're going

20   to take our noon recess.  We'll be in recess until a quarter of

21   one.

22        Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.

25        I assume you have no questions?

PROCEEDINGS

1          MS. NECHAY:  I'll take the recess to contemplate but

2    in all likelihood, Your Honor --

3          THE COURT:  Okay.  Thank you.

4       You're excused.

5                    (The jury leaves the courtroom.)

6      (Proceedings were heard out of the presence of the jury.)

7          THE COURT:  Okay.  We're in recess.

8          MS. BELL:  Your Honor, we did have this issue with

9    respect to the second witness that we can take up after the

10   lunch break or whenever Your Honor --

11         THE COURT:  Okay.  This witness is excused.  I'll see

12   you at 12:45.

13      What is the issue as to the next witness?

14      Well, okay.  Let's get this witness out and then we'll

15   have a discussion.

16         MS. BELL:  Thank you, Your Honor.

17                    (Witness steps down.)

18         THE COURT:  Okay.  Ms. Green, how long do you

19   intend -- what's your expectation as to your redirect?

20         MS. GREEN:  I want -- I'm hoping it's going to be

21   quick.  I mean, definitely less than 30 minutes.  I'm hoping

22   sooner.

23         THE COURT:  I'm sorry?

24         MS. GREEN:  Definitely less than 30 minutes.  I'm

25   hoping --

PROCEEDINGS

1           **THE COURT:**  Okay.  That's all I need to know.  I don't

2    need to -- the answer is less than 30 minutes.  That's the

3    answer.

4           **MS. GREEN:**  That's my hope.

5           **THE COURT:**  Very good.

6        Okay.  Let's turn to this now.  I'm sorry.  Who is the

7    next witness?

8           **MS. BELL:**  So, Your Honor, this is a young man who was

9    a friend of Ms. He's.  He was a consultant at Done for a brief

10   period of several weeks in November to December of 2022, and

11   there are two issues respecting his testimony.  One relates to

12   the two letters Your Honor has there from Fenwick from

13   Mr. Steskal.  But, in effect, there are a number of privileged

14   communications.  It's the company's privilege.  They relate to

15   communications between our client and this witness during the

16   period that he was a consultant for Done.  The company has

17   asserted privilege over these records, which were inadvertently

18   produced by the witness himself.

19       So, in other words, the witness has his own lawyer,

20   received a subpoena from the Government, produced messages in

21   response to the subpoenas, and the company is asserting

22   privilege over those records.  And as we explained by

23   Mr. Steskal, the issue is he did not understand previously

24   during the filter team process that the references in these

25   particular records produced by the witness relate to

PROCEEDINGS

1    communications with or about legal advice provided by Done's

2    counsel.

3        And so Mr. Steskal is now clarifying that with that

4    understanding, which is disputed, the Government agrees that

5    these communications relate to Done's counsel's advice.  And

6    Mr. Steskal is now asserting privilege over those

7    communications.

8        It's our position that this testimony should not be

9    elicited and these records should not be shown.  And to the

10   extent the Government disagrees, as they do, then that seems to

11   be something that will need to be briefed.

12       If they're taking the position that somehow Mr. Steskal's

13   assertion of privilege over these records was waived, then

14   Mr. Steskal will require an opportunity to address that and it

15   would not be proper for the Government to proceed to proffer

16   those privileged materials.

17       That's one issue.  I'll wait on the second one.  And there

18   was a question.

19       **THE COURT:**  Timeout.  Okay.  Let's have -- I'm looking

20   at in the context of the -- I'm looking at a letter of

21   November 4th.  I guess that's yesterday.

22       **MR. FOSTER:**  Yes, Your Honor.

23       **THE COURT:**  Okay.  I'm trying to -- there are four

24   bullet points.  Four purported privileged communications.

25   Okay.

PROCEEDINGS

1    And is it the intention of the Government to elicit any

2  one of those four?

3         **MR. FOSTER:**  Yes.

4         **MS. GREEN:**  Yes.

5         **THE COURT:**  Okay.  All right.  Which one -- are you

6  eliciting all of them or one of them or -- which do I have to

7  look at?  All of them?

8         **MR. FOSTER:**  All of them, yes.

9         **MS. GREEN:**  All of them, yeah.

10        **THE COURT:**  Okay.  All right.  Now, would you

11 explain -- now, each of them says something to the effect --

12 well, three of them -- three of them give the opinion that the

13 lawyer believes that the client is crazy, and the fourth says

14 that the lawyer gave him advice -- or the lawyer has given

15 advice but that the recipient of the -- doesn't -- I don't know

16 who this person is talking to.

17        **MR. FOSTER:**  Sure.  Let me clarify, Your Honor.

18    So Mr. Prasad is a personal friend of the defendant.  So

19 there's information disclosed to him in his capacity as a

20 friend.

21    As your Court is aware, there's also a privilege protocol

22 entered into and agreed to by the parties in this matter that

23 sets forth how to deal with potentially privileged material.

24    So these specific documents with these quotations were

25 provided to Done's lawyers by the Government filter team.

**PROCEEDINGS**

1    Done's lawyers, on February 3rd, 2025, declined to assert a

2    privilege over them pursuant to the discovery protocol and they

3    were then provided to the Government pursuant to that binding

4    protocol.

5         **THE COURT:**  Okay.  Absent the production, is it the

6    Government's position that these documents -- that these

7    communications are or are not privileged?

8         **MR. FOSTER:**  They may not be privileged.

9         **THE COURT:**  They are not privileged?

10         **MR. FOSTER:**  They may not be.  They --

11         **THE COURT:**  Well, I don't know what that means.  Do

12    you mean they may be?  I mean, first --

13         **MR. FOSTER:**  There's --

14         **THE COURT:**  It's an easy task.  The way I go about it

15    is -- make a determination as to whether or not the

16    communication is privileged.  If I determine it is not

17    privileged, then that's the end of the inquiry.

18         Then, if I determine it is privileged, I have to then

19    figure out whether it was waived.  If it was waived, that's the

20    end of it.

21         However, if it was waived inadvertently, that's the third

22    inquiry I must make.  So I'm going to sort of do it by one,

23    two, three, because I don't know how else to do it.

24         And you've answered one.

25         **MR. FOSTER:**  Yep.

PROCEEDINGS

1          **THE COURT:**  You said -- well, not really.  You said it

2   may be privileged.  So I think I have to hear some discussion

3   as to whether or not these communications are privileged.

4          **MS. BELL:**  May I address that?

5          **MR. FOSTER:**  Yes, I don't think they are.  And the

6   witness is a friend, a personal friend, so legal communications

7   shared with a personal friend would not remain privileged.

8          **THE COURT:**  Well, can I understand the communications

9   a bit more?

10         **MR. FOSTER:**  Yeah.

11         **THE COURT:**  Is the communication -- it says -- the

12  communication, I understand, is a communication from the

13  witness to a defendant and what that witness is saying, or at

14  least there's an assumption, because maybe they're not saying

15  it, but there's an assumption that the witness -- maybe this is

16  untrue -- in other words, I guess there are a lot of

17  possibilities.

18      Number 1, the witness could have had a conversation with

19  the lawyers.  I don't know whether that happened.

20      Number 2, the witness could have had a conversation with

21  the recipient of the e-mail in which the recipient of the

22  e-mail -- I think it's the defendant -- says, "My lawyers tell

23  me X."  Or, "I've heard from my lawyers X."  So she is

24  disclosing what she has heard from a lawyer to a third party.

25  And then, at that point, you -- you -- it is your opinion that

1   the privilege has been waived by the disclosure?

2       Or is it your opinion that it hasn't been waived in that

3   disclosure but rather that it was -- well, I don't know.

4           **MS. BELL:**  Can I address the first --

5           **MR. FOSTER:**  It was -- yes, it would be waived by that

6   disclosure.  But then also by the filter protocol process, the

7   whole purpose of which is to provide certainty before trial.

8   And, of course, these exhibits have been available to the

9   Defense, and the first time we heard about this, you see the

10  date of the letter.

11          **MS. BELL:**  May I, Your Honor?

12          **THE COURT:**  Well, I want to think about what counsel

13  is saying.

14      Go ahead, Ms. Bell.

15          **MS. BELL:**  Thank you, Your Honor.

16      So, first of all, the at-issue communications were during

17  and in the course of Mr. Prasad's several-week period of

18  employment at the company as a consultant focused on executive

19  recruiting.

20      The conversations came up in the context of his role in

21  trying to find a new chief operating officer and the

22  discussions were in the context of the difficulties that the

23  negative press was posing in recruiting.

24      And so the communication, it was our client, Ms. He,

25  relaying to Mr. Prasad advice of Done's counsel that she had

1    obtained, and it was in the course and in furtherance of his

2    duties and that's the company's position as well.

3        The issue -- so on the first point, we believe that

4    they're privileged for that reason.  We don't disagree that if

5    this had been prior to his employment and they had been

6    discussing this as friends, that that indeed would have waived

7    the privilege.  It's given the date of the communications and

8    the context and the fact that he was actually working there.

9        **THE COURT:**  But it does appear -- it does appear that

10   it's privileged.

11       **MS. GREEN:**  I think we need to clarify that point

12   because I actually think that misstates the record.

13       My understanding from this witness is he is a personal

14   friend of Ruthia for a long time.  He does not recall whether

15   Ms. He talked to him about this before his period of employment

16   as a consultant or during or after.  But regardless -- so that

17   is not a set point.

18       He's also an outside consultant, not an employee.  And --

19       **THE COURT:**  When is it?

20       **MS. GREEN:**  It's on --

21       **THE COURT:**  You have a date of a communication.

22       **MS. GREEN:**  So this -- the communication itself was in

23   December 2022, which is -- and I think Your Honor has to

24   understand, the communication is a message written from

25   Mr. Prasad to Defendant He.  So that message was written in

1  December 2022, but he is reporting in the message what her

2  lawyers -- what Defendant He has communicated to him previously

3  about her lawyers' view.  So I don't think it's as clear as

4  what Ms. Bell tried to say, that Ms. He communicated about the

5  lawyers during the period of employment.

6       THE COURT:  You don't think she has -- but I think

7  it's still privileged.

8       Okay.  So I'm working with X.  And I tell X the lawyer

9  said something.  And X leaves the firm, leaves the employment

10 months later.  And then writes back to me -- writes back to me,

11 your lawyer told you X -- told you something -- I use X and Y,

12 not helpful.  But the lawyer has written back.  Well, that

13 doesn't mean it's not privileged.  I mean, it's in the mind of

14 the -- if what happened was that he was given information at a

15 time that he was not in the -- that -- pardon me.  That he was

16 in the employment of X, I think it remains privileged on that

17 basis alone.

18      MS. GREEN:  And, Your Honor, I think that's where --

19 what I was trying to make clear.  It's not clear that he was

20 given this information when he was employed by Done.  It could

21 well have been before.

22      THE COURT:  Ms. Green, you've got the witness, you're

23 going to put him on the stand.  And before you put him on the

24 stand, you should -- you should know.  Have you talked to him?

25      MS. GREEN:  I spoke to his lawyer, and his --

1          THE COURT:  Well, that's great.

2          MS. GREEN:  His best recollection is --

3          THE CLERK:  Wait a minute.  I can't believe it.  I

4    mean, really, you're going to put on a witness that you've

5    never talked to?

6          MS. GREEN:  No.  We've talked to -- to Mr. Prasad?

7          THE COURT:  Yeah.

8          MS. GREEN:  Yeah, we've talked to him.

9          THE COURT:  Well, did you ask him when he got this

10   information?

11         MS. GREEN:  He doesn't recall.

12         THE COURT:  Oh, well, then he doesn't recall, but he

13   was within the -- he was an employee within the shadow.  I

14   mean, I think you have to establish -- and it's the burden of

15   the Government -- the burden is on the Government when there's

16   a doc- -- it's ostensibly privileged.  It's talking about

17   communications from a lawyer, it's talking about the subject

18   matter of legal advice and so forth, so it's -- it has at least

19   a presumption in my mind that it's privileged.

20        Now, if you -- therefore, the burden is on the Government

21   to establish -- if you're going to establish an exception to --

22   that is an exception to -- pardon me.

23        If you're going to establish the fact that the privilege

24   doesn't attend to these communications, you mush establish

25   that.  And maybe I've got it backwards, but I've got it -- I've

PROCEEDINGS

1    got it good enough.  And that's something that you have to do.

2        If he says "I can't remember," I don't -- that doesn't --

3    and he was in a position where he held a -- a position to which

4    the privilege would have -- would attend to him as well as to

5    Ms. He, I think the burden is on the Government.

6            MS. GREEN:  Your Honor, I understand that point.

7        May I raise a second point?  And I hear you on that point.

8        I also don't believe that this is -- communications are

9    only privileged if they pertain to legal advice.  And if

10   Your Honor looks at the four statements -- I also don't believe

11   a statement -- so Ms. Bell's context about other things like --

12   I don't think that's relevant.

13       What the statement here is -- is your law firm says

14   Dr. Brody is crazy, your own law firm is calling Dr. Brody

15   crazy, that isn't legal advice either.

16           THE COURT:  I don't know what it is, but it's not

17   coming in.

18       Next.

19           MS. BELL:  Thank you, Your Honor.

20               (Recess taken at 12:16 p.m.)

21               (Proceedings resumed at 1:02 p.m.)

22     (Proceedings were heard out of the presence of the jury.)

23           THE COURTROOM DEPUTY:  Come to order.  Court is now in

24   session.

25       You may be seated.

```
 1              THE COURT:  Is it something that I have to address
 2    with this witness?
 3              MS. BELL:  No.
 4              THE COURT:  Thank you.
 5         Bring in the jury.
 6                   (The jury enters the courtroom.)
 7         (Proceedings were heard in the presence of the jury.)
 8              THE COURT:  Please be seated.  Let the record reflect
 9    all jurors are present.  The parties are present.
10         You may proceed.
11              MS. GREEN:  Thank you, Your Honor.
12                     REDIRECT EXAMINATION
13    BY MS. GREEN:
14    Q.   Good morning, Dr. Goodman.
15    A.   Good afternoon.
16              MS. GREEN:  Good afternoon, members of the jury.
17    BY MS. GREEN:
18    Q.   Dr. Goodman, you were just cross-examined for, I believe,
19    almost 11, maybe 12 hours, for which approximately the first
20    7 hours, I believe, didn't actually even relate to Done.
21         Did any of these topics you discussed with Mr. Schachter
22    change your opinion that what you saw with respect to Done was
23    a model of subscription for prescription, to use your words,
24    not the delivery of actual medical care?
25    A.   Correct.  And the most notable aspect of this is the PDMP
```

which is a template text inserted monthly in patients' charts
attempting to document that the patient's been assessed,
they're stable, they don't have side effects, and they don't
request a face-to-face appointment.

As I mentioned earlier in the testimony, there are 285
medical notes, 233, 82 percent, are template texts without any
verification from a face-to-face appointment with a patient,
which goes to speak to -- goes to speak to my opinion that this
is a platform that prescribes medications on a subscription
basis.

And the basis of saying that is if you pull up the Excel
spreadsheet on any one of the patients and you go across Row 4,
you will see the terms subscription, auto-refill, and
membership.

Those are terms that are used for a business model, not a
medical care model.

Q.    Have you seen anything like you saw with respect to Done's
practice in your 40 years of clinical experience?

A.    No.  In fact, my professional opinion, my expert witness
opinion is, I didn't even understand that it was capable to
call this platform a medical care delivery platform.

Q.    You were asked a lot of questions on cross yesterday
about -- it may have been even Monday at this point, sorry,
about topics like under-diagnosis of ADHD, that ADHD is a
serious illness, that initial appointments can be expensive.

 1    Did any of those issues legitimize giving Schedule II

 2   controlled substances to individuals that do not have ADHD?

 3   **A.**    No.  I'm a proponent of access to care.  I think there's a

 4   great need for access to care.  Telehealth provides increased

 5   access to care.

 6    So I'm not in -- in dispute over the platform, whether you

 7   get your care delivered by a video session, a phone session, an

 8   in-person session is not the issue.  The vehicle of delivery is

 9   not the issue, the quality of care is the issue.  Following

10   usual course of professional practice, using evidence-based

11   decision-making, doing a comprehensive psychiatric evaluation,

12   fulfilling the five criteria of making a diagnosis of ADHD.

13    And it's even more important in ADHD because the

14   medications we use are controlled drugs.  There are specific

15   regulations by the controlled substance act which dictate how

16   these prescriptions are written.  The fact is you cannot write

17   a refill for controlled drugs and yet the Done platform has an

18   auto-renewal option for their members.

19   **Q.**    And you said you're a proponent of access to care and

20   telehealth can sometimes provide that.

21    From what you saw with respect to Done, did you see Done

22   providing access to care or access to pills?

23   **A.**    So it was a vehicle of access to pills.  Access to care

24   would mean that you're getting a standard of care of medical

25   practice.  Of the 16 patients, not a single one fulfilled

1    diagnostic criteria.  80 percent were 20 minutes or less.

2         You cannot -- it is impossible to do a comprehensive

3    psychiatric evaluation.  And 88 percent ended up on Adderall

4    and Adderall XR with follow-ups that were so infrequent it -- a

5    patient could go a year, year and a half, over two years

6    without any blood pressure or pulse and having prescription

7    doses dictated at the request of the patient and prescribers

8    were acquiescing without face-to-face follow-up in regards to

9    assessing how those increased doses were helping.

10        Patients suffered.  Their safety suffered.  Patients

11   decompensated.

12        I'm not drawing a causal relationship between their

13   prescription and their psychiatric illness.  But to be

14   psychiatrically hospitalized is a devastating and frightening

15   occurrence.  If there were face-to-face follow-ups, you could

16   have tracked those symptoms and hopefully avoiding or

17   circumventing the deterioration of the patient's mental state.

18   Q.   Mr. Schachter talked to you about the diagnostic criteria

19   for ADHD.  You spent a fair amount of time on that.  And

20   I believe you talked about how if every one in this room was

21   given Adderall, they could initially report a feeling of

22   improved concentration, perhaps improved focus.

23        Do you remember that?

24   A.   I do.

25   Q.   But there are also risks associated with giving stimulants

1    to people who do not have ADHD; correct?

2    **A.**    Correct.

3    **Q.**    And could you explain to the jury what providing

4    stimulants to people who do not have ADHD, so every one in this

5    courtroom, what types of risks could result?

6    **A.**    So you break out the risks in psychology, psychiatric, and

7    medical.

8        The medical risks are increased heart rate, increased

9    blood pressure.  If patients have medical conditions that

10   aren't being monitored.  Drug interactions.  One of the

11   patients was on phentermine which is a C-IV medication that's a

12   stimulant for diet.  If you add stimulants of ADHD with

13   phentermine, you run the risk of getting elevations in blood

14   pressure, pulse, tachycardia, headaches, tremors.  Again, if

15   you have medical illnesses.

16       So that's medical.

17       Psychiatric, you can become irritable, impulsive,

18   agitated, poor sleep, you can evolve into mania and psychosis.

19       Medical, psychiatric.

20       Psychological, if you come to believe that the positive

21   response to the medication proves that you have ADHD, now

22   you're going to frame your psychological experience and your

23   life in regards to having ADHD.  And what the next provider

24   comes by and says you never had ADHD, there's no legitimacy for

25   this diagnosis, you have to reframe your whole state of mind.

1    And the fourth element is social.  You get a diagnosis of

2    ADHD inaccurately, eradicating that diagnosis from your medical

3    record almost impossible.

4    Now, you're obligated to report it.  So if you want to be

5    a pilot, air-traffic controller, go into the military, that

6    diagnosis, even if incorrect, now has ramifications on the

7    future of your life for decades.

8    **Q.**    Thank you.

9    And you mentioned it could lead to poor sleep.  And just

10   to take one example, could it also lead to insomnia and

11   increased anxiety?

12   **A.**    Anxiety, increase in anxiety, panic attacks.  It can lead

13   to substance use disorders over a period of time as you grow

14   accustomed to taking it more and more for performance

15   enhancement.

16   As I mentioned in my testimony, there was a recent study

17   published, peer-reviewed, scientific journal, telehealth risk

18   of developing substance abuse is higher than a face-to-face

19   initial evaluation.

20   The other aspect of this is misinformation that viewers

21   watch on the Internet increases the likelihood of seeking care

22   because they believe they have ADHD.

23   If they are then seen on a platform that inadequately

24   evaluates, comes to the conclusion I have ADHD and puts you on

25   medication -- the flow of people into the telehealth increases

1    and now those patients become diagnosed with ADHD, get

2    prescribed medications, and the consequences are everything

3    that I just laid out.

4    **Q.**   Mr. Schachter showed you the DSM-5.  You spent a fair

5    amount of time on it.

6         Was there anywhere in the DSM-5 where it said you can

7    prescribe controlled substances to make them feel better as a

8    medication trial even if the patient doesn't meet the criteria?

9    **A.**   So the DSM-5 is a diagnostic criteria.  It does not lay

10   out any medical recommendations as to how a disorder gets

11   treated.

12        But if a diagnosis of ADHD is not made accurately, there's

13   insufficient evidence, because the evidence was not obtained --

14   the absence of evidence here doesn't allow you to make a

15   diagnosis of ADHD unspecified.

16        Unspecified means that the comprehensive evaluation has

17   been done and the conclusion has been we're not fulfilling one

18   of the five criteria.

19   **Q.**   You were asked a lot of questions about your practice

20   versus best practice versus the usual course of practice, so I

21   just want to reorient on that.

22        When you were testifying on direct about your opinions,

23   were those opinions as to the usual course of practice or best

24   practice only expected by a certain subset of physicians?

25   **A.**   So that's a good question, because there's a conceptual

1    difference between usual course of professional practice and

2    best practices.

3        Usual course of practice -- and when I was speaking today

4    in my testimony, it was usual course of professional practice,

5    not what I do.  I'm a specialist.  I operate at a different

6    level with a different expertise.

7        But the usual course of practice is what other clinicians

8    are doing in the community.  And to say that I'm an expert and

9    I have no experience in what other people are doing is simply

10   not true.  Hundreds of lectures, I've talked to hundreds of

11   people, I've published peer-reviewed scientific journal

12   articles on specifically the diagnosis and treatment of ADHD in

13   primary care, so I know what people are doing in primary care.

14       Is there variability across specialties?  Sure.  Training.

15   Everybody in the medical field, though, has training in mental

16   health evaluations.

17       So that's my answer.

18   Q.   You were providing opinions as to the usual course of

19   practice?

20   A.   Correct.

21   Q.   And Mr. Schachter made some point about how you hadn't

22   frequently used the term "usual course of practice" in your

23   past experience, but Dr. Goodman, you aren't typically a

24   testifying expert in litigation; correct?

25   A.   No.  It's an honor and privilege to be here as an expert

1    witness.  And this is the only case I've testified in a federal

2    court and my last forensic expert opinion was rendered

3    eight years ago for a malpractice case for a psychiatrist.

4    Q.   And you are very familiar with the term standard of care?

5    That's something used more frequently in the medical field;

6    correct?

7    A.   Correct.

8    Q.   And that term is similar to usual course of practice?

9         MR. SCHACHTER:  Objection.  Objection, Your Honor.

10   That calls for a legal conclusion.  It's completely

11   inappropriate.

12        THE COURT:  Sustained.

13        MS. GREEN:  I can move on, Your Honor.

14   BY MS. GREEN:

15   Q.   When you were providing your opinion as to -- that an

16   adequate initial evaluation cannot take place in 25 minutes or

17   less, was that a standard you were applying only to

18   board-certified physicians with 40 years of experience or is

19   that a basic usual course of practice?

20   A.    It's an issue of time.  Think about all that I've told you

21   that has to be assessed and solicited from a patient and

22   imagine you can do that in 25 minutes.  It's impossible to do

23   that in 25 minutes.

24   Q.   And the notion that follow-up appointments are regularly

25   required when prescribing Schedule II controlled substances, is

1    that a notion well understood in the usual course of practice?

2    **A.**    Absolutely.  These are controlled drugs for which a

3    certain degree of heightened vigilance is necessary in order to

4    assess the response of the medication, the side effects, change

5    in medical status, and whether the patient is taking

6    compliantly or is now misusing, abusing, or diverting the

7    medications.

8    **Q.**    And is there a well-established usual course of practice

9    with respect to how ADHD should be diagnosed and treated in the

10   U.S.?

11   **A.**    There is a well-established, not controversial, usual

12   course of professional practice.  It's documented in hundreds

13   of articles over the last 20 years, some of which I have

14   contributed to as well.

15   **Q.**    And does this exist despite the fact that there are no

16   published guidelines by this entity that Mr. Schachter told you

17   about, APSARD?

18   **A.**    So there's a difference between usual course of practice,

19   which is what clinicians do in general.  Clinical practice

20   guidelines is a very rigorous process where a task force has to

21   be assembled.  The conflicts of interest have to be vetted.  So

22   I, for example, was on the steering committee and the -- I was

23   the chair of the medical subcommittee.  My COIs, conflicts of

24   interest, had to be vetted so I have no relationships with any

25   company that has a commercial product, including -- including

 1  pharmaceuticals.

 2      But clinical practice guidelines is an academic, rigorous

 3  exercise undertaken by a professional organization, which is

 4  why we don't call the Veterans Administration policy or the

 5  Bureau of Prisons' policy on this a clinical practice

 6  guideline, because it's not widely disseminated and it's not

 7  developed as a function of a professional organization.

 8  **Q.**   You were shown on cross-examination some articles, a blog

 9  post, some comments on websites.

10      Does one comment in one article or one note in one blog

11  post dictate the usual course of practice?

12  **A.**   No, no more than the page out of *Moby Dick* will tell you

13  what the story is.

14  **Q.**   You spoke to Mr. Schachter about advertisements and about

15  that study about 52 percent of TikTok videos being misleading.

16      Do you remember that?

17  **A.**   I do.

18  **Q.**   Okay.  And Mr. Schachter also talked to you -- or showed

19  you, in fact, an article that Done put on its website at one

20  point in time called "ADHD Misinformation and Social Media."

21      Do you remember that?

22      I can pull it up to refresh you.  Mr. Schachter showed you

23  Exhibit 5382.  I think we can pull it up on the screen as well,

24  Dr. Goodman.

25  **A.**   Okay.

1  Q.   If you go -- do you remember Mr. Schachter -- you talked

2  about the study about the TikTok videos and then Mr. Schachter

3  showed you this post on the Done website.

4       Do you remember that?

5  A.   Yes.

6  Q.   Okay.

7  A.   Yes.

8  Q.   Have you ever seen a Done ad?

9  A.   I have.

10 Q.   What was your reaction to it?

11 A.   The ad was a picture of a woman standing on a concrete

12 platform, looked like outside an office building, and the text

13 was, "Your Adderall is waiting."  It was so appalling, I

14 clipped it and used it in two presentations in 2022.

15 Q.   Why?

16 A.   As an example of how marketing -- let me rephrase.  As an

17 example of what I saw marketing doing in regards to recruiting

18 patients with the seduction of receiving an Adderall

19 prescription.

20 Q.   Mr. Schachter spent a lot of time talking to you on cross

21 about topics for which you had not offered an opinion in your

22 direct testimony.  For example, dosage levels, Adderall IR

23 versus XR, ADHD unspecified, mild ADHD, off-label uses of

24 Adderall.

25      Do you remember all those topics?

1    **A.**    I do.  I do.

2    **Q.**    Did any of the discussion on those topics change your

3    opinion as to the legitimacy of the Done prescriptions?

4    **A.**    Didn't change my opinion at all.

5    **Q.**    Right.

6    **A.**    None of the 16 patients had an adequate evaluation and,

7    therefore, everything that followed was not a legitimate

8    medical purpose.

9    **Q.**    Yeah.  And Mr. Schachter, focusing on some of those

10   topics, spent much of cross talking to you about dosage levels

11   generally and with respect to some of the Done patients and FDA

12   limits, et cetera.

13        Thinking back to your direct testimony, did you recall

14   giving any opinion as to the appropriateness of the dosage

15   amounts Done prescribed?

16   **A.**    I was not asked by the Government to opine on dosing

17   titration, chemical equivalence, clinical equivalence,

18   pharmacokinetic curves, nothing at all.

19   **Q.**    Were any of your opinions as to whether the prescriptions

20   to the Done patients were written for a legitimate medical

21   purpose within the usual course of practice premised on the

22   dosage level of the prescription?

23   **A.**    No.  The premise of a legitimate medical practice is an

24   accurate and -- an accurate diagnosis, fulfilling the

25   diagnostic criteria for DSM-5.

GOODMAN - REDIRECT / GREEN

1    **Q.**    So whether a patient got 5 milligrams of Adderall,

2    10 milligrams of Adderall 15 milligrams of Adderall, did that

3    make any difference to your opinion?

4    **A.**    No.  It doesn't matter.  It doesn't matter if I steal a

5    shirt or I steal a hundred million dollars, I'm a thief.

6    **Q.**    Mr. Schachter also spent a fair amount of time talking to

7    you about these off-label uses for Adderall and he talked about

8    things like binge eating and fatigue and daytime sleepiness.

9        When you looked at the Done members, were any of them

10   being given stimulants for these off-label uses that

11   Mr. Schachter was talking to you about?

12   **A.**    Not that was documented in a medical record.

13   **Q.**    Okay.  So did Mr. Schachter's discussion of off-label uses

14   of ADHD in any way change your opinions?

15   **A.**    No.

16   **Q.**    You were asked many questions on cross about this

17   diagnosis of mild ADHD, you know, this subset within the

18   criteria.

19       Do you recall that?

20   **A.**    I do.

21   **Q.**    First of all, of the 16 Done members you reviewed, did any

22   of them receive a diagnosis of mild ADHD?

23   **A.**    No.  This is what we call a specifier, mild, moderate,

24   severe.  There was no indication of mild, moderate, severe in

25   the 16 records I saw.

GOODMAN - REDIRECT / GREEN

1   Q.   And you testified on cross, I think just what you

2   mentioned here, that mild ADHD is just subsumed under the

3   diagnosis criteria for ADHD and all diagnostic criteria still

4   must be met; correct?

5   A.   Correct.

6   Q.   Do you recall -- switching topics.  Mr. Schachter talked

7   to you about Exhibit 7605, which I can pull up for you.

8          MS. GREEN:  Page 5, please, Ms. Braga.

9   BY MS. GREEN:

10  Q.   And looking at that third paragraph down, Mr. Schachter

11  read to you that sort of first sentence, or second sentence

12  about clinicians being cautious when excluding ADHD based on

13  the onset of symptoms over 12 years of age.

14       Do you see that?

15  A.   I do.

16  Q.   But right below that, this article also says that in most

17  cases, the origin of symptoms can be linked to childhood and

18  the escalation over time can be related to changing

19  environment, et cetera.

20       And then goes on to say (as read):

21          "It is critical to perform a thorough

22       differential diagnostic assessment prior to

23       diagnosing adult onset ADHD.  Notably, research

24       suggests that over 90 percent of apparent late onset

25       ADHD cases are ruled out once differential diagnosis

1          procedures are applied."

2          Do you see that?

3    A.    Yes, I do.  It's correct and I would agree completely with

4    that.

5    Q.    Okay.

6          MR. SCHACHTER:  Your Honor, I just -- I have no

7    objection to it, but I -- this -- just want to make sure this

8    document is now in evidence because it's being displayed by the

9    Government.  That's certainly fine with us.

10          MS. GREEN:  I'm sorry.  I do --

11          MR. SCHACHTER:  7605.

12          MS. GREEN:  It was admitted?

13          THE COURTROOM DEPUTY:  Yesterday.

14          MS. GREEN:  Oh.

15          MR. SCHACHTER:  Very good.  Thank you.

16          MS. GREEN:  I guess it was admitted yesterday.

17          THE COURT:  What?

18          MS. GREEN:  Ms. Scott said that was admitted

19    yesterday.  I had only been intending to show the witness, but

20    that's fine.

21          THE COURT:  Okay.  It's in evidence.

22          MR. SCHACHTER:  Thank you, Your Honor.

23    BY MS. GREEN:

24    Q.    With respect to ADHD unspecified, which was the topic you

25    spoke to Mr. Schachter about, are there criteria that still

1    must be met under the DSM-5 in order to receive that diagnosis?

2    A.    Yes.

3    Q.    It's not just a diagnosis you can give in the usual course

4    of practice when your initial evaluation has been limited to

5    25 minutes and you haven't done an adequate assessment;

6    correct?

7    A.    Correct.

8    Q.    You and I talked about four specific patients related to

9    charged counts:  Nicholas Chieppa, Vashti Oechsner-Souza,

10   Harlan Band, and Tapasya Trivedi.

11        Did any of them have this diagnosis of unspecified ADHD in

12   their record?

13   A.    No.

14   Q.    Mr. Schachter talked to you about the efficacy of

15   treatment for ADHD and the topic of stimulants being first

16   line.

17        Do you remember that?

18   A.    Yes.

19   Q.    He also talked to you a fair amount about substance abuse

20   patients and stimulants being given to patients with that

21   history.

22        Do you remember that?

23   A.    Yes.

24   Q.    First of all, thinking back to the actual opinions you

25   rendered in your testimony on direct, did you even give an

1  opinion that stimulants should never be given to a substance

2  abuse patient?

3  **A.**    No.

4  **Q.**    Mm-hmm.  And, in fact, was your opinion merely that when

5  dealing with a patient with substance abuse, stimulants might

6  not be the first-line treatment and non-stimulants should be

7  considered?

8  **A.**    Yes.  The choice of whether as a stimulant or a

9  nonstimulant for a person with ADHD and substance abuse is

10  based on the clinical circumstance.  The drug of choice, the

11  degree of use of the medication, the impairment and symptoms of

12  ADHD.  So the -- they're a usual course of professional

13  practice, but the decision on a particular course of action is

14  individualized to the patient's clinical circumstance.

15  **Q.**    And was it also your opinion that if prescribing

16  stimulants to a substance abuse patient more vigilance is

17  required and monitoring is required?

18  **A.**    And so does the DEA emphasize that frequency of follow-ups

19  for high-risk separation situations, like substance use

20  disorders, and telehealth.

21  **Q.**    So did anything that Mr. Schachter discussed with you

22  about substance use and stimulants change your opinions with

23  respect to the Done patients?

24  **A.**    In no way.

25  **Q.**    Mr. Schachter also -- and I don't need to display this to

1    the jury because I'm not sure if it was or -- I don't believe

2    it was admitted.  But he showed you a chart -- and I can show

3    just the witness to refresh you.

4           MS. GREEN:  7534A for just the witness.

5    BY MS. GREEN:

6    Q.    Do you remember Mr. Schachter showing you this chart?

7    A.    I do.  This is my slide.

8    Q.    Mm-hmm.

9           And he talked about the 79 percent -- 79 of adults with

10   ADHD who receive stimulants.

11          Do you remember that?

12   A.    79 percent of adults with ADHD receive amphetamines.

13   Q.    Amphetamines.

14          Does this chart show the percentage of stimulants given to

15   adults where an ADHD diagnosis was made for a legitimate

16   medical purpose in the usual course of practice following an

17   adequate examination?

18   A.    Repeat the question.  A lot of variables.

19   Q.    I'll rephrase the question.  Does this chart show the

20   percentage of stimulants given to anyone who walks through the

21   door claiming they may have ADHD or is it following an actual

22   diagnosis of ADHD?

23          MR. SCHACHTER:  Objection.  Foundation.

24          THE COURT:  Sustained.

25          MS. GREEN:  Can I ask him what this chart shows?

1          THE COURT:  Well -- okay.  Exactly -- okay.  I think

2    that's right.

3      You created the chart?

4          THE WITNESS:  I did.

5          THE COURT:  Okay.  So what was the basis of the chart?

6          THE WITNESS:  The basis of the chart was the

7    prescription data from -- I think it's IQVIA.  There's a typo

8    here.  So it was simply the prescription data.  It doesn't

9    necessarily convey anything about the diagnosis.

10   BY MS. GREEN:

11   Q.   Okay.

12   A.   But most stimulants in the United States are written for

13   ADHD.

14   Q.   Following an adequate evaluation?

15         MR. SCHACHTER:  Objection.  Foundation.

16         MS. GREEN:  I can move on, Your Honor.

17         THE COURT:  I think the question is this:  This --

18   these figures, these statistics, they don't necessarily -- they

19   are based on prescriptions?

20         THE WITNESS:  Correct.

21         THE COURT:  So you're not in a position to say every

22   prescription in the United States was written for a legitimate

23   medical purpose?

24         THE WITNESS:  Was written for ADHD?

25         THE COURT:  Yeah.

1          THE WITNESS:  Yes.  Or -- or for a legitimate medical

2    purpose.

3          THE COURT:  Or for a legitimate medical purpose?

4          THE WITNESS:  I don't -- the data doesn't reflect the

5    diagnosis for which the prescriptions were written.

6          THE COURT:  Right.  All you know is that there were

7    these prescriptions, what the number of prescriptions is.

8    I guess, and what the population is and you do a little math,

9    and that's how you get the figure.

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  That's all.

12    Move on.

13   BY MS. GREEN:

14   Q.   You testified -- moving on.

15         You testified on direct about the categories of

16   information that need to be -- well, sorry.  Direct and cross.

17         On the categories of information that need to be assessed

18   during the initial evaluation to meet the diagnostic criteria.

19         Do you remember that?

20   A.   Yes.

21   Q.   And then on cross, Mr. Schachter asked you a number of

22   questions about very specific questions that you might ask in

23   your interview but some other practitioner might not, and I'm

24   just going to give you one example, he gave you many.  But

25   things like "Do you wet the bed?"  And he pointed out you might

1    ask that and another practitioner might not.

2         Does the DSM-5 set forth every specific question --

3              THE COURT:  That's been covered.  That's been covered.

4              MS. GREEN:  Great.

5              THE COURT:  You can't go back on redirect and have him

6    testify all over again to what he said.

7              MS. GREEN:  I was just referring to cross-examination.

8    Mr. Schachter said --

9              THE COURT:  Makes no difference.

10             MS. GREEN:  Yep.  That's fine.

11             THE CLERK:  That actually makes no difference because

12   it's simply repeating his direct testimony.  And he, in great

13   detail, explained what the DSM is, what -- what -- that there

14   are examples, and so it's covered.  It's covered.

15   BY MS. GREEN:

16   Q.   Mr. Schachter showed you at the beginning of today that

17   video that was given, I think, in a course.

18        Do you remember that?

19   A.   I do.

20   Q.   Okay.  And did you create that video?

21   A.   No.

22   Q.   Did you endorse that video in any way?

23             MS. NECHAY:  Objection.  Asked and answered.  403.

24             THE COURT:  No.  Doctor, just tell us, what was your

25   role with respect to the video.

1    **THE WITNESS:**  So I was asked by Medscape, the

2    organization that does the educational programs, to

3    participate.  I don't actually remember if I was chair of that

4    session or not, but I was asked to participate.

5    In the course of that, they created a video with actors in

6    order to briefly exemplify how an interview would go and what

7    symptoms to focus on in order to judge whether or not those

8    symptoms needed to be followed up.

9    It was simply a short video of a partial example of

10   questions to ask and how the patient may refer to their

11   symptoms.

12   **BY MS. GREEN:**

13   **Q.**   And --

14   **THE COURT:**  So, in other words, you were shown a video

15   of six minutes -- of a six-minute interview.  Does that mean,

16   is it your understanding that a six-minute evaluation is

17   totally proper because you showed this video, which was a

18   six-minute video.

19   **THE WITNESS:**  Yes.

20   **THE COURT:**  "Yes" what?

21   **THE WITNESS:**  Well, so for *The New York Times*, I'm

22   quoted as saying this video was not an adequate evaluation.  It

23   was simply an educational tool.

24   **THE COURT:**  Okay.  Thank you.  That's enough.

25   Enough of that.  Let's go on.  Next subject.

1    BY MS. GREEN:

2    Q.    You were asked by Mr. Schachter about you being present

3    for conversations or -- speaking to patients, speaking to

4    providers, et cetera.

5         Do you remember that?

6    A.    I do.

7    Q.    Did you need to speak to a patient or a provider for those

8    16 Done members that you reviewed in order to form your opinion

9    as to the appropriateness of Done's treatment?

10   A.    So I'm not a legal expert.  I think that it is reasonable

11   to make an interpretation of the course of medical treatment in

12   my role as an expert witness to evaluate the course of the

13   treatment, the appropriateness of the treatment, the nature of

14   the evaluation and everything involved with that.

15        Did I see the patients?  No.  Did I speak to any

16   providers?  No.  But that was not my role here as an expert

17   witness.

18   Q.    And do you feel that you've rendered reliable opinions

19   based on your review of the documentation?

20   A.    I rendered an independent expert report of 80 pages after

21   an extensive review of incredibly complicated, inaccurate,

22   inconsistent, and incomplete medical records.

23   Q.    And to the extent Mr. Schachter was referring to

24   conversations that may or may not have happened amongst a

25   patient and a provider, based on your training and experience,

1   is it a practitioner's training to write down what is covered

2   in their initial evaluations?

3   A.   Certainly.  We're all trained as clinical professionals to

4   document what you have done in the course of the medical and

5   psychological and mental health care of an individual.  It's

6   the only way you have a record.  And that record -- by the way,

7   there are standards established for medical documentation:

8   Accuracy, completeness, and attribution.

9        Attribution is important because every medical record

10  should have a name of the person who put that record in the

11  chart, and attribution is severely absent from the medical

12  records of 16 patients.  So at the end of the day, I don't know

13  who was altering the medical record.

14  Q.   Well, let's focus on some of these patients now.  You

15  spoke with Mr. Schachter about a patient called Brenda Hill.

16       Do you remember that?  That was yesterday.

17  A.   Yes.

18       MS. GREEN:  And let's show Exhibit 1403, page 1.

19  BY MS. GREEN:

20  Q.   Do you recall that in your report, you had written that

21  the initial provider for Ms. Brenda Hill was someone called

22  C. Ejim and then Mr. Schachter asked you where did you get that

23  name from.

24       Do you remember that?

25  A.   I do.

1  Q.   And you said -- Mr. Schachter suggested if you made a

2  mistake, and you said you would not agree to that unless you

3  were shown the Excel file for that patient.

4       Do you remember that?

5  A.   I do.  So just for a clarification, when I looked at these

6  records, I would have to look at the PDF, which is the medical

7  records you would have received had you ted -- the Excel

8  spreadsheet, and then I would have to check the signature at

9  the bottom of the evaluation.  Three checkpoints all had to be

10 consistent.

11 Q.   So I'm going to show you that Excel.  So this was what

12 Mr. Schachter showed you, the name Callista Chika on the PDF.

13         MS. GREEN:  Let's look at Exhibit 1857.

14 BY MS. GREEN:

15 Q.   This is the note in the Excel from that initial evaluation

16 on October 3rd, 2022.

17       Can you tell me what name is written at the end of that

18 note from the provider?

19 A.   Callista Chika Ejim.

20 Q.   C. Ejim?

21 A.   C. Ejim, the person whose name I put down in my report

22 because this is the person whose signature was at the bottom of

23 the evaluation.

24         MS. GREEN:  We can take that down.  Thank you,

25 Ms. Braga.

1      **THE WITNESS:**  So just as a comment, this is an example

2   of what I refer to as incomplete, inaccurate medical records.

3   **BY MS. GREEN:**

4   Q.    You had to look at the Excel as well as the PDFs?

5   A.    This reflects the complexity of having reviewed 16

6   patients, 300 documents that were notably inconsistent across

7   documents so that I couldn't figure out what was true and what

8   was inaccurate.

9   Q.    Mr. Schachter talked to you about a patient called

10  Mr. Band.

11      Do you remember that?

12  A.    Yes.

13  Q.    And he spent a fair amount of time talking to you about

14  what Mr. Band had reported to the provider in that initial

15  evaluation?

16  A.    Yes.

17  Q.    Does a patient's self-report legitimize a controlled

18  substance prescription where the initial evaluation fails to

19  meet the diagnostic criteria?

20  A.    No, it does not.  And there's, as I pointed out, clinical

21  errors in relying solely on the patient's descriptive report

22  without further clinical evaluation and investigation as to how

23  the person is using the particular term.

24      If you use the term "anxiety," I don't know if that's

25  worry anxiety, whether that's tach- -- heart -- increased heart

1  rate, sweating, and tremor, or whether you're agitated because

2  of some medicine you took that morning.

3  Q.   And Mr. Schachter showed you a document about Ms. Rahimi,

4  a CURES order log, and asked you -- or talked to you about

5  whether or not Ms. Rahimi had checked the CURES according to

6  that log.

7       Do you remember that?

8  A.   I remember being asked about that.

9  Q.   Yeah.  Did you render an opinion as to whether or not

10  Ms. Rahimi had or had not checked the CURES, or was your

11  opinion that there were red flags in the CURES that you would

12  have expected to be followed up on?

13  A.   Well, there were red flags in the CURES that were not

14  noted by Ms. Rahimi, so, therefore, I don't know whether she

15  checked and considered them inconsequential or whether the text

16  was inserted in the medical record and Ms. Rahimi never

17  checked.  I simply don't know.

18  Q.   Focusing on another patient, Mr. Schachter talked to you

19  about a patient called Ms. Patricia Li.

20       Do you remember that?

21  A.   Yes.

22  Q.   And it was noted that her initial visit was 31 minutes.

23       Of the 16 Done members, was Ms. Li the only one that had a

24  visit over 30 minutes?

25  A.   Yes.  She had the longest evaluation.

1  Q.    And then --

2          MS. GREEN:  One moment, Your Honor.

3                    (Pause in proceedings.)

4  BY MS. GREEN:

5  Q.    Mr. Schachter then talked to you about that patient had a

6  follow-up one month later and then went 31 months without

7  follow-ups.

8      Do you remember that?

9  A.    I do.  She went 31 months without a face-to-face

10 appointment.

11 Q.    And he showed you the document about follow-up

12 appointments being requested by the nurse but the patient not

13 showing up.  I think he showed you a couple of documents like

14 that.

15     Do you remember that?

16 A.    Yes.

17 Q.    Do you recall testifying about refill policies and how

18 that might set an expectation that a patient can get a refill

19 without a follow-up appointment?

20 A.    Are you asking if I recall testifying on that or --

21 Q.    Yes.  Do you remember testifying about the refill -- a

22 refill -- refill policies that set the expectation that a

23 patient can get a refill without a follow-up appointment?

24 A.    Yes.

25 Q.    And you said one of the concerns was that such a policy

1   could hinder the ability of the provider to practice

2   independently; correct?

3   **A.**    Correct, because the patient gained the expectation that

4   they could simply call in and get their refill, circumventing

5   the clinician, circumventing a follow-up assessment,

6   circumventing the assessment of their psychiatric state and

7   safety of the medication.

8   **Q.**    I want to talk to you about another patient that

9   Mr. Schachter talked to you about, Cheryle Cooke.

10       Mr. Schachter spent a fair amount of time for Ms. Cooke

11  showing you Exhibit 316, which were these messages where the

12  patient requested to increase their dose and then the provider

13  agreed.

14       Do you remember those messages?

15  **A.**    I do.

16  **Q.**    Between March and June 2021, did this patient request

17  dosage increases at least six times that were agreed to by the

18  provider?

19  **A.**    Yes.

20  **Q.**    Okay.  And how many follow-up appointments did she have in

21  that period, if any?

22  **A.**    She had none, which, as I testified before, would not be

23  the usual course of practice.  She has six -- six increases in

24  prescriptions and no one sees her for an evaluation of how

25  she's responding, her safety, blood pressure, or pulse.

1    Q.    And does the fact -- if the patient was saying that they

2    were doing great or they were feeling better, does that somehow

3    legitimize those prescriptions?

4    A.    Absolutely not.  If I'm a substance abuser, I'm always

5    going to tell my provider I'm doing great, I don't have side

6    effects, and I don't need to see you, thank you very much.

7    Here's my monthly prescription; let me have my auto-refill.

8    Q.    Mr. Schachter then --

9              MS. GREEN:  One moment, Your Honor.

10                     (Pause in proceedings.)

11   BY MS. GREEN:

12   Q.    Mr. Schachter then showed you a record that you hadn't

13   seen previously related to an appointment scheduled for

14   May 2025 and one scheduled for June -- 2021, sorry, and

15   June 2021.

16         You remember that?

17   A.    I do.

18   Q.    And those appointments didn't actually happen with the

19   patient; correct?

20   A.    Correct.  The patient canceled.

21   Q.    Mr. Schachter then talked to you about this one

22   appointment that did occur in December 2021, December 19th, so

23   after the mom had reached out about Ms. Cooke's

24   hospitalizations.

25         Do you remember that?

GOODMAN - REDIRECT / GREEN

1    A.    I do.  Mom reached out on August 11th and it was August,

2    September, October, November -- four months later after the

3    patient has been reported by mom to be deteriorating.

4    Q.    And you saw that -- or you discussed with Mr. Schachter

5    that Mr. Falkner at that December appointment still prescribed

6    Adzenys.

7         Do you remember that?

8    A.    Yes, at lower doses.

9    Q.    Did you see a legitimate medical purpose in the usual

10   course of practice for that Adzenys given the course of that

11   patient's decline?

12   A.    Given that she had decompensated and she was psychotic,

13   it's just not the usual course of practice to continue an agent

14   that might be exacerbating a patient's psychosis.

15   Q.    And did you see -- I think you mentioned that when

16   notified of a hospitalization, the usual course of practice is

17   to obtain the hospital records.

18        Do you remember that?

19   A.    I do remember that and that would be because the

20   information conveyed in those records might have circumvented

21   the continued auto-refill of the prescriptions.

22   Q.    And did you see any record in the Done records that the

23   Done providers requested or obtained that?

24   A.    No.  There seems to be -- in the course of 16 patients

25   there seems to be no platform or vehicle to integrate outside

1    records into the patient's medical records.

2    **Q.**    And Mr. Schachter asked you generally about, like, the

3    involvement of Done management in this sort of back and forth

4    about the patient, and you said you weren't sure.

5        I want to show you one document, Exhibit 450, that

6    Mr. Schachter didn't show you, but is admitted.

7        This is one of the mom's outreach in November 27, 2021.

8    This is where the mother is advising her daughter is suffering

9    from Adderall psychosis, threatening state, et cetera.

10       I want to point you to the Done Care Team,

11   jane@donefirst.com recipient there.

12       Do you see that?

13   **A.**    Yes.

14   **Q.**    Do you know whether or not Defendant He has access to that

15   e-mail listserv?

16       **MR. SCHACHTER:**    Objection.    Foundation.    Calls for

17   speculation.

18       **MS. GREEN:**    I asked if he knows.

19       **MR. SCHACHTER:**    Obviously, she knows he doesn't.

20       **THE COURT:**    Sustained.

21   BY MS. GREEN:

22   **Q.**    Let's look at Exhibit 2627 -- 2677, sorry.

23       So we had, just as a reminder, the initial appointment for

24   Ms. Cooke in March 2021, maybe an appointment in July 2021 that

25   wasn't clear, and then we had that December one.

1    Scrolling down to the bottom of this, please, did

2   stimulant prescriptions continue to Ms. Cooke after

3   December 2021?

4   **A.**   Yes.  They continued until -- what is that, June?

5   **Q.**   Yep, June 2022.

6        **MS. GREEN:**  And let's go to the right, please,

7   Ms. Braga.

8   **BY MS. GREEN:**

9   **Q.**   Do they also go back to -- there was the initial one from

10  Mr. Falkner for Adzenys do you see this reverting reversion

11  back to Adderall?

12  **A.**   Yes.

13  **Q.**   And between December 2021 and April 2022, do you recall

14  how many follow-ups Ms. Cooke had, if any?

15  **A.**   There were no follow-ups.  No -- no -- there were no

16  follow-ups.  No face-to-face follow-ups.

17  **Q.**   Usual course of practice after someone's been

18  hospitalized?

19  **A.**   Absolutely not.

20  **Q.**   Mr. Schachter talked to you about Vashti Oechsner-Souza.

21  Do you remember that patient?

22  **A.**   Yes.

23  **Q.**   And he talked to you about this PDMP you reviewed that

24  showed that Dr. Brody had written and filled -- written a

25  script to this patient, and on the same day the patient had

1    filled an Adderall script from another provider.

2        Do you remember that?

3            **MR. SCHACHTER:**  Objection.  That is beyond the scope

4    and we're going to open up to a lengthy inquiry.

5            **THE COURT:**  Sustained.

6    **BY MS. GREEN:**

7    **Q.**   Mr. Schachter talked to you about an individual called

8    Ms. Trivedi.

9        Do you remember that?

10   **A.**   Yes.

11   **Q.**   He talked to you about, I believe, her initial

12   appointment, and then the November appointment that she had and

13   the dosage amount for her script, like Adderall 10 milligrams.

14       Do you remember that?

15   **A.**   Yes.

16   **Q.**   Ms. Trivedi then went two years without a follow-up

17   evaluation; correct?

18   **A.**   Correct.

19   **Q.**   Does the fact that she was only being prescribed Adderall

20   10 milligrams mean that she didn't require follow-ups in the

21   usual course of practice?

22   **A.**   Absolutely not.  If you're prescribed any C2 drug, the

23   usual course of professional practice is to see patients with

24   some regularity in order to assess the clinical benefit, the

25   side effects, the safety, the change in medical status, and

PROCEEDINGS

```
 1   whether or not the patient is taking the medication as

 2   prescribed.

 3            MS. GREEN:  One moment, Your Honor.

 4                    (Pause in proceedings.)

 5            MS. GREEN:  Thank you.

 6            THE COURT:  Okay.

 7            MR. SCHACHTER:  No, nothing further.  Thank you.

 8            THE COURT:  Do you have any?

 9            MS. NECHAY:  No, thank you.

10            THE COURT:  Thank you very much.  You are released.

11   That's probably the right word too.

12            THE WITNESS:  Thank you, Your Honor.

13                    (Witness excused.)

14            THE COURT:  Call your next witness.

15       Ladies and gentlemen, you want to stretch, stand up a

16   little bit?

17                    (Pause in proceedings.)

18            THE COURT:  Okay.  Call your next witness.

19            MS. GREEN:  The Government calls Mr. Aakash Prasad.

20       (Aakash Prasad steps forward to be sworn.)

21            THE COURTROOM DEPUTY:  Hello.  Please raise your right

22   hand.  Stand to be sworn.  Thank you.

23                    AAKASH PRASAD,

24   called as a witness for the Government, having been duly sworn,

25   testified as follows:
```

PRASAD - DIRECT / GREEN

```
 1            THE WITNESS:  Yes.

 2            THE COURTROOM DEPUTY:  Thank you.  You may be seated.

 3   Please state your full name for the record and spell your full

 4   name.

 5            THE WITNESS:  Aakash Prasad.  A-A-K-A-S-H -- Aakash

 6   Prasad.  A-A-K-A-S-H, P-R-A-S-A-D.

 7                        DIRECT EXAMINATION

 8   BY MS. GREEN:

 9   Q.   Good afternoon, Mr. Prasad.  Where do you live?

10   A.   San Francisco.

11   Q.   And how long have you lived here?

12   A.   11 years.

13   Q.   Where do you work?

14   A.   A startup.

15   Q.   Could you briefly describe your educational background?

16   A.   I studied engineering at UC Berkeley.

17   Q.   And could you provide a brief overview of your employment

18   history between graduating in 2020?

19   A.   Just at various technology startups.

20   Q.   Do you know an individual called Ruthia He?

21   A.   Yes.

22   Q.   When did you first meet?

23   A.   End of 2019.

24   Q.   How did you meet?

25   A.   We met on Facebook dating.
```

PRASAD - DIRECT / GREEN

1   Q.   Where was Defendant He working at the time?

2   A.   She was wrapping up a music startup.

3   Q.   Did you go on a few dates with Defendant He?

4   A.   We had dinner.

5   Q.   And did you become friends with Defendant He?

6   A.   Yes.

7   Q.   Between 2020 and 2022, how frequently were you

8   communicating with Defendant He?

9   A.   Multiple times a week.

10  Q.   Were a lot of those communications on Facebook Messenger

11  app?

12  A.   Yes.

13  Q.   Did you discuss work as well as other personal topics?

14  A.   Yes.

15  Q.   How hard is it for you to be here testifying today?

16  A.   It's hard, yeah.

17  Q.   Because of your friendship with Defendant He?

18  A.   Yeah.

19  Q.   Are you familiar with a company called Done?

20  A.   Yes.

21  Q.   When did you first hear about Done?

22  A.   By name in 2020, early 2020.

23  Q.   We're going to walk through your messages with

24  Defendant He on Facebook Messenger app, at least some of them.

25              MS. GREEN:  I'd like to show Exhibit 897, please,

PRASAD - DIRECT / GREEN

```
 1   page 182.
 2           THE COURT:  897?
 3           MS. GREEN:  Exhibit 897 for admission, please,
 4   Your Honor.
 5           THE COURT:  Admitted.
 6       (Trial Exhibit 897 received in evidence.)
 7           MS. GREEN:  Page 182.
 8   BY MS. GREEN:
 9   Q.   In January -- on January 30th, 2020, did Defendant He
10   write to you (as read):
11           "Trying to get a doctor on board for my drug
12       biz"?
13   A.   Yes.
14           MS. GREEN:  And let's look at Exhibit 178, please.
15           THE COURT:  I'm sorry.  Wait.  Wait.
16           MS. GREEN:  I'm sorry.  Page 178.
17           THE COURT:  You say page 182?  I'm back at the other
18   one.
19           MS. GREEN:  Yep.  The first page I looked at was
20   page 182.
21           THE COURT:  Okay.  So that's the last page in the
22   exhibit?
23           MS. GREEN:  Yes.  So the reason for that, Your Honor,
24   unfortunately these messages run from backwards to forwards, so
25   the oldest message is at the back and then you move forward to
```

**PRASAD - DIRECT / GREEN**

 1   the front.  So you have to read from sort of the bottom of the

 2   page up, unfortunately.

 3          **MS. BELL:**  And, Your Honor, I would object to the

 4   admission of the whole exhibit and ask counsel to simply admit

 5   the pages as she goes based on our colloquy at the prior break.

 6      So I think the best way to proceed is that the pages that

 7   are being used would be admitted and the remainder would not.

 8          **MS. GREEN:**  We already redacted based on that concern.

 9          **MS. BELL:**  Well, I haven't had a chance to review

10   that, so we can cross that bridge when we get to it.

11          **THE COURT:**  I think the suggestion's a good one.  At

12   the present time, those pages that you want -- that you refer

13   to or you're asked -- referred to, just give the page number,

14   it will be admitted.

15      But I have before me something that looks like 100 pages,

16   or 80 pages, and I'm not going to simply let 80 pages in

17   willy-nilly if -- if -- maybe some of it's relevant, maybe some

18   it isn't.  I don't know.

19          **MS. GREEN:**  Yes, Your Honor, and I'm happy to do that.

20   To be clear we excerpted the irrelevant portions and put them

21   into this exhibit and gave them to defense.  But that's fine,

22   I'm happy to proceed in that fashion.

23          **THE COURT:**  The problem is when you say you've

24   eliminated the irrelevant portions -- I guess that's what you

25   said?  You've eliminated those portions that ought not to be

1    considered?  What have you eliminated?

2           MS. GREEN:  We just -- we just pulled the relevant

3    communications that were related to what we would be testifying

4    about today.

5           THE COURT:  So you have 80 pages of relevant

6    communications?

7           MS. GREEN:  We'll be showing some parts of those, yes.

8           THE COURT:  My question is, do you have 80 pages --

9    this is 80 pages?

10          MS. GREEN:  Yes.  We view these as relevant.

11          THE COURT:  All of them?

12          MS. GREEN:  Yes.  They're all communications with

13   Defendant He and Mr. Prasad that we view as relevant.

14          THE COURT:  Okay.  I'll take up -- I will then take

15   this up at the end after we go through -- whatever counsel

16   wants to go through, she can go through, we just ask that you

17   identify the particular page that you're referring to.  And I

18   think you intend to do that in any event.

19          MS. GREEN:  Yes, Your Honor.

20          THE COURT:  And then I'll deal with the issue of what

21   about the other 60 pages or 50 or 80 or whatever the number is.

22      Okay.  Go ahead.

23          MS. GREEN:  Sounds sound.  Thank you, Your Honor.

24   BY MS. GREEN:

25   Q.   So let's look at page 178, please.

PRASAD - DIRECT / GREEN

1    Did Defendant He in February 2020 write (as read):

2         "For drug delivery, 90 percent works is

3    operation"?

4    A.   Yes.

5    Q.   And let's look at page 174, please.

6    On February 16, 2020, did Defendant He write to you (as

7    read):

8         "So you think selling drug is thinking outside

9    the norm?  I guess that's true"?

10   A.   Yes.

11   Q.   And let's look at Exhibit -- as page 169, please.

12   The top there, did Defendant He on March 10th, 2020, write

13   to you (as read):

14        "So I was doing a rebranding of the website,

15   et cetera."

16   And then just scrolling up to the next page.

17   (as read):

18        "Basically rebuild and optimize everything

19   within two days for the drug service."

20   Do you see that?

21   A.   Yes.

22   Q.   So how was Defendant He describing her business to you in

23   early 2020?

24   A.   In our text messages here, she was referring to it as a --

25   a drug business.

PRASAD - DIRECT / GREEN

1   Q.   A drug business.

2        She didn't refer to it as a company providing ADHD mental

3   health care, for example?

4   A.   Correct.

5   Q.   Let's look at page 174, please.

6        On February 16, 2020, did Defendant He write to you --

7   this was -- you know, underneath at the bottom of this page is

8   the page we looked at about selling drug is thinking outside

9   the norm.

10       Did she, then, up above write to you (as read):

11            "That biz is a bit paused because of the

12            regulation we need.  40K to set up legal structure"?

13  A.   Yes.

14  Q.   And then looking at page 172, please.

15            THE COURTROOM DEPUTY:  I'm sorry.  The number again,

16  please.

17            MS. GREEN:  172.

18  BY MS. GREEN:

19  Q.   Later in February, on February 22nd, 2020, did

20  Defendant He write to you (as read):

21            "Like for the drug start-up right now, the legal

22            situation is very tricky.  We may not be able to

23            charge patients directly but need to do it through

24            doctors charge it and pay us a fixed amount.

25            Honestly, I don't care about these.  At the early

PRASAD - DIRECT / GREEN

1    stage, like Uber and Lyft, were all illegal."

2    Do you see that?

3  A.   Yes.

4  Q.   What was your view as -- with respect to comparing a

5  business providing controlled substance or drug prescriptions

6  to an Uber or Lyft?

7         MS. NECHAY:  Objection.  Relevance.

8         THE COURT:  Relevance?  Overruled.

9         THE WITNESS:  They're both regulated startups, but the

10  difference is this company operates in healthcare, and so the

11  consequences are different in terms of impact on people's

12  healths.

13  BY MS. GREEN:

14  Q.   Let's look at page 158, please.

15    On April 27th, 2020, did Defendant He write to you (as

16  read):

17         "I'm -- I find I'm good at convincing people.

18    Like I brainwashed so many people, including

19    psychiatrists, to do this drug thing, but I'm

20    actually not really enjoying doing it myself."

21    And then going to page 157 (as read):

22         "To me it's more like making money."

23    Did she write that?

24  A.   Yes.

25  Q.   And let's look at page 153, please.

```
 1              MR. FOSTER:  I don't think it was displayed.
 2              MS. GREEN:  Oh, I'm sorry.  Can we just display it for
 3     the jury?  So that was page 158, please.  158, please.
 4     Ms. Braga.  That's -- okay.  One moment.
 5          Page 158, yes, that page, please, because I don't think it
 6     was displayed.  It was?  Okay.  Great.  Okay.  So we're good?
 7     Everything's displayed?  Good.
 8     BY MS. GREEN:
 9     Q.   Let's go to page 153, please.
10          On August 9th -- so we've jumped ahead a few months.  On
11     August 9th, 2020, did Defendant He write to you (as read):
12              "Healthcare is such a profitable space" --
13     A.   Yes.
14     Q.   (as read):
15              "What if I just run multiple business in this
16          area and use the same provider I hired.  Easily
17          60 percent plus margin."
18     And then you wrote, you asked her (as read):
19              "Is there any legal or compliance risk?"
20     And Defendant He responded, (as read):
21              "No.  Just working with doctors will be fine."
22     And then continued (as read):
23              "So I started this private practice with that
24          doctor from Stanford."
25     And then if we scroll up.  (as read):
```

1          "Now, I can have more control of the providers."

2          **THE COURTROOM DEPUTY:**  Page number?

3          **MS. GREEN:**  That was page 152.  Thank you, Ms. Scott.

4   BY MS. GREEN:

5   **Q.**   Did she write that to you?

6   **A.**   Yes.

7   **Q.**   Did Defendant He say -- or first of all, do you know if

8   that doctor from Stanford, was that a reference to Dr. Brody?

9   **A.**   I actually don't know.

10  **Q.**   Okay.  And Defendant He wrote, Now she could have more

11  control of the providers, not now providers can exercise their

12  independent clinical judgment; correct?

13         **MS. BELL:**  Objection, Your Honor.  Foundation.

14  Speculation.  And argumentative.  As well as leading.

15         **THE COURT:**  Sustained.

16  BY MS. GREEN:

17  **Q.**   Let's look at page 151, please.

18  On August 8th, 2020, did Defendant He write to you, (as

19  read):

20          "Got an angry person e-mail **that support and

21      call us.  Legal drug dealers profiting off of

22      addiction, Well, I'd say most successful companies

23      usually profit out of addiction, like Facebook and

24      TikTok."

25  Did you see a difference between comparing a company

PRASAD - DIRECT / GREEN

1  providing controlled substances to a company like Facebook or

2  TikTok?

3          MS. BELL:  Same set of objections, Your Honor.

4          THE COURT:  Sustained.

5  BY MS. GREEN:

6  Q.   Does Facebook or TikTok provide controlled substances?

7          MS. BELL:  Your Honor, same set of objections.

8          THE COURT:  I think he can answer that.

9          THE WITNESS:  They don't.

10  BY MS. GREEN:

11  Q.   On let's -- look at page 143, please.

12      We've moved ahead in the time frame.  Did Defendant He

13  write to you in June 5, 2021 (as read):

14          "Right now I just want to be a billionaire?"

15  A.   Yes.

16          MS. GREEN:  One moment, Your Honor.

17  BY MS. GREEN:

18  Q.   Do you know if Defendant He was the sole owner of her

19  company?

20  A.   As far as my understanding.

21  Q.   Let's look at page 137, please.

22      An October 8th, 2021, did Defendant He write to you (as

23  read):

24          "I want the company to run in the exact way I

25      want and execute my vision."

PRASAD - DIRECT / GREEN

 1    A.    Yes.

 2    Q.    Okay.  Let's look at page 120, please.

 3          On January 19th -- so, again, we've moved ahead in time

 4    frame, on January 19th, 2022, did Defendant He write to you (as

 5    read):

 6              "If I can control the company, no need to be --

 7          to -- worried about being fractured by board, then,

 8          yes, I'd like to grow it.  But if being a big company

 9          means I'll need to fight with internal teams and

10          investors, that is meaningless."

11          Did she say that to you?

12    A.    Yes.

13    Q.    What was your impression about how much control

14    Defendant He exerted at the company?

15          MS. BELL:  Objection, Your Honor.  Foundation.

16    Speculation.  This witness is at this point her personal friend

17    and not working at the company.

18          MS. GREEN:  I'm happy to lay a foundation, Your Honor.

19          THE COURT:  Foundation.

20    BY MS. GREEN:

21    Q.    Mr. Prasad, we've just gone over just some messages.  Did

22    you speak frequently with Defendant He about her business and

23    her views with her business?

24    A.    Yes.

25    Q.    And messages like this about Defendant He's desire to

1    control her business?

2    A.    Yes.

3    Q.    And what was your impression based on your communications

4    with Defendant He about her desire to be in control with her

5    business?

6    A.    She was in control, yeah.

7    Q.    Let's look at page 114, please.

8          On January 27th, 2022, did Defendant He write to you (as

9    read):

10              "I need to make up my mind about I should just

11         do one thing like to work on this company and grow it

12         to a unicorn and move it to another thing."

13         Are you familiar with the term "unicorn"?

14   A.    Yes.

15   Q.    What is that?

16   A.    A billion-dollar company.

17   Q.    Was that a stated goal of Defendant He?

18   A.    Yes.

19   Q.    Let's move ahead, please, to page 108.

20         On March 14th, 2022, did Defendant He write to you (as

21   read):

22              "So we're getting featured by WSJ."

23         Do you understand that to be a reference to the Wall

24   Street Journal?

25   A.    Yes.

PRASAD - DIRECT / GREEN

1    Q.    (as read):

2            "In probably not a good way."

3        And then you ask good or bad, and she confirmed bad.  And

4    said (as read):

5            "They reached out to our clinicians."

6        And then on page 107 you continue discussing this and she

7    provides a link to a New York Post article as well.

8        Did you read this Wall Street Journal article from

9    March 2022?

10   A.    Yes.

11   Q.    And do you recall the allegations that were raised in the

12   article?  I'm happy to show it to you if you want to be

13   refreshed.

14   A.    Sure.

15           MS. GREEN:  Okay.  So let's show the witness

16   Exhibit 2861, which has already been admitted.  And let's just

17   go to page 7, Ms. Braga.

18   BY MS. GREEN:

19   Q.    Do you recall that in this article, some of the concerns

20   that were raised were, for example --

21           MS. BELL:  Your Honor, this is cumulative.  And I'm

22   not sure what the question for this witness is, but we've seen

23   this exhibit, we've gone over it multiple times.  I am not

24   sure --

25           MS. GREEN:  It's relevant --

PRASAD - DIRECT / GREEN

1          MS. BELL:  -- what he has to add at this point.

2          MS. GREEN:  It --

3          THE COURT:  Overruled.

4          MS. GREEN:  Thank you, Your Honor.

5    BY MS. GREEN:

6    Q.   -- issues such as concerns with prescribing stimulants

7    being strongly encouraged, even where patients don't meet the

8    criteria.  And if we go to the next page, issues about

9    pressures to prescribe.

10        I'm not going to go through it all in detail but do you

11   remember those issues being raised in the article?

12   A.   Yes.

13   Q.   Were you concerned when you read this article?

14   A.   Yes.

15   Q.   Why?

16   A.   The Wall Street Journal is a really high-profile, and I

17   remember this was some articles on the front page of the

18   Journal and they were, you know, concerning allegations.

19   Q.   And did you discuss this article, this sort of bad press

20   with Defendant He?

21   A.   Not in detail.  I think she had shared that there was

22   press coming out but we did not go into the specifics in

23   detail.

24   Q.   Putting aside the specifics, generally, what was the --

25   what was Defendant He's reaction to the negative news articles

PRASAD - DIRECT / GREEN

1    as expressed to you?

2    **A.**    It -- she would often say that the allegations were wrong

3    in terms of what the media was portraying.

4    **Q.**    Did she ever use the term "fake news"?

5    **A.**    Yes.

6    **Q.**    Based on your interactions with Defendant He and your

7    conversations with her, did Defendant He seem concerned about

8    the underlying substantive allegations or just that there was

9    negative press about Done?

10    **A.**    In our communications, it was about the negative press.

11    **Q.**    Did you ever hear Defendant He discuss prioritizing

12    changing clinical policies, for example, to address the types

13    concerns raised in the articles?

14    **A.**    She had not shared specifics with me.

15    **Q.**    Let's look at page 103, please.

16            **THE COURTROOM DEPUTY:**  From Exhibit --

17            **MS. GREEN:**  Same -- yeah, same exhibit, Ms. Scott.

18    Thank you so much.  Most of these pages will just be

19    Exhibit 897, but thank you for confirming.

20    **BY MS. GREEN:**

21    **Q.**    Here on April 29th, 2022, Defendant He wrote to you (as

22    read):

23            "Basically this is what happened in the past.

24        We already clarified with pharmacies and they

25        unblocked us.  The reason why they blocked us is

1          'cause a lot of local pharmacies are unfamiliar with

2          telehealth and they only filled scripts from

3          clinicians nearby."

4          Did Defendant He discuss this issue of the pharmacies

5    blocking Done in any more detail with you?

6    **A.**    She had just shared the articles where some major

7    pharmacies had -- had blocked Done and Cerebral.

8    **Q.**    And did you ever hear her express concern about the

9    underlying reasons pharmacies might be blocking the Done

10   prescriptions or just this point that they're unfamiliar with

11   telehealth?

12   **A.**    This was the reason she gave.

13   **Q.**    Let's look at page 101, please.

14         So I know I've been moving sort of pretty quickly through

15   the time frame but we're now in June 2022.  So just to reorient

16   the jury, by this point in time, had a fair amount of negative

17   press issues with the pharmacies come out?

18   **A.**    Yes.

19   **Q.**    Okay.  So page 101, did Defendant He in June 26, 2022,

20   write to you (as read):

21          "I think I should be fired as a CEO...  I didn't

22          really take many issues seriously and they caused

23          disruption to the biz..."

24   **A.**    Yes.

25   **Q.**    We're going to read more messages later in the time frame

1    but did you come to find that Defendant He, in your view, had

2    not taken issues seriously, particularly those related to legal

3    and compliance?

4    **A.**    I felt that, yeah.

5    **Q.**    Let's look at page 1- -- page 97, please -- or 98 first.

6          On July 29th, 2022, did Ruthia -- did Defendant He write

7    to you (as read):

8              "I got a lot of white hairs... from stress."

9          And then moving to the next page (as read):

10             "Nothing fun" --

11         **MS. GREEN:**  You might need to zoom -- oh, page 97,

12    please.

13    **BY MS. GREEN:**

14    **Q.**    (as read):

15             "Nothing fun.  Just work but I'm thinking moving

16         the team to Philippines and China."

17         Do you see that?

18    **A.**    Yes.

19    **Q.**    That's July 29th, 2022?

20    **A.**    Correct.

21    **Q.**    In August of 2022, or around that time frame, did you

22    become aware of a news article about a Done member passing away

23    from a drug overdose?

24    **A.**    Yes.

25    **Q.**    Okay.  And did you discuss that issue with Defendant He?

PRASAD - DIRECT / GREEN

1  **A.**    Not in detail.

2  **Q.**    What was Defendant He's reaction to the article, as far as

3  you recall and as expressed to you?

4  **A.**    Her reaction was she felt that the -- it was not -- the

5  death was not specifically caused by the Done prescription.

6  She -- I remember she said that the -- the person involved had

7  been on many different drugs.  So that was kind of the general

8  statement she had shared.

9  **Q.**    Do you recall her discussing any desire to sort of review,

10  audit Done's policies or procedures after this issue?

11  **A.**    She had not shared specifically with me.

12  **Q.**    Did you agree with Defendant He's reaction to this article

13  or would you have -- did you feel something different might

14  have been appropriate?

15        **MS. BELL:**  Objection, Your Honor.  Relevance,

16  argument, consumption of time.

17        **THE COURT:**  Sustained.

18  **BY MS. GREEN:**

19  **Q.**    Let's look at page 95, please.  On September 2nd, 2022,

20  so, again, we've moved forward a few months, did Defendant He

21  write to you (as read):

22        "Hmm I got to wait at the custom inspection.

23  Hope they won't arrest me"?

24  **A.**    Yes.

25  **Q.**    At this point in time in the public sphere, were there

1  articles about risks or issues that Done might be facing?

2  **A.**    Yeah, there had been several articles that year.

3  **Q.**    As her friend, did you think she was running sort of major

4  legal risk by not changing course in summer of 2022 with

5  respect to prescribing practices?

6         **MS. BELL:**  Your Honor, relevance again, argument,

7  leading --

8         **THE COURT:**  Sustained.

9  **BY MS. GREEN:**

10 **Q.**    Let's go --

11        **MS. GREEN:**  We're going to move to admit for now

12 pages 93 and 92.

13 **BY MS. GREEN:**

14 **Q.**    Let's look at this.  So this is September 19th, 2022.

15        On September 19th, 2022, did Defendant He write to you,

16 (as read):

17             "What type of show *Good Morning America* is?"

18        And you replied (as read):

19             "Talk show."

20 **A.**    Yes.

21 **Q.**    She then replies on page 92, (as read):

22             "We're going to be on the show."

23        And then you asked why and she said (as read):

24             "No - obviously not for positive news but more

25        like negative and fun."

```
 1            And you said (as read):
 2                 "Why fun?"
 3            And she said (as read):
 4                 "They sent reporters to use our platform and one
 5       didn't have ADHD and got diagnosed."
 6            Do you see that?
 7   A.   Yes.
 8   Q.   Are you familiar with the GMA segment about Done that
 9   aired in 2022?
10   A.   Yes.
11   Q.   Did you watch it at the time?
12   A.   Yes.
13            MS. GREEN:  The Government --
14            MS. BELL:  Objection, Your Honor.  This is now the
15   third time the Government has attempted to move this in and
16   the Court has sustained the objections and given very specific
17   ruling about under what circumstances the exhibit would be
18   shown.
19            THE COURT:  Actually, I haven't heard the question --
20   oh, I'm sorry.  Is the question to move the --
21            MS. GREEN:  Yeah, we --
22            THE COURT:  Okay.  That's denied.  Go ahead.
23            MS. GREEN:  It's coming in, Your Honor, for the
24   non-hearsay purpose because it's relevant to what Mr. Prasad
25   and Defendant He discussed in response to --
```

1          **THE COURT:**  Well, maybe I can explain the pattern of

2    the testimony and the objections.  Because I've been consistent

3    in -- tried to be consistent in the rulings.

4          What this witness thought about the responses of the

5    defendant isn't relevant unless, of course, it becomes the

6    subject of cross-examination.  If it became the subject of

7    cross-examination, then the witness's reaction to the

8    defendant's statements may be relevant.

9          However, as an initial matter, what is of relevance and

10   why it's been allowed in are statements made by the defendant.

11         Now, the *Good Morning America* or whatever it was called --

12   I don't know what it -- *Good Morning America*?

13         I don't know that that is a statement of the defendant.

14   She's referring to it, but I don't know that -- is she on it?

15         **MS. BELL:**  No, Your Honor.

16         **THE COURT:**  Okay.  So I have ruled.  I understand

17   that.  I have ruled that it ought not to come in.  And it

18   doesn't come in because there was a reference to it.  Okay?

19         So that's sort of the pattern that we're going to proceed

20   on.  And if you have some other argument, you want to make an

21   argument on that, you can but outside the presence of the jury.

22   I'm trying to move the case along to what we have, at least

23   the Court understands to be the relevant material to get to the

24   jury.  Okay?  And all of this is relevant --

25         **MS. GREEN:**  Okay.  I'll --

PRASAD - DIRECT / GREEN

1              THE COURT:  -- for whatever purpose.

2              MS. GREEN:  I'm happy to take that up on a break, Your

3    Honor, but I will show Defendant He's statements about that

4    article -- about that video.

5         So let's look at page 90, please.

6              THE COURT:  Page 90.

7    BY MS. GREEN:

8    Q.   So you watched that video; correct?

9    A.   Yes.

10   Q.   And then you discussed that video with Defendant He;

11   correct?

12   A.   Yes.

13   Q.   And let's look at what Defendant He -- well, first of all,

14   did Defendant He prepare a tweet or a blog in response to that

15   video?

16   A.   Yes.

17   Q.   Okay.  And let's look at that.  Actually, before we get to

18   that, what was your understanding of the concerns raised in the

19   *GMA* video?

20             MS. BELL:  Objection, Your Honor.  This is cumulative.

21   There's been a prior exhibit.  Maybe we could be heard at

22   sidebar because we've had a lengthy colloquy already on this

23   very issue.

24             THE COURT:  Okay.  As to the *Good Morning America*,

25   let's put that aside for a recess.  We'll discuss that outside

PRASAD - DIRECT / GREEN

1  of the presence of the jury.  And you can ask other questions.

2  Okay?

3           MS. GREEN:  We'll come back to that.

4           THE COURT:  And you can return to this after the

5  recess.  Okay?

6           MS. GREEN:  Sounds good.  Thank you, Your Honor.

7  BY MS. GREEN:

8  Q.    Lets go to page 86, please.

9         On October 19th, 2022, so moving ahead, again, did

10 Defendant He write to you (as read):

11          "I also want to do nonprofit now."

12        And then going to the page above, page 85.  (as read):

13          "Dealing with the Government is just a waste of

14     my time."

15        Did she say that?

16 A.    Yes.

17 Q.    From your perspective based on your interactions with

18 Defendant He, did she prioritize compliance with laws and

19 regulations around healthcare?

20          MS. BELL:  Your Honor, same set of objections.

21          THE COURT:  Sustained.

22 BY MS. GREEN:

23 Q.    Let's go to page 83, please.

24        On October 21st, 2022, did Defendant He write to you (as

25 read):

1          "I'm just feeling doing nonprofit now.  And the

2      difference for nonprofit, at least you can get good

3      reputation.  I'm saying I'm doing biz, but the

4      regulation makes no biz make money."

5      Did she write that to you?

6  **A.**   Yes.

7  **Q.**   Did you start to work at Done in around November 2022?

8  **A.**   For several weeks starting early November 2022.

9  **Q.**   What capacity were you working?

10         **MS. GREEN:**  You can take that down, Ms. Braga.

11  **A.**   As a consultant and the goal was to help her hire senior

12  leadership to help run the company.

13  **BY MS. GREEN:**

14  **Q.**   When did you stop working -- or acting as a consultant for

15  Done?  When did you stop acting as a consultant?

16  **A.**   By early December.  So the total engagement was about

17  four weeks.

18  **Q.**   And you mentioned your role was supposed to be helping

19  with hiring some people?

20  **A.**   Correct.

21  **Q.**   Why did you stop working there after a few weeks?

22  **A.**   We disagreed on the kind of person that should be hired

23  for the role.

24  **Q.**   Were you satisfied in the role in those few weeks that you

25  were in there?

1    **A.**    No.

2    **Q.**    Why not?

3    **A.**    We just had a fundamental disagreement on how the hiring

4    should be done and who should be hired, and we weren't coming

5    to an agreement on that.

6    **Q.**    And you said you had a fundamental disagreement.  What was

7    the nature of that disagreement?

8    **A.**    I -- it was my opinion that the company needed more senior

9    healthcare and legal expertise, an executive with strong

10   healthcare and legal background.  And the candidates that the

11   company was presenting to me often had more of maybe a business

12   development kind of background.

13   **Q.**    And you said you had a fundamental disagreement.  Did

14   Defendant He agree with your position on this?

15   **A.**    No.

16   **Q.**    And let's just look at the expectations that Defendant He

17   talked to you about when you were hired, so page 81.

18        So this is where Defendant He, at the bottom of the page,

19   talks to you about the consulting agreement.  And then this is

20   November 11th, 2022, she writes (as read):

21            "The expectations for ops is someone to help us

22        to be the leader in the field and scale beyond a

23        150MM ARR" --

24        What's that, ARR?

25   **A.**    Annual revenue.

PRASAD - DIRECT / GREEN

1    Q.    (as read):

2              -- "and for a finance person is to continue to

3         optimize for profit margin.  To be profitable and

4         raise or sell at least 500 million valuation."

5         Correct?

6    A.    Yes.

7    Q.    Let's look at page 78, please.

8              **THE COURTROOM DEPUTY:**  Do you want 80 admitted?

9              **MS. GREEN:**  Oh, yes, please.  Page 81 and 80 for

10   admission.  Thank you, Ms. Scott.

11   **BY MS. GREEN:**

12   Q.    Let's look at page 78, please.

13        Again, moving ahead a bit.  In November 20th, 2022, did

14   Defendant He write to you, (as read):

15             "Yeah, maybe I should go to Canada.  I've never

16        been.  And it's not Asia, so don't have time

17        difference, but I can still be out of U.S."?

18   A.    Yes.

19   Q.    Let's look at page 76, please.

20        On November 23rd, 2022, did Defendant He write to you (as

21   read):

22             "We got partnerships dropped after negative news

23        *GMA*."

24        And then on page 75, (as read):

25             "Pharmacy partner and an online verification

PRASAD - DIRECT / GREEN

```
 1          certificate required by Google Ads."
 2          You said (as read):
 3               "That second one could be a big deal, right, if
 4          it affects ads."
 5          And you wrote (as read):
 6               "But you're mostly IG and TikTok."
 7          And she said, "Yes."
 8          What was your understanding of this online verification
 9     certificate required by Google ads?
10     A.   If you don't have that certificate, you can't run the ads.
11     Q.   Do you know whether Defendant He continued to run ads
12     without that certificate on Google?
13     A.   I don't know what happened after.
14     Q.   Did you understand, at least based on these messages, that
15     this issue affecting ads could be a big deal for Defendant He?
16     A.   Yes.
17     Q.   Why?
18     A.   They were the main source of customers for the business.
19          MS. GREEN:  We're going to move to admit pages 61 to
20     71, please, Your Honor.
21     BY MS. GREEN:
22     Q.   We're going to start talking about what you've described
23     at a high level to the jury, this -- when you were consulting
24     for Done and these disagreements you were having with
25     Defendant He.
```

1    On December 5, 2022, did you write to Defendant He (as

2   read):

3              "What do you think about getting an experienced

4         healthcare CEO and moving to founder, board, chairman

5         board et cetera?  I think a change of leadership will

6         go a long way to send a message to the market the

7         company is serious about change and fixing the issue

8         and build public trust.  May also reduce your

9         personal vulnerability because people will see that

10        you're taking steps to address the concerns.

11             "The feedback I'm getting right now is people

12        aren't getting confidence in your answers about the

13        issues.  They feel like you are denying the issues

14        versus taking steps to address the feedback and show

15        serious commitment to change."

16   And then moving to page 70, at the bottom, you wrote --

17   and we can like zoom in, if we can, Ms. Braga, to the extent --

18   I know it's hard moving quickly -- just to help with the jury

19   seeing it.

20        (as read):

21             "It's not just the business financial risk to

22        the company, there's a personal Rick for you if the

23        Government claims negligence.  Like if they say x

24        people abused addictive prescription medication

25        because you were negligent and prioritized revenue,

1    growth over compliance and did not take enough

2    precautions."

3    And then higher up, you wrote, (as read):

4         "Some of the allegations in the press articles

5    are company prioritizing growth over compliance.  For

6    a consumer product like a mobile game or social media

7    app -- media platform, that approach works.  But the

8    reason there is so much scrutiny is it's healthcare,

9    and the consequences of mistakes are more serious.

10         "The government can say the platform makes it

11   too easy for someone to abuse addictive controlled

12   meds and take action against the platform."

13   I'm just going to pause there for a moment.

14   First of all, just a point of clarification.  Mr. Prasad

15   you're not a lawyer; correct?

16   **A.**   Yes.

17   **Q.**   So when you used the word "negligence," were you using

18   that in a legal context or just sort of everyday context?

19   **A.**   Everyday context.

20   **Q.**   And what did that word mean to you?

21   **A.**   Just --

22         **MS. BELL:**  Objection, Your Honor.  This is really

23   irrelevant and --

24         **THE COURT:**  Sustained.

25   \\\

1   BY MS. GREEN:

2   Q.   What concerns were you raising to Defendant He in these

3   messages?

4            MS. BELL:   Objection, Your Honor.   This is -- the

5   document speaks for itself and consumption of time.

6            THE COURT:   Overruled.

7            THE WITNESS:   The concerns I was raising was the

8   issues that have been raised by the media are important and

9   should be taken seriously.   And these are -- these concerns

10  are -- you know, they have gravity and, you know, I was

11  concerned for her and for the company.

12  BY MS. GREEN:

13  Q.   You wrote (as read):

14           "You are denying the issues."

15  Why did you write that to Defendant He?

16  A.   When I would ask her about these issues, she would not so

17  much address the issues as much as, you know, kind of say like

18  the press was attacking her and things like that.

19  Q.   You felt she wasn't addressing the substantive issues, but

20  more would say the press is just attacking her?

21  A.   Yes.

22  Q.   And let's look at page 69, please.

23       Did you write referencing a guy called Ric Mercury and

24  then say (as read):

25           "He back out because he did not feel you were

PRASAD - DIRECT / GREEN

1    taking the accusations seriously when your response

2    is, 'Every company is under investigation.'  That

3    answer scares people because they think that means

4    you don't think it's serious and it sounds like you

5    are dismissing it.

6         "And Ric wondered about criminal liability, and

7    that's why he didn't want to touch the company even

8    as a service provider."

9    Did you write that?

10 A.   Yes.

11 Q.   And then later in that message on page 68, focusing at the

12 top of that page, (as read):

13        "The big picture concern from press and

14    regulators is the platform make it easy for people

15    who don't have ADHD to abuse ADHD drugs.

16        "I haven't heard a convincing answer to that.

17    Just that every healthcare company is under

18    investigation, but that answer does not build

19    confidence, it just communicates that you are not

20    taking it seriously."

21    Did you write that?

22 A.   Yes.

23 Q.   And looking at page 67, on December 5th, 2022, and we can

24 focus just at the top of that page, did you inform Defendant He

25 to (as read):

PRASAD - DIRECT / GREEN

1              "Think about what is the best thing for Ruthia,

2         what is the best thing for Done, and what is the best

3         thing for patients."

4    A.   Yes.

5    Q.   And looking at page 66, with respect to the patients, did

6    you write (as read):

7              "What's best for the companies -- the customers?

8         Someone with strong healthcare/medical experience who

9         can put safeguards and guardrails in place to do the

10        best they can to minimize abuse as much as possible.

11        If this were a mobile game or a social media app, it

12        would be a different story but it's because it's

13        healthcare and the consequences are very serious.

14        You did a good job identifying and capturing a big

15        market demand/opportunity.  But" --

16   And let's -- looking higher up on the page (as read):

17             "The regulators aren't going to go after each

18        and every provider saying they wrote these

19        prescriptions, they are going to go after the

20        platform for enabling them and incentivizing them to

21        do quick appointments and refills and not be thorough

22        about the diagnosis."

23   Did you write that to Defendant He?

24   A.   Yes.

25   Q.   And then on page 65, did you continue -- well, on that

1   page you said (as read):

2           "You're not listening to the press.  You don't

3       have a board.  Your investors are not involved in the

4       business."

5       And you said -- continued (as read):

6           "I don't know who else can say this that you

7       would listen to except me.  So while I'm taking risk

8       by saying it (like you may be mad at me for sharing

9       this perspective) I really think for yourself

10      personally and the company, you should bring in a new

11      CEO," et cetera.

12      Did you write that?

13  A.  Yes.

14  Q.  And let's look at page 63.  I'm moving ahead with some of

15  the messages that are similar to this.  Fair to say you were

16  raising similar concerns sort of frequently in these messages?

17  A.  Yes.

18  Q.  I'll try to move ahead as much as I can.

19      So looking at page 63 at the top of the page, did you

20  write to Defendant He (as read):

21          "You can't move fast break things in

22      healthcare" --

23          MS. BELL:  Counsel, can you take this down.  This is

24  the subject --

25          MS. GREEN:  Oh, yeah.  Sorry, you're right.  Take this

PROCEEDINGS

1   down.  Ms. Bell wanted to discuss this in a break.  I

2   apologize, Your Honor.  We think it's --

3           THE COURT:  What do you want to do?

4           MS. GREEN:  Well, I think it's admissible, but

5   Ms. Bell --

6           THE COURT:  Wait a minute.  We are going to take a

7   break, but we're not having -- we're not taking the -- we're

8   not discussing the break now.  I mean, do you want to take a

9   break now?

10          MS. GREEN:  I think --

11          THE COURT:  Let's take a break now.

12          MS. GREEN:  Yeah.

13          THE COURT:  Ladies and gentlemen of the jury, we'll

14  take a break now.  We will be back at 3:00.

15      Remember the admonition given to you:  Don't discuss the

16  case, allow anyone to discuss it with you, form or express any

17  opinion.  Okay.

18                   (The jury leaves the courtroom.)

19    (Proceedings were heard out of the presence of the jury.)

20          THE COURT:  Okay.  Can you tell me, before we get to

21  the *Good Morning America*, can I --

22          MS. GREEN:  Yes.

23          THE COURT:  What page is the discussion of it on this

24  so I can read that?

25          MS. GREEN:  Yep.

PROCEEDINGS

```
 1          THE COURT:  And I think the answer -- the short answer
 2   is I have to look at the tape.  I mean, I can't rule that it is
 3   too prejudicial or on a 403 basis if I haven't seen it, so I
 4   have to look at it and come to some conclusion.  Now, maybe
 5   I'll do that tomorrow or some other time, but we'll figure that
 6   out.  Okay.
 7          MS. GREEN:  So the page, Your Honor, for -- in the
 8   exhibit -- and I would -- if you could look at from page 90
 9   through page 90 -- 93.  And the reason I want you to start on
10   page 90, it's not just that he said there's a video.
11   Defendant He drafted a response to this video, and so they
12   discussed it on page 90.  So I -- and that is text which, quite
13   frankly, I'd like to ask questions about even if we don't show
14   the video today.  That's Defendant He's own statement so that's
15   plainly admissible.  But I think you see that full --
16          THE COURT:  Not necessarily is it plainly admissible.
17          MS. GREEN:  Not a problem.  Just as long as Your Honor
18   could look at the context as well, so that would be much
19   appreciated.
20          THE COURT:  Yeah, okay.  So I look at page 90.  What
21   other pages?
22          MS. GREEN:  90 through 93.
23          THE COURT:  Okay.  I'll look at those pages.  Okay?
24      Now, what else do we want to talk about?
25          MS. BELL:  Thank you, Your Honor.  May I just address
```

1    that very briefly and I will pass up the Court's prior rulings

2    on this?

3             THE COURT:  I know what my prior rulings are.  I ruled

4    that it was too prejudicial and it shouldn't come in.  And I

5    did so in the context -- and this is why motions in limine are

6    dangerous.  I did so in the context of not seeing it, not

7    understanding it, and not seeing what role, if any, it would

8    have in this case.

9        So you know what?  I don't care what I said about it.

10   What I care about is what I now think about it, which I don't

11   know what I think about it.

12       And you can certainly argue that since I said it in the

13   past, it makes sense today, but let's get -- Ms. Bell, I'm

14   being rude to you.  Send it up.  Of course I'll look at it.

15   Okay?

16            MS. BELL:  Let me just clarify.  This was in the trial

17   that --

18            THE COURT:  I know.

19            MS. BELL:  -- this came up during the testimony of

20   Mr. Levy.  That was it, Your Honor.  And our concerns are the

21   same.  I'm just trying to short-cut it so I don't repeat

22   Mr. Schachter's arguments.  It's the exact same argument.  That

23   was it.

24            THE COURT:  I appreciate it.

25            MS. BELL:  Thank you, Your Honor.

1          **THE COURT:**  I think you're right, I was wrong.  I

2    apologize for that.  I think that I should look at it.  And I

3    need to look at the exhibit.

4      Okay.  What's next?

5          **MS. GREEN:**  Your Honor, may I just ask one question on

6    that so -- to clarify my direct?

7      So I understand, Your Honor will make a decision on that,

8    but may I ask this witness about the response from

9    Defendant He?  Because my concern is if this witness leaves the

10   stand, I don't really want to call him back after the ruling on

11   the video.  So would I be allowed to ask him about the text

12   that Defendant He writes on page --

13         **THE COURT:**  I have to read the --

14     **MS. GREEN:**  Okay.

15         **THE COURT:**  I have to read the text and see the video.

16     **MS. GREEN:**  Okay.

17         **THE COURT:**  And I have to see whether or not the text

18   independently should be -- or independent of the video.

19     **MS. GREEN:**  Right.

20         **THE COURT:**  I have to also figure out, maybe there's a

21   part of the video that ought not to be shown so it has to be

22   redacted in some manner.  Or not.

23     Or not.  But I have to see it because I'm ruling in a

24   vacuum.

25         **MR. FOSTER:**  And I think, Your Honor, the Defense,

since that time, has made clear that it's the defendant's state

of mind that matters.  There's been testimony from multiple

witnesses that she viewed this video and the contents of it

bear directly on her state of mind and her consciousness of

guilt that nothing was changed after this video and that's why

it's an important piece of evidence.

THE COURT:  Okay.  Well, I'll take a look at it.

MS. BELL:  And the issue for us, as set forth well by

Mr. Schachter, is it's -- on cross-exam, it's quasi expert

testimony, so it's --

THE COURT:  Well, that may be a function -- I don't

know.  I have to -- let me look at it and then address the

argument.  Okay?

MS. BELL:  Understood, Your Honor.  Thank you.

THE COURT:  Okay.  What else?

MS. BELL:  Very briefly, Your Honor.  So there are a

number of reference in the documents to Theranos, FTX, and Sam

Bankman-Fried --

THE COURT:  I want all of that out.

MS. BELL:  That's what I --

THE COURT:  It's highly prejudicial.

MS. BELL:  Yes.  That was my request.

So she's -- counsel is certainly free to ask him what

did -- you know, what did he tell her, but these -- all of

these references to these companies, we would like that

PROCEEDINGS

1   redacted.

2       **THE COURT:**  And obviously her responses may be

3   relevant.  That's not the issue.  The issue is whether or not

4   the statement is so prejudicial that it carries with it some --

5   take Theranos as an example.  What comes up in -- anybody who

6   has followed the case or aware of the case would draw a

7   parallel between this case and Theranos.  I mean, that's just

8   inevitable.  I guess, as a matter of fact, that's probably -- I

9   haven't seen it but that's probably what the discussion was

10  "It's just like Theranos," or "you may be prosecuted like

11  Theranos."

12      I mean, she -- Mr. Prasad says to her -- I don't know

13  whether you introduced it or not -- says, "By the way, you may

14  face criminal liability."  I mean, that's pretty important

15  testimony because it -- on the one hand, the witness is talking

16  about negligence, whatever that means, and it's been shown he

17  used it as a generic term.  But it's one thing to say to a

18  defendant, "By the way, you may have been negligent," and

19  another -- quite another to say to a defendant, "By the way,

20  you may face criminal liability."

21      That is entirely probative of her -- of what she was told

22  at the time as of that date.  And then what she did in response

23  may or may not be -- maybe she says no or I don't -- whatever

24  she says, she says.  But she's been told that her conduct in

25  this witness's mind may carry with it some criminal liability

1    and she's talking to him about it.

2        It's not like he knocks on her door and says, "Oh, by the

3    way, I want to just tell you as an outside person what's going

4    on here."  They are trading advice.  Or she is listening,

5    apparently, to what he says.  And whether he's a trusted person

6    or not, I don't know, but it appears that he might very well

7    be.  Because, after all, she brings him in.

8        She brings him in to make some choices for the company, so

9    obviously he's trusted by her, at a time where he has already

10   expressed that she may be facing criminal liability.

11       Okay.  So that all comes in except I don't think

12   references to Theranos, Sam Bankman-Fried, or anybody else

13   is -- it carries with it something else, so I'm not going to

14   let that in.

15           MS. GREEN:  Your Honor, may I -- and that's good.  May

16   I be allowed to instruct the witness on that?  Because I --

17           THE COURT:  Yes, of course you can instruct the

18   witness.

19           MS. GREEN:  Okay.  Because I'm going to ask him

20   about --

21           THE COURT:  You have to instruct the witness.

22           MS. GREEN:  -- prior to that, yeah.

23           THE COURT:  How do I see the exhibit?  What exhibit is

24   it?

25           MS. GREEN:  Oh, so the *GMA* video is Exhibit 2348.  And

 1   we can e-mail that to Lashanda.  Would that -- would that help?

 2       2858.  I apologize.  Exhibit 2858.  And we'll have

 3   Ms. Braga send that video to you.

 4           THE COURT:  Well, can it be done now so I can look at

 5   it and --

 6           MS. GREEN:  Yeah.  We can put it on a thumb drive,

 7   they can -- oh, 2858, yeah, it's on there.  So it's an exhibit

 8   on that flash drive.

 9       Thank you, Ms. Scott.

10           MS. BELL:  Thank you, Your Honor.

11                   (Recess taken at 2:48 p.m.)

12               (Proceedings resumed at 3:02 p.m.)

13           THE COURT:  Do we want to have a discussion?  I mean,

14   one of the defendants is not present, but I think it's -- or

15   lawyer.  Dr. Brody and his lawyer is not present.  Hopefully --

16   is she out there?

17           MS. BELL:  Let me check, Your Honor.

18           MR. SCHACHTER:  I'll check.

19           MS. BELL:  Oh, okay.

20           THE COURT:  Well, you better stay here, Ms. Bell.  Let

21   me just tell you what my issue is, and the Government.

22       It appears to me that the -- I'm now just talking about

23   playing the video of *Good Morning America*.  What it is is an

24   experiment run by the people at -- whoever put it together at

25   *Good Morning America* which shows and demonstrates that

**PROCEEDINGS**

1    everything the Government said is right about how things are

2    done and everything the Defense said was wrong.

3        It's a sham, essentially.  I mean, it -- to allow it in is

4    highly prejudicial.

5        On the other hand, because something may be highly

6    prejudicial, or demonstrate that the defendants are guilty is

7    not a reason for exclusion.

8        As a matter of fact, it's a reason for inclusion because

9    it's highly probative.

10       So the question then becomes, and why one should pay

11   attention to -- I do the preamble to show that I think it's

12   significant.  Okay.

13       But moving beyond the preamble, it strikes me that this is

14   un-cross-examined and -- un-cross-examined evidence of guilt.

15   So the question is, can you produce this or show it to the jury

16   and -- and address the issue of the confrontation clause?

17   Because the defendant has a constitutional right to confront

18   witnesses.

19       This is in the form of a witness though the witness is not

20   testifying.  What is being shown is something that was shown to

21   the defendant.

22       Now, in the normal course, these things -- not this kind

23   of thing, but somebody says, "Oh, I think you committed a

24   crime," or, oh, as -- and I think we're getting there in -- in

25   this witness's statement, that is that the defendant was told:

PROCEEDINGS

1    You have potential criminal liability.

2        Well, that's coming in.  That would come in.  That --

3    because that puts her on notice.  Obviously, the video puts her

4    on notice, but it's a -- but there's no way to cross-examine

5    that type of testimony that I know of.

6        And so the question in my mind is does it come -- is it

7    some kind of exception to the confrontation clause?  And

8    I guess one can argue that, well, a lot of evidence -- it's not

9    being -- coming in as a witness.  It's coming in -- and you

10   have a right to cross-examine a witness.  It's simply coming in

11   as substantive evidence, evidence of the crime, because the

12   evidence is she's told certain things are criminal, and then

13   she continues along the path of criminality or coverup or

14   concealment or obstruction of justice or any of the other

15   things.

16       And so it doesn't squarely fit in the right to

17   confrontation.

18       But I would say preliminarily, before I -- I haven't heard

19   any -- I haven't heard from the Government in this,

20   preliminarily, I just think it presents such confrontation

21   issues, it's in the form of a confrontation issue, that I'm

22   concerned about allowing it in.

23       I mean -- and I sit back, you know, after 26 years and I

24   think about how appeals go.  And I know that's not really the

25   way I should look at it, but if I were writing the appeal, if

1    there's a conviction in this case, I would say to the appellate

2    court judge:  I'd like you to look at this tape and, you know,

3    I want to tell you something about it.  Over our objection, we

4    could not cross-examine the individuals who conducted this

5    experiment.  We couldn't cross-examine the two women or whoever

6    it was who got the ADH -- the stimulants.  We couldn't

7    cross-examine this.  We couldn't crass examine that.  And it

8    all came in purportedly to show the defendant's state of mind

9    and not for the truth of this is the way the company works.

10        But who can draw that line?  Who could say, "Oh, that's

11   not the way comp-" -- I'm not going to view it as that's the

12   way the company works.  I'm going to view as to what the

13   defendant was shown.

14        And the problem is after two -- after seven weeks or

15   five weeks of testimony, everybody knows that's the way the

16   company worked, at least that's the allegation.  That's what

17   the evidence has shown.

18        And so to put it in this context, or this presentation,

19   it's so hard to draw the line even by a limiting instruction to

20   say just think about it -- don't think about it for the truth

21   that these women were prescribed -- even though they didn't

22   have ADH, they were prescribed medication.  Look at it only to

23   see what her reaction is.

24        Now, I think that you can bring in what she said about it.

25   What she said about it.  I saw this and this is what I said

1    about it.  That, I think, comes in because it shows her

2    awareness.  It shows her reaction.  It shows how she behaved,

3    it goes to all of those, and it goes to maybe her intent.

4        If told about this tape -- I mean, there's enough in her

5    reaction where she describes the tape itself that you don't

6    have to draw too many lines and too many -- it's not like a

7    conversation that's oblique and -- I mean, that you can't

8    understand it.

9        So, I mean, that's my tentative reaction.  Now, I should

10    hear from the Government since this is their --

11        **MR. FOSTER:**  Yes, Your Honor.  We'd be happy to brief

12    this if it would be helpful.  I have two observations.  One,

13    this is not testimonial in the sense of the confrontation

14    clause and any sort of evidence that goes to a defendant's

15    state of mind can be admitted, just that there happens to be

16    someone on there who isn't a witness in the case is not grounds

17    for exclusion.

18        The second point I'd make is it is not prejudicial in the

19    sense of 403, Ninth Circuit.  All appellate courts, I believe,

20    have held that if something is incriminatory, that doesn't make

21    it prejudicial.  And so it's not prejudicial within the meaning

22    of 403 either.

23        We'd be happy to brief it, but I think the defense has

24    clearly opened the door to this.  They've made clear the

25    central issue is the defendant's state of mind and the fact

1    that she watches an expert saying this is not the practice of

2    medicine, the practices that the company is engaging in, and

3    then persists is highly relevant.  And the fact that that

4    person can't be cross-examined is no different than if it was a

5    recording of the defendant with someone telling her that.  It

6    would still be admissible even though that person wasn't in

7    court, and it should come in with a limiting instruction.

8         **MS. BELL:**  Your Honor, I won't rehash, the Court said

9    it better than I could.  So everything the Court said, I think,

10   is -- exactly articulates our concerns.  Of course, the 403

11   analysis that the Court has to do goes exactly to the issue

12   that it's uncross-examined.  That is part of what makes it

13   highly prejudicial, we can't test it before the jury, and that

14   is certainly something that the Court appropriately considers.

15        The other issues I'd point out is that this -- this

16   exhibit has already been described in detail in

17   Government Exhibit 766 with Mr. Levy.  This is the second

18   witness who has been examined by the Government about the video

19   and about our client's reaction when the Court ruled previously

20   that this would not be admitted because it was cumulative.

21        The Court did so in reference to Government Exhibit 766,

22   which describes in detail the video itself as well as our

23   client's reaction to it.

24        Last point, Mr. Schachter, in making our arguments this

25   morning about why the fact of the diagnosis of ADHD is

 1   relevant, Mr. Schachter said "Well, Your Honor, the entire crux

 2   of the Government's case is that this platform was essentially

 3   handing out pills to people without a legitimate medical

 4   purpose."

 5       The video as Your Honor just observed goes to a finding

 6   that certain patients did not have ADHD and, therefore, again,

 7   I think reopens this question of how do we appropriately

 8   respond to that.  And I don't think we need to go back there at

 9   this juncture.  The Court's ruled.  We've made our record on

10   this.

11       But to put in a video where the finding is, "Oh, people

12   are getting prescriptions when they don't actually have ADHD,"

13   I think tees up the question of, well, there were multiple

14   people, including out of the 10 of the 16 that the Government

15   handpicked and presented to its expert who, in fact, did have

16   ADHD.  And if that's their indictment on the platform, then

17   our -- we certainly should be permitted to respond.

18           **THE COURT:**  Let's talk about that.  In other words,

19   the very last argument, I mean, we've -- we've kept out and --

20   as recently as today the argument about whether or not the 16

21   people had attention deficit disorder.  And the defense has

22   attempted to introduce evidence that would corroborate a

23   finding that one or more had attention deficit disorder.  The

24   Government has objected.  And I've taken the view that it's not

25   relevant.

1          Now, we're getting a flip side.  Now, the Government wants

2     to introduce evidence to show that two people on television in

3     a nationwide program were represented, one or two, represented

4     as absolutely not having attention-deficit disorder and easily

5     received drugs.

6          So, you know, if it's -- if it's germane that people

7     received -- who didn't have attention-deficit disorder received

8     drugs, why is it not relevant that the 16 people picked out

9     actually did have attention-deficit disorder.  Especially when

10    I've ruled that it makes no difference whether they did have

11    attention-deficit disorder.  I just think -- to me it seems

12    just unfair.

13              **MR. FOSTER:**  I think I can answer that, Your Honor.

14              **THE COURT:**  Yeah.

15          **MR. FOSTER:**  I think what the video goes to is the

16    quality of the encounter and it's germane that they're just

17    handing out pills.

18          Now, the point, Your Honor, is making is -- I don't think

19    these are either the flip side of the coin.  If there's someone

20    in an office saying, "I know you don't have ADHD, and I'm going

21    to give you a controlled substance anyways," that's a crime.

22          If there's someone in an office, which I think is the

23    situation Your Honor is speaking about, who's saying, "I'm

24    giving out ADHD to all comers, you know, anyone who walks in

25    the door."  It's not relevant whether someone has ADHD or

 1    doesn't have ADHD, they're still committing the crime.

 2        But the fact that there's, you know, potentially an even

 3    more egregious situation doesn't open the door.

 4        **THE COURT:**  First of all, we -- the -- I mean who is

 5    this provider?  I don't even know who the provider is.

 6        **MR. FOSTER:**  It's --

 7        **THE COURT:**  I know it's a Done employee, but do we

 8    have the identity?

 9        **MR. FOSTER:**  Yeah.  Shiny Easo.  And the defendant

10    keeps Easo on the platform prescribing after this, which is

11    highly relevant.  And I think all the questions that have

12    happened since Mr. Levy's testimony about whether you're in the

13    room, it suggests a lack of awareness on the defendant's part

14    as to what happened between the patient and provider, and this

15    shows she was aware.

16        **THE COURT:**  That -- okay.  That may be relevant --

17    wait a minute.  That may be relevant.  And if she testifies,

18    that may be entirely appropriate cross-examination.  Because

19    after being told about this person and then continuing to

20    employ this person is an indication of her intent.  I

21    understand that, but we're not at that stage of the proceeding.

22    We're at you're presenting the case and the question is, I

23    suppose, if you were to come in and say to me, "Now I have a

24    witness who's going to testify that the individual who is the

25    subject matter of the -- of the defendant's conversation here,

1    as a result of looking at the video, was not terminated."  I

2    don't know.  The question is, it's so -- is it too far afield

3    and so forth.

4        Okay.  This is what I'm going to do, because it's 3:15.

5    I'm not going to allow it at this point.  I'm going to allow

6    the questions.  You read through the questions.  And I have

7    looked at the -- maybe I should just think about it overnight.

8        He's not going anywhere, is he?  He's from San Francisco.

9        MR. FOSTER:  He is from here, Your Honor, yes.

10       THE COURT:  Okay.  So, I mean, if necessary, he can be

11   brought back tomorrow if I change my mind, which as to the

12   misfortune of the lawyers in this case on both sides, I seem to

13   do from time to time.

14       Let's the jury back.

15       You're free to inquire into this, okay, and read through

16   the testimony.

17       Yes, Ms. Bell.

18       MS. BELL:  Very quickly.  On that point, I just -- we

19   don't know how this video was edited, so to the extent -- could

20   we -- how or if the video was edited and so to the extent the

21   questions are going to leave the impression that, well, this

22   was the totality of the interaction and, therefore, she had

23   notice, I think we just need to be careful about how this is --

24   there are series reliability problems is my point with the

25   video itself, the contents of the video.

PROCEEDINGS

1      Right.  But if there are going to be questions about the

2    video and our client's reaction, I don't want there to be --

3    this to be characterized as if it were a clinical -- a full

4    clinical interaction.  We don't know how it was --

5          **MR. SCHACHTER:**  I think they're just using -- they're

6    just eliciting what Ms. He said in the -- in the messages.

7          **THE COURT:**  That's what I understand.

8          **MS. BELL:**  That's fine.  I didn't know if the

9    questions would go beyond that.

10          **THE COURT:**  That's a proper concern.  I understand

11    that.  And by the way, that's another reason why I'm concerned

12    about the video itself.

13          **MR. FOSTER:**  Just on that, Your Honor, it's the whole

14    video, it's what she watched.

15          **THE COURT:**  Of course it's the whole video.

16          **MR. FOSTER:**  And it's what she watched.

17          **THE COURT:**  Ms. Bell is referring to the fact of

18    what's left on the -- what's on the cutting -- on the floor of

19    the -- of the -- you know, they take hours, these -- they take

20    hours and then they cut it down to a snippet.  This is the big

21    snippet, but what was it snipped from?  That's what the issue

22    is.

23          **MS. BELL:**  Exactly, Your Honor.

24          **THE COURT:**  The out -- as we call it in the business,

25    the outtakes.  I don't know where the outtakes are, and maybe

```
 1    there were none.  Maybe it was just pristine, unsnipped, but I
 2    doubt that since I've never seen anything not edited on
 3    television.
 4         MS. BELL:  Thank you, Your Honor.
 5         THE COURT:  Or anywhere in my life.
 6      Okay.  Bring in the jury.  Let's get going.
 7              (The jury enters the courtroom.)
 8      (Proceedings were heard in the presence of the jury.)
 9         THE COURT:  Okay.  Let the record show -- please be
10    seated.
11      Let the record show that the parties are here.  The
12    lawyers -- everybody's here.  Jury's here.  Everybody's here.
13    Almost everybody's here.  All right.  You may start wherever
14    you wish.
15         MS. GREEN:  Thank you, Your Honor.
16    BY MS. GREEN:
17    Q.  Can we bring up -- perfect.
18      Just to reorient, we were in the messages from around
19    December 2022.  We just read through a number related to the
20    risks that you were advising Defendant He on.
21      And then on December 3, 2022, you wrote (as read):
22          "You can't move fast, break things in
23          healthcare."  And then moving to page 62,
24    A.  We can't see.
25         MS. GREEN:  Oh, I'm sorry.  Thank you.
```

1      This is still Exhibit 897, Ms. Scott, and we were just

2  looking at page 63, and moving up to page 62.

3  Q.   (as read):

4           "You can't move fast break things in healthcare.

5      Healthcare it conservative for a reason.  Same with

6      law, finance.  But I feel like I have to tell you my

7      honest opinion, continue as is means personal risk

8      for you, company risk, customer risk.  Government can

9      just say you're negligent and not taking the concerns

10      and accusations seriously."

11  And moving to page 61.  (as read):

12           "The accusations from the articles have to be

13      addressed versus just saying that it's not a problem

14      because everyone is under investigation.  That answer

15      doesn't build confidence or address the actual

16      concerns.

17           I tried bringing up the risk a few times, but

18      you wanted to change the topic.  I might be the only

19      person you might listen to or not, so I feel like I

20      have to try to get through."

21      Mr. Prasad, we just walked through a number of messages

22  from December 2022.  Did you discuss with Defendant He the

23  risks she could be facing personally and the company related to

24  issues with Done's prescribing.

25  A.   Yes.

PRASAD - DIRECT / GREEN

1  Q.    And you wrote -- (as read):

2              "You can't move fast and break things in

3         healthcare and healthcare is conservative for a

4         reason."

5         Did you discuss that issue with Defendant He?

6  A.    Yes.

7  Q.    Why did you raise that issue with Defendant He?

8  A.    Because the consequence of mistakes in healthcare are more

9  serious than the consequences of mistakes in other things.

10 Q.    And when -- we've read a number of messages about

11 Defendant He's response to these risks.

12        When you raised these risks with Defendant He, how did she

13 respond?

14 A.    She did not address the substance of the concerns.

15 Q.    Did you feel like she was denying them?

16 A.    She would not address the substance.  She would speak

17 about the news -- the articles or the press but she would not

18 address the core concern.

19 Q.    Did -- when you discussed the topics with her, did she

20 express any interest in improving Done's compliance with

21 prescribing practices?

22 A.    She did not share any -- anything like that.

23 Q.    We're going to go back to a topic that we discussed

24 previously, so apologies for the change in chronology.

25        I would like to go back to when we were talking about that

1    *GMA* video, so that was back in September 2022.

2            MS. GREEN:  So, Ms. Braga, if you could pull up

3    page 92, please, just to reorient everyone.

4    BY MS. GREEN:

5    Q.   So you were discussing this *GMA* video with Defendant He

6    and Defendant He wrote to you (as read):

7            "Obviously not for positive news but more like

8        negative and fun."

9        And then wrote (as read):

10           "And one" --

11       Describes that they sent reporters to use the platform one

12   didn't have ADHD and got diagnosed.

13       Do you remember that?

14   A.   Yes.

15   Q.   Okay.  And you said that Defendant He prepares for a blog

16   response to this video; correct?

17   A.   Yes.

18   Q.   So let's -- first of all, did you discuss the issues

19   raised in the *GMA* video with Defendant He?

20   A.   Later.  Not at that time.

21   Q.   Okay.  Well, let's look at the response that Defendant He

22   prepared.

23           MS. GREEN:  So page 90, please.  And so let's focus --

24   yeah, that's great.

25   \\\

BY MS. GREEN:

Q.   I'm just going to read from the -- she mentioned some stuff about clinical interaction, telehealth.  She also writes (as read):

        "All clinicians within the field of psychiatry
        are aware that we work in a field that does not have
        lab tests or radiographic evidence to 'prove'
        diagnoses - so we listen with empathy and experience
        and we treat symptoms and try to help.  Does this
        mean that we can be 'tricked'?  Absolutely.  But this
        can occur in any field of medicine because we
        cannot -- absolutely cannot confirm diagnoses...  We
        do not rely on diagnoses to dictate treatment as much
        as we rely on symptoms and focus on alleviating or
        ameliorating symptoms."

Defendant He, when providing this response to the *GMA* video, referenced being tricked; correct?

A.   Yes.

Q.   You also observed the *GMA* video; correct?

A.   Yes.

Q.   What did Defendant He communicate to you about whether or not she felt the patients had tricked the Done providers?

A.   When she shared the video with me -- she used that word here but she didn't communicate that to me directly.

Q.   When you -- did you view this word, that the providers

```
 1   were tricked, or Done was tricked, consistent with what you
 2   observed in the video?
 3             MS. BELL:  Objection, Your Honor.
 4             THE COURT:  Sustained.
 5             MS. BELL:  Yeah.
 6   BY MS. GREEN:
 7   Q.   What was your reaction to Defendant He's drafted response?
 8             MS. BELL:  Objection, Your Honor.  Again, relevance.
 9             THE COURT:  Well, I thought we were going to --
10   sustained.
11             MS. GREEN:  We're going to go back -- ahead to where
12   we were in the chronology, so let's go back to page 59.
13             THE COURT:  Page 59?
14             MS. GREEN:  Of 897.
15             THE COURT:  Sorry?
16             MS. GREEN:  Yep, 59 of Exhibit 897.
17   BY MS. GREEN:
18   Q.   So, Mr. Prasad, you -- we went over, you know, tens of
19   pages of text messages where you warned Defendant He of the
20   risks she might be facing.  And then let's look at the response
21   you got from Defendant He on December 8, 2022 (as read):
22             "Last month we got 1 million profit - highest
23        record."
24        You raised concerns with risks to Defendant He; correct?
25   A.   Yes.
```

PRASAD - DIRECT / GREEN

1    Q.    What was Defendant He's response?

2    A.    She had not addressed the risks that I raised.

3    Q.    Did she just raise the $1 million profit that the company

4    just had?

5    A.    Yes.

6    Q.    And you actually responded to that message on page 58,

7    again, pointing out the regulatory risk for the whole space and

8    prescribing --

9          (Reporter interrupts for clarification of the record.)

10         MS. GREEN:  Sorry.

11   BY MS. GREEN:

12   Q.    -- regulatory risk for the whole space and prescribing

13   controlled substances online.

14         MS. GREEN:  Let's look at page 55, please, also on

15   December 8th, 2022.  And let's look at just the top messages,

16   please.

17   BY MS. GREEN:

18   Q.    Did you write to Defendant He (as read):

19         "You are operating as if the risk is closer to

20         0 percent and focusing on the upside.  But everyone

21         else and the market is thinking the risk is closer to

22         100 percent and focusing on the downside."

23   What were you communicating to Defendant He here?

24         MS. BELL:  Objection, Your Honor.  I think the

25   document speaks for itself.

1          THE COURT:  Overruled.

2          THE WITNESS:  I was communicating that the risk that

3    she is facing is significantly higher than she made it out

4    to -- than maybe she perceived or the way she was operating.

5    BY MS. GREEN:

6    Q.   And on page 54, did you again inform Defendant He on

7    December 8, 2022, (as read):

8              "Currently the answers are not inspiring

9         confidence.  If the answer were we are doing

10        everything we can to prevent abuse, we are in active

11        conversations with the regulators, you have the top

12        law firm representing us, we have the industry

13        experts and lobbyist and litigators on our side,

14        someone could make a credible risk assessment and

15        still take the risk."

16        What did you discuss with Defendant He about her reaction

17   to the risks you were raising or her response to the risks you

18   were raising?

19   A.   They were not -- not -- the responses were not satisfying.

20   Q.   And why were they not satisfying?

21   A.   They were not addressing the root concerns, the root

22   issues.

23   Q.   And when you say "the root issues," what are you referring

24   to?

25   A.   The core issue being is the company taking enough

PRASAD - DIRECT / GREEN

1  precaution and care in terms of, you know, the services

2  providing to make sure that, you know, people are only getting

3  the prescription if they actually need it.

4  Q.   Let's look at page 51, please.  We've -- you know, I moved

5  ahead through a number of messages.

6       Did you -- also in this time frame were you talking about

7  finding potentially a buyer for the company, that type of --

8  those types of issues?

9  A.   Yes.

10 Q.   Okay.  And so on page 51, you wrote on December 8th, 2022

11 (as read):

12          "Which goes back to what your CMO was saying

13       1.5 years ago.  Now I understand why he wanted to

14       sell to a hospital system.  Before" -- there's a

15       swear word -- "before S hits the fan.  I don't know

16       all these issues -- I didn't know all these issues

17       back then.  In hindsight, he was probably right.

18       Could have sold the business for a hundred million to

19       a hospital system before all the press and

20       investigation."

21 And you talk about discount now.

22 And then let's go to page 50 (as read):

23          "The CMO guy saw this coming since he was from a

24       healthcare background.  And so he was pushing you to

25       exit while you're still under the radar and before

PRASAD - DIRECT / GREEN

1          the scrutiny."

2          And he said (as read):

3              "Before earlier this year, someone would have

4          valued the business highly."

5          This reference to a CMO what does CMO stand for?

6   A.    Chief medical officer.

7   Q.    And who was that?

8   A.    It was a former -- I forget the -- Brindala.  Brindala,

9   former chief medical officer.

10  Q.    So did you discuss this issue about what Dr. Brindala,

11  what risks he may have seen facing the company with

12  Defendant He?

13  A.    I had never talked to Dr. Brindala, but Ruthia had shared

14  with me that they had disagreed and he wanted to sell the

15  company to a hospital system.  And this was in 2021.

16  Q.    Did she share with you why they disagreed?

17  A.    What she shared with me was she wanted to grow the

18  business, and he wanted to sell it to a hospital system.

19  Q.    Did she discuss with you any disagreements related to the

20  manner of patient care?

21  A.    Not specifically with me.

22  Q.    But you wrote in these messages (as read):

23              "The CMO guy saw this coming since he was coming

24          from a healthcare background."

25          Can you please explain to the jury why you wrote that?

1    **A.**   What -- what I was -- in this time I -- maybe I -- I

2    remembered that there was a prior employee who -- who had

3    been -- seemed quite frustrated, and I could kind of maybe put

4    myself in his shoes and probably think if I were the chief

5    medical officer from a healthcare background, I may have seen

6    these issues and it would make sense why I would advice to sell

7    the company before it's too late.

8    **Q.**   Seen what issues, Mr. Prasad?

9    **A.**   I -- I was referring to likely healthcare and operations

10   issues that he saw.

11   **Q.**   Issues related to the prescribing practices?

12        **MS. BELL:**  Objection, Your Honor.  Leading and

13   speculation.  Foundation not based on the witness's testimony.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  Yes, to do with the company's practices

16   and the appointments and things like that.

17   **BY MS. GREEN:**

18   **Q.**   So let's move to page 44 and 45, please.  And we'll start

19   with page 45.

20       There are some more messages, but we're still on

21   December 8th, 2022.  So you've been raising the risks to

22   Defendant He, and let's look at her response.

23       Did Defendant He write to you (as read):

24         "Well, any business has risks and we just need

25        one investor who may understand the industry better

PRASAD - DIRECT / GREEN

1        and have some personal connections with ADHD."

2        And then she continues on page 44 (as read):

3            "Well, companies like Uber or Airbnb also were

4        running with regulatory risk."

5        Defendant He in her response to you here compares it to

6   Uber and Airbnb.  Did you discuss with Defendant He the

7   appropriateness of that comparison?

8   **A.**   In these messages?

9   **Q.**   Messages or generally.

10  **A.**   Not generally.  She had mentioned this in one of the

11  earlier messages you had shown from a few years ago, so she had

12  made this comparison before.  But outside of these messages, I

13  don't remember specifically discussing that with her.

14  **Q.**   When you were spending sort of pages warning her of the

15  risks, were you thinking that her company -- or conveying to

16  her that the company's risks were the same as those as Airbnb

17  and Uber?

18  **A.**   No.

19  **Q.**   So she was making that comparison?

20  **A.**   Correct.

21  **Q.**   Did you agree with that comparison?

22  **A.**   No.

23  **Q.**   Why not?

24  **A.**   There were different kinds of -- kind of risks.  This is

25  different because it's healthcare, and the consequences are --

 1   are different of making mistakes in healthcare versus,

 2   you know, a short-term rental.

 3   **Q.**   When you say the consequences are different, what do you

 4   mean?

 5   **A.**   People having health issues or addiction and things like

 6   that.

 7           **MS. GREEN:**  The Government's going to move to admit

 8   pages 42 and 41, please.

 9           **THE COURT:**  Okay.  This whole exhibit is admitted.

10           **MS. GREEN:**  Yeah.  I'm just referencing the page

11   numbers like you instructed.

12           **THE COURT:**  So I don't think you should say we're

13   moving 41 and 42 when they're already in evidence.  You simply

14   can cite to those pages, and that's helpful for all of us to

15   follow it.  Okay?

16           **MS. GREEN:**  I will, Your Honor.  Thank you.

17   **BY MS. GREEN:**

18   **Q.**   So page 42.  A few days later, December 13th, 2022, did

19   you write to Defendant He (as read):

20               "The regulators will just say by doing it

21         online, they're just cranking out as many

22         prescriptions per hour as they can."

23         And then moving to page 41 (as read):

24               "At least so -- I missed it.  Sorry.  "So it

25         should be offline in person."

PRASAD - DIRECT / GREEN

1          That was the top of page 42.  And then moving to page 41

2     (as read):

3               "At least so each patient gets proper attention

4          for a thorough diagnosis.  If I were a regulator, I

5          would describe it as a prescription efficiency

6          machine."

7          Why did you describe it as a "prescription efficiency

8     machine" to Defendant He?

9     **A.**    Well, the allegations in the media were, you know, that

10    it's a -- calling it a pill mill.  Basically the allegations

11    were that, you know, if the appointments are not, you know,

12    long enough, then it's just potentially just generating as many

13    prescriptions as possible.

14         And those were the -- I didn't have any special insight

15    into the healthcare side of the business, but those were the

16    allegations against the company.

17    **Q.**    And you raised those concerns with Defendant He?

18    **A.**    Yes.

19    **Q.**    Let's look at pages 32 to 33, please, and we'll start with

20    page 33.

21         On December 15th, 2022, did you write to Defendant He (as

22    read):

23              "If you just want to keep hiring junior people

24         like this, I don't know how I can help you.  It's

25         your company.  It's not how I would run the company

PRASAD - DIRECT / GREEN

1      if it were my company."

2      You reference (as read):

3          "I would bring in a high-powered CEO, several

4      strong C suite, build a board, maybe stop prescribing

5      Adderall and just prescribe the nonaddictive ADHD

6      meds, and not bring any Adderall/Ritalin would bring

7      in strong healthcare leadership, strong legal risk

8      compliance, et cetera."

9      You then write (as read):

10         "The problem with junior people is they don't

11     know any better.  Sure, they will just do what you

12     tell them to because they're not smart enough to ask

13     the right questions and think more strategically or

14     critically, but that's not going to save your

15     company.  That's just more of the same."

16     And then further up, you write (as read):

17         "The kind of people you're hiring are C and D

18     grade players.  They are just going to do what you

19     ask.  They do not bring the real experience,

20     leadership, maturity to the company.  It's just more

21     of the same."

22     And then on page 32, you continue (as read):

23         "I think you just want to do things your

24     way/continue as is, but that's what's gotten you into

25     trouble.  A strong healthcare CEO can fix this.

1              Maybe stop prescribing Adderall.  You mentioned

2              focusing on other ADHD meds that are not controlled

3              substances.  Improve the appointment thoroughness.

4              Move first appointment to in person ASAP.  Build a

5              strong credible C suite.  Build a board with medical

6              experts.  Partner healthcare CO or PE firm."

7              First of all, just a couple of reference to the board

8    here.  Did Defendant He have a board, as far as you were aware?

9    A.    I believe it was just herself.

10   Q.    Mm-hmm.  And there was this discussion about the type of

11   people Defendant He had and was hiring.

12              Did you discuss the types of people Defendant He was

13   hiring?

14   A.    Yes.

15   Q.    And did you agree with Defendant He's decision-making

16   there?

17   A.    No.

18   Q.    Why not?

19   A.    I felt that the company needed a stronger more -- more

20   experienced people in healthcare and operations and legal.

21   Q.    And did you feel that with the types of people she was

22   hiring, they would just do what Defendant He would ask?

23   A.    Yes.

24   Q.    Let's look at page 31, please.

25              December 15th, 2022, you write, again, (as read):

1          "The way things are going, the company lacks

2      credible senior leadership to fix issues/make

3      necessary changes."

4      It mentioned some other changes, like stopping prescribing

5  Adderall.

6      And then you write (as read):

7          "Number 2 not seeing interest in change or doing

8      things differently.  The investigators will interview

9      current and former employees, patients, doctors,

10     et cetera, and may just accuse you of negligence as

11     healthcare, it's people's lives, it's highly

12     regulated."

13     And then further up (as read):

14         "Right now the team is full of junior C and D

15     players who just do what you say and don't know any

16     better."

17     And further up, you write to Defendant He (as read):

18         "Your employees won't tell you this even if

19     that's what they think because they either don't know

20     better or they will be scared of getting fired.  Your

21     investors are not active, they are keeping their

22     distance.  There is no board."

23     And then moving to page 30.  (as read):

24         "In two weeks, it became obvious" -- you write

25     (as read):

PRASAD - DIRECT / GREEN

1              "In two weeks, it became obvious the company is

2         in big trouble.  I tried to help."

3         And you mention some individuals.  (as read):

4              "But I'm not seeing any interest in change and

5         now *Laura is sending more subpar candidates."

6              And then further up, you mention again the risks

7         that she is face, a reluctance to hire experienced

8         people, and you say (as read):

9              "On top of that, there is an investigation going

10        on, and I'm not sure if that is being taken seriously

11        in terms of driving change.  It feels like you are

12        just focused on revenue growth and ignoring all the

13        problems, but those problems will kill the company.

14             "What do you do if the investigators come next

15        week and say they interviewed ex employees, doctors,

16        and accuse you of negligence and shut down the

17        company, and go after you personally for negligence

18        in running a healthcare operation and overprescribing

19        controlled substances?"

20        You reference -- did you discuss with Defendant He the

21   fact that even within two weeks, you were seeing no interest in

22   change?

23   **A.**   Yes.

24   **Q.**   What was Defendant He's response when you raised that with

25   her?

1    **A.**    I did not -- I do not remember her addressing that -- her

2    addressing what I -- the -- what I raised.

3    **Q.**    Let's look at page 29, please.

4        You, again, mention the risks at the top of page 29.  And

5    then on page 28, you write (as read):

6            "Someone has to tell you the truth.  You're

7        employees won't do it because you'll just fire them.

8        You don't have a board, investors aren't saying

9        anything.

10            "The problems are legal risk, compliance,

11        regulations, medical practices, and quality of team

12        and leadership."

13        And then further up --

14            **THE COURTROOM DEPUTY:**  Is that 28 and 27?

15            **MS. GREEN:**  29 and 28, please, Ms. Scott.  Thank you.

16    Thank you.  Thank you so much.

17    **BY MS. GREEN:**

18    **Q.**    And then (as read):

19            "Now I'm thinking the CMO you used to complain

20        about wasn't wrong.  It's just you don't like what he

21        was saying.  As a healthcare executive" --

22        Moving up, please.  (as read):

23            -- he saw all these issues coming before they

24        came, before the press started.  No wonder he was

25        asking you to sell the company for a 100M because

1        it's too late.  I don't know him, but I imagine he

2        probably felt like you won't listen to what needs to

3        be done and he quit."

4        Again, we see here a reference to the CMO, Dr. Brindala.

5        Why did you write to Defendant He, (as read):

6             "I imagine he probably felt like you won't

7        listen to what needs to be done and he quit"?

8   A.   I felt that at that time myself, so...

9   Q.   So you felt he may have shared that feeling?

10  A.   Yeah.

11  Q.   Let's look at page 27, please.

12       **MS. GREEN:**  Thank you Ms. Scott.

13  BY MS. GREEN:

14  Q.   And then continuing, you wrote on December 15th, 2022, (as

15  read):

16            "If I were a regulator, I would say there is

17       nothing being done to show change, to take the

18       prescription practices and compliance issues

19       seriously, to bring in real healthcare medical

20       experts, it's just business as usual and focused on

21       revenue growth instead of fixing the legal risk,

22       compliance, operations problems.

23            "This is 10 times" -- "10X worse than I thought

24       when I started four weeks ago."

25       You mentioned this (as read):

PRASAD - DIRECT / GREEN

1          "Focus on revenue growth instead of fixing legal

2     risk compliance issues, et cetera."

3     Did you discuss with Defendant He that she was -- seemed

4  to be prioritizing revenue growth over focusing the legal

5  and -- over focusing on the legal and compliance issues?

6  **A.**    Yes.

7  **Q.**    And did you also notice that in your interactions with

8  Defendant He when you spoke about these issues?

9  **A.**    Yes.

10        **MS. GREEN:**  Let's look at page 26, please.

11  **BY MS. GREEN:**

12  **Q.**    Also on December 15th, 2022, you write to Defendant He (as

13  read):

14          "But the truth is, there are serious legal,

15     regulatory, potentially even negligence accusations,

16     you may personally be at risk, Dr. Brody license may

17     be at risk.  The company lacks expertise, senior

18     leadership, credible people.  It is full of junior C

19     and D 'yes men' who just do what you ask them to do

20     and do not bring critical thinking."

21     And higher up (as read):

22          "Also you get 10x scrutiny of other companies

23     because it's healthcare, controlled substances,

24     people's lives."

25        **MS. GREEN:**  And let's go to page 25, please.

1          THE COURT:  Before you do, I have a question.  Many of

2    these pages now that we've gone over for the last 15 minutes or

3    so show your conversations.

4          THE WITNESS:  Yes.

5          THE COURT:  Your input.  These are things that you

6    said.

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.  So they don't say anything that --

9    they don't have references to the defendant's response to this.

10   Did the -- first of all, how do you know that the defendant

11   received these e-mails -- whatever they are.  Chats.  I don't

12   know what they are.  Communications.

13        Do you know that the defendant received these

14   communications even though there's nothing on the page that I

15   can see that indicates she did receive these communications?

16         THE WITNESS:  Yes.  When you send the message in this

17   Facebook application, it shows that it's been delivered.  Or

18   it's been seen by --

19         THE COURT:  Well, wait.  There's a difference.  It

20   shows -- I mean, you have to explain this to me because -- for

21   obvious reasons.

22        Okay.  So it shows delivered.  Or it shows read.  But, I

23   mean, there's a difference between sending something to

24   somebody and somebody reading it.

25         THE WITNESS:  It says "seen."

PRASAD - DIRECT / GREEN

1    **THE COURT:**  My question to you is, does it indicate

2    that it was read as distinct from simply being delivered?

3    **THE WITNESS:**  It -- first it shows delivered, then it

4    shows read.

5    **THE COURT:**  Okay.  And is it your testimony that

6    everything that we have -- that you have testified to, all of

7    these communications, to your recollection, was actually read

8    by the defendant -- read by somebody who you sent it to,

9    whoever that may be?  Ostensibly, it was the defendant.

10   **THE WITNESS:**  Yes.

11   **THE COURT:**  Okay.  Thank you.  You may proceed.

12   **MS. GREEN:**  Thank you, Your Honor.

13   BY MS. GREEN:

14   Q.   So page 25 I think was where we were (as read):

15        "That's why it's so regulated.  You cannot run a

16        healthcare company like a social media company.  This

17        is not TikTok.  This is not Zynga.  You are running a

18        healthcare company, not a consumer social app.  You

19        need people to know what they are doing.  You are

20        dealing with people's lives.  Maybe you don't like

21        what I say.  Maybe you don't want to hear the bad

22        news.  Maybe you just want to present everything is

23        fine.  I didn't even" --

24   And at the top of the page (as read):

25        -- "know it's as bad as it is."

1    This is -- you made a couple of references to realizing

2    quickly how bad it is.  What are you referring to there?

3    **A.**   Prior to this engagement, when I had raised any of the

4    media articles, the response was essentially that the articles

5    were wrong and I had kind of assumed -- as a friend I had

6    assumed she probably has lawyers and doctors and people working

7    on this stuff.

8         When I consulted for four weeks, the new thing I observed

9    was when I brought up these concerns, there was no adequate --

10   or no response given that was convincing.  And so it kind of

11   went from -- my assessment went from there's a problem here, to

12   there's a problem here and I'm not sure something is being done

13   about it.

14   **Q.**   And when you say there was no response that was

15   convincing, are you meaning -- referring to no response from

16   Defendant He that was convincing?

17   **A.**   Yes.

18   **Q.**   Let's look at page 24, please.  December 15th, 2022, you

19   write, (as read):

20        "I really don't know what to do at this point.

21        You don't listen to the CMO.  You're not listening to

22        me.  I can keep telling you the same thing."

23        And then moving to page 23 at the top.  (as read):

24        "I think the company is headed for serious

25        problems, needs drastic change, but it's a ticking

1      time bomb."

2           And let's look at page 20 -- 22.

3           **MS. GREEN:**  Let's zoom in on those -- on the full set

4      of highlighted messages, please.

5      **BY MS. GREEN:**

6      Q.   You think -- you wrote again on December 15th (as read):

7               "You think there is no problem and every company

8           is under investigation and it's just about the latest

9           fire.  You're not seeing the bigger picture."

10     And then you write (as read):

11              "And Dr. Brody is crazy.  He's saying things

12          like he will prescribe Adderall even if the

13          government executes him.  Like what lawyer or

14          regulator is going to take him seriously?  I don't

15          know what I can do at this point.  I have tried

16          giving advice.  I don't think there's an interest in

17          changing.  It's the same day-to-day firefighting.

18          Tactical execution."

19     Why did you write to Defendant He about (as read):

20              "Dr. Brody is crazy, he's saying things like he

21          would prescribe Adderall even if the government

22          executes him"?

23          **MS. NECHAY:**  And, Your Honor, I would just object.

24     This calls for hearsay.

25          **THE COURT:**  Well, it depends on who's -- it depends on

```
1   the basis for his statement.  Maybe I'll ask it this way:  Did
2   the statement -- was it Dr. Brody who said this, that he will
3   prescribe medicine even if -- or Adderall -- where is the
4   statement?
5           MS. GREEN:  Page 22, Your Honor.
6           THE COURT:  Was it -- okay.  And I'm not leading.  I
7   have no idea what the answer is.
8       Was it Dr. Brody --
9           THE WITNESS:  So --
10          THE COURT:  -- who said that -- where is it?
11          MS. GREEN:  Page 22.  If you look near the bottom, it
12  says, (as read):
13          "Dr. Brody -- he's saying things like he will
14      prescribe Adderall even if the government executes
15      him."
16          THE COURT:  Did you hear Dr. Brody say that?
17          THE WITNESS:  No.  It was Ruthia shared that with me.
18          MS. NECHAY:  So, Your Honor, I'd like to --
19          THE COURT:  Well, wait a minute.  It was -- it was
20  Ms. He who said it?
21          THE WITNESS:  Who told me that Dr. Brody told her
22  that.
23          MS. BELL:  This is double --
24          THE COURT:  Okay.  So it's admissible.
25          MS. GREEN:  Thank you, Your Honor.
```

 1              THE COURT:  It's admissible.  Okay?

 2              MS. GREEN:  May I ask my question, then, Your Honor?

 3    That was an objection --

 4              THE COURT:  Go ahead.

 5              MS. GREEN:  Yeah.

 6    BY MS. GREEN:

 7    Q.   So why did you write that to Defendant He, what Dr. Brody

 8    had said?

 9    A.   She had shared that with me in a prior conversation and I

10    thought that was concerning.  I mean, that's kind of a more

11    third party, but I thought that was concerning.

12    Q.   Why did you think that was concerning?

13    A.   Because he was the -- you know, the medical leadership of

14    the company, so...

15    Q.   So we just -- and let's look at page 19.  We just went

16    through a number of messages where you were raising sort of

17    concern after concern with Defendant He; correct?

18    A.   Yes.

19    Q.   And let's look at Defendant He's response.  She just

20    writes to you (as read):

21              "And that's what we're working on, right?  And

22         bringing you to interview the people to evaluate

23         their skills."

24         What was -- how did Defendant He respond to you when you

25    were raising all of these concerns?

1    **A.**   She was not responding to them.

2    **Q.**   Did you feel in any way that she was trying to shift --

3    shift the direction to what you were supposed to be doing,

4    failures you might have with recruiting, et cetera?

5             **MS. BELL:**  Objection, Your Honor.  Leading.

6             **THE COURT:**  Sustained.

7             **MS. GREEN:**  That's fine, Your Honor.

8    BY MS. GREEN:

9    **Q.**   Let's look at page 17, please.  Again, on December 15th,

10   so after Defendant He's response, you write (as read):

11            "Like I'm not seeing seriousness or urgency."

12       You reference someone that you were trying to recruit.

13   You reference on page 16 (as read):

14            "I would go build a strong board.  I would do a

15       real COO search.  You're running a healthcare

16       company, exclamation mark.  You're not Roman, you are

17       not Hims.  They aren't prescribing controlled

18       substances, they're selling ED drugs."

19       Why did you write to Defendant He that she wasn't Roman or

20   hims?  And could you also explain to the jury what Roman and

21   Hims are as you answer that question?

22   **A.**   Yeah, there are online telehealth platforms, but the kind

23   of medication they prescribe is different.  It's not controlled

24   substances, as far as I understand.

25   **Q.**   And why were you making that comparison point to

PRASAD - DIRECT / GREEN

1    Defendant He?

2    **A.**    I was drawing a distinction because controlled substance,

3    you know, are considered to be more serious, and so I -- my

4    understanding was you have to be more careful about prescribing

5    controlled substances instead of, you know, other kinds of

6    medication.

7    **Q.**    And let's look at page 15, please.  You write in the

8    bottom (as read):

9            "If I were a regulator, I would say this company

10           doesn't even care about any of those things.  They

11           don't even hire people with medical, healthcare,

12           legal, risk, compliance background.  I'm not sure I

13           should be involved with this.  Maybe it's better to

14           end the engagement here."

15    You say it's not going to be healthy for you and not worth

16   the legal and reputational risk for you.  And then you say (as

17   read):

18           "I don't see seriousness about change, either

19           taking the issues seriously or urgency to change.

20           All I can give you my best advice but I can't force

21           you to do anything or change or take things

22           seriously."

23    Then on page 14, at the top of the page you say (as read):

24           "Issues are being denied, ignored, trivialized.

25           It's a ticking time bomb at this point.  It's a

1          social -- it's a healthcare company, not a social

2          media app or mobile game."

3      And then on page 13, please.  (as read):

4          "It's a serious business in a highly regulated

5          space of controlled substances."

6      Mr. Prasad, you mentioned here that -- whether maybe you

7  should just end your engagement.

8      Based on your interactions with Defendant He, what was

9  your view as to her willingness to be receptive to your

10 concerns at this point?

11 **A.**   I felt that I would not be able to change things, and so I

12 decided it was time to end the engagement.

13 **Q.**   Were you frustrated at this point?

14 **A.**   Yes.

15 **Q.**   I think you mentioned you were concerned about your health

16 even at this point?

17 **A.**   Yes.

18 **Q.**   Okay.  And let's look at page 13, higher up, please, you

19 write (as read):

20          "At this point" -- "at that point I'd be

21          wondering if it's safer to be in China and if they

22          can extradite you from China or not since you're a

23          Chinese citizen.  The fact that one has to even ask

24          that question is not a good thing.

25          "I know you don't think this is likely but if

1          the investigators find any spread of negligence and

2          press criminal charges against you and Brody, your

3          best bet is to be in China so they don't extradite

4          you."

5          Why did you write that to Defendant He?

6     **A.**    I was highlighting to her that she's at great personal

7     legal risk.

8     **Q.**    And let's look at page 12, please.

9          So, again, you had raised a number of concerns, and then

10    let's look at Defendant He's response.  She just said to you

11    (as read):

12             "It was your job to find this candidate, and

13          we've been working on it for a month with limited

14          progress.  Our recruiter is stepping in to assist.

15             "It's not acceptable to harass someone

16          personally because of challenges with a task."

17          And you respond to her, at the top of page, (as read):

18             "I'm not harassing anyone.  I'm trying to get

19          you to wake up and see/accept the problems.  Now I

20          understand why people keep quitting.  If it's this

21          frustrating for me, I can only imagine a former CEO

22          or any other executives."

23          What was -- so you raised these concerns and Defendant He

24    wrote to you that you were harassing her.  What was your

25    reaction to that?

PRASAD - DIRECT / GREEN

1    A.    I did not believe I was harassing her.  I was trying to

2    share my honest feedback and try to raise -- raise the concerns

3    so that she would accept the problems and make a plan to fix

4    them.

5    Q.    And let's look at page 10, please.

6          And on page 10, you write to her, (as read):

7                "Continue operating as is.  I don't think I can

8          help there.  Then it's a waste of both our time and

9          your money if the goal is to continue to be tactical

10         and in the weeds."

11         And then you say (as read):

12               "It has to be done thoughtfully and

13         strategically if the desire is to do things right and

14         not just fast.  If you want to do things right,

15         there's a different approach to be thoughtful and

16         strategic about it."

17         Did you discuss with Defendant He this concept of doing

18   things right, not just doing things fast?

19   A.    Yes.

20   Q.    And what was her reaction or response to that?

21   A.    I did not see a response to that.

22   Q.    Okay.  And let's look at pages 8 to 9, please.

23         So this is -- we can start with page 8 -- well, actually,

24   sorry.  Let's go to page 9.

25               MS. GREEN:  That was my mistake, Ms. Braga.

1   BY MS. GREEN:

2   Q.   So Defendant He wrote a response to you and, again,

3   summarizes this issue that she is sort of dissatisfied with

4   your recruiting efforts.

5        Is this -- this is the second time we've seen this.  So

6   you raise these concerns and then Defendant He sort of points

7   out your recruiting.

8        Can you explain to the jury that interaction?

9   A.   Yes.  I felt that the company needed more experienced

10  people.  I had looked for candidates who were more experienced

11  healthcare and legal professionals, executives, and the kind of

12  candidates the company seemed interested in were more of

13  business development oriented executives.  And so we just -- we

14  disagreed on what kind of people should be hired into the

15  company.

16  Q.   And we see sort of Defendant He's response to you about

17  sort of critiquing your recruiting efforts, but did she respond

18  to you addressing the underlying sort of legal compliance

19  concerns that you were raising?

20  A.   No.

21  Q.   Okay.  So let's look at the message you send back.  And

22  I'm not going to read all of this, because it's pretty long.

23  So I'm just going to point to portions of your December 15th,

24  2022, message.  You write this message saying it's best to end

25  the engagement; correct?

1    **A.**    Yes.

2    **Q.**    Okay.

3        **MS. GREEN:**  And let's look at the bottom of page 8,

4    please, Ms. Braga.

5    **BY MS. GREEN:**

6    **Q.**    You write (as read):

7        "I genuinely -- I genuinely tried to help you.

8    I don't think you want to listen and take advice from

9    anyone."

10    You reference a person called Anarag (as read):

11        "Also spent a lot of time with you and didn't

12    feel you wanted his help or advice.  But sure, I am

13    at fault for not bringing you a COO in four weeks for

14    $3,500 to a company that has numerous press and

15    regulatory issues."

16    And let's go to page 9.(as read):

17        "If the attitude were to try to solve/address

18    the problem and provide real leadership, this could

19    go somewhere.  But I tried to help as friendly person

20    for next to no compensation.  It has been so

21    frustrating that I do not know what credible

22    executive will take the job.  And it's probably not

23    the first time you've heard this feedback.  I'm sure

24    you've heard it from others who have left your

25    company like the CMO.

1    "I have a moral responsibility to tell you the

2    truth."

3    And then lower down, you say (as read):

4    "And as a moral responsibility not just to you

5    but to the company, to the employees, and to the

6    customers to try to do the right thing for all

7    stakeholders."

8    And a couple of paragraphs below, you write (as read):

9    "Have been trying to get you to address the real

10    problems instead of ignoring them but it's not going

11    through."

12    And then you say (as read):

13    "My professional recommendation is the company

14    needs a new CEO.  I know that's not what you want to

15    hear.  It needs a CEO who will accept the problems

16    and make a good-faith effort to fix them and not just

17    deny the problems."

18    A couple of rows down, you also refer to if the goal is

19    fast and cheap and reference a recruiting issue.  And then

20    below that, you say (as read):

21    "I've spent a lot more time than that and I'm

22    just not seeing the interest in listening to the

23    advice or having real dialogue about these issues and

24    game plan or any strategy."

25    And then looking at your message on December 15th on

PRASAD - DIRECT / GREEN

1    page 8, you continue -- you just said (as read):

2            "I just want to say the reason I'm so strong,

3        passionate, and forceful about this is because I

4        actually care."

5    And then higher up (as read):

6            "It's because I actually do care, and I feel

7        helpless.  I can't do anything here because the way I

8        would handle this situation is very different, and I

9        can't force you to do that."

10    And then on page 7, you write, at the bottom -- you

11   reference an article that came out and say (as read):

12            "And the reason I care is I don't want you to go

13        to jail.  So it's coming from a place of caring,

14        caring, and help and helping helpless I don't -- that

15        I can't do anything because I can't make you do

16        things differently and it's ultimately up to you and

17        your company, not mine."

18    And let's look at page 6.(as read):

19            "I guess where I'm coming from is unlike most

20        other people, I actually do care.  I do not want you

21        to go to jail potentially or get personally impacted

22        versus just the business.  I feel like things have

23        gotten here because you didn't take this problem,

24        concern, feedback you've been receiving the last

25        couple of years seriously and just chased growth

**PROCEEDINGS**

1      instead.  Now, it's a bit late since what's done has

2      been done."

3      You wrote those messages on December 15th, 2022?

4  **A.**   Yes.

5          **MS. GREEN:**  The Government would move to admit

6  Exhibit 784, please.

7      Oh, I'm sorry, Your Honor.  I just noticed the time.

8          **THE COURT:**  Yeah.  We're going to take our recess.

9      Ladies and gentlemen of the jury, we're taking our recess

10 now.

11     Remember the admonition given to you:  Don't discuss the

12 case, allow anyone to discuss it with you, form, or express any

13 opinion.

14              (The jury leaves the courtroom.)

15    (Proceedings were heard out of the presence of the jury.)

16         **THE COURT:**  Let the record reflect the jury has left.

17     Thinking about it, I'm not so sure that the video presents

18 a confrontation issue for the Government's reason, however, it

19 does appear -- and I'd like the parties to talk about it

20 tomorrow or whenever -- that it now is sort of cumulative in

21 the sense -- and it carries with it a lot more.  But in the

22 sense that the defendant herself describes the basic problem of

23 the -- it's identified in the video, I forget what page it is,

24 but she says the video shows --

25         **MS. GREEN:**  It was page -- I think you're referring to

PROCEEDINGS

```
 1   page 91, Your Honor.
 2            THE COURT:  91.  She says on page 91 --
 3            MS. GREEN:  It's actually 92, Your Honor.
 4            THE COURT:  Page 92, she says (as read):
 5            "They sent reporters to use our platform and one
 6       didn't have ADHD got diagnosed."
 7       And that's -- that's really the story in the video.  So I
 8   just have to wonder why it's not cumulative.  The -- you know.
 9   I guess in a sense -- we haven't heard the cross, so we don't
10   know to what extent it then becomes relevant as a result of the
11   cross, but at the present time, I'm not inclined to change my
12   mind because I think under 403, which applies, by the way, to
13   all evidence.  I don't think it's just a particular bit of
14   evidence.  That part which says it's cumulative.  You know,
15   it's cumulative because it was already identified in the record
16   by the defendant herself.  In other words, it wasn't somebody
17   saying, "Oh, did you see that?  This person got diagnosed."
18   She says, "A person who didn't have attention-deficit disorder
19   got diagnosed."
20       So that's her state of mind.  That is to say that is what
21   she saw.
22       Okay.  Well, it's been a long day.  Let me ask the
23   question.  You are almost finished with this witness?
24            MS. GREEN:  I'm almost finished, yep.
25            THE COURT:  How long do you anticipate the cross of
```

1   this witness will be?  I mean, all he did was read his --

2       MS. BELL:  Yes.  So we are going to complete the

3   picture having -- pointing to some other portions, but I think

4   it will be about an hour-ish type of thing to get through --

5   you know, we don't want to read too fast, and it's obviously a

6   very -- it is important for the reasons Your Honor has

7   identified, but we will be pretty surgical in pointing out the

8   things we --

9       THE COURT:  I think you should.  The -- just so you --

10  there's an -- we're all off on the same page.  I'm allowing in

11  the entirety of that exhibit, and I'm doing so because it was a

12  long series of conversations.  It's important for -- in

13  fairness purposes that people see the context so that nobody

14  can make the argument, well, you got a snippet, you got a

15  little bit here, you got a little bit there.

16     I assume -- although I don't know about the foundation, I

17  assume this is the -- is this the entirety of the conver- -- of

18  the communications back and forth between --

19      MS. BELL:  No.

20      THE COURT:  -- these people on this platform or not?

21      MS. BELL:  No, Your Honor.  It's a 7,000 page set of

22  communications --

23      THE COURT:  Oh, my God.

24      MS. BELL:  -- which is why we'll be pointing to --

25  surgically, you know, snippets -- other snippets to complete

1    the picture.  But we will be efficient, I promise.

2         **MS. GREEN:**  And to alleviate Your Honor's concern on

3    that, when I picked, you know, statements made where I saw

4    Ruthia respond, I did include those in the excerpts, so I've

5    done that.

6         **THE COURT:**  Yeah.  And I think you did a -- I think

7    it's very fair what you've done is that you've tried to provide

8    around the so-called -- the statements that you've read into

9    the record, you've tried to provide enough information on the

10   context of those statements surrounding those statements, so we

11   don't have to go through all of that.  That's fine.  But, I

12   mean, obviously, if there are other statements that give some

13   meaning to all of this, that's fine.

14        Okay.  So let's assume that we finish this person, I

15   think, easily tomorrow morning and maybe early on in the

16   morning.  What then?  Because now we're looking at Thursday.

17        **MR. FOSTER:**  Yeah, we've disclosed, I believe, five

18   potential remaining witnesses in the Government's case.  All

19   are very short witnesses.

20        **THE COURT:**  Okay.

21        **MR. FOSTER:**  And that's what we are.

22        **THE COURT:**  Okay.  Well, okay, so it's clear that

23   we'll be going -- that the Government's case will go through

24   Friday.

25        **MR. FOSTER:**  I think, given where we are now.

PROCEEDINGS

```
1          MS. BELL:  That's what we think.

2          THE COURT:  That's the concern.  I want the defense to

3    know that they don't have to call any witnesses this week.

4          MS. BELL:  Thank you, Your Honor.

5          MR. FOSTER:  And we --

6          THE COURT:  However, I want to just make it clear to

7    the defense that I'm going to ask you at the outset of the

8    defense who your witnesses are and if I -- if it's not

9    immediately apparent as to what their testimony would be, I'll

10   ask for an offer of proof, so...

11         MS. BELL:  Yes.  We have an issue to address with

12   the Court on that point but I'll let Mr. Schachter take that

13   up.

14         THE COURT:  Yeah.

15         MR. SCHACHTER:  Yeah.

16         THE COURT:  And, of course, your Rule 29 motions.  And

17   what I generally do is take them under submission.  I mean, you

18   notice it because it's important to say at the end of the

19   Government's case that you move under Rule 29.  But unless it's

20   so apparent that I would seriously entertain it at that point,

21   I generally take it under submission and rule later on it.  But

22   you make the judgment.  That's up to you.  But it's not going

23   to delay the presentation of the defense case.  Maybe that's a

24   better way of saying it.

25         MS. BELL:  We certainly understand that, Your Honor.
```

1   The one thing we would say is that, obviously, the legal

2   question, which we have initially teed up, but I understand the

3   Government's working on a response and we intend to reply to

4   that as well based on what's already in our joint disputed jury

5   instructions, the issue of did *Ruan* change something about

6   Your Honor's instructions in *Napoli*.

7       We believe that issue will impact the contours of our

8   defense case.  And I can let Mr. Schachter say some more, but

9   we can, I think, drastically cut down what we had intended to

10  do if Your Honor instructs --

11         **THE COURT:**  Isn't that nice?

12         **MS. BELL:**  -- the jury in accordance with *Napoli*,

13  which we believe to be consistent with the law.

14         **THE COURT:**  You have given me an incentive for ruling

15  in your favor.

16         **MS. BELL:**  Exactly, Your Honor.

17         **THE COURT:**  I see.  It's like a -- like, gee, Judge,

18  you know, if you grant the Rule 29 motion, don't worry about

19  Christmas, don't worry about Thanksgiving, we've taken care of

20  that problem.

21      Okay.  That probably won't influence me.  I'll probably

22  surmount that tendency to, yeah, Mr. Schachter.

23         **MR. SCHACHTER:**  Your Honor, the Defense case is also a

24  bit of a moving target in that we have learned that as we have

25  disclosed witnesses, the Government has proceeded to contact

 1  the lawyers for the witness and said -- although never saying

 2  it before this -- saying, "Hey, you know, your client's got

 3  some exposure" -- by the way, including a witness who we

 4  understand that the DEA had during the investigation said you

 5  have none -- but they have now been calling and saying, "You've

 6  got some exposure."  And beyond that -- beyond that have been

 7  calling and saying, "You also may have licensing issues," which

 8  obviously the Justice Department has nothing to with, but it is

 9  a form of witness intimidation that is improper and is really

10  obstructing our ability to put on a defense and it is of great

11  concern.

12         **THE COURT:**  Well, you don't have to respond at this

13  point.  You can, so I don't want to foreclose you.

14      In the event you believe that the Government has

15  obstructed, in some manner, your defense, then you have to call

16  it to my attention and we have to have -- the Government's

17  entitled to respond, and, if necessary, we would have a

18  hearing.

19      But I hear from time to time in criminal cases over

20  26 years the allegation that the Government, because they've

21  contacted the lawyer on the other side -- or a lawyer for a

22  witness, rather -- a lawyer for a witness and says, "In

23  representing your witness, you should know X, Y, and Z," I'm

24  not sure I would consider that an obstruction.

25      Now, it may have the effect, obviously.  It may have the

1    effect of chilling the witness -- the desire of the witness to

2    testify.  It may actually have the effect of resulting in some

3    type of Fifth Amendment proceedings.  It may -- I don't know.

4    There are so many things out there that it can and not

5    necessarily cannot do.

6        But, so, I can't give an opinion.

7        I think there are vehicles available to the Defense to

8    test those particular problems if they arise.  But I'm not

9    sitting here thinking that they necessarily will arise and

10   we'll just have to see how it goes.

11       **MR. SCHACHTER:**  We have very limited time before we

12   start the Defense case.  Here is our request:  We had like the

13   Government to report to the Court and to us which witnesses

14   they have told, "By the way, before you testify, we want you to

15   think about your own exposure at this point in the

16   investigation," or that they have made any kind of comment

17   about how it may impact their licensing so that the Court can

18   hear the threats that have been made and so that we can hear

19   them too, because we do not have perfect visibility, and then

20   the Court can -- and we can make a request to the Court and the

21   Court can assess whether or not that request is appropriate.

22       **THE COURT:**  Let me tell you, I have sort of a visceral

23   reaction against the word "threats" because a threat --

24   you know, the word threat basically suggests that it's improper

25   itself.

 1          And that somebody would say -- that the Government would

 2     say to a lawyer, "Your client has exposure," which you may

 3     consider to be a threat -- I think you would -- the question is

 4     does the Government have either, one, the obligation to tell

 5     the lawyer on the other side what his or her client may face?

 6     Or two, even if they do not have that obligation, is it

 7     improper for them to say that?

 8          So those are sort of two steps.  I don't use the word

 9     "threat" until -- I think a threat is -- if it's a threat, it's

10     probably improper as a threat.  But words are words.  As long

11     as we all understand what we're talking about, and what we're

12     talking about the propriety of the Government saying whatever

13     it said and what effect does that have, if at all, on a

14     witness's ability to testify.

15          That's fine.  We can explore that if it occurs.  But I'm

16     not sure that the Government has an obligation to tell you now

17     what conversations it has had with any of these witnesses.  You

18     can certainly -- I mean, you obviously have a basis for

19     expressing your own concerns and so maybe you have to flesh

20     that out more to the Court so I have a bigger picture of,

21     quote, what is going on out there.  And that's up to you.

22          MR. SCHACHTER:  Well, I guess what -- the -- so the

23     problem is we are not going to have visibility as to what

24     communications the Government is having, and I don't -- whether

25     the word -- whether it is characterized properly as a threat or

1    not, I guess the question is, since they are certainly having

2    conversations, as we've -- as been reported to us, about

3    witness's exposure and even their licensing issues, which the

4    Justice Department has nothing to do, we think that is a basis

5    for the Government simply so recount with accuracy to

6    the Court, as well as to us, what communications have they had

7    on that subject so that we then can say and the Court can say:

8    Well, what steps are appropriate to allow this defense witness

9    to otherwise testify."  Without some kind of representation

10   from the Government, we don't -- we can't pierce that.

11            THE COURT:  Why don't you?  I'll say what I -- you

12   can't pierce it.  I got that.  But that doesn't mean you're not

13   aware of it.  And, I mean, I really think the process ought to

14   be -- but you can try to convince me otherwise.  The process

15   ought to be is you come to the Court and you say "We have" --

16   "we are exploring the possibility of calling Ms. Jones.  We

17   spoke to Ms. Jones, or spoke to the lawyer" -- I mean,

18   obviously you've got to get ahold of Jones.  That's up to you.

19   "We spoke to Ms. Jones or her lawyer, and they said she's not

20   willing to testify or that she's very reluctant to testify or

21   blah-blah-blah-blah."

22            Now, I think you would ask the follow-up, "Well, have you

23   had any conversation with the Government on that issue?"  And

24   I -- if there's a lawyer out there who's representing

25   Ms. Jones, I would believe you get a truthful answer, yes, I

1   have, or I haven't.  If you're talking to Ms. Jones, I don't

2   know the answer to that.

3        But you come to me, that is to the Court, not an ex parte

4   way, in a -- you know, in a public way, and you say, "I spoke

5   to Ms. Jones or Ms. Jones' lawyer and here is what I was told."

6   Then we take it from there.

7        I don't know that I can say to the Government, "I want the

8   Government to tell us every contact they've had with a

9   potential witness and what they said to a potential witness."

10       I don't know that I can -- I know I have the power, but

11  it's one thing to have the power and it's another thing to

12  exercise the power.  And obviously this is part of their work

13  product, part of their trial preparation.  But when it crosses

14  the line, and you're suggesting it has, then you have to bring

15  it to my attention.  But I don't think they have to go out and

16  tell me everything they've done in this case.  I don't have the

17  time and I don't have the interest and I don't have the

18  inclination and I don't even know that I could figure it all

19  out.

20       So that's up to you.  You're highly -- you're in a very

21  good position to do it because you're coming to me now and

22  saying you think it's being done.

23       **MR. SCHACHTER:**  So, Your Honor, the reporting that

24  we're asking is not everything that they've said, of course, to

25  a lawyer.  We're only speaking of communications that they have

1  had recently with counsel for defense witnesses or defense

2  witnesses directly in which they are now -- now that they

3  realize the person is going to be called as a witness in which

4  they're advising them of their licensing exposure or their

5  criminal exposure -- I would like to just say this, Your Honor,

6  if I may.  If -- and I represent -- when I represent

7  individuals a lot of times, you know, a defense lawyer may call

8  me up, but I got a client to worry about, and my job is not to

9  help out Schachter and Bell, my job is to say, "Look, I'm" --

10  "basically I'm scared, I'm scared for my client, and there's no

11  upside here in me telling you about what kind of threats the

12  Government has made," so I don't have real access.  There is

13  only -- there is one party to this proceeding who has perfect

14  access to what they have said to witnesses and to counsel for

15  witnesses, and that is the Government.  They know what they are

16  saying.  We cannot and I cannot force witnesses and their

17  lawyers to report to me what has been said.

18      **THE COURT:**  They don't have to.  That's what I'm

19  saying, I'm saying you want to call witnesses X.  Okay.  Now,

20  the first question in my mind will be:  What is witness X going

21  to testify to?

22      I mean, is it -- is it -- there are 3,000 witnesses, is

23  this witness going to give relevant important information.  The

24  answer is, yes, then -- I'm assuming it is because that's why

25  you want to call the witness X.  Then you would say to me "I

PROCEEDINGS

 1  have contacted witness X or witness X's lawyer and they do

 2  not -- they will not voluntarily testify.  And if I subpoena

 3  them, I have every reason to believe that they will take the

 4  Fifth Amendment."

 5      Fine.  Okay.  Then we'll pursue it from there.

 6          MR. SCHACHTER:  Thank you.

 7          THE COURT:  You probably don't have to do more than

 8  that because -- I was a defense lawyer my -- and, you know, I

 9  know that there is a reluctance of lawyers who are representing

10  individual clients to necessarily be forthcoming with other

11  defense counsel because they believe, as you just said, it may

12  not be in their client's interest, and they have their client's

13  interest paramount.  So you just have to give me enough, and

14  we'll take it from there.

15          MR. SCHACHTER:  Understood.  Thank you, Your Honor.

16          THE COURT:  But I'm not going to ask the Government to

17  initiate this conversation.

18          MR. SCHACHTER:  Thank you.

19          THE COURT:  And so have a nice evening, everybody.

20      What?

21          MR. FOSTER:  Your Honor, Reverse Jencks, we've made

22  repeated requests for it, and we also have agreements with the

23  defense on reciprocal disclosure of information.  We were told

24  two weeks ago by the defense that we'd be provided with a list

25  of witnesses who were actually going to testify.  I just want

PROCEEDINGS

1    to put on the record that we don't have it.  And we had an

2    agreement on reciprocal disclosure a certain number of days in

3    advance before testimony, which, as Mr. Schachter has

4    emphasized over and over again, is necessary for preparation,

5    so I just wanted to note that.

6            **THE COURT:**  Yes, indeed.  The sauce for the goose.

7            **MR. SCHACHTER:**  Understood.

8            **THE COURT:**  Okay.

9            **MR. FOSTER:**  Thank you.

10           **THE COURT:**  Good night, everybody.

11           **MS. BELL:**  Good night.  Thank you, Your Honor.

12               (Proceedings adjourned at 4:29 p.m.)

13                       ---o0o---

14                **CERTIFICATE OF REPORTER**

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   DATE:   Wednesday, November 5, 2025

19

20

21

22   _____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                Official Reporter, U.S. District Court

23

24

25