**Volume 11**

**Pages 2298 - 2568**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )   **NO. 3:24-cr-00329-CRB**
                                    )
RUTHIA HE and DAVID BRODY,          )
                                    )
            Defendants.             )
_____)

                        San Francisco, California
                        Thursday, October 16, 2025

              **TRANSCRIPT OF PROCEEDINGS** (CORRECTED)

**APPEARANCES**:

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        Northern District of California
                        450 Golden Gate Avenue
                        San Francisco, California 94102
                   **BY:  KRISTINA GREEN**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        U.S. DEPARTMENT OF JUSTICE
                        FRAUD SECTION
                        950 Pennsylvania Avenue NW
                        Washington, D.C. 20530
                   **BY:  JACOB N. FOSTER,**
                        **ACTING CHIEF, HEALTHCARE FRAUD UNIT**

              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**APPEARANCES**:   **(CONTINUED)**

                        U.S. DEPARTMENT OF JUSTICE
                        CRIMINAL DIVISION
                        1400 New York Avenue NW
                        Washington, D.C. 20001
            BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                        JOSEPH NOCELLA, JR.
                        United States Attorney
                        Eastern District of New York
                        271-A Cadman Plaza East
                        Brooklyn, New York 11201
            BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

                        WILLKIE FARR & GALLAGHER LLP
                        2029 Century Park East - Suite 2900
                        Los Angeles, California 90067
            BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                        WILLKIE FARR & GALLAGHER LLP
                        787 7th Avenue
                        New York, New York 10019
            BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                 **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

                        LAW OFFICE OF VALERY NECHAY
                        Law Chambers Building
                        345 Franklin Street
                        San Francisco, California 94102
            BY:  **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:  Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Ashley Moore**
                **Barbara Hua Robinson, Mandarin Interpreter**
                **Jeff Dinn, Mandarin Interpreter**
                **Yang Shao, Mandarin Interpreter**

**I N D E X**

Thursday, October 16, 2025 - Volume 11

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **DION, DEBRA (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 2303 | 11 |
| **SHAPARD, ELIZABETH** | | |
| (SWORN) | 2313 | 11 |
| Direct Examination by Ms. Green | 2313 | 11 |
| Cross-Examination by Ms. Bell | 2409 | 11 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 296 | | 2398 | 11 |
| 648 | | 2357 | 11 |
| 740 | | 2366 | 11 |
| 811 | | 2348 | 11 |
| 1315 | | 2331 | 11 |
| 1844 | | 2362 | 11 |
| 1848 | | 2540 | 11 |
| 1941 | | 2375 | 11 |
| 1942 | | 2378 | 11 |
| 1985 | | 2389 | 11 |
| 1987 | | 2544 | 11 |
| 1988 | | 2382 | 11 |
| 1990 | | 2389 | 11 |
| 2510 | | 2389 | 11 |
| 2522 | | 2369 | 11 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2670 | | 2328 | 11 |
| 2673 | | 2368 | 11 |
| 2676 | | 2360 | 11 |
| 2679 | | 2374 | 11 |
| 2680 | | 2380 | 11 |
| 2872 | | 2338 | 11 |
| 2873 | | 2401 | 11 |
| 2996 | | 2352 | 11 |
| 3055 | | 2359 | 11 |
| 3058 | | 2394 | 11 |
| 3061 | | 2395 | 11 |
| 6798 | | 2553 | 11 |
| 6801 | | 2437 | 11 |
| 6804 | | 2443 | 11 |
| 6806 | | 2464 | 11 |
| 6808 | | 2484 | 11 |
| 6811 | | 2493 | 11 |
| 6812 | | 2500 | 11 |
| 6813 | | 2501 | 11 |
| 6816 | | 2489 | 11 |
| 6827 | | 2502 | 11 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6828 | | 2510 | 11 |
| 6829 page 4 | | 2512 | 11 |
| 6832 | | 2512 | 11 |
| 6833 | | 2512 | 11 |
| 6834 | | 2512 | 11 |
| 6835 | | 2512 | 11 |
| 6836 | | 2512 | 11 |
| 6839 | | 2512 | 11 |
| 6841 | | 2512 | 11 |
| 6842 | | 2512 | 11 |
| 6843 | | 2512 | 11 |
| 6845 | | 2502 | 11 |
| 6857 | | 2549 | 11 |
| 6858 | | 2503 | 11 |
| 6859 | | 2503 | 11 |
| 6860 | | 2513 | 11 |
| 6861 | | 2520 | 11 |
| 6862 | | 2522 | 11 |
| 6869 | | 2518 | 11 |
| 6907 | | 2546 | 11 |

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday - October 16, 2025**                                    **9:22 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURTROOM DEPUTY:**  All rise.  Court is now in |
| 6 | session, the Honorable Charles R. Breyer presiding. |
| 7 | **THE COURT:**  Okay.  Bring in the jury. |
| 8 | (The jury enters the courtroom.) |
| 9 | (Proceedings were heard in the presence of the jury.) |
| 10 | **THE COURT:**  Okay.  Please be seated.  Let the record |
| 11 | reflect all jurors are present.  Parties are present. |
| 12 | You may proceed. |
| 13 | **MS. GREEN:**  Thank you, Your Honor. |
| 14 | **DEBRA DION**, |
| 15 | called as a witness for the Government, having been previously |
| 16 | duly sworn, testified further as follows: |
| 17 | **MS. GREEN:**  You can angle that towards you. |
| 18 | **BY MS. GREEN:** |
| 19 | **Q.**   Good morning again, Ms. Dion. |
| 20 | **A.**   Good morning. |
| 21 | **Q.**   Yesterday, we had left off talking -- |
| 22 | **MS. GREEN:**  And we can pull up Exhibit 1822 again. |
| 23 | **BY MS. GREEN:** |
| 24 | **Q.**   -- talking about the medical records you received from |
| 25 | Done related to Harlan.  And do you recall that we were talking |

 1    about looking at the clinician notes for that October initial

 2    evaluation?

 3    **A.**    Right.

 4    **Q.**    And the name of the provider assigned at the bottom of

 5    those notes, Shannon Wozniak?

 6    **A.**    Mm-hmm.

 7    **Q.**    Okay.  And let's look at page -- the top of page 2.

 8          Do you see -- we've talked about the October 2020

 9    prescription.

10          Do you see there was also a prescription to Harlan in

11    November 2020?

12    **A.**    Yes.

13    **Q.**    And in these records that were provided by Done, was there

14    any clinician notes associated with an evaluation in

15    November 2020 that was provided to you?

16    **A.**    I don't quite remember.

17    **Q.**    You can look at them.

18    **A.**    Yeah.  I can't move it up.

19    **Q.**    Just scroll to the --

20    **A.**    I see.  It's not scrolling.  Oh.

21    **Q.**    So we see here the clinician notes for the October 2020 --

22    **A.**    Yeah.

23    **Q.**    -- visit.

24    **A.**    Yeah, mm-hmm.

25          **MS. GREEN:**  And let's scroll down, Ms. Braga.

1    **THE COURT:**  What you have to do is before you speak,

2    count to two and make sure the other person has stopped,

3    because it's very hard to -- and I'm not criticizing.  It's

4    hard to control witnesses.  I mean, witnesses speak whatever

5    their normal, customary way of speaking.

6        Attorneys have to take charge and not interfere with a

7    witness's response, because our court reporter, who is

8    essential to this process, has to get down what a person is

9    saying.  If two people speak at the same time, it's impossible,

10   because then she has to make a choice as to what to listen to,

11   and that's a difficult choice that you can't put to a court

12   reporter to make.

13       So that's what you do.  You just stop.  It's okay.  It's

14   not going to delay the proceedings.  Okay.

15       **MS. GREEN:**  Thank you, Your Honor.

16   **BY MS. GREEN:**

17   **Q.**  So we see here the clinician notes on page 2 for the

18   initial evaluation; correct?

19   **A.**  Mm-hmm.

20   **Q.**  And let's just scroll through these notes.

21       **MS. GREEN:**  And keep going, Ms. Braga.

22   **BY MS. GREEN:**

23   **Q.**  And we see the clinician name at the end of those notes,

24   Shannon Wozniak.  Ms. Braga [sic], is that the end of this

25   document?

1    **A.**    Yes.

2    **Q.**    Do you see any clinician notes that were provided for

3    November 2020 evaluation?

4    **A.**    Not on this page.

5    **Q.**    Okay.

6    **A.**    But it says in both of the columns that it's Shabnam

7    Rahimi as the -- and then now it says -- so it doesn't make

8    sense.

9    **Q.**    Mm-hmm.

10        And did you write a message back to Done after you

11    obtained these records?

12    **A.**    I believe I did, asking for more information.

13    **Q.**    Mm-hmm.

14        **MS. GREEN:**  And let's look at Exhibit 248, which was

15    already admitted, page 7.

16        And if we can zoom in on Ms. Dion's message from

17    June 18th.

18    **BY MS. GREEN:**

19    **Q.**    Did you write a message back to Done support on June 18th,

20    2022?

21    **A.**    Yes.

22    **Q.**    And did you ask a series of questions?

23    **A.**    Yes.

24    **Q.**    Okay.  And looking at these questions, one of them was (as

25    read):

1            "Are these complete notes?"

2        There was a second prescription given on 11/11.  Are there

3    any notes related to that?

4        And then 11/11 there was an additional prescription given

5    for an additional five ml (as read):

6            "Can you tell me on what basis this was done --

7        was this done?  Are there any records related to the

8        second prescription?"

9        You then ask for communications with Harlan and the

10    provider, and finally you say (as read):

11            "Also, Shannon Wozniak is listed as the

12        clinician and provider where it seems Shabnam Rahimi

13        was the clinician.  Can you please confirm which was

14        which?"

15        Do you see those questions?

16    **A.**    Yes.

17    **Q.**    And with respect to the last question, were you trying to

18    resolve this confusion you were having about which Done

19    provider actually did the initial evaluation for Harlan,

20    Shannon Wozniak or Shabnam Rahimi, the name on the

21    prescriptions?

22    **A.**    Yeah.  It was just confusing.

23    **Q.**    Mm-hmm.

24        Did you provide the patient record that you had received,

25    the one we looked at in 182022, to the Wall Street Journal?

**PROCEEDINGS**

1  **A.**    Yes.

2  **Q.**    And had the Wall Street Journal author/writer also helped

3  you with these questions?

4  **A.**    Yes.

5  **Q.**    And what was your view as to whether these were valid

6  questions?

7  **A.**    I thought it was really important.  I just hadn't --

8  because everything was a blur to me.  I could barely look at

9  the report.  And when he brought up these questions, I thought,

10  well, yeah, where is this stuff?  Why didn't they provide it?

11  **Q.**    Mm-hmm.

12      And looking further down on page 7, we see a response from

13  Done.

14          **MS. GREEN:**  And we can zoom in on that blue.

15  **BY MS. GREEN:**

16  **Q.**    So we had just discussed that your last question was about

17  who was the provider for this initial evaluation and why did it

18  say Shannon Wozniak.

19      And you receive a response from Done that says (as read):

20          "The medical record notes we send to patients

21      are only based on the approved initial diagnosis

22      clinician notes of your provider."

23      And those notes that you received had Shannon Wozniak's

24  name at the bottom of them; is that right?

25  **A.**    Yes.

**PROCEEDINGS**

1  **Q.**   So in this message, did Done indicate to you that they had

2  sent you the approved initial diagnosis clinician notes for

3  Harlan?

4  **A.**   Yeah, it seems like it.

5  **Q.**   Were you still confused as to why Shannon Wozniak's name

6  was assigned to those notes?

7  **A.**   Yeah.

8  **Q.**   This is in 2022; correct?

9  **A.**   Yes.

10  **Q.**   Did you receive any other communication from Done in 2022,

11  following up on this and clarifying that Shabnam Rahimi was the

12  provider that did the initial evaluation, but Wozniak --

13  Shannon Wozniak's name was listed because of some type of

14  technical glitch?

15  **A.**   I don't remember.

16  **Q.**   You don't recall ever receiving that?

17  **A.**   I don't, uh-uh.

18  **Q.**   From your perspective, based on the responses you received

19  from Done, did you feel like Done took your concerns seriously?

20  **A.**   No.

21  **Q.**   What was your purpose in writing to Done after Harlan died

22  in 2020?

23  **A.**   I wanted --

24          **MS. BELL:**  Objection.  Asked and answered, Your Honor.

25          **THE COURT:**  I'll allow it.  You're --

1          **THE WITNESS:**  Pardon?

2      I wanted them to know what happened.  I wanted them to

3   know -- to look into it, to check their procedures, to know

4   that something slipped but the cracks, that someone provided

5   Adderall, a strong Schedule II, to a drug addict, and that's

6   just not right.

7   **BY MS. GREEN:**

8   **Q.**  And why did you provide information about Harlan to the

9   Wall Street Journal in 2022?

10  **A.**  Because it didn't seem like anyone was really listening.

11  Obviously, Done didn't seem to care.  Not that I knew.  And

12  Rolfe was -- the writer was really -- he was kind, and I

13  thought, oh, maybe we can shine some light on this problem this

14  way.

15  **Q.**  Did you feel finally in 2022 that you were being heard?

16  **A.**  Yes.

17          **MS. GREEN:**  One moment, Your Honor.

18                  (Pause in the proceedings.)

19          **MS. GREEN:**  Thank you.

20          **THE COURT:**  Cross?

21          **MS. BELL:**  We have no questions for this witness.

22  Thank you for your time.

23          **THE COURT:**  Do you have any?

24          **MS. NECHAY:**  No, thank you.

25          **THE COURT:**  Thank you very much.

PROCEEDINGS

```
 1                    (Witness excused.)

 2         THE COURT:  Call your next witness.

 3      And before we do, ladies and gentlemen, I have an update,

 4   a couple of them.

 5      First, in terms of meeting, as I indicated before, we will

 6   not be meeting Monday afternoon.  We'll be meeting Monday.

 7   We're meeting tomorrow and Monday morning, not Monday afternoon

 8   and not the remainder of that week.

 9      We then will resume not the following Monday, but the

10   following Tuesday, and we will go through that week in -- in

11   testimony.

12      I don't have any further information right now about

13   November.  We may -- I told you, of course, we're not meeting

14   Thanksgiving week.  But I may have some updates.  I'll see

15   where we are.  I need to talk to the lawyers, get a better idea

16   of how -- where we are in the case.

17      In terms of the government shutdown, I think there's no --

18   one can have hope when -- that it's not a substitute for

19   optimism.  I'm not optimistic that the government shutdown will

20   end this week.  And I will have an update, I hope, tomorrow on

21   issues involving you financially in terms of compensation for

22   your jury service as well as things like parking and so forth.

23      I -- now, I am optimistic that all that will be

24   successfully addressed tomorrow because of the -- of obviously

25   everybody's concern.  Unfortunately, none of the lawyers here
```

 1    in this room or the Court can do much about that.  It really is

 2    out of our hands.

 3        They can't do anything about it, and every time I try to

 4    do something about it, I'm like -- I'm not all that successful.

 5        So -- however, I just want to assure you that we're

 6    working on it and the clerk's office is working on it, the jury

 7    commissioner, the chief judge of this court.  Everybody is

 8    concerned about jurors, and so it's not being greeted with

 9    indifference or "oh, well, that's the way it is."

10        It may be the way it is, but it's not -- it's not

11    something that we are not constantly addressing and trying to

12    ensure -- because, after all, you're the volunteers.  And I put

13    that in quotes, as I always do, because you're here under --

14    under a court order.

15        But the fact of the matter is you are sacrificing to give

16    this government -- to give the service to the United States

17    that you're giving, and that's extraordinarily significant and

18    unselfish.

19        And I just want to thank you.  All the lawyers in this

20    courtroom are thanking you, through me, for your jury service.

21    And it's important.  It really is important.

22        So, you know, I'll hopefully have a little bit more of an

23    update for you tomorrow.  But thank you.

24        Yes, you may proceed.  Call your next witness.

25            MS. GREEN:  The Government calls Elizabeth Shapard.

```
 1    I believe she was on two but we told her to come up, so she
 2    should be here momentarily.
 3              THE COURT:  Okay.  That's fine.  If you want to talk
 4    amongst yourselves, you can.
 5                      (Pause in proceedings.)
 6        (Elizabeth Shapard steps forward to be sworn.)
 7              THE COURTROOM DEPUTY:  Good morning.
 8              THE WITNESS:  Good morning.
 9              THE COURTROOM DEPUTY:  Please raise your right hand.
10                      ELIZABETH SHAPARD,
11    called as a witness for the Government, having been duly sworn,
12    testified as follows:
13              THE WITNESS:  I do.
14              THE COURTROOM DEPUTY:  Thank you.  You may be seated.
15    Please state your full name for the record and spell your last
16    name.
17              THE WITNESS:  Elizabeth Diane Shapard, S-H-A-P-A-R-D.
18                      DIRECT EXAMINATION
19    BY MS. GREEN:
20    Q.   Good morning, Ms. Shapard.
21    A.   Good morning.
22    Q.   Where do you live?
23    A.   I live in Imperial Beach, California.
24    Q.   And how long have you lived there?
25    A.   Approximately three and a half, four years.
```

SHAPARD - DIRECT / GREEN

1    Q.    When did you move to California?

2    A.    I moved to California in 2011.

3    Q.    Could you provide a brief overview of your educational

4    background?

5    A.    Yes.  I have a bachelor's degree in laboratory science.  I

6    have a master of science in nursing as a women's health nurse

7    practitioner, and I have a post-master's certificate as a

8    psychiatric nurse practitioner.

9    Q.    In what states are you currently licensed to practice?

10   A.    The state of California.

11   Q.    In the 2020 to 2024 time period, where were you licensed?

12   A.    The state of California.

13   Q.    Where do you currently work?

14   A.    I just currently see patients in my private practice.

15   Q.    Did you start working at Done in late 2020?

16   A.    Yes, I did.

17   Q.    Where did you work in the period after completing your

18   education and before joining Done?

19   A.    I -- after I graduated with my women's health degree, I

20   worked in Texas for five years as a women's health nurse

21   practitioner at the University of Texas medical branch.

22        When I moved to California, I worked for Planned

23   Parenthood of Pasadena for six and a half years.  Once I got my

24   post-master's certificate, I worked in various rehabs around

25   the Los Angeles area for patients experiencing substance use

1    disorder.

2        I worked at Gateways Hospital.  I started there in 2018.

3    That's an inpatient psychiatric hospital with adolescents and

4    adults, and also they had a crisis residential program, and I

5    worked there as well.  That's for patients that are discharged

6    from psychiatric hospital and they have -- go there for 30 days

7    to get assistance with things like housing.

8        And then I started with the small private practice as well

9    in 2018.

10   **Q.**   And during some of those later work experiences, did you

11   have experience working and treating with ADHD patients?

12   **A.**   Yes, I did.

13   **Q.**   And did you issue stimulants for controlled substances

14   during those time periods?

15   **A.**   Yes, I did.

16   **Q.**   How long were your initial visits for ADHD patients in

17   that time period?

18   **A.**   They would have been an hour.

19   **Q.**   And did you find that period of time necessary to make an

20   accurate diagnosis?

21   **A.**   Yes, I did.

22   **Q.**   What types of information would you try to gather in those

23   visits?

24   **A.**   You would try to gather -- you know, you ask the patient,

25   you know, what are experiencing now; what -- what happened in

1  this moment that brought you in to seek treatment.

2       And then you'd want to go through and get a thorough

3  history as far as hospitalizations in the past, previous

4  diagnoses, what medications the patient has tried and failed.

5       You want to get a thorough family history, substance use

6  history, medical history to screen for, you know, physical

7  health disorders that can be an issue with psychiatric

8  medications.  Do a thorough mental health evaluation, mental

9  status exam while you're interacting with the patient.

10      And so, you know, the full hour would -- it would be

11  necessary, you know, to get all of that and get the, you know,

12  appropriate detail to make the diagnosis.

13  **Q.**   And how frequently would you do follow-up visits with the

14  patients?

15  **A.**   From one to three months.

16  **Q.**   And if a patient had a comorbidity such as severe anxiety

17  or bipolar, how frequently would you do follow-up visits?

18  **A.**   For a patient like that, you'd probably want to -- you

19  know, normally monthly I would see them.  And, you know, even

20  if somebody was a new diagnosis, I might even bring them back

21  in two weeks.  But monthly for a patient like that.

22  **Q.**   And did you find those follow-up visits important to

23  conduct?

24  **A.**   Yes.  Yes, I did.

25  **Q.**   Why?

1  **A.**   Because you want to have an interaction either via

2  telehealth or have the person in front of you.  You want to be

3  able to look at the patient, lay eyes on them, see how they're

4  doing.  You know, as far as them just telling you, you know, in

5  a written communication, when you actually look at them, you

6  can even assess their mood a lot better.  You can assess -- you

7  know, ask more questions based upon their presentation to get

8  more information to be sure they're getting the appropriate

9  treatment.

10 **Q.**   Can you better assess side effects and you see them either

11 in person or face-to-face via telehealth?

12 **A.**   Yeah.  So you would definitely want to assess for side

13 effects, make sure the patient is responding appropriately.

14 You know, the goal is to correct someone to normal with minimal

15 to no side effects.

16 **Q.**   And prior to Done, would you have found just reading a

17 message from a patient sufficient replacement for a follow-up

18 visit?

19 **A.**   No.

20 **Q.**   How many patients were assigned to you when you practiced

21 in private practice prior to Done?

22 **A.**    In my private practice, anywhere -- I averaged about maybe

23 25 to 30 at that time.

24 **Q.**   And I think you mentioned you also work at CRTP, a type of

25 residential treatment?

SHAPARD - DIRECT / GREEN

1   **A.**   Correct.

2   **Q.**   How many patients were assigned to you when you were

3   working there?

4   **A.**   There were approximately 20, and those patients I saw

5   weekly.

6   **Q.**   And prior to working at Done, would you check the CURES

7   report before writing Schedule II controlled substance scripts?

8   **A.**   Yes.

9   **Q.**   And before I ask a follow-up question on that, can you

10   just remind the jury what CURES is?

11   **A.**   CURES is a California state database that any time a

12   prescription is written for a patient, the patient goes to the

13   pharmacy to pick that prescription up, the pharmacy is going to

14   report in to the database of any controlled substance with the

15   name of the provider that prescribed it, the dates, the

16   medication, the quantity, and that's a requirement that

17   providers check that to see when they last filled their

18   prescription and what other controlled medications they're

19   taking.

20   **Q.**   Did you find it important to check CURES?

21   **A.**   Yes.

22   **Q.**   Why?

23   **A.**   You would want to assess -- maybe the patient didn't

24   disclose that they were on another controlled medicine.  Maybe

25   they weren't aware it was controlled.  So you would want to

SHAPARD - DIRECT / GREEN

1  check that to make sure -- that would be for the safety of the

2  patient.

3  **Q.**  You mentioned you were familiar with a company called

4  Done; correct?

5  **A.**  Correct.

6  **Q.**  Did you start working there in late 2020 as a PMHNP?

7  **A.**  Yes, I did.

8  **Q.**  When did you first become familiar with Done?

9  **A.**  October of 2020.  As I was working at Gateways, I was a

10  contract employee, and they didn't renew my contract due to

11  funding issues, so I needed to find another job.

12      I found them on Indeed, and I applied through that website

13  for Done.

14  **Q.**  And how long did you work at Done for?

15  **A.**  From November of 2020 until February of 2025.

16  **Q.**  Ms. Shapard, have you pled guilty to committing crimes

17  while at Done?

18  **A.**  Yes, I have.

19  **Q.**  What crimes did you plead guilty to committing?

20  **A.**  Conspiracy to distribute controlled substances and

21  conspiracy to defraud the government.

22  **Q.**  And can you describe to the jury in more simple terms what

23  you did to commit these crimes?

24  **A.**  I wrote prescriptions to patients I didn't thoroughly

25  evaluate, so they were prescribed controlled medications

1  without a legitimate medical purpose.

2      And then as the patient would go to the pharmacy to fill

3  their prescription that wasn't for a legitimate medical

4  purpose, if they had Medicare or Medicaid, then the government

5  was paying for those prescriptions that weren't written for a

6  legitimate medical purpose.

7  **Q.**  And were you also involved in submitting or causing the

8  submission of false and fraudulent documents to Medicare and

9  other insurance payers, such as prior authorizations?

10  **A.**  Yes, I was.

11  **Q.**  Did you agree with others to these conspiracies?

12  **A.**  Yes, I did.

13  **Q.**  Who did you agree with?

14  **A.**  With the CEO of Done, Ruthia He; the chief medical

15  officer, Dr. David Brody -- were the ones that I agreed with.

16  **Q.**  Can you explain to the jury why you pled guilty?

17  **A.**  I pled guilty because I am guilty.  I did something wrong,

18  and I'm taking accountability for my actions.

19  **Q.**  As part of your plea agreement, did you agree -- as part

20  of your guilty plea, did you sign a plea agreement?

21  **A.**  Yes, I did.

22  **Q.**  And as part of the plea agreement, did you agree to

23  cooperate with the Government?

24  **A.**  Yes, I did.

25  **Q.**  As part of your cooperation, are you testifying here

**SHAPARD - DIRECT / GREEN**

1  today?

2  **A.**   Yes, I am.

3  **Q.**   What is your principal obligation in testifying here

4  today?

5  **A.**   To tell the truth.

6  **Q.**   Have you been sentenced yet?

7  **A.**   I have not.

8  **Q.**   Who determines your sentence?

9  **A.**   The judge.

10 **Q.**   What is your hope in testifying today?

11 **A.**   My hope is that I will get a lighter sentence because I'm

12 cooperating, and I'm also helping my conscience by -- by

13 admitting to what I did.

14 **Q.**   Who determines whether you will get any decrease in your

15 sentence or lighter sentence?

16 **A.**   The judge.

17 **Q.**   Have I or anyone else within the Government promised you

18 whether that will happen?

19 **A.**   No.

20 **Q.**   And what effect does the outcome of this trial, if any,

21 have on your possible sentence?

22 **A.**   It doesn't have any effect on my sentence.

23 **Q.**   Focusing on your time at Done -- and the majority of my

24 questions are going to be focused on the late 2020 through

25 spring 2023 time period.

1   **A.**   Okay.

2   **Q.**   You mentioned you started at Done in November 2020; is

3   that right?

4   **A.**   That's correct.

5   **Q.**   Why did you join Done?

6   **A.**   I needed a job.

7   **Q.**   Who did you meet with prior to joining Done?

8   **A.**   I met with someone in human resources.  I don't recall her

9   name.

10      And then I met with a lead nurse practitioner that was

11  there at the time.  And I don't -- Hilary.  I don't recall her

12  name, her last name.

13  **Q.**   Okay.  Were you provided with any onboarding material when

14  you joined Done?

15  **A.**   There was a form I was given that just was like a -- this

16  is our like intake.  It was basically like a Word document.  I

17  was provided with that.  That -- that's all I recall.

18  **Q.**   Were you told -- what were you told, if anything, about

19  how you should practice at Done during the onboarding process?

20  **A.**   I wasn't really given any specific instructions for that.

21  **Q.**   Did they -- did anyone mention that you would have to do

22  initial evaluations within 30 minutes?

23  **A.**   Oh, yes, that's correct.  So initial evaluations within

24  30 minutes.  Yes, that was -- as far as -- that was a part of

25  when they were asking me to set up the schedule, that was -- I

1    was told that.

2    Q.    Were you told anything about when you could give a

3    stimulant even if a patient may not meet the criteria for ADHD?

4    A.    Yes.    That was in the contract I signed.    It said that it

5    would be okay to give a trial of a stimulant even if I felt the

6    patient didn't meet the diagnostic criteria.

7    Q.    We'll look at that in a moment.

8         MS. GREEN:    Let's look at Exhibit 6146, which has

9    already been admitted.

10   BY MS. GREEN:

11   Q.    Did you ever see this provider handbook evidence-based

12   medicine document while you were at Done?

13   A.    No --

14   Q.    Sorry.

15   A.    No, I've never seen that.

16   Q.    Do you recall anyone ever sending that to you?

17   A.    No.

18   Q.    Do you recall ever being directed to practice according to

19   this handbook?

20   A.    No.

21   Q.    Okay.

22         Let's look at Exhibit 1308, page 308, your contract.

23         MS. GREEN:    I believe Exhibit 1308 has been admitted

24   already.

25         Okay.

1    BY MS. GREEN:

2    Q.    Is this the contract you signed with Done?

3    A.    Yes, it is.

4    Q.    Okay.  And let's look at page 324 of the contract related

5    to your compensation.

6            MS. GREEN:  And if we can zoom in on that, please,

7    Ms. Braga.

8    BY MS. GREEN:

9    Q.    How was your compensation structured at Done?

10   A.    So the hourly rate of 150.  I would receive $75 for the

11   initial evaluation for 30 minutes.

12        And then after that, I was paid based on how many patients

13   I had on my panel, which would be my hourly rate of $150 for

14   every 14 patients on my panel.

15   Q.    Okay.  And we'll break that down separately.

16        If you hypothetically chose to have a longer initial

17   appointment based on your clinical judgment, would Done have

18   compensated you any more than that 30-minute rate for your

19   initial visit?

20   A.    No.

21   Q.    Okay.  And what about if you felt you needed a second

22   initial appointment in order to ensure you had an accurate

23   diagnosis?  Did Done pay you for that?

24   A.    Only if the patient agreed to pay extra.

25   Q.    So if the patient agreed to pay extra --

**SHAPARD - DIRECT / GREEN**

1  **A.**    Yes.

2  **Q.**    -- in addition to that subscription, then you might get

3  some extra payment?

4  **A.**    Correct.  But if the patient didn't agree, then they

5  either weren't seen or I was not paid.

6  **Q.**    Okay.  And focusing on if Done agreed to pay you for that

7  second initial visit --

8  **A.**    They did not.

9  **Q.**    Okay.  And how often would a patient agree to pay for

10  another visit?

11  **A.**    Very rarely.

12  **Q.**    Okay.

13        And focusing on follow-up visits, there's a line here that

14  says -- related to the panel pay (as read):

15             "This equation is determined by patient load

16        after the initial consultation, not based on how many

17        patients a clinician sees per month."

18        So was any part of this panel pay that you described, this

19  1/14 for each patient on your panel, actually based on meeting

20  with a Done member for a follow-up appointment?

21  **A.**    No.

22  **Q.**    So you would be paid the same whether the patient had a

23  follow-up visit or didn't have a follow-up visit?

24  **A.**    That's correct.

25  **Q.**    What incentive was provided for you to conduct follow-up

**SHAPARD - DIRECT / GREEN**

1    visits?

2    **A.**    None.

3    **Q.**    What did this payment structure incentivize?

4    **A.**    It incentivized to not see patients for follow-up because

5    there was no payment for that.  The payment is based on how

6    many patients are there, so the more patients you have, the

7    more you get paid.  So seeing follow-ups would limit that,

8    limit your payment.

9    **Q.**    So the more patients you have on your panel, the more you

10    get paid?

11    **A.**    Correct.

12    **Q.**    And how did you get a patient on your panel?

13    **A.**    Either I saw them as an initial or they were transferred

14    me -- to me from another provider.

15    **Q.**    And how would a patient stay on your panel?

16    **A.**    They would stay on the panel as they were getting their

17    prescription filled every month.  They would continue to pay

18    the rate and then get their medication.

19    **Q.**    So to get a member on your panel, either you or someone

20    had to diagnose them with ADHD and then provide the

21    prescription every month to keep them on your panel --

22    **A.**    Correct.

23    **Q.**    -- is that right?

24    Fair to say you were discouraged from doing follow-ups

25    under this payment model?

SHAPARD - DIRECT / GREEN

1    **A.**    Yes.

2    **Q.**    Did you agree to practice at Done in accordance with what

3    this payment model incentivized?

4    **A.**    Yes, I did.

5    **Q.**    Approximately how many patients did you have on your

6    panel?

7    **A.**    On average, about 2,500.

8    **Q.**    2,500 patients?

9    **A.**    Yes, 2,500.

10   **Q.**    Okay.  And in the usual course of practice outside of the

11   Done model, would you have got paid for follow-up visits you

12   conducted with patients?

13   **A.**    Yes.

14        **MS. GREEN:**  Let's look at Exhibit 2670 for admission

15   please.

16        **THE COURT:**  2670 admitted.

17        **MS. BELL:**  Your Honor, I would just object and ask for

18   a foundation on this one.

19        **THE COURT:**  Okay.  One moment, please.

20   Well, will you lay a foundation?

21        **MS. GREEN:**  Yes.

22   BY MS. GREEN:

23   **Q.**    Ms. Shapard, do you recognize this document?

24   **A.**    Yes.

25   **Q.**    Did you -- is it a care delivery metrics report from

1    October 2020?  2022.  I'm sorry.

2    **A.**    Yes, correct.

3    **Q.**    And would Done periodically send you these metrics reports

4    for how you were performing at Done?

5    **A.**    Yes.

6         **THE COURT:**  Admitted.

7         (Trial Exhibit 2670 received in evidence.)

8         **MS. GREEN:**  Thank you.

9    **BY MS. GREEN:**

10   **Q.**    And you mentioned your approximate panel size.

11        Looking at just the provider detail section here, do we

12   see your panel size as of this date, 2,345 patients?

13   **A.**    Yes, that's correct.

14   **Q.**    Consistent with your recollection about how many people

15   were approximately on your panel?

16   **A.**    Yes.

17   **Q.**    Did you know all of the people on your panel?

18   **A.**    No, I did not.

19   **Q.**    Would it have even been feasible for you to know all the

20   people on your panel, given that panel size?

21   **A.**    No.

22   **Q.**    And let's just look at page 2 here for a moment.  And we

23   see the box that says -- in the care delivery section there's a

24   point here that says "last chart ordered" and a score.

25        We'll talk about your notes in a bit more detail later.

1          Here, there's an indication that someone is doing a chart

2     audit.  What is your understanding as to whether Done was

3     actually auditing your charts, as would be expected in the

4     usual course of practice?

5     **A.**   They weren't auditing my charts as would normally be done

6     because I wasn't given any feedback or information.

7     **Q.**   Were you copying and pasting your -- many of your notes,

8     your patient notes, in your patients charts?

9     **A.**   Yes, I was.

10    **Q.**   Hundreds to thousands of them?

11    **A.**   Yes, that's correct.

12    **Q.**   And did anyone at Done flag to you, we've done a chart

13    audit and we've noticed you're copying and pasting your notes;

14    please stop doing that?

15    **A.**   No.

16          **MS. GREEN:**  Let's look back at the contract, Exhibit

17    1308, page 325, Schedule C.  And let's focus on the "if patient

18    does not meet DSM-5 criteria."

19          About two-thirds of the way down.  Thank you.

20    **BY MS. GREEN:**

21    **Q.**   I think this is what you were referring to earlier,

22    Ms. Shapard; correct?

23    **A.**   Correct.

24    **Q.**   This Schedule C is part of your contract?

25    **A.**   It is.

1  Q.  And it says here (as read):

2          "If the patient does not meet the DSM-5

3      criteria, the goal is to help patients feel better

4      and reduce significant symptoms.  Still might be

5      worth doing a medication trial."

6      Were you concerned about this language?

7  A.  I was concerned, but I still agreed to continue to see

8  patients in the way I was doing.

9  Q.  And why did you know this direction to be concerning?

10 A.  Because you shouldn't ever prescribe any medication to

11 someone if they don't meet diagnostic criteria, because that

12 could be dangerous.

13 Q.  Is just making someone feel better a legitimate medical

14 purpose for a stimulant?

15 A.  No, it is not.

16 Q.  By agreeing to work at Done, did you agree to work -- to

17 practice according to this portion of your contract as well?

18 A.  I did.

19 Q.  You knew it was wrong?

20 A.  I did.

21 Q.  Why did you do it?

22 A.  I was getting paid very well to do it is why I did it.

23 Q.  Did complex patients make it onto the Done platform?

24 A.  Yes.

25 Q.  Like individuals with comorbidities, substance abuse

1    histories?

2    **A.**    Yes.

3    **Q.**    Anxiety -- okay.

4    And would Done pay you any more for a longer initial visit

5    with a complex patient?

6    **A.**    No.

7    **Q.**    Would Done pay you to do a follow-up visit with a complex

8    patient?

9    **A.**    No.

10   **Q.**    Approximately how much were you being paid at Done from

11   January 2021 onwards?

12   **A.**    30- to $40,000 a month.

13        **MS. GREEN:**  And let's look at Exhibit 1315 for

14   admission, row 131.

15        **THE COURT:**  Admitted.

16        (Trial Exhibit 1315 received in evidence.)

17        **MS. GREEN:**  Thank you.  And we can just maybe

18   highlight that, Ms. Braga, for the jury.

19   **BY MS. GREEN:**

20   **Q.**    You mentioned you were getting paid approximately 30- to

21   $40,000 a month at Done --

22   **A.**    Correct.

23   **Q.**    -- is that right?

24        **MS. GREEN:**  And let's zoom in a bit, Ms. Braga, and

25   just look at some of these numbers.  Let's go to the right.

1    BY MS. GREEN:

2    **Q.**   So, for example, we're seeing 37,000 for the month of

3    September 2021.

4           **MS. GREEN:**  And let's keep scrolling.

5           **THE WITNESS:**  32,700.

6    BY MS. GREEN:

7    **Q.**   Okay.  Oh.  Thank you.  Thank you for correcting me.  My

8    eyes aren't as good as they should be.

9           Let's look at -- we see numbers going up to 36,000 in

10   December 2021, rising up to 43,000 in March 2022, and staying

11   in kind of that 40,000 range a month --

12   **A.**   Yes.

13   **Q.**   -- through much of October 2022?

14   **A.**   Correct.

15   **Q.**   How did this payment amount compare to what you could have

16   obtained at another practice?

17   **A.**   It would be much higher than what I could have obtained at

18   another practice.

19   **Q.**   And in total, between November 2020 and January 2023.

20   Approximately how much were you paid by Done?

21   **A.**   About $800,000.

22   **Q.**   About 855,000.  Sound about right?

23   **A.**   Yes.  Yes, that's correct.

24          **MS. GREEN:**  Thank you, Ms. Braga.  We can take that

25   down.

1    BY MS. GREEN:

2    Q.    Based on your time at Done, what was your understanding of

3    who was the ultimate decision-maker at Done with respect to

4    clinical policies and practices?

5    A.    Dr. Brody.

6    Q.    Mm-hmm.

7          What did you understand about how involved Defendant He

8    was?

9          In reality, I should phrase, as opposed to on paper.

10             MS. BELL:  Objection, leading.

11             THE COURT:  Overruled.

12             THE WITNESS:  As far as you would practice in

13    accordance to seeing as many patients as you possibly could to

14    make more money.

15          And as far as clinical guidelines go, I wasn't able to

16    practice like I would normally because there was not enough

17    time based on the structure and system that was set up by Done.

18    BY MS. GREEN:

19    Q.    And would you sometimes raise clinical practices or

20    clinical concerns about some of the practices?

21    A.    Yes.

22    Q.    And when you raised those with others at Done, did they

23    ever mention having to confirm or check with Defendant He

24    before getting back to you on answers?

25    A.    Yes.

SHAPARD - DIRECT / GREEN

1    Q.    Okay.

2         What was your understanding of Defendant He's priorities

3    when it came to how to run Done?

4    A.    The priority was financial.  It was to make as much money

5    as possible.

6    Q.    And how do you have that understanding?

7    A.    Based on the way the system was set up.  Patients were

8    paying a monthly fee to be seen.  They were expected to get a

9    prescription as a result of paying that.  And there was no

10   expectation that a follow-up was to be done for the patient.

11   Q.    And you said patients were paying a monthly fee to be

12   seen, but in reality, under the Done model, what care was the

13   patient receiving every month?

14   A.    Very poor care.

15   Q.    For those that didn't have visits, were they receiving any

16   care besides a stimulant prescription?

17   A.    No, they were not.

18   Q.    How long were your initial visits scheduled for at Done?

19   A.    For 30 minutes.

20   Q.    Prior to Done, had you ever worked as a clinic where

21   initial visits were scheduled for 30 minutes or less?

22   A.    No.

23   Q.    Did you think 30 minutes was long enough time to do an

24   accurate ADHD evaluation, make a diagnosis and then a treatment

25   decision?

**SHAPARD - DIRECT / GREEN**

1   **A.**   No.

2   **Q.**   Why did you agree to practice in accordance with a

3   30-minute initial visit?

4   **A.**   Because I was being paid very well to do that.

5   **Q.**   In your experience, do you need to be careful about

6   possible drug-seeking when treating patients with Schedule II

7   controlled substances?

8   **A.**   Yes.

9   **Q.**   Can Schedule II controlled substances be abused?

10  **A.**   Yes, they can.

11  **Q.**   When practicing in accordance with standard practice

12  outside of Done, did you need time to weed out whether

13  individuals may be drug-seeking?

14  **A.**   Yes.

15  **Q.**   And to assess whether a patient may be abusing a drug?

16  **A.**   Yes, that's correct.

17  **Q.**   And to assess comorbidities of the patient to determine

18  whether stimulants would be appropriate based on the unique

19  needs of that patient?

20  **A.**   Yes.

21  **Q.**   And all that takes time?

22  **A.**   Yes, it does.

23  **Q.**   Did the amount of time Done scheduled for initial

24  appointments allow sufficient times -- time for such

25  assessments?

SHAPARD - DIRECT / GREEN

1  **A.**   No, it did not.

2  **Q.**   Why not?

3  **A.**   To cram that into a 30-minute time frame -- it was going

4  very quickly.  It was easy to miss -- you know, to miss the

5  details that could lead you to believe as far as patients not

6  mentioning they had heart disease or patient that's not

7  mentioning they had substance use.  Just going through the list

8  very quickly, that's not a sufficient amount of time to make an

9  accurate diagnosis.

10 **Q.**   And could that lead to safety concerns or risks for a Done

11 member?

12 **A.**   Yes.  Yes.

13 **Q.**   Why?

14 **A.**   If a patient is misusing medication, they have an eating

15 disorder, if they're taking it too much they're -- cardiac

16 issues could come up.  So it could be very dangerous.

17 **Q.**   Given Done's payment model, were you incentivized or

18 disincentivized from exceeding 30 minutes for your initial

19 visit?

20 **A.**   Disincentivized.

21 **Q.**   Did Done require members to upload prior medical records?

22 **A.**   No.

23 **Q.**   Was it usual course of practice to obtain those records

24 outside of Done if a patient, for example, claimed they had

25 previously been diagnosed with ADHD?

SHAPARD - DIRECT / GREEN

1  **A.**    Yes.

2  **Q.**    And did that happen at Done?

3  **A.**    No.

4  **Q.**    So at Done, if someone said that they had previously been

5  diagnosed with ADHD and given these short visits, were you

6  essentially having to take their word for it?

7  **A.**    Yes, that's correct.

8  **Q.**    Is that usual course of practice?

9  **A.**    No, it's not.

10  **Q.**    You mentioned that you copy and pasted your evaluation

11  notes for initial -- for your initial evaluations with Done

12  members; is that right?

13  **A.**    That's right.

14  **Q.**    Why?

15  **A.**    It was for time.  I wanted to spend the 30 minutes with

16  the patient, so once I'm finished seeing the patient, now I

17  have the note to do, and now I have a lot of notes to do, so if

18  I do individual notes, that's going to be an excessive amount

19  of time.  So I just made a template note, and I would make

20  small changes, but that's what -- I did that to save time.

21  **Q.**    Okay.  And you mentioned you wanted to save time to see a

22  patient, but also wasn't a significant amount of your time

23  spent writing refill prescriptions?

24  **A.**    Yes, it was.

25  **Q.**    And weren't those refill prescription a major reason why

```
 1   you were able to generate such large amounts of income by
 2   working --
 3   A.   That's correct.
 4   Q.   -- at Done?
 5   A.   Yes.
 6   Q.   So were you also copying and pasting your notes to
 7   prioritize what was going to give you the most lucrative
 8   income?
 9   A.   Yes, it was.
10          MS. BELL:  Objection to leading, Your Honor.
11          THE COURT:  Overruled.
12          THE WITNESS:  Yes.  Yes, I was.
13          MS. GREEN:  And let's look at Exhibit 2872 for
14   admission?
15          THE COURT:  2872 admitted.
16      (Trial Exhibit 2872 received in evidence.)
17   BY MS. GREEN:
18   Q.   This is just an extract of some of your initial evaluation
19   notes.  You mentioned you copied and pasted.  Did that include
20   copying and pasting the HPI section of patient notes?
21   A.   Yes, it did.
22   Q.   And HPI -- what does that mean, HPI?
23   A.   That means history of present illness, so that's the
24   reason that the patient is seeking health care, mental health
25   care.
```

SHAPARD - DIRECT / GREEN

1    **Q.**   And if we focus on --

2          **MS. GREEN:**  Let's just focus on column C.

3    **BY MS. GREEN:**

4    **Q.**   We see here that those three-paragraph or four-line

5    template text, essentially:  Patient presents with

6    psychiatric --

7          **MS. GREEN:**  We can just zoom in on one, Ms. Braga,

8    please.

9    **BY MS. GREEN:**

10   **Q.**   Psychiatric evaluation and assessment of ADHD symptoms,

11   and then it reports some symptoms (as read):

12          "Patient reports a long history of poor focus

13      and poor concentration," et cetera.

14      Does history of present illness differentiate or should it

15   be unique to each patient?

16   **A.**   Yes, it should.

17   **Q.**   Okay.  And I'm not going to take the jury through all of

18   these rows.

19          **MS. GREEN:**  But, Ms. Braga, if you could just

20   control-shift-down arrow so we can see how many there are here.

21   **BY MS. GREEN:**

22   **Q.**   This 1,916 initial notes that all had the same history of

23   present illness?

24   **A.**   Yes, that's correct.

25   **Q.**   So those do not accurately reflect the conditions of the

1  patient?

2  **A.**   No, they didn't.  I wrote a general note as to -- far as

3  how someone with ADHD would present, and if there was -- every

4  now and again I would write a little something else, but many

5  times I had forgotten the unique things when I saw the patient.

6  By the time I wrote the note, I had already forgotten what they

7  said, so I would just leave that one on there, but that was not

8  accurate.

9  **Q.**   You've mentioned a lot about --

10        **MS. GREEN:**   And we can take that down, Ms. Braga.

11  Thank you.

12  **BY MS. GREEN:**

13  **Q.**   -- not having time to do things at Done, do longer visits

14  or follow-up visits.

15        Who controlled scheduling of your calendar at Done, you or

16  Done?

17  **A.**   Done.

18  **Q.**   To the extent you wanted to schedule another visit or you

19  wanted to have a follow-up visit, were you able to just put

20  that on your schedule?

21  **A.**   No, I was not.

22  **Q.**   Is that usual practice, based on your experience?

23  **A.**   No, it's not.

24  **Q.**   So outside of Done, you could control your own schedule in

25  terms of --

SHAPARD - DIRECT / GREEN

1   **A.**   Yes.

2   **Q.**   To the extent a Done member had completed intake

3   questionnaires prior to your visit, did your schedule allow you

4   time to always review that information before your visit?

5   **A.**   No, not always.

6   **Q.**   Would it have been important to review that information?

7   **A.**   Yes.

8   **Q.**   Did you write stimulant prescriptions for Done members who

9   did not meet the DSM-5 diagnostic criteria for ADHD?

10  **A.**   Yes, I did.

11  **Q.**   Why?

12  **A.**   Well, if I prescribed a medication, then the patient would

13  stay on my panel, and I would continue to get paid.

14  **Q.**   And had you also agreed to that in Schedule C of your

15  contract?

16  **A.**   Yes, I did.

17  **Q.**   Did you feel pressure to diagnose someone with ADHD and

18  prescribe a stimulant even if you didn't do an adequate

19  evaluation to confirm the diagnosis?

20  **A.**   Yes.

21  **Q.**   And where was that pressure coming from?

22  **A.**   From the management of Done.

23  **Q.**   Can you explain what you mean by that?

24  **A.**   Well, the expectation was you see the patient, you

25  prescribe them the medication, they become a member of Done,

1  they pay the monthly fee for -- in exchange for the monthly

2  fee, they're able to get a refill of their medication without

3  being seen for a visit.

4  **Q.**   And did Done policy require patients to have follow-up

5  visits?

6  **A.**   No, it did not.

7  **Q.**   Did you always check the CURES report prior to prescribing

8  a Schedule II controlled substance to a Done member?

9  **A.**   No, I did not.

10  **Q.**   Why not?

11  **A.**   I didn't have time.

12  **Q.**   You mentioned that you were not personally able -- and

13  we're shifting to follow-up visits from initial visits.

14      You mentioned you were not personally able to schedule

15  patients for follow-ups; correct?

16  **A.**   Correct.

17  **Q.**   So how would follow-ups get scheduled, if they ever

18  happened?

19  **A.**   I would ask a patient to make an appointment and -- or I

20  would ask the care team to schedule the patient for an

21  appointment.

22  **Q.**   You said you would ask the patient to try and schedule a

23  follow-up appointment?

24  **A.**   Right.

25  **Q.**   Did that strike you as unusual, having to --

SHAPARD - DIRECT / GREEN

1    **A.**    Yes.

2    **Q.**    Did you feel like you were at the mercy of the patient as

3    to whether a follow-up happened?

4    **A.**    Yes, yes, because if they didn't schedule -- I wouldn't

5    even know if they didn't schedule, because I had so many

6    patients, I wasn't able to keep up.

7    **Q.**    And did Done policy allow a Done member to continue

8    getting refill prescriptions without ever needing a follow-up

9    visit?

10   **A.**    Yes.

11   **Q.**    So really it's up to the patient to decide if they choose

12   to try and schedule a follow-up visit?

13   **A.**    Yes.

14   **Q.**    Is that usual practice?

15   **A.**    No.

16   **Q.**    Can you explain to the jury why not?

17   **A.**    If you leave it upon the patient, all they want is their

18   medication.  There's no incentive for them to take their time

19   out of their day to make an appointment to be seen when all

20   they have to do is go in and click a couple of buttons to get a

21   refill.

22   **Q.**    So after your initial visit, did you feel you were able to

23   control whether and when patients had a follow-up visit?

24   **A.**    No.

25   **Q.**    You were not able to do that in accordance with your

1    independent clinical judgment revenue?

2    **A.**    I was not.

3    **Q.**    Even, let's say, a Done member wanted a follow-up visit,

4    did Done's scheduling controls allow for that always to happen?

5    **A.**    No, because many times follow-up visits were backed out

6    two or three months, so if a patient wanted to be seen next

7    month and they want to make an appointment and there weren't

8    any available, they could request one, but there was no way for

9    them to get it.

10    **Q.**    Was most of the calendar blocked out for initial visits

11    with new patients?

12    **A.**    Yes.

13    **Q.**    Did you think it was important to be able to control, as

14    the medical practitioner, when a patient came in for a

15    follow-up?

16    **A.**    Yes.    That's my responsibility.    I'm prescribing them a

17    medication that's controlled.    It's my responsibility to make

18    sure they're being seen.    In typical practice, if patients miss

19    their follow-up or don't make one, their treatment is

20    discontinued.

21    **Q.**    But did Done's policy allow you to enforce your

22    independent clinical judgment to ensure --

23    **A.**    No --

24    **Q.**    -- that happened?

25    **A.**    -- not at all.

SHAPARD - DIRECT / GREEN

1  Q.  Would you sometimes ask patients to book a follow-up

2  within a certain period of time after you prescribed?

3  A.  Yes.

4  Q.  Would that actually happen?

5  A.  No.

6  Q.  For the reasons we've discussed?

7  A.  Correct.

8  Q.  Did Done's model allow you to practice in a way that you

9  believed to be safe for patients with respect --

10  A.  No --

11     (Reporter interruption for clarity of the record.)

12  BY MS. GREEN:

13  Q.  Did Done's model allow you to practice in a way that you

14  believed to be safe for patients with respect to follow-up

15  appointments?

16  A.  No.

17  Q.  At one point in time, did you suggest even putting in a

18  hard stop so the patient couldn't keep requesting a refill if

19  they had not done an appointment every three to six months?

20  A.  Yes.

21  Q.  And have you previously worked at practices where this

22  type of control was in place?

23  A.  Yes.

24  Q.  Based on your experience, if executive leadership had

25  wanted to put in such a control, would that have been feasible?

SHAPARD - DIRECT / GREEN

1    **A.**    Yes.

2    **Q.**    Was your suggestion implemented at Done?

3    **A.**    At one point, yes, there was a way for me to place -- when

4    I did the refill, it said when for the patient to schedule a

5    follow-up, and that was there about two weeks, and follow-ups

6    started getting full, and they said, your schedule is full; why

7    are there so many follow-ups?

8         And I said, well, I'm telling patients they need to

9    schedule.  They have not been seen.  And they removed that

10   feature from -- from the system.

11             **THE COURT:**  They removed what feature?

12             **THE WITNESS:**  For -- they removed the feature where it

13   was reminding patients to schedule the follow-up as part of the

14   note that went into their chart.

15             **MS. GREEN:**  Thank you, Your Honor.

16   **BY MS. GREEN:**

17   **Q.**    Would you do follow-up visits with all of the patients who

18   were on your panel?

19   **A.**    No.

20   **Q.**    Why not?

21   **A.**    There wasn't enough time to do those -- those visits.

22   **Q.**    What were you being paid to do for those patients?

23   **A.**    I was being paid to send their medication to the pharmacy

24   for them.

25   **Q.**    And how thoroughly were you even evaluating those patients

SHAPARD - DIRECT / GREEN

 1  prior to sending refill scripts?

 2  **A.**    I wasn't.

 3  **Q.**    Fair to say you were essentially rubber-stamping those

 4  prescriptions?

 5  **A.**    Yes, that's correct.

 6  **Q.**    Given this refill policy and this follow-up issue we've

 7  discussed, what care were you actually providing to Done

 8  members on your panel?

 9  **A.**    None.

10  **Q.**    Were you providing anything besides the stimulant?

11  **A.**    I was just providing the medication to the patient.

12  **Q.**    Were you giving Done members what they wanted or what they

13  needed?

14  **A.**    What they wanted.

15  **Q.**    Is that usual course of practice?

16  **A.**    No, it's not.

17  **Q.**    When it came to refilling the prescriptions, can you

18  explain to the jury how that process actually worked?

19  **A.**    So the patient would go into the -- their portal, and they

20  would hit a button that says "request a refill," and there were

21  a couple of questions, just asking are you doing okay, do you

22  have any problems.  They would check "everything's fine" and

23  they would hit the submit button.

24       And then the name would be sent to me.  Initially the name

25  was sent to me on an e-mail list.  I would just get a list of

1    names of patients that had put those requests in.

2    **Q.**    And then would you just approve those prescriptions?

3    **A.**    Yes.

4    **Q.**    In terms of the note that was generated to coincide with

5    these refill prescriptions, how was that generated?

6    **A.**    It was like automatically generated once I responded back

7    to the e-mail that I had filled all of those prescriptions.

8            **MS. GREEN:**    And let's look at Exhibit 811 for

9    admission, please.

10           **THE COURT:**    811 admitted.

11       (Trial Exhibit 811 received in evidence.)

12    **BY MS. GREEN:**

13    **Q.**    And this is an example of some refills that were sent to

14    you; is that right?

15    **A.**    Yes, that's correct.

16    **Q.**    And let's just look at page 2 of this.

17       Looking at this page, were you asked to refill scripts for

18    patients that hadn't been seen -- sorry.

19       The date of this message was early 2023; correct?

20       We can go back to page --

21    **A.**    Yes.    It was March 2023.    Correct.

22           **MS. GREEN:**    Let's go to the next page, please.

23    **BY MS. GREEN:**

24    **Q.**    Were you asked to refill scripts for patients that hadn't

25    been seen in some cases for a year or two years?

1    **A.**    Yes.

2    **Q.**    And some that hadn't even been seen since their initial

3    visit for years?

4    **A.**    Yes.  And it's noted on here "no follow-up since initial."

5    **Q.**    Okay.  And taking a look at the third line from the

6    bottom, there's this note to you (as read):

7                "Please let us know if you send a refill or if

8            we need to book an appointment.  Your next

9            availability is in April.  We might need to transfer

10           the patient in case you won't refill the

11           prescription."

12   **A.**    Well, that -- you know, when I see something like that,

13   if -- if I -- then if I don't refill and they transfer, then

14   I'm going to lose money.  So the incentive with that is that

15   you need to send this refill or somebody else going to do it

16   for you.

17   **Q.**    Mm-hmm.  And did you feel pressure to send refills while

18   you were at Done?

19   **A.**    Yes, I did.

20           **MS. GREEN:**  We can take that down.  Thank you,

21   Ms. Braga.

22   **BY MS. GREEN:**

23   **Q.**    Did -- we're going to talk about transfers now.

24       Did you receive transfer patients in bulk while you were

25   at Done?

**SHAPARD - DIRECT / GREEN**

1  **A.**   Yes, I did.

2  **Q.**   Would it be in large numbers?

3  **A.**   Yes, it would.

4  **Q.**   Sometimes in the hundreds?

5  **A.**   Yes.

6  **Q.**   And just so the jury understands what you and I are

7  talking about, when I say transfers, does that mean hundreds of

8  patients given to you to put on your panel?

9  **A.**   That's correct.

10  **Q.**   And these would be individuals for whom you did not do the

11  initial evaluation; correct?

12  **A.**   That's right.

13  **Q.**   Was there any Done policy requiring you to do initial

14  evaluations with all of the patients who were transferred to

15  you?

16  **A.**   No.

17  **Q.**   Would your schedule have allowed for you to do initial

18  evaluations with all of these transfer patients?

19  **A.**   No, it would not have.

20  **Q.**   Were members that were transferred to you able to continue

21  to obtain controlled substance refills even without an

22  evaluation?

23  **A.**   Yes, they were.

24  **Q.**   So there were no controls in place at Done to ensure that

25  didn't happen?

SHAPARD - DIRECT / GREEN

1   **A.**   Right.  There were no controls for that.

2   **Q.**   And did you conduct initial evaluations for all of these

3   patients that were transferred to you?

4   **A.**   No, I did not.

5   **Q.**   Why not?

6   **A.**   I didn't have enough time.  There wasn't -- it wasn't

7   possible to do that.

8   **Q.**   Under Done's model, what was the incentive for doing an

9   evaluation with a transfer patient versus just doing a refill?

10  **A.**   There was no incentive to do any visit, because if I -- if

11  I do that, it's going to take more time.  I need the time to

12  send the refills because I have so many to send.

13  **Q.**   Outside of Done, was it usual practice for a provider to

14  have an appointment with a transfer patient to evaluate that

15  patient?

16  **A.**   Yes.

17  **Q.**   Why is that important?

18  **A.**   You don't know what the initial provider did as far as

19  their evaluation.  You're going -- you're taking the word of

20  the patient.

21      And so you need to use your independent judgment and

22  evaluate the patient yourself to be sure they're on the correct

23  medication and they have the correct diagnosis.

24  **Q.**   Do you know why Done was transferring you so many

25  patients?

1    **A.**    Because I would send the refills for the patients and not

2    require them to be seen.

3    **Q.**    You would practice in the way that the Done model wanted

4    you to?

5    **A.**    Yes.  That's the system that was set up.  That was the way

6    I was practicing under their model.

7    **Q.**    And that's what you agreed to do?

8    **A.**    Yes, I did.

9    **Q.**    Were you paid for an initial evaluation with a transfer

10   patient initially?

11   **A.**    No, I was not.

12            **MS. GREEN:**  Let's look at Exhibit 2996 page 12.

13        I think this does need to be admitted.

14            **THE COURT:**  2996 admitted.

15        (Trial Exhibit 2996 received in evidence.)

16   **BY MS. GREEN:**

17   **Q.**    Is this a communication that was --

18            **MS. GREEN:**  Oh, sorry.  Page 112.  I'm sorry,

19   Ms. Braga.

20   **BY MS. GREEN:**

21   **Q.**    Is this a communication that was sent out to you in

22   November 2022 about your October payroll?

23   **A.**    Yes.  Yes, it is.

24   **Q.**    And focusing on the second paragraph, did this

25   communication point out to you that there had been a mistake

SHAPARD - DIRECT / GREEN

1  with your payroll, and you had been paid for a 25-minute --

2  25-minute visit for a transfer visit instead of a 15-minute

3  visit?

4  **A.**  Yes.  It says that -- that there were some routine

5  follow-ups in transfers that were miscalculated as initial

6  appointments.

7  **Q.**  Prior to this e-mail, had you received any communication

8  being sent out to you publicizing that you could be paid for a

9  transfer visit?

10  **A.**  No.

11  **Q.**  Okay.  So you hadn't seen anything that sort of suggested

12  to you that you could be incentivized to do transfer visits

13  prior to seeing this?

14  **A.**  No.  This was the first time.

15  **Q.**  Okay.  And do you recall this -- around this time being

16  the first time that you saw that this payment was something

17  that was happening?

18  **A.**  Yes.

19  **Q.**  Let's just focus on this compensation for a 15-minute

20  visit.  Let's say you are doing a transfer visit; you're able

21  to do a transfer visit with a patient.

22     How feasible was it to do an adequate evaluation for a

23  patient transferred to you to assess the appropriateness of

24  that diagnosis in 15 minutes?

25  **A.**  That was not adequate.

SHAPARD - DIRECT / GREEN

1    Q.    What was your reaction to this e-mail?

2    A.    I at first was a bit annoyed because they said they were

3    overpaying me, and I'm working many, many hours, and --

4    you know, I -- then I saw this, and then I thought, oh, but

5    they're --they're paying for transfers, and I wasn't aware of

6    that, so I was like, well, that's good.

7    Q.    But initially when you joined Done, they weren't paying

8    for transfers?

9    A.    No, they were not.

10   Q.    And you don't know when that changed?

11   A.    I do not.

12   Q.    Do you think it happened prior to 2022?

13   A.    It appears, by the way the e-mail is written, it must have

14   happened in May of 2022, because that's when this

15   miscalculation thing got started.

16   Q.    Let's focus on discharges.

17         Could you discharge a Done member yourself based on your

18   independent clinical judgment?

19   A.    No.

20   Q.    Was it a difficult process to try and discharge a patient?

21   A.    Yes.  You had to send a note to the Done management

22   expressing the reason for the discharge, and then it would be

23   reviewed by the medical director and they would ultimately make

24   the decision.

25   Q.    How did this discharge process make you feel in terms of

 1   whether your independent clinical judgment with respect to a

 2   discharge was being respected?

 3   **A.**   Well, it wasn't being respected.

 4   **Q.**   And what do you mean by that?

 5   **A.**   Well, in normal practice, if I feel it's not safe for a

 6   patient to continue and they need a higher level of care, I

 7   would discharge the patient with the appropriate referral.

 8        But here there was a middleman that had to come in and

 9   make that decision for me, and that's not appropriate.

10   **Q.**   Was the second review of a provider's discharge request

11   usual practice, based on your experience outside Done?

12   **A.**   No.

13   **Q.**   Do you know what will happen to all of the members for

14   whom you requested discharge?

15   **A.**   I don't know what happened to the members that I requested

16   to be discharged.

17   **Q.**   Do you know if sometimes members were rerouted to another

18   provider after your discharge request?

19   **A.**   Yes, they -- they could have been, because I wasn't given

20   that information.

21   **Q.**   And you requested discharges of Done members on occasion;

22   correct?

23   **A.**   Yes, I did.

24   **Q.**   And fair to say that sometimes those patients may actually

25   have been discharged?

SHAPARD - DIRECT / GREEN

1  A.   They might have been discharged and they might have been

2  transferred to another provider.

3  Q.   Okay.

4        MS. NECHAY:   Objection to this line of questioning,

5  Your Honor.   Speculation.

6        THE COURT:   Overruled.

7  BY MS. GREEN:

8  Q.   Let's assume a patient was discharged.   Does the fact that

9  you sometimes requested a discharge of a patient and if that

10  happened, does that change your view that by practicing

11  according to the Done model, you were prescribing outside the

12  usual course of practice, not for legitimate medical purpose?

13  A.   Well, that's -- that's what I was doing.   I was

14  prescribing outside of the normal course of practice, because

15  proper evaluations and follow-ups were not taking place.

16  Q.   And whether or not sometimes a discharge actually happened

17  doesn't affect that; correct?   You were still practicing,

18  writing illegal prescriptions while at Done?

19  A.   Yes.   Yes, I was.

20  Q.   Does the fact that you requested a discharge for a patient

21  mean that you are not guilty of the crime you have pled guilty

22  to?

23  A.   No, I'm still guilty of the crime.   It was very few people

24  that I would even bring up for discharge.   It was usually

25  patients that, you know, I discovered after a period of time

1    they had bipolar disorder, they had schizophrenia, and that had

2    not initially been disclosed.

3        And so I would bring those patients for discharge, and I

4    don't know what happened to them.  But I didn't request that

5    many patients to be discharged.  It was just ones that were

6    very obviously not safe to be seen, you know, in the Done

7    model.

8    Q.   So ones that you were able to sort of catch in the limited

9    time that you had, the very obvious ones?

10   A.   The very obvious ones.  Yes, that's correct.

11   Q.   I want to focus on some specific patients now.

12       We're going to talk about a Done member called

13   Nicholas Chieppa.

14       Did you write refill prescriptions for a Done member

15   called Nicholas Chieppa?

16   A.   Yes, I did.

17   Q.   Did Done transfer this patient to you?

18   A.   Yes, they did.

19       MS. GREEN:  Let's pull up Exhibit 648 for admission,

20   please.

21       THE COURT:  648 admitted.

22       (Trial Exhibit 648 received in evidence.)

23       MS. GREEN:  And let's go to the next page, please,

24   Ms. Braga.  I'm sorry.  The next page.

25   \\\

BY MS. GREEN:

Q.   And did you receive a communication, a Slack, on around June 28, 2022, transferring 125 patients to your panel?

A.   Yes, I did.

Q.   And it's hard to see, but is Nicholas Chieppa one of those patients?

A.   Yes.  He's Number 24 on the list.

Q.   Okay.  Thank you.

     Was this type of transfer a regular occurrence at Done?

A.   Yes, it was.

Q.   What is the most number of patients you remember being transferred to you in one day, if you remember?

A.   A prior Shannon was her first name.  I don't recall her last name -- had left Done, and two days before she left, I received a message would I accept her panel load, and it was around 550 patients, and I accepted it.

Q.   Okay.  And why did you accept all of these transfer patients?

A.   Because I'm going to get paid more money because now I have many more patients on my caseload.

Q.   Did you do an initial evaluation for Mr. Chieppa when he was transferred to you?

A.   I did not.

Q.   Why not?

A.   I didn't have time.  You can't do 125 initial evaluations

1  in the amount of time, you know, with the number of patients

2  that I had.

3  **Q.**  And was there any requirement at Done that you do a visit

4  with him?

5  **A.**  No, that was it.

6          **MS. GREEN:**  And let's look at Exhibit 3055 for

7  admission, please.  This is the PDMP, page 2.

8          **THE COURT:**  Admitted.

9      (Trial Exhibit 3055 received in evidence.)

10         **MS. GREEN:**  Let's just blow up the table section,

11  please.

12  **BY MS. GREEN:**

13  **Q.**  So we've talked about CURES, this prescription drug

14  history program, with the jury; correct?

15  **A.**  Yes.

16  **Q.**  And is this an example of a CURES report?

17  **A.**  Yes, it is.

18  **Q.**  Does it lay out past controlled substance prescriptions

19  for this individual?

20  **A.**  Yes, it does.

21  **Q.**  And looking at this, for approximately how long did you

22  write refill prescriptions for Mr. Chieppa?

23  **A.**  I wrote from July 26th to November the 11th.

24  **Q.**  Okay.

25         **MS. GREEN:**  Can we also admit Exhibit 2676, please?

SHAPARD - DIRECT / GREEN

```
 1              THE COURT:  Admitted.

 2         (Trial Exhibit 2676 received in evidence.)

 3  BY MS. GREEN:

 4  Q.   Did Done have a prescription sort of database through

 5  which you could send electronic prescriptions?

 6  A.   Yes.

 7  Q.   Okay.  And if we -- is this an extract from that?

 8              MS. GREEN:  Let's go to the left, please, Ms. Braga.

 9  BY MS. GREEN:

10  Q.   Does this also document prescriptions that you were

11  sending from Done for Mr. Chieppa?

12  A.   Yes.

13  Q.   Okay.

14  A.   Yes, it does.

15  Q.   Okay.

16              MS. GREEN:  And if we look to the right, Ms. Braga,

17  just so the jury can get familiar with this type of

18  spreadsheet.

19  BY MS. GREEN:

20  Q.   And we see your name here, Ms. Shapard, for many of the

21  stimulants prescriptions.

22              MS. GREEN:  And let's go all the way to the right.

23  BY MS. GREEN:

24  Q.   Are those for the dates from July 2022 to December 2022?

25  A.   Yes.
```

SHAPARD - DIRECT / GREEN

```
 1              MS. GREEN:  Okay.  And let's scroll to the left.
 2   BY MS. GREEN:
 3   Q.   And this is all for Adderall; correct?
 4   A.   Yes.  Adderall 20 milligrams.
 5              MS. GREEN:  And let's scroll to the left, please, and
 6   up, Ms. Braga.
 7   BY MS. GREEN:
 8   Q.   Does this show that the prior provider to you was someone
 9   called Ms. Katrina Pratcher?
10   A.   Yes, that's correct.
11   Q.   You wrote prescriptions to Mr. Chieppa from July to
12   December 2022, approximately six months.  Did you ever do an
13   evaluation of Mr. Chieppa?
14   A.   No, I did not.
15   Q.   Is that the usual course of practice?
16   A.   No.
17   Q.   Why not?
18   A.   You need to evaluate the patient to determine, first of
19   all, how they're doing, are they on the appropriate treatment,
20   do they have the appropriate diagnosis.  That would be
21   important to determine.
22   Q.   And let's look at this individual's patient chart, their
23   Done medical record.
24              MS. GREEN:  Exhibit 1844 for admission, please.
25              THE COURT:  1844 admitted.
```

1          (Trial Exhibit 1844 received in evidence.)

2     **BY MS. GREEN:**

3     **Q.**   And this is the patient PDMP -- the patient record for

4     Mr. Chieppa; correct?

5     **A.**   Yes, that's correct.

6          **MS. GREEN:**   And let's look at page 6, please.

7     **BY MS. GREEN:**

8     **Q.**   Do you see here a note -- this is before the patient was

9     transferred to you -- from January 2022 that says --

10         **MS. GREEN:**   And we can zoom in on it.

11    **BY MS. GREEN:**

12    **Q.**   (as read):

13             "Received call from 'other' today advising that

14        client was placed on a 5150 and has symptoms

15        characteristic of bipolar disorder.  Client should

16        not admin meds for ADD ADHD."

17    **A.**   Yes, that's on the note.

18    **Q.**   And you started writing your prescriptions in July 2022,

19    did you review the patient chart before writing these

20    prescriptions to Mr. Chieppa?

21    **A.**   No, I did not.

22    **Q.**   Why did you not review this?

23    **A.**   Didn't have time.

24    **Q.**   Did anyone at Done tell you why Mr. Chieppa was

25    transferred to you?

1   **A.**    No, they did not.

2   **Q.**    Were you informed by Dr. Brody or anyone in leadership at

3   Done that the mother of Mr. Chieppa again called Done in

4   March 2022 asking Done to stop issuing prescriptions because he

5   had just been released from hospital on a 5150?

6   **A.**    I was not given that information by anyone from Done.

7   **Q.**    And I realize we should define what 5150 is.  My mistake.

8         And for the jury, what is a 5150?

9   **A.**    A 5150 -- that's California law code.  It's an involuntary

10  hold for 72 hours in an inpatient psychiatric hospital when a

11  patient has either threatened to hurt themselves or threatened

12  to hurt somebody else.

13  **Q.**    Were you aware that the mother had said Mr. Chieppa had

14  called Done to say Mr. Chieppa had been prescribed other

15  medications, including antipsychotics and antidepressants?

16  **A.**    No, I was -- I don't -- there was no information provided

17  to me about his mother calling.

18  **Q.**    And did you know who Ms. Pratcher was the provider?

19  **A.**    I know of her.  I don't know her personally.

20  **Q.**    Was she another PMHNP at done?

21  **A.**    Yes, that's correct.

22  **Q.**    And she had been prescribing to Mr. Chieppa before the

23  patient was transferred to you; correct?

24  **A.**    Yes, that's correct.

25  **Q.**    Were you informed by anyone at Done that Ms. Pratcher had

1    requested that the patient be discharged from the Done platform

2    because of information received from the mother and the fact

3    that the patient was having involuntary holds,

4    hospitalizations, and the patient demanded a higher level of

5    care?

6    **A.**    No, I was not provided with any of that information.

7    **Q.**    So none of this information about Mr. Chieppa was conveyed

8    to you when you received this transfer?

9    **A.**    That's correct.

10   **Q.**    Would this information have been valuable to you?

11   **A.**    Absolutely.

12   **Q.**    Why?

13   **A.**    Because this is a patient that would not be safe to

14   continue on a stimulant medication.  If a patient has bipolar

15   disorder and it's not controlled appropriately, a stimulant can

16   cause them to have a psychotic episode.  And so that's when --

17   you know, someone isn't aware of reality, they're a danger to

18   themselves and other people.  That would not be safe at all.

19   **Q.**    We talked about the automatic generation of chart notes

20   when a provider did a refill, like what you were doing for

21   Mr. Chieppa; correct?

22   **A.**    Correct.

23   **Q.**    And let's just --

24        **MS. GREEN:**  We're not going to show the jury all of

25   these notes, but let's just show them one example.  Let's look

 1    at Exhibit 1844, page 3 to 4.

 2        And if we just zoom in on sort of what -- that note from

 3    September 26, Ms. Braga.

 4    **BY MS. GREEN:**

 5    **Q.**    We see here (as read):

 6            "PDMP reviewed.  No aberrant activities found.

 7        medical history and chart notes reviewed.  Refill

 8        request reviewed and sent.

 9            "Patient reports of stable symptoms, no current

10        side effects, and requests to continue current

11        treatment.  Patient declined follow-up face-to-face

12        consultation."

13        And just to be clear, with respect to how you described

14    this refill process working is just the patient requesting a

15    refill through their phone; correct?

16    **A.**    Right, and the patient telling -- saying, yes, I'm stable

17    and I'd like my refill.  Well, Adderall can be misused, and so

18    this patient was requesting it even though he likely knew it

19    wasn't safe because he's been hospitalized, but all he had to

20    do was tell me he was fine and hit the button, and then I get

21    the refill and I send it.  And I didn't see the chart and I

22    didn't review it, so I was prescribing to him, and that was not

23    safe for him.

24    **Q.**    Okay.  Is that the usual course of practice to just take a

25    patient's word for it that they're stable when they request a

SHAPARD - DIRECT / GREEN

1  refill?

2  **A.**   Not at all, no.

3  **Q.**   Okay.

4          **MS. GREEN:**   And let's look at page 4, please,

5  Ms. Braga.

6  **BY MS. GREEN:**

7  **Q.**   Do we see -- and I'm not going to read it out again.

8          But do we see this type of auto-generated refill note for

9  multiple prescriptions in this chart?

10 **A.**   Yes.

11 **Q.**   And could those chart notes have been populated either by

12 you or the care team?

13 **A.**   Yes.

14 **Q.**   Did you write an Adderall refill prescription for

15 Mr. Chieppa for Walgreens pharmacy on or around September 26th,

16 2022?

17 **A.**   Excuse me.  Yes, I did.

18         **MS. GREEN:**   I'd like to admit Exhibit 2676.

19         **THE COURT:**   2676 admitted.

20         **MS. GREEN:**   I think that may already have been

21 admitted.  Yeah, that's the prescription data.

22         And let's also admit Exhibit 740, please.

23         **THE COURT:**   740 admitted.

24         (Trial Exhibit 740 received in evidence.)

25         **MS. GREEN:**   And let's pull that up, please, Ms. Braga.

**BY MS. GREEN:**

**Q.**   Did you receive a request for you to do refills on September 25, 2022?

**A.**   Yes.  Yes, that's correct.

**Q.**   And do you see Mr. Chieppa's name there?  It's kind of fourth from the top in that table?

**A.**   Mm-hmm.  Yes, I see it.

**Q.**   And you confirmed that you completed all of these refills at the top of this e-mail; correct?

**A.**   Yes.  I responded back "refills complete."

**Q.**   And this communication says that no follow-up has been done since the initial appointment on November 2021 for Mr. Chieppa; right?

**A.**   Yes, that's correct.

**Q.**   So that's almost a year prior with no evaluation of this patient?

**A.**   Yeah, about -- that's about nine -- nine months.  Nine, 10 months.

**Q.**   But you wrote this prescription regardless?

**A.**   Yes, I did.

**Q.**   Why?

**A.**   That's -- the Done model is to send the prescription for the patient to make the patient happy, not to treat the patient based on medical necessity.

**Q.**   To make the patient happy but not treat the patient based

 1   on medical necessity?

 2   **A.**   Correct.

 3           **MS. GREEN:**  And let's look at Exhibit 2673 for

 4   admission.

 5           **THE COURT:**  2673 admitted.

 6       (Trial Exhibit 2673 received in evidence.)

 7   **BY MS. GREEN:**

 8   **Q.**   Was this prescription filled at Walgreens?  And the date

 9   is small, but on or around -- this is the prescription.

10           **THE WITNESS:**  And then let's look at the bottom right

11   on annotations, Ms. Braga, please.

12   **BY MS. GREEN:**

13   **Q.**   October 13th, 2022?  Do you see that date, October 13th --

14   **A.**   Yes, I see the date.  I don't see anything that says

15   Walgreens, though.

16           **MS. GREEN:**  Oh, I'm sorry.  We can zoom out.

17   **BY MS. GREEN:**

18   **Q.**   Do you see the bottom it says "This is a Walgreens

19   document"?

20   **A.**   Oh, yes.

21   **Q.**   This is an electronic prescription.  I'm sorry.  Okay.

22       Does that confirm that to you?

23   **A.**   Oh, yes.  "This report is considered a confidential

24   Walgreens document."

25   **Q.**   And did you write another refill prescription for

SHAPARD - DIRECT / GREEN

1  Mr. Chieppa on October 7th, 2022, for a different pharmacy,

2  Honeybee Pharmacy?

3  **A.**   Yes, I did.

4        **MS. GREEN:**   I would like to admit Exhibit 2522,

5  please.

6        **THE COURT:**   2522 admitted.

7     (Trial Exhibit 2522 received in evidence.)

8  **BY MS. GREEN:**

9  **Q.**   So you wrote this prescription on October 7th, 2022.

10    Do you see that date in blue kind of below the yellow on

11  the right side?

12  **A.**   10/7/2022, yes.

13  **Q.**   And was this prescription filled on October 10, 2022?

14    Do you see that note at the top, the note added?

15  **A.**   Oh, yes.   October 10th, 2022.

16        **MS. GREEN:**   And if we haven't -- let me just make sure

17  we haven't --

18    Oh, yeah.

19  **BY MS. GREEN:**

20  **Q.**   Exhibit 3055 is already admitted.   That's his CURES

21  report.   I can show you that if you want confirmation, but

22  filled on October 10th, 2022?

23  **A.**   Yee, that's correct.

24  **Q.**   So the Walgreens script and the Honeybee script were

25  filled by Mr. Chieppa just three days apart in October 2022; is

1    that right?

2    **A.**    Yes.  That's what the CURES report shows.

3    **Q.**    Is that a red flag?

4    **A.**    Yes, it is.

5    **Q.**    Can you explain that for the jury?

6    **A.**    So a stimulant medication, Schedule II medications, can

7    only be refilled every 30 days, or some pharmacies will allow

8    28 days, because the medications can be misused.

9        So on the CURES report, the prescription was only three

10    days apart, so the patient received an extra prescription

11    from -- one from Honeybee and one from Walgreens.

12    **Q.**    Can that be an indicator of abuse?

13    **A.**    Yes.

14    **Q.**    Are there safety concerns for a patient when that happens?

15    **A.**    Yes, because now he has extra medication, and he could

16    possibly take too much of it or sell it or -- you know, to

17    other people and cause harm to them as a result of doing that.

18    **Q.**    While you were at Done, was Honeybee known as a pharmacy

19    that was more likely to fill prescriptions even if other

20    pharmacies were not filling prescriptions?

21    **A.**    Yes.

22    **Q.**    How do you know that?

23    **A.**    Riley Levy was a member of management at Done, and he

24    informed me that he had made a contract.  He had contacted

25    Honeybee.  They agreed to fill prescriptions specifically for

SHAPARD - DIRECT / GREEN

1    our patients if we put a -- the patient's e-mail address and a

2    specific code on the prescription, which you can see as down at

3    the bottom.  It's the Done_V6RY, and that they would fill those

4    prescriptions specifically for us when they were sent and there

5    would be no issue.

6    **Q.**   And while you were at Done, putting aside Honeybee, were

7    there issues with pharmacies refusing to fill Done

8    prescriptions?

9    **A.**   Yes.

10   **Q.**   We're going to talk about that in a bit more detail later.

11           **THE COURT:**  Let's -- are we finished with this

12   patient?

13           **MS. GREEN:**  I will be in actually less than two

14   minutes.  One minute.

15           **THE COURT:**  Okay.  Go ahead.  Go ahead.

16   **BY MS. GREEN:**

17   **Q.**   Did you check the CURES before you issued -- you wrote

18   your prescriptions to Mr. Chieppa?

19   **A.**   No, I did not.

20   **Q.**   And if you had checked the CURES before you wrote your

21   November 2022 script, would you have seen the issue that we

22   just discussed?

23   **A.**   Yes, I would have seen it.

24   **Q.**   Did you have time to check the CURES under the Done model?

25   **A.**   No, I did not.

SHAPARD - DIRECT / GREEN

1   **Q.**   So you didn't evaluate Mr. Chieppa before writing

2   prescriptions to him?

3   **A.**   I did not.

4   **Q.**   Was your stimulant prescription to Mr. Chieppa on

5   October 7, 2022, which was filled at Honeybee, written within

6   the usual course of practice for a legitimate medical purpose?

7   **A.**   No it was not.

8   **Q.**   Did you write any of your prescriptions to Mr. Chieppa in

9   accordance with the usual course of practice for a legitimate

10  medical purpose?

11  **A.**   No, I did not.

12  **Q.**   Why did you do that?

13  **A.**   Because I was being paid very well.

14  **Q.**   And that's why part of the conspiracy you agreed to with

15  Defendant He and Defendant Brody at Done?

16  **A.**   Yes, that's correct.

17          **MS. GREEN:**   Thank you, Your Honor.

18          **THE COURT:**   Okay.  Ladies and gentlemen, we're going

19  to take our recess now.  We'll be in recess until 11:00.

20      Remember the admonition given to you:  Don't discuss the

21  case, allow anyone to discuss it with you, form or express any

22  opinion.

23                  (The jury leaves the courtroom.)

24      (Proceedings were heard out of the presence of the jury.)

25          **THE COURT:**   And you can step down.

SHAPARD - DIRECT / GREEN

```
 1        (Proceedings were heard out of the presence of the jury.)

 2             THE COURT:  Okay.  We're in recess now until 11:00.

 3   Thank you.

 4                      (Recess taken at 10:45 a.m.)

 5                 (Proceedings resumed at 11:09 a.m.)

 6        (Proceedings were heard out of the presence of the jury.)

 7             THE COURTROOM DEPUTY:  Come to order.  Court is now in

 8   session.

 9             THE COURT:  Bring them in.

10                    (The jury enters the courtroom.)

11        (Proceedings were heard in the presence of the jury.)

12             THE COURT:  Okay.  Please be seated.

13        Let the record reflect all jurors are present.  Parties

14   are present.

15        You may proceed.

16             MS. GREEN:  Thank you, Your Honor.

17   BY MS. GREEN:

18   Q.   We're going to talk about a different Done member,

19   Vashti Oeschner Souza.  V-A-S-H-T-I, second name

20   O-E-S-C-H-N-E-R, last name, S-O-U-Z-A.

21        Did you write stimulant refill prescriptions for a Done

22   member called Vashti Oeschner Souza?

23   A.   Yes, I did.

24   Q.   When you first talked to the Government about this Done

25   member, did you even know who that was?
```

1  **A.**   I did not.

2  **Q.**   Is it telling to you that you did not even know the names

3  of all the Done members that you had on your panel?

4  **A.**   Yes.   I had so many, I couldn't know all of their names.

5         **MS. GREEN:**  And let's admit Exhibit 2679, please.

6         **THE COURT:**  2679 admitted.

7      (Trial Exhibit 2679 received in evidence.)

8         **MS. GREEN:**  The e-prescription data from Done for this

9  individual.

10 **BY MS. GREEN:**

11 **Q.**   And looking at this, did you write a stimulant

12 prescription for this individual on August 25th, 2021, and

13 October 10th, 2021?

14 **A.**   Yes, I did.

15 **Q.**   And according to this Done prescription data, did

16 Dr. Brody write a stimulant prescription for this Done member

17 before you on June 19th, 2021?

18 **A.**   Yes, he did.

19 **Q.**   Did you ever meet with this patient?

20 **A.**   No, I did not.

21 **Q.**   Did you ever evaluate the member to determine whether the

22 patient had ADHD?

23 **A.**   No, I did not.

24 **Q.**   What about whether a stimulant prescription for this

25 patient had a legitimate medical purpose?

1  **A.**   No, I didn't evaluate for that.

2  **Q.**   Was this patient transferred to you?

3  **A.**   Yes.

4        **MS. GREEN:**  Let's look at the patient chart for this

5  patient.

6        Exhibit 1941 for admission.

7        **THE COURT:**  1941 for admitted.

8        (Trial Exhibit 1941 received in evidence.)

9  **BY MS. GREEN:**

10 **Q.**   Did you check this patient chart before writing your

11 prescriptions?

12 **A.**   No, I did not.

13 **Q.**   Why?

14 **A.**   I didn't have time.

15 **Q.**   Did you confirm that the prescriptions you were writing

16 were for a legitimate medical purpose within the usual course

17 of practice?

18 **A.**   No, I did not.

19 **Q.**   So the initial evaluation for that patient was supposed to

20 have occurred, based on the date that we just looked at, on or

21 around April 30th, 2021; correct?

22 **A.**   Yes, that's correct.

23        **MS. GREEN:**  And let's go to page 2 of this, Ms. Braga,

24 please.

25 \\\

1   BY MS. GREEN:

2   Q.   We see a clinician note here from October 2021.  We're

3   going to come back to that.

4          MS. GREEN:  Can you scroll down at all, Ms. Braga, or

5   is that the end of this record?

6   BY MS. GREEN:

7   Q.   Is it confirming that's the end of this record; correct?

8   A.   Okay.

9   Q.   Do you see any chart note here documenting an initial

10  evaluation with this Done member and confirming that the member

11  met the diagnostic criteria for ADHD?

12  A.   No, there's no initial evaluation on the chart.

13  Q.   And do you recall that we saw that Dr. Brody wrote an

14  Adderall prescription for this patient in June 2021, before

15  you; right?

16  A.   Yes, that's correct.

17  Q.   Do we see any note in this chart establishing that this

18  prescription written in June 2021 by Dr. Brody was for a

19  legitimate medical purpose within the usual course of practice?

20  A.   No, there's no note on there from that date.

21  Q.   Let's look at the one note that is on here from

22  October 2021.

23      And this is around the same date when you wrote one of

24  your Adderall prescriptions; correct?

25  A.   Yes, that's correct.

SHAPARD - DIRECT / GREEN

1   **Q.**   The note here just says (as read):

2          "Updated by care team."

3      Did you write this note?

4   **A.**   No, I did not.

5   **Q.**   Does this note provide a legitimate medical purpose for

6   the stimulant prescriptions that you wrote?

7   **A.**   No, it does not.

8   **Q.**   Is it the usual course of the practice to write a

9   stimulant prescription without providing documentation to

10  support the medical purpose of that prescription?

11  **A.**   No.

12  **Q.**   If you had reviewed this patient chart prior to writing

13  the prescriptions, would you have been concerned?

14  **A.**   Yes.  Yes, I would have.

15  **Q.**   Why?

16  **A.**   Because the patient wasn't evaluated at all.  Even the

17  25-minute evaluation is missing.  And the other notes to

18  correspond to the refills are also missing, so there's no

19  documentation.

20  **Q.**   No documentation here supporting that these prescriptions

21  were within the usual course of practice for a legitimate

22  medical purpose?

23  **A.**   Correct.

24          **MS. GREEN:**  And let's look at the PDMP, the record of

25  prescription history for this patient, Exhibit 1942, page 5.

1   And we can blow up the table a little bit, but --

2            **THE COURTROOM DEPUTY:**  Is this admitted?

3            **MS. GREEN:**  Could we admit it, please, Your Honor?

4            **THE COURT:**  Admitted.

5       (Trial Exhibit 1942 received in evidence.)

6   **BY MS. GREEN:**

7   **Q.**   So here's the prescription history for this patient as of

8   September 9, 2021; is that correct?

9   **A.**   Yes, that's correct.

10  **Q.**   And we see here one of the prescriptions you wrote in or

11  around August 2021; correct?

12  **A.**   Yes, that's correct.

13  **Q.**   And looking further down, do you see that this Done member

14  filled the stimulant prescription from Dr. Brody on or around

15  June 18th, 2021, at CVS?

16  **A.**   Yes, I see that.

17  **Q.**   And do you see that on the same date, a stimulant

18  prescription from another provider was filled at Kaiser?

19  **A.**   Yes, I see that.

20  **Q.**   Is that a red flag?

21  **A.**   Yes, that's a red flag.

22  **Q.**   Why?

23  **A.**   Because the patient's obtaining two prescriptions for a

24  controlled medication on the same day when those prescriptions

25  are to be 28 to 30 days apart, so that is very concerning that

SHAPARD - DIRECT / GREEN

1    the patient could be misusing the medication.

2    **Q.**    Did this patient also have phentermine in the history?

3    **A.**    Yes, I see a phentermine prescription from May 11th.

4    **Q.**    Do you know what phentermine is?

5    **A.**    Yes.

6    **Q.**    Is it a weight loss drug?

7    **A.**    Yes.  It's a weight loss drug.  It's a mild stimulant.

8    It's a Schedule IV controlled substance.

9    **Q.**    Can there potentially be drug-on-drug interactions between

10    Adderall and phentermine?

11    **A.**    Yes.

12    **Q.**    Something that a medical provider should take account of

13    when prescribing a stimulant?

14    **A.**    Yes.

15    **Q.**    Is it the usual course of practice for a provider to

16    carefully evaluate the appropriateness of providing a stimulant

17    before writing that prescription?

18    **A.**    Yes, it is.

19    **Q.**    And here, did you evaluate the CURES report for the

20    patient?

21    **A.**    No, I did not.

22    **Q.**    Why?

23    **A.**    I didn't have time to do it based on my patient load.

24    **Q.**    Let's look at another patient, Tapasya Trivedi.

25        Did you write stimulant prescriptions for a Done member

1  called Tapasya Trivedi?

2  **A.**   Yes, I did.

3         **MS. GREEN:**   Admit 2680, which is prescription data for

4  this individual.

5         **THE COURT:**   Admitted.

6     (Trial Exhibit 2680 received in evidence.)

7  **BY MS. GREEN:**

8  **Q.**   So looking at the prescription data from Done, did you

9  write --

10         **MS. GREEN:**   And let's scroll up, please.   Okay.

11  **BY MS. GREEN:**

12  **Q.**   Did you start writing stimulant prescriptions to this

13  individual around January 2021?

14  **A.**   Yes, I did.

15         **MS. GREEN:**   And let's scroll down to the next table,

16  please, Ms. Braga.   And we'll scroll to the right to see the

17  dates.   Go all the way to column l.   There we see Ms. Shapard's

18  name, and then let's keep going to the right to column s for

19  the date.

20  **BY MS. GREEN:**

21  **Q.**   And did you continue writing stimulant prescriptions for

22  this patient at least through July 2022?

23  **A.**   Yes, that's correct.

24  **Q.**   And locking at row 31, which was the row below your

25  name --

SHAPARD - DIRECT / GREEN

```
 1            MS. GREEN:  Let's scroll back to the left.

 2   BY MS. GREEN:

 3   Q.    -- did Dr. Brody also write an Adderall prescription for

 4   this member on July 27th, 2022?

 5   A.    Yes, he did.

 6   Q.    And was that sent to a different pharmacy from your July

 7   23rd one?

 8            MS. GREEN:  You can scroll to the right, Ms. Braga,

 9   please.  And the pharmacy column is column T, I believe.  Keep

10   going.  Did I miss it?  Keep going to the right.  Keep going.

11   Sorry.  Column AD.

12   BY MS. GREEN:

13   Q.    There's one for Walgreens that you wrote, one for

14   Duane Reade that Dr. Brody wrote?

15   A.    Yes, correct, there were two different pharmacies.  And

16   Duane Reade is a pharmacy in New York.

17   Q.    Mm-hmm.  Okay.

18         And looking at row 7 of this spreadsheet --

19            MS. GREEN:  -- and scroll to the left.

20   BY MS. GREEN:

21   Q.    Did Dr. Tsang also write a prescription for this patient

22   on or around December 18th, 2020?

23   A.    Yes, he did.

24            MS. GREEN:  Okay.  Let's admit Exhibit 1988, please,

25   the patient record.
```

1          **THE COURT:**  1988 admitted.

2          (Trial Exhibit 1988 received in evidence.)

3          **MS. GREEN:**  Thank you.

4    BY MS. GREEN:

5    **Q.**   This patient was transferred to you; correct?

6    **A.**   Yes, that's correct.

7    **Q.**   So you don't do the initial evaluation?

8    **A.**   No, I did not.

9    **Q.**   At the top of the page, page 2, according to this, the

10   patient on the GAD-7 and the PHQ-9 had moderate depression and

11   severe anxiety; is that right?

12   **A.**   Yes, that's correct.

13   **Q.**   And let's go to page 10 of this record, which is the

14   patient note from January 2021, which is the first month when

15   you wrote a prescription; correct?  January 2021?

16   **A.**   Yes, that's correct.

17          **MS. GREEN:**  Okay.  And let's just look at that note.

18       We can blow it up.  It's the one in the middle of the

19   page, Ms. Braga.

20   BY MS. GREEN:

21   **Q.**   (as read):

22              "PDMP reviewed, chart reviewed, refill request

23          reviewed."

24       I won't read it again for the jury.  Is this one of the

25   auto-generated refill notes?

1    **A.**    Yes, that's correct.

2    **Q.**    Did you conduct an evaluation for this patient on this

3    date?

4    **A.**    No, I did not.

5    **Q.**    And I'm just going to have Ms. Braga scroll slowly up from

6    this page, page 10, through to page 4 of this record, which is

7    the note from July 2022.

8         **MS. GREEN:**  Keep going.  Keep going.

9    **BY MS. GREEN:**

10   **Q.**    Okay.  I know the text is small, and to be efficient, I'm

11   not reading it out every time.

12        But at any point in time from January 2021 to July 2022,

13   this year and a half, did you conduct an evaluation of this

14   patient?

15   **A.**    No, I did not.

16   **Q.**    And did we see here that same auto-generated refill note

17   just month after month?

18   **A.**    Yes.

19   **Q.**    And the Done member continued to get stimulant

20   prescriptions every month for that year and a half; correct?

21   **A.**    Yes, they did.

22   **Q.**    Did you ever conduct a follow-up evaluation for this Done

23   member during the entirety of the time you wrote prescriptions?

24   **A.**    No, I did not.

25   **Q.**    Were these prescriptions written for a legitimate medical

SHAPARD - DIRECT / GREEN

1  purpose within the usual course of practice?

2  **A.**    No.

3  **Q.**    Why?

4  **A.**    Because the patient was not evaluated by me to determine

5  if the treatment was effective, if the patient was having side

6  effects.  So that's not within the normal course of medical

7  practice.

8  **Q.**    And you recall that Dr. Brody wrote an Adderall

9  prescription for this patient on or around July 27th, 2022;

10  correct?

11  **A.**    Yes, that's correct.

12  **Q.**    And looking at page 4 of this record at the top, we see a

13  note related to your July 23rd one.

14        **MS. GREEN:**  Scrolling.  Sorry.  Zoom out.

15  **BY MS. GREEN:**

16  **Q.**    We see the note related to your July 23rd script; correct?

17  The auto-refill note?

18  **A.**    Correct.

19        **MS. GREEN:**  And then zooming out, the next -- scroll

20  up.

21  **BY MS. GREEN:**

22  **Q.**    The next script above that, the next note is from, I

23  think, February 20 --

24        **MS. GREEN:**  Page 3, please.

25  \\\

SHAPARD - DIRECT / GREEN

1    BY MS. GREEN:

2    Q.    -- is from September 2022?

3    A.    Yes.

4    Q.    Okay.

5    A.    September 2022.

6    Q.    So did we see any note indicating that Dr. Brody met with

7    and evaluated this patient on July 27th?

8    A.    No.  There's no note at all.

9    Q.    And do you recall being informed at Done as to why

10   Dr. Brody was writing the script?

11   A.    It's not documented on the chart.  I'm not aware that he

12   did write the script other than the report I was shown.

13   Q.    The prescription data?

14   A.    Correct.

15   Q.    And that showed that it was a script for New York?

16   A.    Correct.

17   Q.    And looking at page 10, please.

18         You recall that you and I discussed that Dr. Tsang wrote

19   an Adderall prescription for this member on or around

20   December 18th, 2020; correct?

21   A.    Correct.

22   Q.    And we see at the bottom of the page a note from

23   December 29th, 2020.  Is this, again, just the automatic refill

24   note?

25   A.    Yes.

1   Q.   And any indication from this note that Dr. Tsang met with

2   and evaluated this patient?

3   A.   There's no indication the patient was seen.

4   Q.   Let's look at, you know, the last non-template note that

5   we can find in this chart, which is from around November 2020.

6   So that's on page 11.

7        So this is the last non-template note we see from

8   November 21, 2020.  Did this patient continue to get Adderall

9   prescriptions from Done from this date until December 2022, the

10  first date on the chart, without being evaluated?

11  A.   Yes, that's correct.

12  Q.   So this member received Adderall prescriptions from Done

13  for approximately two years without any type of evaluation to

14  assess her condition?

15  A.   Yes, that's correct.

16  Q.   Is that safe for a patient?

17  A.   No.

18  Q.   Why?

19  A.   The patient could be misusing the medicine.  The patient

20  could be having an adverse reaction.  There would be no way to

21  know that without evaluating the patient.

22  Q.   And let's look at page 11.  According to the patient

23  record, this patient had an initial evaluation around

24  October 2020; right?

25  A.   Yes, that's correct.

1   Q.   And was this with a Done provider called Shabnam Rahimi?

2   A.   I don't see a name on this.

3        MS. GREEN:  We can go back to page 1.  And if we

4   scroll through the next --

5        THE WITNESS:  Oh, yes, that's correct.

6   BY MS. GREEN:

7   Q.   Great.  So going back to page 12, Ms. Rahimi's note.

8        MS. GREEN:  And let's just look at the top paragraph

9   and blow it up.  It's very small.

10  BY MS. GREEN:

11  Q.    In the top line, did Ms. Rahimi note that the patient had

12  a past medical history of anxiety?

13  A.   Yes.

14  Q.   Is it documented anywhere in this note that Ms. Rahimi, in

15  fact, did not think the patient had ADHD but more like severe

16  anxiety; however, Rahimi nevertheless gave in and prescribed a

17  stimulant because the patient was adamant that that is what she

18  wanted?

19  A.   Yes.  This is stating that the patient has anxiety.

20  Q.    Is it saying that Ms. Rahimi did not believe the patient

21  had ADHD?

22        MS. BELL:  Objection, Your Honor, leading.  The

23  document speaks for itself.

24        THE COURT:  Overruled.

25        THE WITNESS:  I don't see that in this part of the

1   note.

2   **BY MS. GREEN:**

3   Q.   Okay.

4   A.   If we could review --

5   Q.   That's okay.  Yeah.

6        When this patient was transferred to you, did Done tell

7   you that Ms. Rahimi had messaged the care team to say that her

8   evaluation of the patient found that the patient did not have

9   ADHD?

10  A.   I was not given that information.

11  Q.   Would that information have been important for you to

12  know?

13  A.   Yes.

14  Q.   Why?

15  A.   If the patient has anxiety and you treat them with a

16  stimulant, it's going to increase their anxiety, and so that

17  would not be safe medical care.

18  Q.   Did Done have any policy or control in place that ensured

19  information from a prior provider related to the clinical

20  treatment of a Done member was provided to a second provider

21  when the patient was transferred?

22  A.   No.

23  Q.   Would such a policy be usual practice?

24  A.   Yes, it would.

25  Q.   What is your understanding, if any, for why that policy

1  wasn't in place at Done?

2  **A.**   That would be for the patient to continue to remain on the

3  panel, to continue to pay their monthly fee.   If a patient is

4  discharged, then that's lost revenue.

5  **Q.**   Were those prescriptions --

6        **MS. GREEN:**   And we can take that down.   Thank you,

7  Ms. Braga.

8  **BY MS. GREEN:**

9  **Q.**   Were the prescriptions for this patient written for

10  legitimate medical purpose within the usual course of practice?

11  **A.**   No, they were not.

12        **MS. GREEN:**   I'm just going to admit but not show

13  Exhibit 1990, 2510.

14        **THE COURT:**   Wait.

15        **MS. GREEN:**   I'm sorry.   Sorry, Ms. Scott.

16        **THE COURT:**   One --

17        **MR. FOSTER:**   1990, 2510, and 1985, which are all just

18  PDMP CURES records for this patient.

19        **THE COURT:**   Admitted.

20      (Trial Exhibits 1990, 2510, and 1985 received in

21  evidence.)

22  **BY MS. GREEN:**

23  **Q.**   You said near the start of your testimony that you pled

24  guilty to being in a conspiracy with Defendant He and

25  Defendant Brody.

1   A.   Yes, that's correct.

2   Q.   And we walked through a number of the policies and

3   practices related to initial appointment times, whether

4   follow-ups occurred, et cetera, earlier; right?

5   A.   Correct.

6   Q.   Who was ultimately in charge at Done?

7   A.   Ms. He and Dr. Brody were ultimately in charge.

8   Q.   And why -- why were you in an agreement with Defendant He

9   and Defendant Brody in this conspiracy?

10  A.   Because I was being paid a high amount of money to

11  continue to work with Done and follow the Done model.

12  Q.   Who determined the policies that we've just been

13  discussing -- how long initial appointments were, how whether

14  or not a follow-up occurred?  Who was the ultimate

15  decision-maker with respect to those policies?

16  A.   Ms. He.

17  Q.   And when you signed your -- when you entered into your

18  agreement, your contract with Done, was that with Done Health

19  and yourself?

20  A.   Yes, correct.

21  Q.   And who was the clinical president of Done Health?

22  A.   The -- Ms. He was the CEO and Dr. Brody -- I'm not sure at

23  the time if he was the -- there was another physician that was

24  the chief medical officer at that time.

25  Q.   Who was the clinical president of Done Health?

1    **A.**    Dr. Brody.

2    **Q.**    Okay.  And this Schedule C that you looked at and the

3    Schedule B that you looked at, those were part of your contract

4    with Done Health; correct?

5    **A.**    Yes, that's correct.

6    **Q.**    Who sent out -- did you see Defendant He send out e-mails

7    to the company while you were there?  Newsletters?

8    Defendant Brody?

9    **A.**    Yes, yes.

10    **Q.**    We've talked through a number of specific patients as well

11    as these policies and practices generally at Done that you

12    found concerning, you've testified here today, but you

13    nevertheless adhered to this Done model; correct?

14    **A.**    Yes, that's correct.

15    **Q.**    While you were at Done, did you write communications about

16    what was happening at Done?  E-mails, Slacks, as you were

17    practicing?

18    **A.**    Yes, I did.

19    **Q.**    And in those communications, did you write the truth about

20    how you were practicing at Done and whether that was clinically

21    appropriate?

22    **A.**    No, I did not.

23    **Q.**    Did you instead write things like you were providing

24    access to care and everything was being done, you know, in sum

25    and substance, well and correctly at Done?

SHAPARD - DIRECT / GREEN

1    **A.**    Yes, I did that.

2    **Q.**    Was part of your conspiracy to say that you were providing

3    access to care and helping all of these Done members?

4    **A.**    Yes.

5    **Q.**    Why did you claim to be providing access to care and

6    providing all this good to Done members when, in fact, you

7    weren't actually providing true medical care?

8    **A.**    To justify in my own mind that I wasn't doing anything

9    wrong.

10    **Q.**    Was that correct?

11    **A.**    No, it was not correct.

12    **Q.**    We're going to focus on prior authorizations.

13         Did you sign prior authorizations for insurance companies?

14    **A.**    Yes, I did.

15    **Q.**    And were those prior authorizations to get payment for

16    prescriptions?

17    **A.**    Yes, that's correct.  The prior authorization is a form

18    from an insurance company asking for further information in

19    order for them to pay for the medication at the pharmacy.

20    **Q.**    Did you always sign these or did someone else at Done sign

21    for you?

22    **A.**    Sometimes other people signed for me.

23    **Q.**    Who prepared the prior authorizations?

24    **A.**    Members of the Done care team.

25    **Q.**    Were the prior authorizations that were submitted in your

1  name always accurate in terms of whether the patient actually

2  met the criteria for ADHD diagnosis?

3  **A.**    No, they were not.

4  **Q.**    Why not?

5  **A.**    Because the patients weren't being evaluated thoroughly,

6  so if the thorough evaluation was not done and diagnostic

7  criteria was being provided to an insurance company, that was

8  false information.

9  **Q.**    And did you agree with others at Done to the submission of

10  false or fraudulent prior authorizations to induce insurance

11  payors to pay for prescriptions for Done members?

12  **A.**    Yes, I did.

13  **Q.**    And who did you agree to do that with?

14  **A.**    With Ms. He, with Dr. Brody, with the Done management.

15  **Q.**    Why did you agree to participate in this conspiracy?

16  **A.**    Again, because I was being paid very well to continue to

17  participate in the conspiracy.

18  **Q.**    Were you aware that the prior authorizations sent to

19  insurance companies were sometimes also based on the chart

20  notes?

21  **A.**    Yes.

22  **Q.**    And were your chart notes always accurate?

23  **A.**    No, they were not.

24  **Q.**    In fact, was it quite clear that you were using template

25  chart notes?

SHAPARD - DIRECT / GREEN

```
 1    A.    Yes, I was using template chart notes.
 2              MS. GREEN:  Let's look to admit Exhibit 3058.  This is
 3    just one example of a prior authorization.
 4              THE COURT:  3058 admitted.
 5         (Trial Exhibit 3058 received in evidence.)
 6    BY MS. GREEN:
 7    Q.    What is this document?
 8    A.    This is a provider authorization for a patient that has
 9    MediCal, which is what Medicaid is called in California.
10    Q.    And is this Esdras Macias?
11    A.    That's correct.
12    Q.    And are you listed here as a prescriber?
13    A.    Yes, my name is listed as the prescriber.
14    Q.    Did you write stimulant prescriptions for this Done
15    member?
16    A.    Yes, I did.
17              MS. GREEN:  Let's look at page 3.
18    BY MS. GREEN:
19    Q.    There's a provider signature and date here?
20              MS. GREEN:  And let's blow that up.
21    BY MS. GREEN:
22    Q.    The date is February 8th, 2022, and then there's a
23    signature.  Is that your signature?
24    A.    No, that's not my signature.
25              MS. GREEN:  And let's look at page 4, please.  And
```

 1  let's zoom in on the requested medication paragraph.

 2  **BY MS. GREEN:**

 3  **Q.**   It says here (as read):

 4       "The requested medication is medically necessary

 5       for symptom relief and to manage ADHD.  Patient

 6       underwent psychiatric evaluation and meets the DSM-5

 7       criteria for ADHD."

 8  Have you previously -- first of all, as part of this prior

 9  authorization, did Done attest that the stimulant medication

10  was medically necessary for ADHD and the patient met the DSM-5

11  diagnostic criteria?

12  **A.**   Yes, they did.

13  **Q.**   Have you previously reviewed notes related to the

14  prescriptions that you wrote for this Done member in February

15  and November 2022?

16  **A.**   No.

17  **Q.**   I can show them to you if you want.

18       **MS. GREEN:**  Let's move to admit Exhibit 3061.

19       **THE COURT:**  3061?

20       **MR. FOSTER:**  Yeah.

21       **THE COURT:**  3061 admitted.

22  (Trial Exhibit 3061 received in evidence.)

23       **MS. GREEN:**  Let's scroll down, please.  Is it on the

24  first tab, please?

25  I will re-ask the question, and then if you don't

```
 1  remember, I can pull -- this isn't the right document.  This is

 2  the prescription data.

 3  BY MS. GREEN:

 4  Q.   Have you and I previously reviewed the chart notes that

 5  you wrote for this patient?

 6  A.   Yes.

 7  Q.   You have.  Okay.  Not here today, but prior to today?

 8  A.   Yes, that's correct.

 9  Q.   Okay.  And did you look at the chart notes you wrote --

10        MS. GREEN:  And we can pull back out the prior

11  authorization, 3058.

12  BY MS. GREEN:

13  Q.   And did you look at the chart notes for the prescriptions

14  you wrote in February and November 2022 when you looked at your

15  chart notes?

16  A.   Yes.

17  Q.   Okay.  And what did you notice when you reviewed those

18  chart notes about this patient?

19  A.   Oh, the chart note had mentioned that the patient was seen

20  one month prior in the history of present illness at the top of

21  the note but the patient had not been seen any time close to

22  that.

23  Q.   And what about whether or not your notes were unique or

24  copies of each other?

25  A.   They were copies of each other.
```

1    **Q.**   So this is another example of where you had copied and

2    pasted notes for this patient?

3    **A.**   Yes, that's correct.

4    **Q.**   And did you review these chart notes to confirm whether or

5    not you had actually met -- evaluated this patient and whether

6    or not they met the DSM-5 criteria?

7    **A.**   I didn't even sign the prior authorization, so nothing was

8    reviewed.

9    **Q.**   No, I mean when you looked at these chart notes recently.

10   **A.**   When I looked at them recently --

11   **Q.**   Did the patient meet the DSM-5 criteria for ADHD based on

12   your chart notes?

13   **A.**   No.

14   **Q.**   No.  But nevertheless, in this prior authorization, the

15   attestation is that the patient did meet the DSM-5 criteria;

16   correct?

17   **A.**   That's correct.

18   **Q.**   Was this prior authorization accurate?

19   **A.**   No, it was not.

20   **Q.**   And is this an example of a prior authorization that you

21   agreed could be submitted as part of this conspiracy to defraud

22   insurance payors?

23   **A.**   Yes.  This was how I defrauded the government in that this

24   is a government program, so when the patient went to the

25   pharmacy and this prior authorization was approved, then the

1   government paid for the prescription.

2   **Q.**    And based on the notes that you reviewed, were these

3   stimulants actually medically necessary, as attested to in the

4   prior authorization?

5   **A.**    No, they were not.

6   **Q.**    So was this PA, the prior authorization, that was

7   submitted to MediCal false?

8   **A.**    Yes, it was.

9          **MS. GREEN:**  We're switching topics.

10  **BY MS. GREEN:**

11  **Q.**    Were you licensed to write scripts -- where were you

12  licensed to write scripts while you were at Done?

13  **A.**    In the state of California.

14  **Q.**    Did you issue prescriptions to patients in states where

15  you were not licensed?

16  **A.**    Yes.

17  **Q.**    Which states?

18  **A.**    Texas, New York, Washington, Arizona, Nevada.  I don't

19  recall all of them.  Several.

20         **MS. GREEN:**  And let's look at an example.

21      Let's look at Exhibit 296 for admission.

22         **THE COURT:**  296 admitted.

23      (Trial Exhibit 296 received in evidence.)

24  **BY MS. GREEN:**

25  **Q.**    Is this a communication between yourself and Ms. Mercado

1  on or around February 27th, 2021?

2  **A.**   Yes, that's correct.

3  **Q.**   And looking at page 1 in the top section, did Ms. Mercado

4  here ask you to write a script for a Texas patient?

5  **A.**   Yes, that's correct.

6  **Q.**   Were you licensed in Texas?

7  **A.**   Not at that time, I was not.

8  **Q.**   And looking further down, let's look at the bottom two

9  paragraphs.

10      Did you inform Ms. Mercado that you were not licensed to

11  write the prescription in Texas?

12  **A.**   Yes, I did.

13  **Q.**   And did Ms. Mercado reply that a partner pharmacy, Scripx,

14  would fill it regardless?

15  **A.**   Yes, she did.

16  **Q.**   Did you agree to write this script?

17  **A.**   Yes, I did.

18  **Q.**   And looking an page 2, about four paragraphs up, did

19  Ms. Mercado write (as read):

20          "I will make sure you are compensated with this.

21      I appreciate it much"?

22  **A.**   Yes, that's correct.

23  **Q.**   And who ultimately controlled the compensation structure

24  at Done?  Was it Ms. Mercado or was it someone above her?

25  **A.**   It was Ms. He.

1  **Q.**   Okay.  And was it legal for you to write the script?

2  **A.**   No, it was not.

3  **Q.**   Why not?

4  **A.**   Because I was not licensed in the state of Texas at that

5  time.

6  **Q.**   Why did you agree to write this prescription regardless?

7  **A.**   Because I was compensated to do so.

8  **Q.**   What is your understanding for why you were being asked to

9  issue or write scripts in states where you weren't licensed?

10  **A.**   They knew that I would do it.

11  **Q.**   They knew that you would do it because you were part of

12  this conspiracy?

13  **A.**   That's correct.

14       **MS. GREEN:**  We're going to switch topics.  Pharmacies.

15  **BY MS. GREEN:**

16  **Q.**   While you were at Done in the 2020 to 2023 time period,

17  did you become aware of pharmacies refusing to fill your Done

18  prescriptions?

19  **A.**   Yes.

20  **Q.**   Do you recall examples of which pharmacies?

21  **A.**   CVS was one of the main ones.  They actually blocked Done

22  providers from sending prescriptions to CVS.

23  **Q.**   And were there some other pharmacies, like Walmart,

24  Walgreens?

25  **A.**   Yes.  Walmart blocked Done.  Then Walgreens -- sometimes

 1   they would, sometimes they would not.  I was blocked from Rite

 2   Aid.

 3        Those were the ones I recall, the chains.

 4        MS. GREEN:  And, Your Honor, I'd like to admit but I

 5   don't need to display Exhibit 2873, which is just an example of

 6   a letter from another pharmacy, Express Scripts, to

 7   Ms. Shapard --

 8        THE COURT:  Admitted.

 9        MS. GREEN:  -- looking at some of her scripts.

10        (Trial Exhibit 2873 received in evidence.)

11   BY MS. GREEN:

12   Q.   Okay.  Did this issue of pharmacies not filling your

13   prescriptions frustrate you while you were at Done?

14   A.   Yes.

15   Q.   Why?

16   A.   Because one -- for one, it cost me more time because then

17   I had to send a prescription somewhere else, so now I'm sending

18   one prescription to multiple places.

19        And the other would be that the patient would become upset

20   and leave the Done platform, so I would lose -- I could lose a

21   significant number of patients, and that would affect my pay.

22   Q.   Okay.  And did you communicate with others at Done about

23   your frustrations that the pharmacies were refusing to fill

24   your Done prescriptions?

25   A.   Yes, I did.

**Q.** Did you know when you were writing those communications that the pharmacies had valid reasons for not filling your prescriptions?

**A.** Yes.

**Q.** Reasons such as not evaluating the patient, for example?

**A.** Yes, that's correct.

**Q.** Not doing follow-ups?

**A.** Correct.

**Q.** Not meeting the DSM-5 criteria?

**A.** Correct.

**Q.** Nevertheless, when you communicated about this issue while at Done, did you accurately convey the truth about why you understood these pharmacies were not filling these prescriptions?

**A.** No, I did not.

**Q.** Did you instead try to blame the issue on the pharmacies?

**A.** Yes, I did.

**Q.** Did you try and justify and defend the prescriptions you were writing?

**A.** Yes, I did.

**Q.** Why did you do that?

**A.** I did that because I was being paid. I was being compensated, and I was continuing to follow the Done model. Had I not done that, then I would not have had a job, so I continued to.

SHAPARD - DIRECT / GREEN

1    Q.    And you knew what you were doing was wrong?

2    A.    Yes, I did.

3    Q.    Were you trying to justify it in your own mind even though

4    you knew what you were doing was wrong?

5    A.    Yes.

6    Q.    Do you agree, what you were saying about the pharmacies

7    and their reasons for not filling prescriptions -- was what you

8    were saying about the pharmacies accurate?

9    A.    No, it was not.

10    Q.    In or around May 2022, were you interviewed by one of

11    these pharmacies, CVS, regarding your prescribing activities at

12    Done?

13    A.    Yes, I was.

14    Q.    Do you know whether other providers were also interviewed

15    on different dates?

16    A.    Yes.  I was told other providers were as well interviewed.

17    Q.    When you were interviewed by CVS, did you tell them the

18    truth about how you prescribed at Done?

19    A.    No, I did not.

20    Q.    Did you lie to them?

21    A.    Yes, I did.

22    Q.    Why did you lie to CVS about the prescription practices at

23    Done?

24    A.    Because I would have lost a significant number of patients

25    if CVS stopped filling prescriptions, because at that time they

1  were one of the main pharmacies that the Done patients were

2  using.

3  **Q.**    And was it vital to this conspiracy that you were in that

4  pharmacies continued to fill Done prescriptions?

5  **A.**    Yes, because if the patient doesn't get the prescription,

6  they're going to leave and stop making the payment.

7  **Q.**    Stop making the payments to Done?

8  **A.**    Correct.

9  **Q.**    Was one of the lies that you told to CVS that you only

10  prescribed stimulant when the Done member met the DSM-5

11  criteria?

12  **A.**    Yes, that's correct.

13  **Q.**    Is it fair to say that you didn't want to tell CVS the

14  truth about what Done was doing because it was wrong?

15  **A.**    What I was doing was wrong, and I was afraid if I told

16  them that they would -- you know, would block Done and I would

17  lose a significant number of patients, which would drastically

18  affect my pay.

19  **Q.**    And also have an impact on the Done business as a whole

20  which you were part of?

21  **A.**    Absolutely.

22            **MS. BELL:**  Objection, Your Honor.  Leading.

23            **THE COURT:**  Overruled.

24  **BY MS. GREEN:**

25  **Q.**   Prior to meeting with CVS, did anyone at Done reach out to

1   you to try and help you with what to say to CVS or coach you?

2   **A.**   Yes.

3   **Q.**   Was it consistent with what you did say to CVS?

4   **A.**   Yes.  I spoke to CVS on my own.  Some other providers, I

5   was told, actually had Done management on the phone with them,

6   but I spoke to them on my own.

7   **Q.**   But you sort of spoke to CVS in accordance with what Done

8   would have wanted you to say; is that fair?

9   **A.**   Yes, that's correct.

10          **MS. GREEN:**  We're going to switch topics and move

11   ahead to September 2022.

12   **BY MS. GREEN:**

13   **Q.**   In September 2022, did the DEA leave a business card at

14   your house?

15   **A.**   Yes, they did.

16   **Q.**   What was your reaction when you saw that had happened?

17   **A.**   I was terrified.

18   **Q.**   Did you call anyone at Done after that happened?

19   **A.**   Yes.  I called Dr. Brody.

20   **Q.**   Why?

21   **A.**   I called him to let him know, first, that I got the card

22   and what was going on.  And I was told nothing was going on, to

23   not be concerned about it.  He requested I e-mail him a copy of

24   the card.  And we just discussed, you know, just ADHD in

25   general, but I was told it was nothing to be concerned about.

SHAPARD - DIRECT / GREEN

1   **Q.**   So you were terrified, but Dr. Brody told you nothing to

2   be concerned about?

3   **A.**   Correct.

4   **Q.**   And did he tell you anything about whether to just keep

5   practicing as you were?

6   **A.**   Yes.  He said to continue to practice as I was.

7   **Q.**   Keep doing what you were doing?

8   **A.**   Yes, that's correct.

9   **Q.**   And did he say to let him know if the DEA contacted you

10  again?

11  **A.**   Yes, that's correct.

12  **Q.**   What was your impression from speaking with Dr. Brody as

13  to whether you needed to call the DEA back?

14  **A.**   I felt like I didn't need to call them back.  I would just

15  let him know if it occurred again, and just to continue doing

16  my job as usual.

17  **Q.**   And was that impression based on what Dr. Brody had

18  conveyed to you?

19  **A.**   Yes, that's correct.

20  **Q.**   At some point in time --

21          **MS. GREEN:**  Switching topics.

22  **BY MS. GREEN:**

23  **Q.**   At some point in time, did you become aware that Done had

24  changed its name to Mindful Mental Wellness?

25  **A.**   Yes.

1  **Q.**  And was this after many of the pharmacies had stopped

2  filling Done prescriptions, including CVS, like we discussed?

3  **A.**  Yes, that's correct.

4  **Q.**  How did you become aware of this name change?

5  **A.**  I saw it on a prescription that I had sent.  I was

6  reviewing a prescription that I had sent, and I noticed at the

7  top it no longer said Done Health; it said Mindful Mental

8  Wellness.  And I was concerned because I didn't know where the

9  name came from, as I had not been informed there was a name

10  change.  And it was concerning that I found it just by looking

11  at a prescription randomly.

12  **Q.**  So there hadn't been any formal announcement at Done prior

13  to you finding out that pharmacies were now being told Done was

14  Mindful Mental Wellness?

15  **A.**  Right.  Correct.  Not at that time.

16  **Q.**  What was your understanding for why Done was rebranding

17  its name to Mindful Mental Wellness?

18  **A.**  Because of all the issues with pharmacies blocking Done.

19  If the name was changed, it would appear to be a different

20  company, and then pharmacies would be more likely to fill the

21  prescriptions.

22  **Q.**  And between when you noticed this name change and

23  June 2024, had there been any actual change in Done's clinical

24  practices to make Done more compliant with standard practice?

25  **A.**  No.

1  **Q.**  What was your view as to whether it was appropriate to

2  change Done's name as it was -- as to how the pharmacies saw it

3  when, in fact, Done's clinical policies had not improved or

4  changed?

5  **A.**  Yes.  It didn't make sense that the name was changed and

6  nothing was changed other than the name.

7  **Q.**  Do you think it was appropriate to change this name given

8  that the pharmacies had been trying to actually block done for

9  safety reasons?

10 **A.**  No, because then it appeared it was a different company

11 sending the prescription to the pharmacy.

12 **Q.**  You worked at Done for years; is that right?

13 **A.**  Yes, that's correct.

14 **Q.**  We've talked about a number of topics today -- where you

15 have said that what you were doing was wrong?

16 **A.**  Yes, that's correct.

17 **Q.**  Were you writing illegal prescriptions?

18 **A.**  Yes, I was.

19 **Q.**  Were you agreeing with others to do that?

20 **A.**  Yes, I was.

21 **Q.**  Why did you continue to prescribe at Done for years even

22 though you knew you were prescribing illegally?

23 **A.**  Because I was being well compensated, much above what I

24 would make at another job.

25 **Q.**  If you wanted to comply with Done's model, were you able

1  to practice as you knew you should, based on your independent

2  clinic judgment?

3  **A.**   No, I was not able to do that based on Done's model

4  because there was not enough time.

5  **Q.**   And you weren't compensated for it; correct?

6  **A.**   I wasn't compensated for follow-up visits, so I wasn't

7  doing follow-up visits.  I was just stamping the prescriptions

8  to continue to receive my pay.

9  **Q.**   And did you practice at Done according to your independent

10  clinical judgment as you knew to be what was right or according

11  to the Done model?

12  **A.**   I practiced according to the Done model.

13  **Q.**   And even if you had wanted to exercise your independent

14  clinical judgment, how feasible was it for you to do that

15  within the constraints of Done's model?

16  **A.**   It wasn't feasible to do that.

17       **MS. GREEN:**  One moment, Your Honor.

18       Thank you.

19       **THE COURT:**  Cross?

20       **MS. BELL:**  Thank you, Your Honor.

21                    **CROSS-EXAMINATION**

22  BY MS. BELL:

23  **Q.**   Good morning.

24  **A.**   Good morning.

25  \\\

1          **MS. BELL:**  Excuse me, Your Honor.  I'm just going to

2     get my glasses.  I realize I left them.

3                    (Pause in proceedings.)

4     BY MS. BELL:

5     **Q.**   Today you testified about how you committed crimes to make

6     money.  But that's not what you said back at the time; right?

7     **A.**   Correct.

8     **Q.**   And, in fact, when you learned that --

9          **THE COURT:**  I'm sorry.  Back at what time?

10    BY MS. BELL:

11    **Q.**   Back at the time you were working at Done?

12    **A.**   Yes, that's correct.

13    **Q.**   And, in fact, when Ruthia and Dr. Brody were charged in

14    this case, you were upset and offended by the accusations from

15    the Department of Justice and the DEA; right?

16    **A.**   I was at first, yes.

17         **MS. BELL:**  Your Honor, I'd offer 6800.

18    BY MS. BELL:

19    **Q.**   That's actually what you told Jillian Zimmerman at the

20    time; correct?

21         **THE COURTROOM DEPUTY:**  You want it admitted?

22         **MS. BELL:**  Yes.  I would offer that, Your Honor.

23         **THE COURT:**  Well, she testified that -- I don't

24    understand.  She said, yes, I -- she testified in accordance

25    with this document.

1          **MS. BELL:**  Yes, Your Honor.

2          **THE COURT:**  So I don't know why we put the document

3    in.  It's not inconsistent with her testimony.

4          **MS. BELL:**  Your Honor, it's inconsistent with the

5    testimony she's given today.  It contradicts --

6          **THE COURT:**  I don't know that it contradicts it --

7          **MS. BELL:**  Very well, Your Honor, but --

8          **THE COURT:**  Please take it down.  We'll talk about it

9    during the recess.

10        Do you want to take a recess now?

11         **MS. BELL:**  Yes, Your Honor.

12         **THE COURT:**  Okay.  Ladies and gentlemen, we will

13   recess until a quarter of 1:00.

14        Remember the admonition given to you:  Don't discuss the

15   case, allow anyone to discuss it with you, form or express any

16   opinion.  Thank you.

17                    (The jury leaves the courtroom.)

18      (Proceedings were heard out of the presence of the jury.)

19         **THE COURT:**  Okay.  Let the record reflect jurors have

20   retired.

21        You may be seated.

22        So maybe you can explain to me why it's inconsistent.

23         **MS. BELL:**  Yes, Your Honor.

24        May we excuse the witness?

25         **THE COURT:**  Yes, sure.

1          MS. BELL:  Thank you, Your Honor.

2          THE WITNESS:  What time did Your Honor say to be back

3   from lunch?

4          THE COURT:  A quarter of 1:00.

5      (Witness steps down.)

6          THE COURT:  Yes.

7          MS. BELL:  So, Your Honor, today the witness says that

8   she's committed crimes, but back at the time, in this document,

9   she expresses the view that she's extremely upset and offended

10  by the accusations and as my experience is not that of someone

11  running a pill mill.

12      So as Your Honor has said --

13         THE COURT:  No, wait.  What?

14         MS. BELL:  She's --

15         THE COURT:  She said -- she was asked the question --

16     Let's see if I can get it up.

17         MS. BELL:  And ask let me just say, Your Honor, this

18  would also be a case-in-chief exhibit, so it's not purely for

19  impeachment purposes, but it does do that also.

20      But essentially, in the document at page 1 --

21         THE COURT:  I don't know whether it's going to be an

22  exhibit in your case-in-chief.  It depends on whether it's

23  relevant.

24         MS. BELL:  Yes, Your Honor.  I understand that.

25      Can we go to --

1          Did Your Honor want to see the document?

2                THE COURT:  Yeah.  Put that up.

3                MS. BELL:  Right.  So, Your Honor, as you can see

4     here --

5                THE COURT:  Okay.  Now, here is the question:

6                "And, in fact, when Ruthia and Dr. Brody were

7          charged in this case, you were upset and offended by

8          the accusations from the Department of Justice and

9          the DEA" -- something.

10                "ANSWER:  I was at first, yes."

11          And then you say, "Your Honor, I'd offer 6800."

12          Now, does 6800 demonstrate that in some manner she was not

13     offended or upset by the accusations?

14                MS. BELL:  No, Your Honor.  It contradicts the entire

15     tenor of her testimony today, so --

16                THE COURT:  I don't know whether it does or not.

17                MS. BELL:  Well, it certainly --

18                THE COURT:  I'll read it.  Okay?  I'll read it to see

19     whether I agree with you.

20                MS. BELL:  Yes, Your Honor.

21          Shall I pass the document up?

22                THE COURT:  I've got to see it.

23                THE COURTROOM DEPUTY:  I think you've got to display

24     the whole thing.

25                MS. BELL:  Do we have a copy?

1          **MS. GREEN:**  Here's 6800.

2          **MS. BELL:**  And we could actually go to the second page

3     first as well, in the middle.

4          **THE COURT:**  So she has one sentence in this document

5     which is (as read):

6               "I am extremely upset and offended by the

7          accusations from the DEA/DOJ as my experience is not

8          that of someone running a pill mill."

9          That's what she says.  That's the one sentence that she

10    says related to this.

11         And you asked her (as read):

12              "Did you say that you were offended by it?"

13         So that's not inconsistent with that.  You didn't ask her

14    whether she said it's not my experience as a pill mill.  So

15    that's not inconsistent with any of her testimony.  You just

16    didn't ask her that.

17         As a matter of fact, everything she testified to all day

18    today was that it's a pill mill.  All day today, she said it

19    operated like a pill mill.  Okay.

20         Now, that's not inconsistent.  It may be inconsistent with

21    your client's position.  That's a very different thing from

22    saying it's inconsistent with her testimony.

23         **MS. BELL:**  Your Honor --

24         **THE COURT:**  You can't use a witness's testimony just

25    to put in your side of the case unless it's inconsistent with

 1    the witness's testimony, and this is consistent with the

 2    witness's testimony.

 3         **MS. BELL:**  Your Honor, it's not consistent with her

 4    testimony today, which is that she was participating in a pill

 5    mill.  So the cross is structured as this is what you say now,

 6    but back then you were saying something very different.

 7         **THE COURT:**  Oh.  You can say -- you can ask her, as

 8    you did -- but you had -- by the way, you didn't ask that

 9    question.

10        But if you were to ask her the question, Did you tell

11    anybody on such-and-such a date or around this time that your

12    experience was that it was not a pill mill; she says, no, I

13    didn't say that, or something inconsistent with that -- of

14    course you can use the document.

15        But you can't just -- I'm sorry the way you structure your

16    case.  That's very nice.  You can structure it any way you

17    want.

18        But I -- but you've got to -- whether it's admissible or

19    not is not a function of how you structure it.  It's a function

20    of whether or not the witness -- and we're now in witness

21    Number 9, way behind on our schedule, and in my view, because

22    you are using documents that aren't inconsistent with the

23    witness's testimony but are consistent with your presentation

24    of the case.

25        That's fine.  I'm not saying in your case-in-chief these

 1    things can't be allowed in necessarily.

 2        Okay.  So why don't we take the recess.  You figure it out

 3    how you want to do it, but I'm not allowing -- I'm not allowing

 4    this type of examination.  You can have another type of

 5    examination if you want to point out inconsistencies.  That's

 6    fine.  Inconsistencies with the way she conducted her business,

 7    any type of inconsistency.  You certainly are free to do that.

 8        Yes, Mr. Schachter.  Go right ahead.

 9        **MR. SCHACHTER:**  Thank you, Your Honor.  I just want to

10    make sure I understand.

11        **THE COURT:**  Yeah.

12        **MR. SCHACHTER:**  If the witness says on the witness

13    stand, I was engaged in a pill mill, and there -- and she has

14    in writing written "I was not engaged in a pill mill," that is

15    got to be a prior inconsistent statement that has to be able to

16    be used to impeach the witness, and that is exactly what she

17    said.  She said, "When I was there, I was engaged in a pill

18    mill."

19        **THE COURT:**  No, wait.  You can ask her the question:

20    Did you say when you were there you were not engaged in a pill

21    mill, or did you say I was engaged in a pill mill.

22        **MR. SCHACHTER:**  But whether it is her testimony or

23    whether it is a statement in an e-mail, if it is inconsistent

24    with the statement that she made on direct, that statement in

25    the e-mail is a prior inconsistent statement, which should be

1    admissible.

2        And that's exactly what happened.  The witness says on

3    direct, "I was engaged in a pill mill."

4        There is an e-mail in which she has said, "I was not

5    engaged in a pill mill."

6        That is directly inconsistent, and the e-mail itself

7    should be --

8            **THE COURT:**  But you could ask her.  You could ask her.

9            **MR. SCHACHTER:**  Could --

10           **THE COURT:**  You could say, Did you say to somebody.

11       And by the way, Ms. Bell knows how to ask a question.  She

12   did for the first part.  She asked the question.

13       For example, Ms. Bell could have said, Did you say prior

14   to it when you read about the DEA allegations and so forth, did

15   you say -- did you say that you were upset and offended?

16       That's basically the question.  The witness said yes.

17       Now, you've proven exactly your point, isn't it?  You've

18   proven the point that on a prior occasion, she gave testimony

19   or she made a statement inconsistent with her present

20   testimony.

21       What I'm saying to you, Mr. Schachter, is that she did

22   exactly what is a legitimate thing to do.  Okay.  But then you

23   don't -- unless there's some other reason for it, which I can

24   get to, but I don't know what it is -- bring in the statement.

25       Didn't you tell Jones that it was raining outside?  Yes, I

1    did.

2        Now, isn't this a statement -- I have a statement in front

3    of you I want to introduce into evidence saying -- a letter to

4    Jones saying it's raining outside.

5        What?  Of course you can't do that.  It just -- it's just

6    a reiteration of her testimony.  She's -- it's not

7    inconsistent.

8        The point may be inconsistent.  That is to say, it's not

9    raining outside or it's not a pill mill or any of that.  That

10   may be entirely inconsistent.

11       And her -- but it -- what is impeaching, if it is -- what

12   is impeaching is her earlier statement, not evidence of her

13   earlier statement.  That's the way it works in my court.

14   Otherwise, we have eight-month trials, two-year trials, where

15   they say something, it's correct and -- but it may be

16   inconsistent with their statement.  Now we're going to prove

17   again that they said it on an earlier occasion.  Okay.

18       So I think it's relevant.  I didn't -- there was no

19   objection.  I would have permitted it in any event to have

20   asked the witness, Isn't it a fact that when you learned about

21   the DOJ, you told somebody that it's outrageous that they did

22   this.

23       That's entirely inconsistent with her testimony.  I agree

24   with you.

25       So, I mean, don't paint what I'm doing as not permitting

SHAPARD - CROSS / BELL

 1    you to impeach the witness or impeach their testimony overall.

 2         What I'm saying to you is you can't do it twice -- it --

 3    when the person acknowledges it.  You know?

 4         We're all limited in time.

 5              MS. BELL:  Your Honor, we certainly understand that.

 6         May I just have one final word on this matter?

 7              THE COURT:  Of course.

 8              MS. BELL:  Thank you, Your Honor.

 9         So first of all, I think it will be vastly more efficient

10    if we use the documents.  I don't intend to first ask and then

11    repeat everything by document.

12         But rather than going through a litany of questions which

13    are written in the document, it will be vastly more efficient

14    to use her written words at the time, her actual words.  We can

15    try it this way, but it's going to take a lot more time and be

16    a lot more cumbersome, and I think -- I expect eventually she

17    will not agree with me on something because it was a long time

18    ago, and then we'll --

19              THE COURT:  She doesn't agree with you -- Ms. Bell,

20    it's -- I understand your point.  I have a different

21    perspective because I don't think it is the most efficient way

22    to do it.  But history may prove you right in that regard.  I

23    haven't seen the case in the future, so I can't comment on that

24    because I don't know.

25         And generally, I accept -- when lawyers do things I accept

1  why they're doing it.  For example, I've accepted all sorts of

2  questions about Dr. Brody when the witness isn't really

3  testifying to it or not in that -- in the real sense because I

4  think it saves an enormous amount of time.

5       Nevertheless, I'm trying to set forth ground rules.  If

6  you're telling me, well, Judge, sorry, but you're actually --

7  you don't see the way the case is going to go from our point of

8  view and it's going to take up more time -- okay.  I'm here

9  making decisions based upon today and not on tomorrow.

10      And you may be right; if it's an important document and it

11 establishes something else other than the fact that something

12 different from what the witness has said, okay.  Okay.  I'll

13 let you do it.

14      But I just can't -- I can't sit here as a judge today

15 listening to the evidence which under the rules seems to -- not

16 to permit or -- believe me, it permits it.  In other words, I

17 could make -- these are all judgment calls.  I understand I

18 could just let it go on.  But I've got to draw some limits.

19      I think you're going to have a fairly extensive

20 examination of the witness, which, of course, you're entitled

21 to do, and I just don't want a lot of repetition.

22      If she says it, fine.  You move on.

23           MR. SCHACHTER:  Your Honor --

24           THE COURT:  Yes, Mr. Schachter.

25           MR. SCHACHTER:  We completely understand, and we

SHAPARD - CROSS / BELL

1   completely understand the Court's concern with repetition and

2   the need for us to move efficiently.  As the Court noted --

3   would have noted, we didn't ask the first witness a single

4   question, so we --

5           **THE COURT:**  I thought that was probably a pretty smart

6   move.

7           **MR. SCHACHTER:**  Thank you.

8       We are also interested in moving this along, and I

9   understand the Court's concern about repetition, and I

10  understand the Court's statement that -- that once -- once

11  you've asked the witness, didn't you say at the time that it

12  wasn't a pill mill, for us to then offer the e-mail that says

13  effectively the same thing is that form of repetition.

14      We believe they are distinct, but I certainly understand

15  the Court's view.

16      I would say -- and I would ask over the lunch break if the

17  court could consider this document, and we will take

18  the Court's -- the Court's instruction to us to heart.

19      But nothing could be more material or critical to a

20  cooperating witness who has said, I -- I engaged in a

21  conspiracy with these defendants than the fact that at the time

22  she said that she didn't think she was doing anything wrong and

23  was in a pill mill.  Nothing -- that document could not be more

24  material to our case.

25      I would ask that the Court please just review the e-mail

1    over the lunch break and consider --

2        **THE COURT:**  I'll do that because -- I'll do that.  But

3    I -- what you've just said doesn't actually make any

4    difference.

5        That it's -- the whole thing about, you know, Judge, this

6    is really important to our case.

7        I mean, if you start doing that and just say, okay, I'm

8    going to have one set of rules, is it important, is it

9    unimportant -- listen, it's very important that you be

10   permitted to impeach this witness to the extent you're able to

11   do so.  It's very -- she's totally changed her -- her -- when I

12   say she's changed, I got to be careful of that.

13       She -- the practices that she described are antithetical

14   and incriminating with respect to your client.  I mean, I

15   understand that.  I'm not saying she's only tangentially

16   involved because, after all, she -- if her testimony is

17   accepted, she demonstrates that -- that literally thousands of

18   pills would run afoul of a Controlled Substances Act because

19   they were outside the medical practice in the ordinary course

20   of medical practice.  Then, of course, the key issue, as -- we

21   might as well discuss it, what did -- what did Ruthia He know

22   about it.  That's the key issue the Government has to prove --

23   has to prove that she knew or had -- I don't know even know the

24   high degree of -- I think they have to prove that she knew

25   about it.  They can do it both circumstantially and directly.

1           But they -- that is an element of the offense.  You can't

2      just assume that element of the offense.  They have to prove

3      it.

4           So it's an important -- it's the first step of a

5      several-step series because if, in fact, prescriptions were not

6      dispensed outside the ordinary course of medical practice, then

7      there's no crime, because that -- I mean, that's sort of a

8      threshold question.  She, if her testimony is believed, clearly

9      establishes -- if it's to be believed, clearly establishes the

10     first prong.

11          Now, the second prong is what did Ruthia He and

12     Dr. Brody -- He and Dr. Brody know?

13          Her testimony was -- touched on it in certain instances

14     but I'm quite certain that Ms. Bell will explore that this

15     afternoon in terms of what it really is -- or at least in your

16     version, for your viewpoint, what it really is.

17          I don't want to say version.  Your viewpoint, which may or

18     may not be accurate.

19               **MR. SCHACHTER:**  And --

20               **THE COURT:**  I got that.  I understand that, and that's

21     for the jury to determine.

22          But, you know -- okay.  I'm going to review the document.

23               **MS. BELL:**  Thank you, Your Honor.  I will say there

24     are multiple parts of the document we believe are relevant, and

25     so there's the one piece, but there are other pieces, so

1    there's quite a lot we would be using from the document.

2              **THE COURT:**  I'm just going off on what was asked.

3              **MS. BELL:**  There's more.

4          **MR. SCHACHTER:**  And there are two-points, Your Honor,

5    to this witness -- to the cross-examination of this witness.

6        One is she says now to reach a plea deal with the

7    Government, I intended -- I knew that I was committing a crime

8    at the time.  So statements that are inconsistent, her actions

9    that are inconsistent are obviously vitally relevant.

10        Also, what was she saying to her alleged co-conspirators

11    at the time also goes to their states of mind.

12        So there's two facets of it.

13              **THE COURT:**  I agree.

14          **MS. BELL:**  Thank you, Your Honor.

15          **MS. NECHAY:**  Your Honor, can I just make one final

16    request?  I apologize.

17        This colloquy has taken 15 minutes, and I'm not

18    complaining, but this is barely enough time for my client, with

19    his condition, to have a bite to eat and use the restroom.  Can

20    we have another five minutes?

21              **THE COURT:**  Well, move as quickly as he can.  That's

22    the way trials are.

23                        (Recess taken at 12:15 p.m.)

24                    (Proceedings resumed at 12:55 p.m.)

25        (Proceedings were heard out of the presence of the jury.)

 1          **THE COURTROOM DEPUTY:**  Come to order.  Court is in

 2   session.

 3      You may be seated.

 4          **THE COURT:**  Okay.  Let the record reflect the parties

 5   are present.  Jury is not.

 6      As to Exhibit 6800.

 7          **MS. BELL:**  Yes, Your Honor.

 8          **THE COURT:**  The Court has reviewed it.  Again, even

 9   though there was only one subject addressed in -- by your

10   question, there is obviously relevance as to remarks about

11   pharmacies and so forth.

12      Again, one is you can't use the document if, in fact, her

13   testimony is consistent with what she says in the document.  If

14   it's inconsistent, then obviously you can use it.

15      Okay.

16          **MS. GREEN:**  I just wanted to raise one quick issue,

17   which I've already discussed with Ms. Bell.

18      We received the exhibit the Defense intended to use --

19   there are 160 of them.  Not sure if they're going to be using

20   all of them today -- we noticed that a number of them postdate

21   the charged conspiracy for the drug conspiracy, which is

22   January 2023.  We've said it could go -- should go until April,

23   so let's say the April 2023 is the end date.

24      So the extent that Ms. Bell is trying to seek to admit

25   exhibits that are after that date, I will be objecting as to

1   relevance based on date.

2      And I just wanted to flag that because I hope not to have

3   to do a speaking objection or anything like that.

4      And that's just as a reminder, Your Honor, the drug

5   conspiracy and healthcare fraud conspiracy charged period of

6   time goes to January 2023.  We then submitted a letter

7   saying -- yeah.

8         THE COURT:  Okay.  I need to write the dates down.

9      The drug conspiracy goes to when?

10        MS. GREEN:  In the indictment, January 2023.

11        THE COURT:  Okay.

12        MS. GREEN:  In or around.  And we provided a

13  supplementary letter saying we would potentially move it to

14  April 2023, based on that around date.

15        THE COURT:  Okay.  And any other dates that are

16  relevant?

17        MS. GREEN:  Yeah.  The healthcare fraud conspiracy,

18  same date period.

19        THE COURT:  Same.

20        MS. GREEN:  Yeah, and then the obstruction conspiracy,

21  that allegation does go through --

22        THE COURT:  Well, basically the present.

23        MS. GREEN:  Yeah, time at present.

24        MS. BELL:  May I, Your Honor?

25        THE COURT:  Of course.

1          **MS. BELL:**  Thank you, Your Honor.

2      So this witness has pled guilty to a crime that began in

3  November of 2020 and continued through in or around February of

4  2025, and therefore, what she said and what she did during that

5  period --

6          **THE COURT:**  Sorry.  Did I miss it?  You said 2025?

7          **MS. BELL:**  Yes.

8          **THE COURT:**  Because of the obstruction?  Is that it?

9          **MS. BELL:**  No, no.  This witness, the time frame of

10  her -- of her crime, the crime that she pled guilty, to was

11  November 2020 through February of 2025, and so she's testifying

12  about her purported criminal conduct which frankly post-dates

13  the dates that Ms. Green just set forth and --

14          **THE COURT:**  Okay.  I understand the problem.  I don't

15  understand the answer.

16          **MS. GREEN:**  I think I can clarify on that point.

17      If Your Honor remembers, on direct, I informed Ms. Shapard

18  that we would be focusing our discussion on the time period of

19  her start date through early 2023.

20      So I actually wasn't eliciting questions about 2025.

21          **THE COURT:**  Okay.  But if she pled guilty to a

22  criminal offense that goes up to 2025, if that's what she pled

23  guilty to, then, of course, it comes in.

24      I mean, because it affects her -- you know, it may be

25  germane or may not be to her testimony because I -- you know,

 1    because of my role in it and --

 2        You are asking -- by her guilty plea, you are asking me to

 3    consider her conduct during that period of time, which

 4    postdates the period of time of the conspiracy.

 5            MS. GREEN:  Yes, Your Honor.  I don't -- I think it

 6    depends on what document they're trying to admit and for what

 7    purpose, so I just wanted to flag this as it may be an issue.

 8        Obviously, we're going to see what they're actually doing.

 9    I just wanted to flag this date as there may be an issue, and

10    we'll see what happens.

11            THE COURT:  Thank you.

12        Bring in the jury.

13                    (The jury enters the courtroom.)

14        (Proceedings were heard in the presence of the jury.)

15            THE COURT:  Okay.  Please be seated.  Let the record

16    reflect all parties are present.

17        You may proceed.

18            MS. BELL:  Thank you, Your Honor.

19    BY MS. BELL:

20    Q.    Good afternoon.

21    A.    Good afternoon.

22    Q.    So before the break, we were talking about what you said

23    and did at the time of your work with the Done telehealth

24    platform; right?

25    A.    Correct.

SHAPARD - CROSS / BELL

1   **Q.**   And you were one of Done's most long-standing providers;

2   right?

3   **A.**   Correct.

4   **Q.**   You actually worked as an independent contractor with the

5   platform from November of 2020; right?

6   **A.**   Yes.

7   **Q.**   All the way through February of 2025; right?

8   **A.**   That's correct.

9   **Q.**   Now, in June of 2024, you learned that the charges in this

10   case had been brought against Ruthia and Dr. Brody; right?

11   **A.**   Yes.

12   **Q.**   And at the time, you were upset and offended by the

13   accusations in this case; isn't that true?

14   **A.**   Yes, I was upset.

15   **Q.**   And offended?

16   **A.**   Yes, and offended.

17   **Q.**   You were extremely upset and offended, were your words;

18   right?

19   **A.**   I was.

20   **Q.**   And the reason why you were extremely upset and offended

21   is because your experience was not that of someone running a

22   pill mill; isn't that true?

23   **A.**   I was upset and offended because I was about to

24   potentially lose my income and my job.

25   **Q.**   Isn't it true that what you said at the time is that you

1  were extremely upset and offended by the accusations, as your

2  experience is not that of running a pill mill?  Those were your

3  words; right?

4  **A.**   I was not trying to run a pill mill, but I was.

5  **Q.**   At the time, what you said was that your experience is not

6  that of someone running a pill mill?  That's what you said --

7  **A.**   That's what I said in order to justify my behavior.

8  **Q.**   Okay.

9      And so you said this in an e-mail with a woman named

10 Jillian Zimmerman, Done's lead nurse practitioner at the time;

11 right?

12 **A.**   Yes.

13 **Q.**   And Ms. Zimmerman had reached out to you after the charges

14 and said she would like to meet with you and listen to any

15 concerns or questions you have regarding clinical issues,

16 platform issues, or any feedback you feel would be helpful as

17 you should feel supported in your role; right?

18 **A.**   Yes.

19 **Q.**   And she told you that your input was invaluable; right?

20 **A.**   Yes, because I was one of the top providers.

21 **Q.**   Because you were Done's most long-standing provider, one

22 of them?  That's what she said; right?

23 **A.**   Yes.

24 **Q.**   Okay.

25     And your main concern after these charges were brought was

1    making sure your patients had access to treatment; isn't that

2    right?

3    **A.**    Yes, because if my patients go away, then I don't get

4    paid.

5    **Q.**    What you said at the time is that your main concern after

6    the Government charged Ruthia and Dr. Brody in this case was

7    making sure your patients had access to treatment; isn't that

8    right?

9    **A.**    Yes, and all the follow-ups that I was seeing -- that I

10   wasn't seeing to get their refills so I would continue to get

11   paid based on my caseload.

12   **Q.**    That is not what you said at the time.

13            **MS. BELL:**    Your Honor, at this point, I would offer

14   Defense Exhibit --

15            **THE COURT:**    No, what she's saying is her reason for --

16   first she says yes, agreeing with you, and then she goes on to

17   say why she did what she did, why she said what she said.

18        So that's not inconsistent with her testimony.

19            **MS. BELL:**    Okay.  Understood.

20   **BY MS. BELL:**

21   **Q.**    The words that you said at the time were that your main

22   concern was making sure your patients had access to treatment,

23   period, full stop; right?

24   **A.**    I said that, and that was to make sure that my patients

25   continued to get their refills so I would continue to have

1    2,500 patients so I would continue to get paid 30- to $40,000 a

2    month.

3    **Q.**    That part, you did not tell Ms. Zimmerman --

4    **A.**    No, I did not tell that to Ms. Zimmerman.

5    **Q.**    Instead, what you said is that you found it (as read):

6                    "Frustrating dealing with pharmacies and

7            government agencies that are not trained in mental

8            health and think opioids and stimulants are at the

9            same danger level, and myself and my patients are

10           treated by criminals when just trying to function

11           normally in life"?

12           That's what you said to her; right?

13   **A.**    That's what I said, but opioids and stimulants are both

14   Schedule II controlled substances.  That's what the law says.

15   **Q.**    But at the time, what you said to Ms. Zimmerman was that

16   you found it frustrating --

17           **THE COURT:**  You're arguing with her.  She said yes,

18   that's what she said.

19           **MS. BELL:**  That's what you said at the time --

20           **THE COURT:**  You can't argue with her.  You can't put a

21   witness on and just argue with them.

22           **MS. BELL:**  Understood.

23   BY MS. BELL:

24   **Q.**    So I just want to be clear --

25           **THE COURT:**  She's clear.  Move on.

1              **MS. BELL:**  Okay.

2      **BY MS. BELL:**

3      **Q.**   You also told her that you've had up to 3,000 patients on

4      your caseload; right?

5      **A.**   Yes.

6      **Q.**   And you certainly didn't try to hide that; right?

7      **A.**   No, that was -- everyone knew how many patients I had on

8      my caseload.

9      **Q.**   To the contrary, you touted that as a positive thing;

10     right?

11     **A.**   Of course it's positive.  I'm getting paid.

12     **Q.**   And so, in fact, you were deeply distraught about these

13     charges; right?

14     **A.**   I was.

15     **Q.**   And that's because you had dedicated almost 20 years of

16     your career to providing healthcare to people who needed it;

17     right?

18     **A.**   Yes, that's correct.

19     **Q.**   And you talked a bit about your educational history, your

20     master's degree, which is from Vanderbilt; right?

21     **A.**   Vanderbilt and California State University Long Beach is

22     where my post-master's certificate is from.

23     **Q.**   Right.  And Vanderbilt has a very prestigious master's

24     degree program; right?

25     **A.**   Yes, they do.

1  Q.   One of the top 10 in the country?

2  A.   Yes.

3  Q.   And you began your career working with high-risk patients?

4  A.   High-risk OB -- obstetric patients and gynecology

5  patients.

6  Q.   Through that work, you developed a passion to correctly

7  diagnose adult women with ADHD after they were misdiagnosed

8  with anxiety by their primary care physician; right?

9  A.   That does occur.  But that's beside from the fact that at

10  Done, I was prescribing patients medication that I did not

11  evaluate for two years.

12  Q.   My question is about your passion.

13       You developed a passion early on in your career through

14  that work to correctly diagnose adult women with ADHD after

15  they were misdiagnosed with anxiety by their primary care

16  physicians?

17  A.   That started when I first started treating ADHD in 2018,

18  not when I first started treating patients in 2006.  I wasn't

19  treating mental health then.  I was only a women's health nurse

20  practitioner.

21  Q.   Okay.  But you developed that passion once you started;

22  right?

23  A.   Yes.  I have a passion for my patients.

24  Q.   Okay.  And you knew that ADHD was underdiagnosed in women;

25  right?

1  A.    Yes, I do know that.

2  Q.    You went on to work at Planned Parenthood, you testified;

3  right?

4  A.    Yes.

5  Q.    And that was actually what your motivation was to go to

6  back to school for your post-master's; right?

7  A.    Yes.

8  Q.    Because you witnessed firsthand the number of patients

9  with mental health issues and no help; right?

10  A.    Yes.  Not specifically ADHD at that time, just mental

11  health issues at that time.

12  Q.    And you worked in -- after that, as you told us, in

13  residential treatment rehab, and that was three and a

14  half years or so, right?

15  A.    That's correct.

16  Q.    You also worked at a crisis residential treatment program

17  where you provided healthcare services to people who were

18  almost homeless; right?

19  A.    Yes, that's correct.

20  Q.    And by the time you started working at Done, you had

21  extensive training in ADHD; right?

22  A.    Yes, that's correct.

23  Q.    And also anxiety disorders; right?

24  A.    Yes, that's correct.

25  Q.    You were exceedingly well qualified to exercise your

1  independent clinical judgment to care for your patients,

2  weren't you?

3  **A.**  I was, but I wasn't allowed to at Done based on their

4  system.

5  **Q.**  That's what you're saying now, but back then, you

6  repeatedly expressed the view that you were making a difference

7  by providing access to mental health care to so many people who

8  had nowhere else to go?

9  **A.**  I was making a difference for a lot of people, and then I

10  was harming other people that I was prescribing stimulants to

11  without seeing them and evaluating them.

12  **Q.**  That's what you're telling us now, but at the time, you

13  repeatedly expressed the view that you were making a difference

14  by providing access to mental health care to so many people who

15  had nowhere else to go; right?

16  **A.**  That's what I said, but that's not what I did.

17  **Q.**  I understand that's your testimony now, but I'd like you

18  to focus on what you said at the time.  That's what we're

19  focused on now.

20         **MS. BELL:**  So, Your Honor, I'd like to go through a

21  few examples.  I would move in Exhibit 6801.

22         **MS. GREEN:**  Objection, hearsay and not impeaching.

23         **THE COURT:**  I'm sorry?

24         **MS. GREEN:**  Objection, hearsay and not -- I don't

25  believe this is going to be impeachment, so hearsay.

1              MS. BELL:  It's not being offered for that purpose,

2     Your Honor.

3              THE COURT:  Let me look at 6801.

4              MS. BELL:  Thank you, Your Honor.  These are examples

5     of her expressing views that she was making a difference by

6     providing access to mental health care.

7              THE COURT:  I'll allow it.

8              THE COURTROOM DEPUTY:  Admitted?

9              THE COURT:  Admitted.

10         (Trial Exhibit 6801 received in evidence.)

11             THE WITNESS:  I can't see it.  My screen is not on.

12             THE COURTROOM DEPUTY:  It will turn on in a moment.

13             THE WITNESS:  Oh, there it is.

14    BY MS. BELL:

15    Q.   Is it on now?  Yes?  Okay.

16         All right.  This is a provider spotlight which you

17    authored; right?

18    A.   Yes, I did write that, correct.

19    Q.   Okay.  Could you read it to us, please?

20    A.   Yes, (as read):

21             "I have been with Done for the last three years.

22         My favorite thing is being able to help so many

23         patients all over California because of telehealth

24         access.  For the large panel, checking daily for

25         refills and messages so patients feel seen and heard.

1        Outside of work, proudest accomplishment being able

2        to reach so many people that need help but have no

3        place to go.  Access to mental health care is still a

4        problem, but telehealth is really making a

5        difference.  I was glad to be able to go to the DEA

6        headquarters in person in September to advocate for

7        our patients.  Then we saw the DEA telehealth

8        extension until at least the end of next year.  The

9        best way to support someone struggling with mental

10       illness is to listen to their concerns and give

11       examples they can relate to.  So many patients tell

12       me nobody really -- nobody ever really listened to

13       me."

14  **BY MS. BELL:**

15  **Q.**   And there, you reference going to the DEA headquarters in

16  person in September.  You actually traveled from California,

17  where you live, all the way to Washington, D.C.

18       Do you recall that?

19  **A.**   Yes.

20  **Q.**   For a conference?

21  **A.**   Yes, I did.

22  **Q.**   Okay.  We'll come back to that in a moment.

23       You were aware of the barriers to affordable ADHD care

24  that so many people in the country faced; right?

25  **A.**   That's correct.

1  Q.   And what you said at the time that you worked at Done was

2  that Done provided cost-effective service to patients with ADHD

3  that can't get care other places; right?

4  A.   That's what I said.  That's not what I did, unfortunately.

5  Q.   I understand that's your testimony now, but we're focused

6  on what you were saying and doing back then.  Okay?

7       We'll get to what you have now pled guilty to later.

8  Okay?

9            MS. BELL:  Your Honor, I'd like to move in a few more

10  examples on this point if we could.  6802, if I could offer

11  that.

12            MS. GREEN:  Same objection, Your Honor.

13            THE COURT:  Sustained.

14  BY MS. BELL:

15  Q.   Well, for example, you were very concerned about

16  pharmacies; right?  And pharmacies not filling your patients'

17  prescriptions; right?

18  A.   Yes, I was.

19  Q.   And you felt that that was unfair treatment of patients;

20  right?

21  A.   I did.

22  Q.   And in one message, you said (as read):

23            "I am the provider.  I did have a patient

24        message that Walgreens was requiring they" -- meaning

25        your patient -- "show proof of insurance to get the

1    prescription filled.  How ridiculous.  They are

2    discriminating against patients that don't have

3    insurance.  Not everyone can afford insurance, and we

4    provide cost-effective service to patients with ADHD

5    that can't get care in other places."

6       Do you recall that?

7  A.  I do recall that.  But also, pharmacies require insurance

8  sometimes because patients pay in cash for controlled

9  medications is considered a red flag at a pharmacy for misuse

10 and potential distribution.  So that's the right a pharmacist

11 has to make for safety of patients.

12      But, yes, it did upset me.

13 Q.  At the time, you said, "How ridiculous"?

14 A.  I did say that.

15 Q.  "They are discriminating against patients that don't have

16 insurance"; right?

17 A.  I did say that.

18 Q.  Okay.  And what you said at the time is that you were

19 improving the lives of so many people with ADHD by helping them

20 get the medication they need to function; right?

21 A.  I was helping many people, and then I was harming other

22 people.

23 Q.  But at the time, what you were saying --

24 A.  That's what I said.

25 Q.  Right.

1          And so in another e-mail related to pharmacies, you said

2     (as read):

3               "Today, a patient told me Walgreens in Oakland

4          doesn't want to fill his script and called us a pill

5          mill.  He persisted, and eventually they did.  It

6          seems so ridiculous the lack of knowledge among so

7          many pharmacists about how stimulants [sic] treat

8          ADHD for children and adults.  I feel so frustrated

9          for patients having to deal with such nonsense just

10         to get a medication to help them function as a normal

11         person.

12              "I continue to have patients in tears at the

13         follow-up visit about the drastic improvement in

14         their lives by being able to focus, stay on task, and

15         be efficient, saying nobody ever listened or believed

16         me.  So many with improved sleep, less anxiety, more

17         confidence, and better mood."

18         Do you recall that?

19    **A.**   Yes, for the patients I saw.  For the patients I didn't

20    see, I don't know what happened to those patients.

21    **Q.**   Right.  But this is what you said at the time --

22    **A.**   I did say that at the time.

23    **Q.**   Right.

24         And you were proud of the work you were doing at Done

25    helping so many people; right?

1    **A.**    I was proud I was helping people, but unfortunately, I was

2    harming other people by not seeing them at all.

3    **Q.**    And I understand that's your testimony today, and we will

4    get to what you have now pled guilty to doing.

5        But again, we're focusing --

6            **THE COURT:**  No.  I think you can't make a speech.  You

7    simply move on to the next question.

8        Her testimony is her testimony.  The jury will evaluate

9    it.

10            **MS. BELL:**  Thank you, Your Honor.

11            **THE COURT:**  You cannot comment on the witness's

12    testimony.

13    **BY MS. BELL:**

14    **Q.**    You were vocal back then about sharing the view that you

15    were proud of the work you were doing at Done helping so many

16    people; right?

17    **A.**    I was proud that I was helping people, but again,

18    unfortunately, I was harming other people that I never saw.

19    **Q.**    And in one exchange with Dr. Brody, here is what you said

20    (as read):

21            "Dr. Brody" --

22            **MS. GREEN:**  Objection.  Purpose?

23            **THE COURT:**  Well, I don't know what it is.  She's

24    asking --

25        I think you're asking whether -- is there a document?

1              MS. BELL:  There is a document, Your Honor, and I

2     would offer that document, which will make it vastly more --

3              THE COURT:  What is the document?

4              MS. BELL:  It is 6804, and it is an exchange in which

5     Ms. Shapard is expressing her view, her vocal view, that she

6     was proud of the work she was doing at Done helping so many

7     people.

8              MS. GREEN:  Objection, hearsay and cumulative at this

9     point and not impeaching.

10             THE COURT:  Well, goes to the state of mind.

11        6804 admitted.

12        (Trial Exhibit 6804 received in evidence.)

13             MS. BELL:  Thank you, Your Honor.

14    BY MS. BELL:

15    Q.   So Dr. Brody starts here on Monday, December 5th, 2022,

16    and he says (as read):

17             "As our intrepid leader Ruthia aptly pointed out

18         in her holiday message" --

19        And I think it's up on the screens.  Can you see it,

20    Ms. Shapard?

21    A.   Yes, I can see it.

22    Q.   (as read):

23             "As our intrepid leader Ruthia aptly pointed out

24         in her holiday message, we have improved the lives of

25         thousands of our patients and received wonderful

SHAPARD - CROSS / BELL

```
 1         reviews in which our patients recount shedding tears

 2         of joy on finding how helpful our services can be.

 3              "Why, then, are words of encouragement even

 4         necessary?  I believe in the inconvenient truth of

 5         the pithy saying 'No good deed goes unpunished.'

 6         Done has done many good deeds, so we should not be

 7         surprised by the pushback we have received lately.

 8              "For those of you who are distressed and worried

 9         by recent negative media coverage, if lies,

10         manipulation, and distortions can even be called

11         coverage, I offer this:  Let the unethical media

12         bring out your inner warrior.  Every patient we help

13         represents a blow struck for a more equitable

14         healthcare system in which physical brain

15         dysfunctions, a term more accurate and less

16         stigmatizing than mental illness, will be treated on

17         completely equal terms with all the other physical

18         disorders.  Done's resounding success has

19         demonstrated that telepsychiatry is a powerful tool

20         that will enable those suffering from psychiatric

21         disorders to vault the obstacles raised by stigma and

22         break through the barriers created by unequal

23         access."

24    And if we skip ahead to your response, you say (as read):

25              "We have to laugh when such nonsense is created
```

1          and hope that pharmacists and primary care physicians

2          and the healthcare community understand the burden of

3          ADHD and not to place stigma and judgment on the

4          people seeking help.  Please share with anyone.  I'm

5          proud of us and our work and so tired of hearing such

6          nonsense.  I'm trying to find a happy place to brush

7          it off and keep up with helping our patients."

8          Now, we can move on to another topic, which is your

9     communications with Ruthia.

10         Your communications with Ruthia were limited; right?

11    **A.**    Yes.

12    **Q.**    But in your limited communications with Ruthia, you didn't

13    tell her about any of the things you now say you did that make

14    you guilty of a crime; right?

15    **A.**    No, I didn't tell her.  She knew it was going on because

16    she's the head of the company.

17    **Q.**    You found Done on Indeed, as you said; right?

18    **A.**    Correct.

19    **Q.**    You had interviews, two different interviews; right?

20    **A.**    Correct.

21    **Q.**    And that was with someone in recruitment?

22    **A.**    Yes.

23    **Q.**    And another lead practitioner in Florida; right?

24    **A.**    Yes.  Hilary someone at the time.

25    **Q.**    And Ruthia didn't participate in your job interviews?

SHAPARD - CROSS / BELL

1  **A.**   No, she did not.

2  **Q.**   And you don't recall meeting her immediately after joining

3  Done; right?

4  **A.**   I don't.

5  **Q.**   You didn't speak to her much while you were at Done;

6  right?

7  **A.**   No.

8  **Q.**   She seemed busy running the business side of the company?

9  **A.**   Yes.

10 **Q.**   And at Done, you primarily communicated with the care team

11 and Nikita Mercado; right?

12 **A.**   Correct.

13 **Q.**   And you would discuss any issues you had with Mercado in

14 order not to disturb Ruthia?

15 **A.**   Yes, and then Ms. Mercado would discuss with Ruthia and

16 come back to me.

17 **Q.**   But from your vantage point, you were communicating with

18 Mercado; right?

19 **A.**   I was.

20 **Q.**   Ms. Mercado.

21      And you believed Ms. Mercado knew you cared about your

22 patients; right?

23 **A.**   I did care about my patients.  It's not that I didn't care

24 about my patients, but you can't call someone my patient if I

25 never saw them.

1  Q.   And you actually only met with Ruthia in person once;

2  right?

3  A.   Correct.

4  Q.   And that was on that trip that we touched on a moment ago

5  when you actually went to Washington, D.C. in September of

6  2023; right?

7  A.   Right.

8  Q.   And that was to attend a telehealth conference put on by

9  the DEA; right?

10 A.   Correct.

11 Q.   It was called the DEA Telemedicine Listening Session;

12 right?

13 A.   Yes.

14 Q.   And essentially, the DEA was opening a public listening

15 session to receive comments from healthcare practitioners and

16 experts to inform the DEA's regulations on prescribing

17 controlled substances via telemedicine; right?

18 A.   Right.

19 Q.   And you actually traveled there, and Ruthia also went to

20 the conference; right?

21 A.   She didn't attend the conference.  She stood outside.  I

22 attended the conference.

23 Q.   Okay.  But you were in D.C. together; right?

24 A.   Yes.

25 Q.   And the at-issue changes in regulations were that

1  providers were permitted to see patients through the telehealth

2  platform rather than in person.  There was -- the in-person

3  requirement was lifted; right?

4  **A.**    Well, it was lifted in March of 2020 due to COVID, and

5  this was a listening session to get information to determine if

6  it would continue or in-person would again be required.

7  **Q.**    Right.

8      And you were happy to attend the conference to support

9  making telehealth permanent; right?

10  **A.**    Yeah, and I also wanted to know what was going on.

11  **Q.**    You felt fortunate just to be asked to attend for that

12  purpose, to support this goal of making telehealth permanent;

13  right?

14  **A.**    Yes, and also to find out if the law was going to change,

15  because seeing patients in person is very time-consuming, and

16  then I would lose a large number of patients.  That was the

17  other motivation.

18  **Q.**    But at the time, what you said to Ruthia is (as read):

19          "I feel fortunate to just be asked to attend.  I

20      mentioned to a couple of patients, and they were

21      excited I was willing to go to support us in making

22      telehealth permanent"; right?

23  **A.**    Well, yes, I did say that.  But, again, that was the

24  patients I saw.  The patients I didn't see, those were the

25  patients I was harming.

1    **Q.**   You didn't mention to Ruthia in that comment or at any

2    point in time that you weren't seeing patients; right?  You

3    didn't tell her that; right?

4    **A.**   No, but she was aware because she set the system up.

5    **Q.**   And when you were in D.C., you met with Ruthia as well as

6    former Congressman Bart Stupak.  Do you recall that?

7    **A.**   Yes.

8    **Q.**   And you understood him to be a lobbyist for Done; right?

9    **A.**   Yes.

10   **Q.**   And he was advocating for the DEA to continue to allow

11   providers to provide controlled substances via telehealth;

12   right?

13   **A.**   Yes.

14   **Q.**   And you actually also spoke to the DEA about the

15   investigation into Done.  Do you remember that?

16   **A.**   I didn't speak to the DEA.  I just attended the listening

17   session.  I didn't speak with anyone at the DEA.

18   **Q.**   Do you remember being told at the time that the

19   investigation into Done had closed?

20   **A.**   Bart said that.

21        **MS. BELL:**  Could we pull up Exhibit 6922.

22        We'd offer that, Your Honor.

23        **MS. GREEN:**  Objection.

24        **THE COURT:**  Let me look.

25                  (Pause in proceedings.)

```
 1              THE COURT:  Sustained.
 2    BY MS. BELL:
 3    Q.   Do you recall testifying on direct that you didn't respond
 4    to the DEA because you were directed not to do so by Dr. Brody?
 5    A.   I don't recall if he directed me not to.  He didn't -- I
 6    know he didn't tell me to, and he told me to continue
 7    practicing in the way that I was and let him know if they
 8    contacted me again.  My hope was that they were going to go
 9    away and leave me alone.
10    Q.   And, in fact, what you said then is that you had -- your
11    lawyer had reached out; right?  To the DEA?
12    A.   I didn't have a lawyer at that point.
13              MS. BELL:  Your Honor, could we put the exhibit back
14    up for a moment?
15              THE WITNESS:  In 2022, I did not have an attorney.
16              THE COURT:  I'm a little concerned about the advice of
17    counsel defense being introduced in some indirect way.  I mean,
18    you agreed not to do that.
19              MS. BELL:  Yes, Your Honor --
20              THE COURT:  This is indirect that somebody says
21    something to somebody who's part of a conspiracy.  I mean, it
22    gets into all of those issues.
23              MS. BELL:  We'll move on.
24              THE COURT:  I would move on.
25              MS. BELL:  Okay.  We'll move on.
```

SHAPARD - CROSS / BELL

BY MS. BELL:

**Q.**   Okay.  So you -- one of the reasons why you were so excited to go to this telehealth conference and support the -- this endeavor is because you yourself have ADHD; right?

**A.**   Yes, that's correct.

**Q.**   And you take Vyvanse; right?

**A.**   I do.

**Q.**   You've taken Vyvanse for years?

**A.**   I have.

**Q.**   And you really empathized with your patients; right?

**A.**   The ones that I saw, yes, I did.

**Q.**   And for that reason, too, you thought that traditional healthcare providers and pharmacies stigmatized ADHD patients and treated them poorly; right?

**A.**   Yes, I do feel that way.

**Q.**   And you told Ruthia that less than a month before these charges were brought; right?

**A.**   Right, because that's before the charges were brought, and I was justifying in my mind what I was doing.  But I was still breaking the law.

          **MS. BELL:**  And, Your Honor, I would offer 6808.  This is a lengthy exchange, and it would be --

          **MS. GREEN:**  Objection, Your Honor.

          **THE COURT:**  Sustained.

\\\

1    BY MS. BELL:

2    Q.    You told Ruthia about a patient that you saw; right?  Do

3    you recall that?  Do you recall telling her about a patient you

4    saw?

5    A.    What patient?

6    Q.    That really touched you because of your own experience

7    with ADHD.  Do you remember telling Ruthia that?

8    A.    Which patient are you referring to?

9    Q.    You told her about a patient that ended up canceling her

10   membership in August of 2022 after Walgreens refused to fill

11   her prescription and treated her like a drug addict.

12        Do you remember telling Ruthia about this patient?

13   A.    Could you tell me which patient it is?  I -- I don't

14   recall.

15   Q.    Your message doesn't mention the patient name, but you go

16   on to say that (as read):

17            "The patient started seeing a therapist, and

18        after a few months asked the therapist if they could

19        assist her in finding a local provider after the

20        incident with Walgreens.  The therapist had diagnosed

21        her with ADHD and referred her to a local in-person

22        provider.  The in-person provider at the first visit

23        refused to prescribe her Adderall despite her

24        documented history in CURES, also accused her of

25        being drug-seeking without any evidence, and told her

1    they would only prescribe a mood stabilizer.  This

2    was someone her therapist -- that -- someone her

3    therapist diagnosed -- that diagnosed her with ADHD

4    recommended.

5        "She became very depressed, felt bad about

6    herself, and struggled to keep a job.  She finally

7    decided to reach back out to us because the

8    medication 'changed my life in such a positive way'

9    the time she was able to get it from the pharmacy,

10   and she felt so guilty and ashamed by the way she was

11   treated by Walgreens and the other provider.

12       "How awful someone was treated that way.  I told

13   her I was glad she returned and so disturbed to hear

14   about her other experiences.  This seems to happen

15   way more than it should."

16   Do you remember writing that to Ruthia one month before

17   the charges were brought in this case?

18   **A.**   I recall something similar to that, yes.  And, again, that

19   was one patient.  I had 2,500 patients assigned to me, and I

20   wasn't seeing a majority of them.  I was refilling their

21   prescription without evaluating them?

22       So you can't compare one patient that had a good

23   experience to who knows how many that had a terrible

24   experience.

25   **Q.**   But what you shared with Ruthia one month before these

1  charges was about this patient; right?

2  **A.**    I did share that.

3  **Q.**    And you went on to tell her that the patient --

4        **THE COURT:**    That's -- that's -- there are a hundred

5  thousand patients.    I mean, I'm not quite sure what the

6  intention here is.

7        She said she did share a story, so I don't think you can

8  go on and on about the story.

9        She also indicated this is one of her -- I don't know.    I

10  thought she said how many patients?

11        **THE WITNESS:**    2,500 up to 3,000.

12        **THE COURT:**    2,500 patients.

13        Okay.    Let's move on.

14        **MS. BELL:**    Yes, Your Honor.

15        **THE COURT:**    I really think we should move on.

16        **MS. BELL:**    Yes, Your Honor.    I have one last thing on

17  this, which is Ruthia's response.    I will skip over the rest of

18  the excerpt, if I may.

19        **MS. GREEN:**    Objection, hearsay.

20        **THE COURT:**    Sustained.

21  BY MS. BELL:

22  **Q.**    This was one of very few communications you had with

23  Ruthia; correct?

24  **A.**    Correct.

25  **Q.**    Now, you testified today about policies which you say led

1   you to decide to commit crimes for money, but back then, in

2   your limited communications with Ruthia, you told Ruthia the

3   opposite, didn't you?

4   **A.**    What are you specifically referring to?

5   **Q.**    Well, for example, you testified that Done transferred so

6   many patients to your care that you couldn't keep up with the

7   volume of patients; right?

8   **A.**    Yes, that's correct.

9   **Q.**    But at the time, in your handful of communications to

10  Ruthia, you expressed that you were providing specialized care

11  to patients who were transferred to your panel; isn't that

12  right?

13  **A.**    I was providing it to some patients, but as well, with

14  limited time, I wasn't constantly communicating with Ruthia.  I

15  was sending refills and seeing the few patients that I did see.

16  **Q.**    You were communicating with her very infrequently; right?

17  **A.**    Correct.

18  **Q.**    And with respect to transfer patients in particular, what

19  you told her back then is the following (as read):

20          "I want to let you know about a patient that was

21      transferred to me as this is an example of a provider

22      that should not work at a company specializing in

23      ADHD treatment as she can't even spell Adderall

24      correctly, left incomplete notes, and told the

25      patient it was our policy to require anyone not on

SHAPARD - CROSS / BELL

1    stimulants within the last two years to try Strattera

2    or Qelbree for at least 90 days before trying a

3    stimulant.  This is not correct.  Stimulants are the

4    first line of treatment excluding medical

5    complications."

6    Do you recall telling her that about transfer patients?

7    **A.**    Yes, stimulants are the first line of treatment.  But if

8    you didn't correctly diagnose ADHD, you shouldn't be

9    prescribing anything for it, stimulant or Strattera.

10    And, again, it's just an example of one patient, and I had

11    2,500 patients.

12    **Q.**    It's the example that you gave her then, and you went on

13    to say --

14    **THE COURT:**  Well, she doesn't deny it.  She says then

15    it's one of 2,500.

16    So I think we should move on, as you said you were going

17    to.

18    **MS. BELL:**  Yes, Your Honor.

19    **BY MS. BELL:**

20    **Q.**    So the other issue that you flagged for Ruthia was your

21    feeling of embarrassment that this patient was treated this way

22    at an initial visit and you also --

23    Do you recall that?

24    **A.**    Yes.  I care deeply about my patients, and I'm very upset

25    when they're mistreated.

1      The problem was the patients that I had that I didn't see

2  that were harmed as a result of me prescribing to them without

3  evaluating them.

4  **Q.**  And you were telling her about how deeply you cared and

5  how upset you were about this patient; right?

6  **A.**  Yes, about that one patient.

7  **Q.**  Right.  And you also were upset about copied and pasted --

8  you testified about your own copied and pasted notes with

9  grammatical errors and the like; right?

10  **A.**  Yes.

11  **Q.**  But at the time, what you expressed to Ruthia was that you

12  had high standards for recordkeeping; right?

13  **A.**  I did, and I wasn't keeping good records.  I was copying

14  and pasting my notes.

15      The reason I was proud is I wrote the note out in the

16  first place, so it started out a correct note.

17      But when I applied it to patients that I saw and I didn't

18  put the information in, the correct information, then I was

19  copying and pasting the note, and that was fraudulent charting

20  is what I was doing.

21  **Q.**  And what you told her about this particular patient note

22  was that (as read):

23          "The note was incomplete with numerous blank

24      spaces, missing information, incomplete sentences,

25      and misspelled words.  She wrote 'Adderall' in

1          several places on the chart.  This note looks like it

2          was written by a child, not someone with a valid

3          medical license."

4     **A.**    I did say that.  Yes, I did.  I agree that I said that.

5          But, again, that was one patient.  I wrote my note out

6     myself and then I copied and pasted it onto thousands of

7     charts, unfortunately, and that was wrong that I did that.

8          Again, you're just referring to one patient.

9     **Q.**    But you didn't tell her about what you did; you told her

10    about --

11    **A.**    She knew what I was doing.

12    **Q.**    My question is:  What you told her about was the

13    incomplete, faulty note of another provider --

14    **A.**    Yes, I did.

15    **Q.**    -- not your own incomplete faulty notes; right?

16    **A.**    No.  No one said anything about my notes.

17    **Q.**    And then you also testified today that because you didn't

18    have enough time, you failed to check the CURES reports of

19    patients to make sure there were no red flags; right?

20    **A.**    I did.

21    **Q.**    In their prescription drug history; right?

22    **A.**    Correct.

23    **Q.**    But once again, in your limited communications with

24    Ruthia, you suggested the opposite to her; right?

25    **A.**    Well, I was also told that the care team was checking the

SHAPARD - CROSS / BELL

1    CURES reports for me.

2    **Q.**   You told her that the patient messaged and at first was

3    told by someone -- told someone was reviewing the prescription,

4    since it was controlled.  Then later the provider said she

5    looked at the CURES report, which should be done at the visit,

6    not days later.

7        Do you remember telling Ruthia that?

8    **A.**   Yes, it should be done, and I wasn't doing it.

9    **Q.**   And these were all the things you complained about with

10   respect to this transfer patient; right?

11   **A.**   Yes, I did.

12   **Q.**   Now, let's turn to some of the specific policies that you

13   testified about on direct.

14       So let's start with the 30-minute initial appointment

15   time.

16       You said today that that is not long enough to do an

17   assessment of a patient to diagnose them with ADHD; right?

18   **A.**   Yes, I said that.

19   **Q.**   But that, again, is not what you said back then when you

20   were practicing on Done's platform; right?

21   **A.**   No.  I was practicing on Done's platform so I had to

22   follow Done's model.  So if I said that wasn't sufficient, that

23   would have been a problem.

24   **Q.**   But you did more than that.  You actually wrote to the

25   Done care team and informed them (as read):

1          "There is no standard or requirement for lengthy

2      testing to diagnose, prescribe medication, and treat

3      the patient"; right?

4  **A.**    Lengthy testing is referring to a psychologist evaluation

5  which takes five to six hours.  That's what I was referring to.

6  **Q.**    But what you said is that there's no standard or

7  requirement; right?

8          **MS. GREEN:**  Objection, asked and answered.

9          **THE COURT:**  Overruled.

10  Go ahead.

11          **THE WITNESS:**  The standard is one hour.  Now, is that

12  something that everyone -- some providers see patients for two

13  hours.  One hour is the minimum.  Generally, it's longer than

14  that.

15      But as far as that goes, I was not stating something that

16  was correct; I was stating something that Done was doing so I

17  would be able to continue to do it.

18  **BY MS. BELL:**

19  **Q.**    You wrote to the care team that (as read):

20          "There is no standard or requirement for lengthy

21      testing to diagnose, prescribe medication, and treat

22      the patient"?

23      That's what you said at the time; right?

24  **A.**    Yes, and that was -- I was wrong saying that at the time.

25  **Q.**    Okay.  And, in fact, you know that there are no published

1    U.S. guidelines for the diagnosis and treatment of adult ADHD?

2         You know that, sitting here today; right?

3    **A.**    Well, there's what's called standard of care in the

4    community.  And what standard of care in the community is is

5    what another practitioner would do in a similar situation, and

6    so in that situation, if you ask an expert, most people are

7    going to say an hour?

8         But as far as an actual like law or rule, there isn't one.

9    It's called standard of care in the community.

10   **Q.**    There isn't one.  And, in fact, the American Professional

11   Society --

12              **THE COURT:**  There isn't one what?  There isn't a rule.

13   You're not saying there isn't a standard of care.

14              **MS. BELL:**  Right, Your Honor.  This is --

15              **THE COURT:**  Okay.  So when you ask the question "there

16   isn't one," what you are saying, There isn't a written rule on

17   this.

18              **MS. BELL:**  Yes.  Thank you, Your Honor.

19              **THE COURT:**  Okay.

20   **BY MS. BELL:**

21   **Q.**    So there -- there is not, just to be clear about the

22   testimony, a published U.S. guideline for the diagnosis and

23   treatment of adult ADHD; right?

24   **A.**    As far as I know; that's correct.

25   **Q.**    Right.  And, in fact, the American Professional Society

1    for the Treatment of ADHD-Related --

2              THE COURT:  Well, wait a minute, wait a minute.  You

3    say diagnosis and treatment?

4              MS. BELL:  Yes, Your Honor.

5              THE COURT:  Well, there's a DSM-5.  Isn't that a

6    published standard of diagnosis?

7              THE WITNESS:  Yes, the DSM-5 is the standard of

8    diagnosis.

9              THE COURT:  So I don't understand the question.

10   There's a published --

11             MS. BELL:  Sorry.

12             THE COURT:  There's a published standard --

13             MS. BELL:  I will clarify.

14             THE COURT:  -- the DSM-5.

15   BY MS. BELL:

16   Q.   So the DSM-5, they're criteria?  It's like a definition;

17   right?

18   A.   Correct.

19   Q.   But there are no published U.S. guidelines for the

20   diagnosis and treatment of adult ADHD; right?

21   A.   As far as I know, that's correct.

22   Q.   Now, you know that you left the impression with leadership

23   at Done that you were doing a thorough examination in

24   30 minutes; right?

25   A.   I assume so, but I also know that at Done, the standards

 1  that were -- they were doing there were not the standards of

 2  the community.

 3  **Q.**   And, in fact, Done shared with you feedback of patients

 4  you had seen during your 30-minute appointments; right?

 5  **A.**   Yes.

 6  **Q.**   And the feedback from patients that Done received was that

 7  your exams were thorough; isn't that true?

 8  **A.**   Yes.  That's what they told me.

 9  **Q.**   For example --

10       **MS. BELL:**  And, Your Honor, I would move in -- I will

11  be very efficient, but there are some examples I would like to

12  go through on this point.

13       **MS. GREEN:**  Objection, Your Honor.

14       **THE COURT:**  Well, take one.  Take one and so we can

15  get through it.

16       **MS. BELL:**  May we move in the exhibit?

17       **THE COURT:**  What is the exhibit number?

18       **MS. BELL:**  The exhibit is a spreadsheet with patient

19  reviews, and I'm going to go through a few of them on this

20  issue and a few other issues.

21       **THE COURT:**  What number is it?

22       **MS. BELL:**  It is 6806.  And we have excerpts to make

23  it faster, so the first one is F, as in Frank, at page 2.

24       These -- the next set that I will go through goes

25  specifically to the issue of the 30-minute thorough --

1           THE COURT:  I'll allow it.

2       (Trial Exhibit 6806 received in evidence.)

3           MS. BELL:  Thank you, Your Honor.

4       If we could do -- go to 6806F and publish that.

5           THE COURTROOM DEPUTY:  Is it admitted?

6           MS. BELL:  Thank you.

7   BY MS. BELL:

8   Q.   So one patient said (as read):

9            "Best clinician I've spoken to.  In 30 minutes I

10      had more insight than all of my prior consultations."

11      Do you see that?

12  A.   Yes, I see that.

13          MS. BELL:  Let's go to 6806D at page 2.

14  \\\

15  \\\

16  \\\

17  \\\

18  \\\

19  \\\

20  \\\

21  \\\

22  \\\

23  \\\

24  \\\

25  \\\

1    BY MS. BELL:

2    Q.    Another patient said (as read):

3            "Elizabeth was thorough in explaining symptoms,

4        treatment, options, and what to expect.  I appreciate

5        the thoughtfulness and understanding she showed,

6        making the experience seamless and welcoming."

7        Do you see that?

8    A.    Yes, I do.

9    Q.    Patients also told Done that they didn't feel rushed

10   during their appointments and that you made time for them;

11   right?

12   A.    I tried to.

13           MS. BELL:  If we could go to 6806S.

14   BY MS. BELL:

15   Q.    All right.  I think -- do you see that (as read):

16           "When I have my appointments, my clinician makes

17       me feel like she has time for me, time to listen and

18       time to give me feedback centered around my personal

19       situation."

20   A.    I recognize the name of that patient, and that's a patient

21   I would specifically schedule right before my lunch break or at

22   the end of the day, and I would actually see her for an extra

23   amount of time that I was not paid for.

24   Q.    Oh, you decided to do that?

25   A.    I did.

1           MS. BELL:  Let's go to 6806P.

2    BY MS. BELL:

3    Q.   (as read):

4           "Elizabeth was completely professional and very

5       kind.  I felt comfortable discussing a lot of things

6       with her.  She's changing my medication so it works

7       better, and she explained everything and answered

8       every one of my questions.  I never felt hurried or

9       rushed at all."

10      Do you see that?

11   A.   I do.

12          MS. BELL:  Let's go to 6806R --

13          THE COURT:  I think we've covered this.

14   BY MS. BELL:

15   Q.   Your patients also told you -- new subject -- that you

16   took time to listen to them; right?

17   A.   Yes, I did.  I tried to listen to my patients, and in the

18   time that I had, I tried to do as thorough of an evaluation as

19   I could?

20      The problem is that there were times I wasn't able to do

21   that, and then there were people that weren't evaluated at all.

22   That's the ultimate issue as far as the -- how I was helping

23   people and they were happy, I was harming other people.

24   Q.   And what your patients told Done was that you took the

25   time to listen to them, so let's just look at --

1          **THE COURT:**  That's not an argument.  She's saying --

2     that's not in contention.  She's never testified that I -- in

3     an interview I didn't have time to listen to them.  She

4     listened to them in the interview.  She said what she has said.

5          But to continue to hammer on it or continue to ask

6     questions about it isn't productive.  It's cumulative.

7          **MS. BELL:**  Yes, Your Honor.  We will move on.

8     **BY MS. BELL:**

9     **Q.**   Your patients also told Done that you were knowledgeable

10    about the nuances of ADHD; right?

11    **A.**   Yes, because I have ADHD myself, so that's how I know

12    that.

13         But, again, these were the patients I saw and I spoke to.

14    There were many times I was limited.  I couldn't finish the

15    visit with the patient.  You're showing, you know, some here

16    that are examples of ones that I did a great job.

17         I wanted to do a great job.  I was not able to do a great

18    job based on the system that Done set up.

19    **Q.**   But you knew that what your patients were reporting to

20    Done was that you were doing a thorough examination?

21    **A.**   I was being as thorough as I could.

22    **Q.**   And what they were reporting to Done is that your

23    examination was thorough, you took take time to listen to them,

24    and you were knowledgeable about the nuances of ADHD --

25         **THE COURT:**  Counsel, if you have examples of people

 1   who weren't examined and who wrote to Done that it was a great

 2   examination or something, fine, you can introduce that.

 3       But to continue to talk about the interviews that she has

 4   said -- she's described them in great detail, and the

 5   documentation confirms it -- is what she does during the half

 6   an hour.

 7       Do you want to take a recess and discuss this?

 8           MS. BELL:  Yes, Your Honor.

 9           THE COURT:  Okay.

10   Ladies and gentlemen, we will recess for 15 minutes.

11       Remember the admonition given to you:  Don't discuss the

12   case, allow anyone to discuss it with you, form or express any

13   opinion.

14                   (The jury leaves the courtroom.)

15    (Proceedings were heard out of the presence of the jury.)

16           THE COURT:  Can you step outside.

17                   (Witness steps down.)

18           THE COURT:  Okay.  Let the record show the witness has

19   been excused.  The jury has been excused.

20       I'm not trying to cut you off on what did she say to Done,

21   because I think that -- what did the witness report to Done and

22   who at Done.  Fine.  You've gone through that.

23       And her testimony is very clear.  She says her complaint

24   in the matter was -- in this area was she did not have time to

25   interview 2,500 patients or whatever that number is.  Okay.  So

SHAPARD - CROSS / BELL

1    then you come in and you show that there were favorable

2    comments on patients who were interviewed.  Okay.  That's been

3    demonstrated.  That's been demonstrated.

4        But then to continue asking her about patients who were

5    interviewed or examined and their comments is entirely

6    cumulative, and it's not her point and not the point of the

7    case.

8        The Government has not commented and said everybody who

9    received a prescription didn't have Adderall.  Everyone who

10   received a prescription didn't go through a process, a

11   medically sanctioned process.  They're not saying that.

12       They're saying that there were vast numbers of people who

13   didn't go through this process, and the process required them

14   to go through.

15       And then the question -- that -- by the way, right or

16   wrong -- there would be expert testimony on that because it can

17   be you don't need to interview them.  That can be medical

18   evidence that -- showing you don't need to do it, I understand

19   that.  So I don't -- the jury hasn't heard that yet.

20       But we're spending an enormous amount of time on that.

21            MS. BELL:  Your Honor, as Your Honor correctly noted

22   before the break, the critical issue in the case is what our

23   client knew, and this goes directly to what information was

24   going up to Done leadership.

25       The Government has hammered the point that our client was

excessively focused on patient reviews, and the way that we can

undermine the Government's burden of proof here, which is to

show that this was actually a pill mill, is to demonstrate that

the information that was flowing up to leadership on precisely

the reviews that she was supposed to be laser focused on was

communicating that this provider was thorough.  She was

knowledgeable.  She took time to listen.  She took time to

explain things.

     If the comments had been I feel like I don't have enough

time, she's constantly cutting me off, I don't feel heard, I

don't feel listened to, then there's a basis to say, well --

          **THE COURT:**  But that's not the only thing.  I mean,

that's not the only thing.  She says -- she's a provider of

great experience, and I would guess if you went through all the

people that she actually examined, there would be a vast, vast

majority saying she's fine.

     That's fine.  I understand that.

     And you demonstrated -- you have a big spreadsheet here of

people who were saying that she's fine.

          **MS. BELL:**  Well, Your Honor --

          **THE COURT:**  But to continue to go through people who

were saying she's fine when the complaint isn't that she didn't

follow medical procedure with respect -- at that point with

respect to people she initially examined when that's not the

complaint -- the complaint it she didn't examine a large number

 1    of her patients.

 2         **MS. BELL:**  But --

 3         **THE COURT:**  So what would be probative would be that

 4    there was no report given to your client by anyone who was not

 5    examined who says, I was not examined or I -- or I was denied

 6    without examination or I was -- or to the contrary, I was given

 7    pills even though I wasn't examined.

 8         No, of course not.  There's none of that.  And that's an

 9    absence of evidence.  I understand that.

10         But it's not supplanted by bringing in 50 or a hundred or

11    200 -- which I don't know where the limit is -- of favorable

12    comments by individuals who had been examined.

13         **MS. BELL:**  Your Honor, there are actually two --

14    there's a second issue I'd like to point out.

15         So I understand the Court's ruling on that.  I will tell

16    the Court that there are many, many of these reviews, and we

17    were very selective in getting to reviews that we thought

18    showcased the sufficiency of a 30-minute initial appointment

19    for two -- two reasons, one of which I already mentioned, which

20    goes to notice --

21         **THE COURT:**  I don't know how that does show it at all.

22    You know, I'm sorry.  I don't understand that.

23         Because some people demonstrated in 30 minutes that they

24    had attention deficit disorder therefore establishes that the

25    appropriate standard in the community should be a half an hour

 1    or in the medical community.

 2         Because the argument is -- and she's said it repeatedly

 3    and she'll continue to say it -- is to identify certain

 4    problems, you need a longer interview.  To identify certain

 5    problems, you need a longer interview.

 6         And, actually, I would guess patients don't know about all

 7    these problems.  They're not medical professionals.  They don't

 8    know if they have this problem and that problem; therefore,

 9    they don't have another problem.  They don't understand that.

10         And so she's saying you need an hour.  She may be wrong.

11    That may not be the standard.  We're going to have testimony on

12    that issue.

13         But you can't spend an hour or lengthy periods of time

14    examining her on, quote, the happy patients.

15              **MS. BELL:**  May I --

16              **THE COURT:**  Yes.

17              **MS. BELL:**  I'm sorry, Your Honor.

18         The second point I wanted to make -- I understand the

19    Court's ruling on that.  I promised the Court it wasn't going

20    to be hours; it was going to be tight and efficient, but I

21    understand the Court's ruling on that.

22         But there's a second issue here, which is it directly

23    impeaches her testimony.  Of course, her credibility is at

24    issue.  And she has said it's not possible to do a thorough

25    exam in 30 minutes.

1        How does one impeach the testimony of the testifying

2   witness?  You look back at what's the contemporaneous evidence

3   about whether or not she was able to do this, and the

4   contemporaneous evidence that exists includes and is largely

5   the patient feedback about whether or not they felt that

6   they --

7            THE COURT:  Really?

8            MS. BELL:  -- were thorough.

9            THE COURT:  I mean, really think about that.  In other

10  words, you're saying that because some people are diagnosed

11  within a half an hour, properly -- properly diagnosed within a

12  half an hour, properly -- that is, they have the disorder and

13  it becomes apparent that their disorder -- that it's a genuine

14  disorder within a half an hour; therefore, since some people

15  are diagnosed correctly within a half an hour, the standard is

16  a half an hour.

17       I don't even know how you can suggest something like that.

18            MS. BELL:  That's not the argument, Your Honor.  I'm

19  sorry if I --

20            THE COURT:  Well, that's what I heard.

21            MS. BELL:  Okay.  So, again, there are two points to

22  this.  The one point is the notice to Done.  The other point is

23  impeaching the credibility of a witness who at the time was

24  saying and doing things that directly contradict what she is

25  now --

1          THE COURT:  Let's talk about the second point.

2          MS. BELL:  Okay.  The second point --

3          THE COURT:  I don't believe you're serious in the

4    second point.  Because she was able in a half an hour to

5    correctly diagnose the ADH and correctly prescribe medicine,

6    therefore, that's the standard.

7          MS. BELL:  But --

8          THE COURT:  She doesn't say I was wrong in all those

9    cases that I examined.  To the contrary.  She says there were

10   many satisfied patients, and Adderall did it, and the diagnosis

11   was correct.

12      So how does that impeach her?  Unless you're arguing that

13   that's going to be the standard.

14         MS. BELL:  Well, it does impeach her --

15         THE COURT:  How?

16         MS. BELL:  Our belief is it would support an

17   inference; right?  It's up to the jury at the end, but it would

18   support an inference.  If comes in and says it can't be done,

19   which is her testimony -- she says the policy of 30 minutes

20   made me act as a drug dealer rather than a medical --

21         THE COURT:  I'm sorry.  She says it can't be done

22   properly.  She didn't say it can't be done.  It can be done.  I

23   can have ADH.  I can go in and say to a doctor, I've got ADH,

24   and that doctor gives me medicine.

25      All right.  Guess what?  I have ADH.  And guess what?

SHAPARD - CROSS / BELL

1    That medicine helps me.

2        Yeah, that's right.  It can be done from a mechanistic

3    point of view; that is, a person who needs drugs, who has a

4    disorder, gets the right drugs to treat the disorder.  It can

5    be done.

6        But she says that in her judgment, to do it correctly,

7    that is, to do it according to the standards of the

8    profession -- and she may be wrong in this -- it takes more

9    than a half an hour.

10       And she says notwithstanding that, notwithstanding whether

11   it takes a half an hour or an hour, there were so many patients

12   given to her that nobody -- nobody could possibly conceive that

13   she was interviewing -- examining all these patients.  No one.

14       I did the math.  And that list, 225 transfer patients.

15   Maybe they were in a different category.  You're going to say

16   why you can rely on this, why you can rely on that.  But one

17   thing you can't do -- you can't examine them.  It takes a

18   week -- it takes over 60 hours, in her judgment, on a half an

19   hour to examine 250 new patients at a time that she has 2,500

20   patients or 2,300 patients.

21       And that the -- the platform was set up in a way, which

22   she voluntarily joined and profited from -- it was set up in a

23   way to reward that kind of practice.  That's what -- that's all

24   she's saying.

25       **MS. BELL:**  Well --

1          **THE COURT:** And you want to impeach her.  I'm a

2    little -- I don't -- I sort of don't get it, in a way.  I mean,

3    you're entitled, of course, to impeach her.  But how are you

4    doing it by showing that she had a lot of happy patients?

5          **MR. SCHACHTER:** Can I return Your Honor to point one?

6          **THE COURT:** Yes, go ahead, Mr. Schachter, because I'm

7    missing something.

8          **MR. SCHACHTER:** Can I just return to point one,

9    because I'm not -- I don't know that there's a ruling, and I

10   want to make sure that I -- I don't think there is.

11         With respect to point one, the issue is -- this is

12   obviously not a malpractice case, not a question of like is 30

13   minutes malpractice, isn't it malpractice.

14         The question is entirely what our client knew and

15   intended, and there has been ample evidence that she paid rapt

16   attention to the reviews.  The Government has elicited that

17   from many witnesses.  All she cared about was the reviews.

18         And if there are reviews of patients that are saying

19   this -- my examination was thorough, in 30 minutes this person

20   was extremely efficient -- I don't understand how that could

21   not be relevant -- the jury may reject it, but how it could not

22   be relevant evidence of our client's intent and knowledge.

23         The Government has presented tons of evidence about

24   discussions of reviews and what their purposes were.  To -- for

25   us not to be able to show the actual reviews in which people

1  are saying "This was sufficient time," that -- I don't

2  understand how that -- how that wouldn't be relevant.

3      Now, the witness says -- and frankly, the Court said --

4      **THE COURT:** I've let some of that in.

5      **MR. SCHACHTER:** But, Your Honor, we -- and the Court

6  has interjected and said the witness said this is one of 2,500.

7  We, of course, don't have any burden. We're not here to try to

8  point -- we are trying to pick apart the Government's --

9      **THE COURT:** Okay. So maybe on that issue -- let me

10 respond. This is 6806 or 6808 or whatever it was. Fine.

11     There's nothing to prevent you from saying, I'm

12 representing to you that there are 800 entries on this piece of

13 paper or 400 or 200 or 300. All of them were communicated to

14 my client, and they're all favorable, extolling your medical

15 virtues or the way you conducted the interview. Do you have

16 any reason to disagree with that? Here is the document. Do

17 you have any reason to disagree with that?

18     **MR. SCHACHTER:** The Government has -- we have

19 attempted to introduce the reviews. The Government has

20 objected. The objection was sustained.

21     **THE COURT:** Well --

22     **MR. SCHACHTER:** And we think that -- we do want the

23 reviews --

24     **THE COURT:** I -- look. Well, wait a minute.

25     When you say the objection was sustained, of course it

 1    was, to the -- the one at a time -- if you want to introduce it

 2    as a cumulative exhibit and represent to the Court that you

 3    have reviewed all of the comments or whatever the number is and

 4    this chart represents X or --

 5        There are witnesses who testify to those things every day

 6    in criminal cases.  And one, five minutes, two minutes lets in

 7    the compendium of complaints.  I can't believe you don't know

 8    how to do it because I know you do know how to do it.

 9        I'm telling you you can't do it the way you are doing it,

10    and that's why I've sustained objections, because it takes so

11    long -- so long to do it that way.

12        I don't believe that's your design at all, but it is what

13    I'm being presented with, and I'm not going to allow it because

14    it will ensure that this case goes into next year if you do it

15    that way.

16        If you say, look, I just want to get the document in, then

17    what do I have to do, give you Weinstein on evidence?  You know

18    how to get the document in.  You know how to get all these

19    documents in.  I don't need to tell you how to do it.

20        But you're not going to do it the way you propose to do

21    it.

22            MS. BELL:  Last word, Your Honor, and we'll leave it,

23    but if I may.

24            THE COURT:  Go right ahead.

25            MS. BELL:  So the Government -- I'm going to use their

 1   term again of narrative richness.

 2       As Your Honor knows, we can put in a summary witness and

 3   say here's an Excel.  Will the jury ever look at it back there?

 4       No, it's very different --

 5           **THE COURT:**  I'm so sorry.  I understand that you're

 6   very concerned, as every good trial lawyer always is, is how

 7   does a jury -- how do you make your evidence meaningful to a

 8   jury.  I understand that.

 9       But there are -- and that's sort of the test of the 403.

10   That's where I've got to sort of weigh in.

11       So on the one hand, I know there's a way you can do it,

12   and you're not doing it that way; and on the other hand, that's

13   balanced by reading it all out.  Reading, you know, she

14   doesn't -- she doesn't disagree with the testimony, and you

15   read it out to her or doesn't disagree with she said something,

16   so you read it out what she said.

17       And the reason you're doing it, in my humble opinion, is

18   then you get to read it to the jury, and so it's, quote, more

19   meaningful.

20       And at some point, I've got to draw some limits, because

21   this case -- this is over a million exhibits.

22       And I really do think there ought to be some effort by the

23   Defense to focus on what the issues are.  Here:  What did she

24   know.  What was her understanding?  What was she told?

25   You know?  And the standard.

 1        And, of course, not for a moment do I --

 2        Yeah.  If you were putting on evidence of what is the

 3   standard of care and the science and so forth, you know, have

 4   at it.  I mean, I think that that's a very, very important

 5   issue for you to have fully -- to fully explore.

 6        But not every issue is an important issue fully to

 7   explore, and it's not fully to explore every single accolade

 8   that comes in on how good the platform is, especially when

 9   she's not saying it's not a good platform.  What she says about

10   the platform, at least on this issue, is that there were too

11   many patients in too little time.  That's what she's saying.

12   And she explains that the reason she did it was for money.

13        MR. SCHACHTER:  And if I may just switch to a

14   different piece of evidence that Ms. Bell tried to introduce,

15   and that was a communication between -- between her alleged

16   coconspirator and Ms. He.

17        And that communication -- I don't know that it would have

18   been clear to the Court at the time, but it shows the absence

19   of the existence of a conspiracy.  How the conspirators are

20   communicating with each other during the course of the

21   conspiracy is of critical relevance, because if they're in a

22   criminal conspiracy together, fair argument, they're not going

23   to be lying to each other.  Argument, that's for the jury to

24   decide.

25        But the communications among conspirators regarding the --

1  regarding the charged conduct, I -- we -- I think that that is

2  admissible, certainly as 401 admissible, and given the fact

3  that they are communication with the conspirators, that seems

4  to be relevant evidence.

5         THE COURT:  I'm not saying it's not relevant.  I'm

6  just saying it becomes at some point entirely cumulative.

7         MR. SCHACHTER:  But they had very few communications

8  at all.

9         THE COURT:  But it becomes -- but to go over every --

10  I don't know.  I mean, you -- then the way you ask, did you say

11  anything else to them?  There are these three communications.

12  Was it true?  And I thought you asked that.  I thought you laid

13  the foundation, in my view, listening to it, that this witness

14  had very few conversations, met her once or twice -- I don't

15  know -- didn't really have any communications with her, almost

16  none.

17      So --

18         MR. BODAPATI:  The one communication that she did have

19  with our client, I think the jury should be entitled to see so

20  that they can make the assessment which they ultimately need to

21  make, which is did there exist a conspiracy between this person

22  and our client, and that is very useful information for the

23  jury to see how they were actually communicating with each

24  other.

25      You know, we ask the Court to consider that.

 1          MS. BELL:  Maybe we can pass up the exhibit.

 2          MR. SCHACHTER:  Perhaps we can pass up to the Court

 3   during the break.

 4          MS. GREEN:  If I can respond briefly on that point,

 5   Your Honor.

 6      If my recollection is correct, Ms. Bell asked very clear

 7   questions:  Did you say this to Ms. He?  And she agreed,

 8   I believe, with all of that.

 9          So this document then becomes, as Your Honor said before

10   the break, cumulative.  She hadn't contested what Ms. Bell had

11   said.  It's not impeaching.  And at that point it's cumulative

12   and hearsay because the witness, I believe, agreed with

13   Ms. Bell that she had said it.

14          THE COURT:  Let me look at it during the recess.

15          MR. SCHACHTER:  It's, of course, not hearsay,

16   obviously.  We are not offering it for the truth of the matter

17   asserted.  We are offering it to show the lack of existence of

18   a conspiracy, which is obviously a non-hearsay purpose.

19          THE COURT:  Okay.  Thank you.

20          MR. SCHACHTER:  We'll provide it to the Court.

21          THE COURT:  Recess.  10 minutes.

22                  (Recess taken at 2:07 p.m.)

23              (Proceedings resumed at 2:31 p.m.)

24          THE COURTROOM DEPUTY:  Come to order.  Court is now in

25   session.

1        **THE COURT:**  Wait.  Before you bring in the jury, have

2   a seat.

3        I'm admitting it.  No questions on it.

4        **MS. BELL:**  Thank you, Your Honor.

5        **THE COURT:**  You argue it to your heart's content

6   what's not in it.  Read it to the jury during your closing.  Do

7   anything you want.  Put it up on boards.  Tell everybody what

8   it isn't.

9        But we're not taking 10 minutes going through this

10  document with this witness.  Okay.  It's in.

11       **MS. BELL:**  Yes.  We did not intend to touch it.

12       **THE COURT:**  Great.  And I really do want you guys to

13  sit down and figure out how you're going to start introducing

14  exhibits, because this is not a useful way to do it.

15       Consistent with the Court's ruling, which I think is

16  consistent with the Rules of Evidence.  I think it is.  But you

17  know I could be wrong.  Everybody's got a different view.

18       Bring in the jury.  Let's get going.

19       And you can introduce it in front of the jury.

20       **MS. BELL:**  Thank you, Your Honor.

21            (The jury enters the courtroom.)

22       (Proceedings heard in the presence of the jury.)

23       **THE COURT:**  Okay.  Please be seated.

24       Let the record reflect all jurors are present.  The

25  parties are present.

 1              Defense counsel has moved to introduce 6808?

 2              **MS. BELL:**  Yes, Your Honor.

 3              **THE COURT:**  Okay.  It's admitted.  Thank you.

 4         (Trial Exhibit 6808 received in evidence.)

 5              **MS. BELL:**  Thank you, Your Honor.  May I just say what

 6    it is and we'll move on?

 7              **THE COURT:**  Yes, of course.

 8              **MS. BELL:**  Thank you.  If we could just display it to

 9    the witness, I will just explain what it is.

10         Is it there?

11              **THE COURT:**  6808.

12    **BY MS. BELL:**

13    **Q.**   Now, Ms. Shapard, you previously testified to the few

14    communications you had with Ruthia.

15         Do you recall that?

16    **A.**   Yes.

17    **Q.**   And we were -- you testified about certain communications

18    from a larger set, and we are now admitting the full exhibit.

19         If you could just tell me:  Do you recognize this as the

20    handful of communications you had with Ruthia starting in

21    September of 2023?

22         Do you see that?

23    **A.**   Yes, I do.

24    **Q.**   Which was when you went to D.C. for the telehealth

25    conference; right?

1    A.    Correct.

2         MS. BELL:  And then if we could go to the back of the

3    document.

4    BY MS. BELL:

5    Q.    And we can see that there are communications through June

6    of 2024.

7         Do you see that?

8    A.    Yes, I do.

9    Q.    Okay.  So we are going to move on to a new topic, which is

10   the topic of the follow-up policies.

11        So you testified that there was no policy for follow-ups.

12        Do you recall that?

13   A.    I recall, yes.

14   Q.    Okay.  But, in fact, the best practices attached to your

15   contract says that (as read):

16           "Patients with medical necessity, meaning

17        significant physical problems, may be exacerbated by

18        the medication's potential of abuse/addiction,

19        serious depression and suicidal attempts may be seen

20        every 30 days until stable treatment is determined."

21        Right?

22   A.    Correct.

23   Q.    And that --

24        MS. BELL:  This is already in evidence, so I think if

25   we can we could just put it up at page 18.  It's

1    Government Exhibit 1308.  There we go.

2    **BY MS. BELL:**

3    **Q.**    Do you see that at the top, the medical necessity portion?

4    **A.**    I see that.

5    **Q.**    Okay.

6           **MS. BELL:**  And if we could go down as well under

7    standards of care member communication.

8    **BY MS. BELL:**

9    **Q.**    Could you read the second bullet point for us?

10   **A.**    (as read):

11           "Utilizing all different methods of

12       communication outside of a scheduled appointment is

13       strongly encouraged."

14   **Q.**    Okay.  And you testified also about the DSM-5 criteria.

15           **MS. BELL:**  If we could go down a little bit further,

16   the second bullet point.

17   **BY MS. BELL:**

18   **Q.**    Okay.  So the second bullet point there (as read):

19           "The goal is to help patients feel better and

20       reduce significant symptoms.  Still might be worth

21       doing a medication trial."

22       Right?

23   **A.**    That's what it says.  But helping patients feel better and

24   diagnosing and treating someone medically are two very

25   different things.  Helping the patient feel better because they

1  wanted Adderall because it's going to help their performance at

2  work -- that's what this is stating.

3  **Q.**   Do you see those words there?

4  **A.**   It says (as read):

5          "If they do not meet the DSM-5 criteria."

6       If they do not meet the DSM-5 criteria, then they don't

7  meet the diagnostic criteria for ADHD, and in that case, if a

8  medicine is prescribed, it's outside the normal practice of

9  medicine.

10  **Q.**   So this made you uncomfortable; right?  That was your

11  testimony?

12  **A.**   Yes.

13  **Q.**   Isn't it true that certain experts and board-certified

14  psychiatrists think it is just fine to prescribe a stimulant

15  even if a patient doesn't strictly satisfy the DSM-5 criteria?

16          **MS. GREEN:**   Objection, foundation.

17          **THE COURT:**   Well, I think you -- you have to lay a

18  foundation that she's aware of what you assert is the case.

19  **BY MS. BELL:**

20  **Q.**   Yes.  Well, for example, are you aware that Done's

21  clinical president, Dr. Brody, wrote articles and posted

22  seminars on the Internet expressing his view that it was

23  medically appropriate to treat patients suffering from ADHD

24  symptoms with stimulants even if they did not meet the strict

25  criteria of that manual?

1  **A.**   I'm not aware of articles he's written, but that's his

2  opinion and his view.  That's not the opinion of the entire

3  mental health community.

4  **Q.**   Are you aware that there are experts in the mental health

5  community who share that view?

6  **A.**   Would you give me an example, please?

7  **Q.**   I'm just asking if you're aware of any.

8  **A.**   If I'm aware of any?  Not off the top of my head.

9  **Q.**   We can move on.

10      So we will now move to the topic of additional follow-up

11  policies.

12      So you knew at the time that back in November of 2020,

13  when you started, in fact, that the policies for stable

14  patients was (as read):

15          "Stable patients will be reviewed by their

16          provider online and issued their refills without a

17          follow-up being required.  They will be strongly

18          encouraged to book follow-ups every 90 days."

19      You knew that was the policy; right?

20  **A.**   Yes.

21  **Q.**   And as we talked about, you have extensive training at a

22  host of prestigious places; right?

23  **A.**   Correct.

24  **Q.**   And you are uniquely qualified to determine when, in your

25  clinical judgment, a patient needs a follow-up appointment;

SHAPARD - CROSS / BELL

1    right?

2    **A.**    If I haven't seen the patient at all, such as the patient

3    earlier that was diagnosed with bipolar disorder, then, no.  I

4    need to see the patient face-to-face, and I was not doing that

5    consistently.  Just because the patient said they were stable

6    in a button that they clicked on the platform doesn't mean that

7    they are.  I need to look at that person to make sure they're

8    stable.

9    **Q.**    Now, moving on to additional policies, you know that in

10    July of 2022, Done also implemented a policy to require

11    follow-ups; right?

12    **A.**    I don't recall.

13    **Q.**    You don't recall that?

14        **MS. BELL:**  Your Honor, we would offer 6816.

15        **THE COURT:**  6816?

16        **MS. BELL:**  Yes.

17        **THE COURT:**  Admitted.

18        (Trial Exhibit 6816 received in evidence.)

19        **MS. BELL:**  Thank you.

20    **BY MS. BELL:**

21    **Q.**    All right.  If we could start --

22        **MS. BELL:**  Let me see.  If we could zoom in, please.

23    **BY MS. BELL:**

24    **Q.**    All right.  And so you see this was sent to you from

25    provider support; right?

1    **A.**    I see my name, yes.

2    **Q.**    And let's start --

3           **MS. BELL:**  If we could go up, please, to the top.

4    BY MS. BELL:

5    **Q.**    All right.  And the e-mail begins (as read):

6           "We are writing to touch base with you all to

7           discuss new policies we are implementing.  These

8           policies will ensure we're providing top-notch care

9           to all current patients and better serving our new

10          patients.  We've identified several issues needing to

11          be addressed in regard to the ongoing care of our

12          existing, already established patients."

13   One of those policies was to make follow-up required every

14   six months.

15          Do you see that?

16   **A.**    I do.

17   **Q.**    And then we will get to the other part of that.

18          **MS. BELL:**  We can take that down for now.

19   BY MS. BELL:

20   **Q.**    So you testified that through the compensation model, Done

21   incentivized you not to do follow-ups or to evaluate transfer

22   patients when they would come to you; right?

23   **A.**    Yes, correct, because at first they weren't paying

24   anything for the transfer patients, and then if it's an

25   established patient, there's no additional money paid.  You're

SHAPARD - CROSS / BELL

1   only paid based on the number of patients you have on your

2   panel.

3   **Q.**   But, in fact, you did frequently see patients for both

4   follow-up and transfer appointments; right?

5   **A.**   I did, but I didn't see all 2,500 of them.  But I did see

6   patients on a regular basis, but the ones that I had time to

7   see.

8   **Q.**   And, in fact, more than half, 65 percent of all of your

9   appointments on the platform were follow-up or transfer

10  appointments; right?

11  **A.**   That sounds correct.

12  **Q.**   You also testified that eventually your panel became so

13  big that you could not schedule transfer patients for

14  appointments to see you; right?

15  **A.**   I've never been able to schedule patients to see me.

16  **Q.**   Well, that -- you had no time in your schedule for

17  patients to be seen.

18       That was your testimony; right?  That your --

19  **A.**   Correct.

20  **Q.**   Right.

21  **A.**   I just wanted to clarify I didn't schedule them.

22  **Q.**   Right.  The way that things happened was you actually

23  would write to the care team; right?

24  **A.**   Yes.

25  **Q.**   Ms. Mercado?

1    **A.**    Right.

2    **Q.**    But you never raised the concern back then when you were

3    at Done that there was not enough time for you to schedule

4    transfer patients for appointments; right?

5    **A.**    I would have brought that up.  There were points where I

6    would ask patients to schedule, and then there would be a

7    three-month wait because in the beginning, most of my schedule

8    was new and there was just a few follow-ups at the bottom.

9    When patients would try to schedule for a month, there wouldn't

10   be anything for two or three months.

11   **Q.**    Well, Niki Mercado told you that the care team could add

12   transfer patients to your schedule to be seen for a follow-up

13   appointment if you wanted them to do that; right?

14   **A.**    She told me that, but I don't know if that was

15   implemented.

16   **Q.**    And, in fact, you then explained that you didn't believe

17   it was necessary to see transfer patients for a follow-up if

18   they were stable with no recent dose changes; isn't that

19   correct?

20   **A.**    If that's what I said, yes, that's correct, but I wouldn't

21   know if they were stable if I didn't see them.

22          **MS. BELL:**  Your Honor, we'd offer 6811 so we can go

23   through this document.

24          **THE COURT:**  6811 admitted.

25          **MS. GREEN:**  Objection.  Same objection.

 1              **THE COURT:**  I'll allow it.  Go ahead.

 2          (Trial Exhibit 6811 received in evidence.)

 3              **MS. BELL:**  Thank you.

 4   BY MS. BELL:

 5   **Q.**   Okay.  So do you see, this is an exchange between you and

 6   Ms. Mercado in November of 2020?

 7          Do you see that?

 8   **A.**   Yes.

 9   **Q.**   Okay.  And you say Dr. Brindala --

10          Now, Dr. Brindala was the chief medical officer at this

11   time; right?

12   **A.**   Correct.

13   **Q.**   A member of the clinical leadership team; right?

14   **A.**   Yes.

15   **Q.**   Okay.  (as read):

16              "He discussed during the two-week check-in about

17          adding follow-ups and refills to my caseload for

18          patients previously seen by other providers.  I told

19          him I was happy to take additional patients to my

20          caseload.  He mentioned it could be around a hundred

21          patients, so I was already expecting to see some on

22          my schedule.  Thanks for checking with me and letting

23          me know."

24          And then Ms. Mercado says (as read):

25              "Is it possible to send the refill requests,

1          then let us know if you'd like to see them for

2          follow-ups?  Then we can schedule them."

3          And you respond (as read):

4               "Sure.  That will work.  Some may not need to be

5          seen if stable with no recent dose changes.  I will

6          review case by case and let you know."

7          Do you see that?

8  **A.**    I do.

9  **Q.**    And then Ms. Mercado says (as read):

10              "Please do and just let us know, and we will

11         schedule them for you.  We usually send a little

12         daily list summary of requests at the end of the day,

13         and just let us know."

14         Do you see that?

15  **A.**    I do.

16  **Q.**    Now, you were asked by the Government about 125 patients

17  that you accepted from Nurse Practitioner Pratcher.

18         Do you recall that?

19  **A.**    Yes.

20  **Q.**    And then another 500 from a provider named Shannon

21  Wozniak; right?

22  **A.**    Correct.

23  **Q.**    And you did not tell the Done leadership or the care team

24  that you did not have time to see transfer patients --

25  **A.**    Well, at this point I would have had plenty of time.  I

1  had only been at Done for about two weeks, and all -- I had

2  maybe seen 20 patients.  I had 20 patients assigned to me.

3  Taking an additional hundred would be 120.  It was not at a

4  point where I had 1500 patients or 2,000 patients.  Those

5  were -- I needed patients at that point because I didn't have

6  any because I'd only been there for two weeks.

7          MS. BELL:  Can we put 648 at page 3 back up.

8  BY MS. BELL:

9  Q.   Okay.  You see this is June of 2022?

10 A.   Correct.

11 Q.   Okay.  So you started back in November of 2020; right?

12 A.   Yes.

13 Q.   Okay.  And in June of 2022, you were advised that nurse

14 practitioners -- 125 patients had been transferred to your

15 panel.

16      And you say -- can you tell us what you said?

17 A.   I said, yes, of course, I'm glad to accept these transfer

18 patients.

19 Q.   And you had the same response when you were asked to

20 accept 595 patients from Shannon Wozniak; right?

21 A.   Yes, because that's going to significantly increase my

22 income.

23 Q.   Right.

24      And you could have decided to make less money and not

25 accept these patients; right?

SHAPARD - CROSS / BELL

1  **A.**   Yes, I could have done that.

2  **Q.**   Right.

3      And you instructed the care team that patients needing

4  adjustments need an appointment.  Stable patients can have

5  refills; right?

6  **A.**   Yes, but if I didn't evaluate the patient, I didn't -- at

7  that point I didn't have time.  That's when I did have the

8  2,000 patients, so I wasn't able to go through and look at the

9  individual charts?

10      And even if I asked for a patient to be scheduled, I was

11  never told if they were scheduled or not because I had too many

12  patients.  I didn't have time to check that.

13  **Q.**   But the fact is that when you received transfer patients

14  that were asking for medication adjustments, you did request

15  that they be scheduled for a follow-up --

16  **A.**   I did.

17  **Q.**   Just --

18      You did?

19  **A.**   Yes.

20  **Q.**   And so your rule, as you told Ms. Mercado, was that stable

21  patients did not need to be seen; right?

22  **A.**   Well, Ms. Mercado can't determine if the patient is stable

23  because she's not a medical provider.

24  **Q.**   I'm just asking what you told her --

25  **A.**   Yes, I did say that.  I said that in November of 2020 when

1    I had been at Done for two weeks and I had maybe 20 patients

2    assigned to me, not 2,500.  That was a much different time.

3    **Q.**    And when patients were asking for medication adjustments,

4    you requested that they be scheduled; right?

5    **A.**    I did.

6            **MS. BELL:**  Let's look at a few examples of just that

7    happening, if we could, Your Honor.

8        I would offer 6813.  And we could just actually move them

9    all in at once, and we won't go through them all.

10           **THE COURT:**  I don't know.  I'd better look at it.

11           **MS. BELL:**  I'm sorry, Your Honor?

12           **THE COURT:**  I think I'd better look at it.

13           **MS. BELL:**  Okay.

14       So 6813.

15   **BY MS. BELL:**

16   **Q.**    This is an example of your discussing a follow-up

17   scheduled for a transfer patient; right.

18   **A.**    Yes.

19   **Q.**    And you say (as read):

20            "I can discuss with her at the scheduled

21        follow-up prior to dosage" --

22           **THE COURT:**  Here's what I don't understand about this

23   whole line of questioning.

24           **MS. BELL:**  Yes, sir.

25           **THE COURT:**  You show her a document in which she says

1    that -- the one that was in 2020 -- or am I right there --

2              **THE WITNESS:**  The one from November 29th, 2020.

3         **THE COURT:**  2020, which she says what she said about I

4    can schedule things.

5         Then you show her a document that was two years later.

6              **THE WITNESS:**  Correct.

7         **THE COURT:**  And I'm trying to figure out why the --

8    how is it relevant what she said when she had 20 patients to

9    when she has 150 or 200 or 300 patients?  I'm trying to figure

10   out the relevance of it.

11        **MS. BELL:**  Well, Your Honor --

12        So, Your Honor, I think that we looked at June of 2022,

13   which was Exhibit 6811, when she's accepting all of these

14   patients --

15        **THE COURT:**  Yeah.

16        **MS. BELL:**  -- and so we can --

17        **THE COURT:**  June of 2022.

18        **MS. BELL:**  Yes.

19        **THE COURT:**  Okay.  What was the communication that you

20   cited with Ms. Mercado?  When was that?

21        **MS. BELL:**  Can we go to 6812?

22        **THE COURT:**  You can go to any one you want to.  Just

23   tell me -- I thought it was 6816, but I don't know what number

24   it was.

25        But it was the one you just read from.

1          MS. GREEN:  It was 6811, Ms. Bell, I think is the one

2    Judge Breyer is referring to.  6811.

3          MS. BELL:  Okay.  We can go to 6811.  This is another

4    one later in time, to respond to Your Honor's point.

5       But, yes, we can go to 6811.

6          THE COURT:  Okay.  That's two years before.

7          MS. BELL:  Yes, when Dr. Brindala is asking --

8          THE COURT:  Do you understand my -- I don't understand

9    how -- she took one position in 2020, and then circumstances,

10   as she said, changed in 2022 -- how you tie the two things

11   together.

12         MS. BELL:  We --

13         THE COURT:  It's a different situation.

14         MS. BELL:  We will look at 2022 now.

15         THE COURT:  Okay.

16         MS. BELL:  Okay.  So could we go back to 6812.

17   BY MS. BELL:

18   Q.   This is a document from February of 2022; correct?

19   A.   Correct.

20   Q.   Which was the same year that you agreed to accept the

21   transfer patients from Nurse Practitioner Pratcher and Nurse

22   Practitioner Wozniak; right?

23   A.   Yes.

24   Q.   Okay.  And you see here you were taking the same position

25   as you took back in November of 2020; right?

1    **A.**    Yes, but again, patients needing adjustments -- I have no

2    way to know if they were scheduled.  And as far as if a patient

3    was stable, if I didn't see them -- I mean, back in 2020, I

4    could have had a hundred patients scheduled because they would

5    have been scheduled within the next month and filled my

6    schedule up?

7         But at this point, my schedule is already full, so for me

8    to say stable patient, I can't determine that.  Ms. Mercado

9    cannot determine if a patient is stable because she's not

10   medically trained.

11        And if I don't see these patients, I don't know that

12   they're stable.  And in 2020, I was able to see them because my

13   schedule was completely open.

14   **Q.**    In 2022, these were your words; right?

15   **A.**    Those are my words.

16   **Q.**    Okay.  So let's move on to 68 --

17        **MS. BELL:**  May I just confer for a moment?

18        Could we please offer this, Your Honor.  I apologize.

19   6812.

20        **THE COURT:**  Admitted.

21        (Trial Exhibit 6812 received in evidence.)

22        **MS. BELL:**  Was this published for the --

23        Okay.  My fault there.  So let's go back, then, a moment.

24   Luckily, it's not long.  If we can just publish it for the

25   jury.

 1           **THE COURT:**  What number?

 2           **MS. BELL:**  This is 6812.

 3           **THE COURT:**  6812?

 4           **MS. BELL:**  Yes.

 5           **THE COURT:**  6812 admitted.

 6           **MS. BELL:**  Thank you.

 7       Your Honor, may I just have a moment?  With the Court's

 8   admonition here, I want to see what else I have in this section

 9   before moving on to the next.

10       May I have a moment?

11           **THE COURT:**  Sure.

12                   (Pause in proceedings.)

13           **MS. BELL:**  May we look at a few examples, Your Honor,

14   through this time period of the care team actually adding

15   appointments?

16       Thank you, Your Honor.

17       Okay.  So I think we looked at 6813 already.  I'm not sure

18   if I offered that.

19           **THE COURT:**  Admitted.

20       (Trial Exhibit 6813 received in evidence.)

21           **MS. BELL:**  Thank you, Your Honor.

22       6827.

23           **THE COURTROOM DEPUTY:**  What's being shown right now?

24   Is it 6813?

25           **MS. BELL:**  Yes, this is 6813.

SHAPARD - CROSS / BELL

```
 1          If we could go to 6827.

 2              THE COURT:  Admitted.

 3          (Trial Exhibit 6827 received in evidence.)

 4              MS. BELL:  Thank you, Your Honor.

 5   BY MS. BELL:

 6   Q.   This is another example where you are saying that there's

 7   a transfer patient that you have not seen.  He needs to be seen

 8   for a follow-up before medication is adjusted.

 9          Do you see that?

10   A.   Yes, I do.

11   Q.   All right.

12              MS. BELL:  And if we could go to 6845.  2022 example.

13   And you say --

14              THE COURTROOM DEPUTY:  Do you want it admitted?

15              MS. BELL:  Yes.  If I could offer that, please, Your

16   Honor.

17              THE COURT:  68?  Pardon me.  68 what?

18              MS. BELL:  This is 6845.

19              THE COURT:  6845 admitted.

20          (Trial Exhibit 6845 received in evidence.)

21   BY MS. BELL:

22   Q.   And you say (as read):

23              "This patient was already advised she requires a

24          follow-up visit to review her treatment plan, as she

25          was a no-show times two.  A follow-up is required.
```

 1        Please advise patient she needs to be seen as

 2        required to review the treatment plan."

 3        Do you see that?

 4   **A.**    Yes, I do.

 5            **MS. BELL:**  6858.  Last two examples, Your Honor.

 6        You see here once again --

 7            **THE COURT:**  Admitted.

 8        (Trial Exhibit 6858 received in evidence.)

 9            **MS. BELL:**  Admitted.  I will offer that.  Thank you,

10   Your Honor.

11   **BY MS. BELL:**

12   **Q.**    And you see here, you say (as read):

13            "I believe she has a follow-up scheduled.  I

14        will need to assess her symptoms to determine the

15        best plan.

16        Do you see that?

17   **A.**    I do see that.

18            **MS. BELL:**  6859.  Last one.

19            **THE COURT:**  Admitted.

20        (Trial Exhibit 6859 received in evidence.)

21            **MS. BELL:**  Thank you, Your Honor.

22   **BY MS. BELL:**

23   **Q.**    If you can see, Ms. Mercado is saying (as read):

24            "Can you schedule two follow-ups for this

25        patient, so total 30 minutes, so Elizabeth Shapard

1        can do an initial evaluation?"

2        Do you see that?

3   **A.**    Yes, I do.  And it's not like I didn't ask patients to be

4   scheduled.  I did.  I just couldn't get all of them scheduled

5   because I had so many assigned to me.

6        But I was trying to do the right thing.  The system that

7   Done created didn't allow me to do that.

8   **Q.**    You didn't tell Ms. Mercado (as read):

9            "Well, that's great, but I have so many more

10       that I haven't made time for."

11       Right?

12  **A.**    No, I didn't tell her that.

13  **Q.**    Okay.  Now, going back to 6816, which is already admitted,

14  this was the policy change we discussed which implemented the

15  six-month required follow-up policy; right?

16  **A.**    Correct.

17  **Q.**    And in addition, the executive leadership in July of 2022

18  also imposed limits on panel size; isn't that right?

19  **A.**    I'm not sure.  They didn't limit my panel size until well

20  after Ruthia was arrested.

21  **Q.**    We will get to that in one moment, but let's review this

22  first?

23           **MS. BELL:**  If we could get -- scroll to the "We have

24  come to a general consensus" of the document, please.

25  \\\

BY MS. BELL:

Q.   Okay.  Do you see there (as read):

        "We have come to a general consensus that in the
     event a provider is not able to respond to their
     existing established patients' consultation messages
     or refill requests in a reasonable time frame, that
     provider may have reached the limit as which they can
     continue to accept new patients and would need to
     transition to maintaining their current patient panel
     in order to be able to provide high-quality patient
     care."

     Do you see that?

A.   Yes.  Well, what limit did they establish?  What was the
specific number?

Q.   So let's proceed to the next paragraph (as read):

        "Furthermore, to ensure we maintain high-quality
     ongoing care for our established patients, starting
     Monday July 25, 2022, we will start tracking these
     numbers much more closely, and any refill requests or
     consultation messages that remain in queues that are
     older than 48 hours could be cause for removal of
     initial consultations from a provider's schedule.

        "We may also evaluate if those patients waiting
     should be transferred to another provider and
     scheduled for an initial consultation to restart

1          their care, removing them from your panel.

2               "All providers should be deploying their best

3          efforts in order to respond to patients in a timely

4          manner, and if a provider is struggling to care for

5          their existing patients, it does not make sense for

6          them to continue taking on new patients."

7          Do you see that?

8     A.   Yes, I do.

9     Q.   And shortly after receiving this e-mail, you actually

10    decided that you would not be taking new patients for a --

11    A.   Yes, that was the point.  I had 2,900 patients assigned to

12    me, and yes, I did say I don't want to see any further new

13    evaluations.

14    Q.   You decided that you would open your schedule for

15    follow-ups for the remainder of the year; right?

16    A.   Yes, that's correct.

17    Q.   And you actually wrote to your support team on

18    August 31st, 2022, and you said (as read):

19               "I just want to be sure you are aware I have

20          entered my schedule through the end of December, and

21          all appointments have been set for follow-up, but

22          please be sure transfer patients not seen in some

23          time are still given the 25-minute follow-up slots,

24          and I cannot accept any more new patients, as I need

25          to be available for follow-ups to be seen to continue

1          with treatment."

2          Right?

3    A.    Yes, I did that.  I was trying to do the right thing.

4    Q.    So, you intentionally reduced your panel size and got paid

5    less; right?

6    A.    I didn't reduce my panel size.  I stopped accepting new

7    patients, so -- but at that point, my panel size was 2,900,

8    which was generating somewhere 30- to $40,000 a month.

9    Q.    And the impact of this decision that you took was that

10   your monthly pay went from, actually, about nearly $46,000 in

11   June of 2022, to a reduction of -- or went down to about

12   $28,000 per month.

13         Do you remember that, in January of 2023?

14   A.    It went to 28?

15         MS. BELL:  Yeah.  Let's go ahead and I think

16   Government Exhibit 1315, I believe, is in evidence already.

17         And so we could just go to that to see those metrics.

18   BY MS. BELL:

19   Q.    So do you see the June 2022 --

20   A.    Yes, I do.

21   Q.    -- figure and how it went down from June to January;

22   right?

23   A.    I do.  Again, I couldn't continue to work like that.  I

24   did reduce that, but that's still a significant amount of

25   money.

1  **Q.**    You made that decision; right?

2  **A.**    I did, yes.

3  **Q.**    And you effectively recognized that you may have bit off

4  more than you could chew; right?

5  **A.**    Yes.

6  **Q.**    And you could have taken further measures?

7  **A.**    Yeah, I should have left the company, but I chose to

8  remain with them because this is still well above market pay

9  and I wanted to continue to keep my position.

10  **Q.**    Let's move on to a new topic.

11        So you testified that you didn't have enough time to do

12  things like check chart notes or review the CURES report;

13  right?

14  **A.**    Correct.

15  **Q.**    But, again, that is not what you were saying back at the

16  time; right?

17  **A.**    I was trying to check them.  And I was also informed the

18  care team was checking them for me.  And there were times the

19  care team would point out to me, "We found on this CURES

20  report, this happened."  And I was like, "Oh, no I missed

21  that."

22        So that told me when they told me later on that I had

23  missed checking that, so I was checking as many as I could, I

24  just wasn't checking all of them, which is what I should have

25  been doing.

1   Q.   And sometimes you also raised red flags to the care team

2   when you thought a patient might be drug-seeking; right?

3   A.   Yes, of course I did.

4   Q.   And if you thought a patient needed extra time that was

5   something else you'd alert the care team of; right?

6   A.   I did.  And for that to happen, the patient had to agree

7   to pay extra for that extra time.

8   Q.   And the care team would accommodate your request and give

9   you extra time?

10  A.   If the patient agreed to pay extra for the visit on top of

11  their $79 monthly fee.

12  Q.   Now, you discharged patients.  You testified to that on

13  direct; right?

14  A.   Well, I put them to be discharged.  I didn't discharge

15  them myself, as no provider was allowed to make that decision.

16  It had to go to management to review before the patient was

17  actually discharged.  I could just say:  I think this patient

18  needs to be discharged.

19  Q.   And you actually made sure to let the care team know when

20  you noticed red flags that you thought would warrant a

21  discharge?

22  A.   I tried to do that.  But, again, if I wasn't evaluating a

23  patient, then I wouldn't know if there were any red flags.

24  Q.   In one instance do you remember an autistic patient,

25  Jordan Burns?

1    A.    I believe so.

2            MS. BELL:  Maybe we could go to --

3            THE WITNESS:  Do you have --

4            MS. BELL:  -- 6828 at page 3.

5            THE COURT:  6828 admitted.

6        (Trial Exhibit 6828 received in evidence.)

7            MS. BELL:  Thank you, Your Honor.

8    BY MS. BELL:

9    Q.    And do you see you say, (as read):

10            "Please discharge Jordan Burns.  Refer to the

11        note from Saturday.  Patient admitted to misusing his

12        stimulant medication, seeing another provider outside

13        Done to obtain other medications for depression and

14        anxiety, as well as consulting with anyone, despite

15        being seen every two to three weeks."

16        Do you see that?

17    A.    Yes, this patient was paying extra to be seen for those

18    Saturday appointments.  The patient was paying for that out of

19    his own pocket.

20    Q.    And nonetheless, when you identified behavior that seemed

21    to you to be drug-seeking or inappropriate; right?

22    A.    Yes.

23    Q.    You recommended that he be discharged; right?

24    A.    I did.

25    Q.    And said (as read):

1              "All stimulants were discontinued due to patient

2         admitting to misusing them."

3    **A.**    Yes, I did say that.

4    **Q.**    Okay.  You did that?

5    **A.**    I did that.  But this is the exception to the rule.  This

6    was a patient I was seeing because he was paying extra for

7    longer visits.  He admitted that to me.  I asked that he be

8    discharged because this was not safe.

9         But the patients that were transferred to me that I said

10   were stable there was no way I could determine that if I didn't

11   evaluate them.  If this patient had been transferred to me, I

12   wouldn't have known that because I wouldn't have seen his

13   chart.  So this was just one out of, again, 2,500 patients.

14   **Q.**    Now, when you discharged him you actually went above and

15   beyond because you tried to find a placement for him at Idaho

16   Behavioral Health; right?

17   **A.**    I did.  He had actually moved out of the state of

18   California due to family issues.  And because I had spent all

19   this extra time with him, yes, I was trying to do my best

20   because I do that.  I care about my patients deeply.  I'm a

21   very passionate provider.  The problem is, I wasn't seeing all

22   the patient, and I was providing care that wasn't safe to

23   numerous people.

24   **Q.**    And so you passed on that referral to him so that he could

25   get care somewhere else; right?

1   **A.**    Yes.  I asked the care team to do it.

2   **Q.**    Right.

3       And there were other examples of discharged patients as

4   you mentioned?

5           **MS. BELL:**  And, Your Honor, we'd just offer these.  We

6   don't need to take the time to go through them, but we would

7   like to offer them in as additional examples of discharged

8   patients.

9           **THE COURT:**  Okay.

10          **MS. BELL:**  And that would be -- I'll just go through

11  them slowly.  6829 at page 4, one example.  Perhaps we need to

12  just --

13  **BY MS. BELL:**

14  **Q.**    Do you see Patrice Crowell?

15          **THE COURT:**  Why don't you just give the numbers and

16  I'll let them in.

17          **MS. BELL:**  That would be perfect.

18      6829 at page 4; 6832, 6833, 6834, and then 6835, 6836,

19  6839, 6841, 6842, and 6843 we would offer those, Your Honor, as

20  examples of discharged patients by Ms. Shapard.

21          **THE COURT:**  Admitted.

22      (Trial Exhibits 6829 at page 4, 6832, 6833, 6834, 6835,

23  6836, 6839, 6841, 6842, and 6843 received in evidence.)

24          **MS. BELL:**  Thank you, Your Honor.

25  \\\

 1   BY MS. BELL:

 2   Q.   Moving on to a new topic, note templates.

 3        So you testified that you did not have time to accurately

 4   chart your notes -- right? -- given the size of your patient

 5   panel?

 6   A.   Correct.

 7   Q.   Okay.  And you also said that your charting was outside

 8   the standard of care; right?

 9   A.   It was.

10   Q.   But at the time, you told Ruthia the opposite; right?

11   A.   What did I tell Ruthia?

12   Q.   You told her the opposite, you told her that your practice

13   actually was standard of care; right?

14   A.   Well, it wasn't.  That was not correct information.

15           MS. BELL:  Your Honor, could we go to 6860 at 3?

16           THE COURT:  6860.

17           MS. BELL:  If I may offer that, there's some --

18           THE COURT:  Admitted.

19        (Trial Exhibit 6860 received in evidence.)

20           MS. BELL:  Thank you.

21   BY MS. BELL:

22   Q.   So let's start -- so there came a time, in 2023, when Done

23   wanted providers to include additional information on their

24   patient charts; do you recall that?

25   A.   Yes, because they were thinking about accepting insurance

1    so they wanted the insurance codes and times and things on

2    there.

3    **Q.**    Right and -- I'm sorry.  Go ahead.

4    **A.**    Yes, they wanted the insurance codes placed on there so

5    they could eventually bill insurance.  But that ended up -- it

6    didn't work out, and it never happened.

7    **Q.**    And you were opposed to that measure; right?

8    **A.**    Right, because I don't -- already don't have enough time

9    to see my patients.  If I'm asked to do extra things, that's

10   cutting into the amount of patients that I'm even able to write

11   refills for.  That's going to, again, lower my pay, which has

12   already been lowered because I'm not taking new patients.

13   **Q.**    And can you read to us the highlighted part of what you

14   told Ruthia?

15        **MS. BELL:**  Did we actually show the top of the e-mail,

16   the communication, if we could at the top?

17        If you could just scroll all the way up.

18   **BY MS. BELL:**

19   **Q.**    Okay.  So do you see Ruthia's copied on this e-mail?

20   **A.**    Yes.

21   **Q.**    At the top, okay.  So now if we could go back to where we

22   were.  And if you could read to us what you say there.

23   **A.**    (as read):

24            "I have been doing this as advised but this is

25        taking excessive and unnecessary time I have preset

1           templates."

2           Do you want me to skip the middle part?

3    **Q.**   I'm sorry.  Go ahead.

4    **A.**   (as read):

5               "I use from the Done template.  I have altered

6           with additional information and found them to be

7           extremely helpful, to efficiently utilize time so I

8           can be face-to-face most of the patient visit and

9           have time to complete refills and patient messages

10          which have, again, increased due to ongoing

11          medication shortages.  I'm not sure who to reach out

12          to, but I wanted to report I took time off my

13          December schedule, ending at 4 p.m. instead of 5:00,

14          in order to accommodate the extra time needed to

15          complete the charting."

16               **MS. GREEN:**  Your Honor, sorry.  Could I object to

17    relevance for this document dated November 2023?

18               **THE COURT:**  Go ahead.

19    **BY MS. BELL:**

20    **Q.**   And so at the time, back in November 2023, what you said

21    was that you have preset templates that you used from the Done

22    templates, and you have altered with additional detail which

23    you find them extremely helpful to efficiently utilize your

24    time?

25    **A.**   Exactly.  Those were the ones I made that I was copying

1    and pasting onto the patient's chart and wasn't providing

2    detailed information; I was just putting the same note on

3    there.

4        Yes, it was a thorough note for as far as for a patient,

5    but it wasn't an individualized note, which is what the

6    standard of care would be.

7    **Q.**  But that is not what you told Ruthia then, is it?

8    **A.**  I -- actually that's exactly what I just told her.  I'm

9    trying to efficiently use my time, spend my time with the

10   patient, so the patient feels seen and heard.  And then I just

11   leave the charting until the end of the day.

12       So, yes, I made this template that was additional detail,

13   but I put it on -- over, you know, 1,900 patients and it was

14   the same.  So I wasn't providing the individualized

15   information.  I was just putting the same one on there at the

16   end of the day, after I saw the patient face-to-face.  That's

17   what I said before and that's what this confirms.

18   **Q.**  And so, you go on to say insurance companies -- if we

19   could go to page 1 (as read):

20            "Insurance companies should not be able to

21        dictate requirements that don't match the standard of

22        care.  And because mental health is not reimbursed to

23        the same standard as primary care, despite the

24        passage of a parity law a few years ago, many

25        patients will have to pay a higher co-pay than our

1          monthly rate of $79, and our reimbursement will be

2          less despite patients paying more."

3    A.   That's correct.

4    Q.   Right?

5    A.   Yes.

6    Q.   You said (as read):

7               "I'm trying to utilize my time to focus on

8          patient care and not ridiculous charting

9          requirements.  I hope my experience and advice is

10         helpful."

11         Do you see that?

12   A.   Yeah, I did write that.

13   Q.   And templates, in fact, were recommended by clinical

14   leadership at Done; right?

15   A.   Yes.

16   Q.   So Sarah Barker -- who was Sarah Barker?

17   A.   She was the lead NP very briefly, I believe around

18   sometime 2022.

19   Q.   And she recommended using note templates; right?

20   A.   I believe that's correct.

21   Q.   And what you said at the time was that you used your

22   individualized note template with information you learned

23   during a patient visit; right?

24   A.   I did.  But I, obviously, when you look at the records, I

25   was not charting that consistently.  Yeah, there were some that

1    were done correctly.  But not all of them.  There were 1,900

2    patients that had the copied and pasted note that was exactly

3    the same.

4    **Q.**  So back at the time what you said was that you copy and

5    paste your notes from a template and then fill in the

6    information on the note; right?

7    **A.**  Yes, I did say that.

8         **MS. BELL:**  Your Honor, if we could offer 6869 at 3,

9    and we'll be moving on from this topic.

10        **THE COURT:**  6869, admitted.

11        (Trial Exhibit 6869 received in evidence.)

12   **BY MS. BELL:**

13   **Q.**  And here is the full text of what you said with respect to

14   how you used the information you learned during a patient visit

15   in connection with the note template; right?

16   **A.**  Yes, and that was one patient.  That was also back in

17   2020, when I was able to do individualized notes because I had

18   a very small amount of patients assigned.  At the beginning, I

19   was doing individualized notes.  But as my template -- my

20   patients increased, I made that template.  I copied and pasted

21   it, and I did it on thousands of charts, in order to spend my

22   time with the patient because my time was so limited.

23        I was working 70 to 80 hours a week for months on end.  I

24   didn't have extra time.  But during this time, I did because

25   that's when I first started there.  That's a different time

SHAPARD - CROSS / BELL

1  than 2022.

2  **Q.**   You didn't have extra time because you decided to make

3  money; right?

4  **A.**   I did decide to make money.  But also there's only so many

5  hours in the day.  I mean, again, I had to quit taking new

6  patients and I did make less money.

7  **Q.**   You did?

8  **A.**   Yes.

9  **Q.**   Let's move on to representations to pharmacies.

10      So you testified about CVS?

11  **A.**   I did.

12  **Q.**   And you said today that you were not honest in your

13  interview with CVS.

14      Do you recall that?

15  **A.**   I recall.

16  **Q.**   And, in fact, you said you weren't honest because your

17  practices -- now you say your practices were not the standard

18  of care; right?

19  **A.**   That's correct.

20  **Q.**   But that is not what you said at the time about your CVS

21  interview, is it?

22  **A.**   No, it's not what I said.  I was trying to continue and

23  with the -- Done and with their system, and I didn't want to

24  lose CVS.  That was thousands -- I think we lost, I think, 19-

25  or 20,000 patients that were affected when CVS stopped

1  accepting our patients.  That's a massive amount of patients.

2  I did not want to lose that income, so I told CVS what they

3  wanted to hear, unfortunately.

4  **Q.**  You defended your prescribing practice --

5  **A.**  Yes, I did.

6  **Q.**  Vigorously.

7  **A.**  Yes, I did because I was trying to protect my income.  And

8  I was trying to justify in my mind what I was doing.

9  **Q.**  You defended your prescribing practices vigorously,

10  internally to the Done leadership not just to CVS?

11  **A.**  Yes, I did.

12          **MS. BELL:**  Your Honor could we offer 6861 at 9?

13          **THE COURT:**  6861?

14          **MS. BELL:**  Yes, Your Honor.

15          **THE COURT:**  Admitted.

16      (Trial Exhibit 6861 received in evidence.)

17  **BY MS. BELL:**

18  **Q.**  All right.  You mentioned in your testimony that you spoke

19  with Done leadership; right?

20  **A.**  I did.

21  **Q.**  And that was Riley Levy; right?

22  **A.**  Correct.

23  **Q.**  But you were alone in your interview, to be clear; right?

24  **A.**  I was alone in my interview, yes.

25  **Q.**  And then can you tell us -- can you read to us what you

1    told Riley Levy about how you defended your prescribing

2    practices?

3    **A.**    I just told him I described I prescribed what is standard

4    guidelines and what the patient can afford --

5            (Reporter interruption for clarity of the record.)

6            **THE WITNESS:**  I just told him I prescribed what is

7    standard guidelines, and what the patient can afford based on

8    insurance/formularies and that IR -- which means instant

9    release -- Adderall is efficient and cost effective so tends to

10   be prescribed more often.

11   **BY MS. BELL:**

12   **Q.**    Okay.  Can you continue, please?

13   **A.**    Then I said (as read):

14           "I have called/referred in the past some -- to

15           some uneducated pharmacist to follow up with the good

16           source that has data on how adults are affected by

17           ADHD, how stimulants are neuro-protective, and how a

18           patient's quality of life is drastically reduced when

19           not treated appropriately.  But they get mad when I

20           tell them to follow up with Harvard University,

21           Massachusetts General Hospital for accurate info,

22           child and adolescent psychiatry department."

23   **Q.**    Then at the end you say --

24   **A.**    (as read):

25           "Adderall has been around for over 100 years.

1          Should not be so much confusion about how it works

2          with anyone in healthcare."

3          Yes, I did say that.  And, yes, that's all correct.  The

4     issue is it's still a Schedule II controlled medication.  That

5     is what the law says.

6          A person with ADHD has a different experience with

7     Adderall than a person that doesn't have it.  When you have

8     ADHD and you take it, it has a calming effect.  You're able to

9     sit still.  Your mind is quiet.  The person that doesn't have

10    it, that say, wasn't evaluated appropriately that's given

11    Adderall, it can be a dangerous medication for that patient.

12    **Q.**  What you said internally at Done at the time was that you

13    didn't think was anything wrong with your prescribing

14    practices; right?

15    **A.**  That's what I said.  But there are certainly was something

16    wrong.

17    **Q.**  Let's look at 6862.

18              **MS. BELL:**  If I could offer that, please, Your Honor.

19              **MS. GREEN:**  Objection.  Hearsay.  And not impeaching.

20    And Defendant He isn't on this document.

21              **THE COURT:**  I'll allow it.

22              **MS. BELL:**  Thank you, Your Honor.

23              **THE COURTROOM DEPUTY:**  Admitted?

24        (Trial Exhibit 6862 received in evidence.)

25              **MS. BELL:**  If we can publish this for the jury.  Thank

 1  you.

 2  **BY MS. BELL:**

 3  **Q.**   So you also tell Mr. Levy (as read):

 4       "I'm barely looking at this but the FDA-approved

 5       range for Adderall is 60 milligrams, and I have very

 6       few patients on a dose higher than that.  Where did

 7       the 40 milligrams come from?  More bizarre made up

 8       rules affecting patients' treatment.  By the way, I

 9       always start new patients with either Adderall XR at

10       15 to 20 milligrams or Vyvanse if covered.  I only

11       prescribe IR when patients are already on it from

12       other Done providers, or I can confirm with the CURES

13       report from outside history."

14       I'll skip a little bit.  You say (as read):

15       "I'm just frustrated for all our patients that

16       are stable and doing well on treatment until CVS

17       started nonsense and misinformation."

18       Do you see that?

19  **A.**   Yes, I did say.  That but CVS was just -- the reason that

20  CVS sent that letter is they said I was an outlier.  I was one

21  of the highest prescribers of Adderall in the nation and that

22  was very concerning to them.  CVS was doing their job at that

23  point.

24       As far as CVS goes, I don't care for CVS.  But I --

25  actually surprised me that they did that.  Because, yes,

 1    they've been in trouble before.  But they were the ones

 2    actually saying:  Hey, these numbers are off.  How are they

 3    evaluating all these patients and prescribing this?

 4         And so I was very upset with CVS, but what they were doing

 5    was correct.

 6    Q.   What you said at the time was --

 7    A.   That's what I said at the time because I was very angry.

 8    Again, this is thousands of patients that -- that are going to

 9    be lost.  This is revenue.  You know, this is, again, me losing

10    money.  So I was very upset.

11    Q.   You were so upset that you thought patients should have

12    sued them for the way they were treating telehealth providers

13    like yourself; right?

14    A.   Where did I say that?

15              MS. BELL:  Can we go to 6861 at 3?

16              MS. GREEN:  Same objection, Your Honor, and 403.

17              THE COURT:  I'll allow it.

18              MS. BELL:  This is the last --

19              THE COURT:  I said I'll allow it.

20              MS. BELL:  Thank you, Your Honor.

21    BY MS. BELL:

22    Q.   So could you tell us what you say to Mr. Levy on the topic

23    of lawsuits?

24    A.    (as read):

25              "CVS has caused me trouble for years since I

```
 1          moved to California in 2011.  Walgreens has always
 2          been great overall.  Rite Aid blocked us at Planned
 3          Parenthood in Pasadena in 2014 from sending them
 4          Tylenol with codeine prescription for 12 pills for
 5          three days for recovering abortion patients in pain,
 6          after we sent them a total of five prescriptions
 7          under our medical director's DEA license.  Ralphs,
 8          Vons, et cetera, has been good in the past, but if I
 9          have to pick one, it's hands down Walgreens.  I would
10          love for them to take over CVS as Number 1 by
11          offering friendly and helpful customer service."
12          This was me venting, being upset as far as pharmacies go.
13   But that doesn't excuse what I did.
14   Q.   And could you read what you say down below at 6822?
15   A.   (as read):
16              "I'm glad to help them.  CVS is up to something
17          shady and illegal."
18   Q.   And then can we go to the last portion of that?
19   A.   (as read):
20              "We're increasing to mental health care which is
21          a huge problem in this country.  For no reason they
22          blocked nearly 20,000 patients stable on medicine."
23          Well, I had no way to know if they were stable on
24   medicine.  I made a statement that wasn't correct.
25          And they did do it for a reason.  They did it for a
```

1  reason, as far as that's part of their internal monitoring is

2  the number of controlled substances being prescribed.  So, of

3  course, at the time I was upset.  I was defending myself.  I

4  was -- I was reaching out and venting to Riley, but that

5  doesn't excuse what I did.

6  Q.   At the time, what you said was "We are increasing" --

7  A.   I did say that at that time.

8  Q.   -- "access to mental healthcare, which is a huge problem

9  in the country.  For no reason" -- "for no reason, they blocked

10 nearly 20,000 patients stable on medication."

11      That's what you --

12 A.   That's what I said.  But they certainly had a reason to do

13 it.  But, yes, that is what I'm -- I'm not arguing that I

14 didn't say that.

15 Q.   Let's move on to the topic of prior authorization letters.

16 You testified about that on direct; right?

17 A.   Yes, I did.

18 Q.   You knew that the care team was the team responsible for

19 preparing the prior authorizations submissions; right?

20 A.   Correct.

21 Q.   And you know that insurance companies generally require

22 prior authorization forms for drugs when there is a cheaper

23 alternative; right?

24 A.   Correct.

25 Q.   And so you testified that the care team filled out prior

1   authorizations but did not always do so accurately; right?

2   **A.**   Correct.

3   **Q.**   And you communicated with Ms. Mercado about this; right?

4   **A.**   I believe so, yes.

5   **Q.**   And you specifically understood that there were high PAs

6   coming in for the brand name medication.

7        Do you recall that?

8   **A.**   Yes, sometimes prior authorizations would just in because

9   it was a stimulant and the patient was over 18 or 20.

10  **Q.**   But the amount -- you're -- in your view, at the time, the

11  amount of prior authorizations coming in was high.  You said

12  (as read):

13            "I prescribe these same medications all the time

14        and have never gotten this many PAs for inexpensive,

15        generic medication."

16       Do you recall that?

17  **A.**   I did.  But I was getting so many because of the number of

18  patients that I had.

19  **Q.**   And at the time, you didn't see anything wrong with the

20  care team signing your name; right?

21  **A.**   I told them, yes, that they could sign my name, again,

22  because I didn't have time to sit there and look at these prior

23  authorizations.

24  **Q.**   In fact, you thought that a requirement for a real

25  signature on a prior authorization form was ridiculous; right?

1    **A.**    I don't recall saying that.  I just recall them saying

2    we -- we can electronically sign them, and I agreed.

3         But I should have been reviewing them.  That's what would

4    be standard practice.  I did that in order to save time.  And

5    that was, again, part of the Done model is we have care team

6    members doing things medical providers should be doing.

7    **Q.**    You said at the time (as read):

8              "I can't believe any insurance company would

9         require a real signature."

10        Remember that?

11   **A.**    Well, that's because things are submitted electronically,

12   and I would -- I was putting electronic signatures on there.

13   **Q.**    The care team prepared these, but they also sent letters

14   to you to review and sign; right?

15   **A.**    They did.

16   **Q.**    And in particular you testified about one example.

17        **MS. BELL:**  If we can pull this up.

18        May I have a moment, Your Honor?

19        **THE COURT:**  Of course.

20        **MS. BELL:**  Thank you.

21                  (Pause in proceedings.)

22   **BY MS. BELL:**

23   **Q.**    All right.  You never communicated directly with Ruthia

24   regarding prior authorizations; right?

25   **A.**    I don't recall.  I don't believe so.

 1  Q.    Now, you testified about -- we'll move on to a new topic.

 2  The name change.

 3  A.    Correct.

 4  Q.    And you -- as we've seen, there was this issue with

 5  Walgreens and CVS blocking prescriptions; right?

 6  A.    Correct.

 7  Q.    You started using this Honeybee pharmacy; do you recall

 8  that?

 9  A.    Yes.

10  Q.    And Honeybee is a verified pharmacy; right?

11  A.    Yes, they were.

12  Q.    By the National Association of Boards of Pharmacy?

13  A.    Correct.

14  Q.    Okay.  And you started using Honeybee because, again, you

15  were upset that these large pharmacies were acting

16  inappropriately in denying your prescriptions; right?

17  A.    Well, Mr. Levy is the one that reached out, and Honeybee

18  agreed to fill prescriptions for our patients.

19  Q.    Right.  And you said when you learned about that (as

20  read):

21        "That is just wonderful news.  I'm so sick of

22        hearing new made up rules on a daily basis, as are

23        the patients."

24        Do you recall that?

25  A.    Yes, I did say that because that's going to save me a lot

1   of time now because we've got a pharmacy that's agreeable to

2   fill the prescriptions.

3   **Q.**   Now, you testified that eventually Done changed its name

4   to this Mindful Mental Wellness?

5   **A.**   Correct.

6   **Q.**   You said that was in June of 2024; right?

7          **MS. GREEN:**   Objection.   Misstates testimony.   I don't

8   think she said that.

9          **THE COURT:**   I don't know.

10  BY MS. BELL:

11  **Q.**   When was that change, according to you?

12  **A.**   I don't know exactly when the change was.   I just saw it

13  when I was -- I just happened to be reviewing a prescription,

14  and I just noticed at the top of that prescription, above my

15  name was a different company name and I didn't know where it

16  came from because I was not aware that the name had changed.

17         **MS. BELL:**   Can we go to Exhibit 2673?   I believe

18  that's in evidence.

19         Yes.

20  BY MS. BELL:

21  **Q.**   Okay.   I believe you were asked about this on direct.

22         Do you recall that?

23  **A.**   Yes.

24  **Q.**   In connection with Mr. Chieppa?

25  **A.**   Correct.

 1   **Q.**   And do you see a name on this prescription?

 2          **THE COURT:**  What do you mean "name?"  There are a lot

 3   of names.

 4   **BY MS. BELL:**

 5   **Q.**   I'm sorry.  Do you see Done's name on this prescription?

 6   **A.**   The -- I had access to RXNT, and in RXNT, where the

 7   prescriber's name was, it said Done Health PC, and then it

 8   switched to Mindful.  I can't see this format.  This is the one

 9   that said it was a Walgreens protected document, so I can't see

10   that.  What I can see is the ones I was sending and what I

11   could see on the prescription as I sent it.

12          **MS. BELL:**  And, Your Honor, if I may have a moment to

13   confer.  I'm trying to move very efficiently.

14          **THE COURT:**  Yeah, go ahead.

15          **MS. BELL:**  Thank you.

16                  (Pause in proceedings.)

17          **MS. BELL:**  Okay.  So we're going to move on to a

18   Government -- another Government Exhibit which is 296.  If we

19   could pull that up for a moment.

20      Okay.  And if we could blow that up a bit.  Okay.

21   **BY MS. BELL:**

22   **Q.**   Do you recall testifying about this on direct?

23   **A.**   Yes, I do.

24   **Q.**   Okay.  So first of all, you understand that bridge

25   prescriptions are medically acceptable to hold a patient over

 1  if the provider, for example, is covering for another provider

 2  who's on vacation; right?

 3  **A.**   Yes, that's correct.

 4  **Q.**   And you also understand that out-of-state prescribing is

 5  for continuity of care; right?

 6  **A.**   Yes.

 7  **Q.**   Okay.  So turning back to this document, we see that

 8  Ms. Mercado tells you (as read):

 9          "We have a Texas patient who really needs her

10      medication sent today.  And the pharmacy will close

11      in 30 minutes.  Our pharmacy partner will be able to

12      fill as long as you add collab info, and his or her

13      DEA."

14      Meaning DEA registration number; right?

15  **A.**   Correct.

16          **MS. BELL:**  If we can just zoom out a bit.  Okay there

17  we go.

18  **BY MS. BELL:**

19  **Q.**   And could you say (as read):

20          "Texas won't take out-of-state, even with my

21      collaborating MD, Dr. Jamal.  He's tried to send to

22      Texas in the past, and they won't accept, as we are

23      both only licensed in California.  Probably has to be

24      a Texas provider, although I've sent to almost

25      everywhere else."

1    Do you see that?

2  **A.**   I do see that.

3  **Q.**   So you tell Ms. Mercado.  You flag that this might be a

4  problem for Texas; right?

5  **A.**   I did.

6  **Q.**   But you say, "I have sent to almost everywhere else."

7    Right?

8  **A.**   I did say that.

9    **MS. BELL:**  And if we could go down further.

10  **BY MS. BELL:**

11  **Q.**   And Ms. Mercado says -- I don't know if we're at the right

12  spot -- but she tells you that Done has an endorsement from a

13  pharmacy partner; right?

14  **A.**   Yes.

15  **Q.**   Could we -- well, okay.  You remembered that from the

16  document.  Okay.

17    And so once she tells you that there's an endorsement, you

18  go ahead and proceed; right?

19  **A.**   Yes, I did.

20  **Q.**   Okay.  Let us move on to a new topic.

21    **MS. BELL:**  And, Your Honor, I don't know if -- I don't

22  know where we are with our -- if, Your Honor, wanted to take --

23  no?  Okay.

24  **BY MS. BELL:**

25  **Q.**   So you testified about a handful of patients, out of the

SHAPARD - CROSS / BELL

1   many thousands that were under your care.

2       Do you recall that, on direct?

3   **A.**   A handful, yes.

4   **Q.**   Yes, in other words, Mr. Chieppa, Ms. Trivedi, and

5   Ms. Souza?

6   **A.**   Correct.

7   **Q.**   Okay.  And these were all transfer patients -- right? --

8   to your panel?

9   **A.**   Correct.

10  **Q.**   So other providers had conducted their initial assent;

11  right?

12  **A.**   Yes.

13  **Q.**   And their care prior to getting to you; right?

14  **A.**   Yes.

15  **Q.**   Okay.  As we talked about earlier, you regularly accepted

16  transfer patients from other providers; right?

17  **A.**   Yes, I did.

18  **Q.**   And it was your view, as we saw, in your clinical judgment

19  that unless a transfer patient needed adjustments to their

20  medication, you did not need to see them for a follow-up;

21  right?

22  **A.**   Yes.

23  **Q.**   That's what you said at the time; right?

24  **A.**   Correct.

25  **Q.**   And these all fell into that category, all three of these

 1  patients; right?

 2  **A.**   Well, Mr. Chieppa clearly doesn't fall in that category

 3  because it was documented on his chart that he was

 4  involuntarily hospitalized with bipolar disorder.  But I didn't

 5  review the chart, as I didn't have time, and I didn't see it.

 6  **Q.**   Right.  We'll get to that in a moment, but on the dose

 7  point, none of these patients requested a dose change; right?

 8  **A.**   Correct.

 9  **Q.**   And so you didn't actually change their dose from what

10  they were previously prescribed; right?

11  **A.**   Right.

12  **Q.**   And you, in fact, prescribed the preexisting prescriptions

13  were all below the recommended daily FDA maximum dose; right?

14  **A.**   Yes.

15  **Q.**   Okay.  Which you understood to be 60 milligrams; right?

16  **A.**   Correct.

17  **Q.**   Okay.  And so, at the end of the day, Done actually sent

18  you e-mail notifications informing you of the last time that

19  patients had been seen for an appointment, right, so that

20  you --

21  **A.**   Right.

22  **Q.**   Sorry.  Go ahead.

23  **A.**   Yes, they did.

24  **Q.**   And that was so you could determine, in the exercise of

25  your clinical judgment, when to see them; right?

1  **A.**   Correct.

2         **MS. BELL:**  And so let's see an example of that at

3  Government Exhibit 740.

4      And I think we would offer that.  I don't believe that is

5  in evidence yet.

6         **THE COURT:**  740 admitted.

7  **BY MS. BELL:**

8  **Q.**   Do you see there, Done was telling you that Mr. Chieppa

9  hadn't been seen since his initial appointment?

10  **A.**   Correct.

11  **Q.**   And you could have asked that the care team schedule

12  Mr. Chieppa for a follow-up, like you did for your patients who

13  needed medication adjustments; right?

14  **A.**   Yes, I could have, but I didn't.

15  **Q.**   And you already mentioned the note that you --

16         **MS. BELL:**  We could go to that 1844 at 6 in the chart.

17  Okay.

18  **BY MS. BELL:**

19  **Q.**   So this is the note that was in Mr. Chieppa's chart at the

20  time he was transferred to you; right?

21  **A.**   Correct.

22  **Q.**   And there's a typo there but (as read):

23          "Received call from mother."

24      Do you see that?

25  **A.**   Yes.

1   Q.   (as read):

2            "...today advising that client was placed on a

3        5150, and has symptoms characteristic of bipolar

4        disorder.  Client should not administer meds for

5        ADD/ADHD."

6        Do you see that?

7   A.   I do.

8   Q.   You missed this note?

9   A.   I did.

10  Q.   You just missed it?

11  A.   Correct.

12  Q.   Now, you testified that you wrote two prescriptions for

13  Mr. Chieppa; right?

14  A.   Right.

15  Q.   Both which you say were filled in October of 2021?

16  A.   Correct.

17  Q.   There was one that you wrote on September 26, 2022.

18          MS. BELL:  Maybe we could go to Government

19  Exhibit 2793, which is in evidence already.

20  BY MS. BELL:

21  Q.   Okay.  And so this was a prescription filled by Walgreens

22  on October 13th, 2022.  If we it's kind of cumbersome this

23  Excel, so, if you recall your direct testimony --

24          MS. GREEN:  Ms. Bell, apologies.  I think, that might

25  be the wrong exhibit.

1          **MS. BELL:**  I apologize.  Let me see if we can --

2          **THE COURTROOM DEPUTY:**  What's the exhibit number,

3    because 2793 has not been admitted?

4          **MS. BELL:**  Okay.  My fault, my apologies.

5                    (Pause in proceedings.)

6          **MS. BELL:**  Okay.  2673, please.

7          **THE COURT:**  Is it in?

8          **THE COURTROOM DEPUTY:**  Yes.

9          **MS. BELL:**  Yes, this has been admitted.

10   **BY MS. BELL:**

11   **Q.**   Okay.  So this was the September 26, 2022 prescription;

12   right?

13   **A.**   Correct.

14   **Q.**   That was filled by Walgreens on October 13th, 2022; right?

15   **A.**   Yes.

16   **Q.**   Okay.  And then there was another prescription that you

17   wrote on October 7th of 2022.

18          **MS. BELL:**  If we could go to that.  It's Government

19   Exhibit 2522.

20   **BY MS. BELL:**

21   **Q.**   And this was filled by Honeybee pharmacy on October 11th,

22   2022.  Do you see that?

23   **A.**   Yes, October 10th.

24   **Q.**   Okay.  And so the Honeybee pharmacy, this is the pharmacy

25   you testified about a moment ago; right?

SHAPARD - CROSS / BELL

1   **A.**   Yes; correct.

2   **Q.**   This alternative pharmacy; right?

3   **A.**   Yes.

4   **Q.**   And that pharmacy actually filled the prescription before

5   Walgreens; right?

6   **A.**   Correct.

7   **Q.**   And this is the only time that you wrote two prescriptions

8   for Mr. Chieppa in the same month; right?

9   **A.**   Correct.

10  **Q.**   And you testified that you didn't know that he had filled

11  both prescriptions because you didn't have time to check CURES.

12       Do you recall that?

13  **A.**   Yes; correct.

14  **Q.**   But, in fact -- if we can look at the messages; if we go

15  to Government Exhibit 1848 -- what happened is, after two weeks

16  of not being able to get his medication, Mr. Chieppa messaged

17  you and said that Walgreens could not fill the September 26

18  prescription you had written because of an Adderall shortage;

19  right?

20  **A.**   Yes.  Correct.

21  **Q.**   Okay.  And you can see here he says --

22            **THE COURTROOM DEPUTY:**  1848 is not admitted.

23            **MS. BELL:**  I apologize.

24            **THE COURT:**  What number?

25            **MS. BELL:**  1848, if we can offer that.

1          THE COURT:  Admitted.

2      (Trial Exhibit 1848 received in evidence.)

3  BY MS. BELL:

4  Q.  (as read):

5          "Just curious if I should look into other

6      options with the shortage going on.  I've gone about

7      two weeks without the medication because of it, and

8      it's looking like it might be a while."

9      Do you see that?

10  A.  Yes.

11  Q.  And then you respond that you could switch his

12  prescription to another pharmacy.

13      That's Honeybee; right?

14  A.  Correct.

15          MS. BELL:  And so can we pull up 1848 at cells 1

16  through 53 -- 1-53, 1-54.  Okay.

17  BY MS. BELL:

18  Q.  And you tell him -- can you read that to us, what you say?

19  A.  (as read):

20          "Hello.  We are working with a mail-order

21      pharmacy, Honeybee, that has all doses of generic

22      Adderall in stock.  They don't take insurance but

23      offer discounts.  I can send to them instead.  If you

24      like, please provide me with your e-mail.  Thanks.

25      The cost listed for Adderall 20 milligrams, 60 tabs

1          is $44 a month with Honeybee."

2   **Q.**    Okay.  And then Mr. Chieppa agrees to the change.

3          Do you see that?  He says (as read):

4               "Is it possible to do that until the supply

5          chain issue is sorted so I can go back to using my

6          insurance again afterwards.  If I'm able to switch

7          back later down the road, then, yes, please."

8          Do you see that?

9   **A.**    Yes.

10  **Q.**    Okay.  And so following that exchange with Mr. Chieppa,

11  you wrote a prescription to Honeybee on October 7th, 2022;

12  right?

13  **A.**    Correct.

14  **Q.**    And that's the one you say was filled on October 10th;

15  right?

16  **A.**    Yes.

17  **Q.**    And so at that time, Walgreens still had not filled your

18  initial prescription; right?

19  **A.**    Correct.

20  **Q.**    And the CURES therefore would not have shown that

21  Walgreens had filled a prescription --

22  **A.**    Not at that time.

23  **Q.**    Not in that time.

24  **A.**    Because in November, when he requested another one and I

25  sent it, I would have seen that if I had checked the CURES.

SHAPARD - CROSS / BELL

1    **Q.**    Right.  If you had.

2    **A.**    Correct.

3    **Q.**    But at the time you wrote the October 7th prescription,

4    the Walgreens prescription would not have shown up on CURES?

5    **A.**    No.  And I wouldn't have written two prescriptions that I

6    thought someone was going to fill as well.

7    **Q.**    Okay.

8         Now, moving on to Ms. Trivedi, you testified that she had

9    gone a year and a half -- right? -- with no evaluation?

10   **A.**    Correct.

11   **Q.**    Right?

12        But you, again, did not ask the care team to schedule a

13   follow-up with her like you did in the other examples we

14   reviewed; right?

15   **A.**    I did not.

16   **Q.**    And she was on a 10-milligram dose of Adderall, which is

17   actually lower than the lowest dose you told Mr. Levy you start

18   people on; right?

19   **A.**    Correct, at that time, yes.

20   **Q.**    Okay.  Because the recommended starting dose is actually

21   20 milligrams; right?

22   **A.**    Well, it's actually 10 in the books, but I would start

23   patients at 20 because generally, patients are going to need

24   adjustment and so that had been how I had been doing --

25   prescribing it up to that point.

1    Q.    Okay.  But she came with 10 and you stuck with 10; right?

2    A.    Correct.

3    Q.    And you actually had access to Done's EHR of course;

4    right?

5    A.    Yes.

6    Q.    And you knew that the EHR stored communications; right?

7    A.    Correct.

8    Q.    And Ms. Trivedi had actually communicated that

9    10 milligrams of Adderall was working well for her after Nurse

10    Practitioner Rahimi had increased it from 5 milligrams.

11        Do you remember that?

12    A.    Correct.

13    Q.    Okay.  You do remember that message?

14    A.    Yes, I believe so.

15    Q.    Okay.  So you saw it at the time?

16        MS. BELL:  Why don't we pull it up.  Government

17    Exhibit 1987H-31.  And, I guess, I would offer this.

18        THE COURT:  It's in evidence, isn't it?

19        MS. BELL:  I'm sorry.  Okay.

20    BY MS. BELL:

21    Q.    Do you see this note?

22    A.    Yes, I do.

23    Q.    Okay.  So it's the -- Ms. Trivedi telling Nurse

24    Practitioner Rahimi --

25        MR. SCHACHTER:  I don't think the jurors see it.

1          **THE COURTROOM DEPUTY:**  I don't have it in, Judge.

2          **THE COURT:**  I'm sorry?

3          **THE COURTROOM DEPUTY:**  I don't have it in.

4          **THE COURT:**  Admitted.

5          (Trial Exhibit 1987 received in evidence.)

6  **BY MS. BELL:**

7  **Q.**  (as read):

8               "Hi.  I did as you suggested and for the last

9          five or six days of my last prescription, I doubled

10         the dose to 10 milligrams and it has been extremely

11         effective.  The side effects were the same as they

12         were on the 5 milligrams and have been very

13         manageable so far.  If you can refill for

14         10 milligrams, that would be great.  Thanks."

15         Do you see that?

16  **A.**  Yes, I do see that.

17  **Q.**  5 milligrams is the lowest dose manufactured; right?

18  **A.**  Correct.

19  **Q.**  Okay.  So moving on to Ms. Souza, Ms. Souza is the patient

20  where there was -- actually there was no note in the EHR;

21  right?

22  **A.**  Correct.

23  **Q.**  Maybe we can pull that back up, but it sounds like you

24  remember.  Now -- and you testified that you refilled

25  Ms. Souza's prescription without reviewing her chart note?

 1   **A.**   Correct.

 2   **Q.**   Because if you had looked at it, you would have seen

 3   there's nothing there; right?

 4   **A.**   Correct.

 5   **Q.**   But, of course, it's your job to review the records before

 6   sending a refill; right?

 7   **A.**   Yes.

 8   **Q.**   And it's also your job to review the CURES before every

 9   prescription; right?

10   **A.**   Yes.

11   **Q.**   That was actually Done's policy; right?

12   **A.**   No.  Done's policy was that the care team provided -- the

13   care team was reviewing the CURES reports at that time.

14   **Q.**   But it was up to you, they would provide the report, you

15   were required to review the CURES report; right?

16   **A.**   I should have reviewed the CURES report.  I'm not -- as

17   far as if it was a specific policy, I don't recall.  But I

18   didn't review it.

19         **MS. BELL:**  Let's go to Government Exhibit 1421, if we

20   could offer that, please?

21         **THE COURT:**  1421 admitted.

22         **MS. GREEN:**  Objection foundation.

23         **MS. BELL:**  I can --

24         **THE COURT:**  Okay.  Lay a foundation.

25   \\\

1    BY MS. BELL:

2    **Q.**    Okay.  Do you recognize this as the Done clinicians

3    support page?  If we can go back.

4    **A.**    I'm not -- don't recall reviewing that page.

5    **Q.**    You were actually sent a link to this page to the Done

6    clinician support page.  Do you recall that?

7    **A.**    I don't recall.

8    **Q.**    Let's go to 6907.  Okay.

9            **MS. BELL:**  I'd offer that, Your Honor.

10            **THE COURT:**  Okay.  Admitted.

11        (Trial Exhibit 6907 received in evidence.)

12            **MS. BELL:**  Okay.

13    BY MS. BELL:

14    **Q.**    Do you see that you're being provided a link to CODA Done

15    clinician support?

16    **A.**    Yes.  It just says it's a great new frequently asked

17    questions page that was made specifically for provider

18    workflow, and it can be accessed here.

19    **Q.**    Okay.  And so you were sent the link to access Done

20    clinician support, the support page; right?

21    **A.**    If it was in my e-mail, yes.

22    **Q.**    Okay.

23            **MS. BELL:**  And, Your Honor, may I offer now 1421.

24            **MS. GREEN:**  Objection.  Your Honor, can we establish

25    the date that this -- like match dates, please.

 1          THE COURT:  What's the date of this?

 2          MS. GREEN:  And foundation.

 3          MS. BELL:  So January of -- 6th of 2021 is the link.

 4   And then if we can go back to the Government Exhibit 1421, we

 5   could see if there's a date.  I'm not sure if there's --

 6   there's a date on the exhibit.

 7          MS. GREEN:  Objection as to foundation.  I believe the

 8   witness said she hadn't seen this.

 9          THE COURT:  Well, I think the witness said she didn't

10   see it.

11       It's something called frequently asked -- it's under

12   the -- under the link of frequently asked questions.  This is

13   not under the link of "This is our new policy."  It's under the

14   list of frequently asked questions.

15          MS. BELL:  Your Honor --

16          THE COURT:  I'm sustaining the objection.

17          MS. BELL:  Okay.  Just.

18          THE COURT:  You can get it in some other way.

19          MS. BELL:  Okay.

20          THE COURT:  She didn't see it.

21   BY MS. BELL:

22   Q.   I just want to be clear about your testimony, first of

23   all.  Your testimony is you've never been to the Done clinician

24   support page that we just looked at.

25   A.   I don't believe so.  If I had questions I would reach out

 1   to my care team.  I didn't go to a frequently asked questions

 2   page.

 3   **Q.**   Okay.  And the link that you got, you never visited that

 4   link, as far as you recall?

 5   **A.**   I don't -- I don't recall visiting that link.

 6   **Q.**   Okay.  And your testimony is that you don't recall whether

 7   Done's policy was that the provider was to check the controlled

 8   substance and prescription drug monitoring program database for

 9   your state for patients' prescription history before

10   prescribing controlled substances.

11        You don't remember that?

12   **A.**   I'm sure it became a policy at some point but exactly

13   when, I don't recall.

14   **Q.**   Okay.  So you don't dispute that was the policy?

15   **A.**   Eventually it was the policy.

16   **Q.**   Okay.

17   **A.**   As far as the time, I'm not sure.

18   **Q.**   And you know it is actually important for you to do your

19   job, to check CURES, to make sure patients were not getting

20   multiple prescriptions from multiple doctors; right?

21   **A.**   Correct.

22   **Q.**   Okay.  Okay.  Final topic.

23        You testified about your deal with the prosecutors; right?

24   **A.**   Yes.

25   **Q.**   Okay.  I want to talk about the events that led to that

1    deal.  Okay?

2    **A.**    Okay.

3    **Q.**    You received a letter in October 2024; right?

4    **A.**    I did.

5         **MS. BELL:**  And, Your Honor, I would move to admit that

6    letter.  It's 6857.

7         **THE COURT:**  Admitted.

8       (Trial Exhibit 6857 received in evidence.)

9         **THE COURT:**  6867?

10         **MS. BELL:**  Yes.  Thank you, Your Honor.

11         **THE COURTROOM DEPUTY:**  6857 admitted.

12   **BY MS. BELL:**

13   **Q.**    And this letter says it is to notify you that you are a

14   target of a grand jury investigation involving possible

15   violations of federal criminal law.  And it lists various

16   different statutes there, including at the bottom 841,

17   distribution of controlled substances.

18         Do you see that?

19   **A.**    Yes, I see that.

20   **Q.**    Now, you came to understand that that particular charge

21   exposed you to a possible prison sentence of 20 years; right?

22         **MS. GREEN:**  Objection, Your Honor.  There's been a MIL

23   on this.

24         **MS. BELL:**  There's not --

25         **THE COURT:**  I'm sorry?

1          **MS. GREEN:**  I may have misheard your question.

2   I believe this is a subject of a motion in limine.

3          **THE COURT:**  I'm sorry.  I'm having a hard time

4   understanding the objections.

5          **MS. GREEN:**  I believe Ms. Bell's question was the

6   subject of a motion in limine the topic of that question.

7          **THE COURT:**  Okay.  Fine.

8          **MS. BELL:**  Different question.

9          **THE COURT:**  It's a different question.  Okay.

10  **BY MS. BELL:**

11  **Q.**   So you understood -- you came to understand that that 841,

12  distribution of controlled substances was a charge that could

13  expose you to a possible prison sentence of up to 20 years;

14  right?

15  **A.**   At least 20 years, yes.

16  **Q.**   Right, because, in fact, for every single prescription

17  that you wrote that the Government thought was not appropriate,

18  you could, in theory, have faced a count of 841; right?  You

19  understood that?

20  **A.**   Yes; correct.

21  **Q.**   Okay.  And so that would be like 20, plus 20, plus 20 --

22          **THE COURT:**  No.  Wait a minute.  Wait.  Please.

23      I mean, that's inappropriate.  It's inappropriate.  It's

24  inappropriate because while, technically courts can run

25  sentences consecutively, 20 plus 20 plus 20 plus 20 times a

1  thousand, they can do that; they don't do that.  It's not

2  recommended by the sentencing guidelines.  Congress has enacted

3  no law with respect to this -- to what counsel has suggested

4  could occur, and that's number one.

5      Number two, you can certainly consider what -- and the

6  questions are appropriate and I've allowed them -- what this

7  witness understood her exposure to be why -- what she was told

8  or she thought she was in jeopardy of receiving.

9      However, you cannot consider it at all in terms of a --

10 your determination as to the guilt or innocence of the

11 defendant.  In other words, you can't go back and say:  Well,

12 the crime was committed, but the exposure is so great I don't

13 want -- I'm voting not guilty, or something along that line.

14     Or the opposite.  Well, since it's a very serious offense,

15 I'm going to vote for guilty.

16     You can't do it one way or the other.  You cannot consider

17 sentencing as part of your calculation as part of your

18 decision-making process of the guilt.  However, it's

19 appropriate that counsel asks the question, really:  What did

20 you think your exposure was?

21     And this witness has said:  I thought it could be 20 years

22 or at least 20 years.  So I think that's covered --

23          **MS. BELL:**  Yes, Your Honor it is --

24          **THE COURT:**  -- move on.  Move to a new variation of

25 that.

1              MS. BELL:  Yes, Your Honor.

2    BY MS. BELL:

3    Q.   So we will be moving off this document.  But do you see

4    that there are four different violations of the law listed

5    there.  Do you see that?

6    A.   Yes.

7    Q.   Okay.  One of them is 371, conspiracy to defraud the

8    United States.

9         Do you see that?

10   A.   Yes, I do.

11   Q.   But there are three different other statutes listed there;

12   right?

13   A.   Correct.

14   Q.   Okay.  And so now let's move to your plea agreement at

15   7798.  But first let me ask you, you said on direct that you

16   were terrified when you learned that the DEA was interested in

17   investigating you; right?

18   A.   Yes.

19   Q.   You, of course, don't want to go to prison?

20   A.   No.

21   Q.   You do not want to be separated from your loved ones?

22   A.   Correct.

23   Q.   And you thought about that for many months between

24   receiving this letter on October -- in October of 2024; right?

25   A.   Yes.

1  Q.   And your ultimate decision to enter into the plea

2  agreement that we're going to see now, which was eight months

3  later in June, was when you came to the decision to plead

4  guilty; right?

5  A.   Correct.

6  Q.   June of 2025?

7  A.   Correct.

8  Q.   Okay.  Now, let's look at 6798 at page 1 --

9        **THE COURTROOM DEPUTY:**  Did you want this admitted or

10  just want to --

11        **MS. BELL:**  Yes, if we could, please.

12        **THE COURT:**  6798 admitted.

13     (Trial Exhibit 6798 received in evidence.)

14        **MS. BELL:**  Okay.  So if we could go to page 1,

15  line 15.  I'm sorry that's not the right page.  Maybe it's

16  page 2.  Let me get my copy.

17  **BY MS. BELL:**

18  Q.   Okay.  So do you see there that you -- what you agreed to

19  plead guilty to and you pled guilty to is one of the four

20  crimes listed in the letter; right?

21  A.   Yes.

22  Q.   And that is 371; right?

23  A.   Yes.

24  Q.   Okay.  And we see below that the maximum prison term for

25  371 is five years; do you see that?

 1    **A.**    Yes, I do.

 2    **Q.**    So you understood that one of the major benefits that you

 3    would get in agreeing to plead guilty was that the maximum

 4    possible prison term you faced was capped at five years; right?

 5    **A.**    Correct.

 6    **Q.**    Okay.  Instead of being potentially, as you said, 20 years

 7    or even more; right?

 8    **A.**    Right.

 9    **Q.**    Okay.  And you knew that therefore if everything went well

10    with the deal and there were no problems, you could not be

11    sentenced to more than five years in prison; right?

12    **A.**    What do you mean went well with the deal?

13    **Q.**    Well, yeah -- right.  That was a bad question.

14          As part of this deal, you are required to cooperate with

15    the Government; right?

16    **A.**    Yes.

17    **Q.**    And that includes testifying being here today; right?

18    **A.**    Correct.

19    **Q.**    And you know that the Government, in its sole and

20    exclusive judgment, gets to determine if you've cooperated

21    fully; right?

22    **A.**    The judge determines that.

23    **Q.**    Let's look at the document at page 12 line 1?

24          **THE COURT:**  Well --

25    \\\

BY MS. BELL:

Q.   Do you see that?  (as read):

         "If, in its sole and exclusive judgment the
     Government decides that the defendant has cooperated
     fully and truthfully."
     Do you see that?

A.   I do see that.

Q.   (as read):

         "Provided substantial assistance to law
     enforcement authorities" --
     Yes?

A.   Yes.

Q.   (as read):

         "And otherwise complied fully with this
     agreement --"
     Right?

A.   I see that.

Q.   (as read):

         "It will file with the Court a motion that
     explains the nature and extent of the defendant's
     cooperation and recommends a downward departure."
     Do you see that?

A.   I do see that.

Q.   But you also understood -- we'll get to a motion in a
     minute -- but if the Government decides that you have not

1  cooperated fully and truthfully, and provided substantial

2  assistance -- I'm sorry -- that you have not cooperated fully

3  and truthfully, or otherwise breached your end of the deal,

4  that the deal could go away; right?  You knew that?

5  **A.**    What do you mean "go away"?

6  **Q.**    That they could charge you with those other crimes that we

7  saw in the letter?

8          **THE COURT:**  Oh, I don't think -- that's not -- that's

9  not accurate.  That's totally inaccurate, Counsel.

10         **MS. BELL:**  Shall we go to the --

11         **THE COURT:**  No.  I think I have to explain something

12 to the jury.

13     Ladies and gentlemen of the jury, there are things called

14 sentencing guidelines.  Under the law, the Court is directed by

15 Congress to look at a particular violation of the law and

16 determine what the sentencing guidelines.  They're promulgated

17 by something called the United States Sentencing Commission.

18     They're guidelines; that is, they are exactly what is

19 said.  They are to advise the Court as to a range of sentences

20 that is given in the majority of cases where there are common

21 characteristics among defendants and so forth.  But they're

22 only guidelines.  A court is free to depart downward or depart

23 upward from the sentencing guidelines.

24     And so what this paragraph means and this is why there is

25 this colloquy between counsel and the witness, is when counsel

1  says, "Well the deal can go away," no, it can't go away.  What

2  would happen is that the Government would not make a motion

3  under this 5K1 for a downward departure of the guidelines.

4      The Court can give a downward departure of the guidelines

5  even without a motion.  It doesn't at all restrict the Court's

6  power to provide the appropriate sentence in a case.

7      So that's the way the sentencing guidelines work.  Not

8  that the deal goes away.  Okay.

9      Now, Ms. Bell, I think we spent a lot of time on

10  punishment and --

11          **MS. BELL:**  I'm almost done.

12          **THE COURT:**  You're certainly entitled to explore with

13  her her understanding of the plea agreement and to draw any

14  inference that a jury wants to draw about her testimony and

15  whether it was influenced by one thing or another -- that's

16  perfectly fair -- but not to characterize it in a particular

17  way.

18          **MS. BELL:**  Yes, Your Honor and that was my fault for

19  the lack of clarity.  Let me point to -- I was not intending to

20  do that.  Let me point to the specific text.

21      Paragraph 12 lines 21 to 25.  If we could put that back

22  up, please.  So could we blow up the paragraph 12.

23  **BY MS. BELL:**

24  **Q.**   So that says (as read):

25          "I agree that if I fail to comply with any

 1          promises I have made in this agreement, then the

 2          Government will be released from all of its promises

 3          in this agreement, including those set forth in the

 4          Government's promise section below."

 5               THE COURT:  Could I have the agreement?  Let me see

 6    something a minute.  I need -- we'll take --

 7               MS. BELL:  Do we have an extra copy?

 8               THE COURT:  Do I have it up here?  What number is it?

 9               MS. BELL:  This is 6798.

10               THE COURT:  Do you have a copy of it?  Why don't you

11    just give it to me.

12               MS. GREEN:  Ms. Bell.

13               MS. BELL:  Thank you.

14               THE COURTROOM DEPUTY:  Thank you.

15                         (Pause in proceedings.)

16               THE COURT:  One moment.

17                         (Pause in proceedings.)

18               THE COURT:  Ms. Bell.

19               MS. BELL:  Yes.

20               THE COURT:  The direction of your questioning is, as I

21    understand it, to suggest that if she doesn't give substantial

22    assistance to the Government, she is violating a term of the

23    plea agreement.

24               MS. BELL:  No, Your Honor.  I'm sorry --

25               THE COURT:  She has not committed in the plea

1    agreement to provide substantial assistance.  There's no

2    requirement in that.

3              MS. BELL:  Yes, Your Honor, that's correct.

4              THE COURT:  We'll have to be clear to the jury, in

5    other words, that she is or is not providing substantial

6    assistance is not a requirement of the plea agreement.  The

7    plea agreement doesn't -- if she didn't provide substantial

8    assistance, the Government could not terminate the plea

9    agreement.  They're bound by it and you know that given your

10   extensive experience.

11             MS. BELL:  Yes, Your Honor.

12             THE COURT:  So you shouldn't suggest that.  I would

13   strongly urge you to move on to another --

14             MS. BELL:  Yes, Your Honor.

15             THE COURT:  -- subject and we can discuss it during

16   the recess.  And if it's fair for you to ask further questions

17   about it, I'll certainly permit you.

18             MS. BELL:  Yes, Your Honor.

19             THE COURTROOM DEPUTY:  It's 4:00.

20             THE COURT:  I know it is.  Let's see.  I think counsel

21   is almost finished.

22             MS. BELL:  I'm almost anyone finished, Your Honor.

23             THE COURT:  Okay.  So let's finish.

24             MS. BELL:  We can discuss it or we can leave it.

25   \\\

**BY MS. BELL:**

**Q.**   So in any event, you understood that one of the benefits of this deal was that it capped the maximum potential punishment at five years; right?

**A.**   Yes.

**Q.**   And a second benefit of this deal is that if the Government determines, in its exclusive -- sole and exclusive judgment that you have provided them with substantial assistance, then they can make a motion to the Court to ask for leniency; right?

**A.**   The judge determines my sentence.

**Q.**   Right.

**A.**   What they do is what they do.  I'm not -- I don't know what they're going to do.  The judge determines my sentence. That's what I was told.  That's what I know.

**Q.**   Right.  And they determine whether to make the motion to the Court to ask for leniency; right?

**A.**   I'm not sure.  All I know is the judge takes into account if I was cooperative.  And the reason I'm being cooperative is I'm guilty -- I wouldn't have signed a plea deal if I wasn't guilty.  I did it because what I did was wrong and I'm taking responsibility for what I did and for my part.

        And that the judge determines what happened to me.  As far as you asking me all of these different things, the Government this, the Government that, it doesn't matter.  The judge is

SHAPARD - CROSS / BELL

1 going to take the information into account and determine my

2 dispense.

3 **Q.**    Understood.  Let's go back to paragraph -- page 12

4 line 10.

5      Okay.  You do?

6      **THE COURT:**  Other than questions about the plea

7 agreement, do you have any further questions?

8      **MS. BELL:**  That's it, Your Honor.  We can --

9      **THE COURT:**  Ladies and gentlemen, we're going to

10 discuss this outside the presence because we -- it's a legal --

11 to some extent it involves legal issues.  And I'll see you

12 tomorrow morning.

13      I did tell some of you, but not all of you, that -- I can

14 just run very quickly through the schedule so you know what it

15 is.

16      We are meeting Monday for a half day.  Monday morning.

17 That's the half, by the way; it's the upper half, not the lower

18 half.  We're not meeting the rest of the week.

19      We are resuming trial on Tuesday the 28th -- not on

20 Monday -- and we're going Tuesday, Wednesday, Thursday, and

21 Friday of that week.

22      There may be adjustments in November, I don't know what

23 they are yet, but we'll see.  Okay.

24      Thank you.  Remember the admonition given to you.

25      I need the plea agreement.

 1          And you're excused.

 2               **THE WITNESS:**  I'm excused?

 3               **THE COURT:**  Well, we'll see you tomorrow.

 4                         (Witness excused.)

 5                    (The jury leaves the courtroom.)

 6          (Proceedings were heard out of the presence of the jury.)

 7               **THE COURT:**  Okay.  Ms. Bell, explain to me because you

 8     were about to ask another question on the plea agreement --

 9     which maybe you're entitled to do, but I've got to figure out

10     what you're -- it strikes me that some of your questions may be

11     unintentionally were misleading in terms of the law, so I've

12     commented on that.  But I don't want to keep commenting on your

13     examination.

14          So what is it now that you want to ask the witness about

15     the plea agreement?

16               **MS. BELL:**  We were just about to finish, Your Honor.

17          So it was the two separate points.  One point is that

18     there is a benefit in the 371 charge because it caps the

19     potential exposure.  That benefit can go away if she

20     breaches -- it has nothing to do with substantial assistance,

21     but if she does something that breaches her end of the deal --

22     right? -- then the Government can prosecute her for additional

23     crimes.

24               **THE COURT:**  Of course, if she lied as an example.

25               **MS. BELL:**  Yes.

1          **THE COURT:**  And there may be some other examples too.

2    If she commits other crimes.  There are other examples too.

3          But the problem is what you are tying it into, by virtue

4    of the order in which questions were asked and propounded was a

5    suggestion that a benefit can go away if she doesn't render

6    substantial assistance in the Government's mind.

7          One benefit can go away, and it was covered and that is

8    the Government does not, is not required to make a 5K1 motion.

9          Period.  End.  It's the end of the benefits that go away.

10         And, I guess, any -- how the Court would perceive it and

11   so forth.  But the Court is listening to her testimony anyway.

12         So I don't know to what extent, to be honest -- the fact

13   that the Government may or may not make a motion if there's

14   such little concern to the Court that you and anybody who knows

15   what I do in sentencing, knows that I will pay whatever

16   attention I have to under the law.  But I must say, when a

17   witness testifies in a trial, I make my judgment based upon

18   what the history is and how I perceive her testimony to be.

19         The Government, for example, could say -- let's say,

20   hopefully, from your point of view, defendants are acquitted.

21   Acquitted.  Okay.  Then what will be the sentence of this --

22   obviously, I would take that into account in trying to instruct

23   in my mind, a sense of proportionality among defendants.  I

24   don't know how I would take it.  I mean, that is to say I don't

25   know where I would come out on it, but that's an obvious

1    factor.

2        If your client is convicted I would take that into account

3    too.  So it's all taken into account, and very little depends

4    on the Court -- on the -- on the Government.

5        Where that's not true are mandatory minimums.  That's the

6    exception.  This is not a mandatory minimum case.  What the

7    Government says or not says -- but I don't want to get into all

8    of that because it's very collateral, has nothing to do with

9    the guilt or innocence of your client.

10            **MS. BELL:**  Understood, Your Honor.  Understood.  I --

11            **THE COURT:**  So I do not think that's appropriate.

12            **MS. BELL:**  We will stop.  I just want the Court to

13    understand that was -- then I must have been imprecise because

14    there were two separate points.  But we can move on and finish

15    at this point.

16        I was not intending to suggest that substantial assistance

17    goes to breach of the plea agreement.  I was intending to

18    suggest that there are two benefits at play, which are

19    separate.  One is the opportunity to plead guilty to a 371 with

20    a statutory maximum of five years which is, in and of itself, a

21    benefit.  If she never gets that 5K motion, that's a benefit.

22    And if you breach your plea agreement, that can go away.

23            **THE COURT:**  If you breach it.

24            **MS. BELL:**  If you do something that is a breach of the

25    plea agreement, a contractual breach, then the 371 can go away.

1    **THE COURT:**  But let me stop you there.  There's no

2    suggestion in the testimony -- and I'm not sure I would have

3    allowed it -- that she's in breach of the agreement.

4    **MS. BELL:**  No.

5    **THE COURT:**  You see that could be true -- I'm trying

6    to sort of figure it out.  For any witness who enters a plea

7    agreement, they could always -- you could always question them

8    that, you understand if you didn't -- didn't have this

9    agreement, what your exposure is.

10    You've shown that.  And you go to the second point which

11    is:  By the way, if you breach the agreement -- that's a

12    separate point -- that's a separate point, you then would have

13    much greater exposure.

14    I understand that.  But there -- I'm very -- I guess

15    there's a way to wrap it all up, but I don't know that it's

16    been -- it's not been demonstrated to me.  I can think of one

17    possible way, and my guess is that Mr. Schachter will be heard

18    on the subject.

19    **MS. BELL:**  It's a tag-team situation, Your Honor.

20    **MR. SCHACHTER:**  I would want to study the agreement a

21    little more closely to make sure what I'm about to say is

22    accurate.

23    **THE COURT:**  Don't worry.  I'll tell you.

24    **MR. SCHACHTER:**  Thank God.

25    If -- I believe if the Government concludes that she is

1    lying -- in other words, oh, I think -- I think that that

2    was -- what you're saying now doesn't match up with what we

3    think, the Government has the ability to prosecute her for

4    perjury for false statements.

5         **THE COURT:**  I think that's true.

6         **MR. SCHACHTER:**  And so in that regard, if what she

7    says is the -- is the truth, but the Government says "We don't

8    think that's the truth," they can tear up the agreement and

9    prosecute her for all the offenses.

10        **THE COURT:**  I think that's right.  As I was speaking I

11   was thinking that's what I said.  There's sort of another way

12   around it.

13        And I think that's a legitimate point to make.  And then

14   what flows from it?  Which is -- well, I'm not making your

15   arguments for you.  I know what the arguments are.

16        Mr. Foster, you better come up to the microphone or you'll

17   incur the wrath of my court reporter.

18        **MR. FOSTER:**  Perhaps technically, yes, Your Honor.

19   But the reason this is all cumulative 403, far afield, as

20   Your Honor knows what this Court would do if, as a result of a

21   lack of substantial assistance, the Government just, you know,

22   pulled someone's plea agreement and tried to prosecute them for

23   perjury.  And so the implication that's clearly trying to be

24   drawn if they suggest that that is a realistic possibility is

25   not a fair one, because it's bounded by discretion.

1      **THE COURT:**  Except this:  The witness has spoken to

2  the Government and made a proffer.  And -- and the Defense

3  believes it's false in certain respects, I assume.

4      So they could certainly ask the question, well, if you

5  contradicted on the stand what you said in your proffer or what

6  you told the Government, you understand that the Government

7  then would be entitled to withdraw from the agreement.

8      I think that's accurate.  Whether you would or not --

9      **MR. FOSTER:**  I don't know if a bad faith withdrawal

10  from the plea agreement would be countenanced by this Court or

11  any court.

12      **THE COURT:**  I don't know either.

13      **MR. FOSTER:**  In our sole discretion, you know.

14  Discretion is bounded by the involvement in the system.

15      **THE COURT:**  I think the answer is you have the right

16  to seek withdrawal from the agreement.  Maybe that's a fair way

17  of saying it.

18      **MR. FOSTER:**  Yes, Your Honor.

19      **THE COURT:**  Because we're really talking about her

20  state of mind.

21      **MS. BELL:**  Yes.

22      **THE COURT:**  And so it's what she thought.  And I think

23  that that's a point you can make.

24      I don't have a quarrel with that.

25      **MR. FOSTER:**  I think she's been clear, Your Honor,

1   what she thinks, which is the Court decides it, so...

2          THE COURT:  It will give her another opportunity to

3   say exactly what she has said now 50 times, which is she did

4   all these things, she lied in the past, and she got a lot of

5   money for it, and she's decided to testify, plead guilty and

6   testify.

7          That's about the sum and substance of it.  I don't know

8   that you can beat the horse anymore.  And I don't think it's

9   such a good idea.  Listen, I'm not the Defense, but to hound

10  her on this, it makes the opposite point.  So you got to be

11  careful.

12         This is not like the only witness in this case.  I wish it

13  were.

14                        (Laughter.)

15         MR. SCHACHTER:  Us too.

16         MS. BELL:  You're not having fun, Your Honor?

17         THE COURT:  We're off the record.

18                  (Proceedings adjourned at 4:17 p.m.)

19                        ---o0o---

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Thursday, October 16, 2025




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court