```
                                        Volume 17

                                    Pages 3627 - 3892

                     UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

         Before The Honorable Charles R. Breyer, Judge

         UNITED STATES OF AMERICA,        )
                                          )
                     Plaintiff,           )
                                          )
           vs.                            )   NO. 3:24-cr-00329-CRB
                                          )
         RUTHIA HE and DAVID BRODY,       )
                                          )
                     Defendants.          )
         _____ )


                                    San Francisco, California
                                    Friday, October 31, 2025

                     TRANSCRIPT OF PROCEEDINGS  (CORRECTED)


         APPEARANCES:


         For Plaintiff:
                                CRAIG H. MISSAKIAN
                                United States Attorney
                                Northern District of California
                                450 Golden Gate Avenue
                                San Francisco, California 94102
                           BY:  KRISTINA GREEN
                                ASSISTANT UNITED STATES ATTORNEY

                                U.S. DEPARTMENT OF JUSTICE
                                FRAUD SECTION
                                950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
                           BY:  JACOB N. FOSTER,
                                ACTING CHIEF, HEALTHCARE FRAUD UNIT



                     (APPEARANCES CONTINUED ON FOLLOWING PAGE)

         Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                       Official Reporter, CSR No. 12219
```

**APPEARANCES**:   **(CONTINUED)**

                    U.S. DEPARTMENT OF JUSTICE
                    CRIMINAL DIVISION
                    1400 New York Avenue NW
                    Washington, D.C. 20001
              BY:  **EMILY GURSKIS, ASSISTANT CHIEF**

                    JOSEPH NOCELLA, JR.
                    United States Attorney
                    Eastern District of New York
                    271-A Cadman Plaza East
                    Brooklyn, New York 11201
              BY:  **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:
                    WILLKIE FARR & GALLAGHER LLP
                    2029 Century Park East - Suite 2900
                    Los Angeles, California 90067
               BY:  **KOREN L. BELL, ATTORNEY AT LAW**

                    WILLKIE FARR & GALLAGHER LLP
                    787 7th Avenue
                    New York, New York 10019
              BY:  **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
                    **STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:
                    LAW OFFICE OF VALERY NECHAY
                    Law Chambers Building
                    345 Franklin Street
                    San Francisco, California 94102
              BY:  **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:   Thifany Braga**
                **Simon Hall**
                **Mackenzie Slater**
                **Andy Cepregi**
                **Ashley Moore**
                **Barbara Hua Robinson, Mandarin Interpreter**
                **Jeff Dinn, Mandarin Interpreter**
                **Yang Shao, Mandarin Interpreter**

# I N D E X

Friday, October 31, 2025 - Volume 17

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **HILL-ALVAREZ, CHRISTINA (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 3666 | 17 |
| Cross-Examination by Ms. Nechay | 3666 | 17 |
| Redirect Examination by Ms. Gurskis | 3671 | 17 |
| Recross-Examination by Ms. Bell | 3709 | 17 |
| | | |
| **GRAZIADEI, KELLY** | | |
| (SWORN) | 3754 | 17 |
| Direct Examination by Ms. Green | 3755 | 17 |
| Cross-Examination by Ms. Bell | 3801 | 17 |
| Redirect Examination by Ms. Green | 3873 | 17 |
| Recross-Examination by Ms. Bell | 3879 | 17 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 139 | | 3729 | 17 |
| 190 | | 3726 | 17 |
| 193 | | 3726 | 17 |
| 210 | | 3730 | 17 |
| 252 | | 3726 | 17 |
| 265 | | 3731 | 17 |
| 269 | | 3726 | 17 |
| 270 | | 3726 | 17 |
| 271 | | 3732 | 17 |
| 275 | | 3726 | 17 |
| 316 | | 3726 | 17 |
| 347 | | 3735 | 17 |
| 360 | | 3760 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 363 | | 3726 | 17 |
| 376 | | 3737 | 17 |
| 390 | | 3737 | 17 |
| 394 | | 3726 | 17 |
| 404 | | 3726 | 17 |
| 410 | | 3726 | 17 |
| 426 | | 3739 | 17 |
| 452 | | 3726 | 17 |
| 476 | | 3726 | 17 |
| 477 | | 3726 | 17 |
| 478 | | 3726 | 17 |
| 479 | | 3740 | 17 |
| 480 | | 3726 | 17 |
| 481 | | 3741 | 17 |
| 517 | | 3726 | 17 |
| 518 | | 3726 | 17 |
| 522 | | 3726 | 17 |
| 525 | | 3726 | 17 |
| 527 | | 3726 | 17 |
| 528 | | 3726 | 17 |
| 529 | | 3726 | 17 |

```
1                          I N D E X

2                        E X H I B I T S

3    TRIAL EXHIBITS                        IDEN   EVID   VOL.

4     531                                         3726   17

5     533                                         3726   17

6     534                                         3726   17

7     561                                         3742   17

8     562                                         3726   17

9     567                                         3726   17

10    587                                         3744   17

11    618                                         3726   17

12    629                                         3787   17

13    653                                         3726   17

14    654                                         3788   17

15    663                                         3726   17

16    675                                         3726   17

17    678                                         3726   17

18    689                                         3745   17

19    705                                         3726   17

20    713                                         3726   17

21    747                                         3726   17

22    752                                         3726   17

23    788                                         3726   17

24    821                                         3726   17

25
```

<pre>
 1                        I N D E X

 2                     E X H I B I T S

 3    TRIAL EXHIBITS                      IDEN   EVID   VOL.

 4    822                                        3726   17

 5    824                                        3726   17

 6    827                                        3726   17

 7    832                                        3726   17

 8    833                                        3726   17

 9    893                                        3726   17

10    906                                        3726   17

11    907                                        3726   17

12    911                                        3726   17

13    988                                        3791   17

14    989                                        3785   17

15    990                                        3797   17

16    1200                                       3725   17

17    1201                                       3725   17

18    1202                                       3725   17

19    1203                                       3725   17

20    1204                                       3725   17

21    1205                                       3725   17

22    1206                                       3725   17

23    1207                                       3725   17

24    1208                                       3725   17

25
</pre>

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1209 | | 3725 | 17 |
| 1210 | | 3725 | 17 |
| 1213 | | 3725 | 17 |
| 1214 | | 3725 | 17 |
| 1215 | | 3725 | 17 |
| 1216 | | 3725 | 17 |
| 1217 | | 3725 | 17 |
| 1220 | | 3725 | 17 |
| 1221 | | 3725 | 17 |
| 1222 | | 3725 | 17 |
| 1223 | | 3725 | 17 |
| 1224 | | 3725 | 17 |
| 1310 | | 3725 | 17 |
| 1403 | | 3726 | 17 |
| 1404 | | 3726 | 17 |
| 1405 | | 3726 | 17 |
| 1409 | | 3726 | 17 |
| 1410 | | 3726 | 17 |
| 1413 | | 3726 | 17 |
| 1420 | | 3725 | 17 |
| 1463 | | 3725 | 17 |

```
1                    I N D E X

2                  E X H I B I T S

3   TRIAL EXHIBITS                    IDEN   EVID   VOL.

4   1602                                     3725   17

5   1603                                     3725   17

6   1604                                     3725   17

7   1605                                     3725   17

8   1607                                     3725   17

9   1608                                     3725   17

10  1609                                     3725   17

11  1610                                     3725   17

12  1611                                     3725   17

13  1613                                     3725   17

14  1614                                     3725   17

15  1700                                     3725   17

16  1701                                     3725   17

17  1702                                     3725   17

18  1703                                     3725   17

19  1704                                     3725   17

20  1705                                     3725   17

21  1706                                     3725   17

22  1707                                     3725   17

23  1708                                     3725   17

24  1709                                     3725   17

25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1710 | | 3725 | 17 |
| 1711 | | 3725 | 17 |
| 1712 | | 3725 | 17 |
| 1713 | | 3725 | 17 |
| 1714 | | 3725 | 17 |
| 1715 | | 3725 | 17 |
| 1716 | | 3725 | 17 |
| 1717 | | 3725 | 17 |
| 1718 | | 3725 | 17 |
| 1720 | | 3725 | 17 |
| 1724 | | 3725 | 17 |
| 1726 | | 3725 | 17 |
| 1727 | | 3725 | 17 |
| 1728 | | 3725 | 17 |
| 1729 | | 3725 | 17 |
| 1730 | | 3725 | 17 |
| 1733 | | 3725 | 17 |
| 1805 | | 3726 | 17 |
| 1809 | | 3725 | 17 |
| 1810 | | 3725 | 17 |
| 1811 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1818 | | 3725 | 17 |
| 1820 | | 3726 | 17 |
| 1825 | | 3726 | 17 |
| 1828 | | 3726 | 17 |
| 1830 | | 3726 | 17 |
| 1843 | | 3725 | 17 |
| 1845 | | 3726 | 17 |
| 1849 | | 3726 | 17 |
| 1851 | | 3726 | 17 |
| 1852 | | 3726 | 17 |
| 1857 | | 3726 | 17 |
| 1863 | | 3726 | 17 |
| 1864 | | 3726 | 17 |
| 1865 | | 3725 | 17 |
| 1867 | | 3726 | 17 |
| 1876 | | 3726 | 17 |
| 1877 | | 3726 | 17 |
| 1879 | | 3726 | 17 |
| 1880 | | 3725 | 17 |
| 1886 | | 3726 | 17 |
| 1887 | | 3726 | 17 |

```
 1                    I N D E X

 2                  E X H I B I T S

 3   TRIAL EXHIBITS                      IDEN   EVID   VOL.

 4   1896                                       3725   17

 5   1906                                       3725   17

 6   1923                                       3725   17

 7   1925                                       3725   17

 8   1926                                       3725   17

 9   1927                                       3726   17

10   1928                                       3726   17

11   1948                                       3725   17

12   1951                                       3725   17

13   1962                                       3726   17

14   1963                                       3726   17

15   1964                                       3726   17

16   1972                                       3726   17

17   1973                                       3726   17

18   1977                                       3726   17

19   1981                                       3725   17

20   2012                                       3725   17

21   2013                                       3725   17

22   2014                                       3725   17

23   2015                                       3725   17

24   2016                                       3725   17

25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2017 | | 3725 | 17 |
| 2018 | | 3725 | 17 |
| 2019 | | 3725 | 17 |
| 2020 | | 3725 | 17 |
| 2021 | | 3725 | 17 |
| 2022 | | 3725 | 17 |
| 2023 | | 3725 | 17 |
| 2026 | | 3725 | 17 |
| 2027 | | 3725 | 17 |
| 2028 | | 3725 | 17 |
| 2029 | | 3725 | 17 |
| 2030 | | 3725 | 17 |
| 2031 | | 3725 | 17 |
| 2032 | | 3725 | 17 |
| 2033 | | 3725 | 17 |
| 2034 | | 3725 | 17 |
| 2035 | | 3725 | 17 |
| 2036 | | 3725 | 17 |
| 2037 | | 3725 | 17 |
| 2038 | | 3725 | 17 |
| 2039 | | 3725 | 17 |

<pre>
1                        <u>I N D E X</u>

2                     <u>E X H I B I T S</u>

3   <u>TRIAL EXHIBITS</u>                    <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

4    2040                                      3725  17

5    2041                                      3725  17

6    2042                                      3725  17

7    2043                                      3725  17

8    2045                                      3725  17

9    2046                                      3725  17

10   2047                                      3725  17

11   2048                                      3725  17

12   2049                                      3725  17

13   2080                                      3725  17

14   2081                                      3725  17

15   2086                                      3725  17

16   2087                                      3725  17

17   2088                                      3725  17

18   2089                                      3725  17

19   2090                                      3725  17

20   2091                                      3725  17

21   2092                                      3725  17

22   2093                                      3725  17

23   2094                                      3725  17

24   2095                                      3725  17

25
</pre>

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2096 | | 3725 | 17 |
| 2097 | | 3725 | 17 |
| 2098 | | 3725 | 17 |
| 2099 | | 3725 | 17 |
| 2100 | | 3725 | 17 |
| 2101 | | 3725 | 17 |
| 2102 | | 3725 | 17 |
| 2103 | | 3725 | 17 |
| 2104 | | 3725 | 17 |
| 2105 | | 3725 | 17 |
| 2106 | | 3725 | 17 |
| 2107 | | 3725 | 17 |
| 2108 | | 3725 | 17 |
| 2109 | | 3725 | 17 |
| 2110 | | 3725 | 17 |
| 2111 | | 3725 | 17 |
| 2113 | | 3725 | 17 |
| 2114 | | 3725 | 17 |
| 2115 | | 3725 | 17 |
| 2116 | | 3725 | 17 |
| 2117 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2119 | | 3725 | 17 |
| 2120 | | 3725 | 17 |
| 2121 | | 3725 | 17 |
| 2122 | | 3725 | 17 |
| 2123 | | 3725 | 17 |
| 2124 | | 3725 | 17 |
| 2125 | | 3725 | 17 |
| 2126 | | 3725 | 17 |
| 2127 | | 3725 | 17 |
| 2128 | | 3725 | 17 |
| 2129 | | 3725 | 17 |
| 2130 | | 3725 | 17 |
| 2131 | | 3725 | 17 |
| 2132 | | 3725 | 17 |
| 2133 | | 3725 | 17 |
| 2134 | | 3725 | 17 |
| 2135 | | 3725 | 17 |
| 2136 | | 3725 | 17 |
| 2138 | | 3725 | 17 |
| 2139 | | 3725 | 17 |
| 2140 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2141 | | 3725 | 17 |
| 2142 | | 3725 | 17 |
| 2143 | | 3725 | 17 |
| 2144 | | 3725 | 17 |
| 2145 | | 3725 | 17 |
| 2146 | | 3725 | 17 |
| 2147 | | 3725 | 17 |
| 2148 | | 3725 | 17 |
| 2149 | | 3725 | 17 |
| 2150 | | 3725 | 17 |
| 2151 | | 3725 | 17 |
| 2152 | | 3725 | 17 |
| 2153 | | 3725 | 17 |
| 2154 | | 3725 | 17 |
| 2155 | | 3725 | 17 |
| 2156 | | 3725 | 17 |
| 2157 | | 3725 | 17 |
| 2158 | | 3725 | 17 |
| 2159 | | 3725 | 17 |
| 2160 | | 3725 | 17 |
| 2161 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2162 | | 3725 | 17 |
| 2163 | | 3725 | 17 |
| 2164 | | 3725 | 17 |
| 2165 | | 3725 | 17 |
| 2166 | | 3725 | 17 |
| 2167 | | 3725 | 17 |
| 2168 | | 3725 | 17 |
| 2169 | | 3725 | 17 |
| 2170 | | 3725 | 17 |
| 2171 | | 3725 | 17 |
| 2172 | | 3725 | 17 |
| 2173 | | 3725 | 17 |
| 2174 | | 3725 | 17 |
| 2177 | | 3725 | 17 |
| 2178 | | 3725 | 17 |
| 2179 | | 3725 | 17 |
| 2180 | | 3725 | 17 |
| 2181 | | 3725 | 17 |
| 2182 | | 3725 | 17 |
| 2183 | | 3725 | 17 |
| 2184 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2185 | | 3725 | 17 |
| 2186 | | 3725 | 17 |
| 2187 | | 3725 | 17 |
| 2188 | | 3725 | 17 |
| 2189 | | 3725 | 17 |
| 2190 | | 3725 | 17 |
| 2191 | | 3725 | 17 |
| 2192 | | 3725 | 17 |
| 2193 | | 3725 | 17 |
| 2194 | | 3725 | 17 |
| 2195 | | 3725 | 17 |
| 2197 | | 3725 | 17 |
| 2198 | | 3725 | 17 |
| 2199 | | 3725 | 17 |
| 2200 | | 3725 | 17 |
| 2201 | | 3725 | 17 |
| 2202 | | 3725 | 17 |
| 2203 | | 3725 | 17 |
| 2204 | | 3725 | 17 |
| 2205 | | 3725 | 17 |
| 2206 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2207 | | 3725 | 17 |
| 2208 | | 3725 | 17 |
| 2209 | | 3725 | 17 |
| 2210 | | 3725 | 17 |
| 2211 | | 3725 | 17 |
| 2212 | | 3725 | 17 |
| 2213 | | 3725 | 17 |
| 2214 | | 3725 | 17 |
| 2215 | | 3725 | 17 |
| 2216 | | 3725 | 17 |
| 2217 | | 3725 | 17 |
| 2218 | | 3725 | 17 |
| 2219 | | 3725 | 17 |
| 2220 | | 3725 | 17 |
| 2221 | | 3725 | 17 |
| 2222 | | 3725 | 17 |
| 2223 | | 3725 | 17 |
| 2224 | | 3725 | 17 |
| 2225 | | 3725 | 17 |
| 2226 | | 3725 | 17 |
| 2227 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2228 | | 3725 | 17 |
| 2229 | | 3725 | 17 |
| 2230 | | 3725 | 17 |
| 2231 | | 3725 | 17 |
| 2232 | | 3725 | 17 |
| 2233 | | 3725 | 17 |
| 2234 | | 3725 | 17 |
| 2235 | | 3725 | 17 |
| 2236 | | 3725 | 17 |
| 2237 | | 3725 | 17 |
| 2238 | | 3725 | 17 |
| 2239 | | 3725 | 17 |
| 2240 | | 3725 | 17 |
| 2241 | | 3725 | 17 |
| 2242 | | 3725 | 17 |
| 2243 | | 3725 | 17 |
| 2244 | | 3725 | 17 |
| 2246 | | 3725 | 17 |
| 2248 | | 3725 | 17 |
| 2250 | | 3725 | 17 |
| 2252 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 2254 | | 3725 | 17 |
| 2255 | | 3725 | 17 |
| 2256 | | 3725 | 17 |
| 2269 | | 3725 | 17 |
| 2270 | | 3725 | 17 |
| 2271 | | 3725 | 17 |
| 2272 | | 3725 | 17 |
| 2273 | | 3725 | 17 |
| 2274 | | 3725 | 17 |
| 2275 | | 3725 | 17 |
| 2276 | | 3725 | 17 |
| 2277 | | 3725 | 17 |
| 2280 | | 3725 | 17 |
| 2281 | | 3725 | 17 |
| 2282 | | 3725 | 17 |
| 2283 | | 3725 | 17 |
| 2284 | | 3725 | 17 |
| 2285 | | 3725 | 17 |
| 2286 | | 3725 | 17 |
| 2287 | | 3725 | 17 |
| 2288 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2289 | | 3725 | 17 |
| 2290 | | 3725 | 17 |
| 2291 | | 3725 | 17 |
| 2292 | | 3725 | 17 |
| 2293 | | 3725 | 17 |
| 2294 | | 3725 | 17 |
| 2295 | | 3725 | 17 |
| 2296 | | 3725 | 17 |
| 2297 | | 3725 | 17 |
| 2298 | | 3725 | 17 |
| 2300 | | 3725 | 17 |
| 2301 | | 3725 | 17 |
| 2329 | | 3725 | 17 |
| 2339 | | 3725 | 17 |
| 2340 | | 3725 | 17 |
| 2341 | | 3725 | 17 |
| 2342 | | 3725 | 17 |
| 2345 | | 3725 | 17 |
| 2346 | | 3725 | 17 |
| 2368 | | 3684 | 17 |
| 2382 | | 3810 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2460 | | 3725 | 17 |
| 2461 | | 3725 | 17 |
| 2499 | | 3726 | 17 |
| 2512 | | 3725 | 17 |
| 2513 | | 3726 | 17 |
| 2515 | | 3726 | 17 |
| 2517 | | 3726 | 17 |
| 2519 | | 3725 | 17 |
| 2520 | | 3725 | 17 |
| 2521 | | 3725 | 17 |
| 2544 | | 3725 | 17 |
| 2581 | | 3726 | 17 |
| 2582 | | 3726 | 17 |
| 2583 | | 3726 | 17 |
| 2587 | | 3726 | 17 |
| 2588 | | 3726 | 17 |
| 2612 | | 3725 | 17 |
| 2613 | | 3726 | 17 |
| 2614 | | 3725 | 17 |
| 2629 | | 3725 | 17 |
| 2630 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2631 | | 3725 | 17 |
| 2632 | | 3725 | 17 |
| 2633 | | 3725 | 17 |
| 2639 | | 3726 | 17 |
| 2658 | | 3725 | 17 |
| 2660 | | 3725 | 17 |
| 2661 | | 3725 | 17 |
| 2662 | | 3725 | 17 |
| 2674 | | 3725 | 17 |
| 2675 | | 3725 | 17 |
| 2677 | | 3725 | 17 |
| 2678 | | 3725 | 17 |
| 2681 | | 3725 | 17 |
| 2682 | | 3725 | 17 |
| 2683 | | 3725 | 17 |
| 2684 | | 3725 | 17 |
| 2685 | | 3725 | 17 |
| 2686 | | 3725 | 17 |
| 2687 | | 3725 | 17 |
| 2688 | | 3725 | 17 |
| 2689 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2694 | | 3725 | 17 |
| 2711 | | 3725 | 17 |
| 2726 | | 3725 | 17 |
| 2727 | | 3725 | 17 |
| 2728 | | 3725 | 17 |
| 2729 | | 3725 | 17 |
| 2730 | | 3725 | 17 |
| 2731 | | 3725 | 17 |
| 2732 | | 3725 | 17 |
| 2733 | | 3725 | 17 |
| 2734 | | 3725 | 17 |
| 2735 | | 3725 | 17 |
| 2736 | | 3725 | 17 |
| 2737 | | 3725 | 17 |
| 2738 | | 3725 | 17 |
| 2739 | | 3725 | 17 |
| 2740 | | 3725 | 17 |
| 2741 | | 3725 | 17 |
| 2742 | | 3725 | 17 |
| 2743 | | 3725 | 17 |
| 2744 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2745 | | 3725 | 17 |
| 2746 | | 3725 | 17 |
| 2747 | | 3725 | 17 |
| 2748 | | 3725 | 17 |
| 2749 | | 3725 | 17 |
| 2750 | | 3725 | 17 |
| 2751 | | 3725 | 17 |
| 2752 | | 3725 | 17 |
| 2753 | | 3725 | 17 |
| 2754 | | 3725 | 17 |
| 2755 | | 3725 | 17 |
| 2756 | | 3725 | 17 |
| 2757 | | 3725 | 17 |
| 2758 | | 3725 | 17 |
| 2759 | | 3725 | 17 |
| 2760 | | 3725 | 17 |
| 2761 | | 3725 | 17 |
| 2762 | | 3725 | 17 |
| 2763 | | 3725 | 17 |
| 2764 | | 3725 | 17 |
| 2765 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2766 | | 3725 | 17 |
| 2767 | | 3725 | 17 |
| 2768 | | 3725 | 17 |
| 2769 | | 3725 | 17 |
| 2770 | | 3725 | 17 |
| 2771 | | 3725 | 17 |
| 2772 | | 3725 | 17 |
| 2773 | | 3725 | 17 |
| 2774 | | 3725 | 17 |
| 2775 | | 3725 | 17 |
| 2776 | | 3725 | 17 |
| 2777 | | 3725 | 17 |
| 2778 | | 3725 | 17 |
| 2779 | | 3725 | 17 |
| 2780 | | 3725 | 17 |
| 2781 | | 3725 | 17 |
| 2782 | | 3725 | 17 |
| 2783 | | 3725 | 17 |
| 2784 | | 3725 | 17 |
| 2785 | | 3725 | 17 |
| 2786 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2787 | | 3725 | 17 |
| 2788 | | 3725 | 17 |
| 2789 | | 3725 | 17 |
| 2790 | | 3725 | 17 |
| 2791 | | 3725 | 17 |
| 2792 | | 3725 | 17 |
| 2793 | | 3725 | 17 |
| 2794 | | 3725 | 17 |
| 2795 | | 3725 | 17 |
| 2796 | | 3725 | 17 |
| 2797 | | 3725 | 17 |
| 2798 | | 3725 | 17 |
| 2799 | | 3725 | 17 |
| 2800 | | 3725 | 17 |
| 2801 | | 3725 | 17 |
| 2802 | | 3725 | 17 |
| 2803 | | 3725 | 17 |
| 2804 | | 3725 | 17 |
| 2805 | | 3725 | 17 |
| 2806 | | 3725 | 17 |
| 2807 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2808 | | 3725 | 17 |
| 2809 | | 3725 | 17 |
| 2810 | | 3725 | 17 |
| 2811 | | 3725 | 17 |
| 2812 | | 3725 | 17 |
| 2813 | | 3725 | 17 |
| 2814 | | 3725 | 17 |
| 2815 | | 3725 | 17 |
| 2816 | | 3725 | 17 |
| 2817 | | 3725 | 17 |
| 2818 | | 3725 | 17 |
| 2819 | | 3725 | 17 |
| 2820 | | 3725 | 17 |
| 2821 | | 3725 | 17 |
| 2822 | | 3725 | 17 |
| 2823 | | 3725 | 17 |
| 2849 | | 3725 | 17 |
| 2850 | | 3725 | 17 |
| 2851 | | 3725 | 17 |
| 2854 | | 3725 | 17 |
| 2871 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2874 | | 3725 | 17 |
| 2875 | | 3725 | 17 |
| 2876 | | 3725 | 17 |
| 2877 | | 3725 | 17 |
| 2878 | | 3725 | 17 |
| 2879 | | 3725 | 17 |
| 2884 | | 3725 | 17 |
| 2900 | | 3725 | 17 |
| 2901 | | 3725 | 17 |
| 2902 | | 3725 | 17 |
| 2904 | | 3725 | 17 |
| 2905 | | 3725 | 17 |
| 2997 | | 3725 | 17 |
| 3001 | | 3725 | 17 |
| 3007 | | 3725 | 17 |
| 3008 | | 3725 | 17 |
| 3010 | | 3725 | 17 |
| 3012 | | 3725 | 17 |
| 3041 | | 3762 | 17 |
| 3050 | | 3725 | 17 |
| 3051 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 3053 | | 3725 | 17 |
| 3072 | | 3726 | 17 |
| 3073 | | 3726 | 17 |
| 3074 | | 3726 | 17 |
| 3075 | | 3726 | 17 |
| 3076 | | 3726 | 17 |
| 3077 | | 3726 | 17 |
| 3078 | | 3726 | 17 |
| 3079 | | 3726 | 17 |
| 3080 | | 3726 | 17 |
| 3081 | | 3726 | 17 |
| 3082 | | 3726 | 17 |
| 3083 | | 3726 | 17 |
| 3084 | | 3726 | 17 |
| 3085 | | 3726 | 17 |
| 3086 | | 3726 | 17 |
| 3087 | | 3726 | 17 |
| 3088 | | 3726 | 17 |
| 3089 | | 3726 | 17 |
| 3090 | | 3726 | 17 |
| 4001 | | 3725 | 17 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4002 | | 3726 | 17 |
| 6936 | | 3829 | 17 |
| 6936 page 23 | | 3840 | 17 |
| 6936 page 8 | | 3845 | 17 |
| 6936 page 13 | | 3845 | 17 |
| 6936 page 26 | | 3845 | 17 |
| 6936 page 29 | | 3856 | 17 |
| 6956 | | 3856 | 17 |
| 6957 | | 3857 | 17 |
| 6963 | | 3860 | 17 |
| 6964 | | 3860 | 17 |
| 7266 | | 3829 | 17 |
| 9027 | | 3829 | 17 |

PROCEEDINGS

1    **<u>Friday - October 31, 2025</u>**                                    **<u>9:18 a.m.</u>**

2                       **P R O C E E D I N G S**

3                              ---o0o---

4       (Proceedings were heard out of the presence of the jury.)

5              **THE COURTROOM DEPUTY:**  You may be seated.

6        It's my understanding that the marshals are not here, so

7    we don't have Defendant He here yet, but let's talk about a few

8    scheduling things.

9        May I proceed in her absence?

10             **MS. BELL:**  Yes, Your Honor.  And our apologies

11   again --

12             **THE COURT:**  That's all right.  I do want to point out,

13   on April 21, 2025, the Court entered an order which says:  The

14   normal trial schedule will be 9:15 to 4:00 with two 15-minute

15   breaks and a lunch break.  Counsel must arrive by 8:45 or

16   earlier as needed.

17       So the Court was here at 8:30 because there was a request

18   to meet before the testimony.  But there we are.

19       And now we're moving forward and we're waiting for your

20   client to show up.

21       But is there something that I can talk about that would be

22   helpful?

23             **MS. BELL:**  Yes, Your Honor.  Thank you.

24             **THE COURT:**  Go ahead, Ms. Bell.

25             **MS. BELL:**  Thank you, Your Honor.  And our

PROCEEDINGS

1   apologies --

2           THE COURT:  That's fine.  You don't have to be

3   concerned.  I mean, you should be concerned, but --

4           MS. BELL:  We're concerned and we will --

5           THE COURT:  I'm moving forward because I'm moving

6   forward.

7           MS. BELL:  Thank you, Your Honor.

8       So the issue is -- there are two issues, only one of which

9   needs to be addressed now because it relates to the redirect of

10  Ms. Hill-Alvarez.

11      But as the Court recalls, I questioned Ms. Hill-Alvarez

12  yesterday about assurances she sought from the Government and

13  received that she would not be arrested if she came back from

14  Mexico to testify.

15      The Government now says that it plans to elicit on

16  redirect safety concerns, unspecified safety concerns, which we

17  believe are completely baseless, that our client poses a risk

18  to her physical safety.  And as far as we -- there was some

19  testimony about that, which I'll pass up.  I believe it would

20  be highly --

21          THE COURT:  No, no, I understand.  The question is to

22  what extent -- to what extent does the Government -- it's a

23  legitimate concern.  To what extent does the Government intend

24  to introduce evidence of the witness's concerns about her

25  safety as a result of this prosecution, I guess, is the way or

PROCEEDINGS

 1    this -- what?  Go ahead.

 2         **MS. GURSKIS:**  Yes, Your Honor.  So two points on that.

 3    The first is that when the -- I guess to answer Your Honor's

 4    first, the safety concern question will be addressed in a very

 5    limited fashion to -- in order to reveal the full picture of

 6    the context of her communication with the Government with the

 7    jury.

 8         As Your Honor may recall, when Ms. Bell was asking her

 9    questions about the document, there were a couple of instances

10    where Ms. Hill-Alvarez tried to give a little more context for

11    her concerns, give a little more of the full picture of what

12    was happening, was not permitted to do so.

13         The full sentences of this document show that she was

14    afraid because of fear of retaliation for testifying against

15    certain individuals in this case.

16         So I think -- and when I had correspondence with Ms. Bell

17    on this issue earlier this week regarding some inflammatory

18    language that this witness has said in the past with regard to

19    her client, we were very clear that we were not going to get

20    into those issues, and with regard to this document in

21    particular that we wouldn't be getting into the safety issues

22    unless the door was opened on the letter and the full picture

23    was required in order to not leave the jury with a

24    misimpression.

25         And this was an exhibit introduced, you know, on her

1    cross.

2              MS. BELL:  May I, Your Honor?

3              THE COURT:  I just want to think it through a bit,

4    because I understand it could be prejudicial, but I don't know

5    that it's necessarily excluded.

6         In other words, you're going -- here is the problem that I

7    think you've -- in a sense, it's been created by the cross.

8         The problem is you have left the impression that the

9    reason she didn't want to come up is because she was going to

10   be -- she was afraid that she was going to be arrested for --

11   and you made the link between taking 60-, $80,000 in severance

12   pay or however one wants to characterize it, and therefore she

13   thought if she came up, she could be arrested for it.  That was

14   the trade-off.

15        And by the way -- by the way, that may be the nexus that

16   you would draw, and a fair nexus.  And it may be broader than

17   that, by the way.  She may think that she's complicit in these

18   crimes.  I mean, after all, she's -- the Government has charged

19   a number of people similarly situated -- and I say that in

20   quotes, because they're -- not everybody is similarly

21   situated -- but situated enough that they become -- that the

22   Government, in its judgment, charges them as accomplices,

23   essentially.

24        Okay.  So that was the concern.  What the Government is

25   saying, there was a second concern, and she was concerned about

 1   her safety.  And therefore, that can explain in part and to put

 2   it in a context in part of a reluctance to come up.

 3       I don't see why that shouldn't come in in light of -- in

 4   light of what you've raised.  In other words, should a person

 5   be precluded by giving a full and complete answer, which in her

 6   judgment is the truthful answer, by virtue of the fact that

 7   what she may say would be -- would be potentially harmful.

 8       And I -- you know, I'm trying to figure out why they're

 9   not right --

10           MS. BELL:  Yes, Your Honor.

11           THE COURT:  -- why the Government's not right.

12       Go ahead, Ms. Bell.

13           MS. BELL:  Thank you, Your Honor.

14       So first of all, the Government knows that the company's

15   position is these were unauthorized fraudulent transfers.

16   Mr. Steskal wrote to the Government and reported this crime

17   back in June.

18       Second of all, my cross was very carefully tailored, and

19   Your Honor may recall I didn't seek to admit the letter, which

20   actually itself raises safety concerns.  But it was very

21   carefully tethered to what assurances did you ask for from the

22   Government.

23       The witness did not say:  I'm afraid for my safety because

24   of Ms. He.  Please provide protection.  Please investigate

25   Ms. He.

1     The witness asked for very specific things tethered to not

2  being arrested, and that was set forth in the record.  My

3  questions went just to the assurance about Government conduct,

4  not Ms. He's conduct.

5     I think it would be very different if she said:  And by

6  the way, I'm also afraid that Ms. He might do something to me

7  when I'm in the United States.

8     The Government knows that's baseless, Your Honor.  You

9  know --

10          THE COURT:  Let the record reflect the defendant is

11  present.

12     Go ahead, Ms. Bell.

13          MS. BELL:  We all know that the Government takes

14  safety concerns of witnesses extremely seriously.  I'm

15  confident that if there were any basis for some suggestion that

16  our client posed an actual safety risk or had done anything to

17  interfere with a witness that we would have heard about it, so

18  it's baseless.

19     I'm not saying she doesn't honestly fear.  We've heard

20  she's someone who suffers trauma, et cetera.  I'm not saying

21  it's not her honestly held belief.

22     However, the questions were narrowly tailored to the full

23  range of assurances she sought, which were limited to the

24  Government not taking action to arrest her and --

25          THE COURT:  Okay.  But she also had safety concerns

 1   that you raised.  I mean -- and they may be ill-founded and may

 2   be ephemeral.  And by the way, they may not be the truth.

 3           **MS. BELL:**  Exactly.

 4           **THE COURT:**  I got all that.  I got all that.  I'm not

 5   sitting up here saying who's truthful, who's not truthful.

 6       I'm just saying when you start to explore this, when

 7   you -- and it's a legitimate area.  I won't cut you off.

 8   Legitimate area.

 9       When you do, you have to be prepared for the full answer,

10   and you can't come back and you can't say -- you can't say,

11   Well, that reason is such a bad reason, it's so prejudicial to

12   me, I don't want -- to my client, I don't want to do it.

13       Now, I'm going to allow the Government to do it as

14   represented, that it will be careful and so forth and not dwell

15   on it.

16           **MS. BELL:**  Yes, Your Honor.

17           **THE COURT:**  And I'll allow you no cross on it if you

18   want, but I don't know that you would want to.

19           **MS. BELL:**  No, Your Honor.  Just two final points.

20   And I understand the Court's ruling.

21       One is it's cumulative because the witness already said

22   that in response at the flagged portion in response.

23       And second, then we'd ask for a curative instruction or

24   stipulation that --

25           (Reporter interruption for clarity of the record.)

HILL-ALVAREZ - CROSS / NECHAY

1        THE COURT:  You're from LA, aren't you?

2        MS. BELL:  Yes.

3        THE COURT:  Well, they don't talk that fast in LA.

4        MS. BELL:  I don't know what's happening.  I'm riled

5   up this morning.  I will try and be better.

6        But we'd ask for some type of curative or stipulation that

7   there's no foundation for this, because essentially it

8   leaves --

9        THE COURT:  Okay.  Fine.  Denied, denied.  Thank you.

10       Okay.  Bring in the jury.

11       MS. BELL:  Thank you.

12                 (The jury enters the courtroom.)

13       (Proceedings were heard in the presence of the jury.)

14       (Christina Hill-Alvarez steps forward to resume the

15   stand.)

16                 __CHRISTINA HILL-ALVAREZ__,

17   called as a witness for the Government, having been previously

18   duly sworn, testified further as follows:

19                 __CROSS-EXAMINATION__

20       THE COURT:  Okay.  Let the record show that all jurors

21   are present.  Parties are present.  Good morning.

22       You may proceed.

23       MS. NECHAY:  Thank you very much.

24   BY MS. NECHAY:

25   Q.   Good morning, Ms. Hill-Alvarez.

HILL-ALVAREZ - CROSS / NECHAY

1   **A.**   Good morning.

2   **Q.**   Thank you for returning.

3          I promise to approach my next questions with some brevity.

4   I just have a few more for you.

5          Yesterday, do you recall testifying about a particular

6   exhibit that Dr. Brody had stated that he -- they shouldn't

7   waste time with people that didn't have ADHD?

8   **A.**   I think I vaguely recall, yes.

9   **Q.**   Okay.  And you spoke in such high regard about Dr. Brody.

10  Specifically, do you recall discussing his passion for helping

11  people with ADHD?

12  **A.**   Yes.

13  **Q.**   With respect to his role, I want to go back to the urgent

14  refills issue briefly --

15         And before I get there, I would like to ask you about the

16  care team.

17         The care team, you were aware, was comprised of how many

18  individuals?

19  **A.**   It varied.  When I first started in 2021, I think about

20  50, grew to 80 when I left, and then when I returned, I would

21  say around two to three hundred.

22  **Q.**   And it's true that one of the roles of the care team was

23  to do PDMP checks and CURES checks; correct?

24  **A.**   That was my understanding.

25  **Q.**   And in doing so, they were actually -- Dr. Brody relied,

**HILL-ALVAREZ - CROSS / NECHAY**

1    from your knowledge, on the care team to assist in these tasks?

2             **MS. GURSKIS:**  Objection.

3             **THE COURT:**  Overruled.  Go ahead.

4             **THE WITNESS:**  In the beginning of the -- my experience

5    at Done, that's what I understood.

6    **BY MS. NECHAY:**

7    **Q.**    Okay.  I want to then transition briefly to a comment that

8    you made about your perception that there was --

9             **THE COURT:**  One moment.  The real-time is not working.

10   **BY MS. NECHAY:**

11   **Q.**    In addition, the care team -- what were the other roles,

12   from your perception?

13   **A.**    From the periphery of where I stood, it seemed they had

14   segmented teams.  For example, one team within the care team

15   worked on social media.  Another I believe was assigned to

16   refills.  But I can't give you a granular breakdown of all the

17   teams.

18   **Q.**    Understood.  Is it fair to say that they assisted in some

19   stopgap measures with respect to -- let me clarify a little

20   bit.

21        You spoke about some pain points in the company.  Is it

22   fair to say that they assisted kind of as needed to -- for

23   overflow?

24   **A.**    What do you mean by overflow?

25   **Q.**    Again, for example, if a provider needed assistance to do

**HILL-ALVAREZ - CROSS / NECHAY**

1  a PDMP check and they didn't have time, would they step in and

2  assist in those type of matters?

3  **A.**   From what I heard in company meetings, that seemed to be

4  the procedure in place.

5  **Q.**   Okay.  Let's move to a different subject.

6       Yesterday, you also discussed a comment that there would

7  be, from your understanding, some type of fine given to the

8  Done corporation and that the matter was essentially being

9  resolved.

10      Do you recall discussing the issue of a fine?

11  **A.**   Yes.

12  **Q.**   It's fair to say that -- is it accurate to say that your

13  perception was there were other regulatory or administrative

14  bodies that were involved in observing what was going on with

15  Done?

16  **A.**   When I returned for the second time, yes.

17  **Q.**   Okay.  I want to return just with a final couple of

18  questions with respect to Dr. Brody.

19      Is it fair to say that he pushed back on antiquated ideas

20  that were not rooted in science with respect to the approach to

21  ADHD treatment?

22          **MS. GURSKIS:**  Objection, foundation.

23          **THE COURT:**  I think the problem with the question is

24  you're asking this witness -- you're asking this witness, did

25  Dr. Brody state that, or words to that effect.

HILL-ALVAREZ - CROSS / NECHAY

```
 1              MS. NECHAY:  Her perception, Your Honor.  Her state of
 2    mind with respect to --
 3              THE COURT:  Yes.  Did she -- well --
 4              MS. NECHAY:  I'm happy to lay a further foundation.
 5              THE COURT:  Okay.  Go right ahead.
 6    BY MS. NECHAY:
 7    Q.   So you are familiar that -- with the Done clinical
 8    policies that Dr. Brody had proudly authored?
 9    A.   He became clinical president, I believe, five to six
10    months before my departure, and at the time, I recall them
11    being talked about, but I don't -- I didn't interact with them
12    directly.
13    Q.   Okay.  So you don't remember the specifics, but you recall
14    their existence?
15    A.   I recall them being talked about.
16    Q.   Okay.  And in general, as you discussed yesterday, you had
17    become familiar with his philosophy on the treatment of ADHD;
18    correct?
19    A.   Yes.
20    Q.   And in terms of your perception of that philosophy and
21    clinical approach, you would agree that Dr. Brody pushed back
22    on antiquated ideas in traditional medicine with its approach
23    to ADHD; correct?
24              MS. GURSKIS:  Objection.  This witness is not a
25    medical provider.
```

HILL-ALVAREZ - REDIRECT / GURSKIS

1           THE COURT:  Sustained.

2   BY MS. NECHAY:

3   Q.   Is it fair and accurate to say that Dr. Brody was willing

4   to take risks in innovation in his efforts to providing access

5   to people with ADHD?

6   A.   From what I can recall, Dr. Brody was very concerned with

7   the stigma associated with this disorder.

8   Q.   And he was very concerned with providing people greater

9   access that did suffer from ADHD; correct?

10          MS. GURSKIS:  Objection.  State of mind question.

11          THE COURT:  I'll allow it.

12          THE WITNESS:  I would say that's true from what I

13   heard him say in company meetings.

14          MS. NECHAY:  Okay.  Thank you very much.

15     No further questions.

16          THE COURT:  Okay.  Redirect?  Thank you.

17                   REDIRECT EXAMINATION

18          MS. GURSKIS:  Thank you, Your Honor.

19   BY MS. GURSKIS:

20   Q.   Good morning, Ms. Hill-Alvarez.

21   A.   Good morning.

22   Q.   Ms. Hill-Alvarez, defense counsel examined you for several

23   hours yesterday; is that right?

24   A.   Yes.

25   Q.   And they spent considerable time asking you about the

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1  money you received from Done.  Do you recall that?

2  **A.**   Yes.

3  **Q.**   Let me ask you this:  Did the money you received change

4  the fact that Defendant He was the CEO of Done?

5  **A.**   No.

6  **Q.**   Did the money received -- you received change the fact

7  that Defendant He prioritized growth over real patient care?

8  **A.**   No.

9  **Q.**   Did the money you received change that Defendant He

10  ignored clinicians when they told her Done's practices were

11  unsafe?

12  **A.**   No.

13  **Q.**   And on the subject of severance payments, did you also

14  receive a severance payment when you left the company in March

15  of 2022?

16  **A.**   As the jury saw, in text, I had resigned.  And my

17  resignation and in part was due to the data discrepancies that

18  I was seeing and the rationale that was being provided.  Two

19  plus two did not equal four in that situation.  In part, that

20  is why I resigned.

21       It also led to some unsavory experiences from colleagues

22  and personal attacks.  When I resigned, I was given a 25-page

23  severance letter, I believe, stating that I could not even talk

24  to a therapist about my experience at Done.

25       I did not know articles were being written.  I didn't know

HILL-ALVAREZ - REDIRECT / GURSKIS

1  things were going on, but it was an intuition that I had had,

2  which is why I decided to leave.

3      And so, yes, I received a severance payment.  I did not

4  want to sign that document, but at the time, I felt, well, I

5  may as well.

6      After I signed, that's when I received the call from

7  Ruthia that I felt was a threat where she told me not to talk

8  to reporters, to remember the contract I had signed, and to

9  speak well of the company.

10 Q.  Ms. Hill-Alvarez, do you recall how much that severance

11 payment was for?

12 A.  I believe $25,000.

13 Q.  And did you also receive bonuses when you worked at the

14 company in 2021 and 2022?

15 A.  Occasionally, yes.

16 Q.  Now, you were also asked many questions about when you

17 first discussed those payments with the Government.

18      Do you recall those questions?

19 A.  From yesterday?

20 Q.  Yes.  Do you recall on cross-examination when the Defense

21 attorney asked you questions about when you discussed the --

22 your severance payments with the Government?

23 A.  Yes.

24 Q.  And you mentioned the severance and bonuses you received

25 during multiple interviews; is that correct?

HILL-ALVAREZ - REDIRECT / GURSKIS

1    **A.**    That's correct.

2              **MS. BELL:**  Objection.  *Napue*, Your Honor.

3              **THE COURT:**  Overruled.

4    BY MS. GURSKIS:

5    **Q.**    And the Government had financial records; correct?

6    **A.**    Correct.

7    **Q.**    And in the October 23 discussion, that was when specific

8    dollar amounts and big details were discussed; correct?

9    **A.**    Correct.

10   **Q.**    And, Ms. Hill-Alvarez, you were also asked some questions

11   on cross-examination about the letter you wrote to the

12   Government this month.  Do you recall that?

13   **A.**    Yes.

14   **Q.**    Is it hard for you to be here testifying in this trial?

15   **A.**    As I mentioned yesterday, you all are here in season five.

16   This has been an experience.  I've seen metaphorical

17   guillotines held to ex-colleagues.  I think it's really cruel

18   to contractually agree to pay someone's federal legal bills

19   that equal 20- to $120,000 and then revoke that when you feel

20   that they're talking to somebody that you don't want them to

21   talk to.

22         It is really hard for me to be here and to relive this

23   over and over.  And in a sense, this is an emotionally

24   pornographic situation where the death of my idealism is on

25   display, and I wish it was something I could go through in

1    private.  Me and Ruthia are the same age.  I was 29.  I'm 34

2    now.  I've gone through a character evolution; right?

3        It's incredibly hard, and it's incredibly hard to not only

4    see what's happening, but to also think about the patients,

5    because when I joined this company I thought it was a

6    lighthouse in a really dark time.  The pandemic was a really

7    different time for all of us.

8        And as you saw yesterday, I really cared about Ruthia, I

9    cared about my team.

10       But I think although maybe this company did help some

11   people, it did hurt some people.  There's one e-mail that

12   stands out to me towards the end of my time there the second

13   time, if I may talk about it.

14   **Q.**   Go ahead, Ms. Alvarez.

15   **A.**   A woman e-mailed --

16           **MS. BELL:**  Your Honor, objection.

17           **THE COURT:**  Sustained.

18   **BY MS. GURSKIS:**

19   **Q.**   Ms. Alvarez, in your letter, you cited that you (as read):

20           "Fear potential retaliation and unjust scrutiny

21       for cooperation for speaking against certain

22       individuals."

23       Do you recall writing that?

24   **A.**   Yes.

25   **Q.**   What certain individuals were you worried about?

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1   **A.**   Ruthia.

2   **Q.**   Why did you fear potential retaliation?

3   **A.**   Because of the way that I saw -- if I can give an example.

4   There was a doctor, Dr. Eric Miller.  She had promised to

5   pay his legal bills.  We were in a meeting with him.  He began

6   crying and she started to laugh, and she said, Lawyers are

7   stupid.  I'll go and represent you.  You're going to be fine.

8   That's a window into some of the things I saw, combined

9   with, as I mentioned, refusal to pay legal fees, other

10  measures, the phone call I received after my first severance

11  contract.

12  You all are seeing and being waterboarded with information

13  and visuals, but I was there.  I was there.  I lived it.

14  And when you come across someone with a certain caliber of

15  character, you have to understand that extending empathy or

16  benefit of the doubt is not something you should do anymore

17  with that person.

18  **Q.**   And you are also asked questions about being able to

19  safely return to your home in Mexico without arrest.

20  Do you recall that, Ms. Hill-Alvarez?

21  **A.**   Yes.

22  **Q.**   Did you have -- did you have concerns about the current

23  situation with ICE and border crossings when you were

24  referencing that in your letter?

25  **A.**   Yes.  I am a Mexican national.  Texas is a very different

HILL-ALVAREZ - REDIRECT / GURSKIS

1  place.  As a woman, it's a very different experience to travel

2  this far.  And I do fear the network associated with this

3  individual and what may happen to me.

4  **Q.**  Did you also have --

5         **MS. BELL:**  Objection, Your Honor, 403.

6         **THE COURT:**  I think we've covered it.  Let's go to

7  another topic.

8         **MS. GURSKIS:**  Sure.

9  **BY MS. GURSKIS:**

10 **Q.**  Did you have concerns about directives you received from

11 Defendant He while working at Done?

12 **A.**  Yes.

13 **Q.**  Did you participate in meetings or discussions where

14 employees raised concerns about whether Done was complying with

15 the law?

16 **A.**  Yes.

17 **Q.**  Such as the meeting where Defendant He said, to

18 paraphrase, The first person who goes to jail gets a Tesla?

19 **A.**  Yes.

20 **Q.**  What did Mr. Menesini say in response to that comment, if

21 you can recall?

22 **A.**  "I do not have the same view of the law as you do."

23 **Q.**  Did Defendant He care to listen to employee concerns about

24 breaking the law and changing Done's model or did she continue

25 to pursue growth?

HILL-ALVAREZ - REDIRECT / GURSKIS

1    **A.**    Pursue growth.

2    **Q.**    And turning back to the severance payments for a moment,

3    you were asked a lot of questions about what you told the

4    Government in September 2022 before you received severance

5    payments in 2024.  Do you recall that?

6    **A.**    Vaguely.

7    **Q.**    Back in 2022, before your June 2024 severance payment, did

8    you tell the DEA agents that the chief medical officer and

9    Defendant He would constantly get into arguments and fight over

10    the patient standard of care?

11    **A.**    Yes.

12    **Q.**    And back in 2022, did you report to the DEA that there

13    were patients assigned to clinicians who were no longer with

14    the company?

15    **A.**    Yes.

16    **Q.**    Back in 2022, did you also report that Jayaram Brindala

17    argued with Ruthia concerning the reassignment of patients who

18    were rejected by a provider based on their initial appointment?

19    **A.**    Yes.

20    **Q.**    And isn't it also true that you said Riley Levy was hired

21    because something was wrong with the company and Levy was

22    placed in the company to fix it?

23    **A.**    That is what he told me, yes.

24    **Q.**    And did you also tell the DEA that you would draft

25    investment reports on behalf of Defendant He and that there

HILL-ALVAREZ - REDIRECT / GURSKIS

1    were times that Defendant He would withhold information from

2    investors by not using the reports that you drafted?

3    **A.**    Yes.

4    **Q.**    You testified on cross that Defendant Brody had compassion

5    for patients.  Do you recall that?

6    **A.**    Yes.

7    **Q.**    Was that based on your social interactions with him or

8    from actually observing him in appointments with patients?

9    **A.**    Social interactions.

10   **Q.**    You were asked on cross whether in most circumstances

11   Defendant Brody was not personally interacting with Done

12   patients.

13        Do you know whether Defendant Brody actually ever

14   conducted medical evaluations of any patients on the Done

15   platform?

16   **A.**    I do not.

17          **MS. GURSKIS:**  And, Ms. Braga, if you could pull up

18   Exhibit 7408, which was received on cross-examination

19   yesterday.

20   **BY MS. GURSKIS:**

21   **Q.**    Do you remember looking on this document yesterday on

22   cross-examination, Ms. Hill-Alvarez?

23   **A.**    Yes.

24   **Q.**    Do you know how many patients Defendant Brody was

25   prescribing stimulants to during the course of his time at

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1   Done?

2   **A.**   No.

3   **Q.**   Do you know how long some of these patients assigned to

4   Defendant Brody went without ever seeing a provider?

5   **A.**   No.

6   **Q.**   So when Ms. Mercado is writing (as read):

7              "These patients will remain under Dr. Brody's

8         panel until the transfer is complete."

9         Do you know whether that took days or months or years?

10  **A.**   I did not know at the time, and I still do not.

11  **Q.**   Okay.  Or whether the transfer even actually happened?

12  **A.**   From the top portion I wrote where you see the number of

13  patients by state, that's a fragment of what I recall where I

14  said I saw about 20- to 25,000 patients under their name.  I

15  think these were the states I was working on at the time for

16  the in-person project.

17        And her answer puzzled me, as it was the very next day

18  where that number dropped from about 20,000 down very, very

19  low, and so I did not know how they transferred that quickly.

20  **Q.**   And this was after the situation you're talking about

21  where the data changed and the patient assignment dropped for

22  Defendant Brody and Dr. Tsang.

23        After you raised concerns, was that data changed

24  overnight?

25  **A.**   Yes.

HILL-ALVAREZ - REDIRECT / GURSKIS

1   **Q.**   And you raised concerns about that data change to

2   Defendant Brody?

3   **A.**   I mentioned in passing, not in a formal sense, that I

4   thought something was going on.

5   **Q.**   Did you raise a concern about that to Defendant He as

6   well?

7   **A.**   I don't recall.

8   **Q.**   And did your lingering concerns about this EHR issue --

9   I believe you said contributed to your decision to leave the

10   company in 2022?

11   **A.**   Yes.  As you can see, this is dated March 3rd.  I believe

12   I exited the company around March 15th.

13   **Q.**   Do you know whether Defendant He had a DEA license to

14   prescribe controlled substances?

15   **A.**   Not to my knowledge.

16   **Q.**   And have you ever seen text messages that are only between

17   Defendant He and Defendant Brody?

18   **A.**   I don't think so.

19   **Q.**   Or the e-mails that are only between Defendant He and

20   Defendant Brody?

21   **A.**   No.

22   **Q.**   But you knew that Defendant Brody was a Stanford-trained

23   psychiatrist?

24   **A.**   Yes.

25   **Q.**   And you were impressed by his résumé and his credentials?

HILL-ALVAREZ - REDIRECT / GURSKIS

1    **A.**    Yes.

2    **Q.**    Do you know the medical standard for how often patients on

3    certain medications should be seen?

4              **MS. NECHAY:**  Objection, calls for expert opinion.

5              **THE COURT:**  I think it's not giving an opinion on what

6    the standards are; it's simply asking is she aware of the

7    standards.

8         So preliminary question is permitted.

9              **THE WITNESS:**  No, I'm not aware.

10   **BY MS. GURSKIS:**

11   **Q.**    Do you know how many times Defendant Brody looked at PDMP

12   records before prescribing stimulants?

13   **A.**    I am not aware.

14   **Q.**    Do you know how many times Defendant Brody reviewed

15   medical records before prescribing stimulants?

16   **A.**    No.

17   **Q.**    And do you recall being shown a document -- shifting years

18   are for a moment -- where Dr. Brindala described himself as

19   more conservative?  Do you recall that?

20             **MS. NECHAY:**  Objection, misstates evidence -- or

21   testimony.  Excuse me.

22             **THE COURT:**  The question is proper.

23        Ladies and gentlemen of the jury, you're to determine what

24   the actual evidence was as stated, but lawyers frequently can

25   ask questions about their recollections of what the evidence

HILL-ALVAREZ - REDIRECT / GURSKIS

```
 1   is.  But because they say it doesn't mean that that was an
 2   accurate representation of the evidence.
 3        Go ahead.
 4            THE WITNESS:  May you repeat the question, please?
 5   BY MS. GURSKIS:
 6   Q.   Of course.
 7        Yesterday, on cross-examination, you were shown some
 8   documents where Dr. Brindala was communicating with other
 9   employees at Done.
10        Do you recall looking at those documents?
11   A.   No.  I would need to see them again.  I saw a lot
12   yesterday.  I'm sorry.
13   Q.   Okay.  Moving away from even the documents for a moment
14   and thinking about just Dr. Brindala as an individual.
15        Do you recall instances where Dr. Brindala described
16   himself on the more conservative end of the spectrum?
17   A.   He was more procedural and textbook.
18   Q.   Okay.  And you also testified that Dr. Brindala had
19   specific concerns about whether Done policies appropriately
20   deferred to clinicians and allowed clinicians to spend
21   sufficient time with patients.
22        Do you recall that?
23   A.   Yes.
24   Q.   You also testified that Dr. Brindala voiced a lot of his
25   concerns about this at meetings.
```

1          Do you recall that?

2    **A.**    Yes.

3    **Q.**    Was Dr. Brindala a lone voice in raising concerns or did

4    others agree with him?

5    **A.**    I would say almost the whole team agreed with him.

6          **MS. GURSKIS:**  Your Honor, at this time, we would like

7    to move in Exhibit 2368, which is an org chart.

8          **THE COURT:**  2368 admitted.

9          (Trial Exhibit 2368 received in evidence.)

10          **MS. GURSKIS:**  If you could pull that up, Ms. Braga.

11    Just zoom in.

12          **MS. BELL:**  Can we get a copy?  We were not advised of

13    additional exhibits.

14          **THE COURT:**  Is this out of focus or is this simply my

15    eyes are out of focus?

16          **MS. GURSKIS:**  It may be the quality of the magic, Your

17    Honor.  I can try it on the ELMO if that's better.

18          **THE COURT:**  It may be better, yeah.

19          **MS. BELL:**  Objection on the basis of hearsay.

20          May I confer with Government counsel?

21          **THE COURT:**  Yes.  Go ahead.

22          **MS. BELL:**  This is a surprise.

23          Could we take a down for a moment?

24                    (Counsel conferring.)

25          **MS. NECHAY:**  Also, Your Honor, I would object on

**HILL-ALVAREZ - REDIRECT / GURSKIS**

 1   foundation.

 2           **MS. BELL:**  Your Honor, foundation but also hearsay,

 3   because there appear to be a number of notes on this.  I

 4   don't -- this is not the --

 5           **THE COURT:**  What is -- okay.

 6       Before I rule, what is this document?  What does it

 7   purport to be and who prepared it?

 8           **MS. GURSKIS:**  It's an org chart of the company that

 9   includes the witness, and it was on the defendant's phone.

10           **THE COURT:**  Pardon?

11           **MS. GURSKIS:**  It's from the defendant's phone.

12           **MS. BELL:**  So, Your Honor, again, foundation as well

13   because this is being presented to us and to the witness for

14   the first time, it seems.

15           **THE COURT:**  Well, this is what I'll allow.  I'll -- I

16   will allow it to be admitted subject to a motion to strike, and

17   I'll discuss it during a recess, the production of it and its

18   authenticity.  Okay?

19       I don't know how else to do it other than stopping the

20   examination.

21           **MS. BELL:**  Your Honor, we would ask if Ms. Gurskis has

22   questions to be posed, but to admit an exhibit that is full of

23   hearsay, may be a draft -- we have no idea what this is.  I

24   mean, this witness certainly can't say how this was created,

25   what it was, whether it was accurate, whether it was not --

HILL-ALVAREZ - REDIRECT / GURSKIS

1          **MS. GURSKIS:**  I can lay the foundation.

2          **THE COURT:**  Okay.  It will come in subject to a motion

3    to strike, and I will review it.

4       Ladies and gentlemen, timing is everything in a trial.  In

5    an ideal situation which we've addressed, certain documents

6    come in without objection and so forth.  Certain documents have

7    not been -- for a variety of reasons have not been reviewed by

8    both sides, and rather than stopping the trial midway, we go

9    through this process in which the Court rules -- the jury

10   doesn't really rule -- I allow something in subject to a motion

11   to strike.

12      So what I'm doing with this particular exhibit is to allow

13   it in subject to a motion to strike, and indeed, the testimony

14   concerning it will come in subject to a motion to strike, and I

15   will address it during the noon recess or at some recess, in

16   the inlet we take a recess, which we will.

17      Okay.  Go ahead.

18      So you can show it.

19          **MS. GURSKIS:**  Thank you, Your Honor.

20          **THE COURT:**  If there's a decent copy of it so that

21   people can see it.

22          **MS. GURSKIS:**  If you could pull up the document,

23   Ms. Braga.

24      Unfortunately, the quality of the image is not great, so

25   I'm not sure how much the zooming in helps, but we can zoom in

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1    more if needed.

2    **BY MS. GURSKIS:**

3    **Q.**   Do you see the org chart that's on the screen,

4    Ms. Hill-Alvarez?

5    **A.**   Yes.

6    **Q.**   Do you recognize this as the structure of the company when

7    you were working there in 2021 and 2022?

8             **MS. NECHAY:**  Objection.  The question isn't laying

9    foundation for this document.

10            **THE COURT:**  Overruled.  Go ahead.

11            **THE WITNESS:**  I recall seeing something like this,

12   yes.

13   **BY MS. GURSKIS:**

14   **Q.**   You recall seeing a document like this when you worked at

15   the company?

16   **A.**   Yes.

17   **Q.**   Okay.  So looking at the individuals on this document, do

18   you see where Dr. Brindala is identified?

19   **A.**   Yes.

20   **Q.**   Okay.

21            **MS. GURSKIS:**  If you could circle that, Ms. Braga.

22   **BY MS. GURSKIS:**

23   **Q.**   Did Dr. Brindala leave the company in 2021?

24   **A.**   Yes.

25   **Q.**   Who entered clinical leadership after Dr. Brindala's

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1  departure?

2  **A.**   Dr. Brody, but I don't remember if it was right away.

3  **Q.**   Okay.  And do you see Rick Menesini mentioned on this org

4  chart?

5  **A.**   Yes.

6  **Q.**   Did Mr. Menesini raise concerns about Done operations?

7  **A.**   Yes.

8  **Q.**   Did he leave the company in 2022?

9  **A.**   I believe it was Christmastime of 2021, 2022.

10 **Q.**   And do you see Kristin Neland or Kristin Bowen identified

11 on this org chart?

12 **A.**   Yes.

13 **Q.**   Did Ms. Neland raise concerns about Done operations?

14 **A.**   Yes.

15 **Q.**   Did she raise -- did she leave the company in

16 approximately 2022?

17 **A.**   I believe it was 2021.

18 **Q.**   Okay.

19       And next to her name, do you see Denis Lam?

20 **A.**   Yes.

21 **Q.**   Did Denis Lam raise concerns about Done operations?

22 **A.**   Yes.

23 **Q.**   Did he leave the company in the 2021/2022 time frame?

24 **A.**   Yes.

25 **Q.**   Do you see TJ Williams' name on this document?

HILL-ALVAREZ - REDIRECT / GURSKIS

```
1    A.    Yes.

2    Q.    Did Mr. Williams raise concerns about Done operations?

3    A.    Yes.

4    Q.    Did he also leave the company in around 2021 or 2022?

5    A.    Yes.

6    Q.    And Mr. Menesini, Ms. Neland, Mr. Williams, Mr. Lam, all

7    of them either resigned or were fired by Defendant He?

8    A.    Correct.

9    Q.    How close in time was their departure from the company

10   relative to when they raised problems at Done?

11          MS. BELL:  Objection, Your Honor.  Cumulative and

12   foundation and --

13          THE COURT:  Cumulative overruled.  Foundation

14   sustained.  Lay a foundation.

15   BY MS. GURSKIS:

16   Q.    You were in meetings where each of these individuals

17   raised concerns to Defendant He.

18          Do you recall that?

19   A.    Yes.

20   Q.    And you -- in terms of the way that they would raise

21   concerns, was it calmer or did it escalate?

22   A.    In the beginning it was very calm and professional, and

23   then it would escalate.

24   Q.    And did you observe a pattern in terms of people who

25   voiced concerns and how long they lasted at the company?
```

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1    **A.**    Yes.

2    **Q.**    Did you observe a pattern in terms of people who raised

3    concerns and the timing of when they left the company relative

4    to when they raised those concerns?

5    **A.**    Yes.

6    **Q.**    Was that timing close in time or distant in time from

7    raising concerns?

8            **MS. BELL:**  Objection, Your Honor.

9            **THE COURT:**  Vague.  Sustained.

10            **THE WITNESS:**  May I answer?

11    BY MS. GURSKIS:

12    **Q.**    No.  I'll rephrase the question.  Thank you,

13    Ms. Hill-Alvarez.

14        In terms of -- how long after, on average, would you say

15    after an employee -- one of these employees raised concerns

16    were they then terminated or did they depart from the company?

17            **THE COURT:**  What she wants to know is how soon after

18    somebody raised a concern did they leave the company.

19            **THE WITNESS:**  From what I can recall, an average

20    within a month to two -- two months.

21            **MS. GURSKIS:**  Thank you, Your Honor.

22    BY MS. GURSKIS:

23    **Q.**    And you're not a doctor, right, Ms. Hill-Alvarez?

24    **A.**    Correct.

25    **Q.**    You're not a nurse practitioner?

HILL-ALVAREZ - REDIRECT / GURSKIS

1   **A.**   Correct.

2   **Q.**   But Defendant Brody and Dr. Brindala are medical

3   professionals; right?

4   **A.**   Yes.

5   **Q.**   And were you aware that Ms. Neland has a nursing degree?

6   **A.**   I think I recall that.

7   **Q.**   And they all told Defendant He that the practices at Done

8   were unsafe?

9        **MS. BELL:**  Objection, Your Honor.  Same objections.

10        **THE COURT:**  Foundation.  Foundation.

11        **MS. GURSKIS:**  Yes, Your Honor.

12   **BY MS. GURSKIS:**

13   **Q.**   And the concerns that Defendant Brody, Dr. Brindala, and

14   Ms. Neland raised, did those concerns have to do with patient

15   care and clinic -- clinician-patient interaction at Done?

16   **A.**   In part, yes.  That was the main crux of it.

17   **Q.**   Were there also similar complaints raised from

18   on-the-ground clinicians?

19        **MS. BELL:**  Objection, Your Honor.  Vague.  Same thing,

20   compound, foundation.

21        **THE COURT:**  I'll allow it.  Go ahead.

22        **THE WITNESS:**  Can you define "on-the-ground

23   clinicians," please?

24   **BY MS. GURSKIS:**

25   **Q.**   Sure.  So looking at this org chart, in terms of

HILL-ALVAREZ - REDIRECT / GURSKIS

1  Ms. Neland, were you aware if she had a patient panel of her

2  own?

3  **A.**   Not that I know of.

4  **Q.**   In terms of providers who actually had patient panels or

5  providers who were interviewing with the company, were you

6  familiar with them voicing concerns about Done's clinical

7  policies?

8  **A.**   I recall hearing that a lot of them were concerned about

9  the initial appointment time and then the follow-up.

10  **Q.**   And you referenced initial appointment time.  Was that a

11  concern you also heard Defendant Brody raise?

12  **A.**   Yes.

13  **Q.**   Were you aware of any changes made to the initial

14  appointment time or the follow-up time while you were at Done?

15  **A.**   Not that I'm aware of.

16  **Q.**   You also described Defendant Brody as a figurehead.

17       Do you recall that?

18  **A.**   Yes.

19  **Q.**   Did you use the term "figurehead" because you expected the

20  clinical president to play more of a role in setting clinical

21  policies?

22  **A.**   I expected him to be allowed to do that.

23  **Q.**   Did you believe that Defendant Brody was in place in

24  clinical leadership for the optics of that position?

25  **A.**   Not in the beginning, but that's what I came to believe.

HILL-ALVAREZ - REDIRECT / GURSKIS

1   **Q.**   Okay.

2          **MS. GURSKIS:**  You can take that down.  Thank you,

3   Ms. Braga.

4   **BY MS. GURSKIS:**

5   **Q.**   You were asked some questions on cross-examination about

6   different events that happened when you returned to Done in

7   2023.  Do you recall that?

8   **A.**   Yes.

9   **Q.**   Do you recall on cross-examination being shown some

10  correspondence with Hayley Zhu around the time or close in time

11  to when you returned to the company?

12  **A.**   Yes.

13  **Q.**   When you first returned to the company, who did you think

14  was in charge?

15  **A.**   Hayley Zhu.

16  **Q.**   Was this reflected on company documentation?

17  **A.**   I believe she was listed as -- I don't remember the title,

18  but interim general manager, something of that nature.

19  **Q.**   Who did you come to realize was actually in charge?

20  **A.**   Ruthia.

21  **Q.**   How could you tell that Defendant He was actually in

22  charge?

23  **A.**   Over some dialogues with Hayley, I began to witness her

24  confer with Ruthia, and Hayley was sort of the middle person

25  between other employees and Ruthia, and Ruthia would direct her

HILL-ALVAREZ - REDIRECT / GURSKIS

1    what to tell the employees and what to do, combined with also

2    receiving Slack messages from Ruthia with requests and

3    directions.

4    Q.    At some point, did Ms. Zhu get replaced by Joanne Dai?

5    A.    Joanne Dai and Nikita Mercado.

6    Q.    And were you aware of Joanne Dai and Niki Mercado all

7    acting as a conduit in a similar fashion as Ms. Zhu?

8    A.    Yes.

9         MS. GURSKIS:   Ms. Braga, if we could pull up

10   Government Exhibit 2869.

11   BY MS. GURSKIS:

12   Q.    Did Defendant He present things on paper that didn't

13   accurately reflect the leadership of the company?

14   A.    That's a layered question.

15        I would say this org chart, for example, did not have

16   everyone who worked there on it.

17   Q.    And in addition to not having everyone who worked there on

18   it, do you see where Defendant He is listed off the to side

19   under Innovation?

20   A.    Yes.

21   Q.    I think you just testified that she was running the

22   company; right?

23   A.    That was my perception of it.

24   Q.    And you mentioned Ms. Mercado as somebody who was acting

25   as a conduit or Defendant He during that time period?

**HILL-ALVAREZ - REDIRECT / GURSKIS**

```
 1   A.    Yes.

 2   Q.    Just a moment ago.

 3         Do you ever see Ms. Mercado push back or say no to

 4   Defendant He?

 5   A.    She said --

 6         MS. BELL:  Objection, Your Honor, outside -- beyond

 7   the scope.

 8         THE COURT:  Overruled.

 9         THE WITNESS:  She said she was afraid to.

10   BY MS. GURSKIS:

11   Q.    Did you see that in practice?

12   A.    No.  It's just something she told me.

13   Q.    Would she regularly tell you about her concerns in saying

14   no to Defendant He?

15         MS. BELL:  Objection, Your Honor, leading.

16         THE COURT:  Sustained.

17         MS. GURSKIS:  I'll move on, Your Honor.

18   BY MS. GURSKIS:

19   Q.    You were asked --

20         MS. GURSKIS:  You can take that down.  Thank you,

21   Ms. Braga.

22   BY MS. GURSKIS:

23   Q.    You were asking on cross-examination about Rumi Ge and

24   Xena Zhao.  Do you remember that?

25   A.    Yes.
```

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1  Q.   And Ms. He had presented Ms. Ge and Ms. Zhao as lawyers

2  when you returned to the company.

3       Do you recall that?

4  A.   Yes.

5  Q.   And by the time of the introduction to Ms. Ge and

6  Ms. Zhao, had Defendant He also given you instructions about

7  when and how to communicate with her in writing?

8  A.   Yes.

9  Q.   Did Defendant He tell you only to communicate with her on

10 a privileged and confidential channel that included Ms. Ge and

11 Ms. Zhao?

12 A.   Yes.

13 Q.   And on that channel, were you having general conversations

14 about the company or were you seeking legal advice from Ms. Ge

15 and Ms. Zhao?

16 A.   There were several channels with the title.  I would say,

17 an estimate of two or three, I would seek legal advice but the

18 others seemed to be general conversations.

19 Q.   And thinking also to this time when you returned to the

20 company in 2023, was accessing information and documents when

21 you returned to that -- to Done at that time more challenging

22 than it had been previously, or was it about the same?

23 A.   It was very challenging.

24 Q.   Were people communicating more openly or less openly when

25 you returned to Done in late 2023?

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1   **A.**   It was like a ghost ship.  No one really talked.

2   **Q.**   And you testified on cross that you believe

3   Defendant Brody's communication access was restricted around

4   that time.  Do you recall that?

5   **A.**   Yes.

6   **Q.**   So that would have been in December of 2023 when you

7   returned or later in 2024?

8   **A.**   I want to say if I can recall it was within a week or two

9   of my return.  So I'm not sure of the timing.  September,

10  October 2023.

11  **Q.**   And when you referenced communications, were you

12  specifically referencing to Slack messages and Slack access?

13  **A.**   That's what I can recall.  I'm not sure if e-mail access

14  was removed or not.

15  **Q.**   So Slack was one of the different written communication

16  channels at Done?

17  **A.**   Slack and e-mail.

18  **Q.**   And did you know whether Defendant Brody still had access

19  to his phone and text messages and e-mail, as you said?

20  **A.**   I believe he had access to his e-mail but not Slack.

21  **Q.**   Okay.  You were also asked some questions on cross about

22  33 e-mail user groups that disappeared in June of 2024.

23       Do you recall that?

24  **A.**   Yes.

25  **Q.**   And the Defense attorney showed you some documents where

```
 1   the deletion of 33 e-mail user groups was described as an
 2   accidental mistake by Charo May Sunga.
 3        Do you recall that?
 4   A.   Yes.
 5   Q.   Do you recall whether Ms. Sunga was part of the care team
 6   in the Philippines?
 7   A.   I believe she was.
 8        MS. GURSKIS:  Okay.  Ms. Braga, if you could pull up
 9   Exhibit 7437.
10   BY MS. GURSKIS:
11   Q.   Do you recall looking at this document yesterday on
12   cross-examination, Ms. Hill-Alvarez?
13   A.   It's not on my screen yet.
14   Q.   Oh, I'm sorry.
15                     (Pause in proceedings.)
16   A.   Yes.
17   Q.   Have you ever deleted a document or a piece of data
18   before?
19   A.   Yes.
20   Q.   Is there typically a pop-up message with some kind of
21   warning when you're about to permanently delete a file?
22   A.   Yes.
23   Q.   You also spoke about deleting a group was like deleting
24   photos from your phone; you individually have to click every
25   single one.
```

HILL-ALVAREZ - REDIRECT / GURSKIS

1          Do you recall testifying to that?

2    **A.**   Yes.

3    **Q.**   Are you aware of how adding a provider to one e-mail group

4    could lead to the accidental deletion of 33 different e-mail

5    groups, such as the groups for payroll, finance, compliance,

6    and insurance?

7              **MS. BELL:**  Objection, Your Honor, argument, leading.

8              **THE COURT:**  Overruled.

9              **THE WITNESS:**  The explanation did not make sense to

10   me.

11   **BY MS. GURSKIS:**

12   **Q.**   Is that why you used air quotes when you called the

13   deletion accidental on direct examination?

14   **A.**   Yes.

15   **Q.**   And this wasn't the only situation about data access that

16   concerned you at this time, was it?

17   **A.**   I had a lot of concerns at that time.

18   **Q.**   Such as the materials from your first time at Done that

19   you could no longer access?

20   **A.**   In part, yes.

21   **Q.**   And the role of the China team in document access at that

22   time?

23             **MS. BELL:**  Your Honor, leading.

24             **THE COURT:**  Overruled.

25             **THE WITNESS:**  In part, yes.

HILL-ALVAREZ - REDIRECT / GURSKIS

1    BY MS. GURSKIS:

2    Q.   Do you recall a time when the China team was requesting

3    log-in credentials for U.S.-based Done employees?

4    A.   Yes.   That occurred the morning of the letter I submitted

5    my resignation when they began to ask for my log-in and the

6    log-ins of other employees.

7    Q.   Did it feel like there was an inner circle around document

8    access or document deletion at this time?

9            MS. NECHAY:   Objection, compound.

10           MS. BELL:   Leading, Your Honor.

11           THE COURT:   Sustained.

12   BY MS. GURSKIS:

13   Q.   In terms of who had -- was controlling the access to

14   documents, Ms. Hill-Alvarez, did it seem like that was a large

15   group of people or a small group of people?

16           MS. BELL:   Speculation, vague, beyond the scope,

17   compound.

18           THE COURT:   Overruled.

19           THE WITNESS:   It seemed to me that the team in China

20   was in the know and everyone outside of it was not.

21   BY MS. GURSKIS:

22   Q.   And what about Defendant He?

23   A.   From what I observed, Yue Wang and Defendant He

24   collaborated very closely in that regard.

25   Q.   And Yue Wang was a leader on the China team?

1    **A.**    Correct.

2    **Q.**    You've -- we've heard you testify a few times about --

3         Or actually, let me shift gears for a second.

4         You testified on cross-examination about your blog post

5    related to the stigma of ADHD and controlled substances.

6         Do you recall that?

7    **A.**    Yes.

8    **Q.**    And in terms of the access to care and access to

9    medication -- or let me rephrase.

10        So in terms of your concerns when you left the company in

11   June of 2024, did your concerns relate to the accessibility of

12   care for patients?

13   **A.**    There was not enough manpower to deal with the fallout of

14   the resignations that week combined with the China team

15   removing certain administrative privileges the care team had to

16   connect with patients, combined with the China team's refusal

17   to turn off the intake form, which the marketing team wanted to

18   do, as there was simply not enough manpower to handle any more

19   new patients.

20        Having these abilities in tech removed from you is

21   challenging, and it became evident that the patients were going

22   to fall through the cracks.

23        And so, yes, it was a challenging situation to be in where

24   whatever power you had to help is taken from you.

25   **Q.**    And some of those concerns about patient access to

HILL-ALVAREZ - REDIRECT / GURSKIS

1    providers were concerns that you had even when you were back at

2    the company in 2022, when you had that observation about the

3    EHR; right?

4              **MS. BELL:**  Objection, Your Honor, leading.

5              **THE COURT:**  Sustained.

6    **BY MS. GURSKIS:**

7    **Q.**   You left the company in 2022, right, Ms. Hill-Alvarez?

8    **A.**   Yes.

9    **Q.**   And in terms of when you left the company, did that relate

10   to your concerns about the ratio of patient to providers that

11   you saw in the EHR, as you were testifying about earlier?

12             **MS. BELL:**  Objection, Your Honor, leading.  And we're

13   just rehashing the direct at this point.

14             **THE COURT:**  Well, I think it's already been covered.

15   Thank you.

16             **MS. GURSKIS:**  Thank you, Your Honor.

17   **BY MS. GURSKIS:**

18   **Q.**   You were shown a lot of documents on cross-examination

19   from 2021.  Do you recall that?

20   **A.**   Yes.

21   **Q.**   Was that approximately the year that you joined Done?

22   **A.**   That was the year.

23   **Q.**   And you were shown messages from 2021 where you criticize

24   Ms. Neland.  Do you recall that?

25   **A.**   Yes.

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1   **Q.**   And you also said on cross that by the time you left Done,

2   you saw behind the curtain when it came to the anger and

3   frustration with Ms. Neland?

4   **A.**   Yes.

5   **Q.**   As time went by, did you see similar anger and frustration

6   from other employees at Done?

7   **A.**   Yes.

8   **Q.**   What did it feel like trying to get Defendant He to

9   implement meaningful change at Done?

10          **MS. BELL:**   Your Honor, cumulative at this point.

11  We've covered this as well.

12          **THE COURT:**   I'll allow this.

13          **THE WITNESS:**   There's a level of empathy and giving

14  benefit of the doubt and trying to build a bridge where

15  perspectives can align and move forward with a solution.

16          And so in the beginning, it felt like, well, maybe if I

17  make a more thorough document.  Maybe if I make a more thorough

18  presentation.  Maybe if I collaborate with other team members,

19  we can push forward.

20          And it felt like you were beating a wall till your

21  knuckles were bloody, and that kind of escalation can lead to

22  emotional outbursts, can lead to being frustrated, and then to

23  that in turn be told, "I think your mental health is not well;

24  you need to take a rest," felt a certain way.

25  \\\

HILL-ALVAREZ - REDIRECT / GURSKIS

BY MS. GURSKIS:

Q.   When you say, "to be told, 'I think your mental health is not well; you need to take a rest,'" who would say that?

A.   Ruthia.

Q.   And who would she say that to?

A.   She said it to me several times and sometimes to other employees.

Q.   In the context of people raising concerns like you just were talking about?

          MS. BELL:  Objection, Your Honor, leading.

          THE COURT:  Overruled.

          THE WITNESS:  As I mentioned, this is season five. We're talking season one.  These things progressed to being more intense, and once it got very intense and I felt like I already explained this as thoroughly as I could.  Why are we not doing this in my own workflow and what I witnessed from other employees that I worked with, my ex-colleagues, it seemed to me like gaslighting, in a way.

BY MS. GURSKIS:

Q.   So the gaslighting, is that another -- is that what you meant when you were saying -- or referring to the curtain or looking behind the curtain when it came to your perception of Ms. Neland?

A.   In a remote setting, it's challenging.  Here I can see all your faces; right?

1    In a remote setting -- and this company was primarily

2    remote -- this is the first time I'm -- first time I'm actually

3    seeing my ex-colleagues in person.  You just hear things that

4    happen.  You hear someone had an argument, someone did this,

5    someone did this, and it's all kind of like a video game.  It

6    happens somewhere else on the map.  It's not really something

7    you're seeing?

8    And so these things trickle in.  And it came to be that

9    when people would leave the company, I noticed that was the

10   trend, that they needed to take a break.  They needed to watch

11   for their mental health -- watch out for their mental health.

12   And so it's one of those things where you just have to

13   live through it to understand it, I think.  And then you're put

14   in that situation, and you understand and you remember, oh,

15   this is what happened to them.  This is what they were feeling.

16   This is what they were going through.

17   And so that's why I believe, yes.

18   **Q.**    You were also asked some specific questions on

19   cross-examination about your initial impressions of

20   Defendant He.  One of them was about how you initially

21   perceived her fluency in English.

22   What did you come to learn about Defendant He's fluency in

23   English?

24   **A.**    It's my view that she's fully fluent in English.

25   **Q.**    Can you give any examples?

**HILL-ALVAREZ - REDIRECT / GURSKIS**

1  **A.**   As someone who speaks more than one language, sure there

2  are grammatical errors, especially before ChatGPT, AI could

3  help you out with these things.

4        But all meetings I had with her, 2021 and '22, were in

5  English.  She wrote documents in English.  She seemed to have a

6  very strong grasp of English.

7  **Q.**   You were also shown some birthday cards and some kind and

8  loving messages that you wrote to Defendant He in 2021.

9        Do you recall that?

10 **A.**   Yes.

11 **Q.**   What did you eventually conclude about Defendant He's

12 goals in terms of whether she wanted profit or was more

13 concerned about patient care?

14        **MS. NECHAY:**  Your Honor, asked and answered,

15 cumulative.

16        **THE COURT:**  Sustained.

17 BY MS. GURSKIS:

18 **Q.**   So did the concerns you had at Done feel more like the

19 accidental side effect of a growing company or something more

20 deliberate?

21        **MS. NECHAY:**  Same objection.

22        **MS. BELL:**  Argument, Your Honor.

23        **THE COURT:**  Sustained.

24 BY MS. GURSKIS:

25 **Q.**   Ms. Hill-Alvarez, you've testified about the different

HILL-ALVAREZ - REDIRECT / GURSKIS

1  seasons that you experienced while interacting with Done from

2  season one to season five.

3      How has your perspective on the company and patient care

4  evolved from season one as we sit here now and season five?

5  **A.**   2021, the pandemic vaccine's barely coming out.  People

6  are barely starting to leave their homes again.  I really

7  believed in the mission, and I think my colleagues at the time

8  had the same passion about it, to really believe in it, to

9  really want to help people, really care about people, not in an

10 artificial marketing PR way, but really to see that now, I

11 think my big heart got me in a situation where I got duped, and

12 I think I can say that for some of my ex-colleagues as well.

13     Because in the beginning, you wanted to give benefit of

14 the doubt.  Like okay, we're remote, times are strange in the

15 world, we're all from different cultures.  There's things to

16 fix, things to build, and there was a mindset about

17 problem-solving there, and then it became clear that that was

18 not it, and I think that's evident as well when 2024, you know,

19 taking in new patients when there's not a capacity to take in

20 new patients anymore.  And so for me, it's heartbreaking.

21     It's heartbreaking because, I mean, I think people deserve

22 better, and I think people should be better.  It's

23 heartbreaking to go see that they choose not to be.

24         **MS. GURSKIS:**  No further questions.  Thank you, Your

25 Honor.

1    **THE COURT:**  Ladies and gentlemen, we're going to take

2   our recess now.  We'll be in recess until a quarter of.

3    Remember the admonition given to you:  Don't discuss the

4   case, allow anyone to discuss it with you, form or express any

5   opinion.

6                    (The jury leaves the courtroom.)

7    (Proceedings were heard out of the presence of the jury.)

8    **THE COURT:**  Okay.  The jury has retired.  So let's

9   talk about the organizational chart or whatever that is.

10    Is there -- there's an objection to it.  Ms. Bell.

11    **MS. BELL:**  Thank you, Your Honor.

12    We have a few questions about it, and I think we will be

13   able to withdraw our objection.  I just want to make sure I can

14   see it, because I had trouble --

15    **THE COURT:**  Okay.  Thank you.

16                    (Recess taken at 10:32 a.m.)

17                  (Proceedings resumed at 10:47 a.m.)

18    (Proceedings were heard out of the presence of the jury.)

19    **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

20   session.

21    **THE COURT:**  Okay.  Bring in the jury.

22                  (The jury enters the courtroom.)

23    (Proceedings were heard in the presence of the jury.)

24    **THE COURT:**  Okay.  Let the record reflect -- please be

25   seated.  All parties are here.  Jurors are here.

HILL-ALVAREZ - RECROSS / BELL

1        You may proceed.

2            MS. BELL:  Thank you, Your Honor.

3                    <u>RECROSS-EXAMINATION</u>

4    BY MS. BELL:

5    Q.   Good morning, Ms. Hill-Alvarez.

6    A.   Good morning.

7    Q.   I promise I'll be very brief, just a few questions for

8    you.  I know it's been a long road here.

9        You talked about Ruthia's fluency in English, and in fact,

10   she told you she was fluent in English; right?

11   A.   I don't recall her saying that explicitly.

12   Q.   Okay.  But what she -- what you do remember is that she

13   told you that her pronunciation, choice of words, and grammar

14   aren't great and that she welcomed corrections when she might

15   be confusing or it might be incorrect; right?

16   A.   She said something of that nature.

17   Q.   Okay.  And she also told you that in her feedback,

18   sometimes she sounds more like she's giving an order or being

19   too direct, especially when in a rush or if there's already a

20   stable work relationship, instead of discussing and agreeing on

21   an actionable item, even when she means the latter.

22       Do you remember that?

23   A.   I recall the first portion of your question, which is why

24   the team advocated for executive coaching and had a lot of

25   benefit of the doubt.  I recall her saying something to that

1    effect.

2    **Q.**    And she also explained to you that sometimes she may make

3    the team feel like she's scolding because she very

4    straightforward and direct, and part of it could be due to

5    culture difference as in being angry for a perceived fault, and

6    she said it's okay to say, you know, back to her, I don't mind

7    you making that point, but your tone doesn't make me feel

8    respected.

9        Do you recall that?

10        **MS. GURSKIS:**    Objection, hearsay.    It sounds like the

11    counsel is testifying.

12        **THE COURT:**    Overruled.

13        **THE WITNESS:**    That rationale was something that the

14    team believed and why everyone was very compassionate, and then

15    over time you came to see that was not the case.

16        But she did say that.

17    **BY MS. BELL:**

18    **Q.**    Okay.    And do you recall that she also told you that she

19    can be perceived as negative since she has perfectionism -- a

20    perfectionism habit from being a designer and tends to focus on

21    what can be improved, and so she told you and others that it's

22    okay to ask, What recent improvements are you happy about?

23        Do you recall that?

24    **A.**    I don't recall the exact statement, but she did share some

25    of those sentiments, which is why we all tried to help her and

HILL-ALVAREZ - RECROSS / BELL

1  why we all gave her a lot of grace for how she spoke and acted.

2  But there did come a point where things crossed a line too many

3  times.

4  **Q.**   I totally understand your perspective on that.

5       Last question on this.

6       Do you recall her also saying that she has a strong

7  opinion on the design of the user experience and branding

8  because it's her responsibility to raise the bar in these

9  areas, and she explained it can be perceived --

10          **THE COURT:**  Wait.  This is quite a question.

11          **MS. BELL:**  Yes, Your Honor.  Let me pause.

12          **THE COURT:**  It's a little compound.

13          **MS. BELL:**  Yes, Your Honor.  Let me break that down.

14  Thank you.

15  **BY MS. BELL:**

16  **Q.**   So do you remember her saying that she has strong opinions

17  on the design of the user experience and branding because it's

18  her responsibility to raise the bar in those areas?

19  **A.**   No, I don't remember.

20  **Q.**   And do you recall that that can --

21       Well, let me see if this refreshes your recollection.

22          **MS. BELL:**  Could we put up for the witness, the Court,

23  and the Government Exhibit 7581 at 2, Item 8.

24       And I guess we should show the first page of this

25  document -- okay.

HILL-ALVAREZ - RECROSS / BELL

1   BY MS. BELL:

2   Q.   So these are some instructions which you posted which you

3   testified about yesterday, entitled "Working with Ruthia," and

4   I'd like to see if this refreshes your recollection, page 2,

5   about what I just asked you about.  It was Item 8.

6   A.   I recall she shared this document.

7          MS. BELL:  Your Honor, we'd move to admit the document

8   at this point.

9          THE COURT:  Overruled.

10         MS. BELL:  Okay.

11  BY MS. BELL:

12  Q.   Do you recall, having now reviewed the document, that she

13  expressed to you that she has a strong opinion on the design of

14  the user experience and branding because it's her

15  responsibility to raise the bar in these areas?

16  A.   I recall looking at the document, but I don't recall her

17  ever explicitly stating that to me.

18  Q.   Okay.  And do you recall her talking about -- that her

19  form of communication and interaction can be perceived as

20  micromanagement sometimes, but "if you provide compelling

21  reasoning and evidence, I can be convinced"?

22         Do you recall her saying that to you and others?

23  A.   We learned that was not true, but she did say it.

24  Q.   Okay.  And finally, do you recall her being open about the

25  fact that she does take hard feedback but she's difficult to

1    give feedback to because she can be intimidating, that she

2    acknowledged that.

3         Do you recall that?

4    A.   This is what's in the document, and it's something that me

5    and my ex-colleagues really had empathy to and really gave

6    benefit of the doubt to.  But over time, you see a different

7    side of her.

8    Q.   Thank you.

9         MS. BELL:  We can take that down.

10   BY MS. BELL:

11   Q.   And you do recall that there was an instruction document

12   that was posted publicly for employees about working with

13   Ruthia; is that right?

14   A.   I don't remember if it was posted publicly or just in

15   Slack that she shared it.

16   Q.   Okay.  So you testified that one area in which you had

17   this issue with Ruthia's communication was with the suggestion

18   of taking mental health days or time off, which felt like

19   gaslighting.

20        Do you remember that testimony on redirect?

21   A.   I never mentioned mental health days, but I do recall

22   advocating for the team to have them and arguing with Ruthia

23   and agreeing to do their workload sometimes to allow them to

24   have a day off so she would agree here and there to give them

25   Fridays occasionally off.

1          **MS. BELL:**  Okay.  And if we can just pull up 7441 in

2     evidence.

3     **BY MS. BELL:**

4     **Q.**   And we looked at this message yesterday --

5     **A.**   This is the one that I wrote, yes.

6     **Q.**   Okay.  And so we see on page 2 here --

7          **MS. BELL:**  If we could go to the sixth line from the

8     bottom.  Sixth line from the bottom, Ruthia's message --

9     **BY MS. BELL:**

10    **Q.**   -- which you drafted, where it says (as read):

11         "As a mental health company, it's important that

12        we all remember..."

13        Okay.  And then you say (as read):

14         "We will have -- we will all have off days at

15        some point or we will make mistakes.  Please have the

16        self-awareness needed to know when you need to take a

17        rest"

18        Do you see that?

19    **A.**   Yes.

20    **Q.**   And that's what you're saying you drafted.

21        She was copied on this; right?

22    **A.**   In regard to this message, I drafted it for her because

23    she was starting to have really rocky relationships with the

24    team.  A lot of the meetings we had were arguments.  I mean,

25    sometimes people were flat-out yelling.

HILL-ALVAREZ - RECROSS / BELL

1          MS. BELL:  And then if we could just scroll down and

2    see you respond --

3          THE WITNESS:  I'm not finished speaking.

4    BY MS. BELL:

5    Q.   Oh, I'm so sorry.  Go ahead.

6    A.   Thank you.

7          I drafted this in efforts to try to help because she told

8    us some of these things that were in the other document that we

9    were shown.  And that was evidence of the benefit of the doubt

10   that me and the team tried to extend to her.

11         However, things are not always as they appear, and over

12   time, you learn someone's character.

13         I'm done speaking.

14   Q.   Thank you.

15         And so let's just scroll down.  And you posted a response

16   to the message; right?

17   A.   This is about four months into me working there.  I

18   drafted this.  She copy-pasted it, posted it, and I was

19   supporting her as I wanted the team to find ways to build

20   bridges to communicate across what I believed were cultural

21   differences so that we could provide solutions for patients.

22         So, yes, I supported her in this at that time.

23   Q.   Thank you.

24         MS. BELL:  Okay.  We can take that down.

25   \\\

HILL-ALVAREZ - RECROSS / BELL

```
 1    BY MS. BELL:
 2    Q.    So let's go -- last set of questions -- 2368, which was
 3    the org chart that the Government showed you.  It's very tiny.
 4            MS. BELL:  But if we could blow up, first of all, the
 5    notes next to Ruthia's name.
 6    BY MS. BELL:
 7    Q.    And so do you see here where there are these notes (as
 8    read:)
 9            "Set a clear vision.  Get the right people."
10    Do you see that?
11    A.    Yes.
12    Q.    And then other items related to finances as well as
13    raising the bar for user experience and branding.
14    Do you see that?
15    A.    Yes.
16    Q.    Okay.  Now let's go to Dr. Brody if we could.
17    Okay.  So do you see provider office hours, clinical
18    questions, and clinical protocols there?
19    A.    Yes.
20            MS. BELL:  Now, if we could zoom out a bit and also go
21    over to Dr. Brindala over there on the right.  Okay.
22    BY MS. BELL:
23    Q.    And do you see Dr. Brindala at this point had actually
24    moved into a business role; right?
25    And it says there that he was focused on business strategy
```

HILL-ALVAREZ - RECROSS / BELL

1  and expansion.  Do you see that?

2  **A.**    I see it on the screen.

3  **Q.**    Okay.  And you testified that he left the company, but are

4  you aware that he continued to stay on as a consultant,

5  communicating with investors and potential buyers for the

6  company?

7  **A.**    I was aware he maintained contact when upset patients

8  would message him on LinkedIn for help because nobody in the

9  company was responding.  So in some capacity, yes.

10  **Q.**    Okay.  So you knew he stayed on as a consultant in some

11  capacity?

12  **A.**    Yes.

13  **Q.**    Okay.  And you testified --

14       **MS. BELL:**  We can zoom out a bit.

15  **BY MS. BELL:**

16  **Q.**    But you testified that a number of people on this chart

17  had left after raising concerns.

18       Do you recall that testimony on redirect?

19  **A.**    Yeah.

20       **MS. BELL:**  But if we could go back to Exhibit 6191,

21  which we looked at yesterday.

22  **BY MS. BELL:**

23  **Q.**    So this is in October 2021 document.  And, in fact, here

24  we see you were raising concerns about some of these people to

25  Ruthia; right?

HILL-ALVAREZ - RECROSS / BELL

1    **A.**    This is complex.  From what I recall, this was in October,

2    I believe Kristin left in August, which was two months prior to

3    this message.  And at the time, I was new to tech.  I was an

4    educator.  A lot of my perspective of what was going on was in

5    regard to what Ruthia told me in regard to how employees were

6    or were not performing.

7    **Q.**    Okay.

8    **A.**    She also tasked me with -- which is not reflected on any

9    company org chart -- trying to improve the culture, which, as I

10   mentioned yesterday, I learned that came to mean something

11   very, very different than what I thought.

12       And so this was -- in season one of my experience with the

13   company.  And when I read this message, I feel manipulated,

14   because I think these people were seeing something and they

15   were voicing it, and they were being told that they didn't know

16   how to do their job when I think, in fact, the opposite was

17   true.  They knew how to do their job probably too well.

18   **Q.**    And here what you say -- what you write is (as read):

19           "If you look at lack of communication, it's all

20           the same team members that are our culture fit

21           issues, don't execute tasks, and who undermine

22           you" --

23           This should be the third line now (as read):

24           " -- passive aggressively or just straight-up

25           aggressively, push you into a triangulation or

HILL-ALVAREZ - RECROSS / BELL

1    manipulative dialogue."

     This is what you're writing to Ruthia.

     Oh, there.  We see that she's down there.  Okay.  (as
4    read):

5         "This isn't about lost adults.  This is about
6         people who are just waiting until the company is
7         making more money and have plans for how they want
8         the company to go, who they want to be in it, and
9         what they will do when that happens.  It's a waiting
10        game, and all everyone sees is money."

     And then you go on to say (as read):

12        "However, there is really no point in doing all
13        this culture work since we are just keeping people
14        who have been problems for months."

     And you go on to discuss Mr. Menesini, Ms. Neland,
16   TJ Williams, and others.

     Do you see that over there?  Rick (as read):

18        "Rick, who has managed to rope in almost every
19        new hire into the idea that you can't run the
20        company.  This impacted TJ's performance and
21        commitment.  Kristin, whose colossal failure we still
22        haven't covered from in the growth department.  Jake,
23        who after months has still not managed to train the
24        PRAs asked for.  TJ, who is now bringing in his
25        old -- his friends to play in the waiting game."

**HILL-ALVAREZ - RECROSS / BELL**

1        And you go on.

2        And then let's see how Ruthia responds to what you were

3    telling her back in October.

4        She says (as read):

5            "Christina" --

6    **A.**   I would like to make a comment.

7    **Q.**   If I could just finish with my question, then I'll --

8    okay.  And so --

9            **MS. GURSKIS:**  Objection, Your Honor.

10            **THE COURT:**  Well, I don't quite know --

11            **MS. GURSKIS:**  The witness should be allowed to talk.

12            **THE COURT:**  -- I don't know where the question is.  I

13    mean, you're saying this is all a part of an exchange, and so

14    you want to read the entire exchange.  So --

15            **MS. BELL:**  It's fine.  Ms. Hill-Alvarez --

16            **THE COURT:**  I -- well, but you're in charge of the

17    questioning, so do you want her to respond to the part that you

18    read or do you want to put the whole thing out and then she'll

19    respond?

20    **BY MS. BELL:**

21    **Q.**   Was there something further you'd like to add to the part

22    I just read?

23    **A.**   Yes, context for the jury, as I was there and you were

24    not.

25        If you --

HILL-ALVAREZ - RECROSS / BELL

**Q.**   Go ahead.

**A.**   -- could please scroll up.

So at this time, what I was being told is that these people were attacking her -- this was a private dialogue -- because she was Chinese.  They were Western, men, most of them white.  And so I took a very protective stance as a woman of color towards her to try to protect her, because that's what she told me was happening.

It's really challenging to have really cared about her, to have protected her like that.  I really cared about her.  And then she would see the other side.

And so what I'm hearing from her is people saying, Oh, Rick told me you can't run the company.  And the team is also suggesting you need executive coaching.

From where I stand now, after having lived through it, these people were just seeing that this company could not go on, that this company was not functional.  They were seeing the structure of it.

And it was rationalized as culture.  And what I said yesterday, I came to learn that meant something very different.

But the way that it was presented to me -- and, again, it was a remote setting; right?  I'm hearing things.  I wasn't always in all conversations with her and other individuals.

And so this on my part was a mistake, and I admit that mistake.

HILL-ALVAREZ - RECROSS / BELL

1          And so October 2021 -- we're October 2025 now -- I saw a

2     lot more after the seven months that I worked there, and that's

3     something I think you all should know, that not every dialogue

4     happened in an exhibit you're going to see.  There's a lot more

5     to this story than what the dualistic perspective is that

6     you're getting here.

7     **Q.**    Okay.  My last question is:  Do you see how she responds

8     to what you told her?

9          **MS. BELL:**  Let's go down.

10    **BY MS. BELL:**

11    **Q.**    She writes (as read):

12          "Christina, thanks for sharing me your

13          observations.  I think it's good you can see it from

14          an outsider perspective because I sometimes get too

15          busy in works and meetings."

16          Then down at the bottom (as read):

17          "If they're not a fit, then we should let them

18          go, but they probably don't have bad intention or

19          just want to keep their job.  Ideally we can make

20          decision like this more quickly without influencing

21          our emotions much.  It's tough for every team."

22          Do you see that?

23    **A.**    Yes.  I also see this is a conversation we're having at

24    3:00 a.m., and so, as I mentioned yesterday, I think around

25    this time is when I was having -- I was tasked with being

1    culture lead, which as you saw my titles I was given verbally

2    never reflected in any documentation.  And I was dealing with

3    her blaming me for people not being happy.  Right?

4        And I was trying really, really hard to get people to get

5    along, to see each other's perspective, and I was expressing

6    frustration because of what she had told me, the reasoning why.

7        But I stand by, from what everything I've seen, I see my

8    ex-colleagues as being incredibly frustrated, educated

9    individuals who were pushing back and saw something -- that it

10   had to be something I went through before I believed it.

11       It's one of those things.  Sometimes you just have to go

12   through things before you believe that it can happen.

13   Q.   And one of the things you went through was 10

14   communications with the Government; right?

15   A.   Again, as I mentioned yesterday, I don't remember the

16   number.  It's been four-years.

17       MS. BELL:  Thank you.

18       No further questions.

19       THE COURT:  Anything?  Any questions?

20       MS. NECHAY:  No.  Thank you, Ms. Hill-Alvarez.

21       THE COURT:  Okay.  Thank you very much.  You're

22   excused.

23       THE WITNESS:  Thank you.

24                    (Witness excused.)

25       THE COURT:  Okay.  Ladies and gentlemen, we have now

PROCEEDINGS

1   some things that are going to be read to you so that they will

2   be part of the record, but we're not going to have another

3   witness until after lunch, so once the reading is completed, I

4   will give you your recess and then we'll return here at 12:30.

5            **MR. BODAPATI:**  Thank you, Your Honor.

6            **THE COURT:**  Proceed.

7            **MR. BODAPATI:**  And we'll begin with two stipulations

8   that were --

9            **THE COURT:**  I think you're going to have to speak

10  louder.

11           **MR. BODAPATI:**  Yes.  Apologies, Your Honor.

12      And we'll begin with two stipulations that were filed on

13  the docket this morning.

14           **THE COURT:**  Okay.  A stipulation, ladies and

15  gentlemen -- let me tell you what it is.  You probably know

16  very well what it is.  However, let me just tell you.

17      The parties have agreed to certain facts that will be

18  stated to you.  Those facts are now conclusively established.

19      Go ahead.

20           **MR. BODAPATI:**  Your Honor, the first stipulation,

21  which has been marked as Trial Exhibit Number 4001, is titled

22  "Joint Stipulation Regarding Business Records."

23      Begins:  It is hereby stipulated and agreed between the

24  United States of America through its undersigned counsel,

25  Defendant Ruthia He through her undersigned counsel, and

1   Defendant David Brody through his undersigned counsel, that the

2   following documents produced in the above-captioned case are

3   authentic pursuant to Federal Rules of Evidence 901(a),

4   902(11), 902(13), and/or 902(14), and covered by the business

5   records exception to the rule against hearsay contained in

6   Federal Rules of Evidence 803(6) and 803(8) and are therefore

7   admissible at trial in lieu of the original documents and may

8   be admitted at trial without calling a custodian as a witness.

9        And, Your Honor, at this time, the Government would offer

10  the listed exhibits into evidence.

11           **THE COURT:**  Okay.  Admitted.

12       (Trial Exhibits as listed in Stipulated Exhibit 4001

13  received in evidence.)

14           **MR. BODAPATI:**  Turning to the second stipulation,

15  which is marked Trial Exhibit Number 4001.

16       Apologies.  We've done that one.  Yes.

17       Turning to the second stipulation, which is marked

18  Trial Exhibit 4002, this stipulation is titled "Joint

19  Stipulation regarding Business and Medical Records of Done."

20       And is it reads as follows:  It is hereby stipulated and

21  agreed between the United States of America through its

22  undersigned counsel, Defendant Ruthia He through her

23  undersigned counsel, and Defendant David Brody through his

24  undersigned counsel, that the following documents produced in

25  the above-captioned case are authentic pursuant to Federal

1   Rules of Evidence 901(a), 902(11), 902(13) and/or 902(14) and

2   covered by the medical and/or business records exceptions to

3   the rule against hearsay contained in Federal Rules of Evidence

4   803(4), 803(6), and 803(8) and are therefore admissible at

5   trial in lieu of the original documents and may be admitted at

6   trial without calling a custodian as a witness.

7       And again, a list of exhibits follows, which the

8   Government respectfully offers into evidence at this time.

9           **THE COURT:**  4002 admitted.

10      (Trial Exhibits as listed in Stipulated Exhibit 4002

11  received in evidence.)

12          **MR. BODAPATI:**  Turning now to a series of exchanges

13  between the defendants, the Government would offer Exhibit 127,

14  which is an exchange between Defendant Brody and Defendant He

15  from September 26th, 2020.

16          **THE COURT:**  Admitted.

17      (Trial Exhibit            received in evidence.)

18          **MR. BODAPATI:**  And, Ms. Braga, could we please pull

19  that up.  And could we turn to page 3 and zoom in on those two

20  messages in the middle.

21      At 6:18:11 p.m. on September 26th, 2020, Defendant Brody

22  states (as read):

23          "To confirm what I said last night, I'm enjoying

24      Done and have no plans to leave before two years or

25      even after two years.  I will see patients if

PROCEEDINGS

1      necessary, but I underline 'if necessary,' because

2      one of the reasons I'm enjoying Done is not needing

3      to do that."

4      Defendant He replies (as read):

5          "Thanks for the confirmation.  We will make sure

6      it won't happen often or if it's urgent refill, you

7      don't even need to see the patient at all.  Just

8      click buttons on e-prescribing tool."

9      And, Ms. Braga, you can take that down.

10     Your Honor, the Government offers Exhibit 129, which is

11 another exchange between the defendants from September 26,

12 2020.

13         **THE COURT:**  Admitted.

14     (Trial Exhibit          received in evidence.)

15     **MR. BODAPATI:**  And, Ms. Braga, can we turn to

16 page 2 -- apologies.  I think we have this one already.  Yeah,

17 we can skip this one.

18     Let's turn instead to Exhibit 130, another exchange

19 between the defendants.

20         **THE COURT:**  130 admitted.

21     (Trial Exhibit          received in evidence.)

22     **MR. BODAPATI:**  Defendant Brody begins (as read:)

23         "And responded to the group about NW demanding a

24     '30-day notice.'  I think Amberlee is saying that

25     you're the one that has the copy of the contract to

1      find out if it says anything about such a notice.

2      Even if it does, it probably isn't binding, since she

3      wouldn't follow our guidelines."

4      Defendant He responds (as read):

5          "She was seeing patients like it is her

6      full-time job."

7      Defendant Brody replies (as read):

8          "Then she should be motivated to do what it

9      takes to stay with us.  For example, finding a

10     supervising physician who will be okay with

11     every-three-month visits.  We can tell her she can

12     take a break until she finds one and then come back

13     and resume, but the problem is she has said that she

14     doesn't agree with that every three months either.

15     Sometimes you have to do things you don't agree with

16     in order to survive."

17     The Government will now offer Exhibit 138, another

18  exchange between the defendants.

19          **THE COURT:**  138 admitted.

20     (Trial Exhibit            received in evidence.)

21     **MR. BODAPATI:**  And this exchange is from October 3rd,

22  2020.  Defendant Brody sends a message that reads as follows:

23  (as read):

24          "Again, for the moment, I don't want anyone to

25      see this but you.  Last night I was thinking about

**PROCEEDINGS**

1    Iman because, as you know, she's the one I'm most

2    concerned about in terms of quality and -- quality of

3    care.  It's only natural I would feel somewhat

4    distressed to find she has more patients than the

5    second highest by a factor of 46 percent, to be

6    precise, and way, way more than the average.

7        "I think that 566 patients may be more than any

8    mental health provider or even any clinician in any

9    specialty should have.  I know we can't do much about

10   this quickly, but to me, it's a dilemma."

11   The Government offers Exhibit 139.

12       **THE COURT:**  139 admitted.

13   (Trial Exhibit 139 received in evidence.)

14       **MR. BODAPATI:**  Turning to page 2.

15   And, Ms. Braga, can we zoom in on the top message.

16   On October 4th, 2020, Defendant Brody writes as follows

17   (as read):

18       "Honestly, I have an initial negative response.

19   Some may call me biased, but people who are really

20   into the law and especially who have been in law

21   enforcement -- AKA cops -- are not my cup of tea.

22   Some of the things we do are on the edge to that sort

23   of person, as you yourself have admitted, so I doubt

24   he'd be a good fit.  Then again, I've never talked

25   with him, let alone met him."

PROCEEDINGS

1           You can take that one down, Ms. Braga.

2           The Government offers another exchange, Exhibit 210.

3           **THE COURT:**  210 admitted.

4       (Trial Exhibit 210 received in evidence.)

5           **MR. BODAPATI:**  And, Ms. Braga, can we zoom in on the

6    bottom message.  This is a November 22nd, 2020, message from

7    Defendant Brody to Defendant He.  Reads as follows (as read):

8               "Speaking of working more, I wouldn't mind being

9           the one providers go to with purely clinical

10          questions so Jayaram could focus more on business and

11          administration.

12              "As you know, my dreams are as follows, in order

13          of preference:

14              "Number 1, not having to work at all.

15              "Number 2, making enough money from my writing

16          and photography alone to be totally comfortable.  Fat

17          chance.

18              "Number 3, dealing with clinical psychiatric

19          issues without ever having to see or talk to the

20          patient.

21              "So Number 3 is actually not a purely

22          drug-induced idle fantasy of some hookah-smoking

23          caterpillar sitting on a mushroom.  Maybe somewhere I

24          can find a company crazy enough to pay me to do that

25          (winking emoji)."

1    **MS. NECHAY:**  And, Your Honor, under

2  Rule of Completeness, I would just ask that the paragraph right

3  before that bubble be read as well into the record.

4        **THE COURT:**  Go ahead.

5        **MR. BODAPATI:**  I can read both messages, Your Honor.

6     Starting with the second message from the bottom.

7  Defendant Brody says as follows (as read):

8          "Expecting, encouraging, or even simply wanting

9       people to work weekends can be rough.  Remember I

10      didn't and still don't always want to.  Other times

11      it's okay.  It all depends."

12    Okay.  Put that down.

13    Government offers Exhibit 265.

14        **THE COURT:**  265 admitted.

15    (Trial Exhibit 265 received in evidence.)

16        **MR. BODAPATI:**  And for the record, this is a

17  January 14th to January 16th, 2021, exchange between the

18  defendants.

19    Defendant He writes as follows (as read):

20          "Also, I do think I have ADHD right now.

21      Basically I tried taking (pill emoji) for two days,

22      and now I can focus like before.  I'm not sure if

23      it's triggered by burnout or just me getting old."

24    Defendant Brody replies (as read:)

25          "What is (pill emoji)?  you can tell me on the

1      phone if you don't want to write it."

2      Defendant He respond (as read):

3          "Just Adderall.  I got prescribed from a head

4      when I was doing competitive research but didn't

5      really take it before."

6      And, Ms. Braga, can we turn to the next page, and zoom in

7  on the top message.

8      Defendant Brody responds (as read):

9          "Regarding Adderall, it's fairly obvious to me

10     that it would help anyone focus, ADHD or not.  It's

11     amphetamine, after all.  The question in clinical

12     psychiatry regarding using it is whether someone's

13     inability to focus is so severe as to be termed

14     pathologic, and if it can be called that, it

15     justifies using it as a treatment for a disorder or

16     disease rather than simply as a performing-enhancing

17     technique that some people view as unfair or

18     cheating."

19     You can take that down, Ms. Braga.

20     The Government offers Exhibit 271.

21         **THE COURT:**  271 admitted.

22     (Trial Exhibit 271 received in evidence.)

23         **MR. BODAPATI:**  And, Ms. Braga, let's go to page 4.

24  It's an exchange between the defendants from January 19th,

25  2021.  First Defendant He writes as follows -- and you can zoom

1    in on just the bottom message, Ms. Braga.

2              She writes (as read):

3              "Yes, I can read it.  So the three months

4         follow-up is recommended or mandatory?  It's decided

5         by the patients or the providers?"

6         And turning to the next page, zooming in on the top

7    message (as read):

8              Defendant Brody responds as follows (as read):

9              "If a patient fits the criteria for three-month

10        follow-up, it would be mandatory to see them no later

11        than three months.  It could be earlier than three

12        months if the patient wants.  Whether we allow that

13        is more a business decision than a clinical

14        decision."

15        And, Ms. Braga, you can take that one down.

16        MR. BALLEW:  Your Honor, for completeness, I ask that

17   the following be read as well.

18        MR. BODAPATI:  Sure.  We can pull that back up and

19   read the exchange.

20        MR. BALLEW:  And Ms. He's response afterwards as well.

21        MR. BODAPATI:  Your Honor, I would respectfully --

22        THE COURT:  Just read it.  It's just easy enough to

23   read it.

24        MR. BODAPATI:  Okay.  Okay.  Ms. Braga.

25        THE COURT:  Start at the big top --

PROCEEDINGS

```
 1              MR. BODAPATI:  Exactly, yes.
 2        Ms. Braga, can we zoom in on Ms. He's message at the
 3   bottom again.
 4              MR. FOSTER:  Start at the very beginning.
 5              MR. BODAPATI:  At the very beginning.  Sure.
 6        Okay.  Taking it from the top.  This is a January 19th,
 7   2021, message from Defendant Brody.
 8        And, Ms. Braga, can we zoom in on the first message.
 9        It says (as read):
10              "Finally, I agree with you" --
11        Sorry, Ms. Braga.  Let's turn back to page 4.
12        And now zooming in on the top message from David Brody.
13   He sends an attachment with the text.  (as read):
14              "Here is what I have so far.  Hope you can read
15          it."
16        Now let turn to Defendant He's message (as read):
17              "Yes, I can read it.  So the three months
18          follow-up is recommended or mandatory?  It's decided
19          by the patients or the providers?"
20        Turning to the next page, and now zooming in on the top
21   message.
22        Defendant Brody responds (as read):
23              "If a patient fits the criteria for three-month
24          follow-up, it would be mandatory to see them no later
25          than three months.  It could be earlier than three
```

1    months if the patient wants.  Whether we allow that

2    is more a business decision than a clinical

3    decision."

4    Turning to the next message.  And -- yes, exactly.

5    Defendant Brody continues (as read):

6         "It's not a very simple thing decided by the

7    patients or the providers.  It's hard to say because,

8    Number 1, which providers are we talking about, the

9    front line or the more administrative or supervisory

10   ones like me?

11        "Number 2, there is the concept that the patient

12   is the ultimate boss, and if they want a session

13   earlier, perhaps we should try to provide it.  To me,

14   that's the weakness of the model where providers are

15   paid per patient on their caseload rather than per

16   session."

17   And then Defendant He replies (as read:)

18        "I think the goal we want to optimize for is to

19   help the patients manage their ADHD in a convenient

20   way that is significantly better than the traditional

21   method with potentially better outcome."

22   You can take that down.

23   Government offers Exhibit 347.

24        **THE COURT:**  Admitted.

25   (Trial Exhibit 347 received in evidence.)

1        **MR. BODAPATI:**  And can we turn to page 2, Ms. Braga,

2    and zoom in on the middle message.

3        For the record, this is another exchange between the

4    defendants.  The date is May 5, 2021.

5        Defendant He states (as read):

6            "Also, this investor is asking if we ease access

7        to ADHD medication."

8        Can we turn to the next page, and zoom in on the top

9    message.

10       Defendant Brody replies (as read):

11           "Is this investor who is asking if we ease

12       access to ADHD medication the same one who talked

13       about using Done as a legal way to get stimulants?

14       It sounds like exactly the same question in different

15       words.  I would tell him yes, better living through

16       drugs.  Drugs and medication are the same.  Do you

17       take any drugs?  If you take medications, you're

18       taking drugs, and if your health will suffer if you

19       stop them, then we can call you an addict.  I think

20       you might want to protect that particular investor

21       from exposure to Dr. Brody both for his health and

22       mine."

23       You can take that down.

24       Government offers Exhibit 376.

25           **THE COURT:**  376 admitted.

PROCEEDINGS

 1          (Trial Exhibit 376 received in evidence.)

 2          **MR. BODAPATI:**  This is a June 26, 2021, exchange

 3     between the defendants.

 4          And, Ms. Braga, can we zoom in on the middle three

 5     messages.

 6          And Defendant Brody writes as follows (as read):

 7              "Hi.  Guess we've been kind of busy.  Just

 8          wanted to let you know today I set a new record:

 9          49 -- yes, count them -- 49, as in 49ers,

10          out-of-state patients."

11     You can take that down.

12     The Government offers Exhibit 390.

13          **THE COURT:**  390 admitted.

14          (Trial Exhibit 390 received in evidence.)

15          **MR. BODAPATI:**  This is a July 16, 2021, exchange

16     between the defendants.

17          Zooming in on the bottom message first, Ms. Braga.

18          Defendant Brody writes as follows (as read):

19              "Hi.  I don't know who else to ask, so I'm

20          asking you.  If you don't know this, we're kind of in

21          trouble.

22              "For the purpose of filling out forms and such,

23          what is our official name when it says 'employer'?

24          is it simply Done or Done, Inc. or Okay Health or

25          something else?  Now that I'm an employee, I should

PROCEEDINGS

1        know.  Thanks.  David."

2        Turning to the next page, Defendant He responds as follows

3   (as read):

4            "Thank you so much, David, for bringing this up.

5        This is a good point."

6        Turning to the next message.

7        Defendant Brody responds (as read):

8            "So the founder doesn't know the name of her own

9        company?  Sorry.  Just kidding.  Couldn't resist."

10       And then Defendant He replies (as read):

11           "No.  I meant technically, you're already the

12       president of Done Health PC."

13       Turning to the next page.  And can we zoom in on the top

14  message (as read):

15           "So it's a great point.  You should be employed

16       by Done Health PC."

17       Turning to the next two messages (as read):

18           "And we need to resend a new offer letter and

19       add you in the system.  I'll schedule and you

20       thread."

21       And finally, turning to the next page.

22       Defendant Brody asks (as read):

23           "So when some form like for opening a bank

24       account asks me to fill out who my employer is, I

25       should write Done Health PC?  And what does PC stand

1    for?  I don't think it stands for politically correct

2    in this case."

3    Defendant Brody replies (as read):

4        "Professional corporations like a medical

5    clinic."

6    You can take that down, Ms. Braga.

7    Government offers 426, which is a --

8        **THE COURT:**  Knitted.

9    (Trial Exhibit 426 received in evidence.)

10        **MR. BODAPATI:**  This is a September 14, 2021, exchange

11   between David Brody and a Done employee named Michelle Huynh.

12   Ms. Braga, can we zoom in on the third message.

13   Defendant Brody writes as follows (as read:)

14       "Hi, Michelle.  This may not be a priority right

15   now, but while I'm thinking of it, it would be great

16   if you or someone could go through reviews,

17   specifically Titi's reviews, and look for patterns,

18   especially the patterns as to reasons why she says

19   people don't have ADHD.

20       "For example, I just now noticed another one

21   which says 'If you didn't have it as a child, you

22   couldn't have it now.'  Other examples might be

23   simply not fulfilling every checkbox in the DSM-5 or

24   God knows what (emoji face with rolling eyes).

25       "Anyway, just an idea which I think might help

1              us when we talk to her."

2         You can take that down.

3         The Government offers 479.

4              **THE COURT:**  479 admitted.

5         (Trial Exhibit 479 received in evidence.)

6         **MR. BODAPATI:**  Pull that up?  Another exchange between

7    the defendants.  The date here is December 2nd, 2021.

8         Can we zoom in on the middle message.

9         Purchase Defendant Brody writes as follows (as read):

10             "I'm sure they have (for depression and

11             anxiety).  The problem with acting like the ASRS

12             results prove that our treatment helps:

13             "Number 1.  I don't think the ASRS is validated

14             as a research tool, only as a screening test.

15             "Number 2.  There is no control group.  You

16             would need to compare it to a group that had sham

17             treatment, ideally thinking they were getting

18             treatment even though they weren't, which obviously

19             is rather difficult to do.  You would need a research

20             grant to cover the response

21             "I'm sorry to say that a rigorous psychiatric

22             researcher, a professor at a medical school, would

23             not think that the result of sending out the ASRS and

24             getting 40 percent improvement after a month really

25             means much.  What she would take stock in is a study

PROCEEDINGS

1          in which the patients were diagnosed with DSM-5

2          criteria and then reevaluated according to the same

3          criteria.  It would be even better if there was a

4          control group."

5          You can take that down.

6          The Government now offers Exhibit 481.

7                    **THE COURT:**  481 admitted.

8          (Trial Exhibit 481 received in evidence.)

9                    **MR. BODAPATI:**  And, Ms. Braga, let's turn to page 7,

10   and can we zoom in on the bottom two messages.

11          And these are messages that Defendant Brody sends to

12   Defendant He on December 9th, 2021.  He states (as read):

13               "Also, as I've said before, everyone will say

14          they're for patient first, but if they really, really

15          believe it's either patient first or being

16          disciplined by their board, losing their license, or

17          even going to prison, guess what they will choose?  I

18          don't believe any of those things will happen to me,

19          but even if I did, I would still prescribe what I

20          feel the patient needs."

21          You can take that down.

22                    **MS. NECHAY:**  I would actually, Your Honor, under Rule

23   of Completeness, I would ask --

24                    **THE COURT:**  I'm sorry.  You have to speak.

25                    **MS. NECHAY:**  I apologize.  I'll speak up.

1          Under Rule of Completeness, I would ask that the first

2     paragraph on page 1 also be read into the record.

3               **THE COURT:**  Okay.  Would you do so.

4               **MR. BODAPATI:**  The first paragraph on page 1?  Sure.

5               **MS. NECHAY:**  Thank you.

6               **THE COURT:**  Yes.

7               **MR. BODAPATI:**  Okay.  Zoom in.

8          (as read):

9                "Here is something interesting from a friend of

10         mine:

11              Blank currently does not technically allow their

12         medical clinicians -- PMHNPs and a couple of

13         psychiatrists. me being one of them -- to prescribe

14         stimulants to adult ADHD patients without neuropsych

15         testing.  This was topic of meeting this a.m.

16         Perhaps don't mention company name, but otherwise you

17         may share this info.

18              "The clinicians feel differently about this.

19         Some like the protection.  The other psychiatrist and

20         I did not like the restriction.  We believe in our

21         experience and clinical judgment."

22         Okay.  You can take that down.

23         The Government moves to admit Exhibit 561.

24              **THE COURT:**  561 admitted.

25         (Trial Exhibit 561 received in evidence.)

PROCEEDINGS

1          **MR. BODAPATI:**  And, Ms. Braga, can we turn to page 2,

2    and zoom in on the top message.

3          And this is a March 25, 2022, exchange between

4    Defendant Brody and Defendant He.

5          Defendant He writes (as read):

6               "Also, yesterday on the team leads call, Zoe

7          said something like we're prescribing to people who

8          don't have ADHD, which may concern the team.  I think

9          it'd help for her to clarify and reassure the team."

10         Turning to the next page.

11         **MR. BALLEW:**  Your Honor, can he read the remainder of

12   that bubble?

13         **THE COURT:**  I'm sorry.  What?

14         **MR. BALLEW:**  I think there's more in that text message

15   that was not read that we ask be read.

16         **THE COURT:**  Why don't we start again.

17         **MR. BODAPATI:**  I think we can go back to it, but

18   I believe I did read the full message and it's -- yeah,

19   Defendant He's message at the top.

20         Read it again (as read):

21               "Also, yesterday on the team lead's call, Zoe

22         saying said something like we're prescribing to

23         people who don't have ADHD, which may concern the

24         time.  I think it would help for her to clarify and

25         reassure the team."

1      Now, turning to the next page, zooming in on the middle

2  bubble.

3      Defendant Brody replies -- and the first three lines are

4  quoting the previous message from Defendant He.  He responds

5  (as read):

6          "I first want to point out that I have already

7          addressed this in one of my treatment guidelines

8          dealing with diagnosis.  Plus, I already addressed it

9          in one of my suggested responses to the Wall Street

10         Journal in the first iteration of dealing with their

11         questions.  That being said, I will ask Zoe to

12         consider talking to the team to expand and clarify.

13         "I do agree with her that it's actually

14         inevitable that we will wind up prescribing

15         stimulants to at least a few people who do not have

16         ADHD and perhaps to more than a few.  This is not

17         necessarily a bad thing, I would say, if I were being

18         totally honest."

19  You can take that down.

20      Government offers Exhibit 587, which is an exchange

21  between Riley Levy and Sarah Barker.

22         **THE COURT:**  587 admitted.

23     (Trial Exhibit 587 received in evidence.)

24         **MR. BODAPATI:**  This exchange is on April 23, 2022.

25  Barker begins as follows (as read):

1          "Serena wants me to meet with Ruthia.  Did I

2     tell you that?"

3     And Riley Levy replies (as read):

4          "No.  Just because no one is listening to any of

5     us about Dr. Brody or because Ruthia asked you to?"

6     Sarah Barker responds (as read):

7          "Yes.  She wants me to basically tell her this

8     place sucks, LOL, and I told her I would."

9     Riley Levy responds with an emoji upside-down face (as

10    read:)

11         "Good luck.  I'll get you a good severance

12    package (joy emoji).  Protect Dr. Brody at all costs

13    is the mission right now."

14    Turning to the next page, and zoom in on the top three

15    messages.

16    Barker responds (as read):

17         "Like why?  I don't understand."

18    Levy responds (as read):

19         "Because he does exactly as she asks even if

20    it's not clinically appropriate."

21    You can take that down.

22    And finally, Your Honor, Government offers Exhibit 689.

23         **THE COURT:**  689 admitted.

24    (Trial Exhibit 689 received in evidence.)

25         **MR. BODAPATI:**  This is an August 3rd, 2022, exchange

1    between Zoe Martinez and David Brody.

2         Can we zoom in on the top two messages.

3         Zoe Martinez writes as follows (as read):

4              "Hi, Dr. B.  I am not sure why you have 150

5         refills and I seem to have none.  Do you want me to

6         tackle some?  I can at least do the 15 I have become

7         accustomed to doing."

8         Defendant Brody responds (as read):

9              "Thank you for your kind offer.  Now that they

10        have been pended, it only takes me 30 seconds per

11        refill since, as you know, I do not check the EHR.

12        Therefore, it really doesn't make much difference.

13        It would save me about seven and a half minutes.

14        Probably easier for me just to do them all.  And I'm

15        really hoping there is just a week of this at the

16        most left."

17        And you can take that down, Ms. Braga.

18             **THE COURT:**  Okay.  Finished.

19             **MR. BODAPATI:**  Yes, Your Honor.

20             **THE COURT:**  Ladies and gentlemen, we're going to take

21   our recess now.  We'll be in recess until 12:30.

22        Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.  See you then.

25                  (The jury leaves the courtroom.)

**PROCEEDINGS**

1    (Proceedings were heard out of the presence of the jury.)

2                  (Recess taken at 11:44 a.m.)

3              (Proceedings resumed at 12:37 p.m.)

4    (Proceedings were heard out of the presence of the jury.)

5          **THE COURTROOM DEPUTY:**  Come to order.  Court is now in

6    session.

7        You may be seated.

8          **THE COURT:**  Please be seated.  Let the record show the

9    parties are present.  The jury is not.

10       What's the issue that I have to attempt to resolve?  Who

11   is the witness?

12         **MS. GREEN:**  Kelly Graziadei.

13         **THE COURT:**  Who?

14         **MS. GREEN:**  Kelly Graziadei.

15         **THE COURT:**  Okay.

16         **MS. BELL:**  Thank you, Your Honor.

17         **THE COURT:**  Ms. Bell.

18         **MS. BELL:**  Briefly.  So as the Court knows, there is

19   no charge of investor fraud in this case, much less any charge

20   of investor fraud by material omission predicated on some kind

21   of duty to disclose.  Yet one aspect of this witness's

22   testimony -- this witness is an investor in Done, and the

23   Government seeks to elicit, as we understand it, a set of

24   disputed facts that -- some of which she has no personal

25   knowledge of and present her with internal Done e-mails she's

1  never seen before and then ask her, well, would this have made

2  a difference, would this have been material, what's your

3  reaction to this today.  And she'll say, this is very alarming.

4  This is a huge red flag.

5       And then, well, would you have liked to know that?  Would

6  this have been material?  And she'll say yes.

7       And this just seems like an undue consumption of time,

8  confusing, and it's obviously highly prejudicial on a charge

9  that the Government elected not to bring.

10      So I -- our position is that aspect of the testimony

11 should be excluded.  It's one thing to ask her and there's

12 plenty of substance on what were your meetings with Ruthia,

13 what did you discuss, but it's a whole nother thing to present

14 her with a litany of hypotheticals.

15      And this is distinct from the pharmacy witnesses who have

16 come in to testify that they indeed learned certain things and

17 took certain responses to those types of things in the course

18 of their relationship with Done.

19           **MS. GREEN:**  Your Honor, this is the same concern that

20 Ms. Bell raised before Ms. Graziadei was about to testify,

21 which I think Your Honor may recall it was about a week ago,

22 and the same issue was raised with Your Honor, and Your Honor

23 agreed that we could ask her such hypotheticals.

24      She has been noticed under 404(b), even though we don't

25 think it was 404(b).  We have a limiting instruction that we

**PROCEEDINGS**

1    provided to Ms. Bell to address those concerns.

2        The entire crux of her testimony is what she was told by

3    Defendant He and then what she was not told and whether certain

4    information would have been consistent or inconsistent with

5    what she was told by Ms. He.

6        So it goes directly to --

7        **THE COURT:**  Wait a minute.  I don't understand the

8    difference between two and three.  One is what the defendant

9    said to the witness.

10       **MS. GREEN:**  Yes.

11       **THE COURT:**  Okay.  That's Number 1.  That would come

12   in in the normal course.

13       Number 2, what is the reality of the -- that is, the truth

14   or falsity of the statement?

15       That would come in either through this witness or some

16   other witness.

17       What they're objecting to is had you known that, would you

18   have taken other action.

19       **MS. GREEN:**  I don't intend to ask -- and I heard

20   Ms. Bell say --

21       **THE COURT:**  The materiality -- in other words, the

22   materiality is what they're objecting to, because obviously if

23   it would have made a difference, it's the connection that the

24   jury would make is that investor fraud occurred.

25       **MS. GREEN:**  And I don't intend to ask her that

PROCEEDINGS

1   question.  I only intend to ask her what she was told and what

2   she wasn't told.

3           **THE COURT:**  I think that's all right.

4           **MS. GREEN:**  I won't be asking about materiality.

5           **MS. NECHAY:**  Just to put a finer point on what she

6   wasn't told, we got a number of new exhibits last night which

7   are internal Done e-mails sent at the company long before this

8   woman ever invested in the company, and my understanding is

9   that counsel intends to present her with these and say, well,

10  take a look at this random e-mail.  Would that have made a

11  difference to you?

12      So in terms of, if I may, what she didn't know, I think we

13  need to define the scope of that.  It's one thing to say you

14  had a meeting, you had a conversation on this topic, what was

15  discussed as related to that topic, what wasn't discussed.

16  It's a wholly different thing to start presenting her with

17  stray e-mails which, Your Honor, we're then going to have to

18  complete the story.  It's going to be a very lengthy exam if we

19  start going down that road.  And I think it's far astray of the

20  purpose here, which is to talk about the actual meetings and

21  conversations she did have, not internal e-mails that occurred

22  long before she invested or other hypotheticals about topics

23  that didn't come up.

24      Let me give one example.  The screening exams, for

25  example.  That's been a topic of testimony.  It's been in 302s.

**PROCEEDINGS**

1   There's a whole -- well, I don't know what counsel intends to

2   do, and perhaps the best thing to do is to just object if I

3   think things are going down a road of these are hypotheticals

4   that there was no duty to disclose, not even -- at least --

5   you know, it's just far afield.

6        Things like screening tests and --

7             THE COURT:  Well, we're not going to get into whether

8   there's a duty to disclose, and we're not going to get into

9   would that have made a difference in this investor's actions.

10  Those are two subjects we're not going to get into.

11       So -- but I think you can get into what was she told, and

12  then you can ask the witness, I think -- let's say the witness

13  was told we need a subscriber -- you know, a subscriber gets to

14  do X and Y.  And I think you could say, the defendant said that

15  X and Y.  Okay.  Then --

16       Well, I think that that's -- how are you going to -- to

17  the extent that it's already been received in evidence, that

18  is, that it's not X or not Y., I think you could be asked that.

19            MS. GREEN:  Thank you.

20            THE COURT:  Were you told bah-bah-bah, which is not X.

21  I was told -- I was told X, and you can ask them were you told

22  not X.  I think you could ask that.  I don't think you're

23  objecting to that.

24            MS. BELL:  No, Your Honor, as long as it's tethered to

25  what she was actually told.  My issue is we're bringing up

1    exhibits that --

2    **THE COURT:**  Yes.  No, it has to be tethered to it.  It

3    has to be tethered to it.  In other words, otherwise, it's

4    simply argument.

5    **MS. BELL:**  Right, Your Honor.  And these exhibits that

6    they intend to use, again, are things -- are internal e-mails

7    she only saw last night when the Government presented them to

8    her.  They're Done e-mails, and it's like picking a stray

9    e-mail among the many thousands or hundreds we've already seen

10   and admitted into evidence, so then we have to come up and say,

11   well, okay, they showed you this one, but what about this one,

12   this one, and this one?  It's just such a consumption of time.

13   It's wholly argumentative.  I mean, the Government can later

14   say -- I just don't even understand why that's relevant whether

15   she's seen -- it's internal e-mails.  The question is did she

16   have the information if it's tethered.

17   **MS. GREEN:**  And just so Your Honor is aware of like

18   scope here, it's like three documents, all of which have been

19   previously admitted, two of which --

20   **THE COURT:**  I think you can show them anything that's

21   been admitted.  Anything that's been admitted, I think you can

22   show.

23   **MS. GREEN:**  And --

24   **THE COURT:**  It's been admitted.  I don't see how -- I

25   don't see why you can't be -- I think, though. you can't carry

 1    it out the next step, which is really does this make a

 2    difference, is this -- I mean, there's not an allegation

 3    that -- of material misrepresentation.

 4            **MS. GREEN:**  Absolutely, Your Honor.

 5            **THE COURT:**  Okay.  Are we ready to bring in the

 6    witness?

 7            **MS. BELL:**  Yes.  Thank you, Your Honor, for your time.

 8            **MR. FOSTER:**  And we proposed a limiting instruction,

 9    which is the standard pattern instruction --

10            **THE COURT:**  Yeah, let me see it.

11            **MR. FOSTER:**  -- to be read as well.

12            **MS. BELL:**  We do not want this.  We asked for a

13    curative instruction.  We do not want the limiting instruction

14    because we view it as actually a negative thing for us.  It

15    essentially, in our view, directs the jury to view the evidence

16    in a certain context.

17        So we would oppose giving such a limiting instruction.

18            **THE COURT:**  Is that true both sides?  I mean both --

19    Dr. Brody's client -- have you seen the instruction?

20            **MS. NECHAY:**  Yes, Your Honor.

21            **THE COURT:**  Well, do you oppose it being given or do

22    you want it given?

23            **MS. NECHAY:**  I would absolutely join with Ms. Bell.

24            **THE COURT:**  You oppose the giving of the limiting

25    instruction?

1          MS. NECHAY:  Yes.

2          THE COURT:  Okay.  Well, that's fine.  The record's --

3     I don't even have to read it.

4          MS. NECHAY:  Thank you, Your Honor.

5          THE COURT:  Okay.  I think you want to make it part of

6     the record, by the way.  It should be part of the record.

7          MR. FOSTER:  Yes.

8               (The jury enters the courtroom.)

9          (Proceedings were heard in the presence of the jury.)

10         THE COURT:  Okay.  Please be seated.  Let the record

11    reflect all jurors are present.  Parties are present.

12        You may call your next witness.

13         MS. GREEN:  Thank you, Your Honor.  The Government

14    calls Ms. Kelly Graziadei.

15             (Kelly Graziadei steps forward to be sworn.)

16         THE COURTROOM DEPUTY:  Hello.  Please stand to be

17    sworn.

18                      **KELLY GRAZIADEI**,

19    called as a witness for the Government, having been duly sworn,

20    testified as follows:

21         THE WITNESS:  I do.

22         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

23    Please state your full name for the record and spell your last

24    name.

25         THE WITNESS:  Sure.  My full name is Kelly Graziadei.

1    My last name is spelled G-R-A-Z-I-A-D-E-I.

2    **DIRECT EXAMINATION**

3    **BY MS. GREEN:**

4    **Q.**    Good afternoon, Ms. Graziadei.  Where do you live?

5    **A.**    I live in Marin County, just north.

6    **Q.**    How long have you lived there?

7    **A.**    I've lived there for about eight years.

8    **Q.**    Where do you work?

9    **A.**    I work -- I have my own venture capital firm that I

10   started, and I work there.

11   **Q.**    What's it called?

12   **A.**    It's called F7 Ventures.

13   **Q.**    For how long have you worked at F7 Ventures?

14   **A.**    We started as a small angel fund in 2019 and became an

15   institutional firm and fund in 2020, 2021.

16   **Q.**    What is your title at F7?

17   **A.**    Cofounder and general partner.

18   **Q.**    At a high level, what are your day-to-day

19   responsibilities?

20   **A.**    At a high level, I would say first running the firm,

21   managing our employees, managing day-to-day operations of the

22   jobs to then be done in venture capital.  It's sourcing

23   investments.  It's a lot of relationship building, things like

24   that.

25        The other is meeting a lot of different founders, doing

1  diligence and making decisions around investments and then

2  supporting the portfolio of founders that we've invested in.

3  Q.    And was F7 founded as a female-founded company?

4  A.    Yes.  It's a female-founded and female-run firm, and our

5  mission and where it came about is particularly in 2021 about

6  4 percent of all check writers were women, so we were really

7  passionate about helping to diversify and change those networks

8  and also invest in women and underrepresented or overlooked

9  founders.

10 Q.    Are you familiar with an individual called Ruthia He?

11 A.    I am.

12 Q.    Are you familiar with a company called Done?

13 A.    Yes.

14 Q.    How did you become familiar with Done?

15 A.    I was introduced to Ruthia from a former Facebook

16 colleague, Fidji Simo, and we invested in Ruthia and Done.

17 Q.    Do you have any personal experience with ADHD?

18 A.    I do.  I have a son with ADHD.

19 Q.    And was he diagnosed prior to your investment in Done?

20 A.    Yes, he was.

21 Q.    Do you know about how long his initial evaluation was?

22 A.    He -- so he was diagnosed young.  His original neuropsych

23 was probably a total of six hours across three different days.

24        And then from there, we had an appointment with a

25 psychiatrist to determine course of treatment.

GRAZIADEI - DIRECT / GREEN

Q.    Prior to Done, how much experience had F7 had investing in
healthcare-related startups?

A.    Not a lot.  So I think Done was one of our early
investments, and the other telehealth investment we've done is
Rocket Doctor, a similar time frame, and also a marketplace.

Q.    Is Rocket Doctor more like a primary care telehealth
company?

A.    Yeah.  So I think telehealth or primary care focused on
serving more rural communities.

Q.    Approximately when did you first have contact with
Ruthia He?

A.    I believe that was early May 2021.

Q.    And you mentioned that you invested in Done.  How much did
F7 invest?

A.    We invested a million dollars.

Q.    Approximately when was that investment?

A.    That was, I believe, formally the first week in June of
2021.

Q.    Does June 7, 2021, sound about right?

A.    Yes.

Q.    How large an investment was this for F7 at the time?

A.    It was a large investment.  We target 3 to 5 percent
ownership.  We, again, early in our life cycle as an
institutional firm, so certainly a significant investment,
largest check we had written to date.

1   **Q.**   Why did you want to invest in Done?

2   **A.**   Really, I think I was really passionate about access to

3   care.  And I know you asked about my personal experience, but I

4   think also passionate about ADHD, destigmatizing ADHD, having

5   individuals who need access to care to get that.

6        Certainly firsthand as a parent felt overwhelmed when we

7   first received that diagnosis, and there are lots of different

8   intentions that you can do and trying to figure out where to go

9   to find hope and support, we really aligned with the mission of

10  Done to provide access to care and make it easier for people

11  who might think they have ADHD to get to a physician or

12  clinician.

13  **Q.**   And who was your primary point of contact at Done prior to

14  your investment?

15  **A.**   Ruthia.

16  **Q.**   And who was the primary person that provided you

17  information about Done?

18  **A.**   Ruthia.

19  **Q.**   So when you said you were aligned with the mission of

20  Done, was that the mission of Done as communicated to you by

21  Defendant He?

22  **A.**   Yes.

23  **Q.**   Okay.  And after your investment, was Defendant He still

24  your primary point of contact?

25  **A.**   Yes.

GRAZIADEI - DIRECT / GREEN

1    Q.    When you're investing in an early-stage company, how much

2    trust do you place in the information being provided to you by

3    the leader of that company?

4    A.    We put a tremendous amount of trust.  We invest early.

5    Typically there's just not a -- I mean, you're putting most of

6    your trust in the founder, and you can get references about the

7    founder to further sort of underscore the trust you're putting

8    into the founder, but that's certainly a big component, in

9    addition to things like market sizing and things that you can

10   do on your own research, but...

11   Q.    And just for the benefit of our jurors, you mentioned

12   particularly when you invest early, you have to place a lot of

13   trust in the founder.

14   A.    Yes.

15   Q.    Is that because at the early stage, there isn't as much

16   outside sources of information about the company?

17   A.    Yes.  You're really relying -- it's a lot on vision, just

18   kind of early -- really early kind of traction is being

19   reported by the founder, and it's very consistent across our --

20   across our portfolio of investing.

21   Q.    And so how much trust do you have to place in the leader's

22   mission statement of the company being accurate?

23   A.    A hundred percent, essentially.

24   Q.    Given that, did you put a lot of trust in the information

25   that Defendant He gave you?

1    **A.**    Yes.

2    **Q.**    Did you have a lot of trust in the fact that the

3    information or the hope that the information she was giving you

4    was true?

5    **A.**    Yes.

6    **Q.**    Did you have any reason to doubt what she was telling you?

7    **A.**    No.

8    **Q.**    Did you speak with and engage in communications with

9    Defendant He prior to your investment?

10    **A.**    Yes.

11         **MS. GREEN:**  Let's look at Exhibit 360, please, for

12    admission.

13         **THE COURT:**  360 admitted.

14    (Trial Exhibit 360 received in evidence.)

15         **MS. GREEN:**  And if we could just zoom in to make the

16    text, Ms. Braga.  Great.  Thank you.

17    **BY MS. GREEN:**

18    **Q.**    So this is an e-mail from Defendant He to you on May 20,

19    2021; is that correct?

20    **A.**    Yes.

21    **Q.**    And did you talk with Defendant He shortly before

22    receiving this e-mail?

23    **A.**    Yes.

24    **Q.**    And after speaking with Defendant He, she sends you this

25    e-mail that says (as read):

GRAZIADEI - DIRECT / GREEN

1           "Done is the market leader of ADHD care.  The

2       economic impact of ADHD associated with lost

3       productivity is estimated at 150 to 250B per year.

4       We built a managed marketplace to make psychiatric

5       care more accessible and affordable."

6       What service did Defendant He tell you Done was providing?

7   **A.**   A managed marketplace, so connecting patients with

8   clinicians.

9   **Q.**   Okay.  We're going to come back to that term in a moment.

10  **A.**   Okay.

11  **Q.**   She also mentioned to make psychiatric care more

12  accessible.  So what did you understand that to mean?

13  **A.**   Essentially mental health treatment.

14  **Q.**   Mm-hmm.

15      And when you say mental health treatment, can you explain

16  to the jurors what that means to you?  Does it just mean

17  medication?  Does it mean access to a provider?  What did you

18  understand it to mean?

19  **A.**   The focus here is really around access to clinicians so

20  that clinicians or providers can then make the proper diagnosis

21  and also determine the proper course of treatment.

22  **Q.**   And did you understand there could be a variety of

23  treatment options for ADHD?

24  **A.**   Yes.

25  **Q.**   Below that, it says 1.3 million monthly revenue for

1    profitability 15.6 million annual run rate.

2        What does that -- what's the annual run rate?

3    **A.**   So that's actually -- that's essentially extrapolating out

4    that 1.3 to 12 months, so saying if things continue as they

5    would, in a year it would be at 15.6.

6    **Q.**   Were those impressive revenue numbers, in your view, for a

7    company of Done's size and stage?

8    **A.**   Yes.

9    **Q.**   And the first line of this e-mail said (as read):

10            "Here are our blurb and a link to our deck."

11        Did Defendant He send you a presentation to you about Done

12    in May 2021?

13    **A.**   She did.

14    **Q.**   And did you receive that presentation through Dropbox?

15    **A.**   Yes, or DocSend.

16    **Q.**   Or DocSend.  Thank you for correcting.

17        So let's look at that.

18            **MS. GREEN:**  Exhibit 3041 for admission, please.

19            **THE COURT:**  Admitted.

20        (Trial Exhibit 3041 received in evidence.)

21    **BY MS. GREEN:**

22    **Q.**   So we see the first slide, "ADHD Done, fast, easy,

23    convenient care."

24        And then let's look at Slide 2, please.

25        This diagram about the amount of ADHD spending, 31.6B,

1  versus mental health spending, 186B, what did you understand

2  Defendant He to be communicating with this diagram and this

3  presentation?

4  **A.**    Essentially that it's a large -- large market, large

5  opportunity.

6  **Q.**    And was just a large market large opportunity for Done and

7  F7 -- was that the only thing that F7 cared about when thinking

8  about whether to invest in Done?

9  **A.**    No.  I think -- I mean, I think, of course, for any VC, a

10  large market and the opportunity to build a large business is

11  the -- as a business that we're in, I think for us, even what I

12  described up front, I think part of the reason we were excited

13  about Done was around the mission of providing access to care

14  and as I mentioned, firsthand, sort of feeling some of that

15  struggle and overwhelm when you're looking for care?

16      And so, you know, excited about Ruthia being a female

17  founder, tackling and building a mission-driven company

18  where -- that could really impact and help a lot of people.

19          **MS. GREEN:**   And if we look at Slide 3, please, and

20  let's focus in on the heading.

21  **BY MS. GREEN:**

22  **Q.**    In this presentation from Defendant He, it says (as read:)

23          "We built a two-sided managed, regulated

24          marketplace.  Reduced cost and wait times, affordable

25          access, patient first care."

1      So I want to talk about this term "managed marketplace,"

2  which we've now seen again.

3      Is this a technical term in the industry?

4  **A.**   It is.

5  **Q.**   And can you explain for the jury what it means?

6  **A.**   Yes.  I think that one of best examples or -- like Uber

7  would be an example of making a managed marketplace pretty well

8  known in that example.  It's really connecting supply with

9  demand.  Of course, the Uber example, connecting riders with

10  drivers.

11      But it's really about being a technology layer and

12  connector for, again, that supply/demand to find each other and

13  work together.

14  **Q.**   Okay.  And can there be different types of models to

15  provide technology and services to consumers?

16  **A.**   Yes.

17  **Q.**   So this is being described as a managed marketplace model,

18  but can it also be, for example, direct-to-consumer models?

19  **A.**   Yes.

20  **Q.**   And do these terms have well-understood meanings in the

21  industry?

22  **A.**   Yes.

23  **Q.**   What distinguishes a managed marketplace from, say, a

24  direct-to-consumer model?

25  **A.**   I think the direct-to-consumer model, like going back to

GRAZIADEI - DIRECT / GREEN

1  like what made -- sort of put DTC on the map as a term, if we

2  go all the way back, it would be like Dollar Shave Club.  And

3  you used to buy your razors maybe at the pharmacy or the

4  grocery store, and Dollar Shave Club went and did this

5  direct-to-consumer model where they own the razors, they own

6  the supply, and they go out and build a brand and generate

7  demand and ship the razors to your door.

8      And so it's really about just facilitating that direct

9  relationship, you know, versus going through a retailer, a

10 separate retailer or something like that.

11 Q.   And you described the managed marketplace, in contrast, as

12 more of a company that just connects, say, one side to the

13 other side?

14 A.   Yes.

15 Q.   So in Done's view, did you understand it to mean -- what

16 did you understand it to mean in the Done context?

17 A.   That they're making it easier for patients seeking care to

18 connect to a clinician, and then those clinicians operate

19 independently to diagnose, determine course of care, et cetera.

20 Q.   You mentioned that the clinicians operate independently.

21      Was that important to you that the clinicians were able to

22 operate -- to diagnose and care for their patients

23 independently?

24 A.   Yes.  I mean, I think that -- I mean, part of this in

25 health is putting -- putting a lot of importance and trust into

1    healthcare professionals to -- to practice medicine as -- as

2    they're trained to, as they're supposed to.  So that's

3    certainly an important part.

4    **Q.**  And was the fact that this was presented to you as a

5    managed marketplace -- how did you understand -- I'll rephrase

6    that question.

7        Given that this was presented to you as a managed

8    marketplace, what did you understand that to mean about the

9    providers' ability to practice independently?

10   **A.**  That they were really building -- sorry.  I feel like I'm

11   repeating myself.

12       But building that practice and then, you know, once they

13   meet the patient, that's really, you know, their patient that

14   they're meeting with as they see fit, that they're, you know,

15   determining the right -- the right modality of care.  They may

16   change that over time whatever -- whatever may be needed, but

17   that really the clinician is making those decisions.

18   **Q.**  So your understanding was that at Done, the providers

19   would be able to act independently, make all those decisions?

20   **A.**  Yes.

21   **Q.**  Based on this representation, how much control did you

22   understand Defendant He to be exercising over clinical

23   policies, if any?

24   **A.**  Yeah.  I don't -- I don't think we had a good handle on

25   Ruthia providing any certain oversight to that care.

1  **Q.**  And when you say that you didn't have -- when you say

2  that, was it important to you that Defendant He wasn't

3  controlling that aspect of clinical care?

4          **MS. BELL:**  Objection, Your Honor, leading.

5          **MS. GREEN:**  I can rephrase the question.

6          **THE COURT:**  Overruled.

7  **BY MS. GREEN:**

8  **Q.**  You can answer.

9  **A.**  Okay.  Sorry.  Can you ask the question again?  Obviously

10  short-term memory.

11  **Q.**  So you explained the importance to you that providers were

12  able to act independently; correct?

13  **A.**  Yes.

14  **Q.**  Okay.  So what was your understanding as to how much

15  control Defendant He, as a non-clinician, had over how the

16  providers were able to practice?

17  **A.**  Yeah.  It's our understanding that the clinicians were

18  able to practice as they needed to.

19  **Q.**  And would you have been concerned if that representation

20  wasn't correct?

21  **A.**  Yes.

22  **Q.**  Would it have been consistent with this representation of

23  a managed marketplace if Defendant He had decision-making

24  authority with respect to what screening, clinical screening

25  questionnaires, patients answered?

1        **MS. BELL:**  Objection, Your Honor, per our colloquy.

2        **THE COURT:**  Overruled.  Overruled.

3        **THE WITNESS:**  So specific to screening questions?

4   BY MS. GREEN:

5   **Q.**   No, specific to whether she had decision-making authority

6   over the screening questions that were asked.

7   **A.**   I think that would be important that the -- that the

8   physicians and clinical director would be having guidance

9   around whether the right screening questions.

10  **Q.**   Did Defendant He inform you that approximately two months

11  before your investment in June, she had instituted an

12  auto-renewal policy that informed Done patients that they could

13  opt in and automatically obtain their refills?

14       **MS. BELL:**  Objection, misstates the evidence, Your

15  Honor.

16       **THE COURT:**  I'm going to permit it, and then you have

17  cross-examination.  Okay?

18       **THE WITNESS:**  So, no, we're not aware of the

19  auto-renew policy two months prior.

20  BY MS. GREEN:

21  **Q.**   And if -- if Done providers had not been consulted before

22  that policy was sent to their patients, would that have been

23  consistent with your understanding of a managed marketplace?

24       **MS. BELL:**  Objection, Your Honor, per our colloquy

25  prior to --

1          **THE COURT:**  Well, she's asking whether it would be

2    consistent with it.

3          **MS. GREEN:**  Right.  Correct.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  Sorry.  Can you ask the question again?

6    BY MS. GREEN:

7    **Q.**    If Done providers had not -- had not been consulted before

8    this refill -- auto-refill policy was sent to their patients,

9    would that have been consistent with your understanding of this

10   managed marketplace concept?

11   **A.**    No, that would be inconsistent.

12   **Q.**    Can you explain why?

13   **A.**    That feels like a decision for the physician -- clinician

14   to make with their patient, whether or not that type of

15   auto-refill makes sense or when there needs to be follow-up

16   appointments and methods to check in and things like that.

17   **Q.**    And on that topic of follow-up appointments, would it have

18   been consistent with this representation of a managed

19   marketplace if Defendant He had decided not to compensate Done

20   providers for having follow-up appointments with their

21   patients?

22   **A.**    Sorry.  You said would it be consistent?

23   **Q.**    With this idea of a managed marketplace; correct.

24   **A.**    No, not -- no.

25   **Q.**    And why not?

1    **A.**    As I think that impacts the ability for the clinicians to

2    practice as they see fit.

3    **Q.**    And similar -- similar question:  Would it have been

4    consistent with this representation of a managed marketplace if

5    Done providers were unable to control and enforce whether their

6    patients actually had follow-up appointments?

7    **A.**    No.

8    **Q.**    For the same reason that you just described?

9    **A.**    Yes.

10   **Q.**    And we see on this slide, it says (as read):

11          "Done provides affordable, accessible patient

12       first care."

13       And in "Value to Patients," we see this note about access

14   to clinicians.

15          **MS. GREEN:**  And if we go -- thank you, Ms. Braga.

16   **BY MS. GREEN:**

17   **Q.**    On this same topic, if we just look at Slide 4 very

18   quickly and look at point Number 4 there, we again see this

19   representation to you that Done was providing worry-free

20   ongoing care and a monthly subscription -- under a monthly

21   subscription model.

22       You mentioned sort of access to care earlier, and I just

23   want to build on your understanding about that.

24       So based on these representations about the service Done

25   was providing, what did you understand Done to be offering to

GRAZIADEI - DIRECT / GREEN

1  patients in return for this monthly subscription?

2  **A.**    In my mind, it was really access to the clinician.  Again,

3  I think these experts and clinicians can be really in demand.

4  It can also be difficult -- at least my experience has been it

5  can be difficult to get the right treatment set up out of the

6  gate, so having that ongoing touchpoint and access is

7  important.

8      And so we were excited about this subscription because we

9  felt that that guaranteed patients access to their clinician on

10  an ongoing basis.

11  **Q.**    So you were excited about the subscription because you

12  felt it guaranteed access to that clinician?

13  **A.**    Yes.

14  **Q.**    Okay.  Did Defendant He represent to you that Done was

15  providing access to care as you just described or access to

16  stimulants?

17  **A.**    Access to care.

18  **Q.**    And would that distinction have been important to you?

19  **A.**    Yes.

20  **Q.**    Why?

21  **A.**    Because it's -- I use sort of the hammer analogy.  Like

22  not every problem requires a hammer.  Like, I think with ADHD,

23  for example, there are a number of ways to treat that.  There's

24  anything from executive coaching-type intervention to a

25  stimulant to more naturopathic remedies?

1      So, yes, it was very important to me that they had access

2   to a clinician that could think about all of the different

3   types of care for ADHD.

4           MS. GREEN:  I would like to show Exhibit 343 that has

5   previously been admitted.

6      And we can just focus on Defendant He's message here, the

7   second one, please.

8      Thank you, Ms. Braga.

9   BY MS. GREEN:

10  Q.   So you mentioned that you invested around June 7th, 2021;

11  correct?

12  A.   Yes.

13  Q.   You were having conversations with Defendant He in

14  May 2021; correct?

15  A.   Yes.

16  Q.   Here we see Defendant He writing (as read):

17          "What patients care about is simply to get their

18          refill.  For us, the only goal is to help them get

19          it."

20      Did Defendant He tell you in May 2021 that her view was

21  that what patients care about is simply to get their refill and

22  Done's goal was to help them get it?

23  A.   No.

24  Q.   Would this have been consistent with what Defendant He was

25  telling you about Done's mission to provide access to care?

1   **A.**   No.

2   **Q.**   Can you explain why?

3   **A.**   Well, I realize I'm reading kind of one sentence, but,

4   again, it feels sort of very -- it doesn't -- I feel like it

5   doesn't showcase a lot of personalization for the patient,

6   which, again, I think access to care and a clinician is around

7   personalization.  And I think it would discount -- I feel like

8   it discounts the needs of individuals who may be, you know,

9   certainly looking for ongoing care.  There can be comorbidity.

10   There can be lots of things that they need -- they need more

11   than just getting a prescription refill.

12          **MS. GREEN:**  We can take that down, Ms. Braga.

13   **BY MS. GREEN:**

14   **Q.**   You mentioned the importance of access to the clinician as

15   part of this access to care concept.

16          Would it have been consistent with this representation if

17   Defendant He had implemented refill policies that were

18   hindering the abilities of providers to have follow-up

19   appointments?

20   **A.**   Was the question would I be concerned about that?

21   **Q.**   Would it be consistent with this representation that Done

22   was providing access to care?

23   **A.**   No.  If it's limiting, no.

24   **Q.**   So I'd like to show you Exhibit 209, which has previously

25   been admitted.

1      And I just want to show you -- this is -- if you look at

2  the bottom communication, this Done service update to -- we'll

3  see who it was to in a moment.

4      But if we just look at the bottom paragraph.  We'll only

5  spend a moment on this.

6          MS. GREEN:  Thank you, Ms. Braga.

7  BY MS. GREEN:

8  Q.   Under "Follow-up Appointments," it says (as read):

9          "Follow-up appointments are no longer a

10      requirement to receive your medication."

11         MS. GREEN:  And then if we go to the next page,

12  Ms. Braga.

13  BY MS. GREEN:

14  Q.   We see the appointment canceled for a Done member called

15  Ian Samuel.

16      Did Defendant He inform you that approximately six months

17  before your investment in November 2020, she had directed a

18  message to Done members informing them follow-up appointments

19  are no longer a requirement to obtain your refill?

20  A.   No.

21  Q.   If such a policy were in place, would that have been

22  consistent with this representation of access to care?

23  A.   No.  I think it should be the individual clinician to

24  determine what the right -- what the right follow-up schedule

25  modality is.

1    Q.   And would it have been consistent with that representation

2    if in this same time frame Defendant He had directed over a

3    hundred follow-up appointments be canceled for members without

4    first informing their providers?

5    A.   No.

6         MS. GREEN:   Let's look at page 1, please, of this

7    exhibit.

8         And scroll in on the top sections, please, including the

9    message below, please, Ms. Braga.

10   BY MS. GREEN:

11   Q.   So we see here Mr. Ian Samuel responds asking why his

12   appointment is canceled.

13        And Defendant He responds (as read):

14        "Hi, Ian.  If you just need a refill, you can

15        reply to this e-mail without an appointment."

16        And then mentions to let them know if he wants dosage

17   changes.

18        Did Defendant He inform you that she had had direct

19   communication with some Done members to inform them they no

20   longer needed an appointment?

21   A.   No.

22   Q.   If that were the case, would that have been consistent or

23   inconsistent with this access to care that you were told about?

24   A.   I would say -- yeah, it would be surprising.  Again, I

25   would expect the clinician to -- to be communicating directly

1  with the patient on particularly things like dosage changes.

2  Q.   Focusing on Slide 3 --

3       MS. GREEN:   Oh, sorry, Ms. Braga.  We can go back to

4  the presentation, which was Exhibit 3041, Slide 3.

5  BY MS. GREEN:

6  Q.   This bullet point about managed ongoing care

7  asynchronously, what did you understand that to mean?

8  A.   That's where I really saw that, is this flexibility for

9  patients to be able to reach out to their provider and

10  determine if that should be a synchronous appointment or they

11  can message or e-mail as needed.  They can have check-ins

12  around how they're feeling, and if they -- if they need

13  updates.  Also consistent with my personal experience in

14  working with a psychiatrist.

15  Q.   Did Defendant He communicate to you that that was supposed

16  to be a replacement for a follow-up appointment or something in

17  addition to a follow-up appointment?

18  A.   Our understanding was in addition.

19  Q.   Would you have been concerned if it was a replacement to a

20  follow-up appointment?

21  A.   Again, I would say that needs to be a clinician decision.

22       MS. GREEN:   If we can we go to Slide 4, the patient

23  experience, please.

24  BY MS. GREEN:

25  Q.   What was your understanding from Defendant He about how

1  the quality of care Done offered would compare to an in-person

2  visit?

3  **A.**    I think overall understanding was -- sorry.  I feel like

4  I'm at a loss for words -- good that it was, you know, equally

5  effective as an in-person visit.

6  **Q.**    And we see here on Point 3 in this presentation (as read:)

7          "Get treatment.  We are not a pharmacy."

8      What did you understand that to mean?

9  **A.**    Again, it's very focused on the relationship with the

10  clinician getting treatment.  That treatment can be different

11  things, multiple things, that it isn't just about, you know,

12  getting medication.

13  **Q.**    And that was important to you?

14  **A.**    Yes.

15          **MS. GREEN:**  Let's look at Slide 7, please.

16  **BY MS. GREEN:**

17  **Q.**    Defendant He provided you some pictures of the team

18  members.

19      There's a picture of someone called Dr. Brindala, I'll

20  just say, medical.

21      In this presentation, did Defendant He represent

22  Dr. Brindala as a medical leader of Done?

23  **A.**    Yes, on the -- per the slide.

24  **Q.**    Mm-hmm.

25      Did Defendant He inform you in May or June 2021 about any

1    other information that Dr. Brindala had been communicating to

2    her about Done?

3    **A.**    No.

4              **MS. GREEN:**  I'd like to show Exhibit 364, previously

5    admitted.

6         And let's just look at page 2, please, Ms. Braga.  And

7    let's zoom in on the heading.

8    **BY MS. GREEN:**

9    **Q.**    Do you see here this is a monthly risk mitigation report

10   dated May 31, 2021?

11   **A.**    Yes.

12   **Q.**    And so that's about seven days before your investment;

13   correct?

14   **A.**    Yes.

15   **Q.**    But you had already also been speaking to Defendant He in

16   May --

17   **A.**    Yes.

18   **Q.**    -- correct?

19        Do you see it's from Dr. Brindala; correct?

20   **A.**    Yes.

21             **MS. GREEN:**  And if we go to page 2, lower down,

22   please.  Actually, let's just go straight to page 4.

23        And do you see -- let's focus on -- yeah, that through

24   just -- yeah, we can go through the reality.

25   \\\

GRAZIADEI - DIRECT / GREEN

1    BY MS. GREEN:

2    Q.   In this risk mitigation report, did you see a risk flagged

3    by Dr. Brindala about pressure to diagnose ADHD and prescribe

4    stimulants?

5    A.   I see it now.  I didn't see it then.

6    Q.   Mm-hmm.

7         And that's what we're going to get to.

8    A.   Okay.

9    Q.   Did he write that (as read:)

10            "Multiple Done providers have expressed a

11        perception of pressure to diagnose ADHD and prescribe

12        stimulants"?

13   A.   Yes.

14   Q.   And let's just look at one other example of a risk.

15   Number 2, refilling stimulant prescriptions.

16        Did Dr. Brindala write about a risk that multiple Done

17   providers had expressed concerns with refilling stimulants

18   without synchronous visits?

19   A.   Yes.  That's what I'm reading here.

20            MS. GREEN:  And if we go to the next page and just

21   focus on the reality paragraph at the very top, please,

22   Ms. Braga.

23   BY MS. GREEN:

24   Q.   Did he mention some names of providers and say (as read:)

25            "That they had separated from their -- the

1          company due to their preference for visits, whereas

2          other Done providers continue to refill stimulant

3          prescriptions without synchronous visits, which put

4          their licenses and the company at risk for legal

5          consequences"?

6    A.    Yeah.

7    Q.    Did Defendant He share this risk mitigation report from

8    May 31st, 2021, with you?

9    A.    No.

10   Q.    Did Defendant He tell you when she was meeting with you

11   that Dr. Brindala had written these risk mitigation reports

12   flagging legal and compliance risks related to Done's

13   practices?

14   A.    No.

15   Q.    Did she inform you that Dr. Brindala had raised concerns

16   about pressure to describe stimulants?

17   A.    No.

18   Q.    Did she tell you that he had raised concerns about

19   providers being concerned about the inability to have

20   follow-ups --

21   A.    No.

22   Q.    -- when writing refills?

23          How would this information have been consistent with the

24   representation that was made to you that Done was a managed

25   marketplace and it was providing access to care?

1  **A.**  The question is how would this be consistent?

2  **Q.**  Or inconsistent.

3  **A.**  It would be inconsistent.  Inconsistent.

4  **Q.**  Why?

5  **A.**  Concerning.

6  **Q.**  Why concerning?

7  **A.**  I mean, I think certainly react to the report that if

8  clinicians were feeling pressure to prescribe, again, they

9  should be practicing medicine and providing healthcare

10  according to their expertise and training without any external

11  pressure.

12      **MS. GREEN:**  You can take that down, Ms. Braga.  Thank

13  you.

14  **BY MS. GREEN:**

15  **Q.**  Did Defendant He inform you that in May 2021, again, a

16  month prior to your investment, that Dr. Brindala had expressed

17  concern to her that if we simply try to find a way for every

18  patient to get a stimulant that they want, Done will truly be a

19  pill mill?

20  **A.**  No, she did not share that.

21  **Q.**  Would this concept of a pill mill and Dr. Brindala's

22  concerns about that, if that had been the case, would that have

23  been consistent with the access to care you were told about?

24  **A.**  No.

25  **Q.**  Did you have additional calls with Defendant He in June --

1    **A.**    Yes.

2    **Q.**    -- 2021?

3    **A.**    Yes.

4    **Q.**    And did one of those calls take place on or around

5    June 1st, 2021?

6    **A.**    I don't know.

7    **Q.**    I'm happy to show you a document to refresh you.

8    **A.**    Okay.

9        **MS. GREEN:**  So just for the witness, please,

10   Exhibit 2382, page 6.

11       **MS. BELL:**  Counsel, could we --

12       **MS. GREEN:**  Yeah, just for the witness.  Thanks.  And

13   let's just focus on the bottom paragraph where it says "Notes

14   from."

15       Do you see that?

16       **THE WITNESS:**  Yes.  Thank you.

17   **BY MS. GREEN:**

18   **Q.**    No worries.

19       Does that refresh you that you had a call with

20   Defendant He?

21   **A.**    Yes.

22   **Q.**    Okay.  Great.  And you can actually --

23           (Discussion held off the record.)

24   **BY MS. GREEN:**

25   **Q.**    On that call, what did Defendant He tell you about how

1  Done prevented stimulant abuse by Done members on the platform?

2  **A.**   Sorry.  Can you repeat your question?

3  **Q.**   Yeah.  And I'm happy to put that back up if it will help

4  refresh you.

5       On that call, what did -- did Defendant He talk to you

6  about how Done prevented stimulant abuse by Done members?

7  **A.**   Yes.  She had shared that essentially their practices

8  were -- I would say were better than the norm and that they

9  checked the state database every month if a refill was

10  requested.

11  **Q.**   And when Defendant He communicated to you that Done's

12  practices were better than the norm when it came to this risk,

13  did you take her at her word?

14  **A.**   Yes.

15  **Q.**   Did you have any other sort of understanding about

16  whether, in fact, Done's practices were better than the norm at

17  preventing abuse?

18  **A.**   We didn't, and I think we really took that as her word,

19  and that conversation gave us a lot of confidence that it was

20  something she cared about and took seriously.

21  **Q.**   So was that representation to you important?

22  **A.**   Yes.

23  **Q.**   After investing in Done, how much visibility did F7 have

24  into the clinical practices and policies at Done?

25  **A.**   We did not have visibility into the clinical practices.

1    Our primary role was supporting Ruthia as a leader in the

2    company.

3    **Q.**    Okay.  And you said supporting Ruthia as a leader.  Did

4    you have involvement in trying to help her source employees and

5    personnel?

6    **A.**    So we played a role.  We had a lot of conversations about

7    her hiring a COO to essentially get more operational leadership

8    and support.  We also talked about a chief marketing officer,

9    but the primary focus was chief operating officer.  And so we

10   helped interview a couple of candidates during that process.

11   **Q.**    What was your observation as to the seniority of the team

12   members Defendant He chose to hire around her?

13   **A.**    Our conversations really centered about her being able to

14   up-level some of that talent and really needing what we call a

15   C-suite or senior-level leadership team in the company.

16   **Q.**    And that's something it sounds like you were hoping she

17   would do, correct, but not what she currently had in place?

18   **A.**    Yes, yes.

19   **Q.**    What was your understanding, based on your communications

20   with Defendant He, about how much control she had at the

21   company?

22   **A.**    A lot of -- I mean, I guess a lot of control as the

23   founder and CEO of the company.

24   **Q.**    Did you get a sense of how much she liked to rely on

25   members around her or employees around her, if at all?

1    **A.**    I think I would take from our conversations she really --

2    she wanted to be able to rely on more people that I think

3    didn't always feel like she could and that she would really --

4    what I would say get into the weeds and do kind of individual

5    roles herself.

6        But part of our conversations, again, were around how does

7    she get more help, how does she get more people that she can

8    lean on and delegate to more.

9    **Q.**    And this idea that she -- she didn't feel that she could

10    rely on the people around her -- was that something

11    Defendant He had told you?

12    **A.**    Yes.

13    **Q.**    Did you communicate with Defendant He via chat after F7

14    invested in June 2021?

15    **A.**    Frequently, yes.

16        **MS. GREEN:**    And let's look at Exhibit 989, please.

17    And if we could focus in on the 6:15 chat up above 5/5/22 6:15,

18    Ruthia He, "That's why I'm asking."

19        **THE COURTROOM DEPUTY:**    Do you want this admitted?

20        **MS. GREEN:**    Oh, admitted, please.  Thank you so much.

21        **THE COURT:**    989 admitted.

22        (Trial Exhibit 989 received in evidence.)

23        **MS. GREEN:**    6:13:09 .And the one below, please.

24    Sorry.  You were right.  I was wrong.

25        Thank you.

1    BY MS. GREEN:

2    Q.    We'll sometimes see the name of Ms. Shevelenko.  Is that a

3    colleague you had at F7?

4    A.    Yes.  That's my cofounder and also general partner.

5    Q.    Okay.  And here she -- Defendant He says (as read:)

6           "That's why I'm asking for pulling the salary

7          info.  He's quoting market rate of 300K plus

8          3 percent, which might be for a COO role.  I think

9          Riley is great, but he's still not as productive

10          working on non-op teams like HR, recruiting,

11          partnerships, growth, product, and may not be an SVP

12          or COO to take us to become" --

13           MS. GREEN:  And could we show the picture, please,

14    Ms. Braga?  The little picture?

15    BY MS. GREEN:

16    Q.    -- "to take us to become" -- picture of a unicorn.

17          On May 5th, 2022, did Defendant He write to you about a

18    salary question regarding Riley Levy?

19    A.    Yes.

20    Q.    Do you know who Riley Levy was?

21    A.    Yes.

22    Q.    Who was he?

23    A.    He was -- I guess I can't recall his exact title.  I would

24    liken it to director of operations.

25    Q.    Is "unicorn" a term of art or, in this case, picture of

1    art in the tech field?

2    **A.**    Yes.  It's a known.  It's -- yes.  It's meant to be a

3    billion-dollar company.

4    **Q.**    So Defendant He spoke to you about her goal of making Done

5    a billion-dollar company?

6    **A.**    Yes.

7    **Q.**    After you --

8         **MS. GREEN:**  We can take that down, Ms. Braga.  Thank

9    you.

10   **BY MS. GREEN:**

11   **Q.**    After your investment, did you become aware that

12   pharmacies were blocking Done's prescriptions?

13   **A.**    No, I don't believe I was aware they were blocking.  My

14   understanding was that there might be a shortage or a problem,

15   but I was not aware of blocking.

16   **Q.**    Great.  So let's talk about that.

17        **MS. GREEN:**  Let's look at Exhibit 629, page 2, please.

18   And let's focus on Defendant He's communication just at the

19   bottom.  So -- yep, that one.  Thank you.

20        For admission, please.  Thank you, Ms. Scott.

21        **THE COURT:**  Admitted.

22        (Trial Exhibit 629 received in evidence.)

23   **BY MS. GREEN:**

24   **Q.**    Defendant He writes to F7 here (as read:)

25             "That's a good point.  Now I'm actually asking

```
 1              him to focus a hundred percent on the fires like
 2              pharmacy issues and strategic initiatives."
 3                   MS. GREEN:  And let's look at one more for admission,
 4       please, Exhibit 654.
 5                   THE COURT:  Admitted.
 6              (Trial Exhibit 654 received in evidence.)
 7                   MS. GREEN:  And let's look at -- one moment.  Yeah,
 8       thank you so much.
 9              Ms. Braga is one step ahead of me.
10       BY MS. GREEN:
11       Q.    Again on June 2022, Defendant He writes (as read):
12                   "I do think Riley needs to focus on pharmacy and
13              other burning issues."
14              So Defendant He talked to you, I think you said, about the
15       struggle with pharmacies; correct?
16       A.    Yeah.  I think, on this, I do -- in terms of our
17       partnership, obviously I am on this string.  Joanna was
18       definitely running point on the exchange around Riley, so I had
19       visibility but wasn't -- I guess I want to note that different
20       from me having that conversation, so I certainly want to be
21       thoughtful about representing Joanna.
22       Q.    Definitely.
23              Did Defendant He communicate to you that pharmacies around
24       this time frame had been blocking Done's prescriptions?
25       A.    I did not have an understanding that they were blocking
```

1  prescriptions.

2  **Q.**    Would it have been your expectation that if pharmacies

3  were not filling prescriptions for valid reasons, say, concerns

4  about a lack of patient or provider relationship, that

5  Defendant He would have shared that information with you?

6  **A.**    Yes.  I would like for her to share it.  She technically

7  doesn't have to, but...

8  **Q.**    Something you would have liked, given sort of your

9  investment in the company --

10  **A.**    Yes.

11  **Q.**    -- and your communications with her?

12       Did Defendant He share with you that a month prior to

13  these messages, in May 2022, CVS Pharmacy had informed Done

14  that it had concerns regarding the practices of Done that it

15  could not resolve and would no longer accept Done's

16  prescriptions?

17  **A.**    No, I don't believe we were aware of that.

18  **Q.**    Would that information have been important to you?

19            **MS. BELL:**  Objection, Your Honor, per the colloquy.

20            **THE COURT:**  I think she can answer that.

21            **THE WITNESS:**  It would certainly be concerning, yes.

22            **MS. GREEN:**  You can take that down, Ms. Braga.

23  **BY MS. GREEN:**

24  **Q.**    Did you read an article in the Wall Street Journal in or

25  around March 2022 that raised concerns that Done was

1   overprescribing stimulants or there was a pressure to prescribe

2   stimulants at Done?

3   **A.**    Yes.  I don't recall the exact contents of the article,

4   but yes.

5   **Q.**    No problem.  I can show it to you to refresh, and it's

6   already been admitted.  So let's just look at Exhibit 2861.

7           **MS. GREEN:**  And, you know, let's just show the witness

8   the heading so she can remember it.  This is the article from

9   March 2022, and we can take a look, just as an example, at

10  page 7.

11          **THE COURTROOM DEPUTY:**  Can I show it to the jury?

12          **MS. GREEN:**  Oh, yes, please.  This has already been

13  admitted.  Thank you so much for checking.

14  **BY MS. GREEN:**

15  **Q.**    (as read:)

16          "Former Done workers said prescribing stimulants

17      to patients was strongly encouraged," for example.

18          **MS. GREEN:**  And we could look at the next page as

19  well, Ms. Braga.

20  **BY MS. GREEN:**

21  **Q.**    And we look at the top paragraph (as read:)

22          "A separate monthly risk mitigation report that

23      Done's then chief medical officer Dr. Brindala said

24      he wrote stated that multiple Done providers have

25      specifically expressed the perception of pressure to

1          diagnose ADHD."

2          Do you see that?

3   A.   Yes.

4   Q.   Does this refresh you on that article from March 2022?

5   A.   Yes.  Thank you.

6   Q.   Great.

7          Were you concerned when you read this article?

8   A.   Yes, certainly.

9   Q.   Why?

10  A.   I think -- I mean, certainly concerning on a number of

11  fronts of being -- of, you know, questions around practices,

12  but also, you know, Done being in the press like this and

13  wanting to better understand why the situation is.

14          MS. GREEN:  Let's look -- for admission, please,

15  Exhibit 988.

16          THE COURT:  Admitted.

17      (Trial Exhibit 988 received in evidence.)

18          MS. GREEN:  Page 2.  And let's just focus on -- we can

19  blow up the part from 3/22/2022 where you see "They ask."

20  Yeah, Defendant He's comments "they ask for a breakdown" and

21  all the way to the bottom of the page is fine.

22      Thank you.

23  BY MS. GREEN:

24  Q.   We've gone back to another set of your message exchanges

25  with Defendant He.  Defendant He --

1        Well, first of all, this is March 2022.  Had Defendant He
2   been trying to raise additional funding at this time,
3   additional investments?
4   **A.**   I can't remember the exact timeline, but we were
5   certainly, you know, supporting Ruthia.  She was thinking about
6   raising additional capital.
7   **Q.**   And on March 22, 2022, did Defendant He write to you that
8   (as read:)
9             "The recent news about Cerebral is attracting a
10        lot of scrutiny in this space, and I wouldn't be too
11        optimistic about the raise being smooth now."
12        Did she write that to you?
13  **A.**   Yes.
14       **MS. GREEN:**   Let's look at page 3, please, Ms. Braga
15  and let's zoom in on the 11/17 -- yep, all the way through --
16  yep.  That's good.
17  **BY MS. GREEN:**
18  **Q.**   Did you have a call with Defendant He about this issue on
19  or shortly after March 22nd, 2022?
20  **A.**   I believe so.  From the message exchange you're sharing, I
21  don't directly remember that, though.
22  **Q.**   Yeah.  We're just going to talk about the message.
23  **A.**   Yeah.
24  **Q.**   On that -- as contained in the message and on that call,
25  did Defendant He represent to you --

1          Oh, let me ask you -- rephrase the question.

2          You wrote here (as read:)

3              "Ruthia, did you have a separation agreement

4          non-disparagement with the previous chief medical

5          officer you referenced?"

6          Do you write that?

7   **A.**   Yes.

8   **Q.**   Did Defendant He reference the chief medical officer on

9   that call?

10  **A.**   I believe so, yes.

11  **Q.**   And as we saw in the press article, there had been a

12  reference in the March 2022 Wall Street Journal article to

13  Dr. Brindala, the chief medical officer; correct?

14  **A.**   Yes.

15  **Q.**   What did you recall Defendant He telling you about this

16  negative press in March 2022 when you raised concerns to her?

17  **A.**   Yes.  I think, to be fair, it's not crystal clear, given

18  it's a few years, but I think what I really recall from those

19  conversations was that it felt like the attention -- what she

20  had shared was that the attention was really on Cerebral and

21  that Done was being pulled into that given they're in the ADHD

22  space and that the claims in the article were coming from a

23  disgruntled previous employee.

24  **Q.**   She told you that the claims in the article were coming

25  from a previous disgruntled employee?

1   **A.**    Yes.

2   **Q.**    Did that alleviate some of your concerns?

3   **A.**    A bit.  I think just she -- you know, I think certainly

4   giving us some comfort in that, you know, she felt her

5   practices were -- or were strong and that, again, they were

6   being pulled in more as a result of Cerebral versus something

7   that they were doing explicitly.

8   **Q.**    Did she at this time tell you that, in fact, Dr. Brindala

9   had been the chief medical officer at the time and had indeed

10  written these risk mitigation reports?

11  **A.**    I don't recall discussing that in detail.

12  **Q.**    Did you rely on Defendant He for information as to whether

13  the allegations in the article were correct?

14  **A.**    Yes.

15       **MS. GREEN:**  Let's look just further down on this page.

16  3/26/2022, please, Ms. Braga.

17       And let's see the part where it says 5:47:06.  A bit

18  further down, yeah.  And you can include Ms.-- there we go.

19  Thank you.

20  **BY MS. GREEN:**

21  **Q.**    Did Defendant He write to you (as read):

22            "The PR firm said we don't necessarily need to

23       correct inaccurate info because it doesn't pose any

24       harm to the company or me"?

25  **A.**    Yes.

1  Q.   How did this comment from Defendant He make you view

2  whether the allegations in the article were accurate or

3  inaccurate?

4  A.   I mean, we believed from what she was sharing that the

5  allegations were inaccurate.

6          MS. GREEN:   One moment, Your Honor.

7                    (Pause in proceedings.)

8  BY MS. GREEN:

9  Q.   If Dr. Brindala had indeed been the chief medical officer

10  at the time he had written these risk mitigation reports, would

11  you have -- and you had known that, would you have found the --

12  found Defendant He's representation here to be accurate or

13  inaccurate?

14  A.   I guess that's hard for me to say.  I don't know how the

15  dates line up with his report and what Ruthia was saying, so I

16  don't know if I can fairly answer that.

17  Q.   You responded below this comment (as read:)

18          "Thanks for sending, Ruthia.  You had some

19      response statements in the article which I think was

20      great."

21  Why did you write that to Defendant He?

22  A.   I wrote that in reference to -- to her responding and

23  being participatory versus kind of a "no comment" or something

24  like that, that she was, you know, taking a leadership position

25  with -- with the press.

1  Q.   Did you know whether the response she was providing to the

2  press was accurate or inaccurate?

3  A.   I don't know, no.

4  Q.   So that wasn't part of why you wrote that message?

5  A.   No.  It was just in reference to her saying something.

6  Q.   Did you become aware --

7        MS. GREEN:  And we can take that down.

8  BY MS. GREEN:

9  Q.   -- of an article on September 15th, 2022, about the DEA

10 investigating Done?

11 A.   Can you say that again?  I'm sorry.

12 Q.   Did you become aware of an article in September 15th,

13 2022, about the DEA investigating Done?

14 A.   I believe so.  Again, I recall that there's an article in

15 September but don't remember the details of the content of the

16 article.

17 Q.   Not a problem.

18       MS. GREEN:  I can just put on the heading.  It's

19 already been admitted, Your Honor.  Exhibit 2864, just to

20 refresh you on that.

21       THE WITNESS:  Yes that's clear by the title.

22 BY MS. GREEN:

23 Q.   Great not a problem.

24       And in that article, did Done --

25       MS. GREEN:  And if we look at below, next page,

1    please, Ms. Braga, on the third paragraph.

2    **BY MS. GREEN:**

3    **Q.**    Did Done provide a statement that (as read:)

4          "Done hasn't received any notifications from the

5          DEA or any other federal agency regarding an

6          investigation, request for records, or preservation

7          of documents.  Is committed to providing high-quality

8          psychiatric care."

9          Was that in the article?

10   **A.**    Yes.

11   **Q.**    Great.

12        **MS. GREEN:**  Let's look at Exhibit 990, for admission,

13   please.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit 990 received in evidence.)

16        **MS. GREEN:**  And let's focus on -- thank you -- the

17   text starting from 8/1/2022, up above, 8/1/2022.  Great.  And

18   we can go down through -- all the way through 9:15.  Perfect.

19   Thank you.

20   **BY MS. GREEN:**

21   **Q.**    In August 2022, did Defendant He tell you and Joanna --

22   give you a heads-up that if you get roached out to by a

23   reporter, please don't respond?

24   **A.**    Yes.

25   **Q.**    Okay.  And then on September 15th, 2022, which you will

```
 1   recall is the same date of that article we just saw, did
 2   Defendant He write to you (as read:)
 3              "Wanted to go to the happy hour today but we got
 4       untruthful media coverage that we're then working on
 5       with our PR and have to miss the event tonight"?
 6   A.   Yes.
 7   Q.   What did Defendant He convey to you about the issues
 8   raised in the September 2022 article?
 9   A.   I think -- I don't recall the conversation specifically,
10   but it essentially, from what I'm reading, that they were
11   untruthful, which I know she said in the article and reiterated
12   here again.
13   Q.   And in terms generally of like the negative press in
14   September 2022, did Ruthia -- did Defendant He convey to you
15   the same type of messaging that she'd given to you in March
16   about it being mostly about Cerebral?
17   A.   Yes.
18   Q.   Okay.  Did she, again, mention disgruntled employees sort
19   of being the source of some of this information?
20   A.   I can't recall the -- unfortunately, those -- I think the
21   two timelines are blurring together a bit, but...
22   Q.   You remember her mentioning that with the --
23   A.   Yes, absolutely.  I just can't recall if that was sort of
24   reiterated again in September.
25   Q.   Not a problem.
```

1          Were you having quite regular communications with

2    Defendant He in 2021 and 2022?

3    **A.**    Yes.

4    **Q.**    Did Defendant He tell you a week later that Done had, in

5    fact, received a subpoena requesting documents as part of an

6    investigation?

7    **A.**    No.

8    **Q.**    Given your communications with Defendant He and what she

9    had represented to you on September 15th, would it have been

10   your expectation that if that were the case, you would have

11   been told?

12   **A.**    We certainly would have liked to have been told?

13   **Q.**    Would you have continued your efforts, for example, to

14   source candidates for Done if you had known that information?

15   **A.**    I want to be careful about revisionist history, but I

16   don't -- I don't believe so.   I think we certainly would have

17   been trying to dig in and understand what would be the

18   appropriate next steps.

19   **Q.**    When did you become aware of the Government's

20   investigation into Done?

21   **A.**    I believe it was actually when we received a subpoena,

22   which I believe was January -- January 2023.   Is that right?

23   **Q.**    So your recollection is you first found out about the

24   investigation based on you receiving the subpoena, not

25   Defendant He telling you about it?

1    **A.**    Yes.

2    **Q.**    When you became aware of the investigation -- we've seen

3    some of the bad press and then you became aware of the

4    investigation.  What was your reaction about Done?

5    **A.**    Gosh.  I feel like a myriad of reactions.  I mean, I

6    think -- I mean, a couple that was surprised, scared.  We've

7    never encountered something like this.  I think --

8    disappointment.

9        I think we set out to hopefully, you know, do something

10   that we thought was good for the world with access to care, and

11   set an alarm that we're now in this -- that Done found

12   themselves in this -- in this place, and I think with some

13   very -- obviously some very serious allegations.  So I would

14   say probably all of the emotions during that -- during that

15   time.

16   **Q.**    Did you feel disappointed that -- so this -- you spent a

17   lot of time today talking about this vision that you hoped for

18   about investing in a company providing access to care.

19       Did you feel disappointed that that may not have happened?

20           **MS. BELL:**  Objection, Your Honor, argument, leading.

21           **THE COURT:**  Sustained.

22           **MS. GREEN:**  No problem, Your Honor.

23   Thank you.

24           **THE COURT:**  Cross?

25           **MS. BELL:**  Thank you, Your Honor.

GRAZIADEI - CROSS / BELL

1          <u>CROSS-EXAMINATION</u>

2     BY MS. BELL:

3     Q.   You're going to have to correct me on the pronunciation of

4     your last name.  I thought I got it, but I'm about to say it

5     and I'm afraid it's wrong.  Could you tell me.

6     A.   It's Graziadei.

7     Q.   Graziadei?

8     A.   Yes.

9     Q.   Okay.  So, Ms. Graziadei, your fund, as I understand it,

10    invests in founders and companies that you believe have the

11    potential for innovation; is that right?

12    A.   Yes.

13    Q.   Okay.  Can you tell us what an innovator is?

14    A.   That's a broad -- I feel like that's a broad term.  I will

15    think about -- or I guess I should say like we -- maybe more

16    specifically in the founder realm, we're a founder innovator,

17    individuals who start and build companies, so they pursue

18    something they think is a great idea and really look to achieve

19    that idea and that mission and build a company around it.

20    Q.   And part of the idea of an innovator is -- at least in

21    certain cases is they're changing the status quo or the

22    established way of doing things; is that fair?

23    A.   Oftentimes, yes.

24    Q.   And the idea is to come up with a better solution to solve

25    a problem that they see in the world; is that fair?

GRAZIADEI - CROSS / BELL

1   A.   Sometimes -- sometimes it can be a similar solution, but

2   yes, certainly a solution to solve a problem that they see in

3   the world.

4   Q.   And so when F7 invested in Done back in June of 2021,

5   let's see if you remember.  I know it's a long time ago, but do

6   you remember telling Ruthia that you were incredibly excited

7   about her and what she had already achieved with Done, and then

8   you said (as read:)

9         "You're the kind of founder and this is the kind

10        of product and company we would want to go outside

11        our model for."

12   Do you remember that?

13   A.   Yes, I do.

14   Q.   Okay.  Could you explain why Ruthia was the kind of

15   founder that you would want to go outside your model for and

16   what you meant by that?

17   A.   Sure.

18        I think maybe a bit what I shared before.  I mean, when we

19   set out to build a firm to invest in women and underrepresented

20   founders, and I think a couple of things that Ruthia really

21   represents and that is a female founder taking on a big vision

22   and has a big mission for the world.

23        She's also someone that came recommended to us from our

24   network, from people that we had worked with at Facebook that

25   we deeply respect and said really positive things about Ruthia

1   as -- you know, formally as an operator and someone who did

2   good work and that we thought would be -- would be a great

3   founder.

4       And then, last, you know, really bought into the mission

5   to provide access to care.

6   Q.  And on that point, you mentioned the experience with your

7   son, and as I understand it, before you connected with -- I

8   think you said the neuropsychologist who did the six hours of

9   testing, you personally couldn't find a specialist for your

10  child?  There was a period where it was challenging?

11  A.  Timing-wise, it was actually we had the neuropsych, and

12  then actually after the neuropsych you get a list of potential

13  areas of support or intervention, and I would say that point

14  was the particular point of overwhelm.  It was very difficult

15  to find a psychiatrist to have a medication conversation.

16  There were coaching recommendations.  There was a speech

17  therapist recommendation.

18      And so that was really my personal experience of,

19  you know, wouldn't it be wonderful to have someplace to go

20  where I can, you know, find all of these ADHD resources.

21  Q.  Mm-hmm, mm-hmm.

22      And on the topic of accessibility and what appealed to you

23  about Done in particular, it was also the idea of the gaps in

24  care particularly for women and people of color; is that right?

25  A.  Yes.  Ruthia had shared that with us when we first met,

1   and we were also really struck that those populations were less

2   likely to get care.

3   **Q.**   And so, as you said, you ultimately invested a million

4   dollars, which was one of your largest investments, I think you

5   said?

6   **A.**   Yes.

7   **Q.**   And you're still an investor; right?

8   **A.**   Yes, on a -- yes.

9   **Q.**   Okay.  So I want to talk a little bit about your process,

10  the diligence process, as you mentioned.

11       So you said that you were initially introduced to Ruthia

12  by someone named Fidji -- is it Simo or Simo?

13  **A.**   Simo.

14  **Q.**   Simo.  Can you tell us who he is?

15  **A.**   Fidji is -- she's a female.  She's someone I had worked

16  closely with at Facebook.  She's, you know, currently the CEO

17  of AI applications at Open AI.  She's previously the CEO of

18  Instacart, so someone that we -- we've remained in touch from

19  our working relationship and someone I deeply respect.

20  **Q.**   And she reached out to you, and it was actually what she

21  told you about Ruthia in part that led you to at least pursue a

22  meeting; right?

23  **A.**   Yes.

24  **Q.**   And what she told you is that she herself had invested, as

25  had someone, Julie Zhuo, who used to run design for Facebook?

**GRAZIADEI - CROSS / BELL**

1   **A.**   Mm-hmm.

2   **Q.**   And she also said that she had been (as read:)

3           "Impressed by Ruthia's drive, her can-do

4       attitude, and her strategic approach to which

5       dioceses she could target with the specific approach

6       she's taking."

7       Do you remember that?

8   **A.**   I think I remember the first part better than the last

9   part, but yes.  She reached out to me via e-mail. and I trust

10  that that's what you're reading.

11  **Q.**   Okay.  And then you also knew that there were already

12  other investors in Done; right?

13  **A.**   Yes.

14  **Q.**   So like Craft Ventures, for example?

15  **A.**   Yes.

16  **Q.**   And another firm called Liquid 2 Ventures?

17  **A.**   Yes.

18  **Q.**   And you understood that Done was actually Craft's

19  fastest-growing investment and that they intended to invest,

20  again in the next round?

21  **A.**   Yes.

22  **Q.**   Okay.  So you started interacting with Ruthia around May

23  of 2021, and then your investment was actually made the

24  following month, in June; right?

25  **A.**   Correct.

1    Q.   Okay.  And you -- I think you explained that the focus of

2    your diligence prior to investment and at this early stage is

3    on the founders' experience and then also the other products on

4    the market; right?

5    A.   Yes, and then also -- I mean, talking to, for example,

6    previous investors and then previous individuals who had worked

7    with Ruthia.

8    Q.   Okay.  Great.  We'll get to that.

9         And another factor was looking at the market size and

10   trying to determine, you know, is there a market, how big is

11   the market size for this type of product; right?

12   A.   Yes.

13   Q.   Okay.  And so one of the things you learned about Ruthia

14   in digging into her background is that she -- this is her

15   second time founding a company; right?

16   A.   Yes.

17   Q.   And that she had actually launched a prior startup which

18   was also focused on -- I don't know if it would be correct to

19   call it a two-sided marketplace, but this idea of connecting

20   musicians and fans.

21   A.   I don't recall the details of her first company.

22   Q.   Okay.  Do you remember it was something having to do with

23   music --

24   A.   Yes.

25   Q.   And as you said, you learned -- I think you called her --

1          **THE COURT:** Ms. Bell.

2          **MS. BELL:** Yes.

3          **THE COURT:** Slow down, let the witness finish the

4    answer, and then ask the next question.

5          **MS. BELL:** I'm sorry.  I thought I was going to do

6    better this afternoon.

7    **BY MS. BELL:**

8    **Q.**   Okay.  Sorry about that.

9          So you -- I think you mentioned that you had learned she

10   was a talented operator may have been the word you used?  Did

11   you mean designer?  Or can you explain --

12   **A.**   Yes --

13   **Q.**   -- what you meant?

14   **A.**   -- we use the term "operator" pretty broadly to really

15   mean people who have worked at a tech company, so that -- we

16   use that term across multiple roles, but essentially saying

17   that we had feedback that she was -- I feel like "a good

18   employee" would be the other way to say that.

19   **Q.**   Okay.  And then you had learned at Facebook that she was

20   actually the first designer on something called Portal?

21   **A.**   Yes.

22   **Q.**   Can you tell us what Portal is?

23   **A.**   Yes.  I was not close to the product, but -- and it no

24   longer exists, but I believe Portal -- it was a hardware -- a

25   hardware product, like a screen that Facebook had built for

1    things like video calls.

2    **Q.**    Okay.  And did you also learn that she had been the second

3    designer of something called Facebook Moments?

4    **A.**    Yes.

5    **Q.**    Okay.  And maybe you can tell us what that is.

6    **A.**    I don't actually recall what that is.

7    **Q.**    Okay.  All right.

8         So in addition to this background work, as you said, you

9    spoke with Ruthia, and we'll talk about that.  Right?

10        But another thing that happened was she actually connected

11   you with one of Done's independent licensed medical

12   specialists.

13        Do you remember that?

14   **A.**    Yes.

15   **Q.**    Okay.  And we'll talk about that too.

16        And you also heard some testimonials from users who were

17   pleased with the care that they had received?

18   **A.**    Yes.

19   **Q.**    And then you also dug into Done itself and the ADHD

20   market; right?

21   **A.**    Yes.

22   **Q.**    Okay.  And you yourself tried the Done background

23   screening questionnaire for ADHD.

24        Do you remember that?

25   **A.**    Yes.

GRAZIADEI - CROSS / BELL

1    **Q.**    And you were actually told that you were not likely to

2    have ADHD was the response you got; right?

3    **A.**    And that was Joanna, yes, who went through the flow and

4    got the "you are not likely to have ADHD."

5            **MS. BELL:**    Okay.  And maybe we could just put that

6    up -- well --

7    **BY MS. BELL:**

8    **Q.**    You actually had taken some notes, right, as you were

9    meeting with Ruthia?

10   **A.**    Yes.

11   **Q.**    Do you recall that?

12        And do you recall that you actually put a screenshot in

13   the note of your -- the results that --

14   **A.**    Yes.

15   **Q.**    -- Joanna -- okay.

16           **MS. BELL:**    And so we would seek to admit just that

17   portion of the notes.  If we could display that.

18           **THE COURT:**    Is that the next -- no.  I'm sorry.  Is

19   this -- is this -- what exhibit is this?

20           **MS. BELL:**    This is Exhibit 2382, Government Exhibit.

21           **MS. GREEN:**    Not admitted currently, Your Honor.

22           **THE COURT:**    Would you pass it up, please.  Let me look

23   at it.

24           **MS. BELL:**    Sure.  It's just the image in the center,

25   which is the screenshot.

1        MS. GREEN:  We object to the admission of the exhibit,

2   Your Honor.

3        THE COURT:  Admitted.

4    (Trial Exhibit 2382 received in evidence.)

5        MS. BELL:  Thank you, Your Honor.  We're happy to

6   redact the --

7        MS. GREEN:  Your Honor, may I ask that if it is, it's

8   just as to the screenshot, but we object on hearsay grounds to

9   the rest.

10       MS. BELL:  Thank you.

11   So perhaps we could display that.  It will just be --

12   there we go.

13  BY MS. BELL:

14  Q.   Okay.  So do you see that?

15  A.   Not yet.

16  Q.   Oh.

17  A.   Yes.

18  Q.   Okay.

19       MS. BELL:  Is it on -- not over on for the jury yet?

20   It's up.  Great.

21  BY MS. BELL:

22  Q.   So is this a screenshot of the result that you got after

23  you went through the screening process?

24  A.   That Joanna got after Joanna went through the screening

25  process.

1    **Q.**    Okay.  Got it.  Thank you.

2        And you felt that that was a good sign that people were

3    being filtered out who didn't have ADHD; right?

4    **A.**    Yes.

5    **Q.**    And that it was also a feature that you thought improved

6    efficiency for the provider; right?

7    **A.**    Yes.

8        **MS. BELL:**  So we can take that down.

9    **BY MS. BELL:**

10    **Q.**    So you mentioned that another thing you did was check

11    Ruthia's references; right?

12    **A.**    Yes.

13    **Q.**    And you spoke with Julie Zhuo; right?

14    **A.**    I did not speak to Julie.  So maybe Joanna did.  I don't

15    recall speaking to Julie.

16    **Q.**    Okay.  Would it refresh your memory --

17        **MS. BELL:**  We could -- just for the witness, we could

18    put the notes that you took back up.  And if we go to the top

19    of page 6.

20        **MS. GREEN:**  Objection, Your Honor.  She just said she

21    didn't speak to this person.

22        **MS. BELL:**  It's just to refresh, Your Honor.

23        **THE COURT:**  Well, let me see it.

24        **MS. BELL:**  I think the testimony was that her partner

25    may have been the one.  This is Item 6A.

1          **THE COURT:**  What am I looking at?

2          **MS. BELL:**  Item 6A, Your Honor.

3          **THE COURT:**  And the question is does that refresh your

4    recollection that you were the one who spoke rather than

5    somebody else?

6          **MS. BELL:**  No, no, just that they collectively checked

7    that reference --

8          **THE COURT:**  She said that.  She said she didn't.  She

9    thought that somebody else did.

10         **THE WITNESS:**  I mean, I just can say that I didn't

11   speak to her, so I don't know if...

12         **THE COURT:**  Let's move on.

13         **MS. BELL:**  Okay.

14   **BY MS. BELL:**

15   **Q.**   And there were other references you checked with too;

16   right?  Or was that -- would have that been yourself or Joanna?

17        For example, with Phil Fung.

18   **A.**   So Joanna spoke with Phil Fung.

19   **Q.**   Okay.  And who is Phil?

20   **A.**   Phil was an early engineer at Facebook.

21   **Q.**   Okay.  And then there was something else, Ruchi Sanghvi?

22   **A.**   I don't recall that we connected with Ruchi.

23   **Q.**   Okay.  All right.  But you did talk -- you remember that

24   there were some discussions with references?

25   **A.**   Yes.

GRAZIADEI - CROSS / BELL

Q.    Okay.  And then after doing your diligence and having the conversations, do you remember telling Ruthia (as read):

        "Again, per our conversations, we're incredibly
    excited about you, what you're building, and the
    tremendous results over the last year"?

A.    That -- I don't recall, though, if I did those exact words, but that certainly would be in align with the sentiment we had at that time.

Q.    Okay.  So let's move on today to -- to Done's model.

    So you testified that there were certain aspects of the model that you understood and other things you may not have understood, so I want to walk through the information that you had in the course of your relationship with Done.

    So let's start with actually going back to Exhibit 3041. So this is the slide deck that the Government showed you.  If we could go to that.

    So this was that initial meeting with Ruthia, you actually walked through this slide deck; right?

A.    Yes, I believe so.

Q.    Okay.  And so this first page with the "fast, easy, convenient care," you did understand that was Done's model; right?

A.    Can you say more?  I don't know if I understand the -- when you say "Done's model," the -- yeah.  Can you say more please?

1    **Q.**    Well, here what -- what it says is (as read):

2           "Fast, easy, convenient care."

3    Right?

4    **A.**    Yes, I see that.

5    **Q.**    Okay.  And so, for example, the -- you talked about your

6    personal experience with your son and the six hours of testing

7    and all of that, but that, you knew, was not what Done was

8    advertising, neuropsych testing and --

9    **A.**    Correct.  I did not think they were doing neuropsych

10   testing.

11   **Q.**    Okay.  And you also understood and part of the appeal of

12   Done was that many people didn't have access to that type of

13   range of specialists; right?

14   **A.**    Correct.

15          **MS. BELL:**  So let's go to the next slide.

16   **BY MS. BELL:**

17   **Q.**    Okay.  So this is the slide that focuses on the disparity

18   of treatment in people of color and women.  We can move on --

19   as well as I'll say that here, highlighting the stigma, the

20   high cost, and the long wait time.

21          And so you understood that that was part of what had

22   created this need for a company like Done; right?

23   **A.**    Mm-hmm.

24   **Q.**    Okay.  So then we'll go to the next -- the two-sided

25   managed marketplace here.

1    So here, you understood that part of Done's innovation was

2    bringing technology to close -- or using technology to actually

3    close the gap in care; right?

4    **A.**    Can you say more in terms of using technology to close the

5    gap in care?

6    **Q.**    Yeah.  So back at this time, telehealth was not a

7    prevalent thing; right?  Because this was 2021?

8    **A.**    Yeah.

9    **Q.**    And so part of the innovation was simply being a

10   telehealth platform to connect independent licensed clinicians

11   from around the country with people in need of the ADHD care;

12   right?

13   **A.**    Yes.

14   **Q.**    So at that time, that was one of the new things.

15       And then the other new thing was that the feature would

16   provide -- or the platform would provide certain features, such

17   as the background screening and the asynchronous messaging to

18   make things faster, most convenient, and efficient; right?

19   **A.**    Yes.

20       **MS. BELL:**  Okay.  And then if we could move on to the

21   next page.

22   **BY MS. BELL:**

23   **Q.**    Do you see up top, the demographics there?

24   **A.**    Yes.

25   **Q.**    Okay.  And then we'll come back to -- you talked about

1  this on direct, so we'll come back to the patient experience

2  process outlined here.

3         MS. BELL:  But if we could go to the next slide.

4  BY MS. BELL:

5  Q.   "The patients love us."

6       So this NPS -- can you tell us what NPS is, if you know?

7  A.   It's essentially like -- it stands for net promoter score.

8  I think about it as like a customer satisfaction score.

9  Q.   Okay.  And then Trustpilot.

10      Do you know what Trustpilot is?

11  A.   I'm actually not as familiar with Trustpilot.

12  Q.   Okay.  Do you know it to be just a hosting site for

13  reviews?  Is that consistent?

14  A.   I feel like I don't want to -- I can't define exactly all

15  that Trustpilot offers.

16  Q.   Fair enough.  Okay.  Let's move on to the next slide.

17      So at this point in time, there were 15,000 plus patients

18  and 45 plus providers.

19      Do you see that?

20  A.   I do.

21  Q.   In 25 or so states; right?

22  A.   Yes.

23  Q.   And then if we go to the next slide, you were asked about

24  Dr. Brindala.

25      Were you aware that Dr. Brindala went on to have a role --

GRAZIADEI - CROSS / BELL

1    a significant role interfacing with investors?  Were you aware

2    of that?

3    **A.**    No.

4    **Q.**    Okay.  And did you know anything about Dr. Brindala and

5    Dr. Brody's qualifications?

6    **A.**    Really only as to what was shared here, and then in

7    reference with the previous investors, they underscored that

8    they had a strong clinical team.

9    **Q.**    Okay.  And so we could go to the next slide.  The

10   investors, we've covered that.

11        And then the last slide.

12        So you understood here that there was -- there were hopes

13   to continue to grow and expand to 50 states; right?

14   **A.**    Yes.

15   **Q.**    And that there were hopes also to expand into

16   additional -- I don't know if verticals is the right word, but

17   that there were hopes of expanding into other areas; right?

18   **A.**    Yes.

19   **Q.**    Such as maybe ADHD coaching or pediatrics?

20   **A.**    Yes.

21   **Q.**    Okay.

22        **MS. BELL:**  We can take that down.

23   **BY MS. BELL:**

24   **Q.**    During the meeting, you also were speaking and you were

25   asking questions; right?

1    **A.**    Yes, I assume so.

2    **Q.**    It was a long time ago, in fairness.

3         But you did -- you asked Ruthia how she was different from

4    her competitors and a traditional doctor's visit.

5         Do you remember that?

6    **A.**    Unfortunately, no, I don't recall the exact questions I

7    asked --

8    **Q.**    Okay.

9    **A.**    -- in that meeting.  It seems like a reasonable question.

10   I just don't recall if I asked that.

11   **Q.**    Okay.

12            **MS. BELL:**  We can put up your notes again, 2380 at 3,

13   at the top.

14            **THE WITNESS:**  Thank you.

15            **MS. BELL:**  Okay.  So if --

16            **MS. GREEN:**  We object to the admission here, Your

17   Honor.  Are you using this to refresh?

18            **MS. BELL:**  Just to refresh, yes.  I'm sorry.

19            **MS. GREEN:**  Okay.  Thank you.

20   **BY MS. BELL:**

21   **Q.**    So do you see the -- I guess it's the second --

22   **A.**    Yes.

23   **Q.**    -- sub-bullet point?

24   **A.**    I see this, yes.

25   **Q.**    Okay.  So does that refresh your memory about what Ruthia

GRAZIADEI - CROSS / BELL

1    explained in terms of --

2    **A.**    It does.  Thank you.

3    **Q.**    -- difference?

4    **A.**    Thank you.

5    **Q.**    So she said that (as read):

6            "The traditional doctor's visit, you may have

7        months of waiting time for appointments.  It's hard

8        to get help.  You've -- and she said you have to go

9        to the doctor every three months to get a -- to get

10       prescription renewals or adjustments.  Can do this on

11       line/the phone with Done First."

12       Do you remember that?

13   **A.**    I believe so.

14   **Q.**    We can put it back up --

15   **A.**    You took it away. but --

16           **THE COURT:**  Not at the same time.  You're talking at

17   the same time.

18           **THE WITNESS:**  Apologies.

19           **MS. BELL:**  Apologies.

20   **BY MS. BELL:**

21   **Q.**    Okay.  Do you see that?

22   **A.**    Yes, I see this.

23   **Q.**    Okay.  And so Ruthia also described the compensation

24   model.

25           **MS. BELL:**  We can take that down for a moment.

GRAZIADEI - CROSS / BELL

1  BY MS. BELL:

2  Q.   Do you remember her telling you that Done compensates

3  clinicians by the hour for the first visit?

4      Do you remember that?

5  A.   Yes.

6  Q.   And then for ongoing treatment, they get paid monthly, a

7  monthly fee per person.

8      Do you remember that?

9  A.   Yes.

10 Q.   Okay.  And that your feeling about that was that this

11 created a stickiness for providers.

12     Do you remember that?

13 A.   Yes, that it ensured that patients would have ongoing

14 access to a provider.

15 Q.   And the stickiness for the provider was that this was also

16 a benefit for the provider?

17 A.   That they would have -- for providers looking to create a

18 telehealth practice, that that would also enable them to do

19 that.

20 Q.   Okay.  And based on your market research, you understood

21 that the pricing structure of a monthly fee to care for the

22 patient, that's actually a model of pay that's used in the

23 healthcare industry; right?

24 A.   I don't recall.

25 Q.   Okay.  And you understood that the concept at this

1  point -- we talked about kind of the goals of expanding to

2  other areas, but at this point you understood that this was

3  essentially, in terms of ongoing treatment, a medication

4  management platform; right?

5  **A.**    No.  My understanding was really around access to care.

6  So ADHD-focused, but having ongoing access to clinicians in

7  ADHD to then determine whatever the right course of treatment

8  is.

9  **Q.**    But you understood that while there were goals to build

10  additional support beyond medication, at that point in time,

11  for patients who were diagnosed, the support and the access to

12  care was medication management; right?

13          **MS. GREEN:**  Objection, asked and answered.

14          **THE COURT:**  We're going to take our recess now.

15      Ladies and gentlemen, we'll be in recess until 2:30.

16      Remember the admonition given to you:  Don't discuss the

17  case, allow anyone to discuss it with you, form or express any

18  opinion.

19              (The jury leaves the courtroom.)

20      (Proceedings were heard out of the presence of the jury.)

21          **THE COURT:**  Okay.  The jury has retired.

22      About how much longer do you have?

23          **MS. BELL:**  Well, it's a little hard to say.  Maybe an

24  hour.

25          **THE COURT:**  Well, I want to finish today with this

GRAZIADEI - CROSS / BELL

1   witness.

2           MS. BELL:  You would like to finish today?

3           THE COURT:  No, not what I'd like.  We're going to

4   finish today with this witness.  That's what you'd like.

5           MS. BELL:  Yes.  We will do as the Court wishes.  I

6   will make sure I finish.

7           THE COURT:  So prepare your examination so that we can

8   finish --

9           MS. BELL:  Yes, Your Honor.

10          THE COURT:  -- and this witness can be on her way and

11  not spend the weekend --

12          THE WITNESS:  Thank you.

13          THE COURT:  -- otherwise.

14                  (Recess taken at 2:16 p.m.)

15                  (Proceedings resumed at 2:36 p.m.)

16      (Proceedings were heard out of the presence of the jury.)

17          THE COURTROOM DEPUTY:  Come to order.  Court is now in

18  session.

19          THE COURT:  All right.  Bring in the jury.

20                  (The jury enters the courtroom.)

21      (Proceedings were heard in the presence of the jury.)

22          THE COURT:  Okay.  Please be seated.  Let the record

23  reflect all jurors are present.  Parties are present.

24      You may continue.

25          MS. BELL:  Thank you, Your Honor.

GRAZIADEI - CROSS / BELL

BY MS. BELL:

**Q.**    So before the break, we were talking about the medication management focus of ongoing care at Done.

Do you recall that?

**A.**    Can you repeat your question?

**Q.**    Okay.  How about this:  Let's talk about -- we were talking about medication management.

Do you recall that?

**A.**    Sorry.  I -- I guess if you could repeat your question, like where we -- I don't know where in that where we left off.

**Q.**    Yes.  We left off speaking about medication management, and we'll pick up with that now.  Okay?

**A.**    Okay.

**Q.**    So after your initial discussion with Ruthia, she set you up to meet with this nurse practitioner named Erin Kim; right?

**A.**    Yes.

**Q.**    And Erin Kim told you about how she worked; right?

**A.**    Yes.

**Q.**    And she told you that in four months, she had signed 1,200 new patients.

Do you recall that?

            **MS. GREEN:**  Objection.  Hearsay, not impeaching.

            **MS. BELL:**  Your Honor, it's not for the truth.  It's for the notice.

            **THE COURT:**  Okay.  Ladies and gentlemen of the jury,

GRAZIADEI - CROSS / BELL

1    this testimony is being introduced on the issue of what did

2    this witness hear before or during the course of her making an

3    investment in the company.

4        So it's not being introduced as true; that is, that the --

5    whatever she heard was the truth.  It simply is coming in that

6    whatever she heard, if the witness is to be believed, she heard

7    it, or a statement.

8        Go ahead.

9    BY MS. BELL:

10   Q.   So do you recall -- and, again, I know it's been a while.

11   But do you recall that nurse practitioner Kim told you that in

12   four months, she had signed 1,200 new patients up for care?

13   A.   I don't recall the exact number, but I believe I wrote

14   that down in our -- in my notes.

15   Q.   Yes.

16        MS. BELL:  If we could go to, just for the witness,

17   2382 at 7, the top portion.  Okay.

18   BY MS. BELL:

19   Q.   Do you see that there?

20   A.   Yes.

21   Q.   And she also told you that the first two to three months

22   of patient relationship -- of the patient relationship -- is

23   focused on getting the medication right.

24        Do you see that?

25   A.   Yes.

GRAZIADEI - CROSS / BELL

1  Q.   And that to get the medication right, she would

2  communicate with patients by video or message.

3       Do you see that?

4  A.   Yes.

5  Q.   And then with respect to how she made herself accessible

6  to patients for ongoing care, she told you that thereafter, she

7  did monthly message exchange for refills with her patients.

8       Do you see that?

9  A.   Yes.

10 Q.   And then she also shared two examples of where she

11 screened for patients not being a fit due to history of drug

12 use?

13 A.   Yes.

14 Q.   Okay.  And so --

15      MS. BELL:  We can take that down.

16 BY MS. BELL:

17 Q.   So after speaking --

18      MS. BELL:  Well, actually, we can leave that up for

19 one more moment.

20 BY MS. BELL:

21 Q.   After speaking with nurse practitioner Kim, you came up

22 with some pros and some cons; right?

23 A.   Yes.

24 Q.   And overall, in terms of the pros, you concluded that Done

25 allows nurse practitioners and psychiatrists to build lucrative

1  practices from home; right?

2  **A.**  Yes.

3  **Q.**  Done gives them a steady stream of patients; right?

4  **A.**  Yes.

5  **Q.**  You found the ADHD and subscription model attractive;

6  right?

7  **A.**  For the clinicians, yes.

8  **Q.**  Okay.  Yes.  Because there was ongoing money and not a lot

9  of effort; right?

10  **A.**  Yes.

11  **Q.**  And with that understanding, you decided to invest in

12  Done; right?

13  **A.**  Yes, with all of our other diligence, et cetera.  Yes, we

14  made the decision to invest in Done.

15  **Q.**  Okay.  And in terms of the pros and cons for Ruthia, you

16  also made the same type of list after you finished speaking

17  with her.

18          **MS. BELL:**  If we could go to 20- -- the same document

19  at page 4.

20  **BY MS. BELL:**

21  **Q.**  Do you see that you said (as read):

22          "The numbers incredible growth in one year.

23      Numbers speak for themselves re: product, market fit,

24      and demand.  Clear pull from the market."

25      Do you see that?

GRAZIADEI - CROSS / BELL

1    **A.**    I do see that, yes.

2    **Q.**    Okay.  So that was one of the pros, in your view?

3    **A.**    Yes.

4          I just want to clarify.  This pro and con is not just

5    specific to Ruthia.  It sort of summarizes more broadly, so

6    it's not just specific to her.

7    **Q.**    Thank you.

8    **A.**    Which I think it's probably obvious from the first one,

9    but I just wanted to clarify.

10   **Q.**    Thank you for that.  Okay.

11         And you also found it a pro that she was driven to build a

12   big company; right?

13   **A.**    Yes.

14   **Q.**    And that the market is large and trends in her favor

15   because the stigma regarding ADHD was lessening; right?

16   **A.**    Yes.

17   **Q.**    Improved understanding and research and need for people of

18   all ages to get diagnosis and support?

19   **A.**    Yes.

20   **Q.**    And also, this provides better access for women and people

21   of color who are likely to go undiagnosed; right?

22   **A.**    Yes.

23   **Q.**    Okay.  And then you came up with some cons as well.  Just

24   to highlight two, you were worried about a competitor way ahead

25   of the game; right?

1          **MS. GREEN:**  Your Honor, can we take down -- this is

2    not an admitted exhibit, and I don't --

3          **MS. BELL:**  Sure.

4          **MS. GREEN:**  Yeah.  Thank you.

5          **THE WITNESS:**  Sorry.  Can you ask that again?

6    BY MS. BELL:

7    **Q.**    Sure.  One of the cons was in doing your market research,

8    you saw that there was a competitor that you thought was way

9    ahead of the game; right?

10   **A.**    Yes, that -- I recall that.

11   **Q.**    Okay.  Called Circle Medical?

12   **A.**    Yes.

13   **Q.**    And you were also worried about whether Ruthia could

14   develop the leadership and executive presence to -- to build

15   and lead a large company; right?

16   **A.**    Correct.

17   **Q.**    Okay.  So let's move on to -- you move on and invest.

18        And then Ruthia went on to share additional investor

19   presentations with you once you were already an investor;

20   right?

21   **A.**    Yes.

22   **Q.**    And you would comment on the -- on the presentations from

23   time to time; right?

24   **A.**    I believe so, yes.

25   **Q.**    Okay.

1          MS. BELL:  Let's look at 6936 at 17, just one example

2     of that.  Okay.  And so we can display this for the jury, Your

3     Honor.  We'd offer just this page.

4          THE COURT:  Admitted.

5        (Trial Exhibit 6936 received in evidence.)

6     BY MS. BELL:

7     Q.   And here, Ruthia says (as read):

8              "I got scheduled with Cigna next Monday."

9          And you say (as read):

10             "That's great.  Want to shoot over the latest

11        deck?"

12        And then you give some comments.  You say (as read):

13             "Deck looks great.  Couple recommended

14        additions" and go on; right?

15    A.   Yes.

16    Q.   Okay.  So let's look at two more presentations that Ruthia

17    shared with you.

18          MS. BELL:  If we could offer 9027 and 7266, please,

19    Your Honor.

20          THE COURT:  Admitted.

21        (Trial Exhibit 7266 received in evidence.)

22          MS. BELL:  So let's start with 9027 at the first page,

23    which is actually page 18, if we could.  Okay.

24    BY MS. BELL:

25    Q.   So do you see here it says (as read):

1              "Democratizing high-quality personalized mental

2         health care"?

3    **A.**    Yes.

4    **Q.**    And that idea -- or the democratizing term was that

5    concept of expanding access; right?

6    **A.**    Yes.

7              **MS. BELL:**  And then if we could go to Slide 5 -- or

8    I guess it's -- okay.

9    **BY MS. BELL:**

10   **Q.**    So this -- here it says that (as read):

11             "Telemedicine is the best fit for a chronic

12        condition like ADHD."

13        Do you see that?

14   **A.**    I do see that, yes.

15   **Q.**    And then there's a comparison here between ADHD and

16   depression and anxiety and autism?

17   **A.**    Yes.

18   **Q.**    And they're compared on different metrics that the jury

19   can see, but in terms of treatment, under ADHD it says

20   "primarily medication"; right?

21   **A.**    I see that, yes.

22   **Q.**    And then it says "medication efficacy, high"; right?

23   **A.**    Yes.

24   **Q.**    And, in fact, from your personal experience and your

25   market research, you understand that medication is the --

GRAZIADEI - CROSS / BELL

```
1   widely believed to be in the medical community the best
2   treatment for ADHD; right?
3   A.    I don't know that I can answer that.
4   Q.    Okay.  No problem.
5         Okay.  So next let's go to Slide-- Slide 6 if we could.
6   Yes, thank you.
7   BY MS. BELL:
8   Q.    So this is kind of another version of the patient journey
9   chart here.  And do you see it says there (as read):
10            "With the worry-free chronic care, medication
11        management, longitudinal care 24/7"?
12        Do you see that?
13  A.    I do, yes.
14  Q.    Okay.
15            MS. BELL:  And then if we can go to Slide 7.
16  BY MS. BELL:
17  Q.    In terms of the value for patients, we see here a contrast
18  between in-person, private practice, and the Done model.
19        Do you see that?
20  A.    Yes.
21  Q.    And they go through different comparisons here, including
22  the symptom detection where in-person private practice is three
23  to six months to schedule versus the Done modem, appointment
24  available much faster, in a matter of days.
25        Do you see that?
```

**GRAZIADEI - CROSS / BELL**

1  **A.**   Yes.

2  **Q.**   Then the initial diagnosis, the contrast between the

3  price, do you see that?

4  **A.**   I do, yes.

5  **Q.**   And then do you see there the second bullet point under

6  the Done model, it says (as read):

7          "25 minutes per appointment"?

8       Do you see that?

9  **A.**   I do see that, yes.

10 **Q.**   Versus contrasted up above with the 90 to 150 minutes per

11 visit plus travel.

12      Do you see that?

13 **A.**   So sorry.  I just lost you.  90 minutes.  Where -- oh,

14 above it?  Yes, I do see that.  Thank you.

15 **Q.**   Yes.  And then, of course, the cost differential as well

16 for the different appointment times?

17 **A.**   Yes.

18 **Q.**   Okay.  And then follow-up appointment, we see down below

19 with Done, it says "15 minutes per follow-up appointment," and

20 then up at the top, (as read):

21          "Three to five plus follow-up -- follow-up

22       appointments needed until stabilization."

23       Do you see that?

24 **A.**   Do I see that, yes.

25 **Q.**   And then moving to the last column, Stabilization and

**GRAZIADEI - CROSS / BELL**

1  Refills (as read):

2       "Done model.  Once stabilized, one-click

3       refills."

4       Do you see that?

5  **A.**  I do see that.

6  **Q.**  And then up at the top, an in-person private practice (as

7  read):

8       "Follow-up appointment needed every three to six

9       months after stabilization."

10      Do you see that?

11  **A.**  Yes.

12  **Q.**  No standard refill process; right?

13  **A.**  Yes.

14  **Q.**  Okay.  And then if we could go to Slide 8.  Okay.  So we

15  see, again, here (as read):

16      "Step 4.  Streamlined refill and medication

17      change process.  Follow-up only when flagged by

18      patient or care team."

19      And down at the bottom (as read):

20      "The Done care team verifies prescription

21      eligibility by checking PDMP record."

22      Do you see that?

23  **A.**  I do, yes.

24  **Q.**  Okay.  And you had testified that Ruthia had said that

25  Done was stricter than standard practice in terms of checking

1   for prescription history on a monthly basis?

2   **A.**    That's what she shared during our conversations in May.

3   **Q.**    Okay.  And I assume, but tell me if I'm wrong, that you

4   don't know one way or another what the -- whether there are any

5   federal law requirements for doing that or what the state

6   regulations are for that; right?

7   **A.**    Correct.  We just kind of took that at face value.

8           **MS. BELL:**  Okay.  And then if we could go to Slide 9.

9   **BY MS. BELL:**

10  **Q.**    We see here that it says (as read):

11          "High compensation opportunity.  Compensated for

12      all patients under management.  Incentivized to

13      retain patients."

14      Do you see that?

15  **A.**    Yes.

16  **Q.**    And then, again, there's a reference up at the top to the

17  care team taking care of administrative things like helping

18  with the PDMP check.

19      Do you see that?

20  **A.**    I do, yes.

21  **Q.**    Okay.

22          **MS. BELL:**  Let's go just to 7266 at Slide 5.

23  **BY MS. BELL:**

24  **Q.**    This was the second -- a second presentation that Ruthia

25  sent to you?

**GRAZIADEI - CROSS / BELL**

1    **A.**    Okay.

2    **Q.**    And it's another version of the two-sided managed

3    marketplace slide that we looked at previously?

4    **A.**    Yes.

5    **Q.**    And do you see there --

6    **A.**    This was also post-investment; correct?

7    **Q.**    Post-investment, yes.

8    **A.**    Thank you.

9    **Q.**    So do you see there on the left (as read):

10           "Higher pay.  Manage bigger patient panel"?

11    **A.**    Yes.

12    **Q.**    And then again on the right, we see the reference to

13    asynchronous managed ongoing care?

14    **A.**    Yes.

15           **MS. BELL:**  Okay.  We can take that down.

16    **BY MS. BELL:**

17    **Q.**    So you talked about this Wall Street Journal article, or

18    more than one.

19           **MS. BELL:**  But if we could go back to 2861 at page 9,

20    the bottom paragraph.

21    **BY MS. BELL:**

22    **Q.**    Okay.  So you recall getting this article?  Ruthia

23    actually sent it to you.

24           We can zoom out so you can see what we're looking at.

25    **A.**    Thanks.

1  Q.   And, actually, let's start with going back to the

2  communication where Ruthia sends you the article, and then

3  we'll go back to the article.

4  A.   Thank you.

5        MS. BELL:  Maybe we could just pull up on the

6  left-hand side of the screen -- okay.  Great.

7  BY MS. BELL:

8  Q.   So do you recall this is the exhibit that the Government

9  showed you on direct where -- do you see that, where Ruthia

10  says (as read):

11        "A heads-up that the article is out"?

12  A.   Yes, I see it.

13  Q.   Okay.  Great.

14     And then you respond (as read):

15        "Thanks for sending, Ruthia.  You had some

16     response/statements in the article, which I think was

17     great."

18     Right?

19  A.   Yes.

20        MS. BELL:  Okay.  So let's go back to the article now.

21  And if we could blow -- okay.

22  BY MS. BELL:

23  Q.   You see that's the article in question; right?

24  A.   Yes.

25        MS. BELL:  And if we could go to the bottom of page 9.

GRAZIADEI - CROSS / BELL

BY MS. BELL:

Q.    Okay.  So you see here that this nurse practitioner at Done was interviewed and spoke with the Wall Street Journal, and she told the media about her practice.  So she says that she manages 2,300 patients for Done.

Do you see that?

A.    Mm-hmm.

Q.    (as read):

        "Virtually all have ADHD and virtually all are

        on stimulants."

        Do you see that?

A.    Yes.

Q.    She says she renews (as read):

        "Each patient's prescription each month from her

        home, based mostly on forms patients fill out online,

        sometimes as fast as two renewals per minute."

        Do you see that?

A.    Yes.

Q.    She talks about her compensation.  Then she says that she feels that (as read):

        "Done makes it possible for people struggling

        with ADHD to get a diagnosis and medication more

        easily than they could via in-person psychiatrists

        and that she routinely receives notes from patients

        who say the medication has helped them keep their

GRAZIADEI - CROSS / BELL

1              jobs, for instance.  I just feel I'm able to do more

2         because of the company they built," she said.

3         Right?

4    **A.**   Yes.

5    **Q.**   Then if you go back to your comments on the exhibit we

6    started with, which it should be 988.

7         So you didn't reference Ms. Cruz; right?

8    **A.**   No, not that I see here.

9    **Q.**   Okay.  You also talked about the risk mitigation report,

10   and I think you mentioned that Ruthia didn't tell you about the

11   risk mitigation report written by Dr. Brindala; is that right?

12   **A.**   Here?  I'm so sorry.

13   **Q.**   Oh, no.  Just generally that it didn't come up in

14   conversation between the two of you separately.

15   **A.**   Yes.

16   **Q.**   Okay.  But, again, she did send the article we just looked

17   at; right?

18   **A.**   Yes.

19        **MS. BELL:**  Okay.  And so if we can go back to that

20   article, 2861 at page 8 at the top.

21   **BY MS. BELL:**

22   **Q.**   We see here that the article reports on Dr. Brindala's

23   risk mitigation report; right?

24   **A.**   Yes.

25   **Q.**   And specifically, his statement that (as read):

1              "Multiple Done providers have specifically

2        expressed a perception of pressure to diagnose ADHD

3        and prescribe stimulants."

4        Do you see that?

5   A.   Yes.

6              MS. BELL:  Okay.  And then if we can go back to your

7   comments on -- again, can we go back to -- okay.  Thanks.

8        And so if we can scroll out a little bit.

9   BY MS. BELL:

10  Q.   This was where you had advised her --

11             MS. BELL:  Just above, if we can blow that up.

12  Where -- starting -- can you go up a little bit more?

13  BY MS. BELL:

14  Q.   You had advised her to work with her PR team to provide a

15  statement; right?

16  A.   Yes, I see that.

17  Q.   Okay.  And that's --

18             MS. BELL:  And then if you scroll down.

19  BY MS. BELL:

20  Q.   That's where you're complimenting her for her statement;

21  right?

22  A.   Complementing her for responding to it, yes.

23             MS. BELL:  Okay.  Great.  We can take that down.

24  BY MS. BELL:

25  Q.   And then after you saw the Wall Street Journal article --

1          **MS. BELL:**  We could go to 6936 at 23, because -- I'm

2     not sure if you'll remember this.

3          Okay.  So, Your Honor, I'd move to admit 6936 at 23.

4          **THE COURT:**  Admitted.

5          (Trial Exhibit 6936 page 23 received in evidence.)

6     BY MS. BELL:

7     **Q.**   So on April 6th -- that was after the Wall Street Journal

8     article came out; right?

9     **A.**   Mm-hmm.

10    **Q.**   You offered to go ahead and kick off some of the Tier 2

11    intros to additional inventors; right?

12    **A.**   Yes.

13    **Q.**   And this was -- I think the Government had asked you on

14    direct about -- a little further up on this exchange, Ruthia

15    was explaining that it was difficult to fundraise after the

16    negative press.  Do you remember that?

17         **MS. BELL:**  We could zoom out a bit.

18         Okay.

19    BY MS. BELL:

20    **Q.**   She says -- yeah.  3:50, fundraising is not going well;

21    right?

22    **A.**   Mm-hmm.

23    **Q.**   And then Craft -- the bottom of that paragraph.  Craft

24    also advised (as read):

25              "It's not good timing."

GRAZIADEI - CROSS / BELL

```
 1         And she says (as read):
 2              "I'm trying to talk to investors in China to see
 3         if we can create some urgency."
 4         Do you see that?
 5    A.   I do, yes --
 6    Q.   And then Joanna says (as read):
 7         "Hard to not raise now and halt growth."
 8         And then it's in response to that conversation that you
 9    offer to make some additional intros; right?
10    A.   Yes.
11    Q.   Now, do you remember that she was -- that Ruthia had
12    actually gone to China at this point in time because her mother
13    had been sick?
14    A.   I don't remember.  I do remember Ruthia going to China at
15    some point, but I don't remember the timeline.
16         MS. BELL:  Okay.  We can go just -- if we go to page
17    6936 at 2.
18    BY MS. BELL:
19    Q.   Okay.  Does that refresh you at all where you say (as
20    read):
21              "Ruthia, saw your note and just want to ensure
22         everything is okay on the family front."
23         In September of 2021?
24    A.   I want to say yes.  I see that I wrote that.  I just
25    don't -- I just don't know if that's direct -- I mean, it
```

1  sounds like it would be.  I just don't recall if that was the

2  time frame where she traveled, but...

3         **MS. BELL:**  Let's go to page 3 if we could.

4  **BY MS. BELL:**

5  **Q.**  And she says --

6  **A.**  Got it.

7  **Q.**  (as read):

8            "I'm currently in Asia now for a family visit,

9        but you can send it to the office."

10       Do you see that?

11        **MS. GREEN:**  Objection, relevance, 403.

12        **MS. BELL:**  We'll move on, Your Honor.

13 **BY MS. BELL:**

14 **Q.**  Do you recall, however, in reference to the investors that

15 she was actually meeting with investors in China?

16 **A.**  I do not recall that, I don't know if I knew she was

17 meeting with investors in China.

18 **Q.**  Okay.  So one last question.  Actually, if we could go --

19 or few last questions on this document.

20        **MS. BELL:**  If we could go to the very first page, 6936

21 at -- just the first page.  Okay.

22 **BY MS. BELL:**

23 **Q.**  Do you see the very top of this exchange, it says (as

24 read):

25            "Message and calls are end-to-end encrypted"?

**GRAZIADEI - CROSS / BELL**

1    **A.**    Yes, I do see that.

2    **Q.**    Okay.  So is this -- what -- was this WhatsApp?

3    **A.**    It's WhatsApp, yes.

4    **Q.**    Okay.  And what is end-to-end encryption?  If you know.

5    **A.**    I was like, I feel like I don't know what the formal

6    definition of that would be.

7         But we use WhatsApp for all of our -- all of our internal

8    and founder communication.  Part of our Facebook heritage, if

9    you will.

10   **Q.**    Okay.  Part of your Facebook heritage.  And Ruthia also

11   worked at Facebook; right?

12   **A.**    Yes.

13   **Q.**    Okay.  And then do you remember in the course of these

14   messages that from time to time Ruthia would delete her

15   messages and sometimes you would delete your messages?

16        Do you remember that?

17   **A.**    I don't have memory of that.

18   **Q.**    Okay.  Let's just look very quickly at 6936 at 23, if we

19   could.

20   **A.**    Okay.

21   **Q.**    Do you see right there, there's an exchange, and it says

22   (as read):

23             "This message was deleted"?

24   **A.**    I do see that.

25   **Q.**    Okay.  And then also at 25, another example.

GRAZIADEI - CROSS / BELL

1      Do you see that?

2   **A.**   Yes.

3   **Q.**   Okay.  And then if we could look at --

4           **MS. BELL:**  Yes.  I'm sorry.  Are these being

5   displayed?

6           **THE COURTROOM DEPUTY:**  You said at 23, so they've only

7   seen 23.

8           **MS. BELL:**  Okay.  The first one.  Page 23.  Okay.

9      So could I also offer page 25, Your Honor, which we

10  already saw?

11          **THE COURT:**  Admitted.

12          **MS. BELL:**  And could I offer page --

13     So this is page 25.

14          **THE COURTROOM DEPUTY:**  Okay.  Thank you.

15          **MS. BELL:**  Okay. and then if we could go to page 8.

16          **THE COURTROOM DEPUTY:**  Do you want that admitted?

17          **MS. BELL:**  Yes, please, if we could offer that.  6936.

18  **BY MS. BELL:**

19  **Q.**   Okay.  And so here's an example of where you deleted the

20  message and say "mistyped"?

21          **THE COURTROOM DEPUTY:**  He didn't admit it.

22          **MS. BELL:**  Oh, I'm sorry, Your Honor.

23          **THE COURTROOM DEPUTY:**  Page 8?

24          **THE COURT:**  I'm sorry.  What is it you'd like to do?

25          **MS. BELL:**  Your Honor, I think we admitted --

1          **THE COURTROOM DEPUTY:**  Exhibit 23, 25, and we're

2     waiting for 8 to be admitted.

3          **THE COURT:**  Admitted.

4        (Trial Exhibit 6936 page 8 received in evidence.)

5          **MS. BELL:**  Thank you, Your Honor.

6     **BY MS. BELL:**

7     **Q.**   And we can -- do you see that?

8     **A.**   See the screen?

9     **Q.**   Yes.

10    **A.**   Yeah.

11    **Q.**   Okay.  And so there are two more examples of that at --

12         **MS. BELL:**  -- which we'll offer at page 13 and 26 as

13    well.

14         **THE WITNESS:**  Okay.

15    **BY MS. BELL:**

16    **Q.**   Do you see that?

17    **A.**   Yes.

18         **THE COURTROOM DEPUTY:**  Haven't been admitted.

19         **MS. BELL:**  Your Honor, we'd offer this.

20         **THE COURT:**  Admitted.

21       (Trial Exhibit 6936 page 13 received in evidence.)

22         **MS. BELL:**  And 26.

23         **THE COURT:**  Admitted.

24       (Trial Exhibit 6936 page 26 received in evidence.)

25         **MS. BELL:**  All right.  Thank you.  We'll move off

GRAZIADEI - CROSS / BELL

1    that.

2    **BY MS. BELL:**

3    **Q.**    Okay.  So you testified a bit about growth, and certainly

4    it was your hope that the company would turn into a big

5    success; right?

6    **A.**    Yes.

7    **Q.**    And I think you said even after doing that pros and cons,

8    sort of weighing, you said (as read):

9            "I'm a yes, and I'm willing to make the leap.

10    She can turn this into a massive business."

11        Do you remember that?

12    **A.**    Yes.

13    **Q.**    Okay.  And as I understand it, you understood that Done

14    was profitable early, so it wasn't really dependent on seeking

15    investor funding?

16        Do you recall that?

17    **A.**    I don't recall.  I know they were doing well from a

18    revenue perspective.  I don't recall what the profitability

19    picture was and at what stage.

20    **Q.**    Do you recall that your feeling was they were not

21    dependent on seeking funding because they were doing so well?

22    **A.**    I don't know.

23            **MS. BELL:**  Okay.  Maybe just for the witness, we could

24    put up 9027 at page 9, paragraph 23.

25            **THE WITNESS:**  Thank you.

GRAZIADEI - CROSS / BELL

**BY MS. BELL:**

Q.   Okay.  Does that refresh your recollection?  This is something you told the Government in one of your meetings with them.

A.   In this, I just don't know when early -- I don't know when early was.

Because we were certainly helping with various investor intros, and then I do think at some point, Ruthia was working on profitability.  I just don't know when the timeline of all that was.

Q.   Understood.  Okay.

MS. BELL:  We can take that down.

**BY MS. BELL:**

Q.   Do you remember that when you asked her, even before you made the decision to invest, what her plan was for growth -- growth to market, I think was the question, and you -- and she said her plan was to double down on growth?

Do you remember that?

A.   I don't explicitly, but it would certainly be in line that she was focused on growing the company.

Q.   Okay.  And there was this term used "hypergrowth."

Is that something you all talked about?

A.   I don't -- it might be in the notes, but I don't -- I don't recall.

Q.   Okay.  Does that sound -- just to not bog you down with

**GRAZIADEI - CROSS / BELL**

1    more notes.  Does that sound like something --

2         Did you understand that Done was in a period of

3    hypergrowth?

4    **A.**    Yes.  They were growing quickly.

5    **Q.**    Okay.  And we looked at that slide with the initial deck

6    where there were 15,000 patients and the 45 providers in 25

7    states.

8         You understood that over the next two years, say, from

9    2021 to 2023, that hundreds -- there were hundreds of licensed

10   medical providers and over a hundred thousand patients that

11   were connected on the platform?

12   **A.**    Sorry.  Can you say that again?  I want to understand

13   the -- was that a forward-looking or was the timeline -- if you

14   could share more.  Apologies.

15   **Q.**    No, no, not at all.

16        So did you have an understanding of exactly what the

17   numbers were in terms of the actual growth achieved from 2021

18   to 2023?

19   **A.**    I'm not -- I'm not sure.  That was obviously

20   post-investment, since we did it in 2021, so I think we were --

21   she was obviously sharing some updates with us in terms of her

22   growth.  But I don't recall exactly what the trajectory was.

23   She was certainly growing quickly.

24   **Q.**    Okay.  So you talked a little bit about the efforts to

25   find a COO; right?

GRAZIADEI - CROSS / BELL

```
 1   A.    Yes.

 2   Q.    And in particular, Mr. Levy; right?  You remember

 3   Mr. Levy?

 4   A.    Is that Riley?

 5   Q.    Riley, yes.

 6         (Simultaneous speakers.)

 7   BY MS. BELL:

 8   Q.    And it was actually -- it may have been Joanna who

 9   actually spoke with Riley, but her impression was that Riley

10   was very thoughtful and it was a great conversation; right?

11         MS. GREEN:  Objection, foundation.

12         MS. BELL:  We could just go back to the communication,

13   actually, although -- may I have a moment to...

14         THE COURT:  Proceed.  Just go ahead.  Just go ahead.

15   I'm trying to figure out where you're going with all of this.

16         MS. BELL:  Okay.  Well --

17         THE COURT:  The prosecution put this witness on the

18   stand to testify about her interest and why she was interested

19   and what was told to her, and so far the cross-examination has

20   simply confirmed it.

21         I don't -- I don't know what -- where we're going for

22   here.

23         And the issue of growth, she's now said five times that --

24   that they were told -- she was told this is going to be a big

25   growth business.
```

1          MS. BELL:  Yes, Your Honor.

2          THE COURT:  Okay.  That's -- and are you contesting

3   it?

4          MS. BELL:  No.  We're moving on to a new topic.

5          THE COURT:  Then it's been established, you see.  It

6   was established first by the prosecution and now by you.

7      So I think that -- that given the fact that it's five

8   after 3:00, that it's on a Friday, that people are interested

9   in getting highly relevant information or cross-examining the

10  witness if something that she said was not accurate, in your

11  view, you're entitled to do that.

12     But simply to confirm the testimony that was elicited for

13  an hour or hour and a half on direct is not --

14     We are finishing this witness today.  That is going to

15  happen.  And she's going to be excused at the end of the -- by

16  4:00, and the jurors are going to go home or wherever they want

17  to go, trick-or-treating or whatever they're doing.

18     Okay.  Go ahead.

19          MS. BELL:  Yes, Your Honor.

20  BY MS. BELL:

21  Q.   So, no, I was not talking about growth.  My apologies if

22  that was confusing.

23     I was talking about Ruthia as a leader, and your

24  testimony, I believe, was that she wanted to rely on other

25  people around her but you were assisting in finding a COO;

**GRAZIADEI - CROSS / BELL**

1  correct?

2  **A.**   So I would say yes.  She would -- a lot of our

3  conversations were her coming to us, I think, for some coaching

4  support, and a lot of that centered around how to get her more

5  leadership support, and that then focused getting -- talking

6  about getting a COO into the company.

7  **Q.**   Okay.  And in particular, you had noticed this issue or

8  identified this issue from your initial meeting that she may

9  need some help in the leadership department; right?

10  **A.**   Yes.

11  **Q.**   And as you continued to work with her, you came to think

12  she may be an abrasive leader; right?

13  **A.**   I don't know if we used the word "abrasive," but...

14  **Q.**   Okay.  I have -- I could refresh you with your notes.

15         **MS. BELL:**  6953 at 1.  If we could put those up just

16  for the witness?

17         **THE COURTROOM DEPUTY:**  69 --

18         **MS. BELL:**  53 at 1.

19      Well, we can move on.

20  **BY MS. BELL:**

21  **Q.**   In any event, you were trying to help her with

22  communication help, coaching.

23      And then Riley Levy, you thought he was actually -- would

24  be a thoughtful person; right?

25  **A.**   I think I don't -- I want to be careful not to speak for

1    Joanna, who spent more time with Riley.

2    **Q.**    Understood.  Okay.  So moving on to another topic.

3         You also provided advice where you thought that Ruthia

4    might be missing out on opportunities; right?

5    **A.**    I believe so.

6    **Q.**    Okay.  And so one area which was actually, I think, your

7    area of expertise at Facebook was in advertising and marketing?

8    **A.**    Yes, I did work on advertising and marketing at Facebook.

9    **Q.**    Okay.  And so you thought that she might be missing out on

10   opportunities in that area; right?

11   **A.**    I don't recall if I thought she was missing out.  I think

12   she was advertising -- I think she pursued advertising

13   relatively early in the company.

14        **MS. BELL:**  Okay.  If we could just go to 6951 at 1,

15   just for the witness.

16        **THE WITNESS:**  Thank you.

17   **BY MS. BELL:**

18   **Q.**    Do you see where you say (as read):

19        "Growth, good at this.  Missing opportunities.

20        Likes to spend time here.  Missing opportunities on

21        marketing, brand ambassadors, creative people,

22        et cetera"?

23   **A.**    I do see it.  I just don't know the context of these

24   notes.

25   **Q.**    Okay.

1              MS. BELL:  If we could zoom out --

2              THE WITNESS:  Apologies.

3              MR. SCHACHTER:  That's okay.

4              THE WITNESS:  I'm sorry that my memory does not serve

5     me better than it does.

6     BY MS. BELL:

7     Q.    I believe these are notes you provided to the Government.

8     Does that refresh you?  So this was an October 13th, 2021,

9     note?

10    A.    Yeah, it looks like these were internal notes I may have

11    taken on a note app and then pasted them in here when we were

12    asked to share.

13    Q.    Okay.  It's no problem if it doesn't refresh you about the

14    marketing.

15    A.    Yeah.  Apologies.

16    Q.    No worries.

17    A.    I don't have a good recollection.

18    Q.    Do you remember telling her (as read):

19              "I've seen the Done ads on TikTok?  They are

20         great"?

21    A.    Yes.

22    Q.    Okay.  And there was a discussion -- do you recall having

23    a discussion about a brand ambassador, former NFL player, and

24    you advised her that (as read):

25              "Seeing competitors start to make a bigger

GRAZIADEI - CROSS / BELL

1          market push may push you"?

2              **MS. GREEN:**  Objection, relevance.

3              **THE COURT:**  Well, we haven't heard the question.

4     **BY MS. BELL:**

5     **Q.**   Okay.  Do you recall discussing virality in the product in

6     terms of marketing and advertising with Ruthia?

7              **THE COURT:**  Are we going into the advice that, in

8     other words, this investor gave your client?  Where is this

9     going?

10             **MS. BELL:**  We're moving on.  This was the last

11    question about marketing and advertising.

12             **THE COURT:**  Is what?  I mean, she's an investor.

13             **MS. BELL:**  Yes, Your Honor.

14             **THE COURT:**  She's thinking about investing money in

15    this company, and in the course of that, she gives her views as

16    to what should be done.

17        I'm trying to find the nexus between your -- if what

18    you're going to argue is that your client only did it because

19    the investor told her to do it, if that's the argument, then

20    you could make that argument.

21             **MS. BELL:**  No, Your Honor.  I was just establishing

22    the communication on the topic of ads and marketing.

23             **THE COURT:**  Why?  For what end?  People have -- if

24    you -- to have a real-time trial is -- would take years.

25             **MS. BELL:**  I will be done very shortly.

GRAZIADEI - CROSS / BELL

BY MS. BELL:

Q.    Okay.  Let's move on to the topic of pharmacies.

        MS. BELL:  So you -- I think we can pull up

Government Exhibit 629, which you were asked about.

BY MS. BELL:

Q.    Okay.  So your testimony on direct is that you at least

didn't recall being aware of pharmacy blockings or having

blocked Done, just shortages.

        Do you remember that?

A.    Correct, that we were not -- the pharmacy -- being blocked

by a pharmacy was not what I readily recall.

Q.    Okay.  It was a long time ago, but we'll get to that in a

moment.

A.    Okay.

Q.    But do you see here there was also the reference to --

        THE COURT:  Well, wait a minute.  Are you suggesting

that she was told that?  She was told that the pharmacies were

blocking?

        MS. BELL:  Yes.  We'll move on in a moment.

        THE COURT:  Okay.  Let's pursue that.

        MS. BELL:  Okay.

        THE COURT:  Do you have some evidence that that's what

she was told?

        MS. BELL:  We will go over that.  I had one question

on this --

1           THE COURT:  Let's go over it right now.

2           MS. BELL:  Okay.

3       Let's go to document 6936, if we could, at 29.

4           THE COURT:  Okay.  Admitted.

5       (Trial Exhibit 6936 page 29 received in evidence.)

6   BY MS. BELL:

7   Q.   Okay.  So you can see you say (as read):

8            "How are you doing overall?"

9       And then Ruthia says (as read):

10           "It's been going fine.  We've helped thousands

11      of patients transfer their pharmacies."

12      Do you see that?

13  A.   Yes.

14  Q.   Okay.  And then let's look on a couple of other exhibits.

15          MS. BELL:  6956.

16          THE COURT:  6956 admitted.

17      (Trial Exhibit 6956 received in evidence.)

18  BY MS. BELL:

19  Q.   Okay.  So do you recall getting an investor update on a

20  monthly basis?

21  A.   I recall that there were updates.  I don't recall if they

22  were consistently monthly, but...

23  Q.   Okay.

24  A.   Yes, she certainly shared investor updates.

25  Q.   And do you recognize this as the May monthly update?

1    **A.**    Yes, by the title.  Thank you.

2    **Q.**    Okay.  And you see here she's reporting (as read):

3          "We're facing tremendous challenges externally,

4    especially from the pharmacies.  The team has worked

5    together and has helped tens of thousands of patients

6    transfer their pharmacies within a few days."

7    Do you see that?

8    **A.**    I do, yes.

9          **MS. BELL:**  Okay.  Last exhibit on this, 6957.

10         **THE COURT:**  6957 admitted.

11    (Trial Exhibit 6957 received in evidence.)

12    **BY MS. BELL:**

13    **Q.**    And so there's a reference to the issue with pharmacies,

14    and then if we go -- I think we should go down.  There's

15    another reference to in June we made --

16         **MS. BELL:**  Oh, on the top, the first line.

17    **BY MS. BELL:**

18    **Q.**    (as read):

19          "In June we made good progress on establishing

20    partnerships with two multistate pharmacies."

21    Do you see that?

22    **A.**    Yes.

23    **Q.**    Okay.  And I just had one more thing to talk to you about

24    on Government Exhibit 629 and we will move on?

25         **MS. BELL:**  So if we could go -- just put that back up

1    again for a moment.  Government Exhibit 629, please.

2              THE COURT:  629 admitted.

3              MS. BELL:  It's already admitted.  I just wanted to go

4    back for a moment.  Thank you.  To those same highlighted

5    spots -- okay.

6    BY MS. BELL:

7    Q.   So this is where we started with -- Government asked you

8    about this exhibit.

9         But do you see that in addition to the reference to "fires

10   like pharmacy issues," there's a reference to "strategic

11   initiatives like in-person clinics set up"?

12        Do you see that?

13   A.   Yes.

14   Q.   Do you recall that another issue at the time was planning

15   for the end of the pandemic and the potential --

16   A.   Yes.

17   Q.   Okay.

18             MS. BELL:  All right.  We can take that down.

19   BY MS. BELL:

20   Q.   Okay.  So I know you testified that you -- Ruthia didn't

21   tell you about the investigation and that you learned of it in

22   2023?

23   A.   I believe so, yes.

24   Q.   Okay.

25             MS. BELL:  If we could go back to

GRAZIADEI - CROSS / BELL

 1    Government Exhibit 990.

 2         Oh, I think this was over-redacted.

 3    **BY MS. BELL:**

 4    **Q.**    But let me see if this refreshes you.  Do you see 9/22/22?

 5    **A.**    Yes.

 6              **MS. BELL:**  And maybe we could just put it up.  Let's

 7    do this, Your Honor.  There was a redaction, but it's --

 8              **MS. GREEN:**  Objection.  This was offered

 9    post-redaction.

10              **MS. BELL:**  May I have a moment to confer with

11    Government counsel?

12                          (Counsel conferring.)

13         **MS. BELL:**  We'll have to adjust the redaction, but if

14    we could just display the unredacted version of this document

15    for the witness.

16              **MS. GREEN:**  Just for the witness, Your Honor.

17              **MS. BELL:**  Just for the witness.

18         Meanwhile, if --

19              **MS. GREEN:**  We're looking for it.

20    **BY MS. BELL:**

21    **Q.**    Okay.  Do you remember -- I don't know if you will -- but

22    do you recall that there was a -- Ruthia reached out to ask you

23    for a call on September 22nd?

24    **A.**    I don't recall if that was the specific date.

25    **Q.**    Okay.

```
 1   A.    But... I'm assuming that's in the notes there?

 2   Q.    Yes.

 3   A.    But, no, I just don't remember, unfortunately.

 4         MS. BELL:  Meanwhile, if we're looking for that, are

 5   you able to display other things?  Yes?  Are you able to

 6   display other things while --

 7         MR. CEPREGI:  Yes.

 8         MS. BELL:  Okay.  We'll come back to that.

 9   So just for the witness.

10   BY MS. BELL:

11   Q.    Do you see 9/22/22, the reference to (as read):

12         "Let me know when is good for a quick

13   five-minute call"?

14   A.    Mm-hmm.

15   Q.    Okay.

16         MS. BELL:  And we can take that down.

17   BY MS. BELL:

18   Q.    Do you recall that you discussed the investigation that

19   day?

20   A.    I don't, unfortunately.

21   Q.    Okay.  So after you did learn of the investigation --

22         MS. BELL:  If we could offer 6963 and 6964.  That will

23   make this more efficient.

24         THE COURT:  Admitted.

25         (Trial Exhibits 6963 and 6964 received in evidence.)
```

```
 1              MS. BELL:  6963 first.

 2              MS. GREEN:  One moment, Your Honor.

 3         Can I have a copy of the -- I don't think I have these

 4    ones.

 5              MS. BELL:  I think you should.  I'm sorry if you

 6    don't.

 7                    (Pause in proceedings.)

 8              MS. BELL:  So can we display it for the jury?  It's

 9    up?  Okay.  Great.

10    BY MS. BELL:

11    Q.   So at this point, you now know of the investigation;

12    right?

13    A.   Yes.

14    Q.   And you say (as read):

15              "We appreciate all the steps you're taking to

16         support the operations of Done."

17         Then you say (as read):

18              "We'd like to continue to stay up-to-date on

19         your work and your progress, and we hope this changes

20         in the near future."

21         Do you see that?

22    A.   Yes.

23    Q.   And that's a reference to what your counsel had -- you say

24    in the prior sentence (as read):

25              "Our counsel has instructed us not to provide
```

```
 1          proactive assistance" --
 2              MS. GREEN:  Objection.
 3              THE COURT:  I'll allow it.
 4              MS. BELL:  Okay.  In any event, we can take that down,
 5      but -- and go to the next one, 6964.
 6          Okay.
 7      BY MS. BELL:
 8      Q.   And so up until 2024 and through, actually, Ruthia's
 9      arrest in June, you continued to treat Ruthia as part of the
10      investor network; right?
11      A.   Yes, in terms of like broad communication, et cetera.  We
12      just didn't provide one-on-one support.
13              MS. BELL:  And if we could just zoom out.
14      BY MS. BELL:
15      Q.   We can see that this is an event that she was invited to.
16      She writes (as read):
17              "These photos are so cute.  Thanks so much for
18          organizing the event and inviting me."
19          Do you see that?
20      A.   Yes.
21      Q.   And then you write back (as read):
22              "Wonderful to see you.  So glad you could join
23          us."
24          Okay.  So I want to ask you a bit about these exhibits
25      that the Government showed you.
```

1    So they asked you a series -- about a series of things

2  they said happened and then asked you whether that would have

3  been consistent or inconsistent; right?

4    And just to be clear, you don't have personal knowledge

5  of, you know, whether or not those things indeed happened or

6  not?  You just know what the Government told you and what they

7  showed you; right?

8  **A.**   I believe so, yes.

9  **Q.**   Okay.

10         **MS. BELL:**  So let's go to Government Exhibit 209.

11  **BY MS. BELL:**

12  **Q.**   So this was an exhibit about follow-ups.  Do you recall

13  that exhibit on direct?

14  **A.**   Yes.

15  **Q.**   Okay.  And did -- were you aware that Done's medical

16  leadership approved of the changes in follow-up policy over

17  time?  Were you aware of that?

18  **A.**   No.

19  **Q.**   Okay.

20         **MS. BELL:**  Let's go to exhibit 6287.  This is in

21  evidence, and so I'm just going to read it here.

22  **BY MS. BELL:**

23  **Q.**   So do you know who Dr. Les Tsang is?

24  **A.**   I do not.

25  **Q.**   Okay.

1    A.    Not that I remember, no.

2    Q.    So you see in this e-mail to Ruthia (as read):

3          "Subject:  Refills and dose changes for my

4    patients."

5    In June of 2020, Les Tsang writes (as read):

6          "For convenience and efficiency, I don't require

7    an appointment before I can refill or make dose

8    changes."

9    And then we can go to the third paragraph (as read):

10          "It's also inefficient and not medically

11    necessary to only make dose adjustments during

12    follow-up appointments.  This is a poor use of

13    provider resources that could be used to see new

14    consults that's being wasted on a follow-up

15    appointment that isn't clinically necessary.  There

16    is absolutely no standard of medical practice that

17    requires this."

18    Do you see that?

19    A.    I do see that.

20    Q.    And this did not come up in -- this was not something

21    Ruthia raised in conversations with you either; right?

22    A.    No.

23    Q.    Okay.

24          MS. BELL:  Let's go to Government Exhibit 118 if we

25    could.  And if we could blow this up.

1        This is also in evidence.

2    BY MS. BELL:

3    Q.    And we see here that Dr. David Brody, on September 2020,

4    sends this e-mail that says (as read):

5              "Important information about our medical

6        guidelines."

7        Do you see that?

8    A.    Yes.

9    Q.    Okay.  And it says, second paragraph (as read):

10       "We have received patients' commendations for easing" --

11           MS. BELL:  Second paragraph.  No, sorry.  Third

12   paragraph.  One more down, yeah.

13   BY MS. BELL:

14   Q.    (as read):

15             "We have received patients' commendations for

16       easing their burden of medication management.  In

17       medicine, patient compliance is always a major issue,

18       but even more so among the ADHD population due to the

19       distractibility and difficulty with planning inherent

20       in the disorder.  Thus, it is incumbent on Done to

21       help our patients overcome such obstacles by changing

22       traditional approaches to issues such as punctuality

23       for appointments, missed appointments, and intervals

24       for follow-up appointments."

25       And then if we can go down, and it says there (as read):

1            "Refill policy:  Stable patients will be

2       reviewed by their provider online and issued their

3       refills without a follow-up being required.  They

4       will be strongly encouraged to book follow-ups every

5       90 days."

6       And then it goes on to say (as read):

7            "Patients with medical necessity may be seen

8       every 30 days or as often as necessary for patient

9       safety until they are stable enough to be seen every

10      90 days."

11      Do you see that?

12 **A.**   I do, yes.

13 **Q.**   And Ruthia -- this didn't come up in conversation either,

14 did it?

15 **A.**   No.

16           **MS. BELL:**  Could we also go -- last exhibit on this,

17 6816.  If we could just blow up the top and the second bullet

18 point.  The first bullet point.  Okay.

19 **BY MS. BELL:**

20 **Q.**   So you see this is an e-mail sent by provider support in

21 July of 2022.  And second paragraph, it says (as read):

22           "We have identified several issues needing to be

23      addressed in regard to the ongoing care of our

24      existing already established patients.  We have

25      addressed in a previous e-mail the lack of consistent

1              follow-up requirements, and in response, a minimum

2              six-month follow-up cadence has been implemented."

3         Do you see that?

4    A.   I do, yes.

5    Q.   And that didn't come up in conversation either with

6    Ruthia; right?

7    A.   Let's move on to the topic of reviews.  The Government

8    showed you this exhibit, 343.

9              MS. BELL:  And if we could just blow that up to

10   refresh you.

11   BY MS. BELL:

12   Q.   And so this is where Ruthia says the message below which

13   the Government highlighted, and then she says (as read):

14              "For this type of review, we should really take

15         it seriously."

16         Do you see that?

17   A.   Yes.

18   Q.   Okay.  Now I want to show you the underlying review

19   itself?

20             MS. BELL:  If we could go to 6355.

21   BY MS. BELL:

22   Q.   So this is the review that prompted Ruthia's message.

23   Second paragraph (as read):

24              "My daughter and me have been trying to get her

25         prescription refilled for seven days.  This is a

1          simple task done every day in healthcare practices

2          across the country, but somehow Done First is

3          incapable of handling the routine tasks of medication

4          refills.  Again, something to consider before

5          choosing them."

6               **MS. BELL:**  And if we could scroll down.

7    **BY MS. BELL:**

8    **Q.**   And then it says -- well, in any event, she did not get

9    any response and was very frustrated.

10        Do you see that?

11   **A.**   Do you want -- I'm sorry.  Which part would you like me to

12   read?

13   **Q.**   You can see --

14   **A.**   I believe you.  I just don't --

15   **Q.**   Yeah, yeah.

16   **A.**   What are you referencing?

17   **Q.**   She says, for example (as read):

18            "I would like to write a follow-up on this

19        review explaining how Done First corrected this

20        problem, but until you see that review, you can

21        consider they have not."

22   **A.**   Got it.  Yes, I see that.

23   **Q.**   Okay.  And so if we could go back to Ruthia's message.

24        I'm sorry.  One last thing here.  Last -- on this next

25   paragraph down, second to last sentence (as read):

1              "The medication their provider prescribed has

2         done wonders for my daughter.  To simply let her run

3         out of it is something I do not understand, and I'm

4         not even sure it's safe.  Hopefully they call today."

5         Do you see that?

6    A.   I do, yes.

7    Q.   Okay.  So now let's look back to Ruthia's reaction with

8    that context.

9              MS. BELL:  Could we go back to Government Exhibit 343

10   that they showed the witness.

11   BY MS. BELL:

12   Q.   And you see that's where she says --

13             MS. BELL:  If we could just blow it up a little bit

14   more on the bottom.

15   BY MS. BELL:

16   Q.   (as read):

17             "Besides saying it's unacceptable, which is

18        true, we can also mention some potential reason why

19        this happens and take responsibility.  What patients

20        care about is simply to get their refill.  For us,

21        the only goal is to help them get it."

22        And then you can see she goes on to talk about

23   investigating what happened.

24        Do you see that?

25   A.   Yes.

GRAZIADEI - CROSS / BELL

1    Q.    Okay.

2             MS. BELL:  Now let's go to 6667.

3        I'm sorry.  Let's not actually go to that.

4    BY MS. BELL:

5    Q.    The Government also asked you about screening.  Do you

6    recall that?  The screening tests like the one that you took at

7    the beginning when you signed up or when you went through the

8    process as if you were going to sign up?

9    A.    The screenshot?

10   Q.    The screenshot, exactly.

11   A.    Yes.

12   Q.    And so did you know that, in fact, the -- any changes to

13   the screening process over time were approved by Done's medical

14   leadership?

15   A.    I did not know that.

16   Q.    Okay.  You were also asked about the auto-refill policy.

17       Do you remember that?

18   A.    If you could refresh me, that would be great.

19   Q.    The Government asked you, I believe, if you knew that

20   Ruthia had implemented an auto-refill policy, and you said you

21   didn't -- they --

22   A.    I was not aware of it, yes.

23   Q.    Right.  Okay.  And so you were not aware, then, that, in

24   fact, the proponent of the auto-refill policy was actually

25   Dr. Brindala; right?

1    **A.**    Correct.  I was not aware of that.

2    **Q.**    Okay.  And then the last thing I want to ask you about

3    is --

4            **MS. BELL:**  If we could go to 6088.  This is also in

5    evidence.

6            **THE COURT:**  6088.

7    **BY MS. BELL:**

8    **Q.**    And it's a conversation about panel sizes that took place

9    in May of 2021.

10           Do you see the date at the top?

11   **A.**    I do.

12   **Q.**    Okay.  So that was the month that you first had your

13   initial conversation with Ruthia; right?

14   **A.**    Yes.

15   **Q.**    And so we see -- we see down below that Mr. Menesini says

16   (as read):

17           "Hi, Jayaram.  I have a question.  I believe

18           it's from a possible investor.  I'm struggling to

19           understand how a single individual can manage mental

20           health care for so many individuals and as many as

21           4,000 in the future.  How do you think about

22           achieving this sort of volume safely?  We were going

23           to say something along the lines of it is often

24           clinical industry standard to have 3,000 plus

25           patients on a single panel.  Also, due to ADHD being

1        easily treatable with high efficacy from medication

2        and the majority of patients being stable, it is

3        easier to manage larger patient panels for the

4        specific market.

5            "Given previous information you've stated

6        relating to patient panel sizes and current known

7        information about ADHD medication, let me know if

8        this seems accurate."

9        And Dr. Brindala writes (as read):

10           "Yes, that sounds good.  2,000 to 4,000 panel

11       size is typical in traditional settings for primary

12       care physicians."

13           MS. GREEN:  Objection, beyond scope of direct and

14   relevance.

15           THE COURT:  I'm allowing it.

16   BY MS. BELL:

17   Q.    Do you see that?

18   A.    I see it, yes.

19           MS. BELL:  Okay.  Last exhibit, Your Honor, on the

20   same topic, 6087.  6087.  Okay.  Great.

21           MS. GREEN:  Objection.  Same objection, beyond the

22   scope of direct, hearsay, 403.

23           MS. BELL:  Okay.  I have one question.

24           THE COURT:  I'll allow it.

25   \\\

GRAZIADEI - REDIRECT / GREEN

1  BY MS. BELL:

2  **Q.**   Do you see Mr. Menesini tells Ruthia (as read):

3         "Also, I checked with Jayaram" -- Dr. Brindala.

4         "he says it sounds good and that 2,000 to 4,000 panel

5         size is typical in traditional settings for primary

6         care physicians."

7         Do you see that?

8  **A.**   Yes.

9  **Q.**   Okay.  And this also didn't come up in conversations with

10  Ruthia; right --

11  **A.**   No.

12  **Q.**   -- that Dr. Brindala had given this advice?

13  **A.**   No.

14  **Q.**   And that was the same month that you first met with her;

15  right?

16  **A.**   Correct.

17         **MS. BELL:**  No further questions, Your Honor.

18         **THE COURT:**  The last few questions are coming in

19  subject to a motion to strike.  I'll discuss it outside the

20  presence of the jury.  And the responses.

21         **MS. BELL:**  Thank you, Your Honor.

22         **MS. NECHAY:**  No questions for this witness.  Thank

23  you.

24                    **REDIRECT EXAMINATION**

25  \\\

1    BY MS. GREEN:

2    **Q.**    Good afternoon again.

3         You were asked about negative reviews with Ms. Bell.

4         Do you recall that?

5    **A.**    Sorry.  Negative reviews with whom?

6    **Q.**    A patient's negative review, and Ms. Bell asked you about

7    that; correct?

8    **A.**    Yes.

9    **Q.**    I'd like to show you Exhibit 355, already admitted.

10         **MS. GREEN:**  I'm sorry.  354, page 2.  Thank you,

11   Ms. Braga.  And let's zoom in on Dr. Brindala's comment in the

12   middle of the page at 12:31 a.m., "Almost every patient."

13   BY MS. GREEN:

14   **Q.**    In this exhibit, Dr. Brindala writes (as read):

15              "Almost every patient who does not receive a

16         stimulant and leaves a review complains about the

17         provider not listening."

18         **MS. GREEN:**  And let's zoom out, please.  At the bottom

19   of the page, the last paragraph from Dr. Brindala.

20   BY MS. GREEN:

21   **Q.**    (as read):

22              "Ruthia He, you seem to believe that providers

23         you like are very good at dealing with patients even

24         when they do not prescribe stimulants.  I suspect

25         that those providers you like simply have a higher

1    rate of stimulant prescriptions."

2        MS. GREEN:  And then page 3, please, Dr. Brindala's

3    comment at 1:18 a.m.

4    BY MS. GREEN:

5    Q.   Dr. Brindala writes (as read):

6            "Ruthia He, if we simply try to find a way for

7        every patient to get the stimulant they want, we will

8        truly be a pill mill."

9        Did Defendant He share any of Dr. Brindala's concern with

10   you about a focus on negative reviews and what that could mean

11   for being a pill mill?

12   A.   No.

13   Q.   Okay.  Ms. Bell talked to you a lot about growth.  Did

14   Defendant He share with you her goal of having an IPO at some

15   point?

16   A.   Yes.

17   Q.   Okay.  Ms. Bell talked to you about the Wall Street

18   Journal article from March 2022, Exhibit 2861, and she asked

19   you specifically about Done's responses in that, but I want to

20   show you one of Done's responses?

21       MS. GREEN:  So 2861, please, Ms. Braga, page 8, third

22   paragraph.

23   BY MS. GREEN:

24   Q.   So this was the section Ms. Bell talked to you about the

25   top of the risk mitigation report.  But this is Done's response

1    where Done says (as read):

2         "It does -- did not and does not currently

3    produce a monthly risk mitigation report and that an

4    outside consultant submitted a proposal that included

5    monthly reports on risk mitigation that the company

6    found to be irrelevant."

7    Did Done's response say that the risk mitigation report

8    was written by the chief medical officer, Dr. Brindala?

9    A.    No.

10   Q.    And you looked at the risk mitigation report that was

11   admitted on direct.  Did you find it to be irrelevant?

12   A.    No.

13   Q.    Ms. Bell talked to you about disappearing messages in this

14   WhatsApp communication that you were having with Defendant He.

15   Do you remember that?

16   A.    The deleted messages?

17   Q.    The deleted messages, yes.

18   A.    Yes.

19   Q.    When you were engaging in this WhatsApp conversation with

20   Defendant He, were you subject to a Government criminal

21   subpoena in 2022?

22   A.    No.

23   Q.    Okay.  And let's look at the page Ms. Bell showed you just

24   one example.

25        MS. GREEN:  She showed you Exhibit 6936, page 26.

BY MS. GREEN:

Q.    And you see where it says right in the middle at 4:35 your comment that you deleted the message, and then right below that you wrote (as read):

      "Hi, Ruthia.  Hit send too soon," exclamation mark.

Do you see that?

A.    Yes.

Q.    And she showed you another message.  I can refresh you if you need it, but where you also had deleted a message and you said it was because you had mistyped the message.

Do you remember that?

A.    Yes.

Q.    Is deleting an individual message that was mistyped different than turning on disappearing messages for all communications while under a subpoena?

      MS. BELL:  Objection, Your Honor, argument.

      THE COURT:  Overruled.

      THE WITNESS:  Yes, I would say those are two different things.

BY MS. GREEN:

Q.    Ms. Bell showed you one presentation, Exhibit 9027, and she read it was a presentation from Done?

      MS. GREEN:  Can you pull up Exhibit 9027, please, Ms. Braga.

GRAZIADEI - REDIRECT / GREEN

1    BY MS. GREEN:

2    Q.   And she talked to you about some comments in here?

3         MS. GREEN:   Could we go straight to page 24.

4    Yeah, Number -- 24.

5    BY MS. GREEN:

6    Q.   Do you see the bullet -- so she read you some bullets, but

7    there's one bullet here that I would like to read to you.

8    Do you see where it says (as read):

9         "Free unlimited follow-up appointments with

10   providers"?

11   A.   Yes.

12   Q.   Okay.  Ms. Bell talked to you about this issue of whether

13   or not you were told about pharmacies blocking -- blocking

14   Done, and she showed you a couple of communications.  So let's

15   just look at one of those ones.

16        MS. GREEN:   69 -- I believe it was 69 -- give me a

17   moment.

18        Apologies, Your Honor.  I'm just trying to find the right

19   one -- maybe just remind you -- that's 26597 -- oh, no.  Hang

20   on.  Apologies.

21        Well, it was 6956.  Sorry about that, Your Honor, I

22   apologize.  6956, page 1.

23   BY MS. GREEN:

24   Q.   And so this was just one example, second paragraph.

25        Did these communications --

1          **MS. GREEN:**  Yep, second paragraph, "carrying."

2     Thanks.

3     **BY MS. GREEN:**

4     **Q.**   So this communication actually talks to you about Done --

5     or says that Done is working on transferring patients to

6     different pharmacies; correct?

7     **A.**   Yes.

8     **Q.**   It doesn't say that -- talk about pharmacies blocking Done

9     and provide the reasons that pharmacies are blocking Done;

10    correct?

11    **A.**   Correct.

12          **MS. GREEN:**  Okay.

13          **THE COURT:**  Thank you.  Anything further?

14          **MS. BELL:**  One question, Your Honor.

15          **THE COURT:**  Okay.

16                    **RECROSS-EXAMINATION**

17          **MS. BELL:**  Could we pull up 6057, also in evidence.

18          **MR. CEPREGI:**  What number?

19          **MS. BELL:**  6057.

20    **BY MS. BELL:**

21    **Q.**   So the Government asked you at the beginning of the

22    redirect about a debate between Dr. Brindala and Ruthia about

23    how to interpret patient reviews.

24          Do you recall that?

25    **A.**   Yes.

1    **Q.**    Okay.

2              **MS. BELL:**  And could we blow up Dr. Brindala's --

3              **THE COURTROOM DEPUTY:**  That's not in evidence.

4              **MS. GREEN:**  Objection.  I don't have this either.

5              **MS. BELL:**  This was offered yesterday.

6              **THE COURTROOM DEPUTY:**  No, it might have been offered

7    but it's not marked.  It's not admitted.

8              **THE COURT:**  I don't have it.  60 --

9              **THE COURTROOM DEPUTY:**  6057.  6058 --

10             **MS. BELL:**  I used it with Ms. Hill-Alvarez.  May I

11   confer for a moment.

12             **THE COURT:**  Yes.  I have a list.  I don't see it on

13   it.

14             **MS. BELL:**  I'm sure it's my fault, doubtless.  Let me

15   check.

16             **THE COURT:**  Well, what are you going to do?  It's not

17   in evidence.

18             **MS. BELL:**  It may be because I questioned the witness.

19             **THE COURT:**  Well, what you're going to question her

20   about, you don't need to have this witness on -- I think we can

21   stipulate this witness never saw this.  Okay.  I find it as a

22   matter of law.

23             **MS. BELL:**  Thank you, Your Honor.

24             **THE COURT:**  So that we can deal with it.

25             **MS. BELL:**  We can deal with it afterwards.

1    **THE COURT:**  Yeah.

2    **MS. BELL:**  Thank you very much for your time.

3    **THE WITNESS:**  Thank you so much.

4    **MS. BELL:**  Nothing further.

5    **THE COURT:**  You're excused.

6    **THE WITNESS:**  Thank you.

7                    (Witness excused.)

8    **MR. FOSTER:**  Your Honor, we'd be fine to let the jury

9    go to their trick-or-treating for the weekend.

10    **THE COURT:**  Ladies and gentlemen of the jury, let me

11    give you an idea of where we are.

12    First of all, I have received assurances that the

13    Government will rest their case next week.  That's subject to

14    certain contingencies that -- that can occur, not occur, so I'm

15    not holding them to it, but at least it's an indication that we

16    are completing the Government's case.

17    As you know, we're meeting Monday, Tuesday, Wednesday,

18    Thursday, and Friday of next week.  That's really a grueling

19    schedule for everybody, including -- in particular the lawyers

20    and my court reporter and then you.

21    But I am so interested in making sure that we honor our

22    time commitments that I think it's important to do it

23    otherwise.  We would normally meet four days a week.

24    However, the following week, as you know, there's a

25    holiday.  So what I am -- and also, regrettably, I must attend

**PROCEEDINGS**

1   a meeting.  I have to attend that week.  So we will meet only

2   three days that week, Monday, Thursday, and Friday.  We will

3   not be meeting -- Tuesday is Veterans Day and Wednesday I have

4   my meeting, so we're not meeting those two days.

5        I believe that next week towards the end, I'll have a very

6   good idea of how long the rest of the case will take, so I

7   don't want to make any promises or any statements now because I

8   don't really have any answers, and it appears to me that what's

9   fair to a jury is when I give you information, you can rely on

10  it.  You can make appointments, whatever you're going to do.

11  So I don't want to talk about it until I know a bit more about

12  what I'm going to say about it.  Okay?

13       Meanwhile, have a very nice evening.  All your focus

14  should be on Toronto and what -- it's been an amazing series.

15  I think it's been an amazing playoff series too.  I don't know

16  whether any of you are Detroit Tiger fans and the -- I guess it

17  was the Brewers, was it?  But it was truly one of the most

18  amazing -- it went 15 innings.  It was one of the most amazing

19  baseball games I have ever seen, and I've seen a lot of them

20  too.

21       Anyway, have a good time.  Don't think about the case.

22       Remember the admonition given to you:  Don't discuss the

23  case, allow anyone to discuss it with you, form or express any

24  opinion.

25       I'll see you Monday morning, 9:15.

```
 1                    (The jury leaves the courtroom.)

 2          (Proceedings were heard out of the presence of the jury.)

 3               THE COURT:  Let the record show the jurors have left.

 4       Be seated.

 5          There are two exhibits that came in at the end.  I think

 6     they were exhibits, and what they did was they focused on an

 7     individual's opinion.  I exactly forget who it was, but I think

 8     it was --

 9               MS. GREEN:  Menesini, maybe.

10               THE COURT:  Anyway, what is an appropriate panel size.

11               MS. BELL:  Right.

12               THE COURT:  Microphone.  If you're going to say

13     anything, stand in front of a microphone.

14          And you objected before the exhibits were admitted, and I

15     overruled your objection because I thought, in my mind, there's

16     a possibility that the witness was told those things.  It

17     turned out she was not told those things.

18          And so the question is -- and then I indicated that that

19     would be subject to a motion to strike.

20          My question is to you:  What's the basis for the

21     admissibility of those statements and to this witness?

22               MS. BELL:  So, Your Honor, these were two exhibits

23     that were previously admitted through Mr. Menesini.  The point

24     I was making is that --

25               THE COURT:  They are in evidence?
```

1          MS. BELL:  They are in evidence already.

2          THE COURT:  Well, then, I don't see what -- why I'm

3   getting all hot and bothered by it.  If they're in evidence,

4   then why are you objecting?

5          MS. GREEN:  We hadn't even discussed panel sizes on

6   direct, so it was based on --

7          THE COURT:  Beyond the scope?

8          MS. GREEN:  Yes.

9          THE COURT:  Okay.  Overruled.  Okay.  It's in.

10         MS. BELL:  Thank you, Your Honor.  And I can confer

11  with Lashanda.  We did confirm the last exhibit is in evidence.

12         THE COURT:  Is in evidence?

13         MS. BELL:  It is in evidence at page --

14         THE COURT:  But she didn't see it?

15         MS. BELL:  She didn't see it.  That was just another

16  point of -- you know, there were good things in the

17  communications and, you know, things the Government thinks

18  supports their case, things we think support our case.  None of

19  those things happened to come up in the discussions was the

20  point.

21         THE COURT:  Well, I don't know what that means.

22         THE COURTROOM DEPUTY:  What exhibit are you saying is

23  admitted?

24         MS. BELL:  This is 6057, and it was admitted at

25  page 3556 of the transcript, yesterday's transcript.

1    **THE COURTROOM DEPUTY:**  It's not on my list, but it's

2    in the transcript?

3    **MS. BELL:**  It's in the transcript, yes.

4    **THE COURTROOM DEPUTY:**  Page 3556?

5    **MS. BELL:**  Yes.

6    **THE COURTROOM DEPUTY:**  Thank you.

7    **THE COURT:**  Okay.  Mr. Foster.

8    **MR. FOSTER:**  I mean, they say hope springs eternal,

9    Your Honor.  I just advise that if we're on the same pace next

10   week -- we had three witnesses this week in four days -- that

11   we may not make it through our case, but hopefully we'll be

12   able to speed up.

13   **THE COURT:**  I hope so.

14   **MR. FOSTER:**  I hope so too.

15   I also do want to let Your Honor know that when we were in

16   the hallway, we heard a family member of Defendant Brody loudly

17   characterizing the Government's case, and I just think it would

18   be appropriate to caution the audience members not to speak in

19   public areas in the presence or potential presence of members

20   of the jury.

21   **THE COURT:**  Yeah, so I think it is a responsibility of

22   counsel, because you can identify -- you don't want the

23   Government talking to them and I don't want to talk to them, so

24   you should identify if you can, and I assume you can, anybody

25   associated with any -- the defendants.  Either they're related

1    or they're in support of, and you should have a conversation

2    with them to caution them about speaking about it in the

3    hallways, in the elevators, in the restroom, anyplace where

4    there are other people.

5        They certainly can talk about it.  There's no gag rule.

6    They can say whatever they want to say about the case or about

7    the parties connected with the case.  They just should not have

8    any conversation around somebody who could conceivably be a

9    juror or a witness, for that matter, in this case.  That's

10   fine.

11       I have nothing further to say unless somebody feels

12   compelled to say something.

13           **MS. BELL:**  I'm sure it was inadvertent.

14           **THE COURT:**  That's exactly what I don't want to get

15   into.  I don't know whether it was advertent or inadvertent.  I

16   have no idea.  I don't care at this point.

17           **MS. NECHAY:**  Okay.

18           **THE COURT:**  I don't want to have an inquiry into it.

19           **MS. NECHAY:**  Understood, Your Honor.

20           **THE COURT:**  Just take the curative steps.

21       Yes, Mr. Schachter.

22           **MR. SCHACHTER:**  The only thing I'll say is I respect

23   and appreciate the Government's hope, and I'm excited to

24   complete this next week.

25       The Government has identified -- they've told us they have

PROCEEDINGS

```
 1   21 more witnesses that they are likely to call.

 2        THE COURT:  They're shaking their heads.  Let's get --

 3        How many do you intend to call?

 4        And you shouldn't have to prepare for 21.

 5        MR. SCHACHTER:  Exactly.  They've told us as of right

 6   now, given the list we have, 21.

 7        MS. GURSKIS:  Your Honor, in terms of the assessment

 8   that we have been giving, we have been giving updates

 9   continuously to the defense.  Obviously, Mr. Levy was a big

10   witness.  We certainly, as Your Honor is aware, did not

11   anticipate he would be on the stand for three days.  Our hope

12   and expectation was that his testimony would have concluded

13   within a day, maybe, or shorter, and that we would be at a

14   point in that point to further --

15        THE COURT:  The question is:  Who's going to testify

16   next week?

17        MR. FOSTER:  We've already given them a list for

18   Tuesday and we'll give them a list for Wednesday when we go

19   back.  And to the extent that there are witnesses that are no

20   longer likely to be called, we'll remove those names, as we did

21   last Friday when we gave them a revised list that removed five

22   witnesses from it.  So we'll keep updating them.

23        And of course, given that we've notified them that the

24   Government's case hopefully will conclude next week, I would

25   advise the Court that right now, the two defendants have a
```

1   combined, I think, in excess of 50 witnesses on their list with

2   no stars, and --

3           **THE COURT:**  We don't need -- I'm not going to ask the

4   Defense what their -- but I'm going to tell you so it's not a

5   surprise.

6       When the Government rests in that not-too-distant future,

7   I will turn to the Defense and ask them who their witnesses

8   are, and they should be prepared to tell us.

9       Now, if the witness -- I don't know what the list is going

10  to look like.  You have, I think, 35 witnesses on your original

11  list, or you had a large number, as you should.

12      However, if it appears to the Court or to -- either by my

13  own observations or something that the Government says that

14  there's a duplication or that there is testimony that's

15  irrelevant or inadmissible, what I will probably do is ask for

16  offers of proof as to what they would say, and that's --

17  because it is not my intention to prolong the case through that

18  type of -- that type of witness.

19      Now, on the other hand, you have a witness who has

20  relevant information that you want the jury to consider and it

21  has otherwise not been covered or otherwise somehow in dispute,

22  then that's a different story.  That's a different story.  So

23  you may have to make a case for anybody that you're going to

24  call.

25      But we're not going to have a situation where we sit here

**PROCEEDINGS**

1   and you call a witness and nobody knows why they're up here.

2   When I say nobody, I don't mean nobody.  We don't -- some

3   people in the courtroom don't understand why they're there.

4   Okay?

5           MR. SCHACHTER:  Understood.

6           THE COURT:  We do have time constraints, so I

7   appreciate that.

8           MR. SCHACHTER:  Understood completely.

9       Your Honor, just with respect to the Government's list.

10  So when they say they disclosed the witnesses for Monday and

11  Tuesday, that's one witness, Dr. Goodman.  So Monday and

12  Tuesday we understand right now and they have told us they

13  expected Dr. Goodman man will be on the stand Monday and

14  Tuesday.

15      After that, we are dealing with, I guess, with Dr. Goodman

16  off, a list of 20 witnesses for the remainder of the week.

17  This is hopefully the last weekend.  It's very difficult to

18  prepare.  We would like this list tonight of who they actually

19  intend to call --

20          THE COURT:  I think you can get an updated list as you

21  stand here now.  They're going to give you an updated list.

22      I don't want to -- please don't tell me what you told

23  them.  Only tell me what you're telling them.  Okay?  I don't

24  want to go into the history.

25      Who will be here Monday?  Who will be here Tuesday?

PROCEEDINGS

1  And -- go ahead.

2           MR. FOSTER:  Yes, Your Honor.  We informed the Defense

3  that Mr. Goodman is likely to testify for approximately

4  three hours Monday morning and then he'll be turned over the

5  Defense.

6       Mr. Schachter has said he has approximately four to

7  five hours of cross-examination to engage in.

8       We've also given them three additional witnesses for

9  Tuesday who would potentially follow Mr. Goodman, and when we

10 go back tonight, we'll give them the witnesses for Wednesday as

11 well pursuant to the agreement between both sides.

12          MR. SCHACHTER:  We would just like to know who do they

13 actually -- if they could just cut down 20 so we don't spend

14 the last weekend of the trial -- as Your Honor noted, we're

15 sitting five days.  Makes preparation very hard.

16          THE COURT:  Except their problem is -- their problem

17 is that they're not going to cut their witness list for

18 witnesses that may testify the following week.  I mean, it's

19 really in your hands.

20      What they're saying is we put a person on for three hours.

21 It was an important, significant witness to both sides.  It's

22 almost like it's the only issue of fact in the case.  Okay.

23      So that's an important -- that's an important witness.

24 Obviously, the cross-examination is significant, and it's hard

25 to see how a cross-examination be cut off.  I mean, it's --

1    it -- especially the way it's being conducted.  Okay.  Fine.

2        If that cross-examination takes a day and a half, then

3    we're at Wednesday.  So -- and they're telling you now we will

4    give you -- if it's not, we'll give you who else is going to

5    testify on Tuesday and who else is going to testify on

6    Wednesday.  I think that's really good enough.

7        Now, let's see what happens at the end of Monday where we

8    are.  It may be that they have to tell you something.  I --

9    you know what?  It's -- it is what it is.  I'm saying that --

10   if this was the case that was going bah-bah-bah-bah-bah, I'd

11   have a lot more sympathy for your position.  But it's actually

12   the timing -- it's odd, but isn't it true the timing of all of

13   these witnesses is in your control, not in the Government's

14   control.  That's the truth of the matter.  And you recognize

15   that, which doesn't mean you shouldn't cross-examine people.

16   It just means you can't on the one hand take hours

17   cross-examining people and say, you know, they should tell us.

18       **MR. SCHACHTER:**  I guess, Your Honor, the only request

19   that we're making for -- before this weekend is they know that

20   they're not calling 20 more witnesses.  They have -- all we're

21   asking is some good-faith cuts tonight:  Here's who

22   realistically we know we're not calling.  That would be

23   enormously helpful to us --

24       **THE COURT:**  If there is a person or people who you

25   believe you will not call in your case, please let them know

PROCEEDINGS

1    this evening.

2              **MR. SCHACHTER:**  Thank you.

3              **MR. FOSTER:**  Of course, Your Honor.

4              **MR. SCHACHTER:**  Thank you.

5              **MR. FOSTER:**  Have a great weekend.

6              **MR. SCHACHTER:**  Thank you.

7              **MS. BELL:**  Thank you, Your Honor.

8                   (Proceedings adjourned at 4:01 p.m.)

9                        ---oOo---

10

11                   **CERTIFICATE OF REPORTER**

12         I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:   Saturday, November 1, 2025

16

17

18

19

20    _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
               Official Reporter, U.S. District Court

21

22

23

24

25